# 11-3642-cv(L)
## 11-3962-cv(XAP)

IN THE

# 𝔘𝔫𝔦𝔱𝔢𝔡 𝔖𝔱𝔞𝔱𝔢𝔰 𝔆𝔬𝔲𝔯𝔱 𝔬𝔣 𝔄𝔭𝔭𝔢𝔞𝔩𝔰

FOR THE SECOND CIRCUIT



ALAN KACHALSKY, CHRISTINA NIKOLOV, JOHNNIE NANCE, ANNA MARCUCCI-NANCE, ERIC DETMER, SECOND AMENDMENT FOUNDATION, INC.,

*Plaintiffs-Appellants-Cross-Appellees,*

*v.*

COUNTY OF WESTCHESTER,

*Defendant-Appellee-Cross-Appellant,*

*and*

SUSAN CACACE, JEFFREY A. COHEN, ALBERT LORENZOR, ROBERT K. HOLDMAN,

*Defendants-Appellees.*

_____

*On Appeal from the United States District Court
for the Southern District of New York (White Plains)*

## BRIEF FOR PLAINTIFFS-APPELLANTS-CROSS-APPELLEES WITH SPECIAL APPENDIX

Alan Gura
GURA & POSSESSKY, PLLC
*Attorneys for Plaintiffs-Appellants-
Cross-Appellees*
101 North Columbus Street, Suite 405
Alexandria, Virginia 22314
703-835-9085

*Date Completed: November 9, 2011*

# CORPORATE DISCLOSURE STATEMENT

The Second Amendment Foundation, Inc. has no parent corporations.  No publicly traded company owns 10% or more of appellant corporation's stock.

Dated: November 9, 2011          Respectfully submitted,
                                 Second Amendment Foundation, Inc.


                                 By: /s/ Alan Gura_____
                                     Alan Gura
                                     Counsel for Appellants/
                                     Cross-Appellees

# TABLE OF CONTENTS

Table of Authorities.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

Jurisdictional Statement.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Statement of Issues. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Statement of the Case. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Statement of Facts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    1.   *The Regulatory Framework.*. . . . . . . . . . . . . . . . . . . . . . 6

    2.   *Defendants' Application of the Law to Plaintiffs.* . . . . . . . . . 8

Summary of Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

I.    THE STANDARD OF REVIEW IS DE NOVO. . . . . . . . . . . . . . . . . . . 16

II.   THE SECOND AMENDMENT FOUNDATION HAS STANDING.. . . . . . . 17

III.  THE SECOND AMENDMENT SECURES THE RIGHT TO
      CARRY ARMS IN PUBLIC FOR SELF-DEFENSE. . . . . . . . . . . . . . . . . 18

    A.    THE RIGHT TO BEAR ARMS IS NOT LIMITED TO
         THE HOME. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

    B.    HELLER'S INTERPRETATION OF "BEAR ARMS"
         BINDS THIS COURT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

IV.  NEW YORK HAS SELECTED CONCEALED CARRYING
      AS THE PERMISSIBLE MODE OF EXERCISING THE
      RIGHT TO BEAR ARMS.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

V.   "Proper Cause" Is an Invalid Standard for
     Licensing the Exercise of Fundamental
     Second Amendment Rights............................... 39

     A.   Prior Restraints Against the Exercise of Fundamental
          Rights Must Be Defined Objectively and Narrowly,
          Without Sanctioning Unbridled Discretion.. ........ 39

     B.   Section 400.00(2)(f)'s "Proper Cause" Requirement
          Plainly Fails Prior Restraint Analysis. ............ 44

     C.   Prior Restraint Doctrine Provides A Superior
          Method of Evaluating the Constitutionality of
          Discretionary Handgun Licensing................... 49

VI.  The "Proper Cause" Standard Fails Means-Ends
     Scrutiny. ........................................... 54

     A.   Laws Generally Restricting the Right of
          Law Abiding, Responsible Individuals to Bear
          Arms Are Subject to Strict Scrutiny. .............. 56

     B.   Barring Law-Abiding, Responsible Americans from
          Bearing Arms Serves No Compelling Government
          Interest. ....................................... 60

VII. Overbreadth is a Second Amendment Doctrine........... 62

Conclusion............................................. 66

# TABLE OF AUTHORITIES

## Cases

*414 Theater Corp.* v. *Murphy*,
499 F.2d 1155 (2d Cir. 1974). . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*754 Orange Ave., Inc.* v. *West Haven*,
761 F.2d 105 (2d Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . 41, 51

*Adamson* v. *California*,
332 U.S. 46 (1947) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 28

*Andrews* v. *State*,
50 Tenn. 165 (1871). . . . . . . . . . . . . . . . . . . . . . . 22, 23, 34, 35

*Aymette* v. *State*,
21 Tenn. 154 (1840). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Bach* v. *Pataki*,
408 F.3d 75 (2d Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 10

*Bando* v. *Sullivan*,
735 N.Y.S.2d 660 (3d Dep't 2002) . . . . . . . . . . . . . . . . . . . . . . 7, 45

*Baraket* v. *Holder*,
632 F.3d 56 (2d Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Barclays Capital Inc.* v. *Theflyonthewall.com, Inc.*,
650 F.3d 876 (2d Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Bayside Enterprises, Inc.* v. *Carson*,
450 F. Supp. 696 (M.D. Fla. 1978). . . . . . . . . . . . . . . . . . . . . . . 47

*Beal* v. *Stern*,
184 F.3d 117 (2d Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . 42, 51

*Broadway Books, Inc.* v. *Roberts*,
  642 F. Supp. 486 (E.D.Tenn. 1986). . . . . . . . . . . . . . . . . . . . . . . . . 47

*Cantwell* v. *Connecticut*,
  310 U.S. 296 (1940). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40, 42

*Cent. Hudson Gas & Elec. Corp.* v. *Public Serv. Comm'n*,
  447 U.S. 557 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

*Charette* v. *Town of Oyster Bay*,
  159 F.3d 749 (2d Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . 41, 51

*Chesapeake B & M, Inc.* v. *Harford County*,
  58 F.3d 1005 (4th Cir. 1995) (en banc). . . . . . . . . . . . . . . . . . . . . 42

*City of Lakewood* v. *Plain Dealer Publishing Co.*,
  486 U.S. 750 (1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

*City of Las Vegas* v. *Moberg*,
  485 P.2d 737 (N.M. Ct. App. 1971). . . . . . . . . . . . . . . . . . . . . . . . 23

*Clark* v. *City of Lakewood*,
  259 F.3d 996 (9th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*Clark* v. *Jeter*,
  486 U.S. 456 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

*Connecticut Nat'l Bank* v. *Germain*,
  503 U.S. 249 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*District of Columbia* v. *Heller*,
  554 U.S. 570 (2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

*Elam* v. *Bolling*,
  53 F. Supp. 2d 854 (W.D.Va. 1999). . . . . . . . . . . . . . . . . . . . . . . 47

*Ezell* v. *City of Chicago*,
651 F.3d 684 (7th Cir. 2011). . . . . . . . . . . 17, 18, 25, 53, 57-59, 65

*Fireman's Fund Ins. Co.* v. *TD Banknorth Ins. Agency*,
644 F.3d 166 (2d Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Forsyth County* v. *Nationalist Movement*,
505 U.S. 123 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42, 44

*FW/PBS* v. *City of Dallas*,
493 U.S. 215 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39, 41

*Gay Men's Health Crisis* v. *Sullivan*,
733 F. Supp. 619 (S.D.N.Y. 1989). . . . . . . . . . . . . . . . . . . . . . . . . 17

*Genusa* v. *Peoria*,
619 F.2d 1203 (7th Cir. 1980). . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

*Gonzalez* v. *Vill. of W. Milwaukee*,
2010 U.S. Dist. LEXIS 46281 (D. Wis. May 11, 2010) . . . . . . . . . 37

*Hague* v. *Committee for Indus. Org.*,
307 U.S. 496 (1937) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*Havens Realty Corp.* v. *Coleman*,
455 U.S. 363 (1982). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Heller* v. *District of Columbia*,
2011 U.S. App. LEXIS 20130 (D.C. Cir. Oct. 4, 2011) . . . 55, 56, 59

*Hernandez* v. *Cremer*,
913 F.2d 230 (5th Cir. 1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

*Hormel Foods Corp.* v. *Jim Henson Prods.*,
73 F.3d 497 (2d Cir. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Hunt* v. *Wash. State Apple Adver. Comm'n*,
432 U.S. 333 (1977). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*In re Application of McIntyre*,
552 A.2d 500 (Del. Super. 1988). . . . . . . . . . . . . . . . . . . . . . . . . 36

*In re Brickey*,
70 P. 609 (Idaho 1902) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Johnson* v. *Eisentrager*,
339 U.S. 763 (1950). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Kachalsky* v. *Cacase*,
14 N.Y.3d 743 (2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Kachalsky* v. *Cacase*,
65 A.D.3d 1045 (2d Dept. 2009). . . . . . . . . . . . . . . . . . . . . . . . . 10

*Kachasky* v. *Cacase*,
2011 U.S. Dist. LEXIS 99837 (S.D.N.Y. Sep. 2, 2011). . . . . . . . . 5

*Kellogg* v. *City of Gary*,
562 N.E.2d 685 (Ind. 1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Kent* v. *Dulles*,
357 U.S. 116 (1958). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52, 53

*Kuck* v. *Danaher*,
2011 U.S. Dist. LEXIS 111793 (D. Conn. Sept. 29, 2011). . . . . . . 46

*Kuck* v. *Danaher*,
600 F.3d 159 (2d Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*Kunz* v. *New York*,
340 U.S. 290 (1951). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*Largent* v. *Texas*,
    318 U.S. 418 (1943) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*Louisiana* v. *United States*,
    380 U.S. 145 (1965) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*Lusk* v. *Vill. of Cold Spring*,
    475 F.3d 480 (2d Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . 39, 51

*Malloy* v. *Hogan*,
    378 U.S. 1 (1964) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Marbury* v. *Madison*,
    5 U.S. (1 Cranch) 137 (1803) . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*McDonald* v. *City of Chicago*,
    130 S. Ct. 3020 (2010) . . . . . . . . . . . . . . . . . . . 4, 7, 10, 23, 48, 64

*MD II Entertainment* v. *City of Dallas*,
    28 F.3d 492 (5th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

*Muscarello* v. *United States*,
    524 U.S. 125 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Myers* v. *United States*,
    272 U.S. 52 (1926) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*N.J. Envtl. Fed'n* v. *Wayne Twp.*,
    310 F. Supp. 2d 681 (D.N.J. 2004) . . . . . . . . . . . . . . . . . . . . . . 47

*Nakatomi Inv.* v. *City of Schenectady*,
    949 F. Supp. 988 (N.D.N.Y. 1997) . . . . . . . . . . . . . . . . . . . . . . 40

*Nat'l Fed'n of the Blind* v. *FTC*,
    420 F.3d 331 (4th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . 41

vii

*Nordyke* v. *King*,
    563 F.3d 439 (9th Cir. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

*Nordyke* v. *King*,
    644F.3d 776 (9th Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

*Nunn* v. *State*,
    1 Ga. 243 (1846). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 34

*Ohio Citizen Action* v. *City of Mentor-On-The-Lake*,
    272 F. Supp. 2d 671 (N.D. Ohio 2003). . . . . . . . . . . . . . . . . . . . . 47

*Ohio Citizen Action* v. *City of Seven Hills*,
    35 F. Supp. 2d 575 (N.D. Ohio 1999). . . . . . . . . . . . . . . . . . . . . . 47

*Owen* v. *State*,
    31 Ala. 387 (1858). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*O'Connor* v. *Scarpino*,
    83 N.Y.2d 919 (1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Parker* v. *District of Columbia*,
    478 F.3d 370 (D.C. Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . 31, 56

*Peruta* v. *County of San Diego*,
    678 F. Supp. 2d 1046 (S.D. Cal. 2010). . . . . . . . . . . . . . . . . . . . . 24

*Peruta* v. *County of San Diego*,
    758 F. Supp. 2d 1106 (S.D. Cal. 2010) . . . . . . . . . . . . . . . . . . . . 33

*Planned Parenthood of Southeastern Pa.* v. *Casey*,
    505 U.S. 833 (1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

*R.W.B. of Riverview, Inc.* v. *Stemple*,
    111 F. Supp. 2d 748 (S.D.W.Va. 2000). . . . . . . . . . . . . . . . . . . . . 47

*Regan* v. *Wald,*
    468 U.S. 222 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

*Robertson* v. *Baldwin,*
    165 U.S. 275 (1897). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Sarnoff* v. *Am. Home Prods. Corp.,*
    798 F.2d 1075 (7th Cir. 1986). . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Schneider* v. *New Jersey (Town of Irvington),*
    308 U.S. 147 (1939). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47, 48

*Scott* v. *Sandford,*
    60 U.S. (19 How.) 393 (1857) . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Seminole Tribe of Fla.* v. *Florida,*
    517 U.S. 44 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Shuttlesworth* v. *Birmingham,*
    394 U.S. 147 (1969). . . . . . . . . . . . . . . . . . . . . . . . . . . . 39, 42-44

*State ex rel. City of Princeton* v. *Buckner,*
    377 S.E.2d 139 (W. Va. 1988).. . . . . . . . . . . . . . . . . . . . . . . . . . 23

*State* v. *Rosenthal,*
    55 A. 610 (Vt. 1903) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*State* v. *Chandler,*
    5 La. Ann. 489 (1850). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 35

*State* v. *Delgado,*
    692 P.2d 610 (Or. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*State* v. *Jumel,*
    13 La. Ann. 399 (1858) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*State* v. *Kerner*,
    107 S.E. 222 (N.C. 1921). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*State* v. *Reid*,
    1 Ala. 612 (1840).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 34

*Staub* v. *City of Baxley*,
    355 U.S. 313 (1958) . . . . . . . . . . . . . . . . . . . . . . . 39, 40, 44, 51, 52

*Tennessee Valley Auth.* v. *Hill*,
    437 U.S. 153 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Tom T., Inc.* v. *City of Eveleth*,
    2003 U.S. Dist. LEXIS 3718 (D. Minn. March 11, 2003). . . . . . . 47

*United Food & Commercial Workers Union Local 751*
    v. *Brown Group*, 517 U.S. 544 (1996). . . . . . . . . . . . . . . . . . . . . 18

*United States* v. *Bloom*,
    149 F.3d 649 (7th Cir. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*United States* v. *Chester*,
    628 F.3d 673 (4th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . 55, 58, 65

*United States* v. *Marzzarella*,
    614 F.3d 85 (3d Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . 55, 56

*United States* v. *Masciandaro,*
    638 F.3d 458 (4th Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . 56, 58

*United States* v. *Miller*,
    307 U.S. 174 (1939). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*United States* v. *Reese*,
    627 F.3d 792 (10th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . 55

*United States* v. *Salerno*,
    481 U.S. 739 (1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63-65

*United States* v. *Skoien*,
    614 F.3d 638 (7th Cir. 2010) (en banc) . . . . . . . . . . . . . . . . . . . 26, 59

*United States* v. *Stevens*,
    130 S. Ct. 1577 (2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

*United States* v. *Williams*,
    616 F.3d 685 (7th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

*Utah* v. *Evans*,
    536 U.S. 452 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Vill. of Arlington Heights* v. *Metro. Hous. Dev. Corp.*,
    429 U.S. 252 (1977). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Wash. State Grange* v. *Wash. State Repub. Party*,
    552 U.S. 442 (2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

*Washington* v. *Glucksberg*,
    521 U.S. 702 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

## Statutes

28 U.S.C. § 1291. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

28 U.S.C. § 1343. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

28 U.S.C. §1331. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

42 U.S.C. § 1983. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Conn. Gen. Stat. § 29-28(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

Conn. Gen. Stat. § 29-32b(b)................................. 46

D.C. Code § 22-4504(a) (2008)................................ 31

N.Y. Penal Law § 265.00(10)................................... 7

N.Y. Penal Law § 265.00(3).................................... 6

N.Y. Penal Law § 265.01(1).................................... 6

N.Y. Penal Law § 265.03(3)................................. 6, 8

N.Y. Penal Law § 265.20....................................... 6

N.Y. Penal Law § 400.00(1).................................... 8

N.Y. Penal Law § 400.00(1)(b). .............................. 46

N.Y. Penal Law § 400.00(2)(f)........................... passim

Tex. Gov't Code § 411.177(a)................................. 38

Tex. Penal Code § 46.035(a). ................................ 38

Wis. Stat. § 175.60.......................................... 38

## Other Authorities

BLACK'S LAW DICTIONARY (6th Ed. 1998)........................ 21

CRIME IN NEW YORK STATE, 2010 FINAL DATA,
        available at http://criminaljustice.state.
        ny.us/crimnet/ojsa/ NYSCrimeReport2010.pdf
        (last visited Nov. 7, 2011)......................... 61

Eugene Volokh, *Implementing the Right to Keep
and Bear Arms for Self-Defense: An Analytic
Framework and a Research Agenda*,
56 UCLA L. Rev. 1443 (2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

HANDGUN HUNTER MAGAZINE, available at
www.handgunhunt.com (last visited Nov. 7, 2011). . . . . . . . . . . 26

THE AMERICAN STUDENTS' BLACKSTONE (G. Chase ed. 1884). . . . . . . . 36

THE COMPLETE WORKS OF LEWIS CARROLL (1939). . . . . . . . . . . . . . . . . 28

"Field & Stream Picks the 25 Best Handguns
for Hunters," available at http://www.fieldandstream.com/
photos/gallery/gear/hunting-gear/2010/06/25-best-handguns
-hunting-ever-made (last visited Nov. 7, 2011). . . . . . . . . . . . . . . 26

Jurisdictional Statement

Plaintiffs-Appellants ("Plaintiffs") seek declaratory and injunctive relief barring New York handgun licensing officials from requiring applicants prove "proper cause" to obtain licenses to carry handguns for self-defense, pursuant to N.Y. Penal Law § 400.00(2)(f).[1] Plaintiffs seek relief pursuant to 42 U.S.C. § 1983, as Defendants-Appellees' ("Defendants") application of this provision violates the Second and Fourteenth Amendments to the United States Constitution. The District Court had jurisdiction over this case pursuant to 28 U.S.C. §§ 1331 and 1343.

On September 2, 2011, the District Court denied Defendants' motions to dismiss and Plaintiffs' summary judgment motion, granted the individual Defendants' summary judgment motion, and granted Defendant County of Westchester summary judgment sua sponte. Special Appendix ("SA") 60-61.

---

[1]All further statutory references are to the New York Penal Law unless otherwise stated.

1

This Court has jurisdiction per 28 U.S.C. § 1291 in this appeal from a final judgment. Plaintiffs timely noticed their appeal on September 7, 2011, as amended September 16, 2011 subsequent to entry of judgment. Joint Appendix ("JA") 719-21. Defendant County timely cross-appealed the denial of its motion to dismiss. JA 724.

## STATEMENT OF ISSUES

May licensing authorities condition the issuance of permits to exercise the fundamental Second Amendment right to bear arms, and classify applicants with respect to the exercise of that right, upon a discretionary assessment of "proper cause" to exercise the right?

## STATEMENT OF THE CASE

When individuals enjoy a constitutional "right" to engage in some activity, a license to engage in that activity might be subjected to any number of regulatory limitations—but it cannot be conditioned on the government's determination of one's "proper cause" to exercise that right. Defendants must be enjoined from imposing this classic form of unconstitutional prior restraint against the fundamental right to keep and bear arms. Where fundamental rights are concerned, a system of prior restraint cannot employ unbridled discretion.

Of course, Defendants have an interest in regulating firearms in the interest of public safety, just as Defendants have an interest in regulating the time, place, and manner of speech or public assemblies. Nor do Plaintiffs question the state's ability to license the carrying of firearms, just as it might license parades. But the regulatory interest here is not absolute. Whatever else the state may do, it cannot reserve for itself the power to arbitrarily decide, in all cases, whether individuals deserve to carry guns for self-defense. That decision has already been made in the federal constitution, which guarantees law-abiding individuals their right to carry handguns for self-defense.

On July 15, 2010, Plaintiffs Alan Kachalsky, Christina Nikolov, and the Second Amendment Foundation ("SAF") brought this action against Defendants Susan Cacase and Jeffrey A. Cohen, challenging Defendants' assertion of authority to deny Plaintiffs handgun carry licenses upon determining that Plaintiffs lacked "proper cause" for seeking the license. Plaintiffs also sued Defendant County of Westchester, as its participation is critical to the "proper cause" determination.

Cacase and Cohen suggested the action might be unripe because they had denied Kachalsky and Nikolov's applications prior to the Supreme Court's decision in *McDonald* v. *City of Chicago*, 130 S. Ct. 3020 (2010), and they might reconsider their licensing standards in light of that decision. Endorsed Letter, Aug. 13, 2010, at 2-3 (entered August 18, 2011). Accordingly, Plaintiffs sought leave to file an amended complaint adding post-*McDonald* allegations. On November 4, 2010, Plaintiffs filed their First Amended Complaint (entered November 8), in which they were joined by Plaintiffs Eric Detmer, Johnnie Nance, and Anna Marcucci-Nance, and added as Defendants Albert Lorenzo and Robert K. Holdman. JA 16.[2]

In addition to challenging the substance of Plaintiffs' constitutional claims, the individual Defendants moved to dismiss the case on a broad range of theories, including ripeness; standing with respect to Kachalsky, Nikolov and SAF; *Younger, Pullman* and *Burford* abstention; res judicata; and the *Rooker-Feldman* doctrine. Defendant

_____

[2]Cacase and Cohen subsequently argued, without distinction from the other Defendants, that *McDonald* did not abrogate their discretion to deny license applications for lack of "proper cause."

County moved to dismiss the case, echoing the individual Defendants' abstention, res judicata, standing and Second Amendment arguments, and adding a claim that it was not a proper party to the litigation as it allegedly does not enforce the challenged provisions. Plaintiffs moved for summary judgment, and the individual Defendants cross-moved for summary judgment.

On September 2, 2011, the Hon. Cathy Seibel, United States District Judge, denied the motions to dismiss and Plaintiffs' motion for summary judgment, and granted the individual Defendants' motion for summary judgment. Judge Seibel also entered summary judgment sua sponte for Defendant County. SA 60-61. The lower court's opinion is currently reported at 2011 U.S. Dist. LEXIS 99837 (S.D.N.Y. Sep. 2, 2011). The appeal was noticed immediately upon receipt of the order September 7, 2011, as amended September 16, 2011 to reflect later notice of entry of the judgment. JA 719-21. On September 22, 2011, Defendant County cross-appealed from the denial of its motion to dismiss. JA 724.

1.   *The Regulatory Framework*

Although the Constitution presumes that individuals have a right to keep and bear arms, New York's gun laws embark from the opposite conclusion: without more, mere possession of any firearm is a class A misdemeanor. N.Y. Penal Law § 265.01(1).[3] The possession of a loaded firearm outside one's home or place of business constitutes "Criminal Possession of a Firearm in the Second Degree," a class C felony. N.Y. Penal Law § 265.03(3).

These prohibitions do not apply to the "[p]ossession of a pistol or revolver by a person to whom a license therefor has been issued as provided under section 400.00 or 400.01." N.Y. Penal Law § 265.20(a)(3). For most civilians who are not otherwise barred from possessing and carrying weapons, the only theoretically available license to carry handguns in public for self-defense is a license "to have and carry concealed, without regard to employment or place of possession, by any person *when proper cause exists* for the issuance

---

[3]New York's definition of "firearm" excludes most rifles and shotguns, but includes all handguns. N.Y. Penal Law § 265.00(3).

thereof." N.Y. Penal Law § 400.00(2)(f) (emphasis added). New York state courts interpret "proper cause" to mean "a special need for self-protection distinguishable from that of the general community or of persons engaged in the same profession." *Bando* v. *Sullivan*, 735 N.Y.S.2d 660, 662 (3d Dep't 2002) (internal quotation marks omitted); *Bach* v. *Pataki*, 408 F.3d 75, 80 (2d Cir. 2005) (collecting cases), *overruled on other grounds*, *McDonald* v. *City of Chicago*, supra.

In New York, handgun carry licensing officers "[are] often local judges," but not always. *Bach*, 408 F.3d at 79 & n.7 (citing N.Y. Penal Law § 265.00(10)). Depending on one's residence, or on whether the applicant is a retired state police officer, Section 400.01, the handgun carry licensing officer may also be a police official. Westchester County residents who are not retired from the state police have their handgun carry license applications determined by local judges. "[T]he licensing officers' power to determine the existence of 'proper cause' for the issuance of a license necessarily and inherently includes the power to restrict the use to the purposes that justified the issuance." *O'Connor* v. *Scarpino*, 83 N.Y.2d 919, 921 (1994).

Section 265.03(3)'s prohibition on the public possession of loaded firearms makes no distinction regarding the manner in which firearms would be carried, openly or concealed. As the District Court noted,

> [t]here is no provision for a license to carry an unconcealed weapon, so for applicants who want to carry a weapon and do not fit in one of the occupational categories, the only way to obtain a license to carry a handgun—whether openly or not—is to meet the requirements, including "proper cause," of the licensing provision for concealed weapons.

SA 4.

### 2. *Defendants' Application of the Law to Plaintiffs*

The individual Plaintiffs all reside in Westchester County. JA 74, 76, 78, 80, 82. Apart from the challenged requirement that they demonstrate "proper cause," each Plaintiff is fully qualified to obtain a license to carry a handgun under N.Y. Penal Law § 400.00(1), in that each (a) is over 21 years old, (b) of good moral character, (c) has never been convicted of a felony or serious crime, (d) has never been mentally ill or confined to any institution, (e) has not had a license revoked or been the subject of a family court order, and (f) with exception of Detmer, who is qualified under subdivision 400.00.1(i), has completed a firearms safety course. *Id.*

Each individual Plaintiff applied for a handgun carry license, and was rejected for lack of "proper cause" under Section 400.00(2)(f). JA 32-49. Kachalsky's application for a handgun carry license was referred for decision to Cacase, "in [her] capacity as handgun licensing officer for the County of Westchester." JA 33. Westchester County recommended that the permit be denied, because Kachalsky did not establish "the necessary proper cause for the permit . . . the applicant <u>has not</u> demonstrated a need for self-protection distinguishable from that of the general public." JA 214 (emphasis original).[4]

Referencing the County's recommendation, Cacace denied Kachalsky's permit application. Cacase offered that Kachalsky "has not stated any facts which would demonstrate a need for self protection distinguishable from that of the general public," and concluded that "proper cause does not exist." JA 34. The Appellate Division held that

---

[4]The County observed that Kachalsky had once been accused of various crimes arising from a traffic stop, but was convicted only of "Inadequate Tire, VTL 375-35, traffic infraction, in satisfaction of all charges." JA 213; *see also* JA 228 ($30-$35 fine and agreement not to sue police). The County further observed that Kachalsky, an attorney since 1981, was cleared of a bar complaint in 1984. JA 213; *see also* JA 226 (recounting threats and violence directed at Kachalsky). Neither incident played any role in the denial of Kachalsky's application.

Kachalsky must demonstrate "proper cause" for the issuance of the permit, and that Cacace's "determination was not arbitrary or capricious and should not be disturbed." *Kachalsky* v. *Cacase*, 65 A.D.3d 1045 (2d Dept. 2009).

On February 16, 2010, the New York Court of Appeals dismissed Kachalsky's appeal on the grounds that it presented no substantial constitutional question. *Kachalsky* v. *Cacase*, 14 N.Y.3d 743 (2010). At the time of this decision, it was not a holding of any federal appellate court that the States were bound to respect Second Amendment rights, and in fact, this Court had held that the Second Amendment did not apply to the States. *Bach* v. *Pataki*, *supra*. On June 28, 2010, the Supreme Court overruled *Bach* on this point, in holding that the Fourteenth Amendment applies Second Amendment rights against the States. *McDonald*, supra, 130 S. Ct. 3020.

Nikolov's application for a handgun carry license, and the County's report, were referred to Cohen "in [his] capacity as handgun licensing officer for Westchester County." JA 36. The County advised that the permit be denied for lack of "proper cause." JA 270. Cohen offered that

> conspicuously absent . . . is the report of any type of threat to her own safety anywhere. . . it cannot be said that the applicant has demonstrated that she has a special need for self-protection distinguishable from that of the general public; therefore, her application for a firearm license for a full carry permit must be denied.

JA 36-37.

Detmer serves in the United States Coast Guard, for one weekend each month and two full weeks each year. Since 2004, Detmer has been a qualified Boarding Team Member. Although lacking authority to arrest, Detmer carries a .40 caliber handgun while on duty with the Coast Guard, which he surrenders each time upon leaving duty. Detmer qualifies semi-annually with his handgun, regularly taking a non-firing judgmental pistol course, a firing tactical pistol course, and use-of-force training. JA 78.

Detmer is licensed to have a private handgun for the limited purposes of target shooting and hunting. Detmer applied to amend his license for the purpose of "full carry." JA 79. Westchester County recommended that the application be disapproved, as Detmer's need to enforce laws while off-duty was "speculative." Moreover, Detmer "has not substantiated that he faces danger during non employment hours

that would necessitate the issuance of a full carry firearm license" and "has not demonstrated an exceptional need for self protection distinguishable from that of the general public." JA 253. Defendant Lorenzo denied Detmer's application, stating, "At this time, I see no justification for a full carry permit." JA 39.

Johnnie Nance, licensed to have a private handgun for the limited purpose of target shooting, applied to amend his license for the purpose of "full carry" for self-defense. JA 82. Westchester County recommended that the application be disapproved, as "[n]o safety related concerns have been cited by the applicant," and Nance "has not demonstrated an exceptional need for self protection distinguishable from that of the general public." JA 348.

Holdman denied Nance's application for a carry permit, citing the County's recommendation for denial, and its finding that Nance had not demonstrated "proper cause" for seeking the permit. JA 43. Stated Holdman,

> The applicant has not provided the court with any information that he faces any danger of any kind that would necessitate the issuance of a full carry firearm license; or has not demonstrated a need for self protection distinguishable from that of the general public or of other persons similarly situated.

*Id.* Citing the denial of Kachalsky's application, Holdman found Nance did not demonstrate "proper cause" within the meaning of the governing provision. *Id.* Holdman concluded:

> In sum, the applicant has not shown sufficient circumstances to distinguish his need from those of countless others, nor has he demonstrated a specific need for self protection distinguishable from that of the general community or of persons engaged in the same business or profession.

JA 44.

Anna Marcucci-Nance, licensed to have a private handgun for the limited purpose of target shooting, applied to amend her license for the purpose of "full carry" for self-defense. JA 76. Westchester County recommended that the application be disapproved, as "[n]o safety related concerns have been cited by the applicant," and Marcucci-Nance "has not demonstrated an exceptional need for self protection distinguishable from that of the general public." JA 384. Holdman denied Marcucci-Nance's application for a carry permit. His decision appeared to employ boilerplate, using largely identical language and reasoning invoked to deny Nance's application. JA 46-49.

The individual Plaintiffs would re-apply for a handgun carry license, but refrain from doing so because any such application would be futile. They cannot satisfy the proper cause standard, which has already been applied to them. JA 74, 77, 79, 80, 83.

SAF is a non-profit membership organization incorporated under the laws of Washington with its principal place of business in Bellevue, Washington. SAF has over 650,000 members and supporters nationwide, including many in Westchester County. The purposes of SAF include education, research, publishing and legal action focusing on the Constitutional right to privately own and possess firearms, and the consequences of gun control. JA 84.

SAF expends its resources encouraging exercise of the right to bear arms, and advising and educating its members, supporters, and the general public about policies relating to the public carrying of handguns in New York. The consequences of Defendants' policies greatly interest SAF's constituency. Defendants' policies regularly cause the expenditure of resources by SAF as people turn to it for advice and information, and Defendants' policies bar SAF's members and supporters from obtaining handgun carry licenses. JA 84-85.

The individual Plaintiffs, and SAF's members and supporters, would carry functional handguns in public for self-defense, but refrain from doing so because they fear arrest, prosecution, fine, and imprisonment for lack of a license to carry a handgun. JA 75, 77, 79, 81, 83, 85.

SUMMARY OF ARGUMENT

Americans plainly enjoy a fundamental right to publicly carry handguns for self-defense. Of course, the right is not absolute. The state may regulate the right to bear arms in any number of ways not relevant here. But there is no disputing the fact that the Supreme Court held just three years ago, with reference to the Second Amendment, that "[a]t the time of the founding, as now, to 'bear' meant to 'carry.'" *District of Columbia* v. *Heller*, 554 U.S. 570, 584 (2008) (citations omitted). Defendants might pretend that *Heller*'s holding is optional or unclear, but they offer no alternative definition for the constitutional text.

To the extent that Defendants' discretionary licensing implicates the Equal Protection Clause, by arbitrarily classifying individuals in the exercise of a fundamental right, the case might well be decided under

some level of means-ends scrutiny. But far simpler options exist to resolve this dispute. While courts are only starting to explore the application of means-ends scrutiny in the Second Amendment context, courts are highly experienced in applying standards for licensing the exercise of constitutional rights—standards that account for the nature and function of licensing, without involving any balancing exercises.

To decide this case, it is enough to acknowledge what has long been established in our legal system: access to fundamental rights does not turn on some official's unlimited discretion. There is no need to opine further about what regulations may or may not be acceptable, as no such other regulations are at issue, and Plaintiffs do not dispute that the right to bear arms is subject to regulation in the interest of public safety. Plaintiffs claim only that because the carrying of arms is their right, they cannot be required to prove "proper cause" for enjoying it.

## ARGUMENT

### I. THE STANDARD OF REVIEW IS DE NOVO.

"We review de novo a district court's ruling on cross-motions for summary judgment, in each case construing the evidence in the light most favorable to the non-moving party." *Fireman's Fund Ins. Co.* v. *TD*

*Banknorth Ins. Agency*, 644 F.3d 166, 169 (2d Cir. 2011) (citation omitted).

## II.  THE SECOND AMENDMENT FOUNDATION HAS STANDING.

Although the court below upheld the individual plaintiffs' standing, it found that SAF failed to establish its standing because it did not list its specific members in Westchester County who had been denied licenses per Section 400.00(2)(f), and did not "specif[y] how they would have standing to sue in their own right." SA 22.

As a preliminary matter, it was unnecessary to reach the issue of SAF's standing, as the individual Plaintiffs were determined to have standing. *Vill. of Arlington Heights* v. *Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264 (1977); *Ezell* v. *City of Chicago*, 651 F.3d 684, 696 n.7 (7th Cir. 2011); *Gay Men's Health Crisis* v. *Sullivan*, 733 F. Supp. 619, 631 (S.D.N.Y. 1989).

Nor was it necessary for SAF's complaint to list specific members who had been denied permits. In *Ezell*, a challenge to Chicago's gun range ban, the Seventh Circuit was satisfied that SAF

ha[s] many members who reside in Chicago and easily meet[s] the requirements for associational standing: (1) [its] members would

otherwise have standing to sue in their own right; (2) the interests the association[] seek[s] to protect are germane to [its] organizational purposes; and (3) neither the claim asserted nor the relief requested requires the participation of individual association members in the lawsuit.

*Ezell*, 651 F.3d at 696 (citing *United Food & Commercial Workers Union Local 751* v. *Brown Group*, 517 U.S. 544, 553 (1996); *Hunt* v. *Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977)) (other citation omitted).

As for how SAF's members would have standing to challenge Section 400.00(2)(f), the District Court answered its own question by upholding the individual Plaintiffs' standing. Moreover, as "Defendants' policies regularly cause the expenditure of resources by SAF as people turn to it for advice and information," JA 85, SAF also has organizational standing. *Havens Realty Corp.* v. *Coleman*, 455 U.S. 363 (1982).

III. THE SECOND AMENDMENT SECURES THE RIGHT TO CARRY ARMS IN PUBLIC FOR SELF-DEFENSE.

A. THE RIGHT TO BEAR ARMS IS NOT LIMITED TO THE HOME.

The Second Amendment protects the right "to keep and bear arms." U.S. Const. amend. II. This syntax is not unique within the Bill of Rights. The Sixth Amendment guarantees the right to a "speedy and

public trial," U.S. Const. amend. VI, while the Eighth Amendment protects individuals against "cruel and unusual" punishment. U.S. Const. amend. VIII. Just as the Sixth Amendment does not sanction secret, speedy trials or public, slow trials, and the Eighth Amendment does not allow the usual practice of torture, the Second Amendment's reference to "keep and bear" refers to two distinct concepts.

The Supreme Court has always accepted that the Second Amendment's guarantee extends beyond the threshold of one's home. As early as 1857, the infamous *Dred Scott* case reasoned that no Southern state would have adopted a constitution obligating it to respect privileges and immunities of citizenship held by African-Americans, including "the full liberty . . . to keep and carry arms wherever they went." *Scott* v. *Sandford*, 60 U.S. (19 How.) 393, 417 (1857) (emphasis added).

While *Scott*'s odious holding was never correct, the opinion's recognition of the fact that citizens enjoy a personal right carry arms was no aberration. Nearly a century later, the Supreme Court observed that "during military occupation irreconcilable enemy elements,

guerrilla fighters, and 'werewolves' could [not] require the American Judiciary to assure them . . . [the] right to bear arms as in the Second [Amendment] . . ." *Johnson* v. *Eisentrager*, 339 U.S. 763, 784 (1950). The reference was not limited to home self-defense.

Indeed, the Supreme Court's first foray into Second Amendment law centered around the question of whether individuals had the right to transport a sawed-off shotgun between Claremore, Oklahoma and Siloam Springs, Arkansas—plainly, an activity that took place outside the home. *United States* v. *Miller*, 307 U.S. 174, 175 (1939). Whatever else it might have held, *Miller* indicated that the Second Amendment has operative relevance on the highways.

Nearly seventy years later, the Supreme Court held that the Second Amendment's "words and phrases were used in their normal and ordinary as distinguished from technical meaning." *Heller*, 554 U.S. at 576. After all, "an amendment to the Constitution should be read in a 'sense most obvious to the common understanding at the time of its adoption, . . . For it was for public adoption that it was proposed.'" *Adamson* v. *California*, 332 U.S. 46, 63 (1947) (Frankfurter, J.,

concurring) (citation omitted), *overruled on other grounds by Malloy* v.

*Hogan*, 378 U.S. 1 (1964). Rejecting an argument that the term "bear

arms" indicates an exclusively military undertaking, the Court held

that "[a]t the time of the founding, as now, to 'bear' meant to 'carry.'"

*Heller*, 554 U.S. at 584 (citations omitted).

> To "bear arms," as used in the Second Amendment, is to "wear, bear,
> or carry . . . upon the person or in the clothing or in a pocket, for the
> purpose . . . of being armed and ready for offensive or defensive
> action in a case of conflict with another person."

*Id*. (quoting *Muscarello* v. *United States*, 524 U.S. 125, 143 (1998)

(Ginsburg, J., dissenting); BLACK'S LAW DICTIONARY 214 (6th Ed.

1998)). Accordingly, the Court repeatedly referred to "the Second

Amendment right, protecting only individuals' liberty to keep and carry

arms." *Heller*, 554 U.S. at 604; *id*., at 626.

Having defined the Second Amendment's language as including a

right to "carry" guns for self-defense, the Court helpfully noted several

exceptions that prove the rule. Explaining that this right is "not

unlimited," in that there is no right to "carry any weapon whatsoever in

any manner whatsoever and for whatever purpose," *Heller*, 554 U.S. at

626 (citations omitted), the Court confirmed that there is a right to

carry at least some weapons, in some manner, for some purpose. The Court then listed as "presumptively lawful," *Heller*, 554 U.S. at 627 n.26, "laws forbidding the carrying of firearms in sensitive places," *id.*, at 626, confirming both that such "presumptions" may be overcome in appropriate circumstances, and that carrying bans are not presumptively lawful in non-sensitive places.

Eliminating any doubt that it reached the issue of "bearing arms," *Heller* discussed with approval four nineteenth-century right to arms opinions explicating the rule that a manner of carrying guns may be forbidden, but not the entire practice itself. *See Heller*, 554 U.S. at 629 (discussing *Nunn* v. *State*, 1 Ga. 243 (1846); *Andrews* v. *State*, 50 Tenn. 165 (1871), and *State* v. *Reid*, 1 Ala. 612, 616-17 (1840)); 554 U.S. at 613 (citing *State* v. *Chandler*, 5 La. Ann. 489, 490 (1850)).

In upholding the right to carry a handgun under the Second Amendment, *Heller* broke no new ground. As early as 1846, Georgia's Supreme Court, applying the Second Amendment, quashed an indictment for the carrying of a handgun that failed to allege whether the handgun was being carried in a particular manner. *Nunn*, 1 Ga. at

251; *see also In re Brickey*, 70 P. 609 (Idaho 1902) (Second Amendment right to carry handgun). Numerous state constitutional right to arms provision have likewise been interpreted as securing the right to carry a gun in public, albeit often, to be sure, subject to some regulation. *See, e.g. Kellogg* v. *City of Gary*, 562 N.E.2d 685 (Ind. 1990); *State ex rel. City of Princeton* v. *Buckner*, 377 S.E.2d 139 (W. Va. 1988); *City of Las Vegas* v. *Moberg*, 485 P.2d 737 (N.M. Ct. App. 1971); *State* v. *Kerner*, 107 S.E. 222 (N.C. 1921); *State* v. *Rosenthal*, 55 A. 610 (Vt. 1903) (striking down ban on concealed carry); *Andrews*, *supra*, 50 Tenn. 165; *see also State* v. *Delgado*, 692 P.2d 610 (Or. 1984) (right to carry a switchblade knife).

Indeed, the Supreme Court extolled various traditional outdoor firearms activities. The right was valued "for self-defense *and hunting.*" *Heller*, 554 U.S. at 599 (emphasis added). "The settlers' dependence on game for food and economic livelihood, moreover, undoubtedly undergirded . . . state constitutional guarantees [of the right to arms]." *McDonald*, 130 S. Ct. at 3042 n.27. "No doubt, a citizen who keeps a gun or pistol under judicious precautions, *practices in safe places the*

*use of it*, and in due time teaches his sons to do the same, exercises his individual right [to bear arms]." *Heller*, 554 U.S. at 619 (citation omitted) (emphasis added). Hunting and target practice, at least with firearms, are activities not typically pursued at home.

Even Justice Stevens foresaw the Second Amendment's application beyond the home:

> Given the presumption that most citizens are law abiding, and the reality that the need to defend oneself may suddenly arise in a host of locations outside the home, I fear that the District's policy choice may well be just the first of an unknown number of dominoes to be knocked off the table.

*Heller*, 554 U.S. at 679-80 (Stevens, J., dissenting); *see also id.* at 677 n.38 (majority secures right to arms for "self-defense, recreation, and other lawful purposes") (Stevens, J., dissenting).[5]

Courts sometimes do acknowledge that "*Heller* does not preclude Second Amendment challenges to laws regulating firearm possession outside of home." *Peruta* v. *County of San Diego*, 678 F. Supp. 2d 1046, 1051 (S.D. Cal. 2010). For example, the Seventh Circuit applied the

---

[5]Justice Stevens offered that the Amendment "*does* encompass the right to use weapons for certain military purposes," *Heller*, 554 U.S. at 636 (Stevens, J., dissenting), presumably, outside the home.

right to keep and bear arms outside the home, enjoining Chicago's ban on the operation of gun ranges by recognizing a Second Amendment right to practice shooting. "The right to possess firearms for protection implies a corresponding right to acquire and maintain proficiency in their use; the core right wouldn't mean much without the training and practice that make it effective." *Ezell*, 651 F.3d at 704.

The lower court referenced "pervasive limiting language" in *Heller* allegedly restricting the right to the home, SA 41, but of course *Heller* contains no such language. Plaintiffs remain mystified as to how noting that the right is "most acute" in the home, *Heller*, 554 U.S. at 628, or is secured "most notably for self-defense within the home," *McDonald*, 130 S. Ct. at 3044, somehow means that it applies "only" in the home.

Nor is it logical to seize upon the Supreme Court's mere description of the laws struck down in *Heller*, "[w]e hold that the District's ban on handgun possession in the home [and] its prohibition against rendering any lawful firearm in the home operable for the purpose of immediate self-defense," *Heller*, 554 U.S. at 635, to limit the right's application to only those circumstances. SA 36. The Court's sixty-six pages of

reasoning indeed contain guidance for the lower courts; writing them was not a superfluous exercise adding nothing to what could have been a one-sentence opinion. As the Seventh Circuit observed:

> the Second Amendment creates individual rights, *one of which* is keeping operable handguns at home for self-defense. What other entitlements the Second Amendment creates, and what regulations legislatures may establish, were left open.

*United States* v. *Skoien*, 614 F.3d 638, 640 (7th Cir. 2010) (en banc) (emphasis added).

The lower court's other attempts to side-step the Supreme Court's holding are no more availing. The lower court acknowledged the Supreme Court's observation that the Second Amendment secured a right to use firearms for hunting, but dismissed that fact because it believed "hunting does not involve handguns,"[6] and New York law allows for hunting. SA 43. This is a non-sequitur. The Second Amendment's protection of hunting falsifies the lower court's

---

[6]The lower court erred on this point. *See, e.g.* HANDGUN HUNTER MAGAZINE, available at www.handgunhunt.com (last visited Nov. 7, 2011); "Field & Stream Picks the 25 Best Handguns for Hunters," available at http://www.fieldandstream.com/photos/gallery/gear/hunting-gear/2010/06/25-best-handguns-hunting-ever-made (last visited Nov. 7, 2011).

declaration that the Amendment secures only the right to keep handguns at home, regardless of whether handguns are used in hunting or whether hunting was the subject of the litigation. The lower court noted the Seventh Circuit's holding enjoining Chicago's complete ban on gun ranges, SA 44, but did not consider how such a result might be compatible with a Second Amendment right confined to the home.

The right to keep and bear arms plainly applies outside the home.

B. *HELLER*'S INTERPRETATION OF "BEAR ARMS" BINDS THIS COURT.

Apart from finding non-existent "limiting language" in *Heller*, and dismissing that opinion's extensive discussion of the right to bear arms outside the home, the lower court went so far as to reject the Supreme Court's definition of "bear arms" as used in the Second Amendment. The lower court offered that the Supreme Court's definition of the constitutional text applied only in the context of rebutting Washington, D.C.'s argument that it refers to military duty. SA 41.

Under the lower court's reasoning, the term "bear arms" loses its meaning if the question is not whether the term has a collectivist connotation, but is instead, directly, what do these words mean? Thus,

in the context of this case, "bear arms" might well have the definition repudiated by *Heller*. No reason is offered for why or how the Constitution's words change their meaning from case to case, and the lower court offers no alternative definition of the term.

The Constitution's words do not change "their normal and ordinary as distinguished from technical meaning," *Heller*, 554 U.S. at 576, their "sense most obvious to the common understanding at the time of [their] adoption," *Adamson*, 332 U.S. at 63 (Frankfurter, J., concurring), based on the nature of the litigants' dispute. It does not matter why the Court came to interpret the text, only that it did. "[T]he Constitution is a written instrument. As such its meaning does not alter. That which it meant when adopted it means now." *Utah* v. *Evans*, 536 U.S. 452, 491 (2002) (Thomas, J., concurring and dissenting in part) (citation omitted). The Supreme Court has rejected the *Alice in Wonderland* approach to statutory interpretation. *Tennessee Valley Auth.* v. *Hill*, 437 U.S. 153, 174 n.18 (1978) ("'When *I* use a word,' Humpty Dumpty said, in rather a scornful tone, 'it means just what *I* choose it to mean -- neither more nor less'") (quoting *Through the Looking Glass*, in THE

COMPLETE WORKS OF LEWIS CARROLL 196 (1939)).

> [C]ourts must presume that a legislature says in a statute what it means and means in a statute what it says there. When the words of a statute are unambiguous, then, this first canon is also the last: judicial inquiry is complete.

*Connecticut Nat'l Bank* v. *Germain*, 503 U.S. 249, 253-54 (1992)

(citations omitted). With respect to the term "bear arms" as it appears

in the Second Amendment, judicial inquiry was completed in *Heller*.

The Supreme Court's definition of "bear arms" in *Heller* was not

dictum. It is well established that

> When an opinion issues for the Court, it is not only the result but also those portions of the opinion necessary to that result by which we are bound . . . the principle of *stare decisis* directs us to adhere not only to the holdings of our prior cases, but also to their explications of the governing rules of law . . .

*Seminole Tribe of Fla.* v. *Florida*, 517 U.S. 44, 67 (1996) (citations and

internal marks omitted); *Barclays Capital Inc.* v. *Theflyonthewall.com,*

*Inc.*, 650 F.3d 876, 912 (2d Cir. 2011) (Raggi, J., concurring). Language

"explain[ing] the court's rationale . . . is part of the holding." *United*

*States* v. *Bloom*, 149 F.3d 649, 653 (7th Cir. 1998). In contrast,

> [a] dictum is a statement in a judicial opinion that could have been deleted without seriously impairing the analytical foundations of the

holding—that, being peripheral, may not have received the full and careful consideration of the court that uttered it.

*Sarnoff* v. *Am. Home Prods. Corp.*, 798 F.2d 1075, 1084 (7th Cir. 1986);

*Hormel Foods Corp.* v. *Jim Henson Prods.*, 73 F.3d 497, 508 (2d Cir. 1996). "[I]t is not substantive discussion of a question or lack thereof that distinguishes holding from dictum, but rather whether resolution of the question is necessary for the decision of the case." *Baraket* v. *Holder*, 632 F.3d 56, 59 (2d Cir. 2011) (citation omitted).

Considering its need to address the District of Columbia's collectivist interpretation of "bear arms," the Court's conclusion that the right to "bear arms" is the right to "carry weapons in case of confrontation" was essential to *Heller*'s resolution. The question of what "bear arms" means "was before the court; was argued before the court; and was passed upon by the court. It was not dictum." *Hormel*, 73 F.3d at 508 (citations and internal punctuation omitted). The numerous pages describing how that right applies outside the home confirm that the matter received the Court's exhaustive consideration.[7]

---

[7]The Supreme Court ordered that the District of Columbia "must issue [Heller] a license to carry [his handgun] in the home." *Heller*, 554 U.S. at 635. But using this language to suggest a home-limitation

Missing from the lower court's analysis is any reasoning for *why Heller* must be limited to its facts. Or more critically, even if the Supreme Court's definition of "bear arms" is to be ignored as dicta, what other meaning might that constitutional text hold? "It cannot be presumed that any clause in the constitution is intended to be without effect; and therefore such construction is inadmissible, unless the words require it." *Marbury* v. *Madison*, 5 U.S. (1 Cranch) 137, 174 (1803). "[T]he usual canon of [constitutional] interpretation . . . requires that real effect should be given to all the words it uses." *Myers* v. *United States*, 272 U.S. 52, 151 (1926) (citations omitted).

Until recently, opponents of the individual right to bear arms offered a militaristic, state-directed definition for "bear arms," but *Heller* dispensed with that option. Plaintiffs aver that the definition offered by

---

would be seriously misleading. Heller challenged, among other provisions, former D.C. Code § 22-4504(a) (2008), that had provided that the carrying of handguns inside one's home without a permit constituted a misdemeanor offense. Heller did not seek a permit to carry a handgun in public. *Parker* v. *District of Columbia*, 478 F.3d 370, 400 (D.C. Cir. 2007). The reference to an in-home carry permit merely tracked Heller's prayer for relief. *Heller*, 554 U.S. at 630-31.

the Supreme Court comports with the Second Amendment's original public meaning, if it is not already binding as a matter of *stare decisis*.

IV.   NEW YORK HAS SELECTED CONCEALED CARRYING AS THE PERMISSIBLE MODE OF EXERCISING THE RIGHT TO BEAR ARMS.

Fully consistent with the right to bear arms, states have traditionally been allowed broad leeway in prescribing the manner in which guns are carried. Accordingly, "the right of the people to keep and bear arms (Article 2) is not infringed by laws prohibiting the carrying of *concealed* weapons . . . ." *Robertson* v. *Baldwin*, 165 U.S. 275, 281-82 (1897) (emphasis added).

Plaintiffs have never argued for a right to carry handguns in, specifically, a concealed manner. Nor could Plaintiffs demand a right to carry guns openly. The right is to carry arms, generally, subject to the state's authority to outlaw particular modes of carry. This case is not about an alleged entitlement to carry in some specific manner, but rather, concerns licensing standards for the only manner of handgun carrying permitted by state law, which happens to be (but need not necessarily remain) concealed. Were New York to prohibit concealed

handgun carry and instead license the open carrying of handguns,

Plaintiffs' constitutional interest would be in open-carry licenses.

Concealed carry bans are only "presumptively" constitutional. *Heller*,

554 U.S. at 627 n.26. As one court observed,

> [N]ot *all* concealed weapons bans are presumptively lawful. *Heller*
> and the 19th-century cases it relied upon instruct that concealed
> weapons restrictions cannot be viewed in isolation; they must be
> viewed in the context of the government's overall scheme.

*Peruta* v. *County of San Diego*, 758 F. Supp. 2d 1106, 1114 (S.D. Cal.

2010) (emphasis in original).

Surveying the history of concealed carry prohibitions, it appears

time and again that concealed carry prohibitions have been upheld as

mere regulations of the manner in which arms are carried—with the

understanding that a complete ban on the carrying of handguns is

unconstitutional. As noted *supra*, *Heller* discussed, with approval, four

state supreme court opinions that referenced this conditional rule.

Upholding a ban on the carrying of concealed weapons, Alabama's high

court explained:

> We do not desire to be understood as maintaining, that in regulating
> the manner of bearing arms, the authority of the Legislature has no
> other limit than its own discretion. A statute which, under the

pretence of regulating, amounts to a destruction of the right, or which requires arms to be so borne as to render them wholly useless for the purpose of defense, would be clearly unconstitutional. But a law which is merely intended to promote personal security, and to put down lawless aggression and violence, and to this end prohibits the wearing of certain weapons in such a manner as is calculated to exert an unhappy influence upon the moral feelings of the wearer, by making him less regardful of the personal security of others, does not come in collision with the Constitution.

*Reid*, 1 Ala. at 616-17.

The *Nunn* court followed *Reid*, quashing an indictment for publicly carrying a pistol for failing to specify how the weapon was carried:

so far as the act . . . seeks to suppress the practice of carrying certain weapons *secretly*, that it is valid, inasmuch as it does not deprive the citizen of his *natural* right of self-defence, or of his constitutional right to keep and bear arms. But that so much of it, as contains a prohibition against bearing arms *openly*, is in conflict with the Constitution, and *void*.

*Nunn*, 1 Ga. at 251 (emphasis original).

*Andrews* presaged *Heller* by finding that a revolver was a protected arm under the state constitution's Second Amendment analog. It therefore struck down as unconstitutional the application of a ban on the carrying of weapons to a man carrying a revolver, declaring:

If the Legislature think proper, they may by a proper law regulate the carrying of this weapon publicly, or abroad, in such a manner as may be deemed most conducive to the public peace, and the

protection and safety of the community from lawless violence. We only hold that, as to this weapon, the prohibition is too broad to be sustained.

*Andrews*, 165 Tenn. at 187-88.[8]

Finally, in *Chandler,*

the Louisiana Supreme Court held that citizens had a right to carry arms openly: "This is the right guaranteed by the Constitution of the United States, and which is calculated to incite men to a manly and noble defence of themselves, if necessary, and of their country, without any tendency to secret advantages and unmanly assassinations."

*Heller*, 554 U.S. at 613 (quoting *Chandler*, 5 La. Ann. at 490).

Other decisions reflected rule allowing for concealed-carry

prohibitions only as regulations on the manner of carrying guns. *See,*

*e.g. State* v. *Jumel*, 13 La. Ann. 399, 400 (1858) (concealed carry

prohibition "a measure of police, prohibiting only a *particular mode* of

bearing arms which is found dangerous to the peace of society")

(emphasis original) (citation omitted)); *Owen* v. *State*, 31 Ala. 387, 388

---

[8]*Andrews* appeared to abrogate in large part *Aymette* v. *State*, 21 Tenn. 154 (1840), upholding the prohibition on the concealed carry of daggers. But even *Aymette*, which found a state right to bear arms limited by a military purpose, deduced from that interpretation that the right to bear arms protected the open carrying of arms. *Aymette*, 21 Tenn. at 160-61.

(1858) (concealed carry ban "a mere regulation of the manner in which certain weapons are to be borne").

For supporting the notion that concealed carrying may be banned, *Heller* further cites to THE AMERICAN STUDENTS' BLACKSTONE, 84 n.11 (G. Chase ed. 1884), *Heller*, 554 U.S. at 626, which provides:

> [I]t is generally held that statutes prohibiting the carrying of *concealed* weapons are not in conflict with these constitutional provisions, since they merely forbid the carrying of arms in a particular manner, which is likely to lead to breaches of the peace and provoke to the commission of crime, rather than contribute to public or personal defence. In some States, however, a contrary doctrine is maintained.

AMERICAN STUDENTS' BLACKSTONE, 84 n.11 (emphasis original). This understanding survives today. *See, e.g. In re Application of McIntyre*, 552 A.2d 500, 501 n.1 (Del. Super. 1988) ("'the right to keep and bear arms' does not of necessity require that such arms may be kept concealed").

It is important, then, to recall that (1) the Supreme Court's definition of "bear arms" as that language is used in the Second Amendment includes the concealed carrying of handguns: "wear, bear, or carry . . . *in the clothing or in a pocket . . .*" *Heller*, 554 U.S. at 584

(citations omitted) (emphasis added); (2) the legality of bans on concealed carrying is only presumptive, *Heller*, 554 U.S. at 627 n.26, and (3) the cases supporting concealed carry prohibition explain that no abrogation of the right to carry arms is effected because open carrying is still permitted.

Legislatures might well prefer one form of carrying over another. Precedent reveals an ancient suspicion of weapons concealment where social norms viewed the wearing of arms as virtuous. But today, openly carrying handguns may alarm individuals unaccustomed to firearms. *See* Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense: An Analytic Framework and a Research Agenda*, 56 UCLA L. Rev. 1443, 1523 (2009); *cf. Gonzalez* v. *Vill. of W. Milwaukee*, 2010 U.S. Dist. LEXIS 46281 at *8-*9 (D. Wis. May 11, 2010) ("No reasonable person would dispute that walking into a retail store openly carrying a firearm is highly disruptive conduct which is virtually certain to create a disturbance").[9]

---

[9]Although *Gonzalez* erred in its unexamined statement that the Second Amendment does not secure the bearing of arms, the case is nonetheless instructive as it probably described accurately the local community's modern sentiment regarding the open carrying of arms.

New York's preference for concealed over open carrying is not unusual, and has been adopted by some jurisdictions where the public acceptance of gun rights is relatively high. For example, in Texas, where concealed handgun permits are readily available on a "shall issue" basis, Tex. Gov't Code § 411.177(a), a permit holder who "intentionally fails to conceal the handgun" commits a misdemeanor. Tex. Penal Code § 46.035(a).

*Heller*'s recognition of a right to carry a handgun does not force states to allow the carrying of handguns in a manner that may cause needless public alarm, so long as a more socially-conducive option exists to allow people to exercise the right to bear arms. But once a legislature determines that only a particular manner of carrying will be permitted, that choice must be honored.

The question here is not whether Plaintiffs have the right to carry handguns in some particular manner, but whether access to the state's only available handgun carry license can be qualified by "proper cause"

---

Notably, Wisconsin just enacted a "shall issue" system for the issuance of concealed handgun carrying licenses. Wis. Stat. § 175.60.

as determined at the licensing authority's sole discretion. The answer
to that question is "no."

V. **"PROPER CAUSE" IS AN INVALID STANDARD FOR LICENSING THE EXERCISE OF FUNDAMENTAL SECOND AMENDMENT RIGHTS.**

    A. **PRIOR RESTRAINTS AGAINST THE EXERCISE OF FUNDAMENTAL RIGHTS MUST BE DEFINED OBJECTIVELY AND NARROWLY, WITHOUT SANCTIONING UNBRIDLED DISCRETION.**

This Court correctly applies established constitutional doctrines in
cases involving licenses to carry firearms. *See, e.g. Kuck* v. *Danaher*,
600 F.3d 159 (2d Cir. 2010) (applying established due process
framework to firearms carry license). As the Second Amendment
secures a fundamental right, a license to bear arms cannot be left to the
government's unbridled discretion:

> It is settled by a long line of recent decisions of this Court that an
> ordinance which . . . makes the peaceful enjoyment of freedoms
> which the Constitution guarantees contingent upon the uncontrolled
> will of an official—as by requiring a permit or license which may be
> granted or withheld in the discretion of such official—is an
> unconstitutional censorship or prior restraint upon the enjoyment of
> those freedoms.

*Staub* v. *City of Baxley*, 355 U.S. 313, 322 (1958) (citations omitted); *see
also FW/PBS* v. *City of Dallas*, 493 U.S. 215, 226 (1990) (plurality
opinion); *Shuttlesworth* v. *Birmingham*, 394 U.S. 147, 151 (1969); *Lusk*

v. *Vill. of Cold Spring*, 475 F.3d 480, 486 (2d Cir. 2007). "The Supreme

Court has repeatedly struck down ordinances that make the enjoyment

of constitutional freedoms contingent upon the uncontrolled will of a

government official." *Nakatomi Inv.* v. *City of Schenectady*, 949 F.

Supp. 988, 1002 (N.D.N.Y. 1997).

"While prior restraints are not unconstitutional per se, any system of

prior restraint comes to the courts bearing a heavy presumption

against its constitutional validity." *Clark* v. *City of Lakewood*, 259 F.3d

996, 1005 (9th Cir. 2001) (citation omitted). In *Staub*, the Supreme

Court struck down an ordinance authorizing a mayor and city council

"uncontrolled discretion," *Staub*, 355 U.S. at 325, to grant or refuse a

permit required for soliciting organizational memberships. Such a

permit, held the Court,

> makes enjoyment of speech contingent upon the will of the Mayor
> and Council of the City, although that fundamental right is made
> free from congressional abridgment by the First Amendment and is
> protected by the Fourteenth from invasion by state action. For these
> reasons, the ordinance, on its face, imposes an unconstitutional prior
> restraint upon the enjoyment of First Amendment freedoms and lays
> "a forbidden burden upon the exercise of liberty protected by the
> Constitution."

*Staub*, 355 U.S. at 325 (quoting *Cantwell* v. *Connecticut*, 310 U.S. 296,

307 (1940)); *see also Largent* v. *Texas*, 318 U.S. 418, 422 (1943) (striking down ordinance allowing speech permit where mayor "deems it proper or advisable."); *Louisiana* v. *United States*, 380 U.S. 145, 153 (1965) ("The cherished right of people in a country like ours to vote cannot be obliterated by the use of laws . . . which leave the voting fate of a citizen to the passing whim or impulse of an individual registrar."). This Court has rejected a licensing officer's assessment of what may inure to the "welfare and benefit of the people of and visitors to the city" as a licensing standard. *Charette* v. *Town of Oyster Bay*, 159 F.3d 749, 754 (2d Cir. 1998) (quoting *414 Theater Corp.* v. *Murphy*, 499 F.2d 1155, 1156 n.1, 1159 (2d Cir. 1974)).

"Traditionally, unconstitutional prior restraints are found in the context of judicial injunctions or a licensing scheme that places 'unbridled discretion in the hands of a government official or agency.'" *Nat'l Fed'n of the Blind* v. *FTC*, 420 F.3d 331, 350 n.8 (4th Cir. 2005) (quoting *FW/PBS*, 493 U.S. at 225-26); *754 Orange Ave., Inc.* v. *West Haven*, 761 F.2d 105, 114 (2d Cir. 1985) ("discretion given the police department (presumably the Chief of Police) . . . sets forth no standards

for the issuance or revocation of a license"). Yet

> [t]he existence of standards does not in itself preclude a finding of unbridled discretion, for the existence of discretion may turn on the looseness of the standards or the existence of a condition that effectively renders the standards meaningless as to some or all persons subject to the prior restraint.

*Beal* v. *Stern*, 184 F.3d 117, 126 n.6 (2d Cir. 1999). "Unbridled discretion naturally exists when a licensing scheme does not impose adequate standards to guide the licensor's discretion." *Id.* (quoting *Chesapeake B & M, Inc.* v. *Harford County*, 58 F.3d 1005, 1009 (4th Cir. 1995) (en banc)).

Standards governing prior restraints must be "narrow, objective and definite." *Shuttlesworth*, 394 U.S. at 151. Standards involving "appraisal of facts, the exercise of judgment, [or] the formation of an opinion" are unacceptable. *Forsyth County* v. *Nationalist Movement*, 505 U.S. 123, 131 (1992) (quoting *Cantwell*, 310 U.S. at 305).

Public safety is invoked to justify most laws, but where a fundamental right is concerned, the mere incantation of a public safety rationale does not save arbitrary licensing schemes.

> [W]e have consistently condemned licensing systems which vest in an administrative official discretion to grant or withhold a permit

upon broad criteria unrelated to proper regulation of public places . . . There are appropriate public remedies to protect the peace and order of the community if appellant's speeches should result in disorder or violence.

*Kunz* v. *New York*, 340 U.S. 290, 294 (1951); *Shuttlesworth*, 394 U.S. at 153. "[U]ncontrolled official suppression of the privilege cannot be made a substitute for the duty to maintain order in connection with the exercise of the right." *Hague* v. *Committee for Indus. Org.*, 307 U.S. 496, 516 (1937) (plurality opinion).

> Even when the use of its public streets and sidewalks is involved, therefore, a municipality may not empower its licensing officials to roam essentially at will, dispensing or withholding permission to speak, assemble, picket, or parade, according to their own opinions regarding the potential effect of the activity in question on the "welfare," "decency," or "morals" of the community.

*Shuttlesworth*, 394 U.S. at 153.

For an example of these prior restraint principles applied in the Second Amendment context, the Court need look no further than *Heller*. Among other provisions, Heller challenged application of the District of Columbia's requirement that handgun registrants obtain a discretionary (but never issued) permit to carry a gun inside the home. The Supreme Court held that the city had no discretion to refuse

issuance of the permit: "Assuming that Heller is not disqualified from the exercise of Second Amendment rights, the District must permit him to register his handgun and must issue him a license to carry it in the home." *Heller*, 554 U.S. at 635. The city could deny Heller a permit only if it could identify some constitutionally valid reason for doing so.

B.      SECTION 400.00(2)(F)'S "PROPER CAUSE" REQUIREMENT PLAINLY FAILS PRIOR RESTRAINT ANALYSIS.

New York's "proper cause" requirement for issuance of a handgun carry license, or at least, Defendants' application of that requirement, fails constitutional scrutiny as an impermissible prior restraint. The right to carry a firearm for self-defense is plainly among the "freedoms which the Constitution guarantees." *Staub*, 355 U.S. at 322. The government must bear the burden of proving that an applicant may not have a permit, for some constitutionally-compelling reason defined by application of standards that are "narrow, objective and definite." *Shuttlesworth*, 394 U.S. at 151. Defendants may not engage in the "appraisal of facts, the exercise of judgment, [or] the formation of an opinion." *Forsyth County*, 505 U.S. at 131.

Officials' belief that individuals lack "proper cause" to exercise their constitutional rights is insufficient to deprive them of their rights. "Proper cause" is plainly among the impermissible "illusory 'constraints'" amounting to "little more than a high-sounding ideal." *City of Lakewood* v. *Plain Dealer Publishing Co.*, 486 U.S. 750, 769-70 (1988). Defendants' assessment of "a special need for self-protection distinguishable from that of the general community or of persons engaged in the same profession," *Bando*, 735 N.Y.S.2d at 662, is highly subjective, and quite beside the point—the general public is entitled to Second Amendment rights, and the interest in self-defense secured by that provision is held by everyone.

The desire for self-defense, regardless of Defendants' opinions on the subject, is all the "proper cause" required of Plaintiffs by the Second Amendment to carry a firearm. Any adverse licensing decision barring exercise of this right must be rendered according to constitutionally adequate standards.

New York's "proper cause" prerequisite is readily distinguishable from other licensing regimes providing some amount of discretion to

deny or revoke handgun carry licenses. Connecticut, for example, licenses "suitable" individuals to carry guns, Conn. Gen. Stat. § 29-28(b), but as the District Court for that state recently found in upholding the standard, discretion to determine "suitability" is not unbridled. *Kuck* v. *Danaher*, 2011 U.S. Dist. LEXIS 111793 (D. Conn. Sept. 29, 2011). The term's construction is limited by ten enumerated aspects of suitability, *id.* at *35-*36, and "denial or revocation decisions are subject to de novo review" to assess whether "there was 'just and proper cause' for the denial or revocation." *Id.* at *36 (quoting Conn. Gen. Stat. § 29-32b(b)). Connecticut courts determine unsuitability by reference to an applicant's demonstrated conduct. *Id.* at *33-*35 (citing cases). This differs starkly from New York's "proper cause" demand, which places the burden on the applicant to prove entitlement to the license, and does not require the authorities to point to any specific act of the applicant that demonstrates reason to withhold the license.

Plaintiffs were also constrained to observe that Section 400.00(1)(b)'s requirement that gun carry license applicants be "of good moral character" is also an unconstitutional prior restraint. Although no

Plaintiff was denied a gun license on account of his or her alleged immorality, Defendants' amici endorsed basing handgun licensing decisions upon authorities' assessment of applicants' "personalities." Plaintiffs thus observed that absent further definition, courts typically reject all forms of "moral character" standards for the licensing of fundamental rights. *Schneider* v. *New Jersey (Town of Irvington)*, 308 U.S. 147, 158 (1939); *MD II Entertainment* v. *City of Dallas*, 28 F.3d 492, 494 (5th Cir. 1994); *Genusa* v. *Peoria*, 619 F.2d 1203, 1217 (7th Cir. 1980); *N.J. Envtl. Fed'n* v. *Wayne Twp.*, 310 F. Supp. 2d 681, 699 (D.N.J. 2004); *Ohio Citizen Action* v. *City of Mentor-On-The-Lake*, 272 F. Supp. 2d 671, 682 (N.D. Ohio 2003); *Tom T., Inc.* v. *City of Eveleth*, 2003 U.S. Dist. LEXIS 3718 at *14-15 (D. Minn. March 11, 2003); *R.W.B. of Riverview, Inc.* v. *Stemple*, 111 F. Supp. 2d 748, 757 (S.D.W.Va. 2000); *Elam* v. *Bolling*, 53 F. Supp. 2d 854, 862 (W.D.Va. 1999); *Ohio Citizen Action* v. *City of Seven Hills*, 35 F. Supp. 2d 575, 579 (N.D. Ohio 1999); *Broadway Books, Inc.* v. *Roberts*, 642 F. Supp. 486, 494-95 (E.D.Tenn. 1986); *Bayside Enterprises, Inc.* v. *Carson*, 450 F. Supp. 696, 707 (M.D. Fla. 1978).

The lower court correctly noted that Plaintiffs had not challenged the moral character requirement. SA 50. Yet the court remarked that were the moral character requirement challenged, "it would likely pass muster, as restricting handguns to those of good moral character would [pass intermediate scrutiny] in ways similar to" the "proper cause" requirement. *Id.* Considering the suspicion generally shown moral character requirements, this statement notably underscores the lack of rigor in the lower court's asserted application of intermediate scrutiny to secure a right the Supreme Court considers "fundamental." *McDonald*, 130 S. Ct. at 3042 (plurality opinion) & 3059 (Thomas, J., concurring).

> The phrase [fundamental personal rights and liberties] is not an empty one and was not lightly used. It reflects the belief of the framers of the Constitution that exercise of the rights lies at the foundation of free government by free men. It stresses, as do many opinions of this court, the importance of preventing the restriction of enjoyment of these liberties.

*Schneider*, 308 U.S. at 161. The lower court's statement also confirms that the "proper cause" requirement lies in the same class of dubious qualifications as demands that one prove her "moral character" to enjoy a constitutional right.

The "proper cause" requirement of Section 400.00(2)(f), and

Defendants' manner of implementing it, vests unbridled discretion in

Defendants' authority to license the exercise of fundamental rights. It

must be enjoined.

C.      PRIOR RESTRAINT DOCTRINE PROVIDES A SUPERIOR METHOD
OF EVALUATING THE CONSTITUTIONALITY OF DISCRETIONARY
HANDGUN LICENSING.

*Heller* disposed of two gun regulations without resorting to any level

of means-ends scrutiny: Washington's functional firearms ban simply

conflicted with the Second Amendment's core self-defense guarantee,

while its handgun ban failed the categorical "common use" test for

delineating protected arms. The notable absence of any controlling

standard of review in *Heller* is instructive—however useful in some

cases, means-ends scrutiny is not always the preferred avenue for

adjudication.

Means-ends levels of scrutiny provide a relatively poor method to

test the constitutionality of a discretionary licensing system. Such

levels of scrutiny, whatever they may be in a particular case, are only

useful in evaluating laws that impose or depend upon the existence of

some *specific* condition. In such cases, a court may examine the regulation and weigh it against the right at issue through whichever scrutiny-lens is most apt. In the Second Amendment context, a felon disarmament law, or some condition upon the purchase or sale of firearms, would fit comfortably into this sort of analysis.

But here, the issue is whether Defendants may bar individuals from exercising the right at all by use of a permitting scheme. This comes literally within the definition of a prior restraint—there is no better, indeed, there may be no other, logical interpretive tool.

The time to apply means-ends scrutiny is when a court is presented with an *objective* licensing standard. A court can evaluate objective standards by examining their purpose and impact under whichever means-ends rubric should be applied. But it is difficult to tell exactly what public interest is being served by a policy of unbridled discretion. Since the activity being regulated is the exercise of a fundamental right, its general suppression cannot be in the public interest. And the idea of an official dispensing permission to exercise a "right" is inherently incongruent with the concept of rights.

Notwithstanding the fact that this case concerns the level of officials' discretion in licensing the exercise of constitutional rights, the lower court refused to consider the prior restraint doctrine. In a footnote, the lower court offered that while the First Amendment's "*analytical framework*" may be imported to the Second Amendment, "*substantive* First Amendment rules" should not be considered. SA 49.

That analysis is wrong: prior restraint doctrine does not supply any "substantive First Amendment rules." It holds only that when rules are made, whatever they are, they must be objectively defined. The doctrine is the very model of an "analytical framework" in that it applies uniformly in a wide variety of different contexts. In the First Amendment field alone, it applies to regulations governing solicitation, *Staub*; public demonstrations, *Beal*; nude dancing, *Charette*; residential signs, *Lusk*; and the operation of bookstores, *754 Orange*, to name just a few. The "substantive" rules for regulating these activities are plainly different.

Nor is the prior restraint doctrine exclusive to the First Amendment. The prohibition on unbridled licensing discretion secures "the peaceful

enjoyment of freedoms which the Constitution guarantees." *Staub*, 355 U.S. at 322. While First Amendment freedoms have historically been licensed far more than Second Amendment freedoms, prior restraint has long been demonstrated in non-First Amendment contexts. For example, in *Kent* v. *Dulles*, 357 U.S. 116 (1958), the Secretary of State purported to exercise his discretion to deny plaintiffs' passport applications based on their communist sympathies. The Supreme Court, recognizing that the Fifth Amendment's Due Process Clause secures a fundamental right to international travel,

> hesitate[d] to impute to Congress, when in 1952 it made a passport necessary for foreign travel and left its issuance to the discretion of the Secretary of State, a purpose to give him unbridled discretion to grant or withhold a passport from a citizen for any substantive reason he may choose.

*Kent*, 357 U.S. at 128; *Hernandez* v. *Cremer*, 913 F.2d 230, 237 (5th Cir. 1990); *but see Regan* v. *Wald*, 468 U.S. 222, 241-42 (1984) (passports may be restricted for foreign policy reasons).

> [T]he right of exit is a personal right included within the word 'liberty' as used in the Fifth Amendment. If that "liberty" is to be regulated, it must be pursuant to the law-making functions of the Congress. And if that power is delegated, the standards must be adequate to pass scrutiny by the accepted tests.

*Kent*, 357 U.S. at 129. The Supreme Court observed that historically, passports had been denied only to those who were not citizens of or sufficiently loyal to the United States, or to those fleeing the criminal justice system. Accordingly, the Court refused to accept that without more, the executive branch was authorized by Congress to deny passports for other reasons.

Even were the lower court correct in offering that prior restraint doctrine is a substantive First Amendment rule, that critique would be merely descriptive, not persuasive. Some "substantive" First Amendment law *has* been imported into the Second Amendment. *See, e.g. Ezell*, 651 F.3d at 699 (irreparable harm presumed where Second Amendment violated: right to arms protects "intangible and unquantifiable interests" similar to First Amendment). If some reason exists why First Amendment rights cannot be dispensed by unbridled discretion, but other rights can be, that reason is not readily apparent. Were there some actual, substantive reason to exclude the Second Amendment from the protection of the prior restraint doctrine, the lower court should have explained why.

It will not do to respond that prior restraint has never been applied to Second Amendment rights. Three years ago, municipal handgun bans had never been struck down under the Second Amendment, either. And until *Nordyke* v. *King*, 563 F.3d 439 (9th Cir. 2009), no federal court had applied the Second Amendment to the States. While other emerging Second Amendment challenges may require the development of new doctrines, this case can and should be resolved by the time-tested, straightforward logic of prior restraint law.

VI.   THE "PROPER CAUSE" STANDARD FAILS MEANS-ENDS SCRUTINY.

Although prior restraint provides a superior approach to determining this case, it is nonetheless also true that Defendants' challenged practices violate the Second and Fourteenth Amendments when analyzed under a means-ends level of scrutiny. Whether viewed as a direct infringement of the right to bear arms, or as an equal protection violation insofar as it improperly classifies individuals in the exercise of a fundamental right, the "proper cause" requirement fails any level of scrutiny. Because Plaintiffs challenge the "proper cause" classification as violating their right to equal protection, means-ends scrutiny is relevant to this appeal.

Where laws do not literally conflict with the Amendment's core or trigger a specific test, courts have frequently employed a two-step doctrinal approach to cases potentially implicating the Second Amendment. *Heller* v. *District of Columbia*, 2011 U.S. App. LEXIS 20130 (D.C. Cir. Oct. 4, 2011) ("*Heller II*"); *United States* v. *Marzzarella*, 614 F.3d 85, 89 (3d Cir. 2010); *United States* v. *Reese*, 627 F.3d 792, 800 (10th Cir. 2010). The first step is to consider whether the particular exercise of government power regulates conduct falling within the Second Amendment's scope. *Heller II*, 2011 U.S. App. LEXIS 20310 at *16; *United States* v. *Chester*, 628 F.3d 673, 680 (4th Cir. 2010). As the Second Amendment secures a right to carry guns, a regulation demanding "proper cause" to obtain a gun carry license implicates the Second Amendment.

The Court must then apply the second step, a means-ends level of scrutiny. *Heller II*, 2011 U.S. App. LEXIS 20310 at *16-*17; *Chester*, 628 F.3d at 681-682; *Marzzarell*a, 614 F.3d at 89; *Reese*, 627 F.3d at 800-801. In this case, the appropriate standard is strict scrutiny. But

demanding individuals prove their entitlement to exercise a
fundamental right cannot survive any level of scrutiny.

A.   LAWS GENERALLY RESTRICTING THE RIGHT OF LAW ABIDING,
     RESPONSIBLE INDIVIDUALS TO BEAR ARMS ARE SUBJECT TO
     STRICT SCRUTINY.

The prevailing trend among federal courts holds that no single
standard of review governs all Second Amendment cases. "As with the
First Amendment, the level of scrutiny applicable under the Second
Amendment surely depends on the nature of the conduct being
regulated and the degree to which the challenged law burdens the
right." *Heller II*, 2011 U.S. App. LEXIS 20310 at *30 (citations
omitted). "The protections of the Second Amendment are subject to the
same sort of reasonable restrictions that have been recognized as
limiting, for instance, the First Amendment." *Parker*, 478 F.3d at 399.
"[A]s has been the experience under the First Amendment, we might
expect that courts will employ different types of scrutiny in assessing
burdens on Second Amendment rights, depending on the character of
the Second Amendment question presented." *United States* v.
*Masciandaro,* 638 F.3d 458, 470 (4th Cir. 2011); *cf. Marzzarella*, 614

F.3d at 96; *United States* v. *Williams*, 616 F.3d 685, 692 (7th Cir. 2010)

(declining to "adopt a level of scrutiny applicable to every disarmament

challenge . . . "). Without specifying the exact level of heightened

scrutiny, the Ninth Circuit held that "regulations which substantially

burden the right to keep and bear arms trigger heightened scrutiny

under the Second Amendment." *Nordyke* v. *King*, 644 F.3d 776, 786 &

n.9 (9th Cir. 2011).[10]

 "Borrowing from the Court's First Amendment doctrine, the rigor of

this judicial review will depend on how close the law comes to the core

of the Second Amendment right and the severity of the law's burden on

the right." *Ezell*, 651 F.3d at 703 (citations omitted). As the Seventh

Circuit explained,

> Labels aside, we can distill this First Amendment doctrine and
> extrapolate a few general principles to the Second Amendment
> context. First, a severe burden on the core Second Amendment right
> of armed self-defense will require an extremely strong public-
> interest justification and a close fit between the government's means
> and its end. Second, laws restricting activity lying closer to the
> margins of the Second Amendment right, laws that merely regulate

---

[10]On June 13, 2011, the *Nordyke* Appellees were ordered to
respond to a motion for re-hearing *en banc*. Considering the case's "long
and tangled procedural history" since 1999, *Nordyke*, 644 F.3d at 781, it
would be no surprise were the panel opinion soon vacated.

rather than restrict, and modest burdens on the right may be more easily justified. How much more easily depends on the relative severity of the burden and its proximity to the core of the right.

*Id.* at 708; *cf. Cent. Hudson Gas & Elec. Corp.* v. *Public Serv. Comm'n*, 447 U.S. 557, 563 n.5 (1980) (First Amendment: intermediate standard of review may apply to an enumerated right under circumstances where the right's exercise is "of less constitutional moment.").

Under this approach, where the Second Amendment's standard of review depends on the nature of the claim, the Fourth Circuit applies strict scrutiny to cases implicating the Second Amendment's fundamental core. "[W]e assume that any law that would burden the 'fundamental,' core right of self-defense in the home by a law-abiding citizen would be subject to strict scrutiny." *Masciandaro*, 638 F.3d at 470.[11] But that court applies intermediate scrutiny where the "claim is not within the core right identified in *Heller*—the right of a law-abiding, responsible citizen to possess and carry a weapon for self-defense." *Chester*, 628 F.3d at 683. "[I]ntermediate scrutiny is more

---

[11]*Masciandaro* declined to answer whether the Second Amendment extends beyond the home. Its framework of applying strict scrutiny to core Second Amendment rights is nonetheless instructive.

appropriate than strict scrutiny for [domestic violence misdemeanant] and similarly situated persons." *Id.* Following the trend favoring flexibility in the selection of scrutiny standards, the D.C. Circuit applied intermediate scrutiny to test the District's registration and "assault weapons" laws, as it found these were not substantial burdens on core Second Amendment rights. *Heller II*, 2011 U.S. App. LEXIS 20130 at *32 and *44.

Likewise, the Seventh Circuit applied intermediate scrutiny in reviewing the constitutionality of the federal firearms prohibition directed at perpetrators of domestic violence. *Skoien*, supra, 614 F.3d 638. But enjoining Chicago's ban on the operation and use of gun ranges, the Seventh Circuit concluded that "a more rigorous showing than that applied in *Skoien* [intermediate scrutiny] should be required, if not quite 'strict scrutiny.'" *Ezell*, 651 F.3d at 708.

Here, the burden is substantial, implicating the core rights of responsible, law-abiding citizens to engage in an activity whose protection is literally enumerated. The challenged regulation does not function as one restricting the right as to time, place, or manner, but

generally, at all times and places. Strict scrutiny is thus the most applicable standard. After all, the Second Amendment secures a fundamental right, and absent any of the foregoing reasons for reducing the standard of review, "classifications affecting fundamental rights are given the most exacting scrutiny." *Clark* v. *Jeter*, 486 U.S. 456, 461 (1988) (citation omitted).

Thus, to the extent that the "proper cause" requirement classifies law-abiding, responsible citizens differently in the exercise of their fundamental right to bear arms, application of this requirement must be narrowly tailored to a compelling governmental interest, leaving no less restrictive alternative.

B.      BARRING LAW-ABIDING, RESPONSIBLE AMERICANS FROM BEARING ARMS SERVES NO COMPELLING GOVERNMENT INTEREST.

Regardless of the standard utilized, a "proper cause" prerequisite to the exercise of a fundamental right fails for the simple reason that no legitimate governmental interest is at stake. To be sure, Defendants have a compelling governmental interest in regulating firearms in the interest of public safety. But if there is a *right* to carry a handgun for

self-defense, Defendants cannot deny that right to anyone on grounds that the right itself is too dangerous to permit. The very idea that individuals enjoy a right means that the state lacks an interest, without more, in preventing them from enjoying it.

Nor is the arbitrary licensing practice even rationally tailored to any interest in public safety. In 2010, individuals suffered 2,454 violent crimes—murder, forcible rape, robbery, and aggravated assaults—in Westchester County. See CRIME IN NEW YORK STATE, 2010 FINAL DATA, available at http://criminaljustice.state.ny.us/crimnet/ojsa/ NYSCrimeReport2010.pdf at 10 (last visited Nov. 7, 2011). Defendants are silent as to how many of these victims of violent crime could have established "proper cause" for carrying defensive arms. All of these crime victims, however, presumptively enjoyed the protection of the Second Amendment.

Defendants are plainly incapable of predicting crime. Defendants cannot predict who will face, much less when or where, a situation in which the right to self-defense would be desperately needed. Crime is largely random and unpredictable. Individuals victimized once may never be victimized again, while an individual's first encounter with a

violent criminal often leads to death or seriously bodily harm. The very existence of crime is an argument against its predictability, as prospective victims, with foreknowledge, would take preventive measures.

Individuals enjoy a right to carry handguns "for the purpose . . . of being armed and ready for offensive or defensive action in a case of conflict with another person." *Heller*, 554 U.S. at 584 (citations omitted). The right to self-defense at the Second Amendment's core is enjoyed by everyone, not just those whom officials believe are more likely to require it.

## VII. Overbreadth is a Second Amendment Doctrine.

To the extent Plaintiffs challenge the "proper cause" requirement on its face, the lower court turned the challenge away, asserting that this requirement would be constitutional in at least some of its applications. SA 58.[12]

The first error in this analysis was the lower court's assumption that a "no set of circumstances" rule governs all facial constitutional

---

[12]Plaintiffs challenge Section 400.00(2)(f) both on its face, and as applied to them given their circumstances. JA 25.

challenges. SA 58 (citing inter alia *United States* v. *Salerno*, 481 U.S. 739, 745 (1987)). At times, the Supreme Court has required only that laws have "a plainly legitimate sweep," *Wash. State Grange* v. *Wash. State Repub. Party*, 552 U.S. 442, 450 (2008)—a more permissive standard. *See, e.g. Washington* v. *Glucksberg*, 521 U.S. 702, 739-40 & n.7 (1997) (Stevens, J., concurring in judgments) ("I do not believe the Court has ever actually applied such a strict standard, even in *Salerno* itself"); *United States* v. *Stevens*, 130 S. Ct. 1577, 1587 (2010) (noting neither standard is rooted in the First Amendment) (citations omitted).

By its terms, *Salerno* never governed First Amendment cases. *Salerno*, 481 U.S. at 745. Nor did it apply in abortion cases, where laws were deemed facially invalid where they imposed undue burdens on abortion access—not in *all* cases, but "in a large fraction of the cases." *Planned Parenthood of Southeastern Pa.* v. *Casey*, 505 U.S. 833, 895 (1992).

And of course, the *Salerno* "no set of circumstances" standard did not apply in *Heller* or *McDonald*.

*Heller* sustained a facial challenge to three generally-applicable gun laws. The Supreme Court acknowledged that some individuals could be denied firearms, *Heller*, 554 U.S. at 626, and even cautioned that Mr. Heller, specifically, might not be entitled to relief: "*Assuming that Heller is not disqualified from the exercise of Second Amendment rights*, the District must permit him to register his handgun and must issue him a license to carry it in the home." *Heller*, 554 U.S. at 635 (emphasis added). *McDonald* reiterated the notion that at least some individuals could be denied access to handguns. *McDonald*, 130 S. Ct. at 3047.

If *Salerno* exclusively governed Second Amendment cases, the results in *Heller* and *McDonald* would have been impossible, as there remain individuals in Washington, D.C. and Chicago who may be barred from accessing functional handguns. As there will always be individuals who can, for some specific and obviously compelling reason (violent criminal history, mental illness, etc.) be totally disarmed, a "no set of circumstances" test is simply incompatible with the idea that gun laws might run afoul of the Second Amendment.

The Fourth and Seventh Circuits recently confronted the issue. When a panel majority expressly adopted First Amendment doctrines as a framework for examining Second Amendment rights, *Chester*, 628 F.3d at 682, one judge dissented specifically out of a desire to impose *Salerno* in Second Amendment cases. *Id.* at 687-88 (Davis, J., concurring in judgment). Clearly the argument did not carry the majority. The Seventh Circuit's recent decision in *Ezell* explained in greater detail the *Salerno* standard's limited utility and lack of applicability to overbreadth claims, questioning its use in that Second Amendment case. *Ezell*, 651 F.3d at 697-99.

In any event, while some valid Second Amendment claims would be untenable under *Salerno*, Plaintiffs' facial challenge to Section 400.00(2)(f) would pass such a test. Under no set of circumstances can a person be disarmed according to some official's unbridled discretion. The prior restraint doctrine forbids subjecting individuals to illusory, lawless "standards" in the exercise of fundamental rights, even if some license applicants could undeniably be rejected for failing to satisfy valid, objective criteria.

If a "no set of circumstances" rule applied to claims of unbridled discretion, arbitrary government conduct would be unchecked. Just as the proverbial stopped clock is correct twice a day, the random denial of fundamental constitutional rights in a nation of 300 million people would be bound to deprive a few individuals of rights that could be denied them for appropriate, substantive reasons. But that does not leave the responsible, law abiding majority of the people without recourse against arbitrary deprivation of their fundamental rights.

CONCLUSION

The Second Amendment plainly secures a right to carry handguns for self-defense. New York has opted to regulate this right by allowing the licensed carrying of concealed handguns. It follows that such licensing must satisfy constitutional standards.

The "proper cause" requirement of N.Y. Penal Law § 400.00(2)(f) is a classic form of unconstitutional prior restraint, conditioning the exercise of a fundamental right upon a licensing official's unbridled discretion. Alternatively, the "proper cause" requirement fails to satisfy any means-ends level of scrutiny appropriate to the security of fundamental rights, as Defendants have no interest in preventing the

exercise of constitutional rights—regardless of their opinions as to the right's utility—and they cannot predict when someone might need to exercise their right of self-defense.

The judgment below should be reversed, and the case remanded with instructions to enter summary judgment for Plaintiffs.

Dated: November 9, 2011     Respectfully Submitted,

Alan Gura
GURA & POSSESSKY, PLLC
101 N. Columbus Street, Suite 405
Alexandria, VA 22314
703.835.9085/703.997.7665
alan@gurapossessky.com

By: /s/ Alan Gura
Alan Gura

Counsel for Appellants

CERTIFICATE OF COMPLIANCE
TYPE-VOLUME LIMITATIONS, TYPEFACE REQUIREMENTS,
AND TYPE STYLE REQUIREMENTS

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 12,911 words, excluding the parts of the brief excluded by Fed. R. App. P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in proportionately spaced typeface using WordPerfect X4 in 14 point Century Schoolbook font.

/s/ Alan Gura_____
Alan Gura
Counsel for Appellants

Dated: November 9, 2011

# CERTIFICATE OF SERVICE

On this, the 9th day of November, 2011, I served the foregoing Brief by electronically filing it with the Court's CM/ECF system, which generated a Notice of Filing and effects service upon counsel for all parties in the case.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this the 9th day of November, 2011

/s/ Alan Gura
Alan Gura

SPECIAL APPENDIX

SPECIAL APPENDIX

TABLE OF CONTENTS

District Court Opinion and Order [80]. . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

District Court Judgment [81]. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

U.S. Const. amend. II. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

N.Y. Penal Law § 265.00(10). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

N.Y. Penal Law § 265.01(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

N.Y. Penal Law § 265.03. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

N.Y. Penal Law § 265.20. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

N.Y. Penal Law § 400.00. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

N.Y. Penal Law § 400.01. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------------------x
ALAN KACHALSKY, CHRISTINA NIKOLOV, ERIC
DETMER, JOHNNIE NANCE, ANNA MARCUCCI-NANCE,
and SECOND AMENDMENT FOUNDATION, INC.,

                              Plaintiffs,

                                                           **OPINION AND ORDER**

          - against -
                                                            No. 10-CV-5413 (CS)

SUSAN CACACE, JEFFREY A. COHEN, ALBERT
LORENZO, ROBERT K. HOLDMAN, and COUNTY OF
WESTCHESTER,

                              Defendants.
--------------------------------------------------------------------------x

<u>Appearances:</u>

Alan Gura
Gura & Possessky, PLLC
Alexandria, Virginia
Vincent Gelardi
Gelardi & Randazzo LLP
Rye Brook, New York
*Counsel for Plaintiffs*

Anthony Tomari
Monica Connell
New York State Office of the Attorney General
New York, New York
*Counsel for Defendants Susan Cacace, Jeffrey A. Cohen, Albert Lorenzo & Robert K. Holdman*

Melissa-Jean Rotini
Westchester County Attorney's Office
White Plains, New York
*Counsel for Defendant County of Westchester*

Seibel, J.

Before the Court are the Motion to Dismiss of Defendants Susan Cacace, Jeffrey A. Cohen, Albert Lorenzo, and Robert K. Holdman (the "State Defendants"), (Doc. 30);[1] the Motion to Dismiss of Defendant County of Westchester (the "County"), (Doc. 33); the Motion for Summary Judgment of Plaintiffs Alan Kachalsky, Christina Nikolov, Eric Detmer, Johnnie Nance, Anna Marcucci-Nance, (together, the "Individual Plaintiffs"), and Second Amendment Foundation, Inc. ("SAF"), (Doc. 39); and the State Defendants' Cross-Motion for Summary Judgment, (Doc. 42).

## I.    BACKGROUND

For purposes of deciding the Motions to Dismiss, I assume the facts (but not the conclusions) as alleged in the First Amended Complaint to be true, and for purposes of deciding the Motion and Cross-Motion for Summary Judgment, the following facts are undisputed, except where noted.

The instant case presents a facial and as-applied constitutional challenge to New York Penal Law ("NYPL") Section 400.00(2)(f), which provides that licenses to "have and carry concealed" handguns "shall be issued" to "any person when proper cause exists for the issuance thereof." Plaintiffs claim that the statute violates their rights under the Second Amendment to the U.S. Constitution as recognized in the Supreme Court case *District of Columbia v. Heller*, 554 U.S. 570 (2008), and made applicable to the states in *McDonald v. City of Chicago*, 130 S.

---

[1]    The original Complaint, filed on July 15, 2010 by Alan Kachalsky, Christina Nikolov, and Second Amendment Foundation, Inc., named only Cacace, Cohen, and the County of Westchester as defendants.  (Doc. 1.)  Cacace and Cohen served a motion to dismiss on November 9, 2010, (Docs. 30–32), and, after the remaining parties were added pursuant in the First Amended Complaint ("FAC"), (Doc. 18), joined Lorenzo and Holdman in submitting supplemental materials moving to dismiss the First Amended Complaint, (Docs. 17, 34–35). The Court therefore treats the State Defendants' motion as a motion to dismiss the First Amended Complaint.

Ct. 3020 (2010).  To give proper context to Plaintiffs' claims, a brief description of New York's handgun licensing scheme is warranted.

A.    **New York's Handgun Licensing Scheme**

The NYPL provides for the licensed possession of handguns in New York State.  Article 265 of the NYPL imposes a general ban on the possession of firearms, *see* N.Y. Penal Law § 265.01(1), which includes handguns, *id.* § 265.00(3)(a), but creates various specific exemptions from that ban, *see id.* § 265.20, including "[p]ossession of a pistol or revolver by a person to whom a license therefor has been issued as provided under [NYPL] section 400.00,"[2] *id.* § 265.20(3); *see Matter of O'Connor v. Scarpino*, 83 N.Y.2d 919, 920 (1994) (§ 400.00 "is the exclusive statutory mechanism for the licensing of firearms in New York State").  Section 400.00(1) sets out the eligibility requirements for handgun permit applicants and provides, generally, that applicants must:  be at least twenty-one years of age; be of good moral character; not have been convicted of a felony or a serious offense; not have suffered any mental illness or been confined to an institution for such illness; not have had a handgun license previously revoked or been the subject of a family court order; not exhibit "good cause . . . for the denial of the license"; and, for applicants in Westchester County, have "successfully completed a firearms safety course and test."  N.Y. Penal Law § 400.00(1).  Section 400.00(2) sets out the various types of licenses available, providing that "[a] license for a pistol or revolver . . . shall be issued" under various circumstances, including, for example, to "have and possess in his dwelling by a householder," to "have and possess in his place of business by a merchant or storekeeper," and to

---

[2]    The licensing exemption under Section 400.00 does not, however, preclude a conviction for knowing possession of a handgun on school grounds, in a school building, or on a school bus. N.Y. Penal Law §§ 265.20(3), 265.01(3).  Other exemptions under Section 265.20 include possession by military and law enforcement officers, as well as conditional possession of various firearms for hunting purposes and at shooting ranges.  *See, e.g.*, *id.* § 265.20(1)(a)–(d), (4), (7).

"have and carry concealed" by various city and state judges, bank or express messengers, and corrections officers.  *Id.* § 400.00(2)(a)–(e).

The provision at issue in this case is Section 400.00(2)(f), which provides that a license "shall be issued to . . . have and carry concealed, without regard to employment or place of possession, by any person when proper cause exists for the issuance thereof."  *Id.* § 400.00(2)(f). There is no provision for a license to carry an unconcealed weapon, so for applicants who want to carry a weapon and do not fit in one of the occupational categories, the only way to obtain a license to carry a handgun—whether openly or not—is to meet the requirements, including "proper cause," of the licensing provision for concealed weapons.  Though not defined in the NYPL, the term "proper cause" as used in Section 400.00(2)(f) has been interpreted by New York state courts to mean "a special need for self-protection distinguishable from that of the general community or of persons engaged in the same profession."  *Bando v. Sullivan*, 735 N.Y.S.2d 660, 662 (3d Dep't 2002) (internal quotation marks omitted); *Kaplan v. Bratton*, 673 N.Y.S.2d 66, 68 (1st Dep't 1998) (internal quotation marks omitted); *Williams v. Bratton*, 656 N.Y.S.2d 626, 627 (1st Dep't 1997) (internal quotation marks omitted); *Klenosky v. N.Y. City Police Dep't*, 428 N.Y.S.2d 256, 257 (1st Dep't 1980), *aff'd*, 53 N.Y.2d 685 (1981); *see Bach v. Pataki*, 408 F.3d 75, 80 (2d Cir. 2005).

The application process for licenses under Section 400.00(2)(f), often called "full-carry permits," is administered locally.  *See* N.Y. Penal Law § 400.00(3)–(4).  Applications for full-carry permits in Westchester County request information concerning, for example, discharge from employment or the armed forces for cause, criminal history, treatment for alcoholism or drug use, history of mental illness, previous firearm licenses, and physical conditions that could interfere with safe and proper use of a handgun.  (State Defs.' 56.1 ¶¶ 16–17; Pls.' Resp. 56.1 ¶¶

16–17.)[3]  An applicant must also provide four references to attest to his or her good moral character.  (State Defs.' 56.1 ¶ 16; Pls.' Resp. 56.1 ¶ 16.)  Applications are submitted to the Pistol Licensing Unit of the Westchester County Department of Public Safety for investigation consistent with NYPL Section 400.00(4).  (State Defs.' 56.1 ¶¶ 15, 18; Pls.' Resp. 56.1 ¶¶ 15, 18.)  *See* N.Y. Penal Law § 400.00(4) (outlining investigatory procedures).  As part of this investigation, the Pistol Licensing Unit reviews the information provided and conducts a series of background checks with the New York State Department of Criminal Justice Services, the Federal Bureau of Investigation, the National Instant Criminal Background system, and the New York State Department of Mental Hygiene.  (State Defs.' 56.1 ¶¶ 18–20; Pls.' Resp. 56.1 ¶¶ 18–20.)

Once the investigation is complete, an investigation summary is compiled and, along with the application, submitted to a County Police lieutenant, the Chief Inspector of Administrative Services, and the Commissioner or a Deputy Commissioner for review.  (State Defs.' 56.1 ¶ 21; Pls.' Resp. 56.1 ¶ 21.)  Based upon that review, the Chief Inspector and Commissioner or Deputy Commissioner generate a recommendation as to whether the full-carry permit should be approved or disapproved, (*see, e.g.*, Pls.' MSJ Exs. C, E, G),[4] and the file is submitted to a state licensing officer[5] for a final determination, (State Defs.' 56.1 ¶ 22; Pls.' Resp. 56.1 ¶ 22).  Licensing officers have considerable discretion in deciding whether to grant a license

---

[3]  "State Defs.' 56.1" refers to State Defendants' Statement of Undisputed Material Facts in Support of State Defendants' Motion for Summary Judgment.  (Doc. 44, at 16–36.)  "Pls.' Resp. 56.1" refers to Plaintiffs' Separate Statement of Disputed Material Facts in Opposition to Individual Defendants' Motion for Summary Judgment.  (Doc. 47-1.)

[4]  "Pls.' MSJ" refers to Plaintiffs' Notice of Motion for Summary Judgment.  (Doc. 39.)

[5]  Except for New York City and Suffolk County, a "licensing officer" is defined as a "judge or justice of a court of record having his office in the county of issuance."  N.Y. Penal Law § 265.00(10).

application, *see, e.g.*, *Vale v. Eidens*, 735 N.Y.S.2d 650, 652 (3d Dep't 2002); *Kaplan*, 673

N.Y.S.2d at 68; *Fromson v. Nelson*, 577 N.Y.S.2d 417, 417 (2d Dep't 1991); *Marlow v. Buckley*,

482 N.Y.S.2d 183, 184 (4th Dep't 1984), particularly in determining whether an applicant has

demonstrated "proper cause" under Section 400.00(2)(f), *see Bach*, 408 F.3d at 79–80 & n.8, and

their decisions will not be disturbed unless determined to be arbitrary and capricious, *O'Brien v.*

*Keegan*, 87 N.Y.2d 436, 439–40 (1996).

### B.     The Parties

Individual Plaintiffs are all United States citizens who reside in Westchester County.

(State Defs.' 56.1 ¶¶ 1–5; Pls.' Resp. 56.1 ¶¶ 1–5.)  Plaintiff SAF is a non-profit membership

organization incorporated under the laws of the State of Washington, with its principal place of

business in Bellevue, Washington.  (State Defs.' 56.1 ¶ 6; Pls.' Resp. 56.1 ¶ 6.)  It claims to have

over 650,000 members and supporters nationwide, including in Westchester County, to engage

in education, research, publishing, and legal action focusing on the Second Amendment, and to

expend resources encouraging the exercise of the right to bear arms, as well as advising and

educating its members, supporters, and the general public about policies relating to the public

carrying of handguns in New York.  (Pls.' 56.1 ¶¶ 25–26.)[6]  The State Defendants are judges on

various courts within the New York State Unified Court System and, at the times of Individual

---

[6]      "Pls.' 56.1" refers to Plaintiffs' Separate Statement of Undisputed Material Facts in
Support of Plaintiffs' Motion for Summary Judgment.  (Doc. 41.)  The State Defendants state
that they lack information sufficient to admit or deny these facts, as Plaintiffs moved for
summary judgment prior to discovery.  (State Defendants' Response to Plaintiffs' Statement of
Undisputed Material Facts in Support of Plaintiffs' Motion for Summary Judgment ("State
Defs.' Resp. 56.1") (Doc. 44, at 1–15), ¶¶ 25–26.)

Plaintiffs' full-carry permit applications, described below, served as handgun licensing officers

under NYPL Section 265.00(10).[7]  (State Defs.' 56.1 ¶¶ 7–10; Pls.' Resp. 56.1 ¶¶ 7–10.)

### C.    Plaintiffs' Permit Applications

In May 2008, Plaintiff Kachalsky applied for a full-carry permit to be able to carry a

concealed handgun while in public.  (State Defs.' 56.1 ¶ 25; Pls.' Resp. 56.1 ¶ 25.)  In his

application, Kachalsky asserted that he believed he satisfied Section 400.00(2)(f)'s "proper

cause" requirement because he was a U.S. citizen and therefore entitled to "the right to bear

arms" under the Second Amendment, "we live in a world where sporadic random violence might

at any moment place one in a position where one needs to defend oneself or possibly others," and

he was "a law-abiding citizen" who had neither "been convicted of a crime" nor "assaulted or

threatened to assault another person."  (State Defs.' 56.1 ¶ 26; Pls.' Resp. 56.1 ¶ 26.)  Upon

reviewing Kachalsky's application and completing a corresponding investigation, the

Department of Public Safety recommended that the permit be denied.  (State Defs.' 56.1 ¶ 27;

Pls.' Resp. 56.1 ¶ 27.)  The application, investigation file, and recommendation were forwarded

to Defendant Cacace, who, acting as licensing officer, reviewed those materials and issued a

decision and order, dated October 8, 2008, denying Kachalsky's application.  (State Defs.' 56.1

¶¶ 28–29; Pls.' Resp. 56.1 ¶¶ 28–29.)  Cacace observed that Kachalsky failed to state "any facts

which would demonstrate a need for self protection distinguishable from that of the general

---

[7]       Cacace serves as a Judge on the County Court in Westchester County.  (State Defs.' 56.1 ¶ 7; Pls.' Resp. 56.1 ¶ 7.)  Cohen currently serves as a Justice on the New York State Supreme Court, Appellate Division, Second Department, and, at the time of the relevant licensing decision described herein, served as a Judge on the County Court in Westchester County.  (State Defs.' 56.1 ¶ 8; Pls.' Resp. 56.1 ¶ 8.)  Lorenzo serves as an Acting Justice for the New York State Supreme Court, Westchester County. (State Defs.' 56.1 ¶ 9; Pls.' Resp. 56.1 ¶ 9.)  Holdman currently serves as Justice for the New York State Supreme Court, Bronx County, and, at the time of the relevant licensing decision described herein, served as Justice for the New York State Supreme Court, Westchester County. (State Defs.' 56.1 ¶ 10; Pls.' Resp. 56.1 ¶ 10.)

public," and that "based upon all the facts and circumstances of this application, it is my opinion that proper cause does not exist for the issuance of an unrestricted 'full carry' pistol license." State Defs.' 56.1 ¶ 30; Pls.' Resp. 56.1 ¶ 30.)

On February 6, 2009, Kachalsky filed a petition under Article 78 of the New York Civil Practice Law and Rules with the New York State Supreme Court, Appellate Division, Second Department, appealing his permit denial.  (State Defs.' 56.1 ¶ 31; Pls.' Resp. 56.1 ¶ 31; Tomari Decl. Ex. L.)[8]  By Order dated September 8, 2009, the Appellate Division affirmed the denial, holding that Kachalsky "failed to demonstrate 'proper cause' for the issuance of a 'full carry' permit.  Accordingly, the respondent's determination was not arbitrary or capricious and should not be disturbed."  *Kachalsky v. Cacace*, 884 N.Y.S.2d 877, 877 (2d Dep't 2009).  Kachalsky thereafter sought leave to appeal to the New York State Court of Appeals, (State Defs.' 56.1 ¶ 32; Pls.' Resp. 56.1 ¶ 32), but on February 16, 2010, the court dismissed his appeal *sua sponte* "upon the ground that no substantial constitutional question [was] directly involved," *Kachalsky v. Cacace* ("*Kachalsky II*"), 14 N.Y.3d 743, 743 (2010).

In March 2009, Plaintiff Nikolov applied for a full-carry permit.  (State Defs.' 56.1 ¶ 35; Pls.' Resp. 56.1 ¶ 35.)  In her application, Nikolov asserted that she believed she satisfied Section 400.00(2)(f)'s "proper cause" requirement because  she was a "law-abiding citizen," she possessed a concealed weapon permit in the State of Florida and had neither brandished nor discharged her weapon outside of shooting ranges there, she had completed three firearms safety courses with the National Rifle Association within the previous three years, her experience as a pilot and flight instructor gave her the "calm demeanor . . . essential when either involved in or a witness to a potentially dangerous situation," and she was a transgender female subject to a

---

[8]     "Tomari Decl." refers to the Declaration of Anthony J. Tomari, submitted in support of State Defendants' Cross-Motion for Summary Judgment.  (Docs. 49, 51, 65, 66.)

higher likelihood of being the victim of violence.   (State Defs.' 56.1 ¶ 36; Pls.' Resp. 56.1 ¶ 36.)

Upon reviewing Nikolov's application and completing a corresponding investigation, the

Department of Public Safety recommended that the permit be denied.  (State Defs.' 56.1 ¶ 37;

Pls.' Resp. 56.1 ¶ 37.)  The application, investigation file, and recommendation were forwarded

to Defendant Cohen, who, acting as licensing officer, reviewed those materials and issued a

decision and order, dated October 2, 2008, denying Nikolov's application.  (State Defs.' 56.1 ¶¶

38–39; Pls.' Resp. 56.1 ¶¶ 38–39.)  Cohen observed that "[c]onspicuously absent" from

Nikolov's application "is the report of any type of threat to her own safety," and

"notwithstanding her accomplishments and unblemished record, it cannot be said that the

applicant has demonstrated that she has a special need for self-protection distinguishable from

that of the general public."  (State Defs.' 56.1 ¶ 39; Pls.' Resp. 56.1 ¶ 39; *see* Tomari Decl. Ex.

O.)

    In June 2010, Plaintiff Nance applied for a full-carry permit.  (State Defs.' 56.1 ¶ 47;

Pls.' Resp. 56.1 ¶ 47.)  At that time, Nance was licensed to have a handgun for the purpose of

target shooting only.  (State Defs.' 56.1 ¶ 46; Pls.' Resp. 56.1 ¶ 46.)  In his application, Nance

asserted that he believed he satisfied Section 400.00(2)(f)'s "proper cause" requirement because

he was a "citizen in good standing in the community," he was "steadily employed and stable," he

was "of good moral character," and the permit would facilitate his efforts to become involved

with competitive shooting and gun safety instruction.  (State Defs.' 56.1 ¶ 48; Pls.' Resp. 56.1 ¶

48.)  Upon reviewing Nance's application and completing a corresponding investigation, the

Department of Public Safety recommended that the permit be denied.  (State Defs.' 56.1 ¶ 49;

Pls.' Resp. 56.1 ¶ 49.)  The application, investigation file, and recommendation were forwarded

to Defendant Holdman, who, acting as licensing officer, reviewed those materials and issued a

decision, dated September 9, 2010, denying Nance's application.  (State Defs.' 56.1 ¶ 50; Pls.' Resp. 56.1 ¶ 50.)  Holdman observed that Nance had "not provided the court with any information that he faces any danger of any kind that would necessitate the issuance of a full carry firearm license; [and had not] demonstrated a need for self-protection distinguishable from that of the general public or of other persons similarly situated."  (State Defs.' 56.1 ¶ 53; Pls.' Resp. 56.1 ¶ 53.)

As with Nance, in June 2010, Plaintiff Marcucci-Nance applied to amend her pistol permit from a target-shooting permit to a full-carry permit.  (State Defs.' 56.1 ¶¶ 54–55; Pls.' Resp. 56.1 ¶¶ 54–55.)  In her application, she cited the same reasons as Nance for why she believed she satisfied Section 400.00(2)(f)'s "proper cause" requirement, (State Defs.' 56.1 ¶ 56; Pls.' Resp. 56.1 ¶ 56), and her application was similarly addressed:  after an investigation, the Department of Public Safety recommended denial, and Holdman, to whom the application materials were forwarded, denied the application on September 9, 2010, citing the same concerns as he did with respect to Nance.  (State Defs.' 56.1 ¶¶ 57–60; Pls.' Resp. 56.1 ¶¶ 57–60.)

Finally, in July 2010, Plaintiff Detmer applied for a full-carry permit.  (State Defs.' 56.1 ¶ 41; Pls.' Resp. 56.1 ¶ 41.)  Like Nance and Marcucci-Nance, Detmer was at that time licensed to have a handgun for the purpose of target shooting only.  (State Defs.' 56.1 ¶ 40; Pls.' Resp. 56.1 ¶ 40.)  In his application, Detmer asserted that he believed he satisfied Section 400.00(2)(f)'s "proper cause" requirement because he was a federal law enforcement officer with the U.S. Coast Guard who, while on duty, regularly carried a .40-caliber pistol, and, as part of his training, had completed various courses concerning the use of his pistol.  (State Defs.' 56.1 ¶ 42; Pls.' Resp. 56.1 ¶ 42.)  The Department of Public Safety reviewed Detmer's application, conducted its investigation, recommended denial, and subsequently forwarded the file to

Defendant Lorenzo, who, acting as licensing officer, reviewed those materials and denied the application.  (State Defs.' 56.1 ¶¶ 44–45; Pls.' Resp. 56.1 ¶¶ 44–45.)  Lorenzo informed Detmer of this decision by letter dated September 27, 2010, in which he noted simply that there was "no justification" for issuing a full-carry permit.  (State Defs.' 56.1 ¶ 45; Pls.' Resp. 56.1 ¶ 45.)

Individual Plaintiffs state that they have not re-applied for full-carry permits because they believe such acts would be futile, and that they would carry handguns in public but for their fear of arrest, prosecution, fine, and/or imprisonment.  (Kachalsky Decl. ¶¶ 3–4; Nikolov Decl. ¶¶ 3–4; Nance Decl. ¶¶ 5–6; Marcucci-Nance Decl. ¶¶ 5–6; Detmer Decl. ¶¶ 6–7.)[9]

### D.     Plaintiffs' Claims

As late as 2005, the Second Circuit, in rejecting a constitutional challenge to New York's handgun licensing scheme, held that the "Second Amendment's 'right to keep and bear arms' imposes a limitation on only federal, not state, legislative efforts."  *Bach*, 408 F.3d at 84.  Three years after that, in 2008, the Supreme Court issued its watershed decision *District of Columbia v. Heller*,[10] in which it undertook an exhaustive review of the text and history of the Second Amendment and concluded for the first time that the Second Amendment conferred an individual, as opposed to collective, right to keep and bear arms.  554 U.S. at 595.  The question before the Court in *Heller* was the constitutionality of several District of Columbia statutes that generally prohibited the possession of handguns and required any other lawful firearms in the home to be inoperable—*i.e.*, unloaded and disassembled or bound by a trigger lock or similar

---

[9]      "Kachalsky Decl." refers to the Declaration of Alan Kachalsky.  (Doc. 39-9.)  "Nikolov Decl." refers to the Declaration of Christina Nikolov.  (Doc. 39-12.)  "Nance Decl." refers to the Declaration of Johnnie Nance.  (Doc. 39-13.)  "Marcucci-Nance Decl." refers to the Declaration of Anna Marcucci-Nance.  (Doc. 39-10.)  "Detmer Decl." refers to the Declaration of Eric Detmer.  (Doc. 39-11.)

[10]     *Heller* is discussed in greater detail below; it is mentioned here only to place Plaintiffs' claims in jurisprudential context.

device.  *Id.* at 574–75.  The Court held that the "ban on handgun possession in the home violates the Second Amendment, as does [the] prohibition against rendering any lawful firearm in the home operable for the purpose of immediate self-defense."  *Id.* at 635.  Two years later, in *McDonald v. City of Chicago*, the Supreme Court held that the Fourteenth Amendment's Due Process Clause incorporates the Second Amendment right recognized in *Heller*, thereby extending that right as against the states.  130 S. Ct. at 3050.

On July 15, 2010, less than a month after the Supreme Court issued its decision in *McDonald*, Kachalsky, Nikolov, and SAF filed the Complaint in the instant action.  (Doc. 1.)  On November 8, 2010, they joined Detmer, Nance, and Marcucci-Nance in filing a First Amended Complaint ("FAC"), (Doc. 18), the operative complaint for the purposes of the instant motions.  In it, Plaintiffs assert claims under 42 U.S.C. § 1983 ("Section 1983") for violations of the Second Amendment and the Equal Protection Clause of the Fourteenth Amendment.  Specifically, they claim that Section 400.00(2)(f)'s "proper cause" requirement violates the Second Amendment both facially and as applied to them, and that it classifies individuals on the basis of "irrelevant, arbitrary, and speculative criteria in the exercise of a fundamental right."  (FAC ¶¶ 41, 43.)  Plaintiffs seek to enjoin enforcement of Section 400.00(2)(f)'s "proper cause" requirement, as well as an order directing Defendants to issue Plaintiffs permits, declaratory relief consistent with the requested injunctive relief, costs, and fees.  (*Id.* at 11.)  Defendants filed Motions to Dismiss the First Amended Complaint, (Docs. 30, 33); Plaintiffs filed a Motion for Summary Judgment, (Doc. 39); and the State Defendants filed a Cross-Motion for Summary Judgment, (Doc. 42).

## II.   DISCUSSION

### A.   Motions to Dismiss

Defendants' Motions to Dismiss largely concern threshold issues.  As such, I consider these motions first.  While Defendants briefly touch upon the question of Section 400.00(2)(f)'s constitutionality in these motions, they address that issue in far greater detail in briefing submitted in connection with the Motion and Cross-Motion for Summary Judgment.  I therefore consider Defendants' constitutional arguments in conjunction with those motions.

### 1.    Legal Standards

Defendants bring their Motions to Dismiss under Federal Rules of Civil Procedure 12(b)(1), for lack of subject matter jurisdiction, and 12(b)(6), for failure to state a claim.

### a.    Rule 12(b)(1)

"A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000).  "A plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists." *Id.*  Defendants argue that the Court lacks subject matter jurisdiction because Plaintiffs lack standing and the case is not ripe for adjudication.  I discuss the individual standards for those doctrines below.

### b.    Rule 12(b)(6)

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*  "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief

requires more than labels and conclusions, and a formulaic recitation of the elements of a cause

of action will not do."  *Twombly*, 550 U.S. at 555 (alteration, citations, and internal quotation

marks omitted).  While Federal Rule of Civil Procedure 8 "marks a notable and generous

departure from the hyper-technical, code-pleading regime of a prior era, . . . it does not unlock

the doors of discovery for a plaintiff armed with nothing more than conclusions."  *Iqbal*, 129 S.

Ct. at 1950.

In considering whether a complaint states a claim upon which relief can be granted, the

court may "begin by identifying pleadings that, because they are no more than conclusions, are

not entitled to the assumption of truth," and then determine whether the remaining well-pleaded

factual allegations, accepted as true, "plausibly give rise to an entitlement to relief."  *Id.*

Deciding whether a complaint states a plausible claim for relief is "a context-specific task that

requires the reviewing court to draw on its judicial experience and common sense."  *Id.*

"[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of

misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to

relief.'"  *Id.* (second alteration in original) (quoting Fed. R. Civ. P. 8(a)(2)).

### c.      Documents the Court May Consider

When deciding a motion to dismiss, the Court is entitled to consider the following:

(1) facts alleged in the complaint and documents attached to it or incorporated in
it by reference, (2) documents "integral" to the complaint and relied upon in it,
even if not attached or incorporated by reference, (3) documents or information
contained in [a] defendant's motion papers if plaintiff has knowledge or
possession of the material and relied on it in framing the complaint, (4) public
disclosure documents required by law to be, and that have been, filed with the
Securities and Exchange Commission, and (5) facts of which judicial notice may
properly be taken under Rule 201 of the Federal Rules of Evidence.

*Weiss v. Inc. Vill. of Sag Harbor*, 762 F. Supp. 2d 560, 567 (E.D.N.Y. 2011) (internal quotation

marks omitted); *accord Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152–53 (2d Cir. 2002).  A

document is considered "integral" to the complaint where the plaintiff has "reli[ed] on the terms and effect of [the] document in drafting the complaint." *Chambers*, 282 F.3d at 153 (emphasis omitted).  Such reliance "is a necessary prerequisite to the court's consideration of the document on a dismissal motion; mere notice or possession is not enough." *Id*.  If a document outside of the complaint is to form the basis for dismissal, however, two requirements must be met in addition to the requirement that the document be "integral" to the complaint:  (1) "it must be clear on the record that no dispute exists regarding the authenticity or accuracy of the document"; and (2) "[i]t must also be clear that there exist no material disputed issues of fact regarding the relevance of the document." *Faulkner v. Beer*, 463 F.3d 130, 134 (2d Cir. 2006).

      2.      **Analysis**

          a.      **Standing and Ripeness**

             i.      **Standards**

Article III, Section 2 of the U.S. Constitution restricts federal court jurisdiction to "Cases" and "Controversies."  U.S. Const. art. III, § 2; *Vt. Right to Life Comm., Inc. v. Sorrell*, 221 F.3d 376, 381 (2d Cir. 2000).  "Constitutional standing is the threshold question in every federal case, determining the power of the court to entertain the suit." *Leibovitz v. N.Y. City Transit Auth.*, 252 F.3d 179, 184 (2d Cir. 2001) (internal quotation marks omitted).  To establish standing within the meaning of Article III,

> first, the plaintiffs "must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical."  Second, "there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly . . . trace[able] to the challenged action of the defendant, and not . . . the result [of] the independent action of some third party not before the court."  Third, "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."  Moreover, the "party invoking federal jurisdiction bears the burden of establishing these elements."

*Field Day, LLC v. Cnty. of Suffolk*, 463 F.3d 167, 175 (2d Cir. 2006) (alterations in original) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)).

The ripeness doctrine "is drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction."  *Nat'l Park Hospitality Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003) (internal quotation marks omitted).  Its purpose is to "ensure that a dispute has generated injury significant enough to satisfy the case or controversy requirement of Article III" and "prevent[] a federal court from entangling itself in abstract disagreements over matters that are premature for review because the injury is merely speculative and may never occur."  *Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals*, 282 F.3d 83, 90 (2d Cir. 2002).  In determining whether a claim that challenges a law is ripe for review, the Court must consider whether the issue is fit for adjudication as well as the hardship to the plaintiff that would result from withholding review.  *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967), *overruled on other grounds*, *Califano v. Sanders*, 430 U.S. 99 (1977); *Marchi v. Bd. of Coop. Educ. Servs.*, 173 F.3d 469, 478 (2d Cir. 1999).  "Standing and ripeness are closely related doctrines that overlap 'most notably in the shared requirement that the [plaintiff's] injury be imminent rather than conjectural or hypothetical.'"  *N.Y. Civil Liberties Union v. Grandeau*, 528 F.3d 122, 130 n.8 (2d Cir. 2008) (second alteration in original) (quoting *Brooklyn Legal Servs. Corp. v. Legal Servs. Corp.*, 462 F.3d 219, 225 (2d Cir. 2006)).

### ii.        Individual Plaintiffs

With respect to Individual Plaintiffs, Defendants' arguments as to standing and ripeness are essentially one and the same:  they argue that because Kachalsky and Nikolov failed to apply for full-carry permits post-*McDonald*, and because Detmer, Nance, and Marcucci-Nance's claims precede any state court ruling interpreting New York's "proper cause" requirement post-

*McDonald*, their purported injuries are speculative.  That is, they argue that Individual Plaintiffs'

injuries have not yet manifested themselves in post-*McDonald* permit denials and/or adverse

court rulings.  I therefore consider the ripeness arguments together with and as a part of the

standing inquiry.  *See, e.g.*, *Grandeau*, 528 F.3d at 130 n.8; *Brooklyn Legal Servs.*, 462 F.3d at

225–26.  I find that Plaintiffs have standing and that their claims are ripe.

 "As a general rule, 'to establish standing to challenge an allegedly unconstitutional

policy, a plaintiff must submit to the challenged policy.'"  *Prayze FM v. FCC*, 214 F.3d 245, 251

(2d Cir. 2000) (quoting *Jackson-Bey v. Hanslmaier*, 115 F.3d 1091, 1096 (2d Cir. 1997)); *see*

*Bach v. Pataki*, 289 F. Supp. 2d 217, 223 (N.D.N.Y. 2003) ("In many cases, requiring litigants to

actually apply for a license before challenging a licensing scheme prevent[s] courts, through

avoidance of premature adjudication, from entangling themselves in abstract disagreements over

administrative policies, and also . . . protect[s] the agencies from judicial interference until an

administrative decision has been formalized and its effects felt in a concrete way by the

challenging parties.") (alterations in original) (internal quotation marks omitted), *aff'd*, 408 F.3d

75.  Each of the Individual Plaintiffs have submitted to Section 400.00(2)(f), having applied for,

and subsequently been denied, full-carry permits under the statute.  (FAC ¶¶ 26, 30, 32–37.)

Defendants' characterization of Individual Plaintiffs' injuries as "speculative" ignores the plain

fact that these very permit denials constitute actual, ongoing injuries not contingent upon any

future event.  Recent caselaw in the area of handgun regulation is instructive.  Notably, in *Parker*

*v. District of Columbia*, 478 F.3d 370 (D.C. Cir. 2007), *aff'd sub nom. Heller*, 554 U.S. 570, the

D.C. Circuit observed that "a license or permit denial pursuant to a state or federal administrative

scheme [constitutes] an Article III injury," *id.* at 376, and that by dint of the fact that Heller

applied for and was denied a registration certificate to own a firearm, he had standing to

challenge the D.C. firearm registration system:

> Heller has invoked his rights under the Second Amendment to challenge the
> statutory classifications used to bar his ownership of a handgun under D.C. law,
> and the formal process of application and denial, however routine, makes the
> injury to Heller's alleged constitutional interest concrete and particular.  He is not
> asserting that his injury is only a threatened prosecution, nor is he claiming only a
> general right to handgun ownership; he is asserting a right to a registration
> certificate, the denial of which is his distinct injury.

*Id.*

The D.C. Circuit recently reaffirmed this view in *Dearth v. Holder*, 641 F.3d 499 (D.C.

Cir. 2011).  There, the plaintiff, an American citizen who lived in Canada, challenged a federal

regulation prohibiting people living outside the United States from lawfully purchasing firearms

in the United States.  *Id.* at 500–01.  The plaintiff sought to purchase firearms to stow with his

relatives in Ohio, and had twice attempted to purchase firearms but encountered difficulties with

completing the required paperwork asking for his state of residence.  *Id.* at 501.  The court stated,

> We agree with [plaintiff] that the Government has denied him the ability to
> purchase a firearm and he thereby suffers an ongoing injury.  [Plaintiff's] injury is
> indeed like that of the plaintiff in *Parker*, who had standing to challenge the
> District of Columbia's ban on handguns because he had been denied a registration
> certificate to own a handgun.  As we there stated, a license or permit denial
> pursuant to a state or federal administrative scheme that can trench upon
> constitutionally protected interests gives rise to an Article III injury; the formal
> process of application and denial, however routine, suffices to show a cognizable
> injury.

*Id.* at 502 (citations and internal quotation marks omitted).[11]  I find *Parker* and *Dearth*

persuasive.  The State Defendants' denial of the Individual Plaintiffs' permit applications

---

[11]     *Dearth* reversed *Hodgkins v. Holder*—on which Defendants rely in their papers—in
which the district court held that "past refusals of merchants to sell firearms to [plaintiffs] are not
enough, without more, to provide the basis for a[ ] [declaratory judgment] action."  677 F. Supp.
2d 202, 204 (2010).

constitutes an actual and ongoing injury because it forestalls the exercise of their alleged constitutional rights.[12]

Defendants' attempt to shift the focus of this inquiry to future, contingent events in an attempt to describe the purported injuries as "speculative" is unavailing.  Defendants' reliance upon *Golden v. Zwickler*, 394 U.S. 103 (1969), demonstrates how their focus is misplaced.  In that case, the Court determined that a plaintiff seeking to challenge a New York statute criminalizing the distribution of anonymous election campaign literature did not have standing where he sought only to distribute literature criticizing a particular congressman who, at the time the case was heard, had left the House of Representatives to begin a 14-year term on the New York State Supreme Court.  *Id.* at 109–10 & n.4.  The Court held that because "the prospect was neither real nor immediate of a campaign involving the Congressman, it was wholly conjectural that another occasion might arise when [the plaintiff] might be prosecuted for distributing the handbills referred to in the complaint," and his "assertion in his brief that the former Congressman *can be* 'a candidate for Congress again' is hardly a substitute for evidence that this is a prospect of 'immediacy and reality.'"  *Id.* at 109 (emphasis added).  In sharp contrast to *Golden*, there is no contingency here upon which Individual Plaintiffs' injuries are conditioned; Defendants' permit denials have actually prevented—and indeed continue to prevent— Individual Plaintiffs from being able to exercise their alleged constitutional right.  *See Dearth*, 641 F.3d at 503 (distinguishing *Golden* on similar grounds).

Further, Individual Plaintiffs' injuries may not be labeled as speculative, as Defendants argue, simply because they have failed to submit post-*McDonald* applications for full-carry permits.  That state licensing officers might grant Individual Plaintiffs' second full-carry permit

---

[12]    For purposes of the standing inquiry, the Court assumes the validity of Individual Plaintiffs' claims that their rights have been violated.  *See Lujan*, 504 U.S. at 561.

19

applications were they to submit such applications at some point in the future does not suggest

that their current injuries are speculative—at most, it suggests that the *continuation* of their

injuries *past that point* is speculative.  But putting that aside, Defendants' argument is unavailing

in light of the fact that the decisions denying Detmer, Nance, and Marcucci-Nance's applications

were issued after the Court's decision in *McDonald*.  (FAC ¶¶ 33, 35, 37.)  Crucially, the

decisions issued with respect to Nance and Marcucci-Nance reaffirm that in order to meet the

"proper cause" requirement of Section 400.00(2)(f), applicants must demonstrate a "need for self

protection distinguishable from that of the general public," and cite as support the Appellate

Division's decision upholding the October 2008 denial of Kachalsky's full-carry permit

application.  (*Id.* ¶¶ 35, 37; Rotini Decl. Exs. D–E.)[13]  *See Kachalsky*, 884 N.Y.S.2d 877.  These

decisions signal the continued vitality of the "proper cause" requirement as a basis on which

New York handgun licensing officers deny full-carry permit applications, and demonstrate that

were the Individual Plaintiffs to submit new applications post-*McDonald* (for Detmer, Nance,

and Marcucci, their second post-*McDonald* applications; for Kachalsky and Nikolov, their first),

they would be futile.  Individual Plaintiffs cannot be required to engage in a "futile gesture as a

prerequisite for adjudication in federal court."  *Williams v. Lambert*, 46 F.3d 1275, 1280 (2d Cir.

1995); *cf. Bach*, 408 F.3d at 82–83 (plaintiff's failure to apply did not deprive him of standing to

challenge concealed-firearm statute because he did not live or work in New York, as required by

---

[13]     "Rotini Decl." refers to the Declaration of Melissa-Jean Rotini in Support of Motion to
Dismiss Amended Complaint.  (Doc. 33-1.)  I may consider the decisions issued with respect to
Nance and Marcucci-Nance, as they are quoted in the First Amended Complaint.  *See McCarthy
v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007).

the statute, and thus "[i]mposing a filing requirement would force [him] to complete an application for which he is statutorily ineligible").[14]

Nor were Individual Plaintiffs required to bring their post-*McDonald* federal constitutional challenge in state court before resorting to this Court. It is well-settled that "[w]hen federal claims are premised on 42 U.S.C. § 1983 and 28 U.S.C. § 1343(3)—as they are here—[a plaintiff is] not required [to] exhaust[ ] . . . state judicial or administrative remedies." *Steffel v. Thompson*, 415 U.S. 452, 472–73 (1974) (citing *McNeese v. Bd. of Educ.*, 373 U.S. 668 (1963); *see Monroe v. Pape*, 365 U.S. 167 (1961)). This rule reflects "the paramount role Congress has assigned to the federal courts to protect constitutional rights." *Id.* Defendants argue that *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442 (2008), compels a finding that the case is premature for adjudication, but that case does not speak to the situation here, where a plaintiff challenges existing state court interpretations of a state statute in federal court. Instead, in *Washington State Grange*, the petitioners sought to challenge a state ballot initiative that had never before been subject to state review: indeed, "[t]he State ha[d] had no opportunity to implement [the initiative], and its courts ha[d] had no occasion to construe the law in the context of actual disputes . . . , or to accord the law a limiting construction to avoid constitutional questions." *Id.* at 450. And while it is true that a plaintiff may be required to

---

14      Defendants attempt to distinguish *Bach* on the basis that the in-state residency/work requirement there was written into the statute, whereas here the requirement that applicants demonstrate a "need for self protection distinguishable from that of the general public" does not appear in the statute and is instead derived from state courts' interpretation of the phrase "proper cause," (Reply Memorandum of Law in Further Support of the State Defendants' Motion to Dismiss the Complaint, (Doc. 37), at 10), but the distinction is unavailing. Plaintiffs' claims in essence target the "proper cause" requirement, not the interpretation thereof: they argue that the right to carry handguns in public is absolute and that individuals cannot be required to demonstrate proper cause to exercise that purported right—not that "proper cause" should somehow be interpreted differently. In any event, to the extent that the instant case does not comport with *Bach*, the standing analysis remains unaffected, as, unlike *Bach*, the Individual Plaintiffs here actually submitted applications under the relevant handgun statute.

exhaust his or her state appellate remedies when he or she has already initiated a proceeding in state court, that is an issue properly raised not in the context of ripeness or standing, but rather abstention—which I address below.

### iii.      SAF

SAF asserts both organizational and representational standing.  While it is true that organizations can have standing on their own behalf when they have suffered injuries, *see Warth v. Seldin*, 422 U.S. 490, 511 (1975), SAF has not sufficiently alleged an injury.  It maintains that it "promot[es] the exercise of the right to keep and bear arms" and engages in "education, research, publishing and legal action focusing on the [c]onstitutional right to privately own and possess firearms," (FAC ¶ 6), but such activates, standing alone, are plainly insufficient to give rise to standing.  SAF also maintains that it has "over 650,000 members and supporters nationwide."  (*Id.*)  An organization may sue on behalf of its members, but only if  "[(1)] its members would have standing to sue in their own right, [(2)] the interests at stake are germane to the organization's purpose, and [(3)] neither the claim asserted nor the relief requested requires individual members' participation in the lawsuit."  *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000).  SAF cannot meet the first requirement, as it fails to allege anywhere in the First Amended Complaint that it has any members who have applied for and been rejected full-carry permits under Section 400.00(2)(f).  SAF alleges in conclusory fashion that the various Defendants have "enforced the challenged laws, customs and practices against . . . SAF's membership," (FAC ¶¶ 7–11), but it has neither identified particular members who have standing, nor specified how they would have standing to sue in their own right.  It therefore fails to satisfy the first requirement identified above.  *See, e.g.*, *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 235 (1990).

### b.    Abstention

Defendants argue that this Court should abstain from deciding this case under the doctrines laid down in *Younger v. Harris*, 401 U.S. 37 (1971), *Railroad Commission v. Pullman Co.*, 312 U.S. 496 (1941), and/or *Burford v. Sun Oil Co.*, 319 U.S. 315 (1943).  I find that none of these abstention doctrines apply.

### i.    *Younger* Abstention

In *Younger v. Harris*, the Supreme Court held that federal courts must abstain from exercising jurisdiction over federal constitutional claims that involve or call into question ongoing state proceedings.  401 U.S. at 43–44.  "Although the *Younger* abstention doctrine was born in the context of state criminal proceedings, it now applies with equal force to state administrative proceedings."  *Diamond "D" Constr. Corp. v. McGowan*, 282 F.3d 191, 198 (2d Cir. 2002) (citing *Ohio Civil Rights Comm'n v. Dayton Christian Schs., Inc.*, 477 U.S. 619, 627 (1986)).  "*Younger* abstention is required when three conditions are met:  (1) there is an ongoing state proceeding; (2) an important state interest is implicated in that proceeding; and (3) the state proceeding affords the federal plaintiff an adequate opportunity for judicial review of the federal constitutional claims."  *Id.* (citing *Grieve v. Tamerin*, 269 F.3d 149, 152 (2d Cir. 2001)).  "Despite the strong policy in favor of abstention, a federal court may nevertheless intervene in a state proceeding upon a showing of 'bad faith, harassment or any other unusual circumstance that would call for equitable relief.'"  *Id.* (quoting *Younger*, 401 U.S. at 54).

*Younger* abstention does not apply here because there are no ongoing state proceedings.  "The Supreme Court has clearly held that a would-be plaintiff who has been subjected to a state proceeding which he seeks to challenge in federal court must first exhaust all available state appellate remedies . . . ."  *Kirschner v. Klemons*, 225 F.3d 227, 234 (2d Cir. 2000) (citing

*Huffman v. Pursue, Ltd.*, 420 U.S. 592, 608 (1975)).  Here, Kachalsky initiated an Article 78

proceeding in state court to challenge the denial of his full-carry permit application, but he

exhausted all available state court remedies, appealing the Appellate Division's decision to the

New York Court of Appeals, where his appeal was summarily dismissed.  *See Kachalsky II*, 14

N.Y.3d at 743.  Once the Court of Appeals dismissed Kachalsky's appeal, there ceased to be an

ongoing state proceeding with which lower federal courts were capable of interfering.  *See, e.g.*,

*Aretakis v. Comm. on Prof'l Standards*, No. 08-9712, 2009 WL 1905077, at *5 (S.D.N.Y. July 1,

2009) (where New York Court of Appeals denied plaintiff's application for leave to appeal

Appellate Division's order suspending his license to practice law, court held that "no 'pending

state proceeding' exists, and the *Younger* abstention doctrine cannot be applied"); *Ponterio v.

Kaye*, No. 06-6289, 2007 WL 141053, at *6 (S.D.N.Y. Jan. 22, 2007) ("[Plaintiff] has litigated

and lost his state claims up to the New York Court of Appeals.  As *Younger* requires, he appears

to have exhausted his state-court remedies.").

    Nor are there any ongoing state proceedings with respect to the remaining Individual

Plaintiffs, as none of them commenced state court proceedings to challenge the denial of their

full carry permit applications.  *See Coastal Distribution, LLC v. Town of Babylon*, 216 F. App'x

97, 102 (2d Cir. 2007) (where plaintiff did not challenge zoning board of appeals' decision via an

Article 78 proceeding, *Younger* did not apply; caselaw "gives no support to the proposition that

the availability of an Article 78 action *after* the completion of state administrative proceedings

renders them ongoing perpetually").

ii.      *Pullman* Abstention

*Pullman* abstention applies when "difficult and unsettled questions of state law must be resolved before a substantial federal constitutional question can be decided."  *Haw. Hous. Auth. v. Midkiff*, 467 U.S. 229, 236 (1984).  In the Second Circuit,

> [t]hree basic conditions must be present to trigger *Pullman* abstention:  "First, the state statute must be unclear or the issue of state law uncertain; second, resolution of the federal issue must depend upon the interpretation given to the ambiguous state provision; and third, the state law must be susceptible of an interpretation that would avoid or modify the federal constitutional issue."

*Williams v. Lambert*, 46 F.3d 1275, 1281 (2d Cir. 1995) (internal quotation marks omitted). Abstention under this doctrine is limited to uncertain questions of state law because "[a]bstention from the exercise of federal jurisdiction is the exception, not the rule."  *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 813 (1976).  In fact, even when the three conditions specified above are fulfilled, the court is "not required to abstain, and, to the contrary, important federal rights can outweigh the interests underlying the *Pullman* doctrine."  *Hartford Courant Co. v. Pellegrino*, 380 F.3d 83, 100 (2d Cir. 2005) (internal quotation marks omitted). Moreover, "abstention should not be ordered merely to await an attempt to vindicate the claim in a state court."  *Wisconsin v. Constantineau*, 400 U.S. 433, 439 (1971).

As noted above, courts in New York have consistently interpreted Section 400.00(2)(f)'s "proper cause" requirement to mean "a special need for self-protection distinguishable from that of the general community or of persons engaged in the same profession."  *See, e.g.*, *Bando*, 735 N.Y.S.2d at 662; *Kaplan*, 673 N.Y.S.2d at 68; *Williams*, 656 N.Y.S.2d at 627; *Klenosky*, 428 N.Y.S.2d at 257.  Where, as here, state courts have settled upon an interpretation of the statute at issue, *Pullman* abstention is not warranted.  *See, e.g.*, *Commack Self-Service Kosher Meats v. Rubin*, 986 F. Supp. 153, 157–58 (E.D.N.Y. 1997) (*Pullman* abstention not applicable "[b]ecause there exist[ed] a well established interpretation of the . . . [l]aws by the New York state courts,

and because the constitutional challenges raised by plaintiffs [were] not entangled in a skein of

state law that must be untangled before the federal case can proceed") (internal quotation marks

omitted).

### iii.        *Burford* Abstention

The *Burford* abstention doctrine serves to "protect[ ] complex state administrative

processes from undue federal interference."  *New Orleans Pub. Serv., Inc. v. Council of New

Orleans*, 491 U.S. 350, 362 (1989) (internal quotation marks omitted).  It does not, however,

"require abstention whenever there exists such a process, or even in all cases where there is a

potential for conflict with state regulatory law or policy."  *Id.* (internal quotation marks omitted).

A federal court should abstain under *Burford*

> (1) when there are difficult questions of state law bearing on policy problems of
> substantial public import whose importance transcends the result in the case then
> at bar; or (2) where the exercise of federal review of the question in a case and in
> similar cases would be disruptive of state efforts to establish a coherent policy
> with respect to a matter of substantial public concern.

*Id.* at 361 (internal quotation marks omitted); *accord Dittmer v. Cnty. of Suffolk*, 146 F.3d 113,

116 (2d Cir. 1998).  In evaluating whether the exercise of federal review would be disruptive of

state efforts to establish a coherent policy, district courts should consider "(1) the degree of

specificity of the state regulatory scheme; (2) the need to give one or another debatable

construction to a state statute; and (3) whether the subject matter of the litigation is traditionally

one of state concern."  *Hachamovitch v. DeBuono*, 159 F.3d 687, 697 (2d Cir. 1998).

*Burford* abstention does not apply here because Plaintiffs' claims do not present an

"ambiguous state law issue," and do not seek to "involve federal courts in supervising,

interrupting, or meddling in state policies by interfering in state regulatory matters"; instead, the

claims present "a direct challenge to the constitutionality of a state statute, a controversy federal

courts are particularly suited to adjudicate." *Alliance of Am. Insurers v. Cuomo*, 854 F.2d 591,

600–01 (2d Cir. 1988) (declining, on same grounds, to apply *Burford* abstention to constitutional

challenge to provision of New York Medical and Dental Malpractice and Professional Conduct

Act imposing moratorium on medical malpractice insolvencies and authorizing stabilization of

rates for medical malpractice coverage).  Though not binding on this Court, particularly

instructive is a recent case from the District of Maryland, *Wollard v. Sheridan*, No. 10-2068,

2010 WL 5463109 (D. Md. Dec. 29, 2010), in which the court declined to abstain from passing

on the constitutionality of a nearly identical statute—namely, a state law requiring that applicants

for full-carry handgun licenses demonstrate "good and substantial reason to wear, carry, or

transport a handgun, such as a finding that the permit is necessary as a reasonable precaution

against apprehended danger." *Id.* at *1.  The court held that neither of the two grounds for

*Burford* abstention was applicable because

> Maryland appellate courts have repeatedly examined and interpreted the statute at
> issue in this case, and there is no reason to believe this case will present a new
> question of state law. . . . In addition, where, as here, a plaintiff "launches a *facial*
> attack on [a] state statute [ ] *as a whole*" abstention on the second ground is not
> appropriate because the potential relief—an injunction barring the enforcement of
> the statute—"could not possibly threaten [the statute's] *uniform* application."

*Id.* at *5 n.6 (quoting *Martin v. Stewart*, 499 F.3d 360, 367 (4th Cir. 2007)) (second, third, and

fourth alterations, and emphases in original) (citations omitted).  That rationale applies with

equal force here and compels rejection of Defendants' arguments as to *Pullman* abstention.

<strong>c.    <em>Res Judicata</em></strong>

Defendants argue that Kachalsky's Article 78 proceeding and the State Defendants'

rejection of Individual Plaintiff's permit applications have claim preclusive effect on the Section

1983 claims currently before this Court.  A federal court assessing the effect of a state court

judgment looks to the law of the state in which the judgment was entered, *Marrese v. Am. Acad.*

27
SPECIAL APPX. 27

*of Orthopedic Surgeons*, 470 U.S. 373, 380 (1985), here, New York.  Under New York's *res judicata* doctrine,

> a party may not litigate a claim where a judgment on the merits exists from a prior action between the same parties involving the same subject matter.  The rule applies not only to claims actually litigated but also to claims that could have been raised in the prior litigation. . . . Additionally, . . . once a claim is brought to a final conclusion, all other claims arising out of the same transaction or series of transactions are barred, even if based upon different theories or if seeking a different remedy.

*In re Hunter*, 4 N.Y.3d 260, 269 (2005) (citations and internal quotation marks omitted).

I find that Kachalsky's Article 78 proceeding does not bar him from bringing the instant as-applied and facial challenges to Section 400.00(2)(f).  Whether a claim that was not raised in the previous action could have been raised therein "depends in part on . . . 'whether the facts essential to support the second were present in the first.'"  *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 287 (2d Cir. 2002) (emphasis and internal quotation marks omitted).  Consequently, *res judicata* "does not preclude litigation of events arising after the filing of the complaint that formed the basis of the first lawsuit."  *Curtis v. Citibank, N.A.*, 226 F.3d 133, 139 (2d Cir. 2000).  Similarly, "[m]odifications in controlling legal principles could render a previous determination inconsistent with prevailing doctrine, and changed circumstances may sufficiently alter the factual predicate such that new as-applied claims would not be barred by the original judgment" on *res judicata* grounds.  *Monahan v. N.Y. City Dep't of Corr.*, 214 F.3d 275, 290 (2d Cir. 2000) (citations and internal quotation marks omitted).  Kachalsky's constitutional challenges are based on *McDonald*'s application of the Second Amendment, as discussed in *Heller*, to the states.  At the time of Kachalsky's Article 78 proceeding, however, the prevailing law was that Second Amendment did not apply to the states.  *See Bach*, 408 F.3d at 84 (New York's handgun licensing scheme did not infringe plaintiff's Second Amendment "right to keep

and bear arms," which "imposes a limitation on only federal, not state, legislative efforts").  He therefore could not have based his prior proceeding on the Second Amendment's applicability to the states, and, because of that, his constitutional challenges are not precluded.  *See, e.g.*, *Bronx Household of Faith v. Bd. of Educ.*, 226 F. Supp. 2d 401, 412 (S.D.N.Y. 2002) ("[T]he Supreme Court has cast doubt upon the Court of Appeals' majority opinion . . . .  Because there has been a change in the law, another look at the situation is justified.  Concomitantly, the change in the law is sufficiently serious to reject defendants' assertion that plaintiff's preliminary injunction motion should be denied on the grounds of res judicata or collateral estoppel."), *aff'd*, 331 F.3d 342 (2d Cir. 2003).

Nor are the claims brought by Nikolov, Detmer, Nance, and Marcucci-Nance precluded because their applications for full-carry permits were denied.  *Res judicata* applies to "give conclusive effect to the quasi-judicial determinations of administrative agencies, when rendered pursuant to the adjudicatory authority of an agency to decide cases brought before its tribunals employing procedures substantially similar to those used in a court of law."  *Ryan v. N.Y. Tel. Co.*, 62 N.Y.2d 494, 499 (1984) (citations omitted).  A review of relevant authority and the materials submitted in connection with the Motions to Dismiss, however, does not support the conclusion that the procedures for applying for a full-carry permit in any way resemble those used in a court of law, *see Shapiro v. N.Y. City Police Dep't*, 595 N.Y.S.2d 864, 867 (Sup. Ct. N.Y. Cnty. 1993) (only reference to judicial hearing in New York gun licensing regulations is in connection with suspension and revocation procedures), and, in any event, even were the State Defendants' actions to qualify as quasi-judicial, Individual Plaintiffs neither raised, nor had the opportunity to raise, arguments regarding the constitutionality of Section 400.00(2)(f) in

submitting to the State Defendants their applications for full-carry permits.  *See generally*

Tomari Decl. Exs. G–J (Nikolov, Detmer, Nance, and Marcucci-Nance's permit applications).[15]

### d.    *Rooker-Feldman* **Doctrine**

Finally, Defendants argue that Kachalsky's claims are barred by the *Rooker-Feldman*

doctrine.  *Rooker-Feldman* is a limited doctrine aimed at "cases brought by state-court losers

complaining of injuries caused by state-court judgments rendered before the district court

proceedings commenced and inviting district court review of those judgments."  *McKithen v.*

*Brown*, 626 F.3d 143, 154 (2d Cir. 2010) (internal quotation marks omitted).

> *Rooker-Feldman* directs federal courts to abstain from considering claims when
> four requirements are met:  (1) the plaintiff lost in state court, (2) the plaintiff
> complains of injuries caused by the state court judgment, (3) the plaintiff invites
> district court review of that judgment, and (4) the state court judgment was
> entered before the plaintiff's federal suit commenced.

*Id.*  At a minimum, Defendants' argument fails because Kachalsky does not complain that he

was injured by the state court judgment—*i.e.*, by the decision rendered in the Article 78

proceeding—but rather that he was injured by Section 400.00(2)(f) and by Cacace's

interpretation of the statute and application of it to Kachalsky in denying his application for a

full-carry permit.  *See Skinner v. Switzer*, 131 S. Ct. 1289, 1298 (2011) ("[Petitioner] does not

challenge the adverse [Texas Court of Criminal Appeals] decisions themselves; instead, he

targets as unconstitutional the Texas statute they authoritatively construed. . . . [A] state-court

decision is not reviewable by lower federal courts, but a statute or rule governing the decision

---

[15]     The Court may consider the permit applications in deciding the Motions to Dismiss, as
the applications are discussed in the First Amendment Complaint, (FAC ¶¶ 30, 32, 34, 36), and
incorporated by reference therein.  *See, e.g.*, *Webster v. Wells Fargo Bank, N.A.*, No. 08-10145,
2009 WL 5178654, at *12 n.8 (S.D.N.Y. Dec. 23, 2009) (loan application discussed in complaint
and thereby incorporated by reference).

may be challenged in a federal action.  [Petitioner's] federal case falls within the latter

category.") (footnote omitted).  *Rooker-Feldman* therefore does not bar Kachalsky's claims.

### e.        County as a Proper Party

In its Motion to Dismiss, the County puts forth the separate argument that it is not a

proper party to this lawsuit because it does not effectuate the grant or denial of full-carry permits

and plays a limited role in the permitting process under applicable state law.  The County notes

that, although county law enforcement conducts the investigations that grow out of full-carry

permit applications, the state's licensing officers (here, the State Defendants) make independent

and ultimate determinations regarding such applications.  As such, they argue, Plaintiffs have

failed to allege that they were denied any constitutional right by the County, as required by

Section 1983.  *See Dove v. Fordham Univ.*, 56 F. Supp. 2d 330, 336 (S.D.N.Y. 1999) ("In order

to hold a municipality liable as a 'person' within the meaning of § 1983, [a plaintiff] must

establish that the municipality itself was somehow at fault.").  In response, Plaintiffs note that

defendants sued under Section 1983 are "responsible for the natural consequences of [their]

actions," and "may be held liable for those consequences attributable to reasonably foreseeable

intervening forces, including the acts of third parties."  *Kerman v. City of N.Y.*, 374 F.3d 93, 126

(2d Cir. 2004) (alteration in original) (internal quotation marks omitted).  Here, Plaintiffs argue,

it was reasonably foreseeable that the State Defendants would heed County law enforcement's

recommendations to deny Plaintiffs' full-carry permit applications, and that this is sufficient to

make the County a proper party.

In light of the disposition below, I need not decide whether the County is a proper party

and assume for the sake of argument that it is.  I now turn to the question of the as-applied and

facial constitutionality of Section 400.00(2)(f), which I address in the context of  Plaintiffs'

Motion for Summary Judgment and State Defendants' Cross-Motion for Summary Judgment.

### B.      Motion and Cross-Motion for Summary Judgment

#### 1.      Legal Standard

Summary judgment is appropriate when "the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56(a).  "[T]he dispute about a material fact is 'genuine' . . . if the evidence is such that

a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby,*

*Inc.*, 477 U.S. 242, 248 (1986).  A fact is "material" if it "might affect the outcome of the suit

under the governing law . . . .  Factual disputes that are irrelevant or unnecessary will not be

counted."  *Id.*  On a motion for summary judgment, "[t]he evidence of the non-movant is to be

believed, and all justifiable inferences are to be drawn in [her] favor."  *Id.* at 255.  The movant

bears the initial burden of demonstrating the absence of a genuine issue of material fact, and, if

satisfied, the burden then shifts to the non-movant to present evidence sufficient to satisfy every

element of the claim.  *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008) (citing *Celotex*

*Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986)).  "The mere existence of a scintilla of evidence in

support of the [non-movant's] position will be insufficient; there must be evidence on which the

jury could reasonably find for the [non-movant]."  *Anderson*, 477 U.S. at 252.  Moreover, the

non-movant "must do more than simply show that there is some metaphysical doubt as to the

material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986),

and she "may not rely on conclusory allegations or unsubstantiated speculation," *Fujitsu Ltd. v.*

*Fed. Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001) (internal quotation marks omitted).

"A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials . . . ."  Fed. R. Civ. P. 56(c)(1)(A).  Where, as here, affidavits are used to support or oppose the motion, they "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant . . . is competent to testify on the matters stated."  Fed. R. Civ. P. 56(c)(4); *see Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 310 (2d Cir. 2008).

### 2.      Second Amendment Claim

Plaintiffs claim that Section 400.00(2)(f) violates the Second Amendment, which reads, "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."  U.S. Const. amend. II.  An evaluation of Plaintiffs' claim must necessarily start with a discussion of the Second Amendment right as recognized in *Heller*.

### a.      *Heller* and the Scope of the Second Amendment

As noted above, *Heller* resolved the long-standing question as to whether the Second Amendment guarantees an individual right to keep and bear arms or merely a collective right to do so in connection with service in a militia, holding that "[t]here seems to us no doubt, on the basis of both text and history, that the Second Amendment conferred an individual right to keep and bear arms."  554 U.S. at 595.  The Court observed that, like the First and Fourth Amendments, the Second Amendment "codified a pre-existing right," *id.* at 592 (emphasis omitted), and that the amendment's prefatory clause, while not restricting the scope of the right, did "announce[] the purpose for which the right was codified:  to prevent elimination of the

militia," *id.* at 599.  The Court warned, however, that "[t]he prefatory clause does not suggest

that preserving the militia was the only reason Americans valued the ancient right; most

undoubtedly thought it even more important for self-defense and hunting"—even going so far as

to refer to individual self-defense as the "central component" of the right.  *Id.* (emphasis

omitted).

As so many courts considering statutory challenges post-*Heller* have observed, the *Heller*

Court, while not setting the outer bounds of the Second Amendment, explicitly stated that "[l]ike

most rights, the right secured by the Second Amendment is not unlimited."  *Id.* at 626.  Crucially,

the Court observed, "From Blackstone through the 19th-century cases, commentators and courts

routinely explained that the right was not a right to keep and carry any weapon whatsoever in

any manner whatsoever and for whatever purpose."  *Id.* (citations omitted).  For example, the

Court stated, "the majority of the 19th-century courts to consider the question held that

prohibitions on carrying concealed weapons were lawful under the Second Amendment or state

analogues," and

> nothing in our opinion should be taken to cast doubt on longstanding prohibitions
> on the possession of firearms by felons and the mentally ill, or laws forbidding the
> carrying of firearms in sensitive places such as schools and government buildings,
> or laws imposing conditions and qualifications on the commercial sale of arms.

*Id.* at 626–27 (emphasis added).  And as a footnote to this statement, the Court specified that it

was "identify[ing] these presumptively lawful regulatory measures only as examples," and that

the "list does not purport to be exhaustive."  *Id.* at 627 n.26.[16]

---

[16]     The Court reiterated this point in *McDonald*:

> It is important to keep in mind that *Heller*, while striking down a law that
> prohibited the possession of handguns in the home, recognized that the right to
> keep and bear arms is not "a right to keep and carry any weapon whatsoever in
> any manner whatsoever and for whatever purpose."  We made it clear in *Heller*
> that our holding did not cast doubt on such longstanding regulatory measures as

What very clearly did not fall within the ambit of presumptively lawful gun regulations were the District of Columbia's statutes banning the possession of handguns in the home and requiring that other lawful firearms be inoperable.  The Court observed that "[t]he Constitution leaves the District of Columbia a variety of tools for combating [the] problem [of handgun violence], including some measures regulating handguns," "[b]ut the enshrinement of constitutional rights necessarily takes certain policy choices off the table. . . . includ[ing] the absolute prohibition of handguns held and used *for self-defense in the home*."  *Id.* at 636 (emphasis added).

This emphasis on the Second Amendment's protection of the right to keep and bear arms for the purpose of "self-defense in the home" permeates the Court's decision and forms the basis for its holding—which, despite the Court's broad analysis of the Second Amendment's text and historical underpinnings, is actually quite narrow.  For example, in considering the statutes at issue there, the Court noted that their prohibitions "extend[ ] . . . to the home, where the need for defense of self, family, and property is most acute."  *Id.* at 628.  It discussed the several reasons why citizens might prefer handguns for "home defense," concluding that "handguns are the most popular weapon chosen by Americans for self-defense in the home, and a complete prohibition of their use is invalid."  *Id.* at 629.  In considering the Second Amendment's scope, the Court stated, "whatever else it leaves to future evaluation, it surely elevates above all other interests the

---

"prohibitions on the possession of firearms by felons and the mentally ill," "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms."  We repeat those assurances here. Despite municipal respondents' doomsday proclamations, incorporation does not imperil every law regulating firearms.

130 S. Ct. at 3047 (citations omitted).  "[S]tate and local experimentation with reasonable firearms regulations," it observed, "will continue under the Second Amendment."  *Id.* at. 3046 (internal quotation marks omitted).

right of law-abiding, responsible citizens to use arms in defense of hearth and home." *Id.* at 635.

The Court limited its holding as follows:  "[W]e hold that the District's ban on handgun

possession in the home violates the Second Amendment, as does its prohibition against rendering

any lawful firearm in the home operable for the purpose of immediate self-defense." *Id.* at 635.[17]

### b.    Relationship Between Section 400.00(2)(f) and the Second Amendment Right Recognized in *Heller*

The scope of the right guaranteed by the Second Amendment was not the only matter the

Court left undefined in *Heller*; it also declined to articulate the level of scrutiny that applies to

claims, such as Plaintiffs', challenging the constitutionality of statutes under the Second

Amendment.  Instead, the Court found that "[u]nder any of the standards of scrutiny that we have

applied to enumerated constitutional rights," the District's regulations "would fail constitutional

muster." *Id.* at 628–29.  The Court did, however, rule out rational-basis review,[18] observing that

"[i]f all that was required to overcome the right to keep and bear arms was a rational basis, the

Second Amendment would be redundant with the separate constitutional prohibitions on

irrational laws, and would have no effect." *Id.* at 628 n.27.  It also rejected the "interest-

balancing" approach for which Justice Breyer advocated in dissent.[19] *Id.* at 634–35 ("We know

of no other enumerated constitutional right whose core protection has been subjected to a

freestanding 'interest-balancing' approach.  The very enumeration of the right takes out of the

---

[17]    It has since repeated:  "In *Heller*, we held that the Second Amendment protects the right to possess a handgun in the home for the purpose of self-defense." *McDonald*, 130 S. Ct. at 3050.

[18]    To pass rational-basis review, a law must be rationally related to a legitimate state interest.  *City of Cleburne v. Cleburne Living Ctr.,* 473 U.S. 432, 440 (1985).

[19]    Justice Breyer's test would have courts ask "'whether the statute burdens a protected interest in a way or to an extent that is out of proportion to the statute's salutary effects upon other important governmental interests.'"  *Heller*, 554 U.S. at 634 (quoting *id.* at 689–90 (Breyer, J., dissenting)).

36

hands of government—even the Third Branch of Government—the power to decide on a case-by-case basis whether the right is *really worth* insisting upon."); *see, e.g.*, *Osterweil v. Bartlett*, No. 09-825, 2011 WL 1983340, at *7 (N.D.N.Y. May 20, 2011) (noting *Heller* ruled out rational basis review and the interest-balancing approach); *Peruta v. Cnty. of San Diego*, 758 F. Supp. 2d 1106, 1115 (S.D. Cal. 2010) (same).  Beyond that, however, *Heller* provided no explicit guidance regarding what test should be applied.

Unsurprisingly, the parties in this case advocate for the application of different tests (while arguing, alternatively, that their arguments succeed under *any* level of scrutiny). Defendants argue, first, that Section 400.00(2)(f) does not implicate a right protected under the Second Amendment and that the inquiry must end there; alternately, they argue that if means-ends scrutiny must be applied to the statute, the Court should employ either intermediate scrutiny or reasonableness review.[20]  (State Defs.' Mem. at 12–32.)  Plaintiffs urge the Court to apply strict scrutiny.[21]  (Pls.' Mem. at 19–24.)[22]

Given the lack of a clear directive from the Supreme Court, lower courts have devised a range of approaches to constitutional challenges under the Second Amendment post-*Heller*.  *See*

---

[20]    To pass intermediate scrutiny, a law must be substantially related to an important governmental interest.  *Clark v. Jeter*, 486 U.S. 456, 461 (1988).  As Defendants explain, to pass reasonableness review (a standard located somewhere between rational basis review and intermediate scrutiny) a court must "consider whether the challenged statute is a reasonable limitation of the right to bear arms."  (Memorandum in Support of State Defendants' Cross-Motion for Summary Judgment and in Opposition to Plaintiffs' Motion for Summary Judgment ("State Defs.' Mem."), (Doc. 43), at 20 n.13.)  *Amicus* Brady Center to Prevent Gun Violence (the "Brady Center") also advocates for reasonableness review.  (Amended Brief of *Amicus Curiae* Brady Center to Prevent Gun Violence, (Doc. 24-1), at 15–23.)

[21]    To pass strict scrutiny, a law must be narrowly tailored to serve a compelling governmental interest.  *Abrams v. Johnson*, 521 U.S. 74, 91 (1997).

[22]    "Pls.' Mem." refers to the Memorandum of Points and Authorities in Support of Plaintiffs' Motion for Summary Judgment.  (Doc. 40.)

*Heller v. District of Columbia* ("*Heller II*"), 698 F. Supp. 2d 179, 185–86 (D.D.C. 2010)

(surveying various approaches).  There is much support for Defendants' implicit argument that

before determining the level of scrutiny to be applied, the court must first determine whether the

statute at issue implicates a Second Amendment right as articulated in *Heller*.  As the Third

Circuit has held,

> As we read *Heller*, it suggests a two-pronged approach to Second Amendment
> challenges.  First, we ask whether the challenged law imposes a burden on
> conduct falling within the scope of the Second Amendment's guarantee.  If it does
> not, our inquiry is complete.  If it does, we evaluate the law under some form of
> means-end scrutiny.  If the law passes muster under that standard, it is
> constitutional.  If it fails, it is invalid.

*United States v. Marzzarella*, 614 F.3d 85, 89 (3rd Cir. 2010) (citation and footnote omitted);

*accord, e.g.*, *United States v. Chester*, 628 F.3d 673, 680 (4th Cir. 2010); *United States v. Reese*,

627 F.3d 792, 800–01 (10th Cir. 2010); *United States v. Skoien*, 614 F.3d 638, 639–43 (7th Cir.

2010); *Heller II*, 698 F. Supp. 2d at 188.  Defendants argue that the scope of the Second

Amendment right in *Heller* does not extend to invalidate regulations, such as Section

400.00(2)(f), on carrying handguns.  I agree.

     As explained above, the language of *Heller* makes clear that the Court recognized "not a

right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever

purpose," 554 U.S. at 626, but rather a much narrower right—namely the "right of law-abiding,

responsible citizens to use arms in defense of hearth and home," *id.* at 635.  Indeed, *Heller*

"warns readers not to treat [it] as containing broader holdings than the Court set out to establish:

that the Second Amendment creates individual rights, one of which is keeping operable

handguns at home for self-defense." *Skoien*, 614 F.3d at 640.  In identifying limitations on the

right secured by the Second Amendment, the Court explicitly stated that "the majority of the

19th-century courts to consider the question held that prohibitions on carrying concealed

weapons were lawful under the Second Amendment or state analogues."  554 U.S. at 626.

Various cases read this limiting language as removing modern-day concealed carry regulations

from the ambit of Second Amendment protection.  The district court in *Dorr v. Weber*, 741 F.

Supp. 2d 993 (N.D. Iowa 2010), for example, adopted this view in considering a qualified

immunity defense presented by a sheriff who denied concealed weapons permits to plaintiff

applicants.  As the court there observed, *Heller*'s limiting language makes clear that the Supreme

Court did not disturb its prior ruling in *Robertson v. Baldwin*, 165 U.S. 275 (1897), where it

"recognized that the Second Amendment right to keep and bear arms is not infringed by laws

prohibiting the carrying of concealed weapons."  *Dorr*, 741 F. Supp. 2d at 1005 (citing

*Robertson*, 165 U.S. at 281–82).[23]  The *Dorr* court observed that the plaintiffs in that case failed

to "direct[] the court's attention to any contrary authority recognizing a right to carry a concealed

weapon under the Second Amendment and the court's own research efforts . . . revealed none."

*Id.*  Accordingly, it concluded, "a right to carry a concealed weapon under the Second

Amendment has not been recognized to date."  *Id.*; *see also People v. Flores*, 86 Cal. Rptr. 3d

804, 808 (Ct. App. 2008) (citing *Robertson* and *Heller* in holding that "[g]iven this implicit

approval [in *Heller*] of concealed firearm prohibitions, we cannot read *Heller* to have altered the

courts' longstanding understanding that such prohibitions are constitutional"); *Mack v. United

States*, 6 A.3d 1224, 1236 (D.C. 2010) (citing *Robertson* and *Heller* and noting "it simply is not

obvious that the Second Amendment secures a right to carry a concealed weapon").

Various other courts have seized upon this language in *Heller* in concluding that

concealed weapons bans and regulations are constitutional under the Second Amendment.  *See,*

---

[23]     *Heller* cited to *Robertson*, but only for the proposition that "the Second Amendment was
not intended to lay down a 'novel principl[e]' but rather codified a right 'inherited from our
English ancestors.'"  554 U.S. at 599 (alteration in original) (quoting *Robertson*, 165 U.S. at
281).

*e.g.*, *United States v. Hart*, 726 F. Supp. 2d 56, 60 (D. Mass. 2010) (rejecting defendant's motion to suppress firearm and ammunition recovered by police during *Terry* stop, and citing *Heller* language quoted above in holding that "*Heller* does not hold, nor even suggest, that concealed weapons laws are unconstitutional. . . . Therefore, it was not a violation of [defendant's] Second Amendment rights to stop him on the basis of the suspicion of a concealed weapon."); *Swait v. Univ. of Neb.*, No. 08-404, 2008 WL 5083245, at *3 (D. Neb. Nov. 25, 2008) (rejecting plaintiff's challenge to fine for concealed weapon possession and citing to *Heller* for principle that "[S]tates can prohibit the carrying of a concealed weapon without violating the Second Amendment"); *United States v. Hall*, No. 08-006, 2008 WL 3097558, at *1 (S.D.W.Va. Aug. 4, 2008) (denying motion to suppress and citing *Heller* in concluding "that the prohibition, as in West Virginia, on the carrying of a concealed weapon without a permit, continues to be a lawful exercise by the state of its regulatory authority notwithstanding the Second Amendment"); *State v. Knight*, 218 P.3d 1177, 1190 (Kan. Ct. App. 2009) ("[T]he *Heller* Court specifically mentioned prohibitions on concealed firearms in the sentence before its list of presumptively lawful prohibitions.  The *Heller* Court began the paragraph stating that 'the right secured by the Second Amendment is not unlimited' and, two sentences later, noted prohibitions on carrying concealed firearms as an example.  This clearly shows that the *Heller* Court considered concealed firearms prohibitions to be presumptively constitutional under the Second Amendment.") (citations omitted).[24]

---

[24]     *See also* Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self Defense:  An Analytical Framework and a Research Agenda*, 56 UCLA L. Rev. 1443, 1523–24 (2009) ("For over 150 years, the right to bear arms has generally been seen as limited in its scope to exclude concealed carry.  Constitutional provisions enacted after this consensus emerged were likely enacted in reliance on that understanding.  If *Heller* is correct to read the Second Amendment in light of post-enactment tradition and not just Founding-era original meaning, this

Plaintiffs' attempts to cast *Heller* as creating a broader Second Amendment right implicating Section 400.00(2)(f) are unavailing.  Plaintiffs cite first to the Court's textual analysis of the phrase "keep and bear arms," (Pls.' Mem. at 8), wherein the Court stated that the phrase should be read as meaning "'wear, bear, or carry . . . upon the person or in the clothing or in a pocket, for the purpose . . . of being armed and ready for offensive or defensive action in a case of conflict with another person,'" *Heller*, 554 U.S. at 584 (alteration in original) (quoting *Muscarello v. United States*, 524 U.S. 125, 143 (1998)).  This textual interpretation does not stand on its own, however, but rather appears within the context of, and is provided solely to support, the Court's holding that the Second Amendment gives rise to an individual right, rather than a collective right connected to service in a militia.  Indeed, the Court concludes that same paragraph by observing that the phrase "keep and bear arms" "in no way connotes participation in a structured military organization."  *Id.*  Nor does this textual interpretation somehow expand the Court's holding, as such a reading overlooks the opinion's pervasive limiting language discussed above.  *See, e.g.*, *People v. Dawson*, 934 N.E.2d 598, 605 (Ill. App. Ct. 2010) ("The specific limitations in *Heller* and *McDonald* applying only to a ban on handgun possession in a home cannot be overcome by defendant's pointing to the *Heller* majority's discussion of the natural meaning of 'bear arms' including wearing or carrying upon the person or in clothing."), *cert. denied*, 131 S. Ct. 2880 (2011).

Plaintiffs also point to various nineteenth-century state court cases that they claim demonstrate that state concealed carry bans are constitutional only where the state provides for unconcealed, or open, carry as well.  (Pls.' Mem. at 10–11.)  Those cases' holdings, however, seem not to be premised on the existence of open carry provisions specifically, but rather on the

---

exclusion of concealed carry would be part of the Second Amendment's scope as well.")
(citations omitted).

existence of provisions for some other means of carry generally; in other words, they suggest that such statutes would fail to pass muster only if functioning as complete bans to carrying weapons outside the home under any circumstances.  *See, e.g.*, *State v. Reid*, 1 Ala. 612, 1840 WL 229, at *3 (1840) (regulation that amounted to total ban, *i.e.*, "destruction of the right," would be "clearly unconstitutional"); *Nunn v. State*, 1 Ga. 243, 1846 WL 1167, at *5 (1846) (concealed weapons ban valid so long as it does not impair right to bear arms "altogether"); *Andrews v. State*, 50 Tenn. 165, 1871 WL 3579, at *11 (1871) (statute that forbade carrying "without regard to time or place, or circumstances," violated the state right to keep and bear arms); *see also Peruta*, 758 F. Supp. 2d at 1114 ("The *Heller* Court relied on 19th-century cases upholding concealed weapons bans, but in each case, the court upheld the ban because alternative forms of carrying arms were available.").[25]  Neither the NYPL generally, nor Section 400.00(2)(f) specifically, completely bans the carrying of firearms.  As discussed above, the statute provides for carry permits to be issued under several circumstances including, but not limited to, when an applicant can demonstrate proper cause.  As the statute does not operate as a complete ban, the cases are inapposite.

Moreover, other state court cases decided around that same time suggest that bans on carrying guns in both a concealed and open manner are constitutional.  *See, e.g.*, *Fife v. State,* 31 Ark. 455, 1876 WL 1562, at *4 (1876) (upholding statute prohibiting "the carrying, as a weapon, [of] 'any pistol of any kind whatever,'" as a lawful "exercise of the police power of the State without any infringement of the constitutional right" to bear arms); *Aymette v. State*, 21 Tenn.

---

[25]     *But see State v. Chandler*, 5 La. Ann. 489, 1850 WL 3838, at *1 (1850) (law making it a misdemeanor to be "found with a concealed weapon . . . that does not appear in full open view," while "necessary to counteract a vicious state of society, growing out of the habit of carrying concealed weapons," protected right to carry "'in full open view,' which places men upon an equality" and "is the right guaranteed by the Constitution of the United States").

154, 1840 WL 1554, at *4 (1840) ("The Legislature . . . [has] a right to prohibit the wearing or keeping [of] weapons dangerous to the peace and safety of the citizens, and which are not usual in civilized warfare, or would not contribute to the common defence. . . . [A]lthough [the right keep and bear arms for the common defence] must be inviolably preserved, . . . it does not follow that the Legislature is prohibited altogether from passing laws regulating the manner in which these arms may be employed.") (cited in *Heller*, 554 U.S. at 613); *State v. Workman,* 14 S.E. 9, 11 (W. Va. 1891) (upholding conviction for carrying concealed weapon, and observing, "The second amendment of our federal constitution should be constructed with reference to the provisions of the common law upon this subject as they then existed . . . .  As early as the second year of Edward III, a statute was passed prohibiting all persons, whatever their condition, 'to go or ride armed by night or by day.' And so also at common law the 'going around with unusual and dangerous weapons to the terror of the people' was a criminal offense."); *see also Hill v. State,* 53 Ga. 472, 1874 WL 3112, at *2 (1874) ("I have always been at a loss to follow the line of thought that extends the guarantee [of the right to keep and bear arms] to the right to carry pistols . . . and those other weapons of like character, which, as all admit, are the greatest nuisances of our day.").[26]

Finally, Plaintiffs argue that *Heller*'s discussion of the lawful use of arms for hunting demonstrates that the Court's holding is not limited to possession in the home.  (Pls.' Mem. at 12.)  This argument too is unavailing, as hunting does not involve handguns and therefore falls outside the ambit of the challenged statute.  In any event, the NYPL provides for licenses to possess firearms for hunting purposes.  *See, e.g.*, N.Y. Penal Law § 265.20(4).

---

[26]     *See also* John Norton Pomeroy, *An Introduction to the Constitutional Law of the United States* 152–53 (1868) ("The right of the people to keep and bear arms . . . . is certainly not violated by laws forbidding persons to carry dangerous or concealed weapons . . . .") (source cited in *Heller*, 554 U.S. at 618).

Unlike in this case, the bulk of cases that have applied the two-pronged approach to Second Amendment challenges have found, under the first prong, that the challenged law at issue imposed a burden on conduct falling within the amendment's scope because the restrictions in the challenged statute substantially overlapped with the core Second Amendment right articulated in *Heller*—namely the right to use arms for the purpose of self-defense in the home. The clearest, and most frequent, examples are challenges to various sections of the federal Gun Control Act that ban all gun possession by certain categories of individuals (*e.g.*, felons, domestic violence misdemeanants) irrespective of the location of or purpose for such possession. *See, e.g.*, *United States v. Booker*, 644 F.3d 12 (1st Cir. 2011) (considering 18 U.S.C. § 922(g)(9), which bans possession of firearms by a person convicted of a misdemeanor crime of domestic violence); *Chester*, 628 F.3d 673 (same); *Reese*, 627 F.3d 792 (considering 18 U.S.C. § 922(g)(8), which bans possession of firearms while subject to a domestic protection order); *Skoien*, 614 F.3d 638 (18 U.S.C. § 922(g)(9)); *see also Marzzarella*, 614 F.3d 85 (considering 18 U.S.C. § 922(k), which bans possession of firearms with an obliterated serial number).  As such statutes "permanently disarm[] . . . entire category[ies] of persons," *Chester*, 628 F.3d at 680, they *ipso facto* ban possession by such persons in their homes for the purpose of self-defense, and thus clearly raise red flags under *Heller*.[27]  Section 400.00(2)(f), however, does not impose such a broad prohibition.  For all these reasons, the Court rejects Plaintiffs' claims under the first prong of the two-prong analysis described above.

To the extent that Plaintiffs are attacking New York's statutory scheme as precluding open carry—and it is by no means clear that they are, given their concessions that each applied

---

[27]     *See also Ezell v. City of Chicago*, No. 10–3525, 2011 WL 2623511, at \*14–17 (7th Cir. July 6, 2011) (considering level of scrutiny applicable to city ordinance banning firing ranges, after concluding that "[t]he right to possess firearms for protection implies a corresponding right to acquire and maintain proficiency in their use").

"to carry concealed handguns," (Pls.' Resp. 56.1 ¶¶ 25, 35, 41, 47, 55), their focus on Section

400.00(2)(f) in particular, (*see, e.g.*, FAC ¶¶ 22, 41), and their seeming rejection of open carry as

a reasonable alternative to concealed carry, (Pls.' Reply Mem. at 14)[28]—such carrying is

likewise outside the core Second Amendment concern articulated in *Heller*:  self-defense in the

home.  *See, e.g.*, *Moreno v. N.Y. City Police Dep't*, No. 10-6269, 2011 WL 2748652, at *3

(S.D.N.Y. May 7, 2011) (noting "*Heller* has been narrowly construed, as protecting the

individual right to bear arms for the specific purpose of self-defense within the home," and

collecting cases), *report and recommendation adopted*, 2011 WL 2802934 (S.D.N.Y. July 14,

2011); *Osterweil*, 2011 WL 1983340, at *6 (*Heller* "appears to suggest that the core purpose of

the right conferred by the Second Amendment was to allow 'law-abiding, responsible citizens to

use arms in defense of hearth and home'"); *United States v. Tooley*, 717 F. Supp. 2d 580, 596

(S.D.W.Va. 2010) ("[P]ossession of a firearm outside of the home or for purposes other than

self-defense in the home are not within the 'core' of the Second Amendment right as defined by

*Heller*."); *Gonzales v. Vill. of W. Milwaukee*, No. 09-384, 2010 WL 1904977, at *4 (E.D. Wis.

May 11, 2010) (citing *Heller* for the proposition that "[t]he Supreme Court has never held that

the Second Amendment protects the carrying of guns outside the home"); *Heller II*, 698 F. Supp.

2d at 185 (the "core Second Amendment right" is "the right of law-abiding, responsible citizens

to use arms in defense of hearth and home") (internal quotation marks omitted); *United States v.

Masciandaro*, 648 F. Supp. 2d 779, 788 (E.D. Va. 2009) ("[A]lthough *Heller* does not *preclude*

Second Amendment challenges to laws regulating firearm possession outside the home, *Heller*'s

---

[28]        "Pls.' Reply Mem." refers to the Memorandum of Points and Authorities in Opposition to
Defendants' Motion for Summary Judgment and in Reply to Defendants' Opposition to
Plaintiffs' Summary Judgment Motion.  (Doc. 47.)  Also instructive is Kachalsky's Article 78
petition in the state court, in which he exclusively contested his inability to carry a concealed
weapon, and made no mention whatsoever of open carry.  (*See* Tomari Decl. Ex. L ¶¶ 8, 14.)

*dicta* makes pellucidly clear that the Supreme Court's holding should not be read by lower courts

as an invitation to invalidate the existing universe of public weapons regulations.") (emphasis in

original) (footnotes omitted), *aff'd*, 638 F.3d 458 (4th Cir. 2011) ("[A]s we move outside the

home, firearm rights have always been more limited, because public safety interests often

outweigh individual interests in self-defense."); *Beachum v. United States*, 19 A.3d 311, 319

n.11 (D.C. 2011) ("*Heller* does not address, and we have not decided, whether the Second

Amendment protects the possession of handguns for other than defensive use in the home.");

*Knight*, 218 P. 3d at 1189 ("It is clear that the Court [in *Heller*] was drawing a narrow line

regarding the violations related solely to use of a handgun in the home for self-defense

purposes.").

  Although it is admittedly a closer question, given the existence of some nineteenth-

century state court cases upholding the right to carry openly, *see, e.g.*, *Chandler*, 1850 WL 3838,

at *1, according Second Amendment protection to the carrying of an unconcealed weapon

outside the home would certainly go further than *Heller* did, and Defendants have pointed to no

case decided after *Heller* that has done so.  To the contrary, *Williams v. State*, 10 A.3d 1167,

1169–70 (Md. 2011), considered a Maryland statute prohibiting any carrying outside the home

without a permit, which could only be issued if the applicant, among other things, demonstrated

a "good and substantial reason to wear, carry, or transport a handgun."  *Williams* found that

statute to be "outside of the scope of the Second Amendment," *id.* at 1169, because, like New

York's statute, it "permitt[ed] home possession," *id.* at 1178; *see id.* at 1177 ("*Heller* and

*McDonald* emphasize that the Second Amendment is applicable to statutory prohibitions against

home possession, the dicta in *McDonald* that 'the Second Amendment protects a personal right

to keep and bear arms for lawful purposes, most notably for self-defense within the home,'

notwithstanding.  Although [petitioner] attempts to find succor in this dicta, it is clear that

prohibition of firearms in the home was the gravamen of the certiorari questions in both *Heller*

and *McDonald* and their answers.  If the Supreme Court, in this dicta, meant its holding to extend

beyond home possession, it will need to say so more plainly.") (citation omitted).

Similarly, the court in *People v. Dawson* considered a challenge to Illinois's aggravated

unlawful use of a weapon statute, which made it illegal for any person to carry "on or about his

or her person or in any vehicle or concealed on or about his or her person *except when on his or*

*her land or in his or her abode or fixed place of business* any pistol, revolver, . . . or other

firearm."  934 N.E.2d at 604 (emphasis added).  The court determined that the statute, under

which the defendant challenging the law was convicted, was constitutional, as "*Heller*

specifically limited its ruling to interpreting the [Second A]mendment's protection of the right to

possess handguns in the home, not the right to possess handguns outside of the home in case of

confrontation."  *Id.* at 605–06; *see Little v. United States*, 989 A.2d 1096, 1100–01 (D.C. 2010)

(rejecting defendant's Second Amendment challenge to his conviction under D.C. gun statute

because "[i]n *Heller*, the issue was the constitutionality of the District of Columbia's ban on the

possession of usable handguns in the home," and defendant conceded that he was outside of his

home) (internal quotation marks and citation omitted).

In any event, even if the Second Amendment can plausibly be read to protect a right

infringed upon or regulated by Section 400.00(2)(f), the statute passes constitutional muster for

the reasons explained below.

### c.      Section 400.00(2)(f) Passes Constitutional Muster

As noted above, *Heller* left open the question of which form of means-ends scrutiny

applies to evaluate statutes regulating conduct protected by the Second Amendment, ruling out

only rational basis review and an "interest-balancing approach."  Following closely on *Heller*'s

heels, some lower courts adopted a uniform level of scrutiny applicable to all Second

Amendment challenges.  *See, e.g.*, *Heller II*, 698 F. Supp. 2d at 186 (adopting intermediate

scrutiny); *United States v. Engstrum*, 609 F. Supp. 2d 1227, 1231–32 (D. Utah 2009) (adopting

strict scrutiny);[29] *United States v. Miller*, 604 F. Supp. 2d 1162, 1171 (W.D. Tenn. 2009)

(adopting intermediate scrutiny).  Most circuit courts to have (more recently) considered this

question, however, reject a one-size-fits-all framework in favor of a variable approach whereby

the level of scrutiny to be applied is determined on a case-by-case basis depending on the

proximity of the right burdened by the statute at issue to the core Second Amendment right

recognized in *Heller*.  *See, e.g.*, *Ezell*, 2011 WL 2623511, at *13–17; *Booker*, 644 F.3d at 25;

*United States v. Masciandaro*, 638 F.3d 458, 469–71 (4th Cir. 2011); *Reese*, 627 F.3d at 801–02;

---

[29]    *Engstrum* reasoned that strict scrutiny was warranted for the following two reasons:

> First, the *Heller* Court described the right to keep and bear arms as a fundamental
> right that the Second Amendment was intended to protect.  The Tenth Circuit has
> declared that, where fundamental rights are at stake, strict scrutiny is to be
> applied.  Second, the *Heller* Court categorized Second Amendment rights with
> other fundamental rights which are analyzed under strict scrutiny.

609 F. Supp. 2d at 1231–32.  *Engstrum* appears to be the only case post-*Heller* to adopt a one-size-fits-all strict scrutiny approach; indeed, Plaintiffs do not cite to other cases endorsing such an approach, (Pls.' Mem. at 19–24), and the Court is unable to locate any.  The dissenting opinion in *Heller*, and various lower courts to consider the issue post-*Heller*, reject this approach as inconsistent with the *Heller* majority's reference to "presumptively lawful" statutes prohibiting firearm possession by felons, by the mentally ill, or in sensitive places, or imposing conditions and qualifications on the commercial sale of firearms.  *See, e.g.*, *Heller*, 554 U.S. at 688 (Breyer, J., dissenting) ("the majority implicitly, and appropriately, rejects [strict scrutiny] by broadly approving a set of laws . . . whose constitutionality under a strict scrutiny standard would be far from clear"); *Skoien*, 587 F.3d at 812 ("We do not see how the listed laws could be 'presumptively' constitutional if they were subject to strict scrutiny . . . ."); *Heller II*, 698 F. Supp. 2d at 187 ("[A] strict scrutiny standard of review would not square with the majority's references to 'presumptively lawful regulatory measures . . . .'"); *United States v. Marzzarella*, 595 F. Supp. 2d 596, 604 (W.D. Pa. 2009) ("[T]he Court's willingness to presume the validity of several types of gun regulations is arguably inconsistent with the adoption of a strict scrutiny standard of review."), *aff'd*, 614 F.3d 85.

*Marzzarella*, 614 F.3d at 96–98;[30] *see also Osterweil*, 2011 WL 1983340, at *8–10.  This

approach is borrowed from First Amendment jurisprudence.  As the court in *Marzzarella*

explained,

> Whether or not strict scrutiny may apply to particular Second Amendment
> challenges, it is not the case that it must be applied to all Second Amendment
> challenges.  Strict scrutiny does not apply automatically any time an enumerated
> right is involved.  We do not treat First Amendment challenges that way.  Strict
> scrutiny is triggered by content-based restrictions on speech in a public forum, but
> content-neutral time, place, and manner restrictions in a public forum trigger a
> form of intermediate scrutiny.  Regulations on nonmisleading commercial speech
> trigger another form of intermediate scrutiny,[31] whereas disclosure requirements
> for commercial speech trigger a rational basis test.  In sum, the right to free
> speech, an undeniably enumerated fundamental right, is susceptible to several
> standards of scrutiny, depending upon the type of law challenged and the type of
> speech at issue.  We see no reason why the Second Amendment would be any
> different.

*Marzzarella*, 614 F.3d at 96–97 (footnote and citations omitted); *see Ezell*, 2011 WL 2623511, at

*16–17 (analogizing to the different First Amendment standards applied to restrictions on the

content of speech, the "time, place, and manner" of the speech, political speech, adult

bookstores, commercial speech, and the expressive association rights of voters, candidates, and

parties in elections).  I find this analogy persuasive and apply it in determining the proper level

of scrutiny for Section 400.00(2)(f).[32]

---

[30]    *But see Nordyke v. King*, 644 F.3d 776, 784–85 (9th Cir. 2011) (adopting a "substantial
burden framework" similar to that used in abortion cases).

[31]    Such regulations must directly advance a substantial governmental interest and not be
more burdensome than necessary to serve that interest.  *See Cent. Hudson Gas & Elec. Corp. v.
Pub. Serv. Comm'n*, 447 U.S. 557, 566 (1980).

[32]    Plaintiffs argue that because courts have looked to First Amendment jurisprudence as a
guide in developing a standard of analysis for Second Amendment claims, the Court should
import the First Amendment principle of prior restraint and apply it to strike down Section
400.00(2)(f), as the statute accords licensing officers "unbridled discretion" in granting full-carry
permits.  (Pls.' Mem. at 13–18.)  I decline to do so.  While these cases borrow an *analytical
framework*, they do not apply *substantive* First Amendment rules in the Second Amendment
context, and while state licensing officers do have discretion in deciding whether to grant full-

The question, then, is which level of scrutiny applies here.  Strict scrutiny is not

warranted, as, under this approach, it is reserved for "any law that would burden the

'fundamental,' core right of self-defense in the home by a law-abiding citizen."  *Masciandaro*,

638 F.3d at 470.  Section 400.00(2)(f) clearly does not burden that right, as it speaks only to

possession *outside* the home, and, in any event, the NYPL separately provides that gun permits

"shall be issued to . . . have and possess in his dwelling by a householder."  N.Y. Penal Law §

400.00(2)(a).  And while strict scrutiny is too stringent a standard to apply in this instance,

reasonableness review, which Defendants and *Amicus* Brady Center invite the Court to apply, is

too lenient.  Indeed, "[t]he reasonableness test subjects firearms laws to only a marginally more

heightened form of review than rational-basis review."  *Heller II*, 698 F. Supp. 2d at 186

("'[N]early all laws survive the reasonable regulation standard, thus giving wide latitude to

legislatures. . . . Like rational basis, the reasonable regulation standard tends to be, more than

anything else, shorthand for broad judicial deference.'" (quoting Adam Winkler, *Scrutinizing the*

---

carry permits, their discretion is not "unbridled," but is instead constrained by the well-
established judicial construction of the term "proper cause"—which Plaintiffs themselves admit
is a "strict policy," (FAC ¶ 25)—as well as "arbitrary and capricious" review.

   Further to their "unbridled discretion" argument, Plaintiffs argue that licensing officers
enforce Section 400.00(2)(f)'s "proper cause" requirement together with Section 400.00(1)(b)'s
"good moral character" eligibility requirement.  (Pls.' Mem. at 18–19; Pls.' Reply Mem. at 9.)
The State Defendants' decisions denying Plaintiffs' applications, however, suggest the opposite,
as they do not discuss or even refer to the "good moral character" requirement.  (*See* Rotini Decl.
Exs. A–E.)  To the extent that Plaintiffs raise an independent objection to the "good moral
character" requirement, I decline to consider that argument herein.  Plaintiffs do not object to
that requirement in their pleadings, and their claims target Section 400.00(2)(f) exclusively.
(FAC ¶¶ 22, 41, 43.)  *See, e.g.*, *Chapman v. City of N.Y.*, No. 06-3153, 2011 WL 1240001, at *7
n.5 (E.D.N.Y. March 30, 2011) ("As this claim was not raised in [plaintiff's] complaint, it will
not be considered by the Court [on summary judgment].") (citing *Lyman v. CSX Transp., Inc.*,
364 F. App'x 699, 701 (2d Cir. 2010)).  In any event, were the "good moral character"
requirement subject to intermediate scrutiny (the standard I find applicable for reasons stated
below), it would likely pass muster, as restricting handguns to those of good moral character
would substantially relate to the government's strong interest in public safety and crime
prevention in ways similar to those described below in connection with Section 400.00(2)(f).

*Second Amendment*, 105 Mich. L. Rev. 683, 718–19 (2007))).  In any event, reasonableness review is virtually absent from post-*Heller* Second Amendment jurisprudence.

I therefore join the multitude of other cases applying intermediate scrutiny under this approach.  *See, e.g.*, *Booker*, 644 F.3d at 25; *Masciandaro*, 638 F.3d at 471; *Chester*, 628 F.3d at 683; *Reese*, 627 F.3d at 802; *Skoien*, 614 F.3d at 642; *Marzzarella*, 614 F.3d at 97; *Osterweil*, 2011 WL 1983340, at *10; *Peruta*, 758 F. Supp. 2d at 1117.  As noted above, to the extent that Section 400.00(2)(f) overlaps at all with the core Second Amendment right as recognized in *Heller*, it decidedly does not overlap to the same extent as Gun Control Act provisions that ban certain categories of individuals from both in-home possession and public carry, and thus it may plausibly be argued that a more lenient standard of review is warranted here than in those cases. The application of intermediate scrutiny in two recent cases outside the Gun Control Act context, however, suggests that, if Section 400.00(2)(f) must be subject to constitutional review at all, intermediate scrutiny applies here as well.  Specifically, intermediate scrutiny was applied in *United States v. Masciandaro*, where the federal regulation at issue banned possession of a loaded handgun in a motor vehicle within a national park area, 638 F.3d at 459–60, and in *Peruta v. City of San Diego*, where the state statute at issue, like Section 400.00(2)(f), required applicants for full-carry permits to demonstrate "a set of circumstances that distinguishes the applicant from other members of the general public and causes him or her to be placed in harm's way," 758 F. Supp. 2d at 1110.[33]

As noted above intermediate scrutiny requires that the law be substantially related to an important governmental interest.  To satisfy this standard, Defendants need to show a "reasonable" "fit between the legislature's ends and the means chosen to accomplish those ends."

---

[33]     *Peruta*, which the Court finds persuasive, was decided before the Ninth Circuit adopted a "substantive burden framework" for Second Amendment claims in *Nordyke v. King*.

*Bd. of Trustees of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 480 (1989) (internal quotation marks

omitted).  Defendants here claim that the law serves to promote public safety and prevent crime,

(State Defs.' Mem. at 24), and this is supported by the history behind Section 400.00(2)(f),

which the State Defendants have provided to the Court.

For example, the "proper cause" requirement, now located at Section 400.00(2)(f) was

added in 1913 as N.Y. Penal Law § 1897, (*see* State Defs.' 56.1 ¶ 66), and the law thereafter

underwent a series of modifications to the ordering of its statutory provisions.  In a report

produced in 1962 in connection with one of those modifications, the state Joint Legislative

Committee on Firearms and Ammunitions stated,

> More than a quarter of a million serious crimes are committed with
> weapons annually in the United States, and the number is on the increase.
>     . . . .
>     The legislative problem posed for the fifty-one American jurisdictions
> (fifty states and the District of Columbia), charged with the major responsibility
> of criminal law enforcement in the United States, suggests itself:  to enact statutes
> adapted to prevent these crimes and occurrences before they happen, and, at the
> same time, preserve the legitimate interests of individual liberty, training for
> national defense, hunting, target shooting and trophy collecting.

Report of the N.Y. State Joint Legislative Comm. on Firearms & Ammunition, Doc. No. 29, at

11–12 (1962) (Tomari Decl. Ex. S(9)).  In a 1965 supplement to that report, the committee

added,

> The primary value to law enforcement of adequate statutes dealing with
> dangerous weapons is prevention of crimes of violence before their
> consummation.
>     . . . .
>     . . . In the absence of adequate weapons legislation, under the traditional
> law of criminal attempt, lawful action by the police must await the last act
> necessary to consummate the crime . . . .  Adequate statutes governing firearms
> and weapons would make lawful intervention by police and prevention of these
> fatal consequences, before any could occur.

Report of the N.Y. State Joint Legislative Comm. on Firearms & Ammunition, Doc. No. 6, at

12–13 (1965) (Tomari Decl. Ex. S(13)).  Finally, in 1982, during a floor debate regarding

substantive changes to portions of the state handgun licensing scheme, Senator Franz Leichter,

speaking regarding Section 400.00(2)(f)'s "proper cause" requirement, observed,

> [W]e are not only talking about crime, which obviously is important, but we're
> also talking about public safety. . . . [I]n this instance, it's not only protecting a
> person from himself but it's protecting innocent people who get shot every day
> because handguns are lying around, and that is something that should be of
> concern to all of us.

N.Y. Senate Debate on Senate Bill 3409, at 2471 (June 2, 1987) (Tomari Decl. Exs. S(14)).

Despite proposals to change the licensing scheme, Section 400.00(2)(f)'s "proper cause"

requirement has remained.  (State Defs.' 56.1 ¶ 77.)[34]

The Supreme Court has repeatedly acknowledged that governments have an important,

even compelling, interest in protecting public safety.  *See, e.g.*, *United States v. Salerno*, 481

U.S. 739, 745 (1987) (federal government has "compelling interests in public safety");

*Tennessee v. Garner*, 471 U.S. 1, 25–26 (1985) (O'Connor, J., dissenting) (commenting, in

Fourth Amendment context, that there is an "important public interest in crime prevention and

detection"); *Schall v. Martin*, 467 U.S. 253, 264 (1984) ("The 'legitimate and compelling state

interest' in protecting the community from crime cannot be doubted.  We have stressed before

that crime prevention is 'a weighty social objective' . . . .") (collecting cases) (citations omitted).

And various lower courts have acknowledged the connection between promoting public safety

and regulating the carrying of concealed handguns.  This case finds an analogue in *Peruta*,

where, as noted above, the concealed carry regulation at issue required that an applicant for a

---

[34]    Plaintiffs question the relevance of the legislative history, (Pls.' Reps. 56.1 ¶¶ 63–77), but
courts have cited to such history to demonstrate the important government interest implicated by
a challenged statue, *see, e.g.*, *Heller II*, 698 F. Supp. 2d. at 190.

full-carry permit demonstrate "a set of circumstances that distinguishes the applicant from other members of the general public and causes him or her to be placed in harm's way." There, the court held that the state

> has an important and substantial interest in public safety and in reducing the rate of gun use in crime.  In particular, the government has an important interest in reducing the number of concealed weapons in public in order to reduce the risks to other members of the public who use the streets and go to public accommodations.  The government also has an important interest in reducing the number of concealed handguns in public because of their disproportionate involvement in life-threatening crimes of violence, particularly in streets and other public places.

*Peruta*, 758 F. Supp. 2d at 1117 (citations omitted); *see, e.g.*, *Richards v. Cnty. of Yolo*, No. 09-1235, 2011 WL 1885641, at *4 (E.D. Cal. May 16, 2011) (agreeing with defendants' assertion that "regulating concealed firearms is an essential part of [the] County's efforts to maintain public safety and prevent both gun-related crime and, most importantly, the death of its citizens"); *People v. Yarbrough*, 86 Cal. Rptr. 3d 674, 682 (Ct. App. 2008) ("Unlike possession of a gun for protection within a residence, carrying a concealed firearm presents a recognized threat to public order, and is prohibited as a means of preventing physical harm to persons other than the offender.  A person who carries a concealed firearm on his person or in a vehicle, which permits him immediate access to the firearm but impedes others from detecting its presence, poses an imminent threat to public safety.") (citations, footnote, and internal quotation marks omitted).[35]

Notwithstanding the emphasis placed on the interest in regulating concealed carry, the same rationales apply equally, or almost equally, to the regulation of open carry.  *See, e.g.*,

---

[35]     The court in *Yarbrough* also observed that "carrying a firearm concealed on the person or in a vehicle in violation of [California state law] is not in the nature of a common use of a gun for lawful purposes which the court declared to be protected by the Second Amendment in *Heller*."  86 Cal. Rptr. 3d at 682.

*Osterweil*, 2011 WL 1983340, at *10 ("[T]he harm caused by gun violence in this country has been well-documented, and government efforts to curtail this threat have a direct impact on domestic security.  As such, the government objective promoted by these laws is not only 'legitimate,' but also 'important.'") (citations omitted); *Miller*, 604 F. Supp. 2d at 1171 (same); *City of N.Y. v. Bob Moates' Sport Shop, Inc.*, 253 F.R.D. 237, 240–41 (E.D.N.Y. 2008) ("By enacting strong gun control laws to protect its citizens from gun-related crimes, New York City and State have expressed a special public policy interest in the subject matter of this litigation."); *City of N.Y. v. A-1 Jewelry & Pawn, Inc.*, 501 F. Supp. 2d 369, 429 (E.D.N.Y. 2007) ("New York has a strong interest in the safety of its residents and territory from handgun violence . . . ."); *People v. Marin*, 795 N.E.2d 953, 958–959, 962 (Ill. Ct. App. 2003) ("The overall purpose of the . . . statute is to protect the public from gun violence.  This purpose is accomplished not only by prohibiting the possession of weapons by gang members, but by prohibiting the accessibility to loaded weapons in public places by society at large. . . . [T]he underlying activity of possessing or transporting an accessible and loaded weapon is itself dangerous and undesirable, regardless of the intent of the bearer since it may lead to the endangerment of public safety.  Access to a loaded weapon on a public street creates a volatile situation vulnerable to spontaneous lethal aggression in the event of road rage or any other disagreement or dispute.") (citations omitted).  For all these reasons, I hold that the state has an important government interest in promoting public safety and preventing crime.[36]

---

[36]     In an effort to further demonstrate the state's interest in regulating handguns to promote public safety and prevent crime, the State Defendants have provided the Court various witness affidavits.  Based on those affidavits, the State Defendants conclude that "[t]he likelihood that a gun will be used in crime is closely linked to the general availability of guns, and especially handguns," "[a]llowing more individuals to carry concealed handguns will endanger officers stopping individuals on the street or making car stops, and complicate interactions between uniformed officers and those working in plain clothes or off-duty," "[i]ncreasing the prevalence

I also hold that Section 400.00(2)(f) is substantially related to that important government interest.  The statute does not function as an outright ban on concealed carry, but rather calls for individualized, case-by-case determinations regarding whether full-carry permit applicants have an actual and articulable—rather than merely speculative, potential, or even specious—need for self-defense.  As crafted, the statute seeks to limit the use of handguns to self-defensive purposes—a use which, although in this context existing outside the home, is nonetheless a hallmark of *Heller*—rather than for some other use that has not been recognized as falling within the protections of the Second Amendment.  This purpose is furthered by the statute's directive that full-carry permits "shall be" issued where there exists proper cause—rather than directing merely that permits "may" be issued in such instances.

The other provisions of Section 400.00(2) create alterative means by which applicants may secure permits and highlight the emphasis the statute places upon self-defense:  as noted above, it compels the issuance of handgun permits to merchants and storekeepers for them to keep in their places of business—where they may be subject to robberies—as well as the issuance of full-carry permits to messengers for banking institutions and express companies, who often carry sensitive communications or valuable parcels that others may covet, to state judges and justices, who may be the targets of criminal defendants or disgruntled litigants (or their associates), and to employees at correctional facilities, for whom protection from those being housed at such facilities is necessary.  Surely, the legislature cannot be expected to enumerate every profession or circumstance that might give rise to an articulable need for self-defense, and

---

of concealed handguns will undermine" officers' "ability to stop and frisk individuals who appear to be carrying handguns in public," and "[t]he majority of criminal homicides and other serious crimes are committed by individuals who have not been convicted of a felony and would receive permits to carry concealed weapons without the 'proper cause' requirement."  (State Defs.' 56.1 ¶¶ 87–88, 90–91.)  Plaintiffs dispute these facts, (Pls.' Resp. 56.1 ¶¶ 87–88, 90–91), and, therefore, I do not rely on them in deciding the instant motions.

so Section 400.00(2)(f) vests the responsibility for discerning such need in the capable hands of

the state's neutral and detached licensing officers.

In upholding California's version of Section 400.00(2)(f), the Court in *Peruta* observed

that

> [r]equiring documentation enables Defendant to effectively differentiate between
> individuals who have a bona fide need to carry a concealed handgun for self-
> defense and individuals who do not.
>     The Court acknowledges Plaintiffs' argument that many violent gun
> crimes, even a majority, are committed by people who cannot legally have guns,
> and the ongoing dispute over the effectiveness of concealed weapons laws.  But
> under intermediate scrutiny, Defendant's policy need not be perfect, only
> reasonably related to a "significant," "substantial," or "important" governmental
> interest.  Defendant's policy satisfies that standard.

*Id.* (citations omitted).  Plaintiffs here make the same argument as in *Peruta*, and the Court

recognizes not only that many violent crimes are committed by those carrying handguns

illegally, but also that most gun owners across the country are responsible, law-abiding citizens.

The Court also recognizes the existence of contrasting studies and statistics concerning the

relationship between handgun ownership and violent crime.  But it is the job of the legislature,

not the Court, to weigh the conflicting evidence and make policy choices (within constitutional

parameters).  *See, e.g.*, *Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180, 195 (1997) (legislature is

"far better equipped than the judiciary to 'amass and evaluate the vast amounts of data' bearing

upon legislative questions") (internal quotation marks omitted); *City of Richmond v. JA. Croson*

*Co.*, 488 U.S. 469, 544 (1989) ("Local officials, by virtue of their proximity to, and their

expertise with, local affairs, are exceptionally well qualified to make determinations of public

good within their respective spheres of authority.") (internal quotation marks omitted).  As with

the statute at issue in *Peruta*, Section 400.00(2)(f) may not be perfect, but it need not be to pass

constitutional muster.  Section 400.00(2)(f)'s limitations promote the government's strong interest in public safety and crime prevention, and are substantially related to it.

* * *

Section 400.00(2)(f) does not burden recognized protected rights under the Second Amendment.  If Section 400.00(2)(f) could be read to implicate such rights, the statute, as applied to Plaintiffs, does not violate the Second Amendment under intermediate scrutiny. Accordingly, the Court *a priori* rejects Plaintiffs' facial constitutional challenge.  "[A] plaintiff can only succeed in a facial challenge by 'establish[ing] that no set of circumstances exists under which the Act would be valid,' *i.e.*, that the law is unconstitutional in all of its applications." *Wash. State Grange*, 552 U.S. at 449 (quoting *Salerno*, 481 U.S. at 745); *see Skoien*, 614 F.3d at 645 ("[a] person to whom a statute properly applies [cannot] obtain relief based on arguments that a differently situated person might present").  As Section 400.00(2)(f) is constitutional as applied to Plaintiffs, it is therefore not unconstitutional in all its applications.  *See Heller II*, 698 F. Supp. 2d at 188 n.10.[37]

### 3.     Equal Protection Claim

---

[37]     To the extent that Plaintiffs' facial claim is framed as an "overbreadth" challenge, it must fail on that ground as well:

> Without entertaining the novel notion that an overbreadth challenge could be recognized outside the limited context of the First Amendment, [the Court] conclude[s] that a person . . . to whom a statute was constitutionally applied, will not be heard to challenge that statute on the ground that it may conceivably be applied unconstitutionally to others, in other situations not before the Court.  This conclusion reflect[s] the conviction that under our constitutional system courts are not roving commissions assigned to pass judgment on the validity of the Nation's laws.

*Masciandaro*, 638 F.3d at 474 (fourth alteration in original) (citations and internal quotation marks omitted).

Finally, Plaintiffs challenge Section 400.00(2)(f) as violative of the Equal Protection Clause. The "Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439 (1985). Equal protection claims are subject to a two-step analytical process. *See Phillips v. Girdich*, 408 F.3d 124, 129 (2d Cir. 2005). First, a plaintiff must "demonstrate that he was treated differently than others similarly situated as a result of intentional or purposeful discrimination." *Id.* Second, he must show that "the disparity in treatment cannot survive the appropriate level of scrutiny." *Id.* The claim fails, as Section 400.00(2)(f) does not treat similarly situated individuals differently, but rather applies uniformly. Further, all full-carry permit applicants are not similarly situated because some can demonstrate "proper cause" for the issuance of a permit, while others cannot. *See, e.g.*, *Osterweil*, 2011 WL 1983340, at *11; *Richards*, 2011 WL 1885641, at *6; *Peruta*, 758 F. Supp. 2d at 1117–18; *see also Ruston v. Town Bd.*, 610 F.3d 55, 59 (2d Cir. 2009) (equal protection claim failed because plaintiffs did not allege "applications that were made by persons similarly situated").

## III.   CONCLUSION

For the reasons stated above, I hereby DENY the State Defendants' and the County's Motions to Dismiss, DENY Plaintiffs' Motion for Summary Judgment, and GRANT the State Defendants' Cross-Motion for Summary Judgment.  Although the County has not cross-moved for summary judgment, I hereby GRANT it summary judgment *sua sponte*.[38]  The Clerk of the Court is respectfully directed to terminate the pending motions, (Docs. 30, 33, 39, 42), and close the case.

**SO ORDERED.**

Dated: ~~August~~ 9/2, 2011
      White Plains, New York

                                                  *Cathy Seibel*
                                    CATHY SEIBEL, U.S.D.J.

---

[38]   As the Second Circuit recently stated,

> [D]istrict courts have the discretion to grant summary judgment *sua sponte*, even without notice in certain circumstances.  In granting summary judgment *sua sponte*, however, a district court must determine that the party against whom summary judgment is rendered has had a full and fair opportunity to meet the proposition that there is no genuine issue of material fact to be tried . . . . [T]he district court must assure itself that following the procedures set out in Rule 56 would not alter the outcome.  Discovery must either have been completed, or it must be clear that further discovery would be of no benefit.  The record must, therefore, reflect the losing party's inability to enhance the evidence supporting its position and the winning party's entitlement to judgment.

*Priestley v. Headminder, Inc.*, No. 09-4931, 2011 WL 3190307, at *6 (2d Cir. July 28, 2011) (citation and internal quotation marks omitted).  The Court is satisfied that those standards have been met here.  Although the County did not cross-move for summary judgment, the State Defendants did, on claims identical to those advanced against the County, and Plaintiffs had a full and fair opportunity to submit materials in opposition to that cross-motion—and indeed did submit such materials.  *See, e.g., Parks v. Town of Greenburgh*, 344 F. App'x 654, 655 (2d Cir. 2009) (*sua sponte* grant of summary judgment in favor of remaining defendants not error where "[plaintiff] had the opportunity to submit evidence in opposition to [officer's] summary judgment motion" and "[plaintiff's] claim of selective treatment was identical as it related to the [officer] and the remaining defendants").

60

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

**ALAN KACHALSKY, CHRISTINA NIKOLOV, ERIC
DETMER, JOHNNIE NANCE, ANNA MARCUCCI-
NANCE, and SECOND AMENDMENT FOUNDATION,
INC.,**

       **Plaintiffs,**

  **-against-**

**10 CV 05413 (CS)
JUDGMENT**

**SUSAN CACACE, JEFFREY A COHEN, ALBERT
LORENZO, ROBERT K. HOLDMAN, and COUNTY
OF WESTCHESTER,**

       **Defendants.**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

   Whereas the above entitled action having been assigned to the Honorable Cathy
Seibel, U.S.D.J., and the Court thereafter on September 2, 2011, having handed down an
Opinion and Order (Docket #80), denying the State Defendants' and the County's Motions to
dismiss, denying Plaintiffs' Motion for Summary Judgment, and granting the State defendants'
Cross-Motion for Summary Judgment, it is,

   **ORDERED, ADJUDGED AND DECREED**: that the Court denies the State
Defendants' and the County's Motions to Dismiss, denies Plaintiffs' Motion for Summary, and
grants the defendants' Cross-Motion for Summary Judgment, and although the County has not
moved for summary judgment, the Court also grants the County Summary Judgment sua sponte.
Accordingly, Judgment is entered in favor of defendants, and the case is hereby closed.


**Dated: White Plains, New York
   September 7, 2011**

              **Ruby Krajick - Clerk**

**U.S. Const. amend. II:**

A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed.

**N.Y. Penal Law § 265.00(10):**

"Licensing officer" means in the city of New York the police commissioner of that city; in the county of Nassau the commissioner of police of that county; in the county of Suffolk the sheriff of that county except in the towns of Babylon, Brookhaven, Huntington, Islip and Smithtown, the commissioner of police of that county; for the purposes of section 400.01 of this chapter the superintendent of state police; and elsewhere in the state a judge or justice of a court of record having his office in the county of issuance.

**N.Y. Penal Law § 265.01(1):**

Criminal possession of a weapon in the fourth degree

   A person is guilty of criminal possession of a weapon in the fourth degree when:

(1) He or she possesses any firearm, electronic dart gun, electronic stun gun, gravity knife, switchblade knife, pilum ballistic knife, metal knuckle knife, cane sword, billy, blackjack, bludgeon, plastic knuckles, metal knuckles, chuka stick, sand bag, sandclub, wrist-brace type slingshot or slungshot, shirken or "Kung Fu star"; . . .

> \* \* \*

Criminal possession of a weapon in the fourth degree is a class A misdemeanor.

**N.Y. Penal Law § 265.03:**

Criminal possession of a weapon in the second degree

A person is guilty of criminal possession of a weapon in the second degree when:

* * *

(3) such person possesses any loaded firearm. Such possession shall not, except as provided in subdivision one or seven of section 265.02 of this article, constitute a violation of this [fig 1] subdivision if such possession takes place in such person's home or place of business.

Criminal possession of a weapon in the second degree is a class C felony.

**N.Y. Penal Law § 265.20:**

Exemptions

a. Sections 265.01, 265.02, 265.03, 265.04, 265.05, 265.10, 265.11, 265.12, 265.13, 265.15 and 270.05 shall not apply to:

* * *

3. Possession of a pistol or revolver by a person to whom a license therefor has been issued as provided under section 400.00 or 400.01 of this chapter; provided, that such a license shall not preclude a conviction for the offense defined in subdivision three of section 265.01 of this article.

* * *

**N.Y. Penal Law § 400.00:**

Licenses to carry, possess, repair and dispose of firearms

1. Eligibility. No license shall be issued or renewed pursuant to this section except by the licensing officer, and then only after investigation and finding that all statements in a proper application for a license are true. No license shall be issued or renewed except for an applicant (a) twenty-one years of age or older, provided, however, that where such applicant has been honorably discharged from the United States army, navy, marine corps, air force or coast guard, or the national guard of the state of New York, no such age restriction shall apply; (b) of good moral character; (c) who has not been convicted anywhere of a felony or a serious offense; (d) who has stated whether he or she has ever suffered any mental illness or been confined to any hospital or institution, public or private, for mental illness; (e) who has not had a license revoked or who is not under a suspension or ineligibility order issued pursuant to the provisions of section 530.14 of the criminal procedure law or section eight hundred forty-two-a of the family court act; (f) in the county of Westchester, who has successfully completed a firearms safety course and test as evidenced by a certificate of completion issued in his or her name and endorsed and affirmed under the penalties of perjury by a duly authorized instructor, except that: (i) persons who are honorably discharged from the United States army, navy, marine corps or coast guard, or of the national guard of the state of New York, and produce evidence of official qualification in firearms during the term of service are not required to have completed those hours of a firearms safety course pertaining to the safe use, carrying, possession, maintenance and storage of a firearm; and (ii) persons who were licensed to possess a pistol or revolver prior to the effective date of this paragraph are not required to have completed a firearms safety course and test; and (g) concerning whom no good cause exists for the denial of the license. No person shall engage in the business of gunsmith or dealer in firearms unless licensed pursuant to this section. An applicant to engage in such business shall also be a citizen of the United States, more than twenty-one years of age and maintain a place of business in the city or county where the license is issued. For such business, if the applicant is a firm or partnership, each member thereof

shall comply with all of the requirements set forth in this subdivision and if the applicant is a corporation, each officer thereof shall so comply.

2. Types of licenses. A license for gunsmith or dealer in firearms shall be issued to engage in such business. A license for a pistol or revolver, other than an assault weapon or a disguised gun, shall be issued to (a) have and possess in his dwelling by a householder; (b) have and possess in his place of business by a merchant or storekeeper; (c) have and carry concealed while so employed by a messenger employed by a banking institution or express company; (d) have and carry concealed by a justice of the supreme court in the first or second judicial departments, or by a judge of the New York city civil court or the New York city criminal court; (e) have and carry concealed while so employed by a regular employee of an institution of the state, or of any county, city, town or village, under control of a commissioner of correction of the city or any warden, superintendent or head keeper of any state prison, penitentiary, workhouse, county jail or other institution for the detention of persons convicted or accused of crime or held as witnesses in criminal cases, provided that application is made therefor by such commissioner, warden, superintendent or head keeper; (f) have and carry concealed, without regard to employment or place of possession, by any person when proper cause exists for the issuance thereof; and (g) have, possess, collect and carry antique pistols which are defined as follows: (i) any single shot, muzzle loading pistol with a matchlock, flintlock, percussion cap, or similar type of ignition system manufactured in or before l898, which is not designed for using rimfire or conventional centerfire fixed ammunition; and (ii) any replica of any pistol described in clause (i) hereof if such replica--

(1) is not designed or redesigned for using rimfire or conventional centerfire fixed ammunition, or

(2) uses rimfire or conventional centerfire fixed ammunition which is no longer manufactured in the United States and which is not readily available in the ordinary channels of commercial trade.

3. Applications.

(a) Applications shall be made and renewed, in the case of a license to carry or possess a pistol or revolver, to the licensing officer in the city or county, as the case may be, where the applicant resides, is principally employed or has his principal place of business as merchant or storekeeper; and, in the case of a license as gunsmith or dealer in firearms, to the licensing officer where such place of business is located. Blank applications shall, except in the city of New York, be approved as to form by the superintendent of state police. An application shall state the full name, date of birth, residence, present occupation of each person or individual signing the same, whether or not he is a citizen of the United States, whether or not he complies with each requirement for eligibility specified in subdivision one of this section and such other facts as may be required to show the good character, competency and integrity of each person or individual signing the application. An application shall be signed and verified by the applicant. Each individual signing an application shall submit one photograph of himself and a duplicate for each required copy of the application. Such photographs shall have been taken within thirty days prior to filing the application. In case of a license as gunsmith or dealer in firearms, the photographs submitted shall be two inches square, and the application shall also state the previous occupation of each individual signing the same and the location of the place of such business, or of the bureau, agency, subagency, office or branch office for which the license is sought, specifying the name of the city, town or village, indicating the street and number and otherwise giving such apt description as to point out reasonably the location thereof. In such case, if the applicant is a firm, partnership or corporation, its name, date and place of formation, and principal place of business shall be stated. For such firm or partnership, the application shall be signed and verified by each individual composing or intending to compose the same, and for such corporation, by each officer thereof.

(b) Application for an exemption under paragraph seven-b of subdivision a of section 265.20 of this chapter. Each applicant desiring to obtain the exemption set forth in paragraph seven-b of subdivision a of section 265.20 of this chapter shall make such request in writing of

the licensing officer with whom his application for a license is filed, at the time of filing such application. Such request shall include a signed and verified statement by the person authorized to instruct and supervise the applicant, that has met with the applicant and that he has determined that, in his judgment, said applicant does not appear to be or poses a threat to be, a danger to himself or to others. He shall include a copy of his certificate as an instructor in small arms, if he is required to be certified, and state his address and telephone number. He shall specify the exact location by name, address and telephone number where such instruction will take place. Such licensing officer shall, no later than ten business days after such filing, request the duly constituted police authorities of the locality where such application is made to investigate and ascertain any previous criminal record of the applicant pursuant to subdivision four of this section. Upon completion of this investigation, the police authority shall report the results to the licensing officer without unnecessary delay. The licensing officer shall no later than ten business days after the receipt of such investigation, determine if the applicant has been previously denied a license, been convicted of a felony, or been convicted of a serious offense, and either approve or disapprove the applicant for exemption purposes based upon such determinations. If the applicant is approved for the exemption, the licensing officer shall notify the appropriate duly constituted police authorities and the applicant. Such exemption shall terminate if the application for the license is denied, or at any earlier time based upon any information obtained by the licensing officer or the appropriate police authorities which would cause the license to be denied. The applicant and appropriate police authorities shall be notified of any such terminations.

4. Investigation. Before a license is issued or renewed, there shall be an investigation of all statements required in the application by the duly constituted police authorities of the locality where such application is made. For that purpose, the records of the appropriate office of the department of mental hygiene concerning previous or present mental illness of the applicant shall be available for inspection by the investigating officer of the police authority. In order to ascertain any previous criminal record, the investigating officer shall take the fingerprints and physical descriptive data in quadruplicate of each

individual by whom application is signed and verified. Two copies of such fingerprints shall be taken on standard fingerprint cards eight inches square, and one copy may be taken on a card supplied for that purpose by the federal bureau of investigation; provided, however, that in the case of a corporate applicant that has already been issued a dealer in firearms license and seeks to operate a firearm dealership at a second or subsequent location, the original fingerprints on file may be used to ascertain any criminal record in the second or subsequent application unless any of the corporate officers have changed since the prior application, in which case the new corporate officer shall comply with procedures governing the initial application for such license. When completed, one standard card shall be forwarded to and retained by the division of criminal justice services in the executive department, at Albany. A search of the files of such division and written notification of the results of the search to the investigating officer shall be made without unnecessary delay. Thereafter, such division shall notify the licensing officer and the executive department, division of state police, Albany, of any criminal record of the applicant filed therein subsequent to the search of its files. A second standard card, or the one supplied by the federal bureau of investigation, as the case may be, shall be forwarded to that bureau at Washington with a request that the files of the bureau be searched and notification of the results of the search be made to the investigating police authority. The failure or refusal of the federal bureau of investigation to make the fingerprint check provided for in this section shall not constitute the sole basis for refusal to issue a permit pursuant to the provisions of this section. Of the remaining two fingerprint cards, one shall be filed with the executive department, division of state police, Albany, within ten days after issuance of the license, and the other remain on file with the investigating police authority. No such fingerprints may be inspected by any person other than a peace officer, who is acting pursuant to his special duties, or a police officer, except on order of a judge or justice of a court of record either upon notice to the licensee or without notice, as the judge or justice may deem appropriate. Upon completion of the investigation, the police authority shall report the results to the licensing officer without unnecessary delay.

4-a. Processing of license applications. Applications for licenses shall be accepted for processing by the licensing officer at the time of presentment. Except upon written notice to the applicant specifically stating the reasons for any delay, in each case the licensing officer shall act upon any application for a license pursuant to this section within six months of the date of presentment of such an application to the appropriate authority. Such delay may only be for good cause and with respect to the applicant. In acting upon an application, the licensing officer shall either deny the application for reasons specifically and concisely stated in writing or grant the application and issue the license applied for.

4-b. Westchester county firearms safety course certificate. In the county of Westchester, at the time of application, the licensing officer to which the license application is made shall provide a copy of the safety course booklet to each license applicant. Before such license is issued, such licensing officer shall require that the applicant submit a certificate of successful completion of a firearms safety course and test issued in his or her name and endorsed and affirmed under the penalties of perjury by a duly authorized instructor.

5. Filing of approved applications. The application for any license, if granted, shall be filed by the licensing officer with the clerk of the county of issuance, except that in the city of New York and, in the counties of Nassau and Suffolk, the licensing officer shall designate the place of filing in the appropriate division, bureau or unit of the police department thereof, and in the county of Suffolk the county clerk is hereby authorized to transfer all records or applications relating to firearms to the licensing authority of that county. The name and address of any person to whom an application for any license has been granted shall be a public record. Upon application by a licensee who has changed his place of residence such records or applications shall be transferred to the appropriate officer at the licensee's new place of residence. A duplicate copy of such application shall be filed by the licensing officer in the executive department, division of state police, Albany, within ten days after issuance of the license. Nothing in this subdivision shall be construed to change the expiration date or term of such licenses if otherwise provided for in law.

6. License: validity. Any license issued pursuant to this section shall be valid notwithstanding the provisions of any local law or ordinance. No license shall be transferable to any other person or premises. A license to carry or possess a pistol or revolver, not otherwise limited as to place or time of possession, shall be effective throughout the state, except that the same shall not be valid within the city of New York unless a special permit granting validity is issued by the police commissioner of that city. Such license to carry or possess shall be valid within the city of New York in the absence of a permit issued by the police commissioner of that city, provided that (a) the firearms covered by such license have been purchased from a licensed dealer within the city of New York and are being transported out of said city forthwith and immediately from said dealer by the licensee in a locked container during a continuous and uninterrupted trip; or provided that (b) the firearms covered by such license are being transported by the licensee in a locked container and the trip through the city of New York is continuous and uninterrupted; or provided that (c) the firearms covered by such license are carried by armored car security guards transporting money or other valuables, in, to, or from motor vehicles commonly known as armored cars, during the course of their employment; or provided that (d) the licensee is a retired police officer as police officer is defined pursuant to subdivision thirty-four of section 1.20 of the criminal procedure law or a retired federal law enforcement officer, as defined in section 2.15 of the criminal procedure law, who has been issued a license by an authorized licensing officer as defined in subdivision ten of section 265.00 of this chapter; provided, further, however, that if such license was not issued in the city of New York it must be marked "Retired Police Officer" or "Retired Federal Law Enforcement Officer", as the case may be, and, in the case of a retired officer the license shall be deemed to permit only police or federal law enforcement regulations weapons; or provided that (e) the licensee is a peace officer described in subdivision four of section 2.10 of the criminal procedure law and the license, if issued by other than the city of New York, is marked "New York State Tax Department Peace Officer" and in such case the exemption shall apply only to the firearm issued to such licensee by the department of taxation and finance. A license as gunsmith or dealer in firearms shall not be valid outside the city or county, as the case may be, where issued.

7. License: form. Any license issued pursuant to this section shall, except in the city of New York, be approved as to form by the superintendent of state police. A license to carry or possess a pistol or revolver shall have attached the licensee's photograph, and a coupon which shall be removed and retained by any person disposing of a firearm to the licensee. Such license shall specify the weapon covered by calibre, make, model, manufacturer's name and serial number, or if none, by any other distinguishing number or identification mark, and shall indicate whether issued to carry on the person or possess on the premises, and if on the premises shall also specify the place where the licensee shall possess the same. If such license is issued to an alien, or to a person not a citizen of and usually a resident in the state, the licensing officer shall state in the license the particular reason for the issuance and the names of the persons certifying to the good character of the applicant. Any license as gunsmith or dealer in firearms shall mention and describe the premises for which it is issued and shall be valid only for such premises.

8. License: exhibition and display. Every licensee while carrying a pistol or revolver shall have on his or her person a license to carry the same. Every person licensed to possess a pistol or revolver on particular premises shall have the license for the same on such premises. Upon demand, the license shall be exhibited for inspection to any peace officer, who is acting pursuant to his or her special duties, or police officer. A license as gunsmith or dealer in firearms shall be prominently displayed on the licensed premises. A gunsmith or dealer of firearms may conduct business temporarily at a location other than the location specified on the license if such temporary location is the location for a gun show or event sponsored by any national, state, or local organization, or any affiliate of any such organization devoted to the collection, competitive use or other sporting use of firearms. Any sale or transfer at a gun show must also comply with the provisions of article thirty-nine-DD of the general business law. Records of receipt and disposition of firearms transactions conducted at such temporary location shall include the location of the sale or other disposition and shall be entered in the permanent records of the gunsmith or dealer of firearms and retained on the location specified on the license. Nothing in this section shall authorize any licensee to conduct business from

any motorized or towed vehicle. A separate fee shall not be required of a licensee with respect to business conducted under this subdivision. Any inspection or examination of inventory or records under this section at such temporary location shall be limited to inventory consisting of, or records related to, firearms held or disposed at such temporary locations. Failure of any licensee to so exhibit or display his or her license, as the case may be, shall be presumptive evidence that he or she is not duly licensed.

9. License: amendment. Elsewhere than in the city of New York, a person licensed to carry or possess a pistol or revolver may apply at any time to his licensing officer for amendment of his license to include one or more such weapons or to cancel weapons held under license. If granted, a record of the amendment describing the weapons involved shall be filed by the licensing officer in the executive department, division of state police, Albany. Notification of any change of residence shall be made in writing by any licensee within ten days after such change occurs, and a record of such change shall be inscribed by such licensee on the reverse side of his license. Elsewhere than in the city of New York, and in the counties of Nassau and Suffolk, such notification shall be made to the executive department, division of state police, Albany, and in the city of New York to the police commissioner of that city, and in the county of Nassau to the police commissioner of that county, and in the county of Suffolk to the licensing officer of that county, who shall, within ten days after such notification shall be received by him, give notice in writing of such change to the executive department, division of state police, at Albany.

10. License: expiration, certification and renewal. Any license for gunsmith or dealer in firearms and, in the city of New York, any license to carry or possess a pistol or revolver, issued at any time pursuant to this section or prior to the first day of July, nineteen hundred sixty-three and not limited to expire on an earlier date fixed in the license, shall expire not more than three years after the date of issuance. In the counties of Nassau, Suffolk and Westchester, any license to carry or possess a pistol or revolver, issued at any time pursuant to this section or prior to the first day of July, nineteen hundred sixty-three and not limited to expire on an earlier date fixed in

the license, shall expire not more than five years after the date of issuance; however, in the county of Westchester, any such license shall be certified prior to the first day of April, two thousand, in accordance with a schedule to be contained in regulations promulgated by the commissioner of the division of criminal justice services, and every such license shall be recertified every five years thereafter. For purposes of this section certification shall mean that the licensee shall provide to the licensing officer the following information only: current name, date of birth, current address, and the make, model, caliber and serial number of all firearms currently possessed. Such certification information shall be filed by the licensing officer in the same manner as an amendment. Elsewhere than in the city of New York and the counties of Nassau, Suffolk and Westchester, any license to carry or possess a pistol or revolver, issued at any time pursuant to this section or prior to the first day of July, nineteen hundred sixty-three and not previously revoked or cancelled, shall be in force and effect until revoked as herein provided. Any license not previously cancelled or revoked shall remain in full force and effect for thirty days beyond the stated expiration date on such license. Any application to renew a license that has not previously expired, been revoked or cancelled shall thereby extend the term of the license until disposition of the application by the licensing officer. In the case of a license for gunsmith or dealer in firearms, in counties having a population of less than two hundred thousand inhabitants, photographs and fingerprints shall be submitted on original applications and upon renewal thereafter only at six year intervals. Upon satisfactory proof that a currently valid original license has been despoiled, lost or otherwise removed from the possession of the licensee and upon application containing an additional photograph of the licensee, the licensing officer shall issue a duplicate license.

11. License: revocation and suspension. The conviction of a licensee anywhere of a felony or serious offense shall operate as a revocation of the license. A license may be revoked or suspended as provided for in section 530.14 of the criminal procedure law or section eight hundred forty-two-a of the family court act. Except for a license issued pusuant to section 400.01 of this article, a license may be revoked and cancelled at any time in the city of New York, and in the counties of Nassau and

Suffolk, by the licensing officer, and elsewhere than in the city of New York by any judge or justice of a court of record; a license issued pursuant to section 400.01 of this article may be revoked and cancelled at any time by the licensing officer or any judge or justice of a court of record. The official revoking a license shall give written notice thereof without unnecessary delay to the executive department, division of state police, Albany, and shall also notify immediately the duly constituted police authorities of the locality.

12. Records required of gunsmiths and dealers in firearms. Any person licensed as gunsmith or dealer in firearms shall keep a record book approved as to form, except in the city of New York, by the superintendent of state police. In the record book shall be entered at the time of every transaction involving a firearm the date, name, age, occupation and residence of any person from whom a firearm is received or to whom a firearm is delivered, and the calibre, make, model, manufacturer's name and serial number, or if none, any other distinguishing number or identification mark on such firearm. Before delivering a firearm to any person, the licensee shall require him to produce either a license valid under this section to carry or possess the same, or proof of lawful authority as an exempt person pursuant to section 265.20. In addition, before delivering a firearm to a peace officer, the licensee shall verify that person's status as a peace officer with the division of state police. After completing the foregoing, the licensee shall remove and retain the attached coupon and enter in the record book the date of such license, number, if any, and name of the licensing officer, in the case of the holder of a license to carry or possess, or the shield or other number, if any, assignment and department, unit or agency, in the case of an exempt person. The original transaction report shall be forwarded to the division of state police within ten days of delivering a firearm to any person, and a duplicate copy shall be kept by the licensee. The record book shall be maintained on the premises mentioned and described in the license and shall be open at all reasonable hours for inspection by any peace officer, acting pursuant to his special duties, or police officer. In the event of cancellation or revocation of the license for gunsmith or dealer in firearms, or discontinuance of business by a licensee, such record book shall be immediately surrendered to the licensing officer in the city of

New York, and in the counties of Nassau and Suffolk, and elsewhere in the state to the executive department, division of state police.

12-a. State police regulations applicable to licensed gunsmiths engaged in the business of assembling or manufacturing firearms. The superintendent of state police is hereby authorized to issue such rules and regulations as he deems reasonably necessary to prevent the manufacture and assembly of unsafe firearms in the state. Such rules and regulations shall establish safety standards in regard to the manufacture and assembly of firearms in the state, including specifications as to materials and parts used, the proper storage and shipment of firearms, and minimum standards of quality control. Regulations issued by the state police pursuant to this subdivision shall apply to any person licensed as a gunsmith under this section engaged in the business of manufacturing or assemblying firearms, and any violation thereof shall subject the licensee to revocation of license pursuant to subdivision eleven of this section.

12-b. [None]

12-c. Firearms records.

(a) Every employee of a state or local agency, unit of local government, state or local commission, or public or private organization who possesses a firearm or machine-gun under an exemption to the licensing requirements under this chapter, shall promptly report in writing to his employer the make, model, calibre and serial number of each such firearm or machine-gun. Thereafter, within ten days of the acquisition or disposition of any such weapon, he shall furnish such information to his employer, including the name and address of the person from whom the weapon was acquired or to whom it was disposed.

(b) Every head of a state or local agency, unit of local government, state or local commission, public authority or public or private organization to whom an employee has submitted a report pursuant to paragraph (a) of this subdivision shall promptly forward such report to the superintendent of state police.

(c) Every head of a state or local agency, unit of local government, state or local commission, public authority, or any other agency, firm or corporation that employs persons who may lawfully possess firearms or machine-guns without the requirement of a license therefor, or that employs persons licensed to possess firearms or machine-guns, shall promptly report to the superintendent of state police, in the manner prescribed by him, the make, model, calibre and serial number of every firearm or machine-gun possessed by it on the effective date of this act for the use of such employees or for any other use. Thereafter, within ten days of the acquisition or disposition of any such weapon, such head shall report such information to the superintendent of the state police, including the name and address of the person from whom the weapon was acquired or to whom it was disposed.

13. Expenses. The expense of providing a licensing officer with blank applications, licenses and record books for carrying out the provisions of this section shall be a charge against the county, and in the city of New York against the city.

14. Fees. In the city of New York and the county of Nassau, the annual license fee shall be twenty-five dollars for gunsmiths and fifty dollars for dealers in firearms. In such city, the city council and in the county of Nassau the Board of Supervisors shall fix the fee to be charged for a license to carry or possess a pistol or revolver and provide for the disposition of such fees. Elsewhere in the state, the licensing officer shall collect and pay into the county treasury the following fees: for each license to carry or possess a pistol or revolver, not less than three dollars nor more than ten dollars as may be determined by the legislative body of the county; for each amendment thereto, three dollars, and five dollars in the county of Suffolk; and for each license issued to a gunsmith or dealer in firearms, ten dollars. The fee for a duplicate license shall be five dollars. The fee for processing a license transfer between counties shall be five dollars. The fee for processing a license or renewal thereof for a qualified retired police officer as defined under subdivision thirty-four of section 1.20 of the criminal procedure law, or a qualified retired sheriff, undersheriff, or deputy sheriff of the city of New York as defined under subdivision two of section 2.10 of the criminal procedure law, or a qualified retired bridge and tunnel officer,

sergeant or lieutenant of the triborough bridge and tunnel authority as defined under subdivision twenty of section 2.10 of the criminal procedure law, or a qualified retired uniformed court officer in the unified court system, or a qualified retired court clerk in the unified court system in the first and second judicial departments, as defined in paragraphs [fig 1] a and [fig 2] b of subdivision twenty-one of section 2.10 of the criminal procedure law or a retired correction officer as defined in subdivision twenty-five of section 2.10 of the criminal procedure law shall be waived in all counties throughout the state.

15. Any violation by any person of any provision of this section is a class A misdemeanor.

16. Unlawful disposal. No person shall except as otherwise authorized pursuant to law dispose of any firearm unless he is licensed as gunsmith or dealer in firearms.

17. Applicability of section. The provisions of article two hundred sixty-five of this chapter relating to illegal possession of a firearm, shall not apply to an offense which also constitutes a violation of this section by a person holding an otherwise valid license under the provisions of this section and such offense shall only be punishable as a class A misdemeanor pursuant to this section. In addition, the provisions of such article two hundred sixty-five of this chapter shall not apply to the possession of a firearm in a place not authorized by law, by a person who holds an otherwise valid license or possession of a firearm by a person within a one year period after the stated expiration date of an otherwise valid license which has not been previously cancelled or revoked shall only be punishable as a class A misdemeanor pursuant to this section.

**N.Y. Penal Law § 400.01:**

License to carry and possess firearms for retired sworn members of the division of state police

1. A license to carry or possess a firearm for a retired sworn member of the division of state police shall be granted in the same manner and upon the same terms and conditions as licenses issued under section 400.00 of this article provided, however, that applications for such license shall be made to, and the licensing officer shall be, the superintendent of state police.

2. For purposes of this section, a "retired sworn member of the division of state police" shall mean a former sworn member of the division of state police, who upon separation from the division of state police was immediately entitled to receive retirement benefits under the provisions of the retirement and social security law.

3. The provisions of this section shall only apply to license applications made or renewals which must be made on or after the effective date of this section. A license to carry or possess a pistol or revolver issued pursuant to the provisions of section 400.00 of this article to a person covered by the provisions of this section shall be valid until such license would have expired pursuant to the provisions of section 400.00 of this article; provided that, on or after the effective date of this section, an application or renewal of such license shall be made pursuant to the provisions of this section.

4. Except for the designation of the superintendent of state police as the licensing officer for retired sworn members of the division of state police, all of the provisions and requirements of section 400.00 of this article and any other provision of law shall be applicable to individuals licensed pursuant to this section. In addition all provisions of section 400.00 of this article, except for the designation of the superintendent of state police as licensing officer are hereby deemed applicable to individuals licensed pursuant to this section.