# 11-3642-cv(L)
## 11-3962-cv(XAP)

IN THE

# United States Court of Appeals

### FOR THE SECOND CIRCUIT

>>> <<<

ALAN KACHALSKY, CHRISTINA NIKOLOV, JOHNNIE NANCE, ANNA MARCUCCI-NANCE, ERIC DETMER, SECOND AMENDMENT FOUNDATION, INC.,

*Plaintiffs-Appellants-Cross-Appellees,*

*v.*

COUNTY OF WESTCHESTER,

*Defendant-Appellee-Cross-Appellant,*

*and*

SUSAN CACACE, JEFFREY A. COHEN, ALBERT LORENZOR, ROBERT K. HOLDMAN,

*Defendants-Appellees.*

———————

*On Appeal from the United States District Court
for the Southern District of New York (White Plains)*

**JOINT APPENDIX
VOLUME II OF III
Pages A266 to A557**

WESTCHESTER COUNTY
  ATTORNEY'S OFFICE
Thomas Gardiner
Assistant County Attorney
*Attorneys for Defendant-Appellee-
  Cross-Appellant*
148 Martine Avenue, Room 600
White Plains, New York 10601
914-995-3652

Alan Gura
GURA & POSSESSKY, PLLC
*Attorneys for Plaintiffs-Appellants-
  Cross-Appellees*
101 North Columbus Street, Suite 405
Alexandria, Virginia 22314
703-835-9085

ERIC T. SCHNEIDERMAN
ATTORNEY GENERAL OF THE
  STATE OF NEW YORK
Simon Heller
Assistant Solicitor General
*Attorneys for Defendants-Appellees*
120 Broadway
New York, New York 10271
212-416-8025

JOINT APPENDIX

## TABLE OF CONTENTS

<u>Volume I</u>:

District Court Docket Entries . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

First Amended Complaint [18] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Motion to Dismiss by Individual Defendants [30] . . . . . . . . . . . . . . . . . 27

Motion to Dismiss by County of Westchester [33] . . . . . . . . . . . . . . . . 29

Rotini Affidavit in Support of Motion to Dismiss [33-1] . . . . . . . . . . . 30
    Exhibit A, Cacase Decision re: Kachalsky Application . . . . . . . . 32
    Exhibit B, Cohen Decision re: Nikolov Application . . . . . . . . . . 35
    Exhibit C, Lorenzo Decision re: Detmer Application . . . . . . . . . 38
    Exhibit D, Holdman Decision re: Nance Application . . . . . . . . . 40
    Exhibit E, Holdman Decision re: Marcucci-Nance Application . 45

Tomari Declaration re: State Defendants' Motion to Dismiss [34] . . . 51
    Exhibit 2, Tomari Letter to Court, 11/5/2010 . . . . . . . . . . . . . . . 54
    Exhibit 3, Rotini Letter to Court, 11/5/2010 . . . . . . . . . . . . . . . 57
    Exhibit 4, Gura Letter to Court, 11/5/2010 . . . . . . . . . . . . . . . . 60
    Exhibit 5, Tomari Letter to Court #2, 11/5/2010 . . . . . . . . . . . . 64
    Exhibit 6, Endorsed Letter, 11/8/2010 . . . . . . . . . . . . . . . . . . . . 68

Plaintiffs' Motion for Summary Judgment [39] . . . . . . . . . . . . . . . . . . 72
    Alan Kachalsky Declaration [39-9] . . . . . . . . . . . . . . . . . . . . . . . 74
    Anna Marcucci-Nance Declaration [39-10] . . . . . . . . . . . . . . . . 76
    Eric Detmer Declaration [39-11] . . . . . . . . . . . . . . . . . . . . . . . . 78
    Christina Nikolov Declaration [39-12] . . . . . . . . . . . . . . . . . . . 80
    Johnnie Nance Declaration [39-13] . . . . . . . . . . . . . . . . . . . . . . 82
    Julianne Versnel Declaration [39-14] . . . . . . . . . . . . . . . . . . . . 84

Plaintiffs' 56.1 Separate Statement of Undisputed Facts [41] . . . . . . 86

State Defendants' Cross-Motion for Summary Judgment [42] . . . . . . 94

State Defendants' 56.1 Separate Statement of
    Undisputed Facts [44] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 96

Rotini Declaration Opposing Plaintiffs'
    Summary Judgment Motion [45] . . . . . . . . . . . . . . . . . . . . . . . . 132
    Exhibit A, Bruce Bellom Declaration . . . . . . . . . . . . . . . . . . . . . 134
    Exhibit B, Blank Pistol Permit Forms . . . . . . . . . . . . . . . . . . . 139

Plaintiffs' 56.1 Statement Opposing Defendants'
    Summary Judgment Motion [47.1] . . . . . . . . . . . . . . . . . . . . . . . 151

Westchester County's Response to Plaintiffs' 56.1 Statement [48] . . 193

Tomari Declaration in Support of State Defendants'
    Summary Judgment Motion [49] . . . . . . . . . . . . . . . . . . . . . . . . 205
    Exhibit F, Kachalsky Investigative File [49-6] . . . . . . . . . . . . . 210
    Exhibit H, Detmer Investigative File [49-8]* . . . . . . . . . . . . . . 248

Volume II:

Additional Exhibits to Tomari Declaration in
    Support of Summary Judgment
    Exhibit G, Nikolov Investigative File [49-7] . . . . . . . . . . . . . . 266
    Exhibit I, Nance Investigative File [49-9]* . . . . . . . . . . . . . . . . 343
    Exhibit J, Marcucci-Nance Investigative File [49-10]* . . . . . . . 380
    Exhibit L, Kachalsky Article 78 Petition [51-2]* . . . . . . . . . . . 413
    Exhibit M, Answer, Affirmation Opposing
        Article 78 Petition [51-3]* . . . . . . . . . . . . . . . . . . . . . . . . . 428
    Exhibit N, Kachalsky Letter to Court of Appeals [51-4] . . . . . . 440

Philip Cook Declaration [52] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 446

Franklin Zimring Declaration [53] . . . . . . . . . . . . . . . . . . . . . . . . . . . 486

Susan Cacase Declaration [54] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 509

Jeffrey Cohen Declaration [55] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 512

Albert Lorenzo Declaration [56] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 514

Robert Holdman Declaration [57] . . . . . . . . . . . . . . . . . . . . . . . . . . . . 517

David Roefaro Declaration [58] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 521

Stephanie Miner Declaration [59] . . . . . . . . . . . . . . . . . . . . . . . . . . . 524

Thomas Fazio Declaration [60] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 526

James Sherman Declaration [61] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 531

Andrew Lunetta Declaration [62] . . . . . . . . . . . . . . . . . . . . . . . . . . . . 542

Bruce Bellom Declaration [63] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 549

Marge Cohen Declaration [64] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 554

Volume III:

Additional Exhibits to Tomari Declaration in
        Support of Summary Judgment
        Exhibit S1, Laws of New York, Chapter 195,
                §1897 (1911) [65-2] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 558
        Exhibit S2, New York Times article, 1911 [65-2] . . . . . . . . . . . 563
        Exhibit S3, New York Tribune article, 1911 [65-2] . . . . . . . . . 566
        Exhibit S4, "Topics of the Time," 1911 [65-2] . . . . . . . . . . . . . 568
        Exhibit S5, New York Tribune Article, 1911 [65-2] . . . . . . . . 571
        Exhibit S6, New York Times Article, 1911 [65-2] . . . . . . . . . . . 573
        Exhibit S7, Laws of New York, Chapter 608,
                §1897 (1913) [65-2] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 576

iii

Exhibit S8, Laws of New York, Chapter 297,
  §1897 (1921) [65-2] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 581
Exhibit S9, 1962 Legislative Committee Report [65-3] . . . . . . 586
Exhibit S10, 1963 Legislative Committee Report [65-3] . . . . . 616
Exhibit S11, 1963 Legislative Annual Report [65-3] . . . . . . . . 622
Exhibit S12, Laws of New York, Chapter 136,
  §1903 (1963) [66-1] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 627
Exhibit S13, 1965 Legislative Committee Report [66-1] . . . . . 648
Exhibit S14, 1987 New York Senate Debate
  on Senate Bill 3409 [66-2] . . . . . . . . . . . . . . . . . . . . . . . . 682

Notice of Appeal [82] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 719

Amended Notice of Appeal [83] . . . . . . . . . . . . . . . . . . . . . . . . . . . 721

Notice of Appeal [85] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 724

*Duplicative material in this exhibit redacted.

# EXHIBIT G

THIS PAGE INTENTIONALLY LEFT BLANK

**REDACTED**

NEW YORK
~~NSE~~ APPLICATION

INSTRUCTIONS: Print or type in black ink only

COUNTY OF ISSUE Westchester

EXPIRATION DATE ~~REDACTED~~

DATE OF ISSUE ▓▓▓▓▓

**REDACTED** **REDACTED**

PRESENT OCCUPATION **REDACTED**   CITIZEN OF U.S.A. ☐ YES ☐ NO

EMPLOYED BY Self   NATURE OF BUSINESS Financial Research

I HEREBY APPLY FOR A PISTOL/REVOLVER LICENSE TO:   (Check one only)   ☒ CARRY CONCEALED   ☐ * POSSESS ON PREMISES
☐ * POSSESS/CARRY DURING EMPLOYMENT (* Premise address or place of employment must be provided)

STREET ADDRESS OR OTHER LOCATION   CITY, VILLAGE, TOWN   ZIP CODE
A LICENSE IS REQUIRED FOR THE FOLLOWING REASON: Full Carry

GIVE FOUR CHARACTER REFERENCES WHO BY THEIR SIGNATURE ATTEST TO YOUR GOOD MORAL CHARACTER

| LAST, FIRST MI | SIGNATURE |
|---|---|
| Robert, Donald D | Donald Robert |
| Parks, Vivienne | Vivienne Parks |
| Davis, Allen | ~~REDACTED~~ |
| LaRosa, Rosemary | Rosemary LaRosa |

HAVE YOU EVER BEEN ARRESTED, SUMMONED, CHARGED OR INDICTED ANYWHERE FOR ANY OFFENSE, INCLUDING DWI (EXCEPT TRAFFIC INFRACTIONS)?   ☐ YES   ☐ NO   IF YES, FURNISH THE FOLLOWING INFORMATION:

| DATE | POLICE AGENCY | CHARGE | DISPOSITION - COURT AND DATE |
|---|---|---|---|
| | | | |
| | | | |

| | YES | NO |
|---|---|---|
| HAVE YOU EVER BEEN TERMINATED/DISCHARGED FROM ANY EMPLOYMENT OR THE ARMED FORCES FOR CAUSE? | ☐ | ☒ NO |
| HAVE YOU EVER UNDERGONE TREATMENT FOR ALCOHOLISM OR DRUG USE? | ☐ | ☒ NO |
| HAVE YOU EVER SUFFERED ANY MENTAL ILLNESS, OR BEEN CONFINED TO ANY HOSPITAL, PUBLIC OR PRIVATE INSTITUTION, FOR MENTAL ILLNESS? | ☐ | ☒ NO |
| HAVE YOU EVER HAD A PISTOL LICENSE, DEALER'S LICENSE, GUNSMITH LICENSE, OR ANY APPLICATION FOR SUCH A LICENSE DISAPPROVED, OR HAD SUCH A LICENSE REVOKED OR CANCELLED? | ☐ | ☒ NO |
| DO YOU HAVE ANY PHYSICAL CONDITION WHICH COULD INTERFERE WITH THE SAFE AND PROPER USE OF A HANDGUN? | ☐ | ☒ NO |
| HAVE YOU EVER BEEN CHARGED, PETITIONED AGAINST, A RESPONDENT, OR OTHERWISE BEEN A SUBJECT OF A PROCEEDING IN FAMILY COURT? | ☐ | ☒ NO |

IF ANSWER TO ANY QUESTION IS YES, EXPLAIN HERE:

ANY OMISSION OF FACT OR ANY FALSE STATEMENT WILL BE SUFFICIENT CAUSE TO DENY THIS APPLICATION AND CONSTITUTES A CRIME PUNISHABLE BY FINE, IMPRISONMENT, OR BOTH.
I AM AWARE THAT THE FOLLOWING CONDITIONS AFFECT ANY LICENSE WHICH MAY BE ISSUED TO ME:

NO LICENSE ISSUED AS A RESULT OF THIS APPLICATION IS VALID IN THE CITY OF NEW YORK. ANY LICENSE ISSUED AS A RESULT OF THIS APPLICATION WILL BE VALID ONLY FOR A PISTOL OR REVOLVER SPECIFICALLY DESCRIBED IN THE LICENSE PRIVATELY ISSUED BY THE LICENSING OFFICER. IF I PERMANENTLY CHANGE MY ADDRESS, NOTICE OF SUCH CHANGE AND MY NEW ADDRESS MUST BE SENT TO THE LICENSING OFFICER WITHIN 10 DAYS OF SUCH CHANGE AND, IN NASSAU AND SUFFOLK COUNTY, TO THE LICENSING OFFICER OF THAT COUNTY WITHIN 10 DAYS OF SUCH CHANGE. ANY LICENSE ISSUED AS A RESULT OF THIS APPLICATION IS SUBJECT TO REVOCATION AT ANY TIME BY THE LICENSING OFFICER OR ANY JUDGE OR JUSTICE OF A COURT OF RECORD.

PATRICIA M. PRICE
Notary Public, State of New York
Registration #01PR6040763
Qualified in Westchester County
My Commission Expires May 1, 20 10

JURAT:
SIGNED AND SWORN TO BEFORE ME
THIS 4th DAY OF March , 20 09
AT White Plains , NEW YORK

Patricia M. Price
SIGNATURE OF OFFICER ADMINISTERING OATH
NOTARY PUBLIC
TITLE OF OFFICER

APPLICATION NOT VALID UNLESS SWORN

Christina Nikolov
SIGNATURE OF APPLICANT

THIS FORM APPROVED BY SUPERINTENDENT OF STATE POLICE AS REQUIRED BY PENAL LAW SECTION 400.00, SUBD. 3.
PPB3/PPB3A

| 1. RIGHT THUMB | 2. RIGHT FOREFINGER | 3. RIGHT MIDDLE FINGER | 4. RIGHT RING FINGER | 5. RIGHT LITTLE FINGER |
|---|---|---|---|---|

**REDACTED**

| 6. LEFT THUMB | 7. LEFT FOREFINGER | 8. LEFT MIDDLE FINGER | 9. LEFT RING FINGER | 10. LEFT LITTLE FINGER |
|---|---|---|---|---|

**REDACTED**

FOUR IMPRESSIONS TAKEN SIMULTANEOUSLY

| LEFT FOUR FINGERS | THUMBS TAKEN TOGETHER | RIGHT FOUR FINGERS |
|---|---|---|

**REDACTED**          **REDACTED**

| IMPRESSIONS TAKEN BY: | NAME _Underwood_ | RANK _Det_ | SHIELD _45_ | DATE 03-09 |
|---|---|---|---|---|

REDACTED    RLDPC

APPLICANT'S SIGNATURE AND ADDRESS: _Christina Nitolo_

**INVESTIGATION REPORT - ALL INFORMATION PROVIDED BY THIS APPLICANT HAS BEEN VERIFIED:**

NAME _Underwood_    RANK _det_    ORGANIZATION _W/a DPS_

SIGNATURE OF INVESTIGATING OFFICER

THIS APPLICATION IS   APPROVED  (DISAPPROVED)  STRIKE OUT ONE)    THE FOLLOWING RESTRICTION(S) IS (ARE) APPLICABLE TO THIS LICENSE:

TITLE AND SIGNATURE OF LICENSING OFFICER    HON. JEFFREY A. COHEN   COUNTY COURT JUDGE    10/2/09

**IF LICENSING OFFICER AUTHORIZES THE POSSESSION OF A PISTOL OR REVOLVER AT THE TIME OF ISSUE OF ORIGINAL LICENSE, FURNISH THE FOLLOWING INFORMATION:**

| MANUFACTURER | PISTOL OR REVOLVER | CALIBER | SERIAL NUMBER | MODEL | PROPERTY OF: |
|---|---|---|---|---|---|
| Glock | Pistol | 45 | KPL 141 | 30 | Palm Beach Shooting Center |
| Glock | Pistol | 45 | HLD 597 | 39 | Coles Gun Shop |
|  |  |  |  |  |  |
|  |  |  |  |  |  |

DUPLICATE OF THIS APPLICATION MUST BE FILED WITH THE SUPERINTENDENT OF STATE POLICE WITHIN 10 DAYS OF ISSUANCE AS REQUIRED BY PENAL LAW SECTION 400.00 SUBD. 5.

PPK3A(PPK3)



**Robert P. Astorino**
**County Executive**

**Department of Public Safety**

June 5, 2009

**George N. Longworth**
**Commissioner-Sheriff**

Honorable Justice
Westchester County Court
111 Dr. Martin Luther King, Jr. Blvd.
White Plains, NY 10601

RE:    Pistol License application of Christina M. Nikolov

# REDACTED

Dear Honorable Justice:

The above captioned individual has submitted an application to Westchester County for a New York State (NYS) pistol license for the purpose of **FULL CARRY**.

A fingerprint based criminal background check was conducted, and a response by both the NYS Department of Criminal Justice Services and the Federal Bureau of Investigation revealed no derogatory information. A query of the files of the NYS Department of Mental Hygiene also revealed no derogatory information; however, the applicant revealed that she underwent counseling prior to undergoing transgender surgery in 1999.

Letters from each of four character references attesting to the good moral character and reputation of the applicant are on file. The applicant has provided proof that she is a United States citizen.

The applicant has submitted notarized documentation attesting that 1) she has been a law abiding citizen her entire life as evidenced by her non-existent criminal record, and 2) she currently possesses a concealed weapon permit with full carry privileges in the state of Florida, and 3) she has never once brandished or discharged a firearm other than in a safe manner, and 4) she is well aware of the responsibility and restraint involved when carrying a concealed weapon, and 5) if she is ever confronted with a potentially dangerous situation, common sense dictates that the course of action is to extract herself from the situation and contact the authorities immediately, and 6) if she is unable to escape such a situation, the only time that she would ever use a firearm is if her life were in imminent danger and she has exhausted all other non-lethal options, and 7) even in such a situation, depending on the circumstances (close quarters, innocent people nearby, etc.), she would still need to determine whether using a firearm would be prudent, and 8) she has completed three firearm safety courses with NRA Certified Instructors over the past three years, and 9) for the past twenty years she has been a licensed commercial pilot, and 10) for more than two years she has been a

A New York State Accredited
Law Enforcement Agency

1 Saw Mill River Parkway
Hawthorne, NY 10532          Telephone: (914) 864-7700          Website: westchestergov.com

Christina M. Nikolov
June 5, 2009
Page 2 of 2

certified flight instructor and instrument flight instructor, and 11) as a pilot and more importantly, someone who teaches people to fly, it is absolutely critical for her to always remain calm regardless of how stressful a situation becomes which is essential when confronted with a potentially dangerous situation, and 12) as a transgender female, she is far more likely to be a victim of violent crime than is a genetic female, and 13) hate crimes are increasing locally as well as nationwide, and 14) she requires a Full Carry firearm license for personal protection.

It appears that the necessary proper cause for the issuance of a firearm license for the purpose of Full Carry has not been met. The applicant has not provided information that she has ever been threatened in any way. Rather, the applicant has asserted that she is "more likely" to be a victim of a violent crime than is a genetic female. The applicant has provided only general information that might be applicable to any member of the public. The applicant has not demonstrated an exceptional need for self protection distinguishable from that of the general public, or from other persons similarly situated.

This application is respectfully forwarded with a recommendation of **DISAPPROVAL**.

Sincerely,

DEPARTMENT OF PUBLIC SAFETY
Westchester County Police

Thomas Belfiore
Commissioner-Sheriff

TB/fd



Westchester
gov.com

Memorandum
**Department of Public Safety**

DATE:      May 20, 2009

TO:        Lt. Frank Donovan

FROM:      Sgt. Bruce Bellom #15

RE:        Pistol License application of Christina M. Nikolov

The above captioned individual has submitted an application to Westchester County for a New York State (NYS) pistol license for the purpose of **FULL CARRY**.

A fingerprint based criminal background check was conducted, and a response by both the NYS Department of Criminal Justice Services and the Federal Bureau of Investigation revealed no derogatory information. In addition, a query of the files of the NYS Department of Mental Hygiene also revealed no derogatory information. Letters from each of four character references attesting to the good moral character and reputation of the applicant are on file. The applicant has provided proof that she is a United States citizen.

The applicant has submitted notarized documentation attesting that 1) she has been a law abiding citizen her entire life as evidenced by her non-existent criminal record, and 2) she meets all the other minimum requirements as stated within the Pistol License Information Handbook, and 3) she currently possesses a concealed weapon permit with full carry privileges in the state of Florida, and 4) she has never once brandished or discharged her firearms anywhere other than in a safe manner at a law enforcement utilized shooting range, and 5) as someone with considerable experience carrying a firearm legally, she is well aware of the responsibility and restraint involved when carrying a concealed weapon, and 6) if she is ever confronted with a potentially dangerous situation, common sense dictates that the course of action is to extract herself from the situation and contact the authorities immediately, and 7) if she is unable to escape such a situation, the only time she would ever take out her firearm is if her life were in imminent danger and she has exhausted all other non-lethal options, and 8) even in such a situation, depending on the circumstances (close quarters, innocent people nearby, etc.), she would still need to determine whether using her firearm would be prudent, and 9) she has completed three firearm safety courses with NRA Certified Instructors over the past three years, and 10) she continually seeks opportunities to further educate herself in the area of safety, even when not required by law, and 11) for the past twenty years she has been a licensed commercial pilot, and 12) for more than two years she has been a certified flight instructor and instrument flight instructor, and 13) as a pilot and more importantly, someone who teaches people to fly, it is absolutely critical for

Christina M. Nikolov
May 20, 2009
Page 5 of 5

her to always remain calm regardless of how stressful a situation becomes which is essential when either involved in or witness to a potentially dangerous situation, and 14) also relevant to her application and establishing proper cause for a full carry license is her status as a transgender female as the National Coalition of Anti-Violence Programs reports that she is far more likely to be a victim of violent crime than a genetic female, and 15) hate crimes are increasing locally as well as nationwide, and 16) she has included a list of hundreds of crimes against people in similar circumstances as herself, some of which are high profile, like the Brandon Teena murder.

The applicant states that the Canadian government required pre-op counseling and review as well as a post-op interview following her reassignment surgery, however no documentation or reports regarding the counseling sessions are available. While there is ample evidence to indicate that individuals who have undergone transgender reassignment have suffered extreme pain and death (as supplied by the applicant in a 49-page supporting document), the applicant has not provided evidence that she has ever been harassed, threatened, assaulted, abused, robbed or burglarized. She points out only that she is "more likely" to be a victim of a violent crime than a genetic female as reported by the National Coalition of Anti-Violence Programs.

Although the applicant's circumstances are unique, it appears that the necessary proper cause for the issuance of a firearm license for the purpose of Full Carry has not been met. The applicant has not demonstrated an extraordinary need for self protection distinguishable from that of the general public.

This application is respectfully forwarded with a recommendation of **DISAPPROVAL**.

April 11, 2008

To: Whom it may concern

From: Dan Waters

Subject: Employment Reference

This letter is to verify that Christina Nikolov has been employed at Falcon Aviation Academy from February, 2008 until April 11, 2008 as an Instructor Pilot. She performed her assigned tasks within company requirements with no problems noted. I will be happy to provide a reference to anyone as needed in the future.

Dan Waters
President
Falcon Aviation Academy
770-486-5561
dan@falconairservices.com



# WESTCHESTER COUNTY POLICE
# PISTOL LICENSE UNIT

## ATTACHMENT: FULL CARRY

| OFFICE USE ONLY |
| --- |
| CASE#:_____ |
| DET:_____ |

**Answer all questions fully and in accordance with the guidelines set forth in the Pistol Safety & Information Handbook. This form and attachments must be notarized.**

**APPLICANT INFORMATION:**

Last Name: _Nikolov_   First Name: _Christina_ M.I. _M_

Address: REDACTED

STREET          CITY          STATE          ZIP

**List all factors which you believe to be relevant to your application and which establish <u>proper cause</u> for issuance of a firearm license for the purpose of Full Carry:**

_____ _Please see attached_ _____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

WCPD-126H (02-02-2007)          Page 1 of 2 Pages

_please see attached_

Christina Nikolov
**APPLICANT NAME (PRINT)**

Christina Nikolov
**APPLICANT NAME (SIGNATURE)**

STATE OF NEW YORK )
COUNTY OF WESTCHESTER )

SUBSCRIBED AND SWORN TO BEFORE ME THIS ___3___ DAY OF _March_ YEAR _2009_

LAINE TARBANIA
Notary Public - State of New York
No. 01TA6179669
Qualified in Westchester County
My Commission Expires December 31, 2011

_____
SIGNATURE OF NOTARY PUBLIC

WCPD-126H (02-02-2007)                    Page 2 of 2 Pages

Westchester
gov.com

Andrew J. Spano
County Executive

Department of Public Safety
Thomas Belfiore
Commissioner/ Sheriff

OFFICE USE ONLY:

CASE #:____ 69-192 ____

DETECTIVE:____ Ju ____

Date:__ 3/01/09 ____

State of New York
Department of Mental Hygiene
44 Holland Avenue
Albany, New York 12229

Re:  Application for Firearm License

Dear Sir or Madam:

It is hereby requested that you conduct a check of your records against the name of the
below listed person, in accordance with New York State Penal Law, section 400 (4), and
that you respond to this agency in writing, as soon as possible:

APPLICANT: PLEASE COMPLETE THE BELOW LISTED INFORMATION:

Name (Last): __Nikolov__   First __Christina__   M.I. __M__

Alias/ Maiden Name:_____

Address: __REDACTED__                __REDACTED__
              STREET              CITY              STATE              ZIP

Sex: __F__  Birth Date __REDACTED__

Place of Birth: __New York__   Country: __United States__

Sincerely,

DEPARTMENT OF PUBLIC SAFETY
Westchester County Police

*Thomas Belfiore*

Thomas Belfiore
Commissioner-Sheriff

NO OFFICIAL RECORD OF HOSPITALIZATION
FOR MENTAL ILLNESS SINCE 1965. IF SEARCH
PRIOR TO 1965 IS REQUIRED, PLEASE SUBMIT
WRITTEN REQUEST

WCPD- 126N (01-01-2007)

Christina Nikolov          Explanation of "Yes" answers

(1) In addition to that which is listed in this application, I work as a flight instructor. I have worked for flight schools, as well as on an individual basis with private clients, training students and providing refresher lessons. I am also a volunteer with Civil Air Patrol, which is a branch of the United States Air Force. In addition, I also do other volunteer work.

(9) I applied for and currently hold a Concealed Weapon Permit in Florida, since Nov. 15, 2006.

(13) Even though it was not required by law, I opted to take two 6 hour training courses (Firearm Safety with live fire) and (Tactical Training). Approximately 800 Rounds fired.

Christina Nikolov          Christina Nikolov

sworn to me this
3rd day March 2009

LAINE TARBANIA
Notary Public - State of New York
No. 01TA6179869
Qualified in Westchester County
My Commission Expires December 31, 2011

\* Please describe your interest in target shooting as a sportsman:

My family and I have been involved in target shooting and other outdoor activities for as long as I can recall. Outdoor sports like target shooting have been a part of our family's culture for so long that it is difficult to imagine life without them. And it is my belief that target shooting as a sportsman strengthens ones character, while also allowing a person to connect with this nation's traditions.

\* List any other Factor(s) which you believe to be relevant to your application and which establish proper cause for the issuance of a firearm license for the express purpose of target shooting as a sportsman:

I enjoy target shooting to practice safety procedures and improve my personal marksmanship. Safety is my number one priority, so as a responsible and experienced owner of firearms, it is my belief that anyone who is afforded with opportunities to practice handling and discharging firearms in a safe environment such as a shooting range staffed by range officers, will be a far safer gun owner.

\* List all factors which you believe to be relevant to your application and which establish proper cause for the issuance of a firearm license for the purpose of Full Carry:

First of all, I have been a law-abiding citizen my entire life, as evidenced by my non-existent criminal record. And I meet all the other minimum requirements stated within the Pistol License Information Handbook.

In addition, I currently possess a concealed weapon permit (with full-carry privileges) in the State of Florida and have never once brandished or discharged my firearms anywhere other than in a safe manner at a law-enforcement utilized shooting range. As someone with considerable experience carrying a firearm legally, I am well aware of the responsibility involved when carrying a concealed firearm and the restraint required.

If ever confronted with a potentially dangerous situation, common sense dictates that the course of action is to extract myself from the situation and contact the authorities immediately. And if I am unable to escape, the only time I would ever take out my firearm would be if my life were in imminent danger and I have exhausted all other non-lethal options. But even then, depending on the circumstances (closed quarters, innocent people nearby, etc.), I would still need to determine whether using a firearm would be prudent.

I have completed three firearms safety courses with NRA Certified Instructors over the past three years and continually seek opportunities to further educate myself in the area of safety, even when not required by law.

For the past 20 years I have been a licensed commercial pilot and for more than two years, a certified flight instructor and instrument flight instructor. As a pilot and more importantly, someone who teaches people to fly, it is absolutely critical for me to always remain calm regardless of how stressful a situation becomes. I mention this because a calm demeanor is essential when either involved in or a witness to a potentially dangerous situation.

Also relevant to my application and establishing proper cause for issuing me a New York State full carry firearm license is my status a transgender female, the National Coalition of Anti-Violence Programs reports that I am far more likely to be a victim of violent crime than a genetic female. And these hate crimes are increasing locally, as well as nationwide. I have included a list of hundreds of crimes against people in similar circumstances as myself, some of which are high profile, like the Brandon Teena murder.

_Christina Nikolov_

_Christina Nikolov_
sworn to me
this 3rd day
March 2009
_[signature]_

LAINE TARBANIA
Notary Public - State of New York
No. 01TA6179869
Qualified in Westchester County
My Commission Expires December 31, 2011

CLINIQUE DE CHIRURGIE ESTHÉTIQUE
SAINT-JOSEPH

### AFFIDAVIT

I, Pierre Brassard, M.D., swear under penalty of perjury as follows:

1.  I am a physician with offices at: 1003, boulevard St-Joseph est, Montréal, Québec, Canada, H2J 1L2.

2.  I am a surgeon duly licensed to practice in Québec, Canada. My license number is 185 196.

3.  I am experienced in gender reassignment surgery.

4.  On October 25th 1999, at Montréal, Québec, Canada, I performed male-to-female gender reassignment surgery on an individual then identified to me as ~~REDACTED~~ formerly ~~REDACTED~~ New York City, New York and identified as male on this individual's birth record.

5.  At that time, I successfully completed gender reassignment surgery for Christina Nikolov and the anatomical sex of the person has changed from male to female. Any designation on her birth record and all official documents as male is incorrect.

6.  I am completing this notarized Affidavit to support Christina Nikolov's request to amend her birth record and all official documents to reflect her new name and female gender.

_September 29, 2006_
Date:

_Pierre Brassard_, M.D.

SWORN BEFORE ME in the City
of Montréal, Province of Québec,
on the twenty ninth day of
September two thousand six.

_Paul Doval, Notary Public_

PAUL DORVAL, Commissioner to the Oath/Notary Public for the whole Province of Québec, Canada, Commission expires September 11, 2009.

151,122
Paul Dorval
Notary Public

**MAJOR NORM BELSON, INC.**
**CERTIFICATE OF TRAINING**

This is to certify that I have observed _Christina Nikolov_ Safely
Handle and Discharge a firearm as required by Florida State Statute 790.06 for a
**CONCEALED WEAPON PERMIT.**

_Norman D Belson_
(Signature)

**NORMAN D. BELSON, PRESIDENT**
(Printed Name)

NRA INSTRUCTOR #3696248

_11/02/2006_
(Date)

---

I, _Christina Nikolov_ , certify that I have demonstrated safe handling and
discharging of a firearm as required for a **CONCEALED WEAPON PERMIT APPLICATION** by
Florida State Statute 790.06.

Date: _11/2/06_        Firing Facility:  _Knight Shooting Sports Complex_

_Christina Nikolov_
Firearms Training Course Participant

State of: Florida                        County of: Pinellas

Sworn to and subscribed before me this _2nd_ day of _November_ , 2006

My Commission Expires:

_Norman D Belson_
NOTARY PUBLIC

_N241-113-70-708-0_
Identification Number

_FL DL_
Identification Type

Norman D. Belson
Commission # DD349351
Expires October 23, 2008

Copyright 2006 @ Norm Belson




VR 115 (Rev. 10/83) 500M-319044(85)

DOCUMENT NO. B874441

# THE CITY OF NEW YORK
### DEPARTMENT OF HEALTH
### BUREAU OF VITAL RECORDS
## CERTIFICATION OF BIRTH

This is a certification of name and birth facts on file in the Bureau of Vital Records, Department of Health, City of New York.

**REDACTED**

156-70-411675

| DATE OF BIRTH | | | | |
|---|---|---|---|---|
| BOROUGH | QUEENS | DATE FILED | 08-25-70 | DATE ISSUED 08-01-86 |

NAME          CHRISTOPHER PANDO NIKOLOV ***

SEX           MALE

MOTHER'S MAIDEN NAME    VICTORIA ANN BROWN

FATHER'S NAME    NIKOLAI PANDON NIKOLOV

*Irene A. Scanlon*
IRENE A. SCANLON
CITY REGISTRAR

Do not accept this transcript unless it bears the raised seal of the Department of Health. The reproduction or alteration of this certification is prohibited by Section 3.21 of the New York City Health Code.



THE NATIONAL RIFLE
ASSOCIATION OF AMERICA

Awards this certificate to

Christina Nikolov

for successful completion of the

NRA
BASIC PISTOL
COURSE

Issued in

West Nyac NY

NRA Certified Instructor

Date 2/5/07

NRA Secretary

April 11, 2008

To: Whom it may concern

From: Dan Waters

Subject: Employment Reference


This letter is to verify that Christina Nikolov has been employed at Falcon Aviation Academy from February, 2008 until April 11, 2008 as an Instructor Pilot. She performed her assigned tasks within company requirements with no problems noted. I will be happy to provide a reference to anyone as needed in the future.

Dan Waters
President
Falcon Aviation Academy
770-486-5561
dan@falconairservices.com

## MAJOR NORM BELSON, INC.
## CERTIFICATE OF TRAINING

This is to certify that I have observed *Christina Nikolov* Safely Handle and Discharge a firearm as required by Florida State Statute 790.06 for a **CONCEALED WEAPON PERMIT.**

*Norman D Belson*
(Signature)

**NORMAN D. BELSON, PRESIDENT**
(Printed Name)

**NRA INSTRUCTOR # 3696248**

11/02/2006
(Date)

---

I, *Christina Nikolov*, certify that I have demonstrated safe handling and discharging of a firearm as required for a **CONCEALED WEAPON PERMIT APPLICATION** by Florida State Statute 790.06.

Date: 11/2/06    Firing Facility: __Knight Shooting Sports Complex__

*Christina Nikolov*
Firearms Training Course Participant

**State of: Florida**    **County of: Pinellas**

Sworn to and subscribed before me this *2nd* day of *November*, 2006

My Commission Expires:

*Norman D Belson*
NOTARY PUBLIC

N241-113-70-70B-0
Identification Number

FL DL
Identification Type

Norman D. Belson
Commission # DD349351
Expires October 23, 2008

Copyright 2006 @ Norm Belson

# NCIC SEARCH

# REDACTED

# NCIC SEARCH

# REDACTED

# NCIC SEARCH

# REDACTED

# NCIC SEARCH

# REDACTED

A transgender woman survived an attack by a male who drove her home from a nightclub. The woman recognized the offender as a nightclub patron when he stopped his car to offer her a ride. The offender invited himself into the woman's home by asking to use the phone. Once inside of the residence, the offender proceeded to hit and choke the woman, leaving her with a broken nose, facial fractures, bruises, and he also ripped her ear during the attack. During the attack, neighbors called police and they arrived as the offender was leaving the residence. The offender was arrested and after several court appearances, paid the survivor's medical bills. (Chicago)

Two friends, a gay man and a transgendered woman, were accosted by a group of 12 teenage males on their way home. One of the male perpetrators threatened to stab the gay man. Then the rest of the group joined in and began swinging at him with hands and punching him. Victim's friend tried to aid him and was punched in the face. She suffered a split lip and was bleeding. The perpetrators yelled anti-gay slurs during the attack and threatened to kill both of them. The victims ran for help to the precinct located across the street from where the incident took place, but the police were indifferent and refused to intervene. The Anti-Violence Project met with precinct commanders. (New York)

Although the decrease in overall number of hate crime incidents reported in 2006 may falsely suggest that violence in New York is on the retreat, a closer look at the hate violence data proves to the contrary. With 5 hate crime murders, 35 robberies, 218 assaults and attempted assaults, and 837 reported incidents of harassment, 2006 proved to be a violent year for the LGTB community in New York.

These somber statistics only confirm that LGTB people remain a prime target for hate-motivated violence in a persisting sociopolitical climate of inequality, discrimination and social exclusion of LGTB individuals by mainstream society.

The number of female victims of hate-motivated violence rose 5% (from 148 in 2005 to 155 in 2006), and the number of transgender males reporting bias incidents increased by 20% (from 5 in 2005 to 6 in 2006). On the contrary, the number of transgender female victims dropped 12% (from 100 in 2005 to 88 in 2006) and the number of male victims reporting bias-motivated violence decreased by 17% (from 434 in 2005 to 362 in 2006). Despite the 17% drop in male victims and 12% drop in transgender female victims in 2006, together they represent 70% of the total number of hate violence victims AVP assisted in 2006 (with males representing 56% and transgender females 14%). Reports of LGTB organizations targeted for hate violence were down 45% (from 29 in 2005 to 16 in 2006). Overall, there was a 13% decrease in total number of bias crime victims in 2006 (down from 735 in 2005 to 641 in 2006).

Victim numbers dropped in all age categories except for the youth and the elderly. Sixty-five of the LGTB hate crime victims in 2006 were youth under 18, a 35% increase over 48 in a previous year, and 16 were adults 65 years and older, a 33% increase over 12 victims last year. In 2006, AVP continued a focused outreach targeting LGTBQ youth which may have contributed to the higher number of victims in this age category. Victims ages 30-44 comprised the largest age group in both 2005 and 2006, however, last year the number of victims in this category dropped 22% from 263 in 2005 to 205 in 2006. Also, there was a 24% drop in 18-22 year-olds (from 62 in 2005 to 47 in 2006) and a 19% fall in victims ages 23-29 (from 127 in 2005 to103 in 2006).

The number of victims of African-descent rose 2% to 134, the only ethnic/racial category to show an increase over previous year. Asian/Pacific Islanders decreased by 43% as did Multi-racial victims who dropped by 42%, and Whites declined by 19%. Despite an overall 12% decrease in a number of reported anti-LGTB hate crime assaults, incidents involving use of weapons rose a noticeable 10% (from 73 in 2005 to 80 in 2006). The most significant was an increase in use of bats, clubs or other blunt objects as a weapon of choice by perpetrators of anti-LGTB hate crimes, a 64% increase from 11 uses in 2005 to 18 in 2006. Even though the number of victims suffering physical injuries fell 15% in 2006 (from 176 in 2005 to 150 in 2006), the number of victims requiring hospitalization in 2006 remained constant compared to 2005, with 17 victims needing to be hospitalized.

Harassment incidents, including such acts as intimidation, mail and telephone harassment, are the most common form of anti-LGTB hate-motivated violence. Despite a drop of 20% in 2006, harassment occurs with a higher frequency than any other type of anti-LGTB bias crime, with 837 instances of harassment reported to AVP in 2006 (down from 1040 in 2005). Anti-LGTB hate incidents happen all year long; however, the greatest number of bias incidents in a single month in 2006 unsurprisingly occurred in June, a month of pride and increased visibility of LGTB communities. This works to support a trend documented by AVP in prior reports that suggests that an increased visibility of LGTB people equals a rise in anti-LGTB violence.

The number of LGTB hate crime victims choosing to report bias incidents to law enforcement continued to decline in 2006. The reporting dropped by 28% (from 275 in 2005 to 198 in 2006). While victims gave a variety of reasons for not reporting the anti-LGTB hate crimes to the authorities, one most often cited reason was a fear of bias attitude from and revictimization by the police. These statements are paralleled by 25% drop in reported courteous attitude exhibited by the police. Reports of incidents of verbal and physical abuse by police remained relatively even as compared to 2005. There was a considerable increase of 118% (from 11 in 2005 to 24 in 2006) in reported incidents that were refused hate crime classification by police. Getting the law enforcement to properly classify incidents as hate crimes continues to be a challenge and a

source of frustration for many LGTB hate crime victims. To further complicate the matter, the vast majority of those who commit bias crimes against LGTB people are never caught and their acts of hate go unpunished. In 2006, just 23% (45) of 197 anti-LGTB hate crimes reported to the police resulted in arrests, a 25% decline from 60 arrests in 2005. Males remain the primary perpetrators of anti-LGTB hate violence, even thought their numbers registered a slight decline of 19% (from 841 in 2005 to 682 in 2006). The number of female offenders also declined from 160 in 2005 to 127 in 2006, a 21% decrease. There was however a significant decrease of 92% in offenders 65 years and older (down from 12 in 2005 to 1 in 2006), and a 72% drop in Multi-racial perpetrators. Overall, there was a 16% decrease in total number of bias crime offenders in 2006 (down from 1058 in 2005 to 893 in 2006).

An analysis of data for bias crime location showed that the LGTB hate crime victims are increasingly targeted at a residence or near their home. Thirty-six percent more hate crimes in 2006 occurred at a residence or the home of the victim (132 in 2005 and 179 in 2006). When a crime occurs at one's home or residence the sense of safety that it is supposed to offer is gone. This can further complicate the trauma suffered by the LGTB hate crime victims who were targeted at home. In contrast, the number of hate-motivated violence in cruising areas declined a significant 79% (from 14 in 2005 to 3 in 2006).

## 2005-2006 TRENDS SUMMARY
TOTAL VICTIMS -9%
**Female -14%**

**Intersex +50%**

**Male -10%**

Transgender F-M N/C

**Transgender M-F +20%**

**Self-Identified -62%**

**Organizations -45%**

**Lesbian or Gay-Identified -14%**

**Bisexually-Identified +14%**

Heterosexually-Identified -6%

**Questioning or Unsure +18%**

African Descent +7%

Arab & Middle Eastern -27%

Asian & Pacific Islander +10%

**Indigenous/First Peoples +133%**

Latina/o -1%

Multi-Racial +9%

White -21%

Extent of Injuries:

**No injuries -18%**

**Minor injuries +14%**

**Serious injuries -10%**

Of Victims Injured:

*No medical attention req. +153%*

*Needed, but not received N/C*

*Outpatient treatment received -4%*

*Hospitalized +7%*

Travesty of justice

May 1997

# articles

| clubs and cafés | events | resources | articles | hot links | feedback |

# Travesty of justice

## When is a murder not a murder? When the victii transsexual.

### by Kevin Rothstein

There is no one to answer for the death of Chanelle Pickett, a pre-operative transsexual whose one-night stand ended with a vicious beating in the bedroom of a Watertown apartment in November 1995. The man who took her home that night was found guilty May 3 only of punching Pickett in the face -- and not, as police and prosecutors charged, of wrapping his hands around her throat and squeezing the life out of her.



Nearly a month after the verdict was delivered, the local transgendered community and others remain outraged by the acquittal of Wi Palmer, Jr., 35, a computer programmer who took Pickett home after meeting her Playland Café. On May 16, Palmer was sentenced to two years in prison (see "Jus page ). In the weeks since a Middlesex County jury aquitted Palmer of Pickett's de observers have charged that Palmer used a top-notch team of lawyers (including a nationally known forensic expert who testified for O.J. Simpson) to manipulate a homosexual panic defense -- and get away with murder.

### Homosexual panic

On November 20, just hours after Palmer had brought Pickett home, police found frequent Playland patron lying face down in a pool of blood. The room was dishev Cocaine and a homemade pipe had been swept into the trash.

An autopsy showed that fluid had accumulated in Pickett's lungs and brain. This e together with hemorrhages found on her neck muscles, led a medical examiner to c that she had been strangled -- and possibly suffocated with a piece of cloth -- for an eight consecutive minutes. According to Palmer's trial testimony, trouble started w discovered that Pickett had a penis and asked her to leave his apartment. Instead of Pickett allegedly attacked Palmer, screaming "God will never die," and "the devil i Palmer testified that he got her to quiet down by sitting on her buttocks and holdin shoulders down. "I used enough force to stabilize him. . . . I intended to get him ou house," Palmer said, adding that Pickett was still breathing when he released her.

Case 7:10-cv-05413-CS   Document 49-7   Filed 02/23/11   Page 30 of 77

Throughout the trial, Palmer's defense team emphasized that Palmer had no idea he had picked up a man. His lawyers even tried to introduce as evidence a segment from the talk show *Geraldo* entitled "Dead Ringers, Twisted Tales of Twins." On the show, Pickett appeared with her twin Gabrielle, also a pre-operative transsexual, and said she fooled men "all the time."

Describing Pickett as he first saw her at Playland shortly before midnight on November 19, Palmer carefully testified: "She was very attractive. She had nice curly hair, lipstick, full face, smelled nice, nice mannerisms."

He then told the jury how, upon their return to his Watertown apartment, the two first cooked and smoked crack, and then began to get intimate. "Chanelle Pickett reached over and removed my boxer shorts from my waist area. At that time she bent over and began to give me oral sex," he said. "We were getting romantic and I reached down and discovered Chanelle Pickett was a man. . . . I jumped up and I said `You're out of here' and turned the light on."

Under questioning from his lead attorney, Walter Price, Palmer then painted a picture of a transsexual furious at being denied sex. "It was frightening. All of a sudden it turned from a soft voice to not just a man but a crazed man who began banging the walls and preaching. Crazy talk that made no sense whatsoever," he said.

At this point in his testimony, Palmer began referring to Pickett as "he" rather than "she." As in, "I approached the bed and he kicked me in the chest, just a violent blow."

Palmer's he/she switch was apparently motivated by the idea that a jury, confronted with a heterosexual man who willingly dabbled in transsexual sex, would believe such a man capable of stuffing a comforter down someone's throat and choking him to death -- the scenario suggested by Dr. Stanton Kessler, the state's forensic pathologist. But a regular guy, a onetime construction worker who worked his way up to a good job at UNISYS -- a regular guy who felt up a girl and found a penis beneath her silk panties -- would garner sympathy.

The strategy evidently worked, which angers local transsexuals. "Is his defense, then, that he was so upset that this person had a penis?" asks Nancy Nangeroni, a Cambridge activist for Transexual Menace, which tracks cases of violence against transgenders. "Is the fact that someone's genitals are not the shape you expect them to be grounds for murder?

"[The jurors] let their homophobia, their transphobia, get the better of them," she adds. "I feel they did not do their job and, frankly, I hope this keeps them awake at night."

Others wondered what the outcome of the case would have been if Palmer had been the one found dead and a poor black transsexual who used drugs had been charged with murder. Another assault-and-battery conviction? "No way," says Watertown Police Captain Edward Deveau, who headed the investigation into Pickett's death.

### 'The story he told just didn't add up'

To investigators, the notion that Palmer didn't know Pickett was a man dressed as a woman when he brought her home from the Playland Café is ludicrous. Deveau said in an

interview after the trial that police assumed Palmer was lying after they visited Playland themselves. Their own observations of the bar, coupled with Palmer's admission that he had previously visited Playland and Jacques -- the only two transsexual bars in Boston -- made Palmer's claim seem implausible. And that doesn't even take into account the fact that six other transsexuals stepped forward to say they'd had previous encounters with Palmer. Of the two that Judge Robert A. Barton allowed to testify, both said they had given Palmer blowjobs.

"It's obvious that an argument or something happened [at Palmer's apartment] that led to her death. But the story he told about being surprised just didn't add up," Deveau says.

On the stand, Palmer changed his story from his original statement to police -- that he had stepped into the bar for a beer -- and said that he went to Combat Zone bars like the Playland every so often, but only to buy cocaine. Deveau didn't buy that either. And neither did Assistant District Attorney Adrienne Lynch, who asked the jury during closing arguments: "Do you honestly think that Playland and Jacques are the only places he could get cocaine in Boston? Or is it the only place in Boston he could get cocaine *and* a transsexual date?"



Prosecutors, meanwhile, laid out a bedroom scenario quite different from the one Palmer described. Lynch pointed to the lacy top of the purple negligee Pickett wore the night she died as evidence that Pickett's gender would have been obvious from her lack of breasts. And physical evidence suggested, but couldn't prove, that more than just an interrupted blowjob had occurred. Investigators found a stain on Pickett's jeans containing semen and saliva. Tests showed the semen could not have been Palmer's, but that the saliva could have been his. As Lynch hypothesized during closing arguments, the stain was "consistent with Chanelle Pickett ejaculating in the defendant's mouth and the defendant spitting it out in the crotch of those jeans."

As for why Palmer attacked Pickett in the first place, Lynch told the jury: "Chanelle Pickett was killed because she made too much noise. She made too much noise and William Palmer would be found out. She made too much noise and he wanted her to shut up."

### 'They didn't do a complete job'

But in a final twist reminiscent of the way O.J. Simpson's defense team devastated the credibility of physical evidence collected by the prosecution, experts brought in by Palmer's lawyers raised doubts about the way Pickett died. The only evidence linking Palmer's hands to Pickett's throat was the autopsy performed by state forensic pathologist Kessler -- which found bruises and hemorrhages on Pickett's neck muscles.

Dr. Michael Baden, who has investigated genocide in Bosnia and the assassinations of John F. Kennedy and Martin Luther King -- and who took the stand for the defense during the O.J. Simpson murder trial -- testified that there was not enough evidence to show

beyond a reasonable doubt that Pickett had been strangled to death. And Dr. Charles Wetli, an expert on cocaine's effect on the body, testified that the cocaine Pickett had inhaled that night could have caused her death. But he added that not enough tests had been done to show whether that had killed her.

Taken together, Baden and Wetli's testimony led the jury to conclude that Pickett's autopsy was incomplete and inconclusive. Facing the media after the verdict, one juror pointed specifically to the medical evidence as the fatal flaw in the prosecution's case. "They didn't do a complete job," said juror Robert Cunningham, referring to the autopsy.

### 'It could have happened to anyone'

After the verdict was read, Palmer and his family emerged from the courtroom. He clutched a Bible in one hand and held onto his girlfriend with the other. Facing the television cameras that had waited three days for the verdict, he said, "There's a lot of remorse for the Pickett family." He also reiterated his innocence.

Those who knew Pickett, meanwhile, saw no justice in the verdict. "It's a tragedy," says Joseph Michael Raedy, who has tended bar at Playland for eight years and knew the Pickett twins. Raedy, who testified that he had seen Palmer at Playland on several occasions prior to the night he picked up Pickett, questioned how Palmer could claim that Pickett's death was an accident given that he never dialed 911 for help, either after their fight or the next morning. "He didn't give a shit," Raedy says. "It could have happened to anyone who was ever with him."

---

# Justice

On May 16, citing what he called the "vicious beating" of Chanelle Pickett, Judge Robert A. Barton sentenced William Palmer to two years in prison for assault and battery. The sentence exceeded the prosecution's request for 18 months of jail time; if Barton had followed the court's sentencing guidelines, Palmer would have received only probation. Palmer will spend two years in the Billerica House of Corrections, with six months suspended for five years.

"This sends a clear message to the inadequacy of the jury's ruling," Transexual Menace spokesperson Nancy Nangeroni said after the sentencing.

Nearly 25 other transgenders and their supporters joined Nangeroni outside the Middlesex Courthouse in Cambridge the morning of Palmer's sentencing to call attention to violence against transgendered people -- violence that often goes unpunished. Activists bore a copy of a letter from US Congressman Barney Frank to Attorney General Janet Reno, urging the Justice Department to begin an inquiry into violence against transgenders. Frank also asked the Justice Department to begin compiling statistics to better track such violence. Many demonstrators pointed to Palmer's murder acquittal as proof that transgenders are not being served by this country's system of justice.

"There's just a feeling that if these people were rich white boys, things would have come

out very differently," said transsexual Stacey Montgomery.

But Judge Barton, perhaps, saw it differently. In sentencing Palmer, he addressed lead defense attorney Walter Prince: "This defendant should kiss the earth you walk on," he said.

Somebody is listening.

---

*Kevin Rothstein is a freelance writer living in Brookline.*

---

**Respond** to this article.

---



| What's New | About the Phoenix | Home Page | Search | Feedback |

Copyright © 1996 The Phoenix Media/Communications Group. All rights reserved.

# Brandon
# (aka Brandon Teena, Tenna Ray Brandon, Teena Brandon)

Location: Humboldt, Nebraska
Cause of Death: Shot to death, then stabbed, by John Lotter and Marvin Thomas Nissen.
Date of Death: December 31, 1993
Source: *Omaha World Herald*, January 9, 1994, amongst others.

## Remembering Brandon

On December 31, 1993, John Lotter and Marvin Thomas Nissen murdered Brandon, Lisa Lambert, and Philip De Vine in a farmhouse in rural Richardson County, Nebraska. These multiple murders occurred one week after Lotter and Nissen forcibly removed Brandon's pants and made Lana Tisdel, whom Brandon had been dating since moving to Falls City from Lincoln three weeks earlier, look to prove that her boyfriend was "really a woman." Later in the evening of this assault, Lotter and Nissen kidnapped, raped, and assaulted Brandon. Despite threats of reprisal should these crimes be reported, Brandon filed charges with the Falls City Police Department and the Richardson County Sheriff, however, Lotter and Nissen remained free. Lotter and Nissen have both been convicted; Lotter is currently on death row and Nissen, who testified against Lotter, was sentenced to life without parole.

Brandon was a female-bodied twenty-year-old who passed, to some extent, as a man, without hormonal or surgical intervention. Given the name "Teena Renae Brandon" at birth, Brandon used a number of different gender-neutral and masculine names. Upon first arriving in Richardson County, Tenna Ray Brandon said it would be easier to be called "Brandon". Although "Brandon Teena" has become codified as the name with which to refer to Brandon, there is little evidence for Brandon's own use of this name.

Trans, lesbian and gay, and mainstream media have been interested in this case. It received coverage and analysis in many newspapers, and in publications such as *The FTM Newsletter, Transsexual News Telegraph, TransSisters, Transgender Tapestry, The Village Voice, The Advocate, Girlfriends, Playboy, The New Yorker,* and *GLQ: A Journal of Lesbian and Gay Studies.* Aphrodite Jones wrote a true crime book, *All S/He Wanted,* about Brandon's life and death. Independent filmmakers Susan Muska and Greta Olafsdottir's documentary *The Brandon Teena Story* is currently on a theater run in the United States. The Guggenheim Museum commissioned Shu Lea Chang's web-based art installation project *Brandon.* A novel by Dinitia Smith, *The Illusionist,* bears a striking resemblance to the story of Brandon's life and death, although the novel includes the customary caveat that any resemblance to real persons is unintended. Several mainstream filmmakers, including Diane Keaton, have explored possibilities for a feature-length movie based on this story.

The murder of Brandon was a catalyst for mid-1990s trans activism, especially for the rise of Transexual Menace to national recognition in the United States and for the increased participation of ftms in U.S. trans activism.

David King
Location: Atlanta, Georgia
Cause of Death: Shot in the head
Date of Death: October 14, 1991
Source: Dallas Denny of GEA, and the Atlanta Journal-Constitution

# Ontwon Curtis

**Location:** Newport News, Virginia
**Cause of Death:** Shot several times in the chest
**Date of Death:** September 13, 2002
**Source:** WVEC Channel 13, September 13, 2002
**Notes:** Ontwon Curtis, who neighbors claim was a transvestite, was shot several times in the chest while at home. Andrew Coleman has been arrested in this crime, and is awaiting trial.

# Roberta Nizah Morris

**Location:** Philadelphia, Pennsylvania
**Cause of Death:** Beaten with a crowbar
**Date of Death:** December 24, 2002
**Source:** *Philadelphia Inquirer*, December 31, 2002
**Notes:** Morris was a popular transgender performer. Police initially attempted to assist her on December 22nd, but released her after she refused medical treatment. She was later found by a passing motorist, and died in the hospital on Christmas Eve. While a medical examiner has declared this a homicide, the police want to assume it to have been an accidental bludgeoning. Many in the community have wondered why the police have been so difficult to work with on this case.

# Chandini, aka Nazir

**Location:** Bangalore, India
**Cause of Death:** Burned to death
**Date of Death:** December 1, 2002
**Source:** Sangama (rights organization)
**Notes:** Chandini was a 22 year old hijra, or transgendered woman. While police has declared this to be a suicide, strong evidence suggests otherwise.

# Shelby Tracey Tom

**Location:** North Vancouver, British Columbia, Canada
**Cause of Death:** Murdered, allegedly by Jatin Patel
**Date of Death:** May 31, 2003
**Source:** *Xtra! West*, Jun 12, 2003br /> Notes: Tom was a 40-year-old Asian transsexual. Her body was discovered in a shopping cart behind a North Vancouver laundromat. Jatin Patel, a 29-year-old, was charged with 2nd degree murder.

# Unknown Transgendered woman

**Location:** Cali, Columbia
**Cause of Death:** Stabbed multiple times
**Date of Death:** March 6, 2003
**Source:** Vanessa Foster
**Notes:** This transgendered person was roughly 25 years of age. She was dumped from a car alongside a highway. Reports indicate that she died of six stab wounds in different parts of her body.

# Jessica Mercado

**Location:** New Haven, Connecticut
**Cause of Death:** Stabbed multiple times, then burnt
**Date of Death:** May 9, 2003

Michelle Paz
Location: Valencia, Carabobo, Venezuela
Cause of Death: Shot four times
Date of Death: January 11, 2002
Source: The International Gay and Lesbian Human Rights Commission (IGLHRC)
Notes: As part of continued violence and harassment of transvesti activists in Venezuela,
Michelle Paz was shot four times, reportedly by police officers. Other local transpeople
were fired upon and detained by police in the days that followed Paz's death.

# Paola Matos

Location: Brooklyn, New York
Cause of Death: Strangled, allegedly by Fernando Batista
Date of Death: July 22, 2002
Source: The New York Post, July 23, 2002
Notes: Paola Matos had recently moved to New York after a series of transsexual-related surgeries done
abroad. She was discovered in her home by her live-in boyfriend with a white cord wrapped around her
throat.

# Terrianne Summers

Location: Jacksonville, Florida
Cause of Death: Shot
Date of Death: December 12, 2001
Source: Florida Times-Union, December 14, 2001
Notes: Terrianne Summers was a transgender activist in the Jacksonville area, who had been very involved
in efforts against discrimination at the Winn-Dixie food chain. She was shot to death on her own front yard
days after participating in the 2001 Transgender Day of Remembrance in Florida.

# Deasha (Gerald Andrews)

Location: Jacksonville, Florida
Cause of Death: Shot multiple times
Date of Death: August 8, 2002
Source: WLTV 12, Jacksonville, Florida
Notes: Deasha Andrews was discovered in her car, after having been shot several times.

# Pilar (Vladimir) Ibáñez Carrasco

Location: Rinconada, Chile
Cause of Death: Murdered
Date of Death: April 5, 2002
Source: La Cuarta, April 22, 2002
Notes: Pilar (Vladimir) Ibáñez Carrasco met up with an unknown man on a motorcycle on the night of April
5th. Some time thereafter, her body was found floating in a canal in Chile. The president of Traves Chile, a
Chilean transgender activism group, counted Pilar as their 23rd murder their group has been involved with.

**Source:** *New Haven Register*, May 11, 2003
**Notes:** Jessica Mercado was a 24-year-old transwoman. Mercado's body was found draped across her mattress in the charred remains of her apartment. She has been stabbed multiple times before the apartment was set on fire. Mercado was laid to rest in her native Puerto Rico.

# Selena Álvarez-Hernández

**Location:** Council Bluffs, Iowa
**Cause of Death:** Stabbed several times
**Date of Death:** July 31, 2003
**Source:** *Daily Nonpareil*, August 2, 2003
**Notes:** Álvarez-Hernández was a resident of Nebraska, and worked at an Omaha meatpacking plant, and was last seen alive leaving an Omaha bar. Álvarez-Hernández was found stabbed several times and unconscious on the lawn of a house in Council Bluffs, and was pronounced dead a short time later at a nearby Hospital.

# Dayana Valverde

**Location:** Guatamala City, Guatamala
**Cause of Death:** Shot
**Date of Death:** July 1, 2003
**Source:** *La Hora*, July 1, 2003 **Notes:** Valverde was shot multiple times in the streets of Guatamala City. Paramedics called to the scene did attempt to stabilize her wounds, but she passed away in intensive care at a local hospital.

# Rider Orcero

**Location:** Milan, Italy
**Cause of Death:** Strangled
**Date of Death:** October 30, 2003
**Source:** *Il Cittadino*, November 1, 2003
Orcero was a 35-year-old Peruvian national living in Milan, Italy. She was found in her apartment, hogtied and strangled with nearly three yards of cord from a Playstation. Her nose was also broken with an undetermined blunt object, causing a hemorrhage that left blood stains on the bedroom floor.

# Darryl Fearon

**Location:** New York, New York
**Cause of Death:** Stabbed
**Date of Death:** July 16, 2004
**Source:** *Newsday*, July 16, 2004
**Notes:** The 17 year old victim had come to the aid of three transgender individuals who were being harassed by Christian Soto-Ruiz. Soto-Ruiz stabbed this victim to death with a kitchen knife, and slashed one of the transgender individuals.

# Divas B

**Location:** Portage la Prairie, Manitoba, Canada
**Cause of Death:** Beaten to death
**Date of Death:** November 3, 2004
**Source:** *CBC*, November 5, 2004
**Notes:** Divas was a 20-year-old transgender woman. She had been living as a woman for many years. Her body was found by a couple of hunters in some brush near a rest stop eight kilometres east of Portage. She had been beaten to death.

## Robert Binenfeld

Location: Monroe, New York
Cause of Death: Strangled by Jason Bardsley
Date of Death: December 21, 2004
Source: *Times Herald-Record*, August 6, 2005

## Tyra Hunter

Location: Washington, D.C.
Cause of Death: Received inadequate care from D.C. general hospital, and from the medical team on scene of the accident.
Date of Death: August 8, 1995
Source: Widely reported
Notes: For details on the Wrongful Death / Survivor's action suit brought forth by Tyra's mother

## Unidentified crossdressed person

Location: Atlanta, Georgia
Cause of Death: Shot to death
Date of Death: December 20, 1992
Source: Dallas Denny of GEA

## David Perez

Location: San Francisco, California
Cause of Death: Murdered
Date of Death: 1991 (?)
Source: Dallas Denny of GEA
Notes: Case is believed to be unsolved.

## Logan Smith

Location: Hoffman Estates, Illinois
Cause of Death: Septic shock due to a punctured bladder.
Date of Death: February 22, 1996
Source: *Transgender Tapestry*, Issue #79, Summer 1997
Notes: Police officers kicked Logan in his abdomen and sprayed him with pepper gas, after stopping him for "failure to signal a right turn and failure to display a license plate." Smith had offered no physical resistance. He died later that evening.

## Alan Fitzgerald Walker

Location: Fayetteville, Arkansas
Cause of Death: Beaten and strangled to death by Adam David Blackford and Yitzak Abba Marta
Date of Death: November 9, 1996
Source: *Southern Voice*, July 24, 1997 and the *Northwest Arkansas Times*, July 11, 1997
Notes: Walker's body was discovered three days after the murder. "KKK" was scrawled in blood on a closet door in Walker's home, and the tires were slashed on Walker's vehicle. Blackford and Marta were both convicted to life in prison.

## Jose Angel Osuna

Location: San Diego, California
Cause of Death: Shot several times in the chest and stomach
Date of Death: July 2, 1990
Source: *The San Diego Union-Tribune*, December 17, 1990

# Richard Goldman

Location: New York City, New York
Cause of Death: Shot and killed by his father, retired state judge Milton Goldman.
Date of Death: December 29, 1991
Source: *St. Paul Pioneer Press*, December 30, 1991
Notes: Richard Goldman was shot to death by his father, who then took his wife Phoebe's life, then his own life. A neighbor indicated that the family was upset with Goldman's crossdressing and "wanted him to 'act normal."

# Thomas Hall

Location: Wahiawa, Hawaii
Cause of Death: Beaten in the head with a brick by U.S. soldier Anthony Tyrone Biscoe.
Date of Death: August 15, 1996
Source: *Honolulu Star-Bulletin*, August 16, 1996 and August 28, 1996

# Chrissey (Marvin) Johnson

Location: Baltimore, Maryland
Cause of Death: Multiple stab wounds delivered by Allen Horton
Date of Death: January 2, 1993
Source: *Cross-Talk* #42, April 1993 and *The Baltimore Sun* January 4, 1993
Notes: Chrissey was found by police naked, with her feet tied together. She had been stabbed at least 15 times and had been thrown from the second floor of her apartment to the first. Horton has told the police four different stories about that evening; one version had Johnson raping Horton.

# Venus Xtravaganza

Location: New York City, New York
Cause of Death: Murdered
Date of Death: 1989 ?
Source: *Transgender Warriors* by Leslie Feinberg
Notes: Venus appeared in the film *Paris Is Burning*. Died before the film was finished.

# Lazaro Comesana

Location: Miami, Florida
Cause of Death: Strangled to death by Rory Enrique Conde
Date of Death: September 17, 1994
Source: Lexis-Nexis
Notes: The first of six victims of the "Tamiami Strangler," a serial killer who focused on prostitutes. Lazaro was the only one of his six victims who was transgendered.





# Anna Francisco

**Location:** Philadelphia, Pennsylvania
**Cause of Death:** Stabbed several times in the chest and stomach.
**Date of Death:** December 22, 1990
**Source:** Natasha (Tash515@aol.com) and *Cross-Talk* #25, June 1991.

# Stephan "Stephanie" Chapman

**Location:** New York City, New York
**Cause of Death:** Gunshot wound to the head
**Date of Death:** December, 1992
**Source:** www.godhatesfredphelps.com.

# Ernest "Ernestine" Murray

**Location:** Oakland, California
**Cause of Death:** Shot
**Date of Death:** March 2, 1981
**Source:** *San Francisco Examiner*, March 3, 1981

# Unknown Transvestite Prostitute

**Location:** Bronx, New York.
**Cause of Death:** Beaten and stabbed to death by Augustin Rosado
**Date of Death:** February 8, 1992
**Source:** *Orlando Sentinel*, February 9, 1992
**Notes:** Mr. Rosado, shortly after the murder, jumped to his own death.

# Reynaldo "Reyna" Sandoval

**Location:** Oxnard, California
**Cause of Death:** Shot in the chest and head.

**Date of Death:** February 26, 1995
**Source:** *The Los Angeles Times*, December 30, 1995

# Christiaan D'Arcy

**Location:** Hartford, Connecticut
**Cause of Death:** Strangled by Thomas Saltonstall. He also tied up D'Arcy and put him in the trunk of D'Arcy's car, which Saltonstall set on fire.
**Date of Death:** January 26, 1993
**Source:** *The Hartford Courant*, January 28, 1993 and July 23, 1994
**Notes:** Saltonstall, a friend of D'Arcy's, pled guilty of the crime and was sentenced to 32 years in prison.

# Emmon Bodfish
# (aka Margaret Ingalls Bodfish)

**Location:** Orinda, California
**Cause of Death:** Bludgeoned to death with a blunt object
**Date of Death:** June 24, 1999 (approximate)
**Source:** *San Francisco Chronicle*, July 1, 1999, and the *Contra Costa Times*, July 2, 1999
**Notes:** Emmon's son, Maxwell Wills, was found dead from self-inflicted wounds in Santa Monica the day after Bodfish was discovered. The police, though, have all-but-ruled out Max in connection with Emmon's death.

## FTM Found Dead in Northern California

Emmon Bodfish, a reclusive female-to-male transperson, was found by police in their Orinda, California home on July 1st. Police are investigating the death as a homicide.

Mr. Bodfish's body was discovered by police, who had been asked by another individual to check the home. They were discovered on the floor in the main part of the house. Police reports point to blunt force trauma as the cause of death, though the murder weapon has been determined. There were no signs of forcible entry, and while the house was in some disarray, the police were unsure if these were signs of struggle and/or ransacking, or just indicators of the upkeep of the house.

While the police have been reluctant to speak about the gender identity of the victim, neighbors have indicated that Bodfish had been living as a male and may have undergone some surgery. Initial reports on this case indicated that the coroner's office was having difficulty determining the gender of the victim, though this may have had more to do with the decomposition of the body — which had been sitting in the home for "about a week" — rather than any other reason.

Bodfish, under their birth name of Margaret Ingalls Bodfish, purchased the home in Orinda, saying that it was for "her son," Emmon. He also owned another residence in Mill Valley.

Anyone with information is urged to contact Sgt. Mark Hale at 925-313-2630, or Sgt. Chris Wenzel at 925-253-4250.

# Derrick "Miss Tess" Hampton

**Location:** Memphis, Tennessee
**Cause of Death:** Stabbed and beaten
**Date of Death:** October 23, 1993
**Source:** *The Memphis Commercial Appeal*, January 2, 1994

## Sherri Ransom

**Location:** Morrisville, Pennsylvania
**Cause of Death:** Beaten to death with a hammer by Johnny Fitzpatrick.
**Date of Death:** June 24, 1990
**Source:** *Philadelphia Daily News*, January 17, 1991
**Notes:** Fitzpatrick confessed to the slaying, saying he went to the Ransom's apartment to steal her fur coat.

## Michelle Byrne

**Location:** Nashville, Tennessee
**Cause of Death:** Tortured for several hours, beaten to death, and beheaded by Kenneth Poole and Ralph David Frantzreb
**Date of Death:** January, 12, 1987
**Sources:** *United Press International*, March 30, 1987 and *The Tennessean*, September 13, 1988
**Notes:** Byrne's body, minus its head, hands and feet, was found floating in the Cumberland River. Frantzreb was given a life term.

## Clyde Massie

**Location:** Pittsburgh, Pennsylvania
**Cause of Death:** Shot to death by Stephen Orosz Jr.
**Date of Death:** August 15, 1985
**Source:** *United Press International*, July 18, 1986
**Notes:** Stephen Orosz Jr. tried to claim self defense in this case, but the judge rejected Orosz's claim. Orosz was convicted of first-degree murder, which carries a mandatory life sentence.

## Jane Golden
## (James Boyd)

**Location:** St. Petersburg, Florida
**Cause of Death:** Murdered by Steven W. White
**Date of Death:** February 6, 1987
**Source:** *St. Petersburg Times*, December 13, 1987
**Notes:** White was convicted of first-degree murder.

## Perry Young

**Location:** New York City, New York
**Cause of Death:** Shot in the head by Ronald Haynes
**Date of Death:** December 21, 1977
**Source:** *New York Times*, December 23, 1977 and March 13, 1980
**Notes:** Young was killed at the same time and William Flood, an off-duty police officer. Ronald Haynes, after three mistrials, was sentenced for both murders.

## Person dressed in women's clothing

**Location:** Santa Ana, California
**Cause of Death:** Shot to death
**Date of Death:** July 10, 1993
**Source:** *The Los Angeles Times*, July 12, 1993

## Yancey-Lisa R.

Location: San Francisco, California
Cause of Death: Stabbed once in the abdomen and four times in the back
Date of Death: Easter, 1975
Source: Drag, Volume 5, Number 19, the San Francisco Sentinel, April 10, 1975, and Crusader, May 1975
Notes: Yancey-Lisa was the neighbor of Barbarella (Joe V.), who was killed within weeks of Yancey-Lisa.

## Marvin Ball

Location: Oklahoma City, Oklahoma
Cause of Death: Gunshot wound
Date of Death: 1987 (approximate)
Source: The Oklahoman, August 9, 1988 and September 9, 1988
Notes: Ball was found about six months to a year after their murder, as the body was in an advance state of decay. They were found at Lake Stanley Draper.

## Lindsey Alexander
## (Todd Alexander Asay)

Location: Portland, Oregon
Cause of Death: Shot to death, allegedly by Brian David Hill.
Date of Death: May, 1989
Source: KOIN Channel 6 and KPTV Channel 12

### Body Unearthed in Portland:
### Disappearance Now Considered Solved

A body, unearthed in the backyard of a southeast Portland home on December 24th, 1999, has been identified by police as that of Todd Alexander Asay, who worked as a female impersonator at Darcelle's Nightclub, under the name of Lindsey Alexander.

Todd/Lindsey was last seen alive in May of 1989, and, due to circumstances surrounding the death, was listed as a homicide victim by Portland police. A phone tip led officers to the remains, located in the yard of a residence on Southeast Hollman Avenue. The Oregon State Medical Examiner's office determined that the remains were, indeed, of Todd/Lindsey.

Police have also already determined a suspect in the case, that being Brian David Hill. Hill is currently in custody for the murder of his ex-wife. The owner of the yard in which the body was found was not linked to the death, according to police.

Todd/Lindsey was 25 years old at the time of the disappearance. They were shot to death.

## Jill Seidel

Location: Honolulu, Hawaii
Cause of Death: Undetermined, see notes
Date of Death: February 3, 2000
Source: Carolyn Golujuch
Notes: Though police, who have been lax to pursue this case, claim this to be an substance abuse case, evidence in the autopsy report indicate that foul play may have played a much larger part than the police wish to admit.

## A Trans Death In Paradise

Jill Seidel, a 32-year-old homeless transsexual in Hawaii, died after being discovered, unconscious, in the middle of the night near Aala Park in Honolulu 's Chinatown. The cause of death is still undetermined.

Jill, originally from Chicago, faced a large number of obstacles in her life, including an AIDS diagnosis in the 1980s, a drug addiction, and a history of time spent in area psychiatric care for depression.

She was making her life in Hawaii as a prostitute, and was often beaten by pimps for not sharing her profits.

Carolyn Golujuch, a local activist and president of the Honolulu chapter of PFLAG, feels that her death may have been at the hands of these same pimps, who may have had a hand in this death.

"I'm as sure as I can be that this case is connected to a bias or hate crime," Golujuch said

The local medical examiner's office first listed the case as "natural causes," and, after this was challenged, it was changed to no official cause of death. The Medical Examiner's office listed Seidel's death as a drug overdose, though toxicology reports had not yet been completed.

Some details about the scene of her death, though, add to Golujuch's claim, or at least should open this case up for a second look. A swastika was drawn on her right arm, in lip stick. A curious adornment for a person who had very strong feelings about the Holocaust. Further, her body showed a fresh puncture wound of the right face and a small laceration of the lower potion of the right earlobe with abrasions/ contusions. None of these were considered in the 'Cause of Death."

Seidel addiction was not her biggest issue, according to anothera local transsexual, Tammy Wronski. Seidel's biggest problem was finding acceptance, even in his own mind.

It was Wronski, also from Chicago and facing many of the same life issues as Seidel, who suggested the move to Hawaii, feeling that living in " paradise" would help them stay sober. Seidel found herself unable to change.

"I can't tell you the number of times she would say, 'I'm a freak! I'm a freak!' " said Jerry Ford, assistant director of Gregory House Programs, a Honolulu agency that provides housing for people suffering from HIV and AIDS.

"This is what people would tell her, and i think, deep down, she had trouble accepting herself.

# Michelle Lynne O'Hara

Location: New York City, New York
Cause of Death: Suicide after being brutally beaten and raped
Date of Death: March 14, 2000
Source: Lynne Smith
Notes: Though transgender suicides generally fall outside the scope of this project, I have chosen to include this case due to the circumstances surrounding her death. One can easily assume that Michelle would not have taken her life if not for the rape and beating she suffered

### Remembering Michelle

Michelle was love. She loved her friends, family, the theater, living in New York City, and life. Michelle's smile and warmth were her signature. She was always happy and full of energy. Running and keeping fit was a passion for Michelle. She was so giving and generous as well. Her sense of humor was inspiring. Recently, she had redone her bedroom in a Martha Stewart inspired motif. She took the brunt of many of her friends "ribbing" and would point her finger and say, "Go ahead and make fun. I'm telling Martha! Then we'll see who has the last laugh!"

Michelle could recite the lines and songs of many Broadway shows. She practically lived in the theater ! She saw Cabaret 7 times, the Lion King 5 times and many others multiple times. The theater was magical for Michelle.

She always said it energized her after seeing a show.

Recently, Michelle met a wonderful man — Greg. They were well on their way to dating. Michelle would talk to me for hours about him. How nice and gentle his voice was. How their senses of humor were congruent. She talked on the phone for hours with him and afterwards, would recant the conversations with me. Her face would light up and that beautiful smile abounded. Her friend, Barbara, was a confidant and supporter. Barbara encouraged Michelle to take a risk with Greg. She was always there for Michelle with kind words and hugs. After Michelle was assaulted, Barbara and Greg were an endless source of encouragement and support. I will never be able to thank them enough for being in her life.

The beating and rape were the direct cause of her suicide. Prior to that, Michelle was the happiest and most positive person I knew. Afterword, she completely withdrew. She did reach out to friends and her therapist, however, the emotional scars were much deeper than anyone knew. I found her in her apartment after her suicide. I called 911, started CPR without successful resuscitation. She also left two notes. One to me and one to her friend Greg. The note explained her hopelessness. I still cannot bring myself to read it again. This is still all very fresh and upsetting.

The beating and rape occurred randomly as Michelle was walking home from an evening out with a friend. She was followed and pulled into an alleyway. According to Michelle's recant of this horrific tragedy, she said that as soon as the rapist saw she was biologically a male, he began beating and kicking her. He fractured 2 of her ribs, her genitalia were badly bruised and swollen secondary to his kicks. Her rectum was ripped secondary to the rape and required several stitches. Her right eye was badly bruised. He left her badly beaten and terrified. She laid in the alleyway for several hours until a passerby heard her and assisted her until the ambulance arrived. She was taken to the hospital and was treated with indifference by the hospital staff because of her transgendered status. The police were also less than empathic. To this day, no follow-up has occurred by the police — to my knowledge. So yes, Michelle was raped, beaten, treated horribly by hospital personnel and the police because of her transgendered status. I am outraged by it all!

Dear Michelle, we will never forget you. You have left a void in our lives. Our hearts are broken.

In the words of Mother Teresa: "Yesterday is gone. Tomorrow is yet to come. We have only today. Let us begin to heal."

# Tyra Henderson

Location: Washington, D.C.
Cause of Death: Bludgeoned to death
Date of Death: April 23, 2000
Source: Transgender Nation Washington

## Another Tyra

In the early morning hours of Easter Sunday, Tyra Henderson, a 22-year old African-American transgendered person, was found murdered in the 3600 block of 13th Street in Northwest Washington. She had been bludgeoned to death. There were reports that her body was mutilated (her breasts were slashed and her penis cut off) but the Metropolitan Police Department (MPD) has denied them. Earlier that night she had been working the 5th Street NW corridor. A friend reported her missing after she did not return from a date.

A 911 call was made at 4 a.m. Sunday morning, reporting a woman yelling, "help, help, call the police" from the 3600 block of 13th Street NW. According to MPD, officers from the Metropolitan Police Department's 4th District responded, saw nothing and left. Two hours later, the 911 caller, having not seen the any police, called 911 a second time to report a body outside of her house. An ambulance finally responded, but Tyra Henderson was already dead.

The Metro Section of the Washington Post, following its usual pattern of execrable coverage of transgendered people, erased the victim's transgender identity in a story on Monday, April 24. Despite evidence of overkill, the MPD has labeled this a pick-up murder and not a hate crime, and have stated they have no suspects in the case at this time.

The Gay and Lesbian Activists Alliance (GLAA) has asked the police to investigate why the police failed to respond appropriately to the first 911 call. The ACLU National Capital Area has been contacted by the family and is looking into the case. Despite reports of MPD harassment, GLAA will continue to monitor the case and work with the police.

A candlelight vigil for Tyra Henderson, held Friday night, April 28 at 6th & K Streets NW drew over a hundred people, including family members, friends, and many transgendered people, and was sponsored by GLAA, HIPS (Helping the Individual Prostitute Survive) GLAAD and Transgender Health Empowerment (THE — formerly known as TADD).

# Dinh Van Vo

**Location:** Honolulu, Hawaii
**Cause of Death:** Strangled by Demian McGuire
**Date of Death:** September 6, 1993
**Source:** *Honolulu Star-Bulletin,* December 5, 2000
**Notes:** McGuire was sentenced to 10 years in prison, for manslaughter.

# Antonio Johnson

**Location:** Dallas, Texas
**Cause of Death:** Shot
**Date of Death:** April 10, 2001
**Source:** Monica Helms
**Notes:** Johnson was the third Texas death in 2001.

# Jamie (James) Jackson

**Location:** Washington, D.C.
**Cause of Death:** Beaten to death in her own doorway
**Date of Death:** November 21, 2001
**Source:** Jessica Xavier
**Notes:** Jackson was a member of Transgender Health Empowerment, a D.C.-area African-American support group. Jackson's death has yet to be officially reported as a homicide by the DC Metropolitan Police.

# Alejandro Ray Lucero

**Location:** Phoenix, Arizona
**Cause of Death:** Murdered
**Date of Death:** March 3, 2002
**Source:** Phoenix, Arizona police report
**Notes:** Little is known about the death of Alejandro Ray Lucero, aside from the fact that she was murdered in Phoenix, and her body was dumped in the alley.

# Ukea Davis

**Location:** Washington, DC
**Cause of Death:** Shot multiple times
**Date of Death:** August 12, 2002

Source: WJLA ABC 7, Washington, DC
Notes: Ukea was killed at the same time as Stephanie Thomas. Ukea and Stephanie were friends living in Washington, D.C., and had begun living in their preferred gender roles. Both were shot multiple times in a car they often shared. They were half a block away from home. Anyone with information about this crime is asked to call (202) 727-9099. There is a $10,000 reward available.

# Kim Mimi Young

Location: Washington, D.C.
Cause of Death: Stabbed to death, allegedly by Corena Niko Watkins.
Date of Death: April 9, 2003
Source: Jessica Xavier
Notes: Mimi was a transgendered sex-worker in Washington, D.C., and had also been a key prosecution witness in a murder trial in 2000. She was initially found on the 9th, gasping for air, by a D.C. resident. She had been stabbed, and succumbed to those injuries later that morning. 34-year-old Watkins has been charged with this murder.

# Cinnamon (Kendrick) Perry

Location: Houston, Texas
Cause of Death: Shot to death
Date of Death: July 20, 2003
Source: The Houston Chronicle, July 20, 2003
Notes: Perry, a 32 year old African-American, was shot by a passing car while walking down a street in the Montrose area in Houston shortly after dawn. She was taken to a local hospital, but died that afternoon

# Bella Evangelista

Location: Washington, D.C.
Cause of Death: Shot, allegedly by Antoine Jacobs
Date of Death: August 16, 2003
Source: Washington Post, August 18, 2003
Notes: Bella Evangelista was a popular entertainer in D.C., and periodically performed at Club Chaos. She was shot multiple times at close range. Antoine D. Jacobs has admitted to the murder, but claims it was in self-defense. Police do not believe his story, and are treating this murder as a hate crime.

# Erika Johana

Location: Rome, Italy
Cause of Death: Bludgeoned
Date of Death: October 10, 2003 (approximate)
Source: Corriere della Sera, October 15, 200
Notes: Johana was a young Columbian transgendered woman living in Italy. Her body was found by a friend in the bathroom, in only a bra and slip, leaning over the tub. Her skull was shattered by a blunt object. She had been dead for several days before she was discovered.

# Reshae McCauley

Location: Largo, Florida
Cause of Death: Severe upper body trauma
Date of Death: December 7, 2003
Source: St. Petersburg Times, December 9, 2003

## Joel Robles

Location: Fresno, California
Cause of Death: Stabbed
Date of Death: August 15, 2004
Source: KFSN, August 16, 2004
Notes: Estanislao Martinez is being held by police for this murder.

## Ryan Shey Hoskie

Location: Albuquerque, New Mexico
Cause of Death: Undetermined; body did show signs of upper body trauma.
Date of Death: December 27, 2004
Source: Albuquerque Tribune, January 8, 2005

## Eddie "Michelle" Chung Chou Lee

Location: Daly City, California
Cause of Death: Multiple stab wounds
Date of Death: March 1, 2005
Source: San Mateo County Times, March 1, 2005

## Kasha Blue, aka Antonio Wright, aka Sydney

Location: Chicago, Illinois
Cause of Death: Stabbed
Date of Death: June 18, 2005
Source: Chicago Sun-Times, June 22, 2005

## Kaaseem Adalla Juanda

Location: Glenwood, Iowa
Cause of Death: Shot to death
Date of Death: October 17, 2005
Source: Council Bluffs Daily Nonpareil, October 22, 2005
Notes: Juanda was a 60 year old, post-operative transsexual woman who had been living in Kansas City, Kansas. On October 17, 2005, her body was found near a rest stop on Interstate 29 outside of Glenwood, Iowa. There was initially some suspicion that her death was a suicide, but additional details have caused police to suspect a homicide. If you have any information on this murder, please contact the Iowa Division of Criminal Investigation at (712) 322-1585 or the Mills County Sheriff's Office at (712) 527-4871.

## Harvey Aberles

Location: New York City, New York
Cause of Death: Shot by NYPD
Date of Death: 1975
Source: Drag Magazine, Volume 6, Number 24
Notes: Aberles was a decorated hero of the Vietnam War.

## Anthony Swain

Location: Atlanta, Georgia
Cause of Death: Shot to death
Date of Death: November 8, 1992
Source: Dallas Denny, GEA

# Michelle Maree
# (aka Michelle Hays, Joe Michael Hays)

Location: Memphis, Tennessee
Cause of Death: Shot in the chest
Date of Death: November 5, 1990
Source: Dallas Denny of GEA and *Cross-Talk* #25, June 1991
Notes: Michelle won Miss Gay Memphis in 1974

# Jae Stevens

Location: San Francisco, California
Cause of Death: Five stab wounds, three directly to the heart.
Date of Death: June 24, 1974
Source: *Drag* Magazine, Volume 4, Number 16

### Jae Stevens: 1974, Contemporary

Sometimes when you look into the past, you find tales that echo events of today, such as the case of the murder of Jae Stevens.

Stevens, born in 1947, was an accomplished drag performer in San Francisco, having started her performing career in 1967, at "The Fantasy," a club that was then on Mason Street. She then went on to the famed Finocchio's club and played the cabaret circuit in San Francisco and Los Angeles.

She seemed well-loved by her SF peers, who spoke of her, in memory, as a good friend, with a "great ability to find humor in any situation." A good example would be when, in 1970, she attended a gala charity benefit in drag, and won the grand prize in a contest at the event, only them revealing herself to be a female impersonator. This, as was reported, upset "the socially prominent judges no small degree."

On the night of June 24th, 1974, a resident from near Golden Gate Park heard cries for help, and the morning of the 25th, Jae's body was discovered near Spreckels Lake. She had been stabbed five times, three of which went directly into her heart.

Two hours before the body was found, a suspect had been seen driving Ms. Stevens' car in Hayward, in an area then known for a high incidence of rape attacks. The suspect escaped, after crashing the car into a house. I was unable to find any information that would lead me to believe that any suspect was ever caught and tried.

How is this story contemporary? As of this writing, another transperson has recently passed on in Austin, Texas, of multiple stab wounds. Others have died in Boston, and California, in the same pattern. And police are still not finding our murderers. It seems to be an established pattern, spanning from at least 1974 to the present.

This pattern needs to break. Not just for the Brandon Teenas and Rita Hesters with whom we are familiar with today, but for the Jae Stevens and others in our past.

# Mara Duvouw

Location: New York City, New York
Cause of Death: Murdered
Date of Death: 1995
Source: Rosalyne Blumenstein, GIP
Notes: This case was officially labeled a "suicide," though most in the community have suspected it to be a murder.

# Chanel Chandler

Location: Clovis, California
Cause of Death: Stabbed to death, allegedly by Christopher Joseph Lopez and a 16-year-old friend.
Date of Death: September 20, 1998
Sources: *IYF*, 11/98 and *The Fresno Bee*, December 15, 1998

### In Memory Of One Of Us

Chanel Chandler was one of the transgendered people you don't hear about.

She was raised in a conservative Montana family. She was living a successful life, and had started a perfume business, and was respected and admired by people around her. Charlie Gilbert, a close friend of hers, said of her "I wouldn't be surprised if she was wealthy in 10 years. She had that energy and drive."

From the few accounts we have, she lived "stealth" — her roommate and close friends of hers didn't know she was transsexual. When all is said and done, her attempts to live a normal life were ended far too quickly.

In the end, she was not given an ounce of respect by her murderers — the last people to see her on this earth. Her murderers set fire to the apartment she was killed in, probably to make the murder appear like another type of crime, according to police.

Many of us live our lives quietly — just like most people. We go to work, we have our dreams, our friends, and our lives. And no matter how much we try to live those lives, and frequently even hide our transness out of an all-too-justifiable fear of repercussions, we are murdered at an astonishing rate. We need to remember the quiet faces — the ones who barely make it into the news, and frequently only after some barbaric atrocity like this occurs. Raising our voices in anger and indignation for the dead — our dead, for Chanel could easily be one of us — gives breath to the vision that this should never, happen, again.

In memory of Chanel Chandler, another trans person taken from us.

# Monique Rogers

Location: Boston, Massachusetts
Cause of Death: Drowned
Date of Death: August 3, 1986
Source: *Gay Community News*, August 24, 1986
Notes: Monique was pulled out of Boston Harbor during a series of gay- and trans-bashing incidents in the city. It is likely that this is the case referred on some other websites as "Mary S."

# Robert H. Jones

Location: New Castle, Delaware
Cause of Death: Stabbed to death by Ronald Taitoan
Date of Death: October 15, 1997
Source: Renaissance Delaware Chapter
Notes: Ronald Taitoan pled guilty, and was given a 10-year manslaughter sentence.

# Lisa Janna Black

Location: Toronto, Ontario, Canada
Cause of Death: Struck 20 times with a hammer by Synthia Kavanagh, her roommate and another transsexual. Kavanaugh also stuck a knife into one of Black's eyes. Brian Inch was reported as beating and stabbing Black.
Date of Death: March 2, 1987
Source: *Metamorphosis*, Volume 6, Number 1-2, January – April 1987 and the *Toronto Sun*, March 3, 1987.
Notes: Brian Inch was sentenced to seven years in prison after pleading guilty to manslaughter. Synthia Kavanagh was given a life sentence in this crime, and was sentenced to Kent Institution, a maximum-security, men's prison in British Columbia.

# Donald Pierce

Location: San Diego, California
Cause of Death: Struck by a car driven by Fred Ray Belloff and dragged about 50 feet.
Date of Death: September 4, 1990
Sources: *The Los Angeles Times*, September 17, 1990 and *The San Diego Union-Tribune*, December 17, 1990
Notes: Belloff, a minister for the homeless, was arrested, but the district attorney's office decided not to file a murder charge.

# Peggy Santiago

Location: South Bronx, New York
Cause of Death: Murdered
Date of Death: 1989
Source: The Page of Rage
Notes: This is Jessy Santiago's sibling. Jessy was killed three years later, in the same area.

# Grayce "Candace" Baxter

Location: Toronto, Ontario, Canada
Cause of Death: Choked to death by Patrick Daniel Johnson, who then dismembered the body into several parts with a hacksaw.
Date of Death: December 8, 1992
Source: *Toronto Star*, April 20, 1994
Notes: Patrick Daniel Johnson pled guilty and was sentenced to life in prison with no chance of parole for at least 10 years. Additional information may be found on this "In Memoriam" Page to Grayce.

# Lynn Montana

Location: Washington, D.C.
Cause of Death: Burn wounds
Date of Death: 1997
Source: Natasha (Tash515@aol.com) and *The Washington Post*, January 29, 1997
Notes: Lynn died in police custody of severe burns inflicted on her by her boyfriend. He died in the fire and, because she lived, she was accused by the police of setting him on fire.

# Unknown person wearing women's clothing

Location: Houston, Texas
Cause of Death: Shot in the abdomen

Date of Death: February 25, 1999
Source: Katrina C. Rose and KPRC Channel 2

# Unknown person dressed in women's clothing

Location: Oakland, California
Cause of Death: Blows to the head and face
Date of Death: July 10, 1995
Source: *The San Francisco Chronicle* July 11, 1995

# Donnie O. Osby

Location: Orlando, Florida
Cause of Death: Shot in the chest with a .45-caliber handgun by Keith Neil Washington
Date of Death: August 17, 1993
Source: *Orlando Sentinel*, August 19, 1993



# Ruby Bota

Location: Gibsonton, Florida
Cause of Death: Unknown
Date of Death: 1988
Source: GenderPAC

### Ruby Bota Murder Case Closed

As reported in the Tampa Tribune, the Hillsborough County Sherrif's Department has closed the case on Ruby Bota, a transwoman killed in 1988. Ruby's body was discovered in May of this year in Gibsonton, Florida.

The case was closed because officials claim to not be able to prove that Bob Bota, Ruby's husband who has all-but-admitted to the killing, actually killed her. The statute of limitations for other felonies and misdemeanors involved in this case has run out.

Although Bob Bota admitted that he had struck Ruby with his elbow, he claims that he later found her dead, and then buried her body. He contends that a "mysterious black limo" spotted at a local convenience store prior to her death had some involvement. Bota had at first denied hitting Ms. Bota.

After her passing he not only buried Ruby, but also had many of her belongings and her Airstream Travel trailer buried on the same plot. No missing persons report had ever been filed on Ruby, and Bob Bota had initially told Ruby's friends that she had "left with some socialites in a limo and was planning to live in Italy."

Bota's Body was discovered wrapped in plastic bags and tied with electrical cords. No murder weapon was found, though there were small pieces of glass found in the front part of Ruby's brain. The medical examiner ruled Ruby's death "homicidal violence of an undetermined type."

## Jacqueline Julita Anderson

**Location:** Portland, Oregon
**Cause of Death:** Shot in the head with a shotgun by Eric Walter Running
**Date of Death:** February 24, 1998
**Sources:** Los Angeles Times, February 28, 1998
**Notes:** Stories of this case call Anderson a "bearded woman," which is not uncommon in articles of FTM murders. Anderson was killed at the same time as their lover of 10+ years, Barbara J. Gilpin.

## Unknown person wearing women's clothes

**Location:** Miami, Florida
**Cause of Death:** Shot to death
**Date of Death:** 1984
**Source:** The Miami Herald, January 10, 1985

## Chiron Collins
## (Allen Kenneth Byrd)

**Location:** Philadelphia, Pennsylvania
**Cause of Death:** 42 stab wounds to the head, neck, face, and arm by Theodore Roebuck
**Date of Death:** May, 1984
**Source:** Philadelphia Daily News, May 4, 1985
**Notes:** Theodore Roebuck was convicted of murder, and sentenced to a 40-year state prison term.

## Tianna (Timothy) Langley

**Location:** Philadelphia, Pennsylvania
**Cause of Death:** Shot once in the back of the head
**Date of Death:** March 1, 1985
**Source:** Philadelphia Daily News, April 3, 1995

## Juaquin Jiminez

**Location:** New York City, New York
**Cause of Death:** Beaten to death, allegedly by Richard Davella
**Date of Death:** October 1, 1989
**Source:** United Press International, October 1, 1989
**Notes:** Davella told police that Jiminez died of a drug overdose, in spite of evidence to the contrary. Davella was charged with second-degree murder in the case.

## Jessica (Gerardo) Castillo

Location: New Brunswick, New Jersey
Cause of Death: Shot in the head by Felix Rodriguez Diaz and Pedro Juan Concepcion
Date of Death: October 7, 1985
Source: *United Press International,* October 10, 1985 and April 8, 1988
Notes: Not only was Jessica murdered by Diaz and Concepcion, but Maria Luisa Castillo Perez, age 7, and James Chapelle, who lived at the same home as Jessica, were killed.

## Terry Wilson

Location: New York City, New York
Cause of Death: Stabbed to death, allegedly by Warren Yaeger
Date of Death: December 25, 1981
Source: *United Press International* December 30, 1981
Notes: Yaeger had previously been convicted of killing a non-transgendered woman in December 24, 1957. A reporter noticed similarities between the cases, and tipped off the police.



## Dion Webster

Location: New York City, New York
Cause of Death: Knife wound to the head
Date of Death: November 4, 1996
Source: *Associated Press,* August 28, 1999

## Yamile (Jorge) Lee

Location: San Diego, California
Cause of Death: Stabbed in the back with a large butcher knife, allegedly by Luis Garces
Date of Death: December 4, 1997
Source: Just Evelyn and *The San Diego Union-Tribune,* December 5, 1997

## Chareka Keys

Location: Cleveland, Ohio
Cause of Death: Blunt trauma to the head
Date of Death: September 27, 1999
Source: *Gay People's Chronicle,* October 8, 1999

### Transwoman Killed in Cleveland

According to a source with the "Gay People's Chronicle," the body of Chareka Keys, a transgendered woman, was found on a loading dock at the corner of Central and 69th streets in Cleveland Ohio on the morning of September 27th.

Although details are sketchy at this time, police have listed this as a murder, and give the cause of death to be blunt force trauma to her head. There are, as of yet, no suspects in this murder. The Cleveland police are looking for any information about this case that they can get, and the homicide department can be contacted at 623-5464.

# Unnamed Infant with Ambiguous Genitalia

**Location:** Dallas, Texas
**Cause of Death:** Blunt force trauma to the head, as well as strangulation, allegedly by the child's mother, Aruna Kavill.
**Date of Death:** December 8, 1999
**Source:** *The Dallas Morning News*, February 12, 2000

### Ambiguous Genitalia Leads To Infant's Death

In an evolving case in Dallas, Texas, a mother has been charged with killing her own child on December 8, 1999, simply because the child was born with ambiguous genitalia.

The baby was three days old, and died of blunt force trauma to the head, as well as strangulation.

Investigators were initally told that, while Gangaudaya Kavali, the father, was at the store, and his wife, Aruna Kavili, was in the bathroom, a stranger entered the apartment, grabbed the newborn from a couch and threw him outside.

Dallas police have concluded that this was not the case, noting that their investigation has shown that the newborn was dead only three hours after his parents brought him home from the hospital. Further, physical evidence did not support the couple's account.

A Collin County Medical Examiner also found shards of glass in the baby's esophagus and small intestine, possibily indicating that someone initally tried to kill the child by forcing them to eat glass, in an effort to cause internal bleeding.

Investigators from Child Protective Services, who have custody of the parents 2-year-old daughter, have indicated that she appears to have knowledge of her siblings death.

Detectives won't speculate whether Aruna Kavili allegedly killed her child because she was ashamed, or because she was pressured into doing so by her husband.

Mr. Kavali has not been charged.

# Delores Mack

**Location:** Hahnville, Louisiana
**Cause of Death:** Strangled
**Date of Death:** February 22, 1993
**Source:** *The Associated Press*, August 17, 1999 and *The Times-Picayune*, August 27, 1995
**Notes:** Mack was part of a series of murders, by an individual who reportedly would inject his victims with drugs, have sex with them when they were unconscious, and then kill them before dumping their body.

# Carla Natasha Hunt

**Location:** Suitland, Maryland
**Cause of Death:** Single gunshot wound to the head

Date of Death: May 15, 2000
Source: *The Washington Blade, May 26, 2000*

# Amanda Milan

Location: New York City, New York
Cause of Death: Throat slashed by Dwayne McCullar
Date of Death: June 18, 2000
Source: Anonymous
Notes: According to one report, several of the yellow cab drivers parked along the street cheered and applauded as Amanda bled to death. In exchange for pleading guilty, McCullar was promised a sentence of seventeen and a half years in prison, plus five years supervised release.

# Chris Muzett (Eddie Matthews)

Location: Detroit, Michigan
Cause of Death: Strangled with a phone cord
Date of Death: February 20, 1999
Source: Anonymous and the *Detroit Free Press*, January 21, 2000

# Brandi Houston

Location: Houston, Texas
Cause of Death: Murdered, allegedly by Richard Masterson
Date of Death: January 26, 2001
Source: Houston Imperial Court

# Daniel Phillip "Danielle" Redding

Location: Daytona Beach, Florida
Cause of Death: Single gunshot wound to the head, allegedly by Jason Lee Starkey
Date of Death: September 7, 2002
Source: *Daytona Beach News-Journal*, September 23, 2002 Notes: Redding worked at a hair salon by day, and as a sex worker in the evening. He was found face down with a bullet hole in his head in a vacant lot near a church. The alleged killer, Jason Lee Starkey, was shot and killed two weeks later.

# Joseph Moran

Location: Redwood Citry, California
Cause of Death: Stabbed by Richard Mroczko
Date of Death: 1974
Source: *The Advocate*, November 6, 1974

# Timothy "Cinnamon" Broadus

Location: Fort Lauderdale, Florida
Cause of Death: Shot multiple times
Date of Death: January 8, 2003
Source: *South Florida Sun-Sentinel*, January 8, 2003
Notes: Broadus, a 21 year old transgendered sex worker, was shot several times by the driver of a Honda Civic or Accord. She ran a few steps from the car, collapsed, and died on the street. Very little else has been reported in this case.

## Hendricks Thomas aka Tanesha Starr

**Location:** Birmingham, Alabama
**Cause of Death:** Stabbed multiple times
**Date of Death:** May 22, 2003
**Source:** *Birmingham News*, May 25, 2003
**Notes:** Hendricks Thomas was a drag performer who also went by Tanesha Starr. Thomas was found stabbed and died in route to the hospital. A $2000 reward has been offered for information on this case. Any information concerning this homicide should be reported to the Northside Precinct of the Birmingham Police Department, Detective Division, at (205) 254-2860

## Nireah Johnson

**Location:** Indianapolis, Indiana
**Cause of Death:** Shot to death by Paul Anthony Moore
**Date of Death:** July 22, 2003
**Source:** *Indianapolis Star*, July 26, 2003
**Notes:** Nireah Johnson, a 17-year-old African-American transwoman, was known for being sweet and funny. Her and a friend, 18-year-old Brandie Coleman, were shot in the head while sitting in a SUV. The murderer, Paul Anthony Moore, then set the truck on fire. Their bodies were burnt beyond recognition. Paul Anthony Moore was found guilty of murder and sentenced to 120 years in prison.

## Emonie Kiera Spaulding

**Location:** Washington, D.C.
**Cause of Death:** Shot, allegedly by Antwan D. Lewis. Emonie also had severe head wounds.
**Date of Death:** August 20, 2003
**Source:** WMAR, August 21, 2003
**Notes:** 25-year-old Emonie Kiera Spaulding was from Massachusetts and North Carolina, and had been living in D.C. for about two years. According to her Uncle, Spaulding loved music as a child and sang in a church choir. Her partially nude body was discovered by police in a field. She had been shot but also had severe head wounds. Another transgendered woman was brutally attacked the same evening as Spaulding, and a memorial to the recently-murdered Bella Evangelista was also destroyed that night. It is unknown if these are connected with Spaulding's death

## Cassandra "Tula" Do

**Location:** Toronto, Ontario, Canada
**Cause of Death:** Strangled
**Date of Death:** August 26, 2003
**Source:** Toronto Police Department, August 26, 2003
**Notes:** Cassandra Do, or "Sandra" as her friends knew her, was working as a sex-worker under the pseudonym "Tula" in Toronto, saving up for genital surgery and nursing school. She had many friends. She was found in her 11th-floor apartment. An autopsy concluded that she was strangled to death. Cassandra is no relation to Carolyn Cossey, also known as "Tula," and famous for her modeling work as well as an appearance as a "Bond Girl."

## Mickey Ward-El Smith

**Location:** Washington, D.C.
**Cause of Death:** Shot ten times
**Date of Death:** March 3, 2004
**Source:** Jessica Xavier
**Notes:** Smith was 19-years-old

## Cedric Thomas

Location: Baton Rogue, Louisiana
Cause of Death: Shot multiple times
Date of Death: June 5, 2004
Source: *The Advocate* (Newspaper), June 8, 2004
Notes: Thomas was shot several times on May 18th, and finally succumbed to those wounds on the 5th

## Bella Martinez

Location: Los Angeles, California
Cause of Death: Shot
Date of Death: August 28, 2004
Source: GLAAD
Notes: Martinez was 24 years old

## Donathyn J. Rodgers

Location: Cleveland, Ohio
Cause of Death: Shot multiple times
Date of Death: November 15, 2005
Source: Lesbian-Gay Community Service Center of Greater Cleveland
Notes: Rodgers identified as a male to female transsexual, and had participated in events at the Lesbian-Gay Community Service Center of Greater Cleveland. Rodgers was also a sex worker, and was working near Max Hayes High in the early morning hours of November 15th. She was shot in the head by one of two assialiants, and when she ran, she was shot several additional times. Anyone with information is asked to call homicide detectives at (216) 623-5464.

## Julio Argueta

Location: Miami, Florida
Cause of Death: Stabbed twelve times, allegedly by John Valdespino
Date of Death: May 16, 2005
Source: WPLG, May 31, 2005
Notes: If you have any information on this murder, please contact the Miami Police Department at (305) 579-6530.

## Lisa D.

Location: Dorchester, Massachusetts
Cause of Death: Shot to death
Date of Death: September 17, 2005
Source: *Boston Herald* September 20, 2005
Notes: Lisa was 42 years old, and was found dead near a local Stop n Shop.

## Amancio "Delilah" Corrales

Location: Yuma, Arizona
Cause of Death: Violent trauma
Date of Death: May 6, 2005
Source: *Yuma Sun*, May 7, 2005
Notes: If you have any information on this murder, please contact lead Detective Raul Garcia at (928) 783-4427.

## Phool Chand Yadav

Location: Lucknow, India
Cause of Death: Murdered
Date of Death: March 17, 2005
Source: *Hindustan Times*, March 18, 2005
Notes: Once Yadav's murderers discovered that he was biologically female, he was raped and murdered.

## Karlien Carstens

Location: Okahandja, Namibia
Cause of Death: Strangled
Date of Death: February 16, 2005
Source: *Afrol News*, February 16, 2005
Notes: Eyewitnesses at the scene said that Carstens was tied up with cords cut off of electrical appliances, with one cord tied tightly around her neck.

## Precious Armani

Location: Atlanta, Georgia
Cause of Death: Shot in the Head
Date of Death: February 29, 2004
Source: The Associated Press, March 1, 2004

## Michael Charles Hurd

Location: Houston, Texas
Cause of Death: Shot to death
Date of Death: June 18, 2003
Source: *Houston Chronicle*, June 18, 2003
Notes: Little information has been provided on this case, other than that Hurd was found shot to death in a car, and was found wearing a wig, makeup, and feminine attire.

## Jorge Rafael Cruz

Location: Guatemala City, Guatemala
Cause of Death: Murdered
Date of Death: March 25, 2003
Source: *Guatemala Hoy*, March 26, 2003
Notes: Several individuals dumped Cruz's body in Guatemala City. Local authorities do not expect that they will be able to find Cruz's murderers, as transgendered people in the area are known to have "many enemies." Cruz was 19 years old.

## Brandie Coleman

Location: Indianapolis, Indiana
Cause of Death: Shot to death by Paul Anthony Moore
Date of Death: July 22, 2003
Source: *Indianapolis Star*, July 26, 2003
Notes: 18-year-old Brandie Coleman, while not a transgendered woman herself, was a close friend to Nireah Johnson, and was also shot in the head while sitting in Coleman's mother's SUV with Ms. Johnson. She had recently become a mother just two months prior to the murder. Paul Anthony Moore was found guilty of murder and sentenced to 120 years in prison.

# Merlinka (Vjeran Miladinovic)

**Location:** Belgrade, Serbia
**Cause of Death:** Beaten to death
**Date of Death:** March 22, 2003
**Source:** *Politika*, May 20, 2003
**Sources:** Merlinka, also known as Vjeran Miladinovic, was known as the first out transwoman in Serbia. She wrote a book, *Terezas' Son*, and had been in two Serbian films. She was murdered in Belgrade on March 22nd, and her body was found a month later. Two men, one of whom is a minor, have been arrested in this case.

# Nikki Nicholas

**Location:** Green Oak Township, Michigan
**Cause of Death:** Shot to death
**Date of Death:** February 21, 2003
**Source:** *Ann Arbor News*, February 25, 2003
**Notes:** Nikki Nicholas was a 19-year-old African-American transwoman. She was making a living as a female impersonator at nightclubs around Detroit, and was well-known for her impersonations of singer Beyoncé. Her body was discovered during a routine property check of an abandoned farmhouse.

# Porfiro Mejia (aka Daisey, Flora Blanca)

**Location:** Delano, California
**Cause of Death:** Blunt force trauma to the head
**Date of Death:** August 20, 2002
**Source:** *The Bakersfield Californian*, October 25, 2002
**Notes:** Little is known about this death. Mejia, a transwoman, used to frequent some of the bars in the Delano area. She was found in a grape vineyard just south of Delano. Anyone with information on this apparent homicide is asked to call Secret Witness at (661) 322-4040.

# Stephanie Thomas

**Location:** Washington, DC
**Cause of Death:** Shot multiple times
**Date of Death:** August 12, 2002
**Source:** WJLA ABC 7, Washington, DC
**Notes:** Stephanie was killed at the same time as Ukea Davis. Stephanie and Ukea were friends living in Washington, D.C., and had begun living in their preferred gender roles. Both were shot multiple times in a car they often shared. They were half a block away from home. Anyone with information about this crime is asked to call (202) 727-9099. There is a $10,000 reward available.

### The Death of Stephanie and Ukea

In the early morning hours of Monday, August 12 Stephanie (Wilbur) Thomas, age 19, was driving her friend Ukea (Deon) Davis, age 18, home in South East Washington, DC. Thomas has just purchased her Toyota Camry a few weeks ago. A car drove up beside them, and a gunman fired shots from an automatic weapon. The gunfire killed Ukea Davis and critically wounded Stephanie Thomas.

According to an eyewitness report, another car drove up after the shooting, and an unidentified man got out and walked up to the driver's side of Thomas' Camry. The man pushed Thomas' shoulder to see if she was still alive. Thomas moaned in pain, but the man fled upon hearing the first car return. The gunman then got out of the first car and fired additional shots into Thomas' car, killing her.

The two young transgendered women were members of Transgender Health Empowerment, an African-American transgender support group coordinated by Earline Budd. They also may have been members of the Teen Divas of the Sexual Minority Youth Assistance League (SMYAL) although that has not yet been confirmed.

Whether or not the DC Metropolitan Police Department (MPD) will investigate this gruesome double homicide as a hate crime remains to be seen, but the assailants' return to the scene to fire additional shots does seem to indicate an overkill factor common in many murders of transgendered people in the U.S.

# Amy (Raymond) Soos

Location: Phoenix, Arizona
Cause of Death: Murdered
Date of Death: February 16, 2002
Source: Phoenix, Arizona police report
Notes: Amy Soos lived all her life on the Salt River Pima Indian Reservation in Arizona, but often went into Phoenix in the evenings. After not returning home one such night, her body was discovered in a roadway. She died of multiple blunt force trauma. She had been beaten many other times before her death.

# Bibi Barajas
# (Hugo César Barajas)

Location: Houston, Texas
Cause of Death: Shot multiple times
Date of Death: January 26, 2002
Source: KTRK News and Vanessa Foster
Notes: Bibi Barajas was a sex worker in Houston, after coming over the border from Mexico. She is believed to have been killed by some of her customers, who dumped her body near a local club.

# Robert Martin

Location: Ashburn, Georgia
Cause of Death: Severly beaten
Date of Death: April 3, 2001
Source: Monica Helms
Notes: Martin was beaten on January 7, and laid in a semi-coma state in the hospital until his death.

# James Jerome Mack

Location: Buffalo, New York
Cause of Death: Beaten with beer bottles, sexually assaulted with a broom handle, strangled with an electrical cord and then drowned in a bathtub. His body was later set on fire in a trash can behind a church
Date of Death: January 21, 2001
Source: *The Associated Press*, February 23, 2001
Notes: Mack was not himself transgendered, but was the lover of a transgendered woman. On January 21, 2001 he was beaten with beer bottles, sexually assaulted with a broom handle, strangled with an electrical cord and then drowned in a bathtub. His body was later set on fire in a trash can behind a church.

# Keith E. Jackson

Location: Miami, Florida
Cause of Death: Blunt trauma

Date of Death: August 27, 2000
Source: *Miami Herald*, August 29, 2000

# Julie Birchall

Location: San Francisco, California
Cause of Death: Injuries sustained in a hit and run accident.
Date of Death: June 16, 1990
Source: Kerry Birchall
Notes: In spite of being hit on a busy street during the afternoon, no one ever came forward with any information. Police reported that this was likely due to her transgender status.

# Stephanie Yazum
# (Frank Yazum)

Location: Schenectady, New York
Cause of Death: Throat slashed, allegedly by David A. Bronson
Date of Death: March 23, 2000
Source: *The Daily Gazette*, March 24, 2000

# Toni Lee

Location: New York City, New York
Cause of Death: Murdered
Date of Death: 1976
Source: *Drag* Magazine, Volume 6, Number 23

# "Tiny"
# (Robert Howard Gibson)

Location: El Cajon, California
Cause of Death: Multiple stab wounds, allegedly by Shawn Keith Wilson.
Date of Death: July 31, 1998
Source: Just Evelyn

# Barbarella (Joe V.)

Location: San Francisco, California
Cause of Death: Stabbed in the chest
Date of Death: March 15, 1975
Source: *Drag*, Volume 5, Number 19, *the San Francisco Sentinel*, April 10, 1975, and *Crusader*, May 1975
Notes: Barbarella was the neighbor of Yancey-Lisa R., who was killed within weeks of Barbarella.

# Phyllis Olson

Location: Minneapolis, Minnesota
Cause of Death: Strangled
Date of Death: September 23, 1986
Source: *United Press International*, October 28, 1987 and *the GL Voice*, October 6, 1986

## Linda Williams

Location: Yonkers, New York
Cause of Death: Stabbed to death by Ron Johnson
Date of Death: October 15, 1983
Source: *United Press International*, April 1, 1985

## Steven Hernandez

Location: San Francisco, California
Cause of Death: Murdered by Kelly Nichols
Date of Death: February 16, 1989
Source: *San Jose Mercury News*, February 18, 1989

## Jonathan "Tanya" Streater

Location: Philadelphia, Pennsylvania
Cause of Death: Shot in the face, beaten and sexually mutilated by Donald Jennings
Date of Death: June 30, 1986
Source: *Philadelphia Daily News*, August 12, 1986 and December 5, 1986
Notes: Streater was murdered at the same time as Faustino "Tina" Arroyo. Both were burnt and their bodies
were discovered in trash bags, with their legs sawed off above the knees.

## Barbara (William) Brodie

Location: Feltonville, Pennsylvania
Cause of Death: nternal injuries: the liver, abdomen, and lungs were punctured when a blunt instrument
was inserted in Brodie's rectum.
Date of Death: January 3, 1981
Source: *Philadelphia Inquirer*, January 5, 1981 and *Philadelphia Daily News*, January 5, 1981

## Person dressed in women's clothing

Location: San Diego, California
Cause of Death: Murdered
Date of Death: June 22, 1994
Source: *The San Diego Union-Tribune*, June 24, 1994

## Person dressed in women's clothing

Location: San Diego, California
Cause of Death: Murdered
Date of Death: June 22, 1994
Source: *The San Diego Union-Tribune*, June 24, 1994

## David Edward Wigley

Location: San Antonio, Texas
Cause of Death: Stabbed repeatedly in the chest and stomach
Date of Death: November 8, 1993
Source: *San Antonio Express-News*, November 9, 1993

## Philip Robert Filshie

**Location:** Toronto, Ontario, Canada
**Cause of Death:** Stabbed in the side by Joyce Lorraine Filshie.
**Date of Death:** December 20, 1984
**Source:** *Metamorphosis*, Volume 4, Number 6, December 1985 and the *Toronto Star*, November 20, 1995
**Notes:** Ms. Filshie claimed that her husband was beating her, and she "accidentally" stabbed him in the side, from which he bled to death. He was a 51-year-old, post-op FTM. She was acquitted of second-degree murder charges.

## Rosando "Crystal" Sanchez-Reyes

**Location:** Oxnard, California
**Cause of Death:** Shot six times at point blank range by Daniel Montenegro Delgado.
**Date of Death:** December 25, 1987
**Source:** *The Los Angeles Times*, November 16, 1990
**Notes:** Delgado shot Sanchez-Reyes because she danced with his brother, Loreno Montenegro. He was convicted of second-degree murder and sentenced to 17 years in prison.

## Larry Venzant

**Location:** Chicago, Illinois
**Cause of Death:** Stabbed repeatedly and castrated by David Feikema
**Date of Death:** December 19, 1993
**Source:** *Windy City Times*, November 9, 1995
**Notes:** After Feikema stabbed and castrated Venzant, he then placed the severed penis in Venzant's mouth and shoved him in a closet. Feikema was found guilty of first-degree murder.

## Ashley-Ann Summers
## (Eric Farrow)

**Location:** Columbus, Ohio
**Cause of Death:** Shot to death
**Date of Death:** November 20, 1993
**Source:** *The Columbus Dispatch*, November 21, 1993 and www.godhatesfredphelps.com

## Patrick Calvert

**Location:** St. Louis, Missouri
**Cause of Death:** Stabbed
**Date of Death:** August 7, 1991
**Source:** *Cross-Talk* #29, October 1991
**Notes:** His body was witnessed being pushed out of a car at an off-ramp of Interstate 55-70.

## Monique Thomas
## (aka Rufus P. Thomas)

**Location:** Dorchester, Massachusetts
**Cause of Death:** Murdered, allegedly by George Stallings
**Date of Death:** September 11, 1998 (estimated, body was not discovered for a week)
**Source:** Dallas Denny of GEA

Notes: George Stallings, caught using Thomas's car and credit cars, has pinned the murder on "some men" who, he said, had discovered that Thomas was biologically male. Stallings has been charged with first-degree murder.

# Felix Abarca

Location: East County, California, on Sunrise Highway
Cause of Death: Murdered
Date of Death: November 23, 1990 (approximate)
Source: *The San Diego Union-Tribune*, December 17, 1990
Notes: The slaying of Felix, a 24-year-old Tijuana transsexual (according to the source above) was linked to the 5-year series of slayings of female prostitutes and drug addicts.

# Janice Ricks

Location: Cleveland, Ohio
Cause of Death: Shot once in the neck and once in the abdomen
Date of Death: June 13, 1996
Source: *Transgender Tapestry*, #76, Summer 1997

# Christian Paige

Location: Chicago, Illinois
Cause of Death: Brutally beaten about the head and ears, then strangled, stabbed deeply in her chest and breast area between 15 and 2 dozen times, and finally, burned.
Date of Death: March 22, 1996
Source: Riki Anne Wilchins

# Rene "Michelle" Ouellet

Location: Cape May, New Jersey
Cause of Death: Strangled by Brian Halter
Date of Death: June, 1992
Source: *IYF*, December 1997
Notes: Halter claimed he had fallen asleep in a public place, and when he woke up he found Ouellet performing oral sex on him. He was given a 15 year prison sentence.

# Jessy Santiago

Location: South Bronx, New York
Cause of Death: Beaten with an iron bar and stabbed with a box cutter, a screw driver and a knife by Augustin Rosado
Date of Death: February 18, 1992
Source: <u>The Page of Rage</u>
Source: This is <u>Peggy Santiago's</u> sibling. Peggy was killed three years earlier, in the same area. In spite of evidence to the contrary, the NYPD refused to call the murder a bias crime.

# Rita Hester

Location: Boston, Massachusetts
Cause of Death: Multiple stab wounds
Date of Death: November 28, 1998
Source: *IYF*, November 1998

### Remembering Rita

The atmosphere at the club on the night of December 1st, 1998, was filled with tension, fear, and only the most anxious of laughter. Just three days earlier, some of us had learned that one of our compatriots, Rita Hester, had been brutally stabbed to death in her apartment. Informing our sisters and brothers was not the easiest of duties, but one for which we felt much compulsion — not only for the increased alertness required by all, but in sheer shock of Rita's portrayal by the local and national media.

For those of you who haven't already heard the full story, or have only managed to gather what morbid morsels the rest of the press has doled out, here's an account combined from various eyewitness and friends' accounts. Rita Hester was an out transgendered woman who had lived as a full-time woman for over 10 years in the Allston/Brighton community (just west of Boston proper). Comfortable with both herself and the way she was received by all segments of the local communities, Rita was a well-loved patron of both transgender-friendly clubs such as Jacques and straight bars such as Allston's Model Cafe and The Silhouette. She had just returned from performing abroad, a career path which she thoroughly enjoyed. While the press has chosen to focus on Rita's transgendered nature, her friends have instead highlighted her vivaciousness. Jessica Piper remembered her particularly well:

"Everywhere Rita went, people experienced her as an incredibly vivacious, outgoing woman. The Globe's quote about her 'double life' only makes sense metaphorically: in Boston, she hung out in two different cultures, on opposite sides of town, and she was one of the only links between the two. The other queens wouldn't go out to Allston from fear. And the straight Allston kids didn't want to go to downtown queen bars."

Rita was also known as a "large woman who could take care of herself," a fact which makes her murder only more puzzling. On Saturday November 28th, at about 6:20 pm, a neighbor reported to police a disturbance at Rita's residence. Upon arrival, they found her in cardiac arrest, having been stabbed multiple times. She was rushed to Beth Israel Deaconess Hospital, only to be declared dead after her arrival. Eyewitness reports variously claim that she went home with one or two people after meeting them at Jacques on the prior Tuesday, behavior that struck them as not typical of her style. Rumors abounded in the lay press, at various time suggesting the potential involvement of everything from blackmail (hardly likely, given how out she was to friends, family, and community) to Rohypnol ("Roofies," or "the date-rape drug"), but nothing has been substantiated at this point. The only suggestion that seems plausible is that she was murdered by people she knew; since she was a 6'2", 6'3", 225, maybe 230 pound woman, it seems unlikely that she could have been murdered by someone breaking into her home.

But all the conjecture aside, what enrages me (and my friends here at TCNE) is her blatant misrepresentation by the press as he, male, and "Rita," as if this name was an improper appellation. A transgendered individual who has had breast implants, who has lived in a community for 10 years as a woman, and who is known even by "straight" acquaintances as Rita, is not "Rita." She is a woman, and whether or not you agree with her chosen lifestyle in *any* aspect, you owe her the respect to treat her as she wished to be treated. Yet the *Boston Globe*, an otherwise respectable publication, referred to her repeatedly as male while quoting friends who correctly used female pronouns and her correct first name. Even Boston's gay/bi/lesbian newspaper, *Bay Windows*, repeatedly used male pronouns and Rita's obscure given male first name throughout the article. But to everyone who knew Rita, this was the first they had heard her referred to in this way.

## Carmen Marie Montoya

**Location:** Oakland, California
**Cause of Death:** Multiple blows from a blunt object to her face and head
**Date of Death:** July 10, 1991
**Source:** GenderPAC
**Notes:** Police questioned at least one suspect, but there were no arrests.

## Stella Essie (Jerome Brent)

Location: Chicago, Illinois
Cause of Death: Hit in the head with a sledgehammer by Loveless Austin
Date of Death: July 17, 1985
Source: *The Chicago Tribune*, August 28, 1985 and September 12, 1986
Notes: Austin was found guilty of murder, and sentenced to 40 years in prison.

## Derry Glenn

Location: Atlanta, Georgia
Cause of Death: Shot to death
Date of Death: December 19, 1992
Source: Dallas Denny of GEA

## Unknown person wearing wig

Location: Atlanta, Georgia
Cause of Death: Killed by blow to head
Date of Death: October 29, 1991
Source: Dallas Denny of GEA

## Unidentified crossdressed person

Location: New York City, New York
Cause of Death: Puncture wounds over the right eye
Date of Death: Early 1972
Source: *Drag Magazine*, Volume 2, Number 7

## Rhonda Star (Ronnie Dean Lyles)

Location: Atlanta, Georgia
Cause of Death: Shot to death
Date of Death: October 29, 1991
Source: Dallas Denny of GEA and the *Atlanta Journal-Constitution*

## Jamie D. Ford

Location: San Diego, California
Cause of Death: Stabbed
Date of Death: 1973
Source: *Drag Magazine*, Volume 3, Number 12
Notes: According to police, Ford was attacked in his home, and managed to walk to a neighborhood bar before he collapsed and died

## Quincy Favors Taylor

Location: Atlanta, Georgia
Cause of Death: Shot to death
Date of Death: October 11, 1995
Source: *Atlanta Journal/Constitution*, October 11, 1995

# Chanelle Pickett

**Location:** Watertown, Massachusetts
**Cause of Death:** Strangled by William Palmer. She also suffered a beating that left her face terribly bruised and bloody.
**Date of Death:** November 20, 1995
**Source:** Dallas Denny, GEA and Nancy Nangeroni
**Notes:** For more information, please see this short summary of events surrounding the death of Chanelle Pickett by Nancy Nangeroni.

## The Murder of Chanelle Pickett

Chanelle Pickett, a young (23) black "pre-operative" transsexual woman, was found dead in the apartment of William Palmer, 35, a computer programmer, on November 20, 1995. According to the report of the police-appointed medical examiner, Chanelle had died of strangulation. She also suffered bruises about the face consistent with having received a severe beating. Palmer denied having murdered her, claiming that she died while he slept.

Chanelle met Palmer at Playland, Boston's oldest gay bar and a downtown Boston hangout popular with trans girls. According to Chanelle's twin sister Gabrielle, Chanelle thought Palmer was genuinely interested in having a relationship with her. On Sunday evening, November 19, the three of them indulged in some crack cocaine together. When Palmer was unable to convince Gabrielle to join them in a threesome, he took Chanelle to his apartment. Later that night Palmer's roommates heard loud noises coming from his room and knocked on the door to ask if everything was OK, but he said he had the situation under control. The next day, at the advice of his lawyer, Palmer reported Chanelle's death to the police, and was eventually charged with first-degree murder.

On December 10, about 250 people attended a memorial service followed by a candlelight vigil in memory of Chanelle. Many of those in attendance did not know Chanelle, but appreciated the ongoing struggle of all transgender people represented by her murder.

In the ensuing murder trial, judge William Barton did not allow the jury to see photographs of Chanelle's bruised and bloodied face. The medical examiner testified to death by strangulation, but the jury believed the medical witnesses for the defense. Palmer's lawyer incited the prejudices of the jury, repeatedly referred to Chanelle's "bizarre" transformation that took place as she struggled for her life, her voice and manner becoming more masculine. The jury found Palmer guilty only of assault and battery. At the sentencing, judge Barton admonished Palmer, telling his attorney "quite frankly, the defendant should kiss the ground you walk on," before sentencing Palmer to two years in prison. Such a sentence for assault and battery with no priors sent a clear message that the judge believed Palmer to be guilty of at least manslaughter.

In the words of the headline to the Boston Phoenix article about the murder, "When is a murder not a murder? When the victim is a transsexual."

# Unknown person dressed in women's clothing

**Location:** Santa Ana, California
**Cause of Death:** Shot once in the chest
**Date of Death:** November 20, 1988
**Source:** *Los Angeles Times*, November 22, 1988 and *Orange County Register*, November 21, 1988

# Tasha Dunn

**Location:** Tampa, Florida
**Cause of Death:** Bludgeoned to death
**Date of Death:** February 14, 1998
**Source:** *Transgender Tapestry*, Summer 1998 and *IYF*, February 27, 1998

# Vianna Faye Williams

Location: Jersey City, New Jersey
Cause of Death: Multiple stab wounds to back, neck, and chest
Date of Death: December 24, 1997
Source: *Transgender Tapestry*, Summer 1998 and *IYF*, March 1, 1998

## Remembering Vianna Faye Williams

She had been working for sometime down in the Meatmarket in New York City—a notorious place for she-male street hookers. Vianna was turning tricks, and saving her money for her SRS, skirting the edge of Nothingness to save herself. Vianna Faye Williams was doing what a young trans immigrant from Jamaica could do to get by, and get on. Youthful and sweet, she became friends with David, my close friend, the one who was there for me from my coming out through my surgery.

I never met her, never even knew about her until a month before my sojourn to Montreal. She was scheduled for surgery the week following mine. She was looking forward to the end of sex work. Vianna was trying to line up a normal job. She knew her degradation and she knew she had to get out of it. SRS would provide her with a second freedom. It would end her nights as a chick-with-a-dick for hire. But with all this she was able to maintain a lightness of being that few "straight" people could exude. David told her about me and visa versa, and we were both looking forward to meeting each other, one done and one to go, both of us surviving our own nightmares, triumphant over our own demons.

The day after my release from hospital, David called. I could hear it in his voice—anxious, distraughtful. He kept asking me if I was okay, I had to do the same. "You're sure there's nothing wrong, David?"

Just some personal matter that would work itself out. I asked about this young new-woman-in-waiting and all he could say was "don't worry, it's going to be alright."

She never did show. I though it might have had something to do with Ice Storm 98, which crippled Montreal with a two foot layer of ice the day of my SRS. As soon as I got back I called David. "She didn't make it up to Montreal, David. Was it because of the Ice Storm? I heard they didn't let anyone into Quebec Province for over ten days."

No. On Christmas Eve, 1997 the doorbell rang. It was the neighbor's twelve year old boy. He came to give Vianna something, at least that's how the rumor goes.

Vianna Faye Williams was stabbed over forty times by a twelve year old boy whom it was later rumored confessed to the police that he hated faggots. The police never released any official details about the murder despite press inquiries.

David didn't want to tell me about her death. He even pretended that everything was alright when I mentioned her days after Christmas. He wanted me to go into surgery and heal with a clear mind. But he just had to call me afterwards. He had to know that at least I was alright, that I made it though, and he would see me again.

As soon as I was healed enough I went over David's. He was treating me to dinner, a quiet celebration of my second birthday. The talk turned to Vianna. It had to. How, how could a horror like this occur? It wasn't an occupational hazard rearing it's brutal head, it was a twelve year old on Christmas eve. Promises of delight, little angel ornaments dangling from trees, smiling faces on glowing children. The gift of the little drummer boy.

We broke down in tears and he cried on my shoulder. At least I made it.

Vianna Faye Williams, murdered on Christmas Eve, 1997.

# Unknown person wearing a dress

**Location:** Hollywood, California
**Cause of Death:** Multiple gunshot wounds.
**Date of Death:** February 18, 1991
**Source:** *Cross-Talk* #25, June 1991

# Shawn "Junior" Keegan

**Location:** Toronto, Ontario, Canada
**Cause of Death:** Shot twice in the head with a .357 magnum filled with hollow-point bullets, by Marcello Palma
**Date of Death:** May 20, 1996
**Sources:** *XTRA!*, June 6, 1996, Issue No. 303 and the *Toronto Star*, April 29, 1999.
**Notes:** Shawn was one of three murders over the same weekend by the same killer. Two of the victims were transpeople. Palma's lawyer claims that Palma was not "criminally responsible" when he killed them.

# Nikki

**Location:** New York City, New York
**Cause of Death:** Thrown off roof
**Date of Death:** Spring of 1976
**Source:** Rosalyne Blumenstein, GIP

# Rafael Sanchez Ayala

**Location:** San Diego, California
**Cause of Death:** Shot in the head
**Date of Death:** June 11, 1990
**Source:** *The San Diego Union-Tribune*, December 17, 1990
**Notes:** Rafael was shot at the same time as Castro Nova Estabon.

# William Battles

**Location:** South Bronx, New York
**Cause of Death:** Beat and sexually mutilated by members of a local street gang.
**Date of Death:** November 24, 1973
**Source:** *Drag Magazine*, Volume 4, Number 15 and the *New York Times*, November 25, 1973

# Regina Haskins

**Location:** New York City, New York
**Cause of Death:** Shot at least twice, once in the neck and once in the head.
**Date of Death:** April 4, 1998
**Source:** *New York Daily News*, August 18, 1998

# Leslie Re'Geanne

**Location:** Chicago, Illinois
**Cause of Death:** Struck and killed by a car
**Date of Death:** March 24, 1998
**Source:** Outlines
**Notes:** Leslie was a well-known drag performer, and was among the first to be outspoken about transgendered people, appearing on the Donahue Show, Oprah and others. She was killed in a hit-and-run.

# Tracy Thompson
# (aka Tracy Turner, Billy Joe Turner)

**Location:** Cordele, Georgia
**Cause of Death:** Head wounds, most likely caused by a baseball bat.
**Date of Death:** March 30, 1999
**Source:** *The Macon Telegraph*, April 1, 1999
**Notes:** Anyone with information about Tracy Thompson's death call the Wilcox County Sheriff's Office at 912-647-2322 or the GBI's Perry office at 912-987-4545.

# Daniel A. Castro

**Location:** Santa Ana, California
**Cause of Death:** Shot once with a small-caliber handgun
**Date of Death:** July 10, 1993
**Source:** *The Orange County Register*, July 11, 1993
**Notes:** Police suspect that the gunman may have confronted Castro because he was crossdressed.

# Unnamed Transvestite

**Location:** San Antonio, Texas
**Cause of Death:** Bludgeoned to death
**Date of Death:** March 29, 1991
**Source:** *San Antonio Light*, March 30, 1991
**Notes:** Victim was found partially burnt.

# Valerie Hill

**Location:** Akron, Ohio
**Cause of Death:** Shotgun wound to the abdomen by Edward Blazeff
**Date of Death:** July 12, 1995
**Source:** *Akron Beacon Journal*, July 13, 1995
**Notes:** This may have been a murder-suicide, as it appeared that Blazeff shot Hill and then shot himself in the side of the head. No note, however, was found.

# Faustino "Tina" Arroyo

**Location:** Philadelphia, Pennsylvania
**Cause of Death:** Suffocated, beaten and sexually mutilated by Donald Jennings.
**Date of Death:** June 30, 1986
**Source:** *Philadelphia Daily News*, August 12, 1986 and December 5, 1986
**Notes:** Arroyo was murdered at the same time as Jonathan "Tanya" Streater. Both were burnt and their bodies were discovered in trash bags, with their legs sawed off above the knees.

# Samantha York

Location: Fayetteville, North Carolina
Cause of Death: Murdered, allegedly by James Edward Shaffer
Date of Death: June 26, 1988
Source: *The Charlotte Observer*, June 29, 1988

# Vernon Sivills

Location: Norfolk, Virginia
Cause of Death: Head injuries attained in a hit-and-run accident perpetrated by Michael O'Donnell and Joseph P. Stone.
Date of Death: November 4, 1988
Source: *The Virginian-Pilot*, June 27, 1990 and July 11, 1990.
Notes: Prior to the trial, O'Donnell said "Excuse me, but he was a faggot, right? All faggots deserve to die anyway, don't you think so?" O'Donnell was sentenced to to three years in prison for voluntary manslaughter, time suspended. Stone was sentenced to ten years in prison for involuntary manslaughter and five years for hit-and-run.

# "Benderella"
# (Benjamin Scott Rae)

Location: Tacoma, Washington
Cause of Death: Shot in the face three times with a small caliber handgun, by Victor Lynn Velasquez.
Date of Death: July 10, 1977
Source: Mardi Clark and the *Tacoma News Tribune*

### Remembering Benderella

In early 1977, I met Benderella for the first time. It was at her home, and I was brought there by friends of mine. She was a gracious hostess, and was able to make an extremely shy young FtoM feel comfortable. During a tour of her home, to look at the antiques she had collected in her 38 years, she talked about wishing she could get SRS, but how she felt it was out of the question, as she could never pass. She had had ' water on the brain' as a newborn, and her skull was misshapen because of this. "Finding wigs that fit is a real bitch!" was one of the things she told me that night.

In July, she was dead, having been murdered by a 20 year old soldier who used the "She told me she was a real woman. Of course I freaked out when I found out it wasn't true." defense to receive the lightest possible sentence that could be given at that time, plus a recommendation that could allow him to serve only months of a 20-year sentence.

No one but the participants will ever really know what transpired that night, but no one who knew her ever believed that he was telling the truth.

# Felix Benitez

Location: New York City, New York
Cause of Death: Murdered
Date of Death: July 16, 1985
Source: *The New York Times*, November 2, 1986
Notes: Media coverage of the time pointed to this being part of a series of murders of primarily homosexual individuals in New York.

# Rita Sellers

Location: El Rancho, Colorado
Cause of Death: Murdered
Date of Death: December 16, 1979 (approximate)
Source: *United Press International*, February 11, 1981

# Rodney D. Neadeau

Location: Minneapolis, Minnesota
Cause of Death: Blows to the head and abdomen.
Date of Death: May 31, 1996
Source: *Minneapolis Star Tribune*, June 1, 1996

# Kevin Freeman

Location: New York City, New York
Cause of Death: Skull split nearly in half
Date of Death: June 20, 1997
Source: *Associated Press*, August 28, 1999

# Kareem Washington

Location: Passaic, New Jersey
Cause of Death: Murdered
Date of Death: August 29, 1999
Source: *The Bergen Record*, August 31, 1999

# Quona R. Clark

Location: Chicago, Illinois
Cause of Death: Murdered
Date of Death: March 2, 1993
Source: *The Chicago Tribune*, March 6, 1999

# Alina Marie Barragan

Location: San Jose, California
Cause of Death: Not yet specificed: allegedly strangled by Kozi Santino Scott.
Date of Death: January 19, 2000
Source: *San Jose Mercury News*, January 20, 2000

## The Whole World Wasn't Watching

On January 19, 2000, Alina Marie Barragan, a 19-year-old transgender woman, was murdered in a hate crime in San Jose, California. Ten days later, on January 29, hundreds of transgender people met for the Transgender San Francisco (TGSF) annual cotillion and beauty pageant. No mention was made of the hate crime, and almost no one there knew about it. How did this happen?

While I never knew Alina in life, I have become personally involved in the events surrounding her death. I first heard about the murder on Tuesday the 25th, from my gender counselor, who had been asked if Alina was one of her patients (she wasn't). She mentioned that an article about it had been published in the San Jose Mercury News. She asked me to send any information I could find about it to her, and I assured her that I was connected to many gender-oriented online resources, and I was sure that the community would be informed through this means.

That night I could find no mention of the crime anywhere. I did a search for the words "transsexual" and "transgender" on the Mercury News website, and came up with no hits. The murder had been reported, it turns out, but the body hadn't been positively identified. The Merc reported the body to be that of a "man", and made no mention of Alina's gender identity.

# Unidentified person dressed in women's clothes

**Location:** New York City, New York
**Cause of Death:** Murdered, allegedly by William Harris.
**Date of Death:** August 1975
**Source:** *The New York Times*, August 18, 1975

# Julia Carrizales

**Location:** Webster, Texas
**Cause of Death:** Strangulation
**Date of Death:** July 21, 2000
**Source:** Community Awareness for Transgender Support
**Notes:** There were also numerous stab wounds on the body of the victim.

# Ana Melisa Cortez

**Location:** Nashville, Tennessee
**Cause of Death:** Stabbed to death
**Date of Death:** October 15, 2000 (Approximate)
**Source:** *Nashville Tennessean*, October 21, 2000

# Sissy (Charles) Bolden

**Location:** Savannah, Georgia
**Cause of Death:** Murdered
**Date of Death:** October 15, 1999
**Source:** Savannah Police Department Press Releases, October 15, 1999 and October 18, 1999
**Notes:** If anyone has any information concerning this incident they are encouraged to contact Savannah Police at 232-4141 or CrimeStoppers, anonymously, at 234-2020. A reward of up to $2500 is available from CrimeStoppers for credible information leading to an arrest or conviction in the incident.

# Willie Houston

**Location:** Nashville, Tennessee
**Cause of Death:** Shot, allegedly by *Lewis Maynard Davidson III*
**Date of Death:** July 29, 2001
**Source:** *Bay Windows*, August 3, 2001
**Notes:** Houston was not himself transgendered, but faced anti-transgendered and (and anti-gay) violence because he was carrying his wife's purse, and assisting a blind male.

# Antonio Texera Dos Santos

**Location:** Rome, Italy
**Cause of Death:** murdered
**Date of Death:** October 22, 1999

Source: Crisalide AzioneTrans
Notes: Dos Santos was a Brazilian transperson living in Italy. Her body was found with both hands tied behind her back.

# Marquita (Martin) Johnson

Location: Xenia, Ohio
Cause of Death: Shot three times in the face at close range, by Juan Lamont Harding
Date of Death: October 7, 1993
Source: State v. Harding, No. 94-CA-64 (Ohio App. May 12, 1995)

# Arlene (Hector) Diaz

Location: El Paso, Texas
Cause of Death: Shot in the back, allegedly by Justen Grant Hall
Date of Death: April 10, 2002
Sources: El Paso Times, April 27, 2002
Notes: Arlene (Hector) Díaz was planning her upcoming transition, and attended a local transgender support group the night of her murder. She was fatally shot in the back, allegedly by Justen Grant Hall. The local police have classified this murder as a hate crime.

# Nicole Lee Anderson (Thomas Shrom)

Location: Hopewell, New York
Cause of Death: Bludgeoned with a claw hammer, by Randy Loomis.
Date of Death: September 2001
Sources: Rochester Democrat and Chronicle, August 21, 2002
Notes: Anderson and Loomis met in a medium security prison. Loomis killed Anderson four days after his release. Loomis has been sentenced to 20 years for this murder.

# Victor Pachas

Location: Paterson, New Jersey
Cause of Death: Beaten, stabbed, slashed, and asphyxiated by Carlos Camacho
Date of Death: February 25, 2001
Source: The Record, October 30, 2002

# Nguyen Bui Linh

Location: Vinh City, Vietnam
Cause of Death: Stabbed by Tran Quoc Dung and Nguyen Binh Hung
Date of Death: July 15, 2002
Source: Sapa-AFP, July 22, 2002
Notes: Nguyen Bui Linh, a 14 year old, was impersonating a female on an online chat forum in Vietnam. After Tran Quoc Dung and Nguyen Binh Hung discovered that they were not talking to a pretty 16 year old named Phuong Anh, they met and stabbed Linh in the back.

# Gwen Araujo

Location: Newark, California
Cause of Death: Beaten to death, allegedly by four ex-classmates.
Date of Death: October 3, 2002
Source: San Francisco Chronicle, October 17, 2002

Notes: Araujo had been dressing as a woman since she was 14 years old, and was murdered at the age of 17. During a house party, she was revealed to have been more a male. After this revelation, at least three individuals — Michael Magidson, Jose Antonio Merel, and Jason Cazares — allegedly beat her, dragged her into a garage, and strangled her, before disposing of her body in a remote location 150 miles away. All three of the above suspects are in custody awaiting trial on murder charges with a hate crime enhancement. A fourth suspect, Jaron Chase Nabors, pled out in exchange for testimony, receiving a 10-year prison sentence.

# Danisha Victoria Principal Williams

Location: Bradenton, Florida
Cause of Death: Murdered
Date of Death: February 28, 2003
Sources: *Sarasota Herald Tribune*, March 4, 2003
Notes: Williams was very open as a transgendered woman. She was discovered in her apartment after neighbors discovered a trail of blood in the hall which lead to Williams's bathroom. Her body had been left in her bathtub.

# Tamyra Michaels

Location: Highland Park, Michigan
Cause of Death: Shot to death
Date of Death: December 14, 2002
Sources: WXYZ-TV Detroit, December 14, 2002
Notes: Tamyra Michaels was a transgendered woman who had been living full-time since age 17. She was shot by an assailant that she described as a white male with a foreign-sounding accent, on December 14th. She passed away while in the hospital.

# Amanda Jofré

Location: Chile
Cause of Death: Murdered, allegedly by Winston Michelson del Canto
Date of Death: November 24, 2002
Sources: IGLHRC and TravesChile
Notes: Amanda Jofré, then 23 years old, was found dead in Michelson del Canto's apartment. Michelson del Canto is a known as a drug dealer and manufacturer. It is also rumored that he likes to keep underage transgender sex-workers locked in his apartment for days. Nevertheless, Michelson del Canto was unanimously acquitted of any wrongdoing, and escorted home by police.

# Stanley Van Dyke Traylor

Location: Oakland, California
Cause of Death: Shot multiple times
Date of Death: November 6, 2003
Source: *San Francisco Chronicle*, November 7, 2003
Notes: Traylor was a 38-year-old transperson who came to the San Francisco Bay Area from Louisiana. Police found Traylor's body in the middle of a West Oakland street early in the morning on the 7th, wearing a halter top and earrings. A wig was also found nearby.

# Rivera Rene

Location: Grand Rapids, Michigan
Cause of Death: Throat cut
Date of Death: August 14, 2004
Source: *The Grand Rapids Press*, September 1, 2004

# Unknown Transsexual

**Location:** Long Beach, California
**Cause of Death:** Beaten to death
**Date of Death:** November 6, 2004
**Source:** *Long Beach Press Telegram*, November 7, 2004
**Notes:** This transsexual woman was found beaten to death in an alleyway near 14th and Paloma streets in Central City neighborhood. She was badly beaten. Very little additional information has been presented.

# Felicia Moreno

**Location:** Hollywood, California
**Cause of Death:** Shot twice by Patrick Edward Vallor
**Date of Death:** December 26, 2004
**Source:** *The Desert Sun*, December 28th, 2004
**Notes:** Her murderer, a Active-Duty U.S. Marine lance corporal named Patrick Edward Vallor, was shot and killed after a standoff with police.

# Ashley Nickson

**Location:** Dothan, Alabama
**Cause of Death:** Shot multiple times
**Date of Death:** May 1, 2005
**Source:** WTVY, May 3, 2005

# Ronnie Paris, Jr.

**Location:** Tampa, Florida
**Cause of Death:** Beaten by his father, Ronnie Paris, Sr.
**Date of Death:** January 28, 2005
**Source:** PlanetOut, July 14, 2005

# Christina Smith

**Location:** Houston, Texas
**Cause of Death:** Shot
**Date of Death:** October 12, 2005
**Source:** *Houston Chronicle*, October 14, 2005
**Notes:** Christina was a Hurricane Katrina evacuee from New Orleans.

# EXHIBIT
# I



**REDACTED**
**REDACTED** ~~ESTER COUNTY~~
Y C. IDONI
County Clerk

## APPLICATION FOR AMENDED OR DUPLICATE PIS

**104518**

ORIGINAL LICENSE #

INSTRUCTIONS: Complete form and submit in DUPLICATE to the Westchester County Clerk's Office and i
duplicate.

| NAME: Johnnie Nance | **REDACTED** |
|---|---|
| AGE: 51 | HEIGHT: 6' 1" | WEIGHT: 300 | NOTE: Check box if purchase c |

### CIRCLE APPROPRIATE TRANSACTION (S

RESIDENCE CHANGE   (DISPOSED)   (ACQUIRED)   NAME CHANGE   (RESTRICT

DUPLICATE   SURRENDERED   SUSPENDED   REVOKED   DECEASED   OTHER_____

### I. TO AMEND LICENSE COMPLETE 1 THROUGH 7 WHERE APPROPRIATE

1. NAME **Johnnie Nance**   PHONE #'s: HOME 9__ **REDACTED   REDACTED**

2. NEW ADDRESS _____

3. THE FOLLOWING WEAPON (S) HAVE BEEN ACQUIRED FROM: NAME **GANDER MTN.**

ADDRESS **100 NORTH GALLERIA DR. MIDDLETOWN NY   10941**

LICENSE #/DEALER LICENSE #/SHIELD # **FFL# 6-14-00588** . IF MORE THAN ONE SELLER, CHECK THIS

BOX [ ] AND FILL OUT BOX 7 ON THE BACK OF THIS FORM.

| MAKE | REV/AUTO | MODEL | CALIBER | SERIAL # |
|---|---|---|---|---|
| HERITAGE | REV | ROUGH RIDER | .22 | G 37997 |

4. THE FOLLOWING WEAPON (S) HAVE BEEN DISPOSED TO: NAME **GANDER MTN.**

ADDRESS **100 NORTH GALLERIA DR. MIDDLETOWN NY   10941**

LICENSE #/DEALER LICENSE #/SHIELD # **FFL# 6-14-00588** . IF MORE THAN ONE BUYER, CHECK THIS

BOX [ ] AND FILL OUT BOX 7 ON THE BACK OF THIS FORM.

| MAKE | REV/AUTO | MODEL | CALIBER | SERIAL # |
|---|---|---|---|---|
| S+W | SEMI-AUTO | | 9MM | TFK 9124 |

5. THE FOLLOWING WEAPON (S) HAVE BEEN: (CIRCLE ONE)   LOST   STOLEN   DESTROYED

LAW ENFORCEMENT AGENCY REPORTED TO: _____

| MAKE | REV/AUTO | MODEL | CALIBER | SERIAL # |
|---|---|---|---|---|
| | | | | |

6. AMEND LICENSE TO: (CIRCLE ONE)   ADD   DELETE   (A RESTRICTION)

IF AMENDMENT IS EMPLOYMENT RELATED, STATE THE FOLLOWING: (FOR A BUSINESS, EMPLOYMENT, OR FULL CARRY)
I AM REQUESTING THAT THE RESTRICTION ON MY LICENSE BE CHANGED TO: **FULL CARRY**

| NAME: Johnnie Nance | **REDACTED** | **REDACTED** |
|---|---|---|

7. NAMES AND ADDRESS' OF BUYERS AND/OR SELLERS (IDENTIFY IF BUYER OR SELLER)

| NAME | ADDRESS | WEAPON SERIAL # |
|------|---------|-----------------|
|      |         |                 |
|      |         |                 |

(A separate list of buyers/sellers must be submitted in triplicate on plain white paper, if there are more than 4 buyers/sellers.)

## II. TO REQUEST A DUPLICATE LICENSE, COMPLETE AFFIDAVIT

STATE OF NEW YORK          :
COUNTY OF WESTCHESTER      :    S.S.
CITY/VILLAGE OF            :

Full Name   JOHNNIE C. NANCE

Present Occupation   TRAIN OPERATOR

Name and Address of Employer   NYCT 130 LIVINGSTON ST. BROOKLY NY 11201

Serial number of lost license _____    Date of Issuance _____

Brief statement of circumstances under which permit was lost:

_____

_____

_____

_____

Statement of weapon (s) now in applicant's possession, which are to be registered on license:

| MAKE | REV/AUTO | MODEL | CALIBER | SERIAL # | |
|------|----------|-------|---------|----------|--|
|      |          |       |         |          |  |

(A separate list of guns must be submitted in triplicate on plain white paper, if applicant possesses more than 3 guns.)

Sworn to before me this _____ day of _____ , 19 _____    _____
                                                                        Applicant's Signature

_____
Notary Public

## III. TO BE COMPLETED BY ALL APPLICANTS

Have you been arrested for any crime, been a patient at any mental institution, or had an order of protection issued against you since the last license was issued?    (CIRCLE ONE)    YES    (NO)
If yes, give details below:

_____

_____

_____

Date and Place of Birt.        **REDACTED**         ↻ YORK

Foreign Born Citizens Only - Naturalization Certificate Number _____

Date of Issuance _____ Court _____

I SWEAR THAT ALL THE ABOVE FACTS ARE TRUE TO THE BEST OF MY KNOWLEDGE _____
                                                                        APPLICANT'S SIGNATURE

### FOR OFFICE USE ONLY

| AMENDED LICENSE APPROVED ☐  NOT APPROVED ☐ | DATE | COUNTY JUDGE |
|--------------------------------------------|------|--------------|
| DUPLICATE LICENSE APPROVED ☐  NOT APPROVED ☐ |      |              |
| EXPIRATION DATE _____            | SEP 1 0 2010 |  |

Revised: 1/12/2005                                    HON. ROBERT K. HOLDMAN



Robert P. Astorino
County Executive

Department of Public Safety

George N. Longworth
Commissioner of Public Safety

August 11, 2010

Honorable Justice
Westchester County Court
111 Dr. Martin Luther King, Jr. Blvd.
White Plains, New York 10601

Re:   Pistol License amendment of Johnnie Nance

# REDACTED

Dear Honorable Justice:

The above captioned individual has submitted an application to Westchester County to amend his
New York State (NYS) Pistol License to allow the category of **FULL CARRY.**

The applicant is currently licensed by Westchester County for the purpose of Target Shooting
(#104518).  This amendment application is for the following:

   1)      Delete Target Shooting.
   2)      Add Full Carry.
   3)      Delete one (1) firearm.
   4)      Add one (1) firearm.

A name based criminal background and related database check through the National Instant
Criminal Background check system was conducted.  No derogatory information was uncovered.
In addition, a query of the files of the NYS Department of Mental Hygiene also revealed no
derogatory information.

The applicant submitted notarized documentation attesting that 1) he is a citizen in good standing in
the community with many family and social ties, and 2) he is steadily employed and stable and of
good moral character, and 3) he has a desire to become involved in competitive shooting at various
ranges, and 4) the NRA has offered to partner with his wife to provide all female classes to women,
and 5) he would like to use his NRA Instructor Safety Certifications to promote safe gun handling at
various locations and having a full carry permit would facilitate these endeavors.

A Scott Frost, State Accredited
First Deputy Commissioner

1 Saw Mill River Parkway
Hawthorne, NY 10532

Telephone: (914) 864-7700

Website: westchestergov.com





Johnnie C. Nance
August 11, 2010
Page 2 of 2

It appears that the necessary proper cause for the issuance of a firearm license for the purpose of Full Carry has not been met by the applicant. No safety related concerns have been cited by the applicant in support of the license sought. The applicant's current firearm license would appear to cover the sport target shooting related endeavors that he has cited. The applicant has not demonstrated an exceptional need for self protection distinguishable from that of the general public.

This application is respectfully forwarded with the following recommendations:

> The category of **Full Carry** is recommended for **DISAPPROVAL.**
> The addition of one firearm to license is recommended for **APPROVAL.**
> The deletion of one firearm from license is recommended for **APPROVAL.**

Sincerely,

DEPARTMENT OF PUBLIC SAFETY
Westchester County Police

Joseph J. Yasinski
First Deputy Commissioner

JJY/fd

Chief Inspector's Endorsement                                        August 5, 2010

RE:   Pistol License Amendment – **TARGET SHOOTING ADD FULL CARRY ADD ONE FIREARM**
                            **DELETE ONE FIREARM**
        Mr. Johnnie Nance, Pistol License #104518

I have reviewed the attached investigative report and the foregoing comments of Sergeant Bruce Bellom and
Lieutenant Frank Donovan. I concur with both of their recommendations.

Forwarded to First Deputy Commissioner Joseph J. Yasinski and recommend **disapproval** of this application
amendment to Pistol License #104518 to add the category of **FULL CARRY** firearm license for the applicant.
Recommend **approval** of the addition of one firearm and deletion of one firearm to the license of the applicant.

*C.I. Roger R. Rokicki*

Chief Inspector Roger R. Rokicki
Chief of Administrative Services

RRR/jw

08/03/2010: Endorsement by Lieutenant Frank J. Donovan of memorandum by Sergeant Bellom dated 08/02/2010 entitled: Pistol License amendment of Johnnie Nance (FC).

The applicant is currently licensed by Westchester County for the purpose of Target Shooting (#104518). This amendment application is for the following:

1)   Delete Target Shooting.
2)   Add Full Carry.
3)   Delete one (1) firearm.
4)   Add one (1) firearm.

The applicant submitted notarized documentation attesting that 1) he is a citizen in good standing in the community with many family and social ties, and 2) he is steadily employed and stable and of good moral character, and 3) he has a desire to become involved in competitive shooting at various ranges, and 4) the NRA has offered to partner with his wife to provide all female classes to women, and 5) he would like to use his NRA Instructor Safety Certifications to promote safe gun handling at various locations and having a full carry permit would facilitate these endeavors.

It appears that the necessary proper cause for the issuance of a firearm license for the purpose of Full Carry has not been met by the applicant. No safety related concerns have been cited by the applicant in support of the license sought. The applicant's current firearm license would appear to cover the sport target shooting related endeavors that he has cited. The applicant has not demonstrated an exceptional need for self protection distinguishable from that of the general public.

I concur with Sergeant Bellom and recommend the following:

The category of **Full Carry** is recommended for **DISAPPROVAL.**
The addition of one firearm to license is recommended for **APPROVAL.**
The deletion of one firearm from license is recommended for **APPROVAL.**

Forward to Chief Inspector Roger R. Rokicki.

Lieutenant Frank J. Donovan


Westchester
gov.com

DATE:       August 2, 2010

TO:         Lt. Frank Donovan

FROM:       Sgt. Bruce Bellom #15

RE:         Pistol License amendment of Johnnie Nance

The above captioned individual has submitted an application to Westchester County to amend his
New York State (NYS) Pistol License to allow the category of **FULL CARRY.**

The applicant is currently licensed by Westchester County for the purpose of Target Shooting
(#104518). This amendment application is for the following:

1)  Delete Target Shooting.
2)  Add Full Carry.
3)  Delete one (1) firearm.
4)  Add one (1) firearm.

A name based criminal background and related database check through the National Instant
Criminal Background check system was conducted. No derogatory information was uncovered.
In addition, a query of the files of the NYS Department of Mental Hygiene also revealed no
derogatory information.

The applicant submitted notarized documentation attesting that 1) he is a citizen in good standing in
the community with many family and social ties, and 2) he is steadily employed and stable and of
good moral character, and 3) he has a desire to become involved in competitive shooting at various
ranges, and 4) the NRA has offered to partner with his wife to provide all female classes to women,
and 5) he would like to use his NRA Instructor Safety Certifications to promote safe gun handling at
various locations and having a full carry permit would facilitate these endeavors.

It appears that the necessary proper cause for the issuance of a firearm license for the purpose of
Full Carry has not been met by the applicant. The applicant has not demonstrated an exceptional
need for self protection distinguishable from that of the general public.

This application is respectfully forwarded with the following recommendations:

    The category of **Full Carry** is recommended for **DISAPPROVAL.**

    The addition of one firearm to license is recommended for **APPROVAL.**

  


### WESTCHESTER COUNTY POLICE
### PISTOL LICENSE UNIT

**ATTACHMENT: FULL CARRY**

| OFFICE USE ONLY |
| --- |
| CASE#:_____ |
| DET:_____ |

**Answer all questions fully and in accordance with the guidelines set forth in the Pistol Safety & Information Handbook. This form and attachments must be notarized.**

**APPLICANT INFORMATION:**

Last Name: NANCE **REDACTED**

First Name: **REDACTED** M I  C

Address: _____
        STREET          CITY        STATE        ZIP

**List all factors which you believe to be relevant to your application and which establish <u>proper cause</u> for issuance of a firearm license for the purpose of Full Carry:**

The following is intended to show cause for a restriction change from TARGET to FULL CARRY.

I am a citizen in good standing in the community with many family and social ties. I am steadily employed and stable. I am of good moral character.

My intent to change restriction is due to my desire to become involved in competitive shooting at various range locations. Also, the NRA has offered to partner with my wife to provide all female classes to women. It is my intention to co-instruct these classes. I would like to use my NRA Instructor Safety Certifications to promote safe gun handling at various locations. Having a full carry permit would facilitate these endeavors.

Thanking you in advance for your consideration.

_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

_____              _____
APPLICANT NAME (PRINT)                        APPLICANT NAME (SIGNATURE)

STATE OF NEW YORK                )
COUNTY OF WESTCHESTER            . )

SUBSCRIBED AND SWORN TO BEFORE ME THIS _30__ DAY OF _June_ YEAR _2010_

                         _____
                         SIGNATURE OF NOTARY PUBLIC

                         DULCE MARINA WASHBURN
                         Notary Public, State of New York
                         No. 0-WA6052549
                         Qualified in Westchester County
                         Commission Expires Dec. 18, 2010

                                              2010

 **GANDER** MTN.

**Used Firearm Purchase Agreement**
**Customer Copy**

GM#250 - Wallkill FFL# 6-14-00588
100 N. Galleria Dr

Middle Town, NY 10941
(845) 692-5600

**Entered Date:** 06/29/2010

**Printed Date:** 06/29/2010 12:29 pm

**Customer Information:**

| | |
|---|---|
| **Name:** | anna l marcucci |
| **Address:** | REDACTED |
| **City:** | |
| **State:** | NY  **Zip:** 10701  **County:** westchester |
| **Phone:** | REDACTED REDACTED ers Lic. REDACTED |

**Firearm Information:**

| | | | |
|---|---|---|---|
| **UPC:** | 499925041272 | **Barrel Length:** | 3-3/4in FS |
| **Manufacturer:** | Smith & Wesson | **Serial Number:** | tfr9124 |
| **Model:** | 910S | **Cost:** | $225.00 |
| **Cal/Gauge:** | 9mm Luger | **Department:** | Used Firearms |
| **Grade:** | Good | **Class:** | Handguns |
| | | **Subclass:** | Semi-Auto Pistol |

```
        GANDER MOUNTAIN #250
           (845)692-5600
          Mon-Sat 9am-9pm
          Sundays 10am-6pm

SERIAL NUMBER tfr9124
          PAID OUT
ED GUN PAID OUT        $225.00

OTAL                   $225.00-
ASH                    $225.00-

      CUSTOMER COPY
                    JT.Des.
-29-2010  12:32:20  0250 45 531411 1280
```

GANDER MOUNTAIN #250
(845)892-5600
Mon-Sat 9am-9pm
Sundays 10am-6pm

## LAYAWAY SALE
LAYAWAY NUMBER 10011499
CUSTOMER NAME: Anna Marcucci-Nance
PHONE:

ADDRESS     **REDACTED**
CITY:
STATE:      **REDACTED**
ZIP:

ROUGH RIDER:22 WIN MAG:6-1/2IN FS:RIGHT:
727962500316                    199.99 TC
SERIAL NUMBER G37997

| | |
|---|---|
| SUBTOTAL | $199.99 |
| New York State Tax | $8.00 |
| CNTY TAX 4.125% | $8.25 |
| LAYAWAY SALE TOTAL | $216.24 |
| LAYAWAY DEPOSIT | $216.24 |
| **TOTAL** | $216.24 |
| **CASH** | $220.00 |
| CHANGE | $3.76 |
| **BALANCE DUE** | $0.00 |

All items on Layaway will be
held for 90 days. If the items
are not picked up within
90 days, the items will be
returned to stock.
A $25.00 restocking fee
will be charged for all
cancelled layaways.

## CUSTOMER COPY

ITEMS 1                     Robert H
06-29-2010   12:45:58   0250 26 525287 2021

3 Ways To Shop
In Store, Online and Catalog!

---

Printed: 06/29/2010

### Firearm Information

| | |
|---|---|
| Serial Number: | G37997 |
| UPC: | 727962500316 |
| Description: | 6.5" heritage rough |
| New/Used?: | New |

| | |
|---|---|
| Manuf/Importer: | heritage |
| Model: | rough rider |
| Caliber/Gauge: | .22 caliber |
| Type: | Revolver |

INQUIRY DETAIL REPORT
GM#250 - Wallkill FFL# 6-14-00588

Page: 1

**INQUIRY DETAIL REPORT**
**GM#260 - Wallkill FFL# 6-14-00588**

| **Firearm Information** | | | **Current** |
|---|---|---|---|

| Serial Number: | tfr9124 | Manuf/Importer: | smith &wesson 6946 |
|---|---|---|---|
| UPC: | 499925041272 | Model: | 6946 |
| Description: | two mags total | Caliber/Gauge: | 9mm |
| New/Used?: | Used | Type: | Pistol |

**Acquisition Information**

Acq From:

| Date: | 06/29/2010 |
|---|---|
| Assoc.: | 531411, JT DESIMONE |

**REDACTED**

**Disposition Information**

Transfer/Sold To:

Date:
Assoc.:

Cost:              Retail:

APPX. 356



June 16, 2010

Dear NRA Certified Instructor,

Perhaps you've seen it, too – a dramatic rise in the demand for NRA classes for women. It's true that there has never been a greater need for firearms training for women. Often, the request for information on such classes is accompanied by the comment, "I'd like to take a class taught by a woman."

Women who seek firearms instruction often encounter obstacles. Some are discouraged because of stereotypical gender roles, and others mistakenly believe that they do not have a place in a field that is dominated by men. With that in mind, the NRA is asking you to reach out to the women in your community. Consider offering women-only classes, or hosting successful programs such as Women On Target® Instructional Shooting Clinics or Refuse To Be A Victim® Seminars. Let us show you how to incorporate these programs into your NRA Education and Training modules. You'll not only build a whole new market for firearms training, but you'll be making your community a safer place, too.

We'll showcase your accomplishments in a variety of ways, including various NRA magazines. If you'll send us photos of yourself teaching other women, we'd like to use those to show other women what is available to them. Also, if you schedule a Women On Target® Instructional Shooting Clinic or a Refuse To Be A Victim® Seminar, NRA Media Relations Division can help promote your efforts by issuing media releases on your behalf. NRA Women's Programs will post clinics and seminars on its website at www.nrawomen.org and through various social networking sites, too. We'll help you every step of the way.

Can we count on you to be a part of a new initiative to help women become shooters, and to help women learn about other NRA Women's Programs? A simple yes or no answer is all we need. Please email us at instructorupdate@nrahq.org, and we'll be in touch.

Kindest regards,

Elizabeth D. Hellmann
NRA Women's Programs

Encl.: FID Brochure

Westchester
gov.com

OFFICE USE ONLY

CASE #: _____

DETECTIVE: _____

Date: _____

State of New York
Department of Mental Hygiene
44 Holland Avenue
Albany, New York 12229

## Re:   Application for Firearm License

Dear Sir or Madam:

It is hereby requested that you conduct a check of your records against the name of the below listed person, in accordance with New York State Penal Law, section 400 (4), and that you respond to this agency in writing, as soon as possible:

**APPLICANT: PLEASE COMPLETE THE BELOW LISTED INFORMATION:**

Name (Last): __Nance_____    First: __Johnnie_____    M.I. __C__

Alias/ Maiden Name __REDACTED_____    Date of Birth: **REDACTED**

Address: _____    **REDACTED**
STREET               CITY               STATE               ZIP

Sex: __M__    Social Security. #: **REDACTED** of Birth: __N.Y.C.___

Sincerely,

DEPARTMENT OF PUBLIC SAFETY
Westchester County Police

George N. Longworth
Commissioner/ Sheriff

WESTCHESTER COUNTY
TIMOTHY C. IDONI
Westchester County Clerk

Bring or mail to:

**PISTOL LICENSE RECERTIFICATION**

ORIGINAL LICENSE #

*104518*

**INSTRUCTIONS: Complete form and submit in DUPLICATE to the Westchester County Clerk's Office with $10.00 Certification Fee**

1. NAME: _Johnnie C. Nance_     DATE OF BIRTH: **REDACTED**

2. ADDRESS: **REDACTED**

3. CITY/TOWN/VILLAGE: **REDACTED**     STATE: N.Y.     **REDACTED**

4. PHONE NUMBER HOME: _____     PHONE NUMBER WORK: 7____

5. LIST OF 5 WEAPON(S) ON OPPOSITE SIDE IS COMPLETE AND ACCURATE

License Holder's Signature

Sworn to before me this ___10 TH___ day of ___MARCH___, 20 09

MARY FERENCI
Notary Public, State of New York
No. 04FE6126306
Qualified in Westchester County
Commission Expires May 2, 2009

Notary Public

FOR OFFICE USE ONLY

| RECERTIFICATION LICENSE   APPROVED ☑ NOT APPROVED ☐ | DATE | COUNTY JUDGE |
|---|---|---|
| RECERTIFICATION DATE     10-29-14 | 4/30/09 | |

Revised: 1/19/2007

HON. RORY J. BELLANTONI
ACTING JUSTICE SUPREME COURT

6. THE FOLLOWING WEAPON(S) ARE IN MY POSSESSION: (ATTACH ADDITIONAL SHEETS AS NECESSARY):

| MAKE | REV/AUTO | MODEL | CALIBER | SERIAL # |
|------|----------|-------|---------|----------|
| S-W | Auto | 6946 | 9mm | TFR 9124 |
| S-W | Auto | 4576-2 | 45 | VCC7002 |
| Glock | Auto | 17 | 9x19 | LVX172 |
| Springfield | Auto | XD 45 | 45 | US707965 |
| Ruger | Auto | 22/45 | 22 | 22464831 |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |





D/O/B  **WESTCHESTER COUNTY**
NYSID# **TIMOTHY C. IDONI**
**County Clerk**

## APPLICATION FOR AMENDED OR DUPLIC

*104518*

**ORIGINAL LICENSE #**

**INSTRUCTIONS: Complete form and submit in DUPLICATE to the Westchester County Clerk's Office and include $3.00 for Amendment or $5.00 for duplicate.**

NAME:
*Johnnie C. Nance*  **REDACTED   REDACTED**

| AGE: | HEIGHT: | WEIGHT: | NOTE: Check box if purchase order is needed | ☑ |
|---|---|---|---|---|
| 49 | 6'1" | 294 | | |

### CIRCLE APPROPRIATE TRANSACTION (S)

RESIDENCE CHANGE     DISPOSED     (ACQUIRED)     NAME CHANGE     RESTRICTION CHANGE     TRANSFER

DUPLICATE     SURRENDERED     SUSPENDED     REVOKED     DECEASED     OTHER _____

### I. TO AMEND LICENSE COMPLETE 1 THROUGH 7 WHERE APPROPRIATE

1. NAME _____ PHONE #'s: HOME _____ WORK _____

2. NEW ADDRESS _____

3. THE FOLLOWING WEAPON (S) HAVE BEEN ACQUIRED FROM: NAME *Gander Mountain*

ADDRESS *100 N. Galleria Drive   Middletown   NY   10941*

LICENSE #/DEALER LICENSE #/SHIELD # *6-14-00588* _____. IF MORE THAN ONE SELLER, CHECK THIS

BOX ☐ AND FILL OUT BOX 7 ON THE BACK OF THIS FORM.

| MAKE | REV/AUTO | MODEL | CALIBER | SERIAL # |
|---|---|---|---|---|
| Glock | Auto | 19 XD45 | 9mm 45Acp | LVX 172 US 909965 |
| Springfield Arm. | Auto | | | |
| Ruger | Auto | 22/45 | .22 | 224-64831 |

4. THE FOLLOWING WEAPON (S) HAVE BEEN DISPOSED TO: NAME _____

ADDRESS _____

LICENSE #/DEALER LICENSE #/SHIELD # _____ . IF MORE THAN ONE BUYER, CHECK THIS

BOX ☐ AND FILL OUT BOX 7 ON THE BACK OF THIS FORM.

| MAKE | REV/AUTO | MODEL | CALIBER | SERIAL # |
|---|---|---|---|---|
| | | | | |

5. THE FOLLOWING WEAPON (S) HAVE BEEN: (CIRCLE ONE)     LOST     STOLEN     DESTROYED

LAW ENFORCEMENT AGENCY REPORTED TO: _____

| MAKE | REV/AUTO | MODEL | CALIBER | SERIAL # |
|---|---|---|---|---|
| | | | | |

6. AMEND LICENSE TO: (CIRCLE ONE)     (ADD)     DELETE     A RESTRICTION

IF AMENDMENT IS EMPLOYMENT RELATED, STATE THE FOLLOWING: (FOR A BUSINESS, EMPLOYMENT, OR FULL CARRY)
I AM REQUESTING THAT THE RESTRICTION ON MY LICENSE BE CHANGED TO: _____

| NAME: | STREET: | CITY/VILLAGE/TOWN: |
|---|---|---|
| | | |

7. NAMES AND ADDRESS' OF BUYERS AND/OR SELLERS (IDENTIFY IF BUYER OR SELLER)

| NAME | ADDRESS | WEAPON SERIAL # |
|------|---------|-----------------|
|      |         |                 |
|      |         |                 |

(A separate list of buyers/sellers must be submitted in triplicate on plain white paper, if there are more than 4 buyers/sellers.)

## II. TO REQUEST A DUPLICATE LICENSE, COMPLETE AFFIDAVIT

STATE OF NEW YORK )
COUNTY OF WESTCHESTER )   S.S.
CITY/VILLAGE OF )

Full Name _____

Present Occupation _____

Name and Address of Employer _____

Serial number of lost license _____   Date of Issuance _____

Brief statement of circumstances under which permit was lost: _____

Statement of weapon (s) now in applicant's possession, which are to be registered on license:

| MAKE | REV/AUTO | MODEL | CALIBER | SERIAL # |
|------|----------|-------|---------|----------|
|      |          |       |         |          |

(A separate list of guns must be submitted in triplicate on plain white paper, if applicant possesses more than 3 guns.)

Sworn to before me this _____ day of _____, 19 _____

_____
Applicant's Signature

_____
Notary Public

## III. TO BE COMPLETED BY ALL APPLICANTS

Have you been arrested for any crime, been a patient at any mental institution, or had an order of protection issued against you since the last license was issued?   (CIRCLE ONE)   YES   (NO)
If yes, give details below:

Date and Place of Birth   **REDACTED   REDACTED**

Foreign Born Citizens Only - Naturalization Certificate Number _____

Date of Issuance _____   Court _____

I SWEAR THAT ALL THE ABOVE FACTS ARE TRUE TO THE BEST OF MY KNOWLEDGE _____
APPLICANT'S SIGNATURE

| FOR OFFICE USE ONLY | | |
|---|---|---|
| AMENDED LICENSE APPROVED ☑   NOT APPROVED ☐ | DATE 5/14/08 | COUNTY JUDGE Robert M. DiBella |
| DUPLICATE LICENSE APPROVED ☐   NOT APPROVED ☐ | | |
| EXPIRATION DATE _____ | | |

:evised: 1/12/2005

HON. ROBERT M. DiBELLA
ACTING SUPREME COURT JUSTICE

# INQUIRY DETAIL REPORT
## GM#250 - Wallkill FFL# 6-14-00588

## Firearm Information

| | | | |
|---|---|---|---|
| Serial Number: | LVX172 | Manuf/Importer: | Glock |
| UPC: | 764503195020 | Model: | 19 |
| Description: | 4 " | Caliber/Gauge: | 9X19 |
| New/Used?: | New | Type: . | Pistol |

## Acquisition Information

**Date:** 03/05/2008
**Assoc.:** 525205, patty c

**Acq From:**

GM#1 - CRW Lebanon FFL# 4-35-01430
700 South Council Drive

Lebanon, IN 46052

## Disposition Information

**Date:**
**Assoc.:**

**Cost:**          **Retail:**

**Transfer/Sold To:**

LAYAWAY - # 10007449

APPX. 365

Printed: 04/30/2008

**INQUIRY DETAIL REPORT**
**GM#250 - Wallkill FFL# 6-14-00588**

Page: 1

---

### Firearm Information

| | | | |
|---|---|---|---|
| Serial Number: | US707965 | Manuf/Importer: | Springfield Armory u.s.a |
| UPC: | 706397866136 | Model: | XD-45 |
| Description: | S4" | Caliber/Gauge: | .45 ACP |
| New/Used?: | New | Type: | Pistol |

---

### Acquisition Information

Date:       01/24/2008
Assoc.:    525205, patty c

**Acq From:**

GM#1 - CRW Lebanon FFL# 4-35-01430
700 South Council Drive

Lebanon, IN 46052

---

### Disposition Information

Date:
Assoc.:


Cost:                          Retail:

**Transfer/Sold To:**

LAYAWAY - # 10007449

---

APPX. 366

Printed: 04/30/2008

**INQUIRY DETAIL REPORT**
**GM#250 - Wallkill FFL# 6-14-00588**

Page: 1

| **Firearm Information** | | **Current** |
|---|---|---|

| | | |
|---|---|---|
| **Serial Number:** | 224-64831 | **Manuf/Importer:** Ruger |
| **UPC:** | 499925026125 | **Model:** 22/45 |
| **Description:** | . | **Caliber/Gauge:** .22 caliber |
| **New/Used?:** | Used | **Type:** Pistol |

| **Acquisition Information** | | **Acq From:** |
|---|---|---|

| | |
|---|---|
| **Date:** | 04/07/2008 |
| **Assoc.:** | 525224, Gary Pawliczak |

**8· REDACTED**

| **Disposition Information** | | **Transfer/Sold To:** |
|---|---|---|

**Date:**

**Assoc.:**

LAYAWAY - # 10007451

**Cost:**          **Retail:**





**Andrew J. Spano**
**County Executive**

Department of Public Safety

**Thomas Belfiore**
**Commissioner/Sheriff**
April 11, 2005

Honorable Justice
Westchester County Court
White Plains, NY  10601

Re: Mr. Johnnie C. Nance

**REDACTED**

Dear Honorable Justice:

The above captioned individual has submitted an application to this department for a New York State Pistol Permit:

**TARGET SHOOTING**

A search of the files of the Division of Criminal Justice Services in Albany reveals no derogatory information.

A search of the files of the New York State Department of Mental Hygiene reveals no derogatory information.

Letters from each of the four character references attesting to the good moral character and reputation of the applicant are on file.

The applicant is a citizen of the United States by virtue of birth as evidenced by a copy of the applicant's birth certificate.

There are no means available to this Office to further verify statements made on the application.

Application is hereby forwarded with whatever action you deem appropriate.

Should you require any additional information regarding our investigation of this applicant, please contact the Pistol Permit Unit at (914) 995-2709.

Sincerely,

*Thomas Belfiore*
Thomas Belfiore
Commissioner/Sheriff

TB/db/cf
attachments

A New York State Accredited
Law Enforcement Agency

Saw Mill River Parkway                    March 4, 2005
Hawthorne, New York 10532     Telephone: (914)864-7700  Website: westchestergov.com

 



Andrew J. Spano
County Executive

Department of Public Safety                 DATE: _3/4/5___

Thomas Belfiore
Commissioner/Sheriff

| OFFICE USE ONLY | |
| --- | --- |
| CASE #: 05-266 | |
| DET: D.S | |

State of New York
Department of Mental Hygiene
44 Holland Avenue
Albany, New York 12229

Re:  Applicant for a New York State Pistol License

Dear Sir:

It is hereby requested that you check your records against the name of the following, in compliance with the New York State Penal Law, Subdivision 4, Section 400.00:

### PLEASE FILL IN INFORMATION:

Name: __Johnnie Nance__

**Aliases and/or Maiden Name:**

Address:_____ **REDACTED**                **REDACTED**

Date of Birth:__ **REDACTED**

Place of Birth:_ **REDACTED**

Sex:__MALE_____

Your cooperation is greatly appreciated.

Very truly yours,

_Thomas Belfiore_

Thomas Belfiore
Commissioner/Sheriff

A New York State Accredited
Law Enforcement Agency

Saw Mill River Parkway
Hawthorne, New York 10532

NO OFFICIAL RECORD OF HOSPITALIZATION FOR MENTAL ILLNESS SINCE 1965. IF SEARCH PRIOR TO 1965 IS REQUIRED, PLEASE SUBMIT WRITTEN REQUEST.

Telephone: (914)864-7700   Website  westchestergov.com



Memorandum
**Department of Public Safety**

## PISTOL LICENSE APPLICATION QUESTIONNAIRE

### ANSWER ALL QUESTIONS FULLY:     ATTACH SEPARATE SHEETS IF NECESSARY

LAST NAME: REDACTED   FIRST: REDACTED   M.I.

ADDRESS

ALIAS_____ SEX M RACE BLK HAIR BLK EYES BRO WEIGHT 244

HEIGHT: 6 1   D.O.B REDACTED   PLACE OF BIRTH_____

1) X CITIZEN BY BIRTH
___ NATURALIZED CITIZEN – NATURALIZATION NUMBER _____
___ RESIDENT ALIEN   ALIEN REGISTRATION NO. _____

2) MARITAL STATUS:   IF FEMALE, MAIDEN NAME_____
___ SINGLE
X MARRIED ___ DIVORCED   NUMBER OF CHILDREN AT HOME_____

3) LIST ALL PLACES OF RESIDENCE FOR THE LAST FIVE YEARS.
REDACTED   REDACTED
REDACTED

3a) PHONE NUMBER (H) REDACTED   (W)_____

4) LIST ALL PLACES OF EMPLOYMENT FOR THE PAST FIVE YEARS:
Premier Distribution

5) LIST ALL PISTOLS YOU WILL BE REGISTERING:
Make Smith twesson - Model 6946-Serial # TFR9124 · Cal 9mm
Make Smith twesson - model 4516-Serial # VCC 9002 · Cal 45ACP

6) HOW AND WHERE WILL PISTOLS BE SAFEGUARDED WHEN NOT IN USE:
in locked box

7) GIVE NAME, ADDRESS AND TELEPHONE NUMBER OF THE PERSON WHO WILL SAFEGUARD THE PISTOL (S) IN THE EVENT OF YOUR DEATH OR DISABILITY:
REDACTED   REDACTED

8) LIST THE NEAREST RELATIVES NOT LIVING WITH YOU:

1) NAME REDACTED   REDACTED
ADDRESS

2) NAME Patricia Wanna   PHONE NO. REDACTED
ADDRESS REDACTED

~ OVER ~

# DEPARTMENT OF PUBLIC SAFETY
## WESTCHESTER COUNTY POLICE
### PISTOL LICENSE UNIT

### PISTOL LICENSE APPLICATION SUPPLEMENT

**INSTRUCTIONS:** Read each question carefully and answer each question in black ink.  Place a check mark in the box which represents your response.  **You MUST have this form NOTARIZED.**

1) Do you have, or have you ever had, an Order of Protection issued against you?

YES ☐  NO ☐

2) Do you have, or have you ever had, an Order of Protection issued by you against a member of your household or any family member?

YES ☐  NO ☑

3) Do you have, or have you ever had, an Order of Protection issued by you against a person other than a member of your household or family?

YES ☐  NO ☑

• **Note:** If you have checked YES to question one (1), you **MUST** attach a signed and notarized letter explaining your answer and include the following information:

A. The court of issuance
B. The date of issuance
C. Complainant's name
D. Complainant's address
E. Complainant's telephone number
F. Complainant's relationship to you
G. Reason for issuance of Order of Protection

• **Note:** If you checked YES to either question two (2) or question three (3), you **MUST** attach a signed and notarized letter explaining your answer and include the following information:

A. The court of issuance
B. The date of issuance
C. Respondent's name
D. Respondent's address
E. Respondent's telephone number
F. Respondent's relationship to you
G. Reason for issuance of Order of Protection

I, the undersigned applicant, being duly sworn, deposes and says under penalty of perjury that all of the aforementioned answers are true to the best of my knowledge.

_____
Signature of Applicant

STATE OF NEW YORK
COUNTY OF _____

Sworn to before me this _____ day
of _____, 19___

_____
Notary Public, State of New York

Affix Seal Above

*WALTON A. WALLACE, JR.*

# REDACTED

*NRA CERT. # 18534852*

To Whom It Might Concern,

  This Letter is to Certify that the below named Student has successfully completed the NRA BASIC PISTOL SAFETY COURSE as follows:

Lesson I:  Pistol Knowledge and Safe Gun Handling.

Lesson II:  Ammunition Knowledge and The Fundamentals of Pistol Shooting.

Lesson IV:  Two Handed and One Handed Standing Shooting Positions.

Lesson V:  Pistol Sports Activities.

  In Addition:  Care, Cleaning and the Proper Storage of Firearms, specifically pistols, have been explained.

Lesson III:  Deals with the Actual Shooting of the Pistol.
     Since New York State Law does not permit a student to handle a Firearm until their license has been approved a follow up lesson is provided. When the Student has obtained His / Her Permit, they will return for Proper Instruction on the Firing Range.

STUDENT NAME:  *Johnnie Nave*

DATE OF COURSE:  *4/18/04 , 4/25/04*

COURSE REFERENCE MATERIAL:  **THE BASICS OF PISTOL SHOOTING**
            Published by The NRA

*Walton A. Wallace J.*

*Walton A. Wallace Jr.*

# THE NATIONAL RIFLE
# ASSOCIATION OF AMERICA

Awards this certificate to

Johnnie Nance

for successful completion of the

## NRA
## BASIC PISTOL
## COURSE

Blue Mt. Sportsmen Center

Issued at

Walter A. Wallace Jr

NRA Certified Instructor

NRA # 185 39852

25 April 2007

Date

Edward S. Small Jr

NRA Secretary

# <u>NCIC SEARCH</u>

# <u>REDACTED</u>

# NCIC SEARCH

# REDACTED

# NCIC SEARCH

# REDACTED

INSTRUL    5: Print or type in black ink

| NYSID NUMBER | | | PB-3 REV. 6/00 | COUNTY OF ISSUE Westchester |
| LICENSE NUMBER | 104518 | STATE OF NEW YORK PISTOL/REVOLVER LICENSE APPLICATION | |
| DATE OF ISSUE | 02/19/05 | | EXPIRATION DATE |

LAST NAME   NANICK          FIRST NAME   JOHNNIE

EMPLOYED BY   Premier Distribution    NATURE OF BUSINESS   Transportation    BUSINE

I HEREBY APPLY FOR A PISTOL/REVOLVER LICENSE TO: (Check one only)   [X] • CARRY CONCEALED   [ ] • POSSESS ON PREMISE
[ ] • POSSESS/CARRY DURING EMPLOYMENT (• Premise address or place of employment must be provided)

STREET ADDRESS OR OTHER LOCATION          CITY, VILLAGE, TOWN          ZIP CODE
A LICENSE IS REQUIRED FOR THE FOLLOWING REASON:
TARGET

GIVE FOUR CHARACTER REFERENCES WHO BY THEIR SIGNATURE ATTEST TO YOUR GOOD MORAL CHARACTER

| LAST, FIRST, MI | | SIGNATURE |
| Hargrove Richard | REDACTED | Richard Harge |
| Hargrove Shirley | REDACTED | Shirley Harg |
| Hulas Edward | REDACTED | Edward B Hur |
| Sarah Mured | | |

HAVE YOU EVER BEEN ARRESTED OR INDICTED ANYWHERE FOR ANY OFFENSE, INCLUDING DWI (EXCEPT TRAFFIC INFRACTIONS)?
[ ] YES  [X] NO   IF YES, FURNISH THE FOLLOWING INFORMATION:

| DATE | POLICE AGENCY | CHARGE | DISPOSITION – COURT AND DATE |
| | | | |
| | | | |

| | | YES | NO |
| HAVE YOU EVER BEEN TERMINATED/DISCHARGED FROM ANY EMPLOYMENT OR THE ARMED FORCES FOR CAUSE? | | [ ] YES | [X] NO |
| HAVE YOU EVER UNDERGONE TREATMENT FOR ALCOHOLISM OR DRUG USE? | | [ ] YES | [X] NO |
| HAVE YOU EVER SUFFERED ANY MENTAL ILLNESS, OR BEEN CONFINED TO ANY HOSPITAL, PUBLIC OR PRIVATE INSTITUTION, FOR MENTAL ILLNESS? | | [ ] YES | [X] NO |
| HAVE YOU EVER HAD A PISTOL LICENSE, DEALER'S LICENSE, GUNSMITH LICENSE, OR ANY APPLICATION FOR SUCH A LICENSE DISAPPROVED, OR HAD SUCH A LICENSE REVOKED OR CANCELLED? | | [ ] YES | [X] NO |
| DO YOU HAVE ANY PHYSICAL CONDITION WHICH COULD INTERFERE WITH THE SAFE AND PROPER USE OF A HANDGUN? | | [ ] YES | [X] NO |
| HAVE YOU EVER BEEN CHARGED, PETITIONED AGAINST, A RESPONDENT, OR OTHERWISE BEEN A SUBJECT OF A PROCEEDING IN FAMILY COURT? | | [ ] YES | [X] NO |

IF ANSWER TO ANY QUESTION IS YES, EXPLAIN HERE:

NY OMISSION OF FACT OR ANY FALSE STATEMENT WILL BE SUFFICIENT CAUSE
J DENY THIS APPLICATION AND CONSTITUTES A CRIME PUNISHABLE BY FINE,
IPRISONMENT, OR BOTH.

AM AWARE THAT THE FOLLOWING CONDITIONS AFFECT ANY LICENSE WHICH
IAY BE ISSUED TO ME:

NO LICENSE ISSUED AS A RESULT OF THIS APPLICATION IS VALID IN THE CITY OF NEW YORK.
ANY LICENSE ISSUED AS A RESULT OF THIS APPLICATION WILL BE VALID ONLY FOR A PISTOL OR
REVOLVER SPECIFICALLY DESCRIBED IN THE LICENSE PROPERLY ISSUED BY THE LICENSING OFFICER.
IF I PERMANENTLY CHANGE MY ADDRESS, NOTICE OF SUCH CHANGE AND MY NEW ADDRESS MUST
BE FORWARDED TO THE SUPERINTENDENT OF THE STATE POLICE AND IN NASSAU COUNTY AND SUFFOLK COUNTY,
TO THE LICENSING OFFICER OF THAT COUNTY, WITHIN 10 DAYS OF SUCH CHANGE.
ANY LICENSE ISSUED AS A RESULT OF THIS APPLICATION IS SUBJECT TO REVOCATION AT ANY
TIME BY THE LICENSING OFFICER OR ANY JUDGE OR JUSTICE OF A COURT OF RECORD.

4973656
2006

JURAT:
SIGNED AND SWORN TO BEFORE ME
THIS   19   DAY OF   FEB   , 20 05
AT   WESTCHESTER COUNTY, YONKERS   , NEW YORK

SIGNATURE OF APPLICANT

SIGNATURE OF OFFICER ADMINISTERING OATH
NOTARY PUBLIC
TITLE OF OFFICER

THIS FORM APPROVED BY SUPERINTENDENT OF STATE POLICE AS
REQUIRED BY PENAL LAW SECTION 400.00.SUBD.3.

139-PP02
139-PP02A

APPLICATION NOT VALID UNLESS SWORN

| 1. RIGHT THUMB | 2. RIGHT FOREFINGER | 3. RIGHT MIDDLE FINGER | 4. RIGHT RING FINGER | 5. RIGHT LITTLE FING |
|---|---|---|---|---|

REDACTED   REDACTED   REDACTED

REDACTED

| 6. LEFT THUMB | 7. LEFT FOREFINGER | 8. LEFT MIDDLE FINGER | 9. LEFT RING FINGER | 10. LEFT LITTLE FINGE |
|---|---|---|---|---|

REDACTED   REDACTED   REDACTED

PLAIN IMPRESSIONS TAKEN SIMULTANEOUSLY

LEFT FOUR FINGERS          RIGHT FOUR FINGERS

THUMBS TAKEN TOGETHER

REDACTED          REDACTED

REDACTED          REDACTED   REDACTED

REDACTED   REDACTED   REDACTED

IMPRESSIONS TAKEN BY: NAME _DalByn_   RANK _Lieut_   SHIELD _34_   DATE _3/9/5_

APPLICANT'S SIGNATURE AND ADDRESS _____

INVESTIGATION REPORT - ALL INFORMATION PROVIDED BY THIS APPLICANT HAS BEEN VERIFIED:

NAME _DalByn_   RANK _Lt_   ORGANIZATION _WCPD_

RECOMMEND APPROVAL - DISAPPROVAL (STRIKE OUT ONE) _4/19/05_          SIGNATURE OF INVESTIGATING OFFICER

THIS APPLICATION IS APPROVED / DISAPPROVED (STRIKE OUT ONE)   THE FOLLOWING RESTRICTION(S) IS (ARE) APPLICABLE T. THIS LICENSE: _T/S_ )

TITLE AND SIGNATURE OF LICENSING OFFICER

IF LICENSING OFFICER AUTHORIZES THE POSSESSION OF A PISTOL OR REVOLVER AT THE TIME OF ISSUE C ORIGINAL LICENSE, FURNISH THE FOLLOWING INFORMATION:

| MANUFACTURER | PISTOL OR REVOLVER | CALIBER | SERIAL NUMBER | MODEL | PROPERTY OF |
|---|---|---|---|---|---|
| Smith+tueson | Pistol | 9mm | TFR 9124 | 6946 | ALL Counties Sport |
| Smith+tueson | Pistol | 45ALP | VCC 7002 | 4516-2 | 677 Yonkers Ave |
|  |  |  |  |  | Yonkers NY 10704 |
|  |  |  |  |  | NY Dealers NY |
|  |  |  |  |  | 104245-F |

DUPLICATE OF THIS APPLICATION MUST BE FILED WITH THE SUPERINTENDENT OF STATE POLICE WITHIN 10 DAYS OF ISSUANCE AS REQUIRED BY PENAL LAW SECTION 400.00 SUBD. 5.

# EXHIBIT J

05 267 (10-597)

D/O/B **REDACTED** ESTCHESTER COUNTY
NYSID# **REDACTED** TIMOTHY C. IDONI
County Clerk

## APPLICATION FOR AMENDED OR DUPLICATE P~~~~~~~~~~

104519

**ORIGINAL LICENSE #**

INSTRUCTIONS: Complete form and submit in DUPLICATE to the Westchester County Clerk's Office and include $3.00 for Amendment or $5.00 for duplicate.

| NAME: ANNA MARCUCCI-NANCE | **REDACTED** | **REDACTED** |
|---|---|---|
| AGE: 44 | HEIGHT: 5'5" | WEIGHT: 235 | NOTE: Check box if purchase order is needed ✓ |

## CIRCLE APPROPRIATE TRANSACTION (S)

RESIDENCE CHANGE  (DISPOSED)  (ACQUIRED)  NAME CHANGE  (RESTRICTION CHANGE)  TRANSFER

DUPLICATE  SURRENDERED  SUSPENDED  REVOKED  DECEASED  OTHER _____

## I. TO AMEND LICENSE COMPLETE 1 THROUGH 7 WHERE APPROPRIATE

1. NAME ANNA MARCUCCI-NANCE PHONE #'s: **REDACTED** ORK **REDACTED**

2. NEW ADDRESS _____

3. THE FOLLOWING WEAPON (S) HAVE BEEN ACQUIRED FROM: NAME GANDER MTN

ADDRESS 100 NORTH GALLERIA DR. MIDDLETOWN NY 10941

LICENSE #/DEALER LICENSE #/SHIELD # FFL# 6-14-00588 . IF MORE THAN ONE SELLER, CHECK THIS BOX ☐ AND FILL OUT BOX 7 ON THE BACK OF THIS FORM.

| MAKE | REV/AUTO | MODEL | CALIBER | SERIAL # |
|---|---|---|---|---|
| Heritage | REV | ROUGH RIDER | -22 | G 37997 |

4. THE FOLLOWING WEAPON (S) HAVE BEEN DISPOSED TO: NAME GANDER MTN

ADDRESS 100 NORTH GALLERIA DR. MIDDLETOWN NY 10941

LICENSE #/DEALER LICENSE #/SHIELD # FFL# 6-14-00588 . IF MORE THAN ONE BUYER, CHECK THIS BOX ☐ AND FILL OUT BOX 7 ON THE BACK OF THIS FORM.

| MAKE | REV/AUTO | MODEL | CALIBER | SERIAL # |
|---|---|---|---|---|
| S&W | SEMI-AUTO | | 9MM | JFR 9124 |

5. THE FOLLOWING WEAPON (S) HAVE BEEN: (CIRCLE ONE)    LOST    STOLEN    DESTROYED

LAW ENFORCEMENT AGENCY REPORTED TO: _____

| MAKE | REV/AUTO | MODEL | CALIBER | SERIAL # |
|---|---|---|---|---|
| | | | | |

6. AMEND LICENSE TO: (CIRCLE ONE)    ADD    DELETE    (A RESTRICTION)

IF AMENDMENT IS EMPLOYMENT RELATED, STATE THE FOLLOWING: (FOR A BUSINESS, EMPLOYMENT, OR FULL CARRY)
I AM REQUESTING THAT THE RESTRICTION ON MY LICENSE BE CHANGED TO: FULL CARRY

| NAME: ANNA MARCUCCI-NANCE | **REDACTED** | ITY/VILLAGE/TOWN **REDACTED** |
|---|---|---|

APPX. 381

7. NAMES AND ADDRESS' OF BUYERS AND/OR SELLERS (IDENTIFY IF BUYER OR SELLER)

| NAME | ADDRESS | WEAPON SERIAL # |
|------|---------|-----------------|
|      |         |                 |
|      |         |                 |

(A separate list of buyers/sellers must be submitted in triplicate on plain white paper, if there are more than 4 buyers/sellers )

## II. TO REQUEST A DUPLICATE LICENSE, COMPLETE AFFIDAVIT

STATE OF NEW YORK
COUNTY OF WESTCHESTER : S.S.
CITY/VILLAGE OF

Full Name  ANNA L. MARCUCCI-NANCE

Present Occupation  TRAIN OPERATOR

Name and Address of Employer  NYCT 130 LIVINGSTON ST BROOKLYN NY 11201

Serial number of lost license _____ Date of Issuance _____

Brief statement of circumstances under which permit was lost:

N/A

Statement of weapon (s) now in applicant's possession, which are to be registered on license:

| MAKE | REV/AUTO | MODEL | CALIBER | SERIAL # |
|------|----------|-------|---------|----------|
|      |          |       |         |          |

(A separate list of guns must be submitted in triplicate on plain white paper, if applicant possesses more than 3 guns.)

Sworn to before me this _____ day of _____, 19 ____    _____
                                                                  Applicant's Signature

_____
Notary Public

## III. TO BE COMPLETED BY ALL APPLICANTS

Have you been arrested for any crime, been a patient at any mental institution, or had an order of protection issued against you since the last license was issued?    (CIRCLE ONE)    YES    NO
If yes, give details below:

_____

**REDACTED** REDACTED

Date and Place of Bir___

Foreign Born Citizens Only - Naturalization Certificate Number _____

Date of Issuance _____    Court _____

I SWEAR THAT ALL THE ABOVE FACTS ARE TRUE TO THE BEST OF MY KNOWLEDGE  _____
                                                                        APPLICANT'S SIGNATURE

| FOR OFFICE USE ONLY | | |
|---|---|---|
| AMENDED LICENSE APPROVED ☒ NOT APPROVED ☒ | DATE | COUNTY JUDGE |
| DUPLICATE LICENSE APPROVED ☐ NOT APPROVED ☐ | SEP 1 0 2010 | |
| EXPIRATION DATE _____ | | |

Revised: 1/12/2005

APPX. 382

HON. ROBERT K. HOLDMAN


Westchester
gov.com

Robert P. Astorino
County Executive

Department of Public Safety

George N. Longworth
Commissioner of Public Safety

August 11, 2010

Honorable Justice
Westchester County Court
111 Dr. Martin Luther King, Jr. Blvd.
White Plains, New York 10601

Re:     Pistol License amendment of Anna L. Marcucci-Nance

# REDACTED

Dear Honorable Justice:

The above captioned individual has submitted an application to Westchester County to amend his New York State (NYS) Pistol License to allow the category of **FULL CARRY.**

The applicant is currently licensed by Westchester County for the purpose of Target Shooting (#104519). This amendment application is for the following:

   1)     Delete Target Shooting.
   2)     Add Full Carry.
   3)     Delete one (1) firearm.
   4)     Add one (1) firearm.

A name based criminal background and related database check through the National Instant Criminal Background check system was conducted. No derogatory information was uncovered. In addition, a query of the files of the NYS Department of Mental Hygiene also revealed no derogatory information.

The applicant submitted notarized documentation attesting that 1) she is a citizen in good standing in the community with many family and social ties, and 2) she is steadily employed and stable and of good moral character, and 3) she has a desire to become involved in competitive shooting at various ranges, and 4) the NRA has offered to partner with her to provide all female classes to women, and 5) she would like to use her NRA Instructor Safety Certifications to promote safe gun handling at various locations and having a full carry permit would facilitate these endeavors.

A New York State Accredited
Law Enforcement Agency

1 Saw Mill River Parkway
Hawthorne, NY 10532        Telephone: (914) 864-7700        Website: westchestergov.com

  

Anna L. Marcucci-Nance
August 11, 2010
Page 2 of 2

It appears that the necessary proper cause for the issuance of a firearm license for the purpose of Full Carry has not been met by the applicant. No safety related concerns have been cited by the applicant in support of the license sought. The applicant's current firearm license would appear to cover the sport target shooting related endeavors that she has cited. The applicant has not demonstrated an exceptional need for self protection distinguishable from that of the general public.

This application is respectfully forwarded with the following recommendations:

The category of **Full Carry** is recommended for **DISAPPROVAL.**
The addition of one firearm to license is recommended for **APPROVAL.**
The deletion of one firearm from license is recommended for **APPROVAL.**

Sincerely,

DEPARTMENT OF PUBLIC SAFETY
Westchester County Police

Joseph F. Yasinski
First Deputy Commissioner

JJY/fd

Chief Inspector's Endorsement                                    August 5, 2010

RE:    Pistol License Amendment – **TARGET SHOOTING ADD FULL CARRY ADD ONE FIREARM**
                                    **DELETE ONE FIREARM**
         Ms. Anna L. Marcucci-Nance, Pistol License #104519

I have reviewed the attached investigative report and the foregoing comments of Sergeant Bruce Bellom and
Lieutenant Frank Donovan.  I concur with both of their recommendations.

Forwarded to First Deputy Commissioner Joseph J. Yasinski and recommend **disapproval** of this application
amendment to Pistol License #104519 to add the category of **FULL CARRY** firearm license for the applicant.
Recommend **approval** of the addition of one firearm and deletion of one firearm to the license of the applicant.


Chief Inspector Roger R. Rokicki
Chief of Administrative Services

RRR/jw

08/03/2010: Endorsement by Lieutenant Frank J. Donovan of memorandum by Sergeant Bellom dated 08/03/2010 entitled: Pistol License amendment of Anna L. Marcucci-Nance (FC).

The applicant is currently licensed by Westchester County for the purpose of Target Shooting (#104519). This amendment application is for the following:

      1)     Delete Target Shooting.
      2)     Add Full Carry.
      3)     Delete one (1) firearm.
      4)     Add one (1) firearm.

The applicant submitted notarized documentation attesting that 1) she is a citizen in good standing in the community with many family and social ties, and 2) she is steadily employed and stable and of good moral character, and 3) she has a desire to become involved in competitive shooting at various ranges, and 4) the NRA has offered to partner with her to provide all female classes to women, and 5) she would like to use her NRA Instructor Safety Certifications to promote safe gun handling at various locations and having a full carry permit would facilitate these endeavors.

It appears that the necessary proper cause for the issuance of a firearm license for the purpose of Full Carry has not been met by the applicant. No safety related concerns have been cited by the applicant in support of the license sought. The applicant's current firearm license would appear to cover the sport target shooting related endeavors that she has cited. The applicant has not demonstrated an exceptional need for self protection distinguishable from that of the general public.

I concur with Sergeant Bellom and recommend the following:

      The category of **Full Carry** is recommended for **DISAPPROVAL**.
      The addition of one firearm to license is recommended for **APPROVAL**.
      The deletion of one firearm from license is recommended for **APPROVAL**.

Forward to Chief Inspector Roger R. Rokicki.

Lieutenant Frank J. Donovan



Westchester
gov.com

Memorandum
Department of Public Safety

DATE:     August 3, 2010

TO:       Lt. Frank Donovan

FROM:     Sgt. Bruce Bellom #15

RE:       Pistol License amendment of Anna L. Marcucci-Nance

The above captioned individual has submitted an application to Westchester County to amend his New York State (NYS) Pistol License to allow the category of **FULL CARRY.**

The applicant is currently licensed by Westchester County for the purpose of Target Shooting (#104519). This amendment application is for the following:

        1)    Delete Target Shooting.
        2)    Add Full Carry.
        3)    Delete one (1) firearm.
        4)    Add one (1) firearm.

A name based criminal background and related database check through the National Instant Criminal Background check system was conducted. No derogatory information was uncovered. In addition, a query of the files of the NYS Department of Mental Hygiene also revealed no derogatory information.

The applicant submitted notarized documentation attesting that 1) she is a citizen in good standing in the community with many family and social ties, and 2) she is steadily employed and stable and of good moral character, and 3) she has a desire to become involved in competitive shooting at various ranges, and 4) the NRA has offered to partner with her to provide all female classes to women, and 5) she would like to use her NRA Instructor Safety Certifications to promote safe gun handling at various locations and having a full carry permit would facilitate these endeavors.

It appears that the necessary proper cause for the issuance of a firearm license for the purpose of Full Carry has not been met by the applicant. The applicant has not demonstrated an exceptional need for self protection distinguishable from that of the general public.

This application is respectfully forwarded with the following recommendations:

        The category of **Full Carry** is recommended for **DISAPPROVAL.**

        The addition of one firearm to license is recommended for **APPROVAL.**

Westchester
gov.com

OFFICE USE ONLY

CASE #:_____ 10  597

DETECTIVE:____ FO_____

Date:_____7/20/10_____

State of New York
Department of Mental Hygiene
44 Holland Avenue
Albany, New York 12229

## Re:   Application for Firearm License

Dear Sir or Madam:

It is hereby requested that you conduct a check of your records against the name of the below listed person, in accordance with New York State Penal Law, section 400 (4), and that you respond to this agency in writing, as soon as possible:

**APPLICANT: PLEASE COMPLETE THE BELOW LISTED INFORMATION:**

Name (Last): Marcucci-Nance    First: Anna    M.I.

Alias/ Maiden Name:_____    Date of Birth: REDACTED

Address:_____REDACTED_____REDACTED_____
          STREET          CITY          STATE          ZIP

Sex: F    Social Security. #: REDACTED    Place of Birth: REDACTED

Sincerely,

DEPARTMENT OF PUBLIC SAFETY
Westchester County Police

George N. Longworth
Commissioner/ Sheriff

P.2

Printed: 06/30/2010

**INQUIRY DETAIL REPORT**
**GM#250 - Wallkill FFL# 6-14-00588**

Page: 1

| Firearm Information | | Current | |
|---|---|---|---|

| | | | |
|---|---|---|---|
| Serial Number: | tfr9124 | Manuf/Importer: | smith &wesson 6946 |
| UPC: | 499925041?72 | Model: | 6946 |
| Description: | two mags total | Caliber/Gauge: | 9mm |
| New/Used?: | Used | Type: | Pistol |

| Acquisition Information | | Acq From: |
|---|---|---|

| | | |
|---|---|---|
| Date: | 06/29/2010 | anna l marcucci-nance |
| Assoc.: | 531411. JT DESIMONE | 2€ **REDACTED** |
| | | y **REDACTED** |

| Disposition Information | | Transfer/Sold To: |
|---|---|---|

| | |
|---|---|
| Date: | |
| Assoc.: | |
| Cost: | Retail: |

APPX. 389



**Used Firearm Purchase Agreement**
**Customer Copy**

GM#250 - Wallkill FFL# 6-14-00588
100 N. Galleria Dr

Middle Town, NY 10941
(845) 692-5600

**Entered Date:** 06/29/2010                    **Printed Date:** 06/29/2010 12:29 pm

**Customer Information:**

| | |
|---|---|
| **Name:** | anna l marcucci |
| **Address:** | REDACTED |
| **City:** | |
| **State:** | REDACTED **Zip:** REDACTED **County:** REDACTED |
| **Phone:** | **DOB:** REDACTED **Drivers Lic.:** |

**Firearm Information:**

| | | | |
|---|---|---|---|
| **UPC:** | 499925041272 | **Barrel Length:** | 3-3/4in FS |
| **Manufacturer:** | Smith & Wesson | **Serial Number:** | tfr9124 |
| **Model:** | 910S | **Cost:** | $225.00 |
| **Cal/Gauge:** | 9mm Luger | **Department:** | Used Firearms |
| **Grade:** | Good | **Class:** | Handguns |
| | | **Subclass:** | Semi-Auto Pistol |

```
        GANDER MOUNTAIN #250
           (845)692-5600
          Mon-Sat 9am-9pm
          Sundays 10am-6pm

 SERIAL NUMBER tfr9124
          PAID OUT
 SED GUN PAID OUT        $225.00

 OTAL                    $225.00-
 ASH                     $225.00-

       CUSTOMER COPY
                          JT,Des.
 5-29-2010  12:32:20   0250 45 531411 1280
```

APPX. 390

Printed: 06/29/2010

INQUIRY DETAIL REPORT
GM#250 - Wallkill FFL# 6-14-00588

Page: 1

### Firearm Information

| | | | |
|---|---|---|---|
| Serial Number: | G37997 | Manuf/Importer: | heritage |
| UPC: | 727962500316 | Model: | rough rider |
| Description: | 6.5" heritage rough | Caliber/Gauge: | .22 caliber |
| New/Used?: | New | Type: | Revolver |

GANDER MOUNTAIN #250
(845)692-5600
Mon-Sat 9am-9pm
Sundays 10am-6pm

LAYAWAY SALE
LAYAWAY NUMBER 10011499
CUSTOMER NAME: Anna Marcucci-Nance
PHONE:       **REDACTED**

ADDRESS:
CITY:        **REDACTED**
STATE:
ZIP:
ROUGH RIDER:22 WIN MAG:6-1/2IN FS:RIGHT:
727962500316              199.99 TC
SERIAL NUMBER G37997
SUBTOTAL
New York State Tax                    $199.99
CNTY TAX 4.125%                         $8.00
LAYAWAY SALE TOTAL                      $8.25
                                      $216.24

LAYAWAY DEPOSIT                        $216.24

TOTAL                                 $216.24
CASH                                  $220.00
CHANGE                                  $3.76

BALANCE DUE              $0.00

All items on Layaway will be
held for 90 days. If the items
are not picked up within
90 days, the items will be
returned to stock.
A $25.00 restocking fee
will be charged for all
cancelled layaways.

CUSTOMER COPY

ITEMS 1
06-29-2010  12:45:58                 Robert H
                    0250 26 525287 2021

3 Ways To Shop
In Store, Online and Catalog!

APPX. 391


                                                                    June 16, 2010

Dear NRA Certified Instructor,

Perhaps you've seen it, too – a dramatic rise in the demand for NRA classes for women. It's true that there has never been a greater need for firearms training for women. Often, the request for information on such classes is accompanied by the comment, "I'd like to take a class taught by a woman."

Women who seek firearms instruction often encounter obstacles. Some are discouraged because of stereotypical gender roles, and others mistakenly believe that they do not have a place in a field that is dominated by men. With that in mind, the NRA is asking you to reach out to the women in your community. Consider offering women-only classes, or hosting successful programs such as Women On Target® Instructional Shooting Clinics or Refuse To Be A Victim® Seminars. Let us show you how to incorporate these programs into your NRA Education and Training modules. You'll not only build a whole new market for firearms training, but you'll be making your community a safer place, too.

We'll showcase your accomplishments in a variety of ways, including various NRA magazines. If you'll send us photos of yourself teaching other women, we'd like to use those to show other women what is available to them. Also, if you schedule a Women On Target® Instructional Shooting Clinic or a Refuse To Be A Victim® Seminar, NRA Media Relations Division can help promote your efforts by issuing media releases on your behalf. NRA Women's Programs will post clinics and seminars on its website at www.nrawomen.org and through various social networking sites, too. We'll help you every step of the way.

Can we count on you to be a part of a new initiative to help women become shooters, and to help women learn about other NRA Women's Programs? A simple yes or no answer is all we need. Please email us at instructorupdate@nrahq.org, and we'll be in touch.

                    Kindest regards,

                    Elizabeth D. Hellmann
                    NRA Women's Programs

Encl.: FID Brochure



# WESTCHESTER COUNTY POLICE
## PISTOL LICENSE UNIT

### ATTACHMENT: FULL CARRY

| OFFICE USE ONLY |
| --- |
| CASE#: _____ |
| DET: _____ |

**Answer all questions fully and in accordance with the guidelines set forth in the Pistol Safety & Information Handbook. This form and attachments must be notarized.**

**APPLICANT INFORMATION:**

Last Name: MARCUCCI-NANCE      First Name: ANNA      M.I. L

Address: 6    **REDACTED   REDACTED  REDACTED**

STREET          'CITY          'STATE          ZIP

**List all factors which you believe to be relevant to your application and which establish proper cause for issuance of a firearm license for the purpose of Full Carry:**

The following is intended to show cause for a restriction change from TARGET to FULL CARRY.

I am a citizen in good standing in the community with many familial and social ties. I am steadily employed and stable. I am of good moral character. My intent to change restriction is due to my desire to become involved in Competitive target shooting at various range locations. Also, the NRA has offered to partner with me to provide all female classes to women.

I would like to use my NRA Instructor Safety Certifications to promote safe gun handling at various locations. Having a full carry permit would facilitate these endeavors.

Thanking you in advance for your consideration.

_Ann Marina - Nurse_
APPLICANT NAME (PRINT)

_Anna Marina - Nurse_
APPLICANT NAME (SIGNATURE)

STATE OF NEW YORK              )
COUNTY OF WESTCHESTER          )

SUBSCRIBED AND SWORN TO BEFORE ME THIS _30_ DAY OF _July_ YEAR _2010_

_Dulce Marina Washburn_
SIGNATURE OF NOTARY PUBLIC

DULCE MARINA WASHBURN
Notary Public, State of New York
No. 04WA6152549
Qualified in Westchester County
Commission Expires Dec. 18, 2066



WESTCHESTER COUNTY        Bring or mail to
TIMOTHY C. IDONI
Westchester County Clerk

WESTCHESTER COUNTY CLERK
NATURALIZATION/PASSPORTS
WESTCHESTER COUNTY
03/10/2009
45 PRM      $10.00Cash
TOTAL :    $10.00

## PISTOL LICENSE RECERTIFICATION

### ORIGINAL LICENSE #

104519

INSTRUCTIONS: Complete form and submit in DUPLICATE to the Westchester County
Clerk's Office with $10.00 Certification Fee

1. NAME: _Anna L. Marcucci-Nance_    DATE OF BIRTH: **REDACTED**

2. ADDRESS: **REDACTED**

3. CITY/TOWN/VILLAGE: **REDACTED**   STATE: _NY_ ZIP: **REDACTED**

4. PHONE NUMBER HOME: **REDACTED** PHONE NUMBER WORK: **REDACTED**

5. LIST OF _5_ WEAPON(S) ON OPPOSITE SIDE IS COMPLETE AND ACCURATE

_Anna Marcucci-Nance_
License Holder's Signature

Sworn to before me this _10 TH_ day of _MARCH_, 20_09_

MARY FERENCI
Notary Public, State of New York
No. 04FE6126306
Qualified in Westchester County
Commission Expires May 2, 2009

_Mary Ferenci_
Notary Public

FOR OFFICE USE ONLY

| RECERTIFICATION LICENSE   APPROVED ☑  NOT APPROVED ☐ | DATE 4/30/09 | COUNTY JUDGE |
|---|---|---|
| RECERTIFICATION DATE    8-15-14 | | |

Revised: 1/19/2007

HON. RORY J. BELLANTONI
ACTING JUSTICE SUPREME COURT

6. THE FOLLOWING WEAPON(S) ARE IN MY POSSESSION: (ATTACH ADDITIONAL SHEETS AS NECESSARY):

| MAKE | REV/AUTO | MODEL | CALIBER | SERIAL # |
|---|---|---|---|---|
| S-W | AUTO | 6946 | 9mm | TFR9124 |
| S-W | AUTO | 4516-2 | 45 | VCC7002 |
| Glock | AUTO | 19 | 9x19 | LVX172 |
| Springfield | AUTO | XD45 | 45 | US707965 |
| Ruger | AUTO | 22/45 | 22 | 2246483 |



# NCIC SEARCH

# REDACTED

# NCIC SEARCH

# REDACTED

D/O/B **REDACTED** WESTCHESTER COUNTY
TIMOTHY C. IDONI
NYSID# **County Clerk**

## APPLICATION FOR AMENDED OR DUPLICAT!

*104519*

ORIGINAL LICENSE #

INSTRUCTIONS: Complete form and submit in DUPLICATE to the Westchester County Clerk's Office and include $3.00 for Amendment or $5.00 for duplicate.

NAME: ANNA L. MARCUCCI - NANCE    **REDACTED** ) **REDACTED**

| AGE: 42 | HEIGHT: 5'5" | WEIGHT: 245 | NOTE: Check box if purchase order is needed ☑ |

### CIRCLE APPROPRIATE TRANSACTION (S)

RESIDENCE CHANGE    DISPOSED    (ACQUIRED)    NAME CHANGE    RESTRICTION CHANGE    TRANSFER

DUPLICATE    SURRENDERED    SUSPENDED    REVOKED    DECEASED    OTHER _____

### I. TO AMEND LICENSE COMPLETE 1 THROUGH 7 WHERE APPROPRIATE

1. NAME _____ PHONE #'s: HOME _____ WORK _____

2. NEW ADDRESS _____

3. THE FOLLOWING WEAPON (S) HAVE BEEN ACQUIRED FROM: NAME *GANDER MOUNTAIN*

ADDRESS *100 NORTH GALLERIA DRIVE MIDDLETOWN NY 10941*

LICENSE #/DEALER LICENSE #/SHIELD # *6-14-00588* . IF MORE THAN ONE SELLER, CHECK THIS

BOX [ ] AND FILL OUT BOX 7 ON THE BACK OF THIS FORM.

| MAKE | REV/AUTO | MODEL | CALIBER | SERIAL # |
|------|----------|-------|---------|----------|
| GLOCK | AUTO | 19 | 9X19 | LVX 172 |
| SPRINGFIELD ARMORY | AUTO | XD45 | .45 | US707905 |
| RUGER | AUTO | 22/45 | .22 | 224-64831 |

4. THE FOLLOWING WEAPON (S) HAVE BEEN DISPOSED TO: NAME _____

ADDRESS _____

LICENSE #/DEALER LICENSE #/SHIELD # _____ . IF MORE THAN ONE BUYER, CHECK THIS

BOX [ ] AND FILL OUT BOX 7 ON THE BACK OF THIS FORM.

| MAKE | REV/AUTO | MODEL | CALIBER | SERIAL # |
|------|----------|-------|---------|----------|
| | | | | |

5. THE FOLLOWING WEAPON (S) HAVE BEEN: (CIRCLE ONE)    LOST    STOLEN    DESTROYED

LAW ENFORCEMENT AGENCY REPORTED TO: _____

| MAKE | REV/AUTO | MODEL | CALIBER | SERIAL # |
|------|----------|-------|---------|----------|
| | | | | |

6. AMEND LICENSE TO: (CIRCLE ONE)    (ADD)    DELETE    A RESTRICTION

IF AMENDMENT IS EMPLOYMENT RELATED, STATE THE FOLLOWING: (FOR A BUSINESS, EMPLOYMENT, OR FULL CARRY)
I AM REQUESTING THAT THE RESTRICTION ON MY LICENSE BE CHANGED TO: _____

| NAME: | STREET: APPX. 402 | CITY/VILLAGE/TOWN: |

7. NAMES AND ADDRESS' OF BUYERS AND/OR SELLERS (IDENTIFY IF BUYER OR SELLER)

| NAME | ADDRESS | WEAPON SERIAL # |
|---|---|---|
|  |  |  |
|  |  |  |

(A separate list of buyers/sellers must be submitted in triplicate on plain white paper, if there are more than 4 buyers/sellers.)

## II. TO REQUEST A DUPLICATE LICENSE, COMPLETE AFFIDAVIT

STATE OF NEW YORK          )
COUNTY OF WESTCHESTER   )  S.S.
CITY/VILLAGE OF               )

Full Name _____

Present Occupation _____

Name and Address of Employer _____

_____

Serial number of lost license _____ Date of Issuance _____

Brief statement of circumstances under which permit was lost:

_____

_____

_____

Statement of weapon (s) now in applicant's possession, which are to be registered on license:

| MAKE | REV/AUTO | MODEL | CALIBER | SERIAL # |
|---|---|---|---|---|
|  |  |  |  |  |

(A separate list of guns must be submitted in triplicate on plain white paper, if applicant possesses more than 3 guns.)

Sworn to before me this _____ day of _____, 19 _____

_____
Applicant's Signature

_____
Notary Public

## III. TO BE COMPLETED BY ALL APPLICANTS

Have you been arrested for any crime, been a patient at any mental institution, or had an order of protection issued against you since the last license was issued?   (CIRCLE ONE)   YES / NO.
If yes, give details below:

_____

_____

Date and Place of Birth          **REDACTED**

Foreign Born Citizens Only - Naturalization Certificate Number _____

Date of Issuance _____ Court _____

I SWEAR THAT ALL THE ABOVE FACTS ARE TRUE TO THE BEST OF MY KNOWLEDGE _____

_____
APPLICANT'S SIGNATURE

| FOR OFFICE USE ONLY | | |
|---|---|---|
| AMENDED LICENSE APPROVED ☑  NOT APPROVED ☐ | DATE | COUNTY JUDGE |
| DUPLICATE LICENSE APPROVED ☐  NOT APPROVED ☐ | 5/14/08 | Robert A. Bell |
| EXPIRATION DATE_____ | | HON. ROBERT M. DiBELLA |
| Revised: 1/12/2005 | APPX. 403 | ACTING SUPREME COURT JUSTICE |





**Andrew J. Spano**
County Executive

Department of Public Safety

Thomas Belfiore
Commissioner/Sheriff

April 11, 2005

WESTCHESTER COUNTY CLERK
LEONARD N. SPANO

NATURALIZATION/PASSPORTS
WESTCHESTER COUNTY

05/14/2004

35 LAP        $10.00Cash
-----------
TOTAL :       $10.00
===========

Honorable Justice
Westchester County Court
White Plains, NY  10601

Re: M **REDACTED**

Dear Honorable Justice:

The above captioned individual has submitted an application to this department for a New York State Pistol Permit.

TARGET SHOOTING

A search of the files of the Division of Criminal Justice Services in Albany reveals no derogatory information.

A search of the files of the New York State Department of Mental Hygiene reveals no derogatory information.

Letters from each of the four character references attesting to the good moral character and reputation of the applicant are on file.

The applicant is a citizen of the United States by virtue of birth as evidenced by a copy of the applicant's birth certificate.

There are no means available to this Office to further verify statements made on the application.

Application is hereby forwarded with whatever action you deem appropriate.

Should you require any additional information regarding our investigation of this applicant, please contact the Pistol Permit Unit at (914) 995-2709.

Sincerely,

Thomas Belfiore
Commissioner/Sheriff

TB/db/cf
attachments
A New York State Accredited
Law Enforcement Agency

Saw Mill River Parkway
Hawthorne, New York  10532         Telephone: (914)864-7700   Website: westchestergov.com

APPX. 405



Andrew J. Spano
County Executive

Department of Public Safety          DATE: 3/9/15

Thomas Belfiore
Commissioner/Sheriff

| OFFICE USE ONLY | |
| --- | --- |
| CASE #: | O5-267 |
| DET: | DB |

State of New York
Department of Mental Hygiene
44 Holland Avenue
Albany, New York 12229

Re:  Applicant for a New York State Pistol License

Dear Sir:

It is hereby requested that you check your records against the name of the following, in compliance with
the New York State Penal Law, Subdivision 4, Section 400.00:

### PLEASE FILL IN INFORMATION:

Name:  Anna L. Marcucci-Nance

Aliases and/or M~~~~~ Anna L. Marcucci  REDACTED

Address  REDACTED

Date of Birth:  REDACTED

Place of Birth:  REDACTED

Sex:  Female

Your cooperation is greatly appreciated.

Very truly yours,

*Thomas Belfiore*

Thomas Belfiore
Commissioner/Sheriff

NO OFFICIAL RECORD OF HOSPITALIZATION
FOR MENTAL ILLNESS SINCE 1965. IF SEARCH
PRIOR TO 1965 IS REQUIRED, PLEASE SUBMIT
WRITTEN REQUEST.

A New York State Accredited
Law Enforcement Agency

Saw Mill River Parkway
Hawthorne, New York  10532          Telephone: (914)864-7100  www.westchestergov.com

Westchester gov.com

Memorandum
**Department of Public Safety**

<u>PISTOL LICENSE APPLICATION QUESTIONNAIRE</u>

ANSWER ALL QUESTIONS FULLY:      ATTACH SEPARATE SHEETS IF NECESSARY

LAST NAME: REDACTED      FIRST: REDACTED      M.I. L

ADDRESS: REDACTED      REDACTED

ALIAS: Anna      SEX: REDACTED   RACE: BLACK   HAIR: BLACK   EYES: REDACTED   WEIGHT: 145

HEIGHT: 5·5·   D.O.B. REDACTED   AGE: REDACTED   PLACE OF BIRTH: REDACTED

1) __X__ CITIZEN BY BIRTH
   _____ NATURALIZED CITIZEN      – NATURALIZATION NUMBER _____
   _____ RESIDENT ALIEN      ALIEN REGISTRATION NO. _____

2) MARITAL STATUS:      IF FEMALE, MAIDEN NAME _____
   _____ SINGLE
   __X__ MARRIED   _____ DIVORCED      NUMBER OF CHILDREN AT HOME _____

3) LIST ALL PLACES OF RESIDENCE FOR THE LAST FIVE YEARS:

REDACTED      REDACTED
REDACTED

3a) PHONE NUMBER (H)

4) LIST ALL PLACES OF EMPLOYMENT FOR THE PAST FIVE YEARS:

NYCTA - 130 Livingston St Brooklyn NY

5) LIST ALL PISTOLS YOU WILL BE REGISTERING:

make - Smith & wesson - Model 6946 - serial# TFR 9124 -CAL9MM
                                                    -CAL 45ACP
make - Smith & wesson - Model 4516-2 serial UCC 7002

6) HOW AND WHERE WILL PISTOLS BE SAFEGUARDED WHEN NOT IN USE:

REDACTED   REDACTED

7) GIVE NAME, ADDRESS AND TELEPHONE NUMBER OF THE PERSON WHO WILL SAFEGUARD THE PISTOL (S) IN THE EVENT OF YOUR DEATH OR DISABILITY:

Johnnie Nancer      REDACTED      REDACTED

8) LIST THE NEAREST RELATIVES NOT LIVING WITH YOU:

1) NAME REDACTED Nancer Jackson      PHONE NO. REDACTED
   ADDRESS REDACTED   REDACTED

2) NAME REDACTED      PHONE NO. REDACTED
   ADDRESS REDACTED   REDACTED

~ OVER ~

# DEPARTMENT OF PUBLIC SAFETY
## WESTCHESTER COUNTY POLICE
### PISTOL LICENSE UNIT

### PISTOL LICENSE APPLICATION SUPPLEMENT

**INSTRUCTIONS:** Read each question carefully and answer each question in black ink. Place a check mark in the box which represents your response. **You MUST have this form NOTARIZED.**

1) Do you have, or have you ever had, an Order of Protection issued against you?

        YES ☐   NO ☒

2) Do you have, or have you ever had, an Order of Protection issued by you against a member of your household or any family member?

        YES ☐   NO ☒

3) Do you have, or have you ever had, an Order of Protection issued by you against a person other than a member of your household or family?

        YES ☐   NO ☒

**\* Note:** If you have checked YES to question one (1), you MUST attach a signed and notarized letter explaining your answer and include the following information:

    A.  The court of issuance
    B.  The date of issuance
    C.  Complainant's name
    D.  Complainant's address
    E.  Complainant's telephone number
    F.  Complainant's relationship to you
    G.  Reason for issuance of Order of Protection

**\* Note:** If you checked YES to either question two (2) or question three (3), you MUST attach a signed and notarized letter explaining your answer and include the following information:

    A.  The court of issuance
    B.  The date of issuance
    C.  Respondent's name
    D.  Respondent's address
    E.  Respondent's telephone number
    F.  Respondent's relationship to you
    G.  Reason for issuance of Order of Protection

I, the undersigned applicant, being duly sworn, deposes and says under penalty of perjury that all of the aforementioned answers are true to the best of my knowledge.

_____
Signature of Applicant

STATE OF NEW YORK
COUNTY OF _WESTCHESTER_

Sworn to before me this _19_ day
of _____FEB_____ _2000_

_____
Notary Public, State of New York

APPX. 408

Affix Seal Above

*WALTON A. WALLACE, JR.*

~~REDACTED~~ ~~REDACTED~~ ~~REDACTED~~

*NRA CERT. # 18539852*

**To Whom It Might Concern,**

   This Letter is to Certify that the below named Student has successfully completed the NRA BASIC PISTOL SAFETY COURSE as follows:

**Lesson  I:**       **Pistol Knowledge and Safe Gun Handling.**

**Lesson II:**       **Ammunition Knowledge and The Fundamentals of Pistol Shooting.**

**Lesson IV:**       **Two Handed and One Handed Standing Shooting Positions.**

**Lesson  V:**       **Pistol Sports Activities.**

      **In Addition:**    **Care, Cleaning and the Proper Storage of Firearms, specifically pistols, have been explained.**

**Lesson III:**      **Deals with the Actual Shooting of the Pistol.**
                  **Since New York State Law does not permit a student to handle a Firearm until their license has been approved a follow up lesson is provided. When the Student has obtained His / Her Permit, they will return for Proper Instruction on the Firing Range.**

**STUDENT NAME:**   *ANNA MARCUCCI - NANCE*

**DATE OF COURSE:**   *4/18/04    6/25/04*

**COURSE REFERENCE MATERIAL:**        **THE BASICS OF PISTOL SHOOTING**
                           **Published by The NRA**

*Walton A. Wallace Jr.*

*Walter A. Wallace Jr.*

# THE NATIONAL RIFLE ASSOCIATION OF AMERICA

Awards this certificate to

Anna Marcucci-Nance

for successful completion of the

## NRA
## BASIC PISTOL
## COURSE

Issued at Blue Mt. Sportsmen Cntr.

Walter A. Walker Jr
NRA Certified Instructor

NRA # 185 3982

Date 25 April 2004

Edward J. Land Jr
NRA Secretary

INSTRUCTIONS: Print or type in black ink or

**REDACTED** 8/00

NYSID NUMBER

LICENSE NUMBER **104519**

DATE OF ISSUE **07 1905**

STATE OF NEW YORK

PISTOL/REVOLVER LICENSE APPLICATION

COUNTY OF ISSUE **Westchester**

EXPIRATION DATE

LAST NAME **MARCUCCI-NANCE**   FIRST NAME **ANNA**   M.I. **L** **REDA**

HEIGHT **5 5**   WGT **245**   EYES **BR**   HAIR **BK**   RACE **BLK**

PRESENT OCCUPATION **8 Train Operator**

CITIZEN OF U.S.A ☒ YES ☐ NO

EMPLOYED BY **NYCTA**   NATURE OF BUSINESS **Transportation**   BUSINESS ADDRESS **130 Livingston St. Brooklyn NY 112c**

I HEREBY APPLY FOR A PISTOL/REVOLVER LICENSE TO: (Check one only) ☒ CARRY CONCEALED ☐ POSSESS ON PREMISES

☐ * POSSESS/CARRY DURING EMPLOYMENT (* Premise address or place of employment must be provided)

STREET ADDRESS OR OTHER LOCATION                     CITY, VILLAGE, TOWN                     ZIP CODE

A LICENSE IS REQUIRED FOR THE FOLLOWING REASON:   **TARGET**

GIVE FOUR CHARACTER REFERENCES WHO BY THEIR SIGNATURE ATTEST TO YOUR GOOD MORAL CHARACTER

| LAST, FIRST, MI | STREET ADDRESS | CITY, VILLAGE, TOWN | SIGNATURE |
|---|---|---|---|
| Hargrove Shirley | | **REDACTED** | Shirley Hargrove |
| Hargrove Richard | | | Richard Hargrove |
| Hicks Edward | **REDACTED** | | Edward B Hicks |
| Sarah Murray | | | |

HAVE YOU EVER BEEN ARRESTED OR INDICTED ANYWHERE FOR ANY OFFENSE, INCLUDING DWI (EXCEPT TRAFFIC INFRACTIONS)?

☐ YES ☒ NO   IF YES, FURNISH THE FOLLOWING INFORMATION:

| DATE | POLICE AGENCY | CHARGE | DISPOSITION – COURT AND DATE |
|---|---|---|---|
| | | | |
| | | | |

| | | |
|---|---|---|
| HAVE YOU EVER BEEN TERMINATED/DISCHARGED FROM ANY EMPLOYMENT OR THE ARMED FORCES FOR CAUSE? | ☐ YES | ☒ NO |
| HAVE YOU EVER UNDERGONE TREATMENT FOR ALCOHOLISM OR DRUG USE? | ☐ YES | ☒ NO |
| HAVE YOU EVER SUFFERED ANY MENTAL ILLNESS, OR BEEN CONFINED TO ANY HOSPITAL, PUBLIC OR PRIVATE INSTITUTION, FOR MENTAL ILLNESS? | ☐ YES | ☒ NO |
| HAVE YOU EVER HAD A PISTOL LICENSE, DEALER'S LICENSE, GUNSMITH LICENSE, OR ANY APPLICATION FOR SUCH A LICENSE DISAPPROVED, OR HAD SUCH A LICENSE REVOKED OR CANCELLED? | ☐ YES | ☒ NO |
| DO YOU HAVE ANY PHYSICAL CONDITION WHICH COULD INTERFERE WITH THE SAFE AND PROPER USE OF A HANDGUN? | ☐ YES | ☒ NO |
| HAVE YOU EVER BEEN CHARGED, PETITIONED AGAINST, A RESPONDENT, OR OTHERWISE BEEN A SUBJECT OF A PROCEEDING IN FAMILY COURT? | ☐ YES | ☒ NO |

IF ANSWER TO ANY QUESTION IS YES, EXPLAIN HERE:

ANY OMISSION OF FACT OR ANY FALSE STATEMENT WILL BE SUFFICIENT CAUSE TO DENY THIS APPLICATION AND CONSTITUTES A CRIME PUNISHABLE BY FINE, IMPRISONMENT, OR BOTH.

I AM AWARE THAT THE FOLLOWING CONDITIONS AFFECT ANY LICENSE WHICH MAY BE ISSUED TO ME:

NO LICENSE ISSUED AS A RESULT OF THIS APPLICATION IS VALID IN THE CITY OF NEW YORK. ANY LICENSE ISSUED AS A RESULT OF THIS APPLICATION WILL BE VALID ONLY FOR A PISTOL OR REVOLVER SPECIFICALLY DESCRIBED IN THE LICENSE PROPERLY ISSUED BY THE LICENSING OFFICER. IF I PERMANENTLY CHANGE MY ADDRESS, NOTICE OF SUCH CHANGE AND MY NEW ADDRESS MUST BE FORWARDED TO THE SUPERINTENDENT OF THE STATE POLICE AND IN NASSAU COUNTY AND SUFFOLK COUNTY, TO THE LICENSING OFFICER OF THAT COUNTY, WITHIN 10 DAYS OF SUCH CHANGE. ANY LICENSE ISSUED AS A RESULT OF THIS APPLICATION IS SUBJECT TO REVOCATION AT ANY TIME BY THE LICENSING OFFICER OR ANY JUDGE OR JUSTICE OF A COURT OF RECORD.

4973656

2006

JURAT:

SIGNED AND SWORN TO BEFORE ME

THIS **19** DAY OF **FEB** 20 **05**

AT **WESTCHESTER COUNTY YONKERS** NEW YORK

SIGNATURE OF OFFICER ADMINISTERING OATH

NOTARY PUBLIC

TITLE OF OFFICER

SIGNATURE OF APPLICANT

THIS FORM APPROVED BY SUPERINTENDENT OF STATE POLICE AS REQUIRED BY PENAL LAW SECTION 400.00.SUBD 3.

APPX. 411   **APPLICATION NOT VALID UNLESS SWORN**

| 1. RIGHT THUMB | 2. RIGHT FOREFINGER | 3. RIGHT MIDDLE FINGER | 4. RIGHT RING FINGER | 5. RIGHT LITTLE FINGER |
|---|---|---|---|---|

**REDACTED** **REDACTED** **REDACTED**

6.

**REDACTED** **REDACTED** **REDACTED**

PLAIN IMPRESSIONS TAKEN SIMULTANEOUSLY

LEFT FOUR FINGERS · RIGHT FOUR FINGERS

THUMBS TAKEN TOGETHER

**REDACTED** **REDACTED** **REDACTED**

IMPRESSIONS TAKEN BY:  NAME _Oal Byn_  RANK _Lt_  SHIELD _JY_  DATE _3/9/4_

APPLICANT'S SIGNATURE AND ADDRESS: _Xanna Marcucci-Dai_  **REDACTED** **REDACTED**

INVESTIGATION REPORT — ALL INFORMATION PROVIDED BY THIS APPLICANT HAS BEEN VERIFIED:

NAME _Oal Byn_  RANK _Lt_  ORGANIZATION _WCPD_

_4/19/05_

RECOMMEND APPROVAL - DISAPPROVAL: (STRIKE OUT ONE)       SIGNATURE OF INVESTIGATING OFFICER

THIS APPLICATION IS APPROVED - DISAPPROVED (STRIKE OUT ONE)   THE FOLLOWING RESTRICTION(S) IS (ARE) APPLICABLE TO THIS LICENSE:
_T/S_

TITLE AND SIGNATURE OF LICENSING OFFICER

IF LICENSING OFFICER AUTHORIZES THE POSSESSION OF A PISTOL OR REVOLVER AT THE TIME OF ISSUE OF ORIGINAL LICENSE, FURNISH THE FOLLOWING INFORMATION:

| MANUFACTURER | PISTOL OR REVOLVER | CALIBER | SERIAL NUMBER | MODEL | PROPERTY OF |
|---|---|---|---|---|---|
| Smith+wesson | Pistol | 9mm | TFR 9124 | 6946 | All compo spity Suppher |
| Smith+wesson | Pistol | 45AcP | VCC7002 | 4516-2 | All compo Spring 54ppla |
| | | | | | NY State LIC / 104245-F |

DUPLICATE OF THIS APPLICATION MUST BE FILED WITH THE SUPERINTENDENT OF STATE POLICE WITHIN 10 DAYS OF ISSUANCE AS REQUIRED BY PENAL LAW SECTION 400.00 SUBD.5



NYS OFFICE OF THE ATTORNEY GENERAL
WESTCHESTER REGIONAL OFFICE

FEB 06 2009

RECEIVED BY

ASSISTANT ATTORNEY GENERAL

SUPREME COURT OF THE STATE OF NEW YORK **Docket No.**
APPELLATE DIVISION: SECOND DEPARTMENT
----------------------------------------------------------

In the Matter of ALAN KACHALSKY,

                                    Petitioner,                              **NOTICE OF PETITION**

        -against-

SUSAN CACACE, as Justice of the County Court,

                                    Respondent.
----------------------------------------------------------

     **PLEASE TAKE NOTICE** that upon the petition of Alan Kachalsky, verified on the 4th day of February, 2009, an application will be made to this Court to be held at the Court House, 45 Monroe Place, Brooklyn, NY 11201, on the 20th day of March, 2009, at 9:30 o'clock in the forenoon or as soon thereafter as counsel can be heard for a judgment granting the relief demanded in the petition and that a verified answer and supporting affidavits, if any, must be served at least five days before such time.

     **PLEASE TAKE FURTHER NOTICE** that pursuant to Section 7804 of the Civil Practice Law and Rules you are directed to file with the Clerk of the Court your answer, and answering affidavits, etc. together with a certified transcript of the record of the proceeding, together with the entire official file containing the records of the petitioner herein held by the Respondent and referred to in said hearing as being in the record as official records kept by the Respondent herein.

Dated: Rye Brook, New York
     February 4, 2009

                       ALAN KACHALSKY, ESQ.
                       Attorney for Petitioner, Howard Silberman
                       800 Westchester Avenue, Suite S-608
                       Rye Brook, NY 10573
                       (914) 220-5324
                       e-mail: catchsky@earthlink.net

To:

Pistol Permit Department
County of Westchester
110 Dr. Martin Luther King Jr.
Blvd., Rm. 340A
White Plains, New York 10601
(914) 995-2709

Office of the Attorney General
Westchester Regional Office
101 E. Post Road
White Plains, NY 10601-5008
(914) 422-8755

HON. SUSAN CACACE
County Court Judge
111 Dr. Martin Luther King Jr. Blvd.
White Plains, New York 10601
(914) 824-5401

Charlene M. Indelicato
County Attorney, County of Westchester
148 Martine Ave., Rm 600
White Plains, New York 10601
(914) 995-5858

SUPREME COURT OF THE STATE OF NEW YORK  **Index No.**
APPELLATE DIVISION: SECOND DEPARTMENT
-------------------------------------------------

In the Matter of ALAN KACHALSKY,

**VERIFIED PETITION**

Petitioner,

-against-

SUSAN CACACE, as Justice of the County Court,

Respondent.
-------------------------------------------------

The petition of ALAN KACHALSKY, respectfully shows:

1. That petitioner is a resident of the County of Westchester, State of New York, to wit: 47C Rye Colony, Peck Avenue, Rye, New York.

2. That Petitioner applied for a pistol permit pursuant to Penal Law Section 400.00.

3. A Decision and Order, of the Hon. Susan Cacace, Westchester County Court Judge (in its capacity as handgun licensing officer for the County of Westchester, pursuant to Penal Law §265.00(10)), was filed and entered on October 8, 2008. The Order denied Petitioner's application for an unrestricted full carry pistol permit. Annexed hereto as Exhibit "1" is a copy of the Decision and Order.

4. That Petitioner, by the order of the Hon. Susan Cacace, has been deprived of a valuable property right and a valuable Constitutional Right and therefore violated N.Y. C.P.L.R. § 7803(3) in making its determination to deny Petitioner an unrestricted full carry pistol permit, and therefore denying Petitioner his right, pursuant to the Second Amendment of the Constitution of the United States "to keep and bear arms."

5.  That the determination under review was made in violation of lawful procedure, was affected by an error of law and/or was arbitrary and capricious or an abuse of discretion, including abuse of discretion.

**Penal Law Section 400.00(2)(f) Places Unconstitutional Burden on Petitioner**

6.  The Decision denying petitioner's concealed pistol permit states that "In order for the issuance of a license to "have and carry concealed without regard to employment or place of possession by any person, " the Court must find "proper cause exists for the issuance thereof." Penal Law §400.00(2)(f).

7.  The Second Amendment provides that: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."

8.  Imposing a requirement on Petitioner to demonstrate proper cause exists for the issuance of a concealed pistol permit is an infringement of petitioner's right to keep **and bear** arms; thus §400.00(2)(f) of the Penal Law violates the Second Amendment of the Constitution of the United States.

**District of Columbia v. Heller**

9.  In *District of Columbia v. Heller*, 128 S.Ct. 2783, 171 L.Ed.2d 637, 76 USLW 4631, the Supreme Court of the United States held that the District of Columbia statute which banned handgun possession in the home violated the Second Amendment.

10. In doing so, the Court further held that (1) the Second Amendment conferred an **individual** right to keep **and bear arms**, and (2) statutes banning handgun possession in the home violated the Second Amendment.

11. The Court in *Heller* further analyzed the meaning of the term "bear arms," as used in the Second Amendment, and stated, in relevant part:

At the time of the founding, as now, to "bear" meant to "carry." See Johnson 161; Webster; T. Sheridan, A Complete Dictionary of the English Language (1796); 2 Oxford English Dictionary 20 (2d ed.1989) (hereinafter Oxford). When used with "arms," however, the term has a meaning that refers to carrying for a particular purpose-confrontation. In *Muscarello v. United States*, 524 U.S. 125, 118 S.Ct. 1911, 141 L.Ed.2d 111 (1998), in the course of analyzing the meaning of "carries a firearm" in a federal criminal statute, Justice Ginsburg wrote that "[s]urely a most familiar meaning is, as the Constitution's Second Amendment ... indicate[s]: **'wear, bear, or carry ... upon the person or in the clothing or in a pocket, for the purpose ... of being armed and ready for offensive or defensive action in a case of conflict with another person.'** " *Id.*, at 143, 118 S.Ct. 1911 (dissenting opinion) (quoting Black's Law Dictionary 214 (6th ed.1998)). We think that Justice GINSBURG accurately captured the natural meaning of "bear arms." 128 S.Ct. @ 2793.

12. Further, as the Court stated in *Heller*,

"But the enshrinement of constitutional rights necessarily takes certain policy choices off the table. These include the absolute prohibition of handguns held and used for self-defense in the home. Undoubtedly some think that the Second Amendment is outmoded in a society where our standing army is the pride of our Nation, where well-trained police forces provide personal security, and where gun violence is a serious problem. That is perhaps debatable, but what is not debatable is that it is not the role of this Court to pronounce the Second Amendment extinct." 128 S.Ct. @ 2822.

13. Petitioner contends that Penal Law §400.00(2)(f)'s requirement that applicants must demonstrate that "proper cause exists for the issuance thereof" is unconstitutional in that it stands the meaning of the word 'right' on its head. A 'right' is not something one must demonstrate a need for! Is one required to demonstrate a need for one's Right to Free Speech prior to exercising this right? Is one required to apply for a license to exercise their right to free speech?

14. Furthermore, to require one to demonstrate that proper cause exists for the issuance of a concealed pistol permit is antithetical to the purpose of carrying a concealed weapon. One carries a concealed weapon either for one of two reasons: defensive purposes or offensive purposes.

**Defects in Procedure & Application**

15. The application provided to me by the Westchester County Police Pistol Licensing Unit included a form entitled 'Attachment: Full Carry.' The form said: 'List all factors which you believe to be relevant to your application and which establish <u>proper cause</u> for the issuance of a firearm license for the purpose of Full Carry.'

16. I responded to this question as follows (see exhibit "2," annexed hereto).

The factors which establish proper cause for the issuance to myself of a Full Carry pistol Permit are: 1) The Second Amendment of the Constitution grants citizens the right to bear arms. As a citizen, I am therefore entitled to exercise my Constitutional right to bear arms. I believe that Constitutional right entitles me to the permit without further the need to establish "proper cause."

If the issuing agency for some reason requires more than this, then I will cite the fact that we live in a world sporadic random violence might at any moment place one in a position where one needs to defend oneself or possibly others, e.g. random shootings in universities (Virginia Tech), post offices, airline check-in counters, malls, road rage, as well as the run-of-the-mill street muggings and robberies. While the odds of finding oneself in a Virginia Tech type situation are remote, one must reflect that had there been even one armed person, the death toll might have been considerably less than 31 dead. While one never knows what one might do in such situations, it is my belief that it is better to have the option to defend oneself (and others) than not to have the option. As a pilot and a skydiver, I have been trained to handle emergencies, and I have actually handled several emergencies, so it is unlikely that I will respond in a dangerous manner.

17. What more can one say in response to an absurd question asking to 'List all factors which you believe to be relevant to your application and which establish <u>proper cause</u> for the issuance of a firearm license for the purpose of Full Carry.' Is one required to actually have been threatened in order to be entitled to exercise one's Constitutional Right to "keep and bear arms?" That is certainly an absurd requirement as well as an absurd question. Certainly, the Westchester County Police know that except in rare instances, such as domestic violence, or perhaps loan shark 'victims,' a potential 'victim' does not get a threat before being beaten, murdered or robbed. I would guess that most homicides don't come with a one year (which seems to be about the waiting time for a law-abiding citizen with no

criminal record, such as petitioner, to be rejected after applying for a Full Carry permit) 'warning.'

18. The requirement set forth in Section 400.00(2)(f) of the Penal Law, to demonstrate that proper cause exists for the issuance of a license 'to have and carry concealed, without regard to employment or place of possession thereof', (hereinafter referred to as a "Carry Permit") places an improper and unconstitutional burden on petitioner as a prerequisite to petitioner's exercise of his Second Amendment right to keep and bear arms.

19. Furthermore, the Decision denying my application for a Carry Permit (exhibit "1,") also states that "He has not stated any facts which would demonstrate a need for self protection distinguishable from that of the general public."

20. The only pertinent question asked on the application is 'list all factors which you believe to be relevant to your application and which establish proper cause for the issuance of a firearm license for the purpose of Full Carry.' Nowhere does the application mention that the applicant is required to state "facts which would demonstrate a need for self protection distinguishable from that of the general public," such as to put the applicant on notice that this is a requirement.

21. One is not required to state any facts to demonstrate a 'need' to exercise one's Constitutional (and god-given) rights! Would the Court uphold the imposition of such a requirement in order to exercise one's right to attend religious services (freedom of religion) or to exercise one's right to post comments on a 'blog' (right to free speech)? Where does the Westchester County Police derive the authority to require an applicant to"demonstrate a need for self protection distinguishable from that of the general public?"

22. And, if there is such a requirement to "demonstrate a need for self protection distinguishable from that of the general public,", it is respectfully submitted that the fundamental principles

of due process as well as ordinary fairness and common sense require that the applicant be

placed on notice of such requirement in the application, rather than ambushing an applicant

with the 'failure' to distinguish his need for self-protection from that of the general public.

**The Issuing Agency failed to provide Petitioner with the specific reasons for the denial of the permit, or an opportunity to respond to the objections to his application.**

23. The Decision also states that "The Westchester County Department of Public Safety has

forwarded a recommendation that his application be denied."

24. Petitioner was never given the specific reasons for the Department of Public Safety's

recommendation that the applicant be denied, nor was Petitioner given an opportunity to

respond to the objections to his application, as required by *Babu v. Lange*, 164 A.D.2d 910,

559 N.Y.S.2d 747 (N.Y.A.D. 2 Dept.,1990).

25. In *Savitch v. Lange* 114 A.D.2d 372, 493 N.Y.S.2d 889, the 2nd Dept. held that it was

improper to give as sole reason for denial of pistol license the fact that police commissioner

recommende 1 that application for pistol license be disapproved.

26. Penal Law § 400.00 [4- a] also requires that the licensing officer must, if she denies the

petitioner be given the **specific** reasons for the denial of the pistol license, as well as an

opportunity to respond to the objections to her application.

27. Penal Law § 400.00 [4- a] also requires that "the licensing officer shall either deny the

application **for reasons specifically and concisely stated** in writing or grant the application

and issue the license applied for.

28. To pretend or to hold that the failure of the applicant to state "any facts which would

demonstrate a need for self protection distinguishable from that of the general public"

constitutes the requisite specific reasons required by § 400.00 [4- a] of the Penal Law is

illogical and disingenuous. It is the equivalent of "Heads I win, tails you lose." If licensing

officer cannot find a specific reason to deny the application, then they will deny the

application because the applicant failed to provide a specific reason why he required it. Heads I win, tails you lose!

29. Nor does the( undoubtedly usual and customary) totally unsupported and unspecific boilerplate recommendation of the Westchester County Department of Public Safety that the application be denied constitute a specific reason. I have no doubt that the Westchester County Department of Public Safety recommends that 95% of applications be denied, with the same utter lack of specificity, except in those cases where they are actually able to come up with a specific reason, (see paragraph 32).

30. It is the epitomy of arbitrariness and capriciousness to justify denying a permit based on recommendations of the The Westchester County Department of Public Safety which fail to specify any reason at all. This situation creates the danger of the perception that the granting of Carry Permits is based on membership in the 'privileged class;' members of 'the club,' so to speak; which again, is further evidence that to allow applicants to be denied without any specific reason being stated is of itself arbitrary and capricious.

31. It is respectfully suggested that the 'specific reasons for the denial' should mean precisely that - **specific** reasons - not the **absence** of specific reasons, or the failure to state "any facts which would demonstrate a need for self protection distinguishable from that of the general public.", whi h is what the instant denial is clearly based on. Clearly the 'specific reasons contemplated by § 400.00 [4- a] are those found in cases cited in paragraph 32.

32. Numerous cases specify the reasons for denying Full Carry Permits. These reasons nkud:

    a. Lack of "the requisite maturity, good judgment and temperament to carry a pistol, as evidenced by the applicant having been arrested and charged with stalking in the fourth degree in connection with his repeated unwelcomed interactions with his ex-girlfriend and her family *Dorsey v. Teresi*, 26 A.D.3d 635, 809 N.Y.S.2d 617, 2006 N.Y (3rd Dept.,2006);

    b. Prior arrests based upon having misrepresented his identity to police officer when stopped for speeding, as well as failing to disclose arrest history on application, and subsequent misrepresenttion to the Court of circumstances leading to, and reasons for his nondisclosure. *Westfall v. Lange*, 175 A.D.2d 290, 572 N.Y.S.2d 739 ( 2nd Dept.,1991).

    c. Conviction of unlawful entry and conviction for driving while impaired and driving while intoxicated. *Schnell v. Spano*, 120 A.D.2d 669, 502 N.Y.S.2d 263, (2nd Dept.,1986);

    d. Six arrests where Petitioner submitted uncontested explanations regarding the circumstances of the arrests. *Servedio v. Bratton*, 268 A.D.2d 356, 702 N.Y.S.2d 264 (1st Dept.,2000).

33. When, as in the case at bar, the licensing officer is unable to specify a reason for denying the license, it is respectfully contended that it constitutes an abuse of discretion, as well as being arbitrary and capricious, to uphold the denial based upon nothing more than the reasons set forth in the decision (exhibit "1,"), to wit: "that "The Westchester County Department of Public Safety has forwarded a recommendation that his application be denied," and "He has not stated any facts which would demonstrate a need for self protection distinguishable from that of the general public."

34. In *Leone v. Silverman*, 153 A.D.2d 862, 545 N.Y.S.2d 582 ( 2nd Dept.,1989), the Court held that it was an abuse of discretion to revoke the applicant's pistol license where the information before the court was the same as that before the court which originally issued the license, there was no indication that licensee had not made full disclosure on his original application, and there was no evidence of an act after the grant of the license demonstrating unfitness to carry a pistol.

35. The only relevant distinction between the case at bar, and *Leone*, is that the case at bar involves an initial application, whereas *Leone* involved an application to modify a pistol license. In the case at bar, as well as in *Leone*, there was no indication of failure to make full disclosure, nor was there any evidence of an act demonstrating unfitness to carry a pistol.

36. Under these circumstances, it would clearly be arbitrary and capricious to grant the modification of Leone's application while denying Petitioner's application when there is no logical distinction other than that one is an initial application and the other is a modification application. Neither Leone nor petitioner failed to make full disclosure, nor was there any evidence of an act demonstrating unfitness to carry a pistol, however, Leone is granted a license to exercise his Second Amendment Right to keep and bear arms, whereas petitioner is denied this right. Action taken which has no foundation in fact or reason is, by definition, arbitrary and capricious. *Miller v. Valley Forge Village*, 43 N.Y.2d 626, 374 N.E.2d 118, 403 N.Y.S.2d 207.

**WHEREFORE**, petitioner respectfully asks for an Order:

a. setting aside, annulling and voiding the Order of the Hon. Susan Cacace, County Court Judge (in her capacity as handgun licensing officer for the County of Westchester) which denied petitioner's application for an unrestricted full carry pistol permit (Exhibit "1"), and;

b. enjoining, on Second Amendment grounds, the State of New York from enforcing the requirement set forth in Penal Law §400.00(2)(f). that the Court must find "proper cause exists for the issuance of a full-carry permit, and;

c. granting Petitioner a license as set forth in §400.00(2)(f) of the Penal Law" to "have and carry concealed, without regard to employment or place of possession (referred to herein, as in the Decision and Order of the Hon. Susan Cacase, as an "unrestricted full carry pistol permit")

Dated: Rye Brook, New York
   February 4, 2009

ALAN KACHALSKY, ESQ.
*Attorney for Petitioner*
800 Westchester Avenue, Suite 608
Rye Brook, New York 10573
(914) 696-5555

TO:

Pistol Permit Department
County of Westchester
110 Dr. Martin Luther King Jr. Blvd. White Plains, New York 10601

(914) 995-2709

HON. SUSAN CACACE
County Court Judge
111 Dr. Martin Luther King Jr. Blvd.
White Plains, New York 10601
(914) 824-5401

Office of the Attorney General
Westchester Regional Office
101 E. Post Road
White Plains, NY 10601-5008
(914) 422-8755

Charlene M. Indelicato
County Attorney, County of Westchester
148 Martine Avenue
White Plains, New York 10601
(914) 995-5858

VERIFICATION

STATE OF NEW YORK        )
                                           :ss:
COUNTY OF WESTCHESTER )

ALAN KACHALSKY, being duly sworn, says that he is the Petitioner in the above-named

proceeding and that the foregoing petition is true to his own knowledge, except as to matters

therein stated to be alleged on information and belief and as to those matters he believes it to be

true.

_____
ALAN KACHALSKY, Petitioner

Sworn to before me this
5th day of February, 2009

_____
Notary Public

DONNA M. CCMPITO
NOTARY PUBLIC, STATE OF NEW YORK
NO. 01CO6145887
QUALIFIED IN WESTCHESTER COUNTY
COMMISSION EXPIRES MAY 8, 2010

SUPREME COURT OF THE CITY OF NEW YORK
APPELLATE DIVISION : SECOND DEPARTMENT

In the Matter of ALAN KACHALSKY,

                Petitioner,            **Docket No.**

      -against-

SUSAN CACACE, as Justice of the County Court

                Respondent.

**ARTICLE 78 PETITION (RE: DENIAL OF FULL-CARRY PISTOL PERMIT)**

**ALAN KACHALSKY, ESQ.**
Attorney for Alan Kachalsky
800 Westchester Avenue
Rye Brook, New York 10573
(914) 220-5324

Rule 130-1.1-a certification

ALAN KACHALSKY, ESQ.

TO:

| | |
|---|---|
| Pistol Permit Department | HON. SUSAN CACACE |
| County of Westchester | County Court Judge |
| 110 Dr. Martin Luther King Jr. | 111 Dr. Martin Luther King Jr. Blvd. |
| Blvd., Rm. 340A | White Plains, New York 10601 |
| White Plains, New York 10601 | (914) 824-5401 |
| (914) 995-2709 | |
| | |
| Office of the Attorney General | Charlene M. Indelicato |
| Westchester Regional Office | County Attorney, County of Westchester |
| 101 E. Post Road | 148 Martine Ave., Rm 600 |
| White Plains, NY 10601-5008 | White Plains, New York 10601 |
| (914) 422-8755 | (914) 995-5858 |

SUPREME COURT OF THE CITY OF NEW YORK
APPELLATE DIVISION : SECOND DEPARTMENT

In the Matter of ALAN KACHALSKY,

               Petitioner,             **Docket No.**

      -against-

SUSAN CACACE, as Justice of the County Court

               Respondent.

**ARTICLE 78 PETITION (RE: DENIAL OF FULL-CARRY PISTOL PERMIT)**

**ALAN KACHALSKY, ESQ.**
Attorney for Alan Kachalsky
800 Westchester Avenue
Rye Brook, New York 10573
(914) 220-5324

Rule 130-1.1-a certification

ALAN KACHALSKY, ESQ.

TO:

Pistol Permit Department
County of Westchester
110 Dr. Martin Luther King Jr.
Blvd., Rm. 340A
White Plains, New York 10601
(914) 995-2709

Office of the Attorney General
Westchester Regional Office
101 E. Post Road
White Plains, NY 10601-5008
(914) 422-8755

HON. SUSAN CACACE
County Court Judge
111 Dr. Martin Luther King Jr. Blvd.
White Plains, New York 10601
(914) 824-5401

Charlene M. Indelicato
County Attorney, County of Westchester
148 Martine Ave., Rm 600
White Plains, New York 10601
(914) 995-5858

SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE DIVISION: SECOND DEPARTMENT

-----------------------------------------------------------------------x

In the Matter of

ALAN KACHALSKY

|  |  |
|---|---|
| Petitioner, | **ANSWER AND AFFIRMATION IN OPPOSITION TO ARTICLE 78 PETITION** |

For a judgment under Article 78 of
Civil Practice Law and Rules

  -against-

HON. SUSAN CACACE, Westchester County
Court Judge of the State of New York,

                             Respondent.

-----------------------------------------------------------------------x

              CHARLES F. SANDERS, an attorney duly admitted to the Bar of this State

affirms and states as follows, under penalties of perjury:

              1. I am an Assistant Attorney General in the Office of Andrew M. Cuomo,

Attorney General of the State of New York, attorney for respondent the Honorable Susan Cacace,

Westchester County Court Judge of the State of New York ("Judge Cacace" or "respondent") in

this Article 78 proceeding brought by petitioner Alan Kachalsky ("petitioner").

              2. I submit this answer and affirmation in opposition to petitioner's Article 78

petition. I am familiar with this matter based upon a review of the papers submitted by

petitioner, the underlying proceedings, and through conversations with Chambers of Judge

Cacace.

              3. Petitioner brings this Article 78 petition seeking an order annulling the October

8, 2008 Decision and Order of Judge Cacace, a writ of mandamus compelling Judge Cacace to

issue an unrestricted "Full Carry" pistol license to petitioner pursuant to New York State Penal Law Section 400, and a writ of prohibition enjoining the State of New York from enforcing the requirements of Section 400 that a court find "proper cause" for issuing full-carry permits. For the reasons set forth herein, petitioner's application should be denied.

4. All allegations in the petition are denied unless specifically admitted herein.

**Statutory/Regulatory Framework**

5. Penal Law §400.00(1) states, in pertinent part: "No license shall be issued or renewed pursuant to this section except by the licensing officer, and then only after investigation and finding that all statements in a proper application for a license are true."

6. Penal Law §400.00(2)(f) states, in pertinent part: "A license for a pistol or revolver . . . shall be issued to, have and carry concealed, without regard to employment or place of possession, by any person when proper cause exists for the issuance thereof."

7. Penal Law §400.00(4) states, in pertinent part: "Before a license is issued or renewed, there shall be an investigation of all statements required in the application by the duly constituted police authorities of the locality where such application is made."

8. Penal Law §265.00(10) defines "licensing officer" and for the purposes of Westchester County said licensing officer is a county court judge.

**Statement of Facts**

9. On May 13, 2008, Petitioner submitted an application for a New York State unrestricted "Full Carry" pistol license. See Attachment: Full Carry, Petition, Exhibit 2.

10. Judge Cacace, in her capacity as a handgun licensing officer for the County of Westchester, reviewed and considered the Westchester County Department of Public Safety's

2

background investigation of petitioner prior to making a determination with respect to the proposed issuance of a pistol permit. See Decision and Order, Petition, Exhibit 1 at 1.

11. By Decision and Order, dated October 8, 2008, Judge Cacace denied petitioner's application for a unrestricted Full Carry pistol license based on petitioner's failure to demonstrate "a need for self protection distinguishable from that of the general public." See Decision and Order, Petition, Exhibit 1 at 2.

## Argument

### Respondent Reasonably Exercised Her Discretion When She Denied Petitioner's Pistol Permit Application

12. The standard of review in such a proceeding is whether the agency determination was rationally based and not arbitrary and capricious. Sumowicz v. Kelly, 14 A.D.3d 407 (1st Dep't 2005), appeal den., 5 N.Y.3d 712 (2005)(court upheld denial of pistol permit because it was a rationally based administrative determination); Matter of Bernstein v. NYPD, 85 A.D.2d 574,574 (1st Dep't 1981)(denial of full carry pistol license not arbitrary and capricious where petitioner has failed to establish "proper cause"). To the extent that petitioner relies on Leone v. Silverman, 153 A.D.2d 862 (2nd Dep't 1989), that case is distinguishable in that the first court that granted the original license had already found a sufficient basis to grant the petitioner a license, whereas here, no such basis exists.

13. Where there is a rational basis for the determination, the court may not disturb the agency's decision. This is so "even where the court might have reached a contrary result." Kaplan v. Bratton, 249 A.D.2d 199, 201 (1st Dep't 1998)(judicial review in pistol permit cases "is limited to deciding whether the agency's actions were arbitrary and capricious").

3

14. Indeed, it is well-settled that "[t]he possession of a handgun license is a privilege rather than a right." Sewell v. City of New York, 182 A.D.2d 469, 472 (1st Dep't 1992), appeal denied, 80 N.Y.2d 756 (1992). See also, Williams v. Bratton, 238 A.D.2d 269, 270 (1st Dep't 1997).

15. Thus, a pistol permit may be denied for any good cause. Marlow v. Buckley, 105 A.D.2d 1160, 1161 (4th Dep't 1984). A licensing officer possesses exceptionally broad discretion in determining whether to issue a pistol permit. See Eddy v. Kirk, 195 A.D.2d 1009, 1010 (4th Dep't 1993), aff'd sub nom. O'Connor v. Scarpino, 83 N.Y.2d 919 (1994).

16. Judge Cacace's decision denying petitioner's pistol permit application, based upon petitioner's failure to demonstrate factors warranting a need for self protection different from the general public is rationally supported by the record and, therefore, is neither arbitrary nor capricious. Fromson v. Nelson, 178 A.D.2d 479 (2nd Dep't 1991) (pistol licensing officer has broad discretion in ruling on permit applications, which the licensing officer can deny for any good reason); Matter of Klenosky v. NYPD, 75 A.D.2d 793 (1st Dep't 1980)(failure of petitioner to sufficiently demonstrate a special need for self-protection distinguishable from that of the general community or persons engaged in the same profession provided sufficient basis to deny the application). After a review of the record, including petitioner's application, Judge Cacace rendered the October 8, 2008 Decision and Order to deny the license based on petitioner's failure to demonstrate proper cause for the need of an unrestricted full carry pistol license.

**Respondent is not Required to Provide Petitioner an Opportunity to Respond to Objections to his Application in Cases Where the Petitioner has not Met his Burden to Establish Proper Cause**

17. An applicant for an "On-premises" pistol permit (in contrast to "Full Carry")

4

must meet four requirements: 1) good moral character; 2) no prior felony or serious offense convictions; 3) no history of mental illness; and 4) for whom no "good cause" exists to deny the license. See Archibald v. Codd, Police Commissioner of the City of New York, 59 A.D.2d 867 (1st Dep't 1977); Penal Law § 400.00(2). Applicants seeking a license for a Full Carry pistol permit must meet an additional requirement that "proper cause exists for the issuance thereof". See Penal Law § 400.00(1)(e); Archibald at 867. Petitioner has failed to meet his burden of establishing "proper cause".

18. At least one case suggests that an applicant needs to be given an opportunity to respond to any objections against the application *only if* the licensing officer relies on the objections, and the reasons therefore, to make its determination. See Matter of Demyan v. Monroe, 108 A.D.2d 1004, 1005 (3rd Dep't 1985)(citing Matter of Guida v. Dier, 54 A.D.2d 86, 87 (3rd Dep't 1976). Although Judge Cacace mentions the Westchester County Department of Public Safety's recommendation, the decision and order is based upon Petitioner's failure to establish proper cause. See Decision and Order, Petition, Exhibit 1 at 2.

19. To the extent that an applicant must be given an opportunity to respond to any objections to his or her application, see Matter of Savitch v. Lange, 114 A.D.2d 372, 373 (2nd Dep't 1985), there is no need for such an opportunity when the decision to deny is based on a failure by the applicant to meet the application requirements. See supra at 17; Matter of Bando v. Sullivan, 290 A.D.2d 691, 692-93 (3rd Dep't 2002)(denial not arbitrary and capricious where applicant failed to establish "proper cause" for a "Full Carry" permit). In this case Petitioner was fully aware of the potential negative history, having submitted the information and statements in his application, and was given a full opportunity at the time of the application to clarify these

5

incidents. See Petitioner's Application and Supporting Statements, Exhibit A. Furthermore, the

recommendation for denial of Petitioner's application by the Department of Public Safety was

not based on the negative history in Petitioner's application, but was based on the fact that he

was unable to demonstrate a need for self-protection different from that of the general public –

the same grounds Judge Cacace denied the application on. See Decision and Order, Petition,

Exhibit 1; Department of Public Safety's Recommendation of Disapproval, Exhibit B. An

applicant only needs to be given an opportunity to respond when the determination is based on

information not available to him or her, therefore petitioner's assertion that he has been denied an

opportunity to respond is unavailing.

**Requiring A Pistol Permit Is Proper Under New York Law**

20. Contrary to petitioner's allegations (see Petition, p. 7), his civil and

constitutional rights have not been violated. The Second Amendment to the U.S. Constitution

does not limit the authority of the states to regulate arms, especially handguns and pistols. By

neither the Second Amendment nor Civil Rights Law §4 does an individual have an unfettered

right to possess and bear arms absent any regulation, for the courts have stated that:

> While the petition under article 78 of the Civil Practice Act invokes the guarantee
> of the Second Amendment to the Constitution of the United States, petitioner's
> brief on this appeal relies not upon those provisions but upon section 4 of the
> Civil Rights Law, which, except for the substitution of "cannot" for "shall not" is
> *in ipsissimis verbis* as those of the Second Amendment. Accordingly,
> authoritative Federal decisions construing the Second Amendment may properly
> be applied to the State statute in the interest of homogeneity of interpretation.
> (*Matter of Weiden*, 263 N.Y. 107; *Matter of Cregan*, 276 N.Y. 337.) Obviously,
> petitioner cannot rest his case upon the Second Amendment which is a limitation
> upon the exertion of the power of Congress and the national government, but not
> upon that of the state. (*United States v. Cruikshank*, 92 U.S. 542, 553; *Presser v.
> Illinois*, 116 U.S. 252, 265.) Moreover, the Second Amendment created no right

6

to bear arms, a right which long ante-dated the adoption of the Federal Constitution, having originated in a design to strengthen the national militia, an institution first established by King Alfred. (*Robertson v. Baldwin*, 165 U.S. 275, 282; *United States v. Miller* 307 U.S. 174, 179.) Indeed, the main purpose of the Second Amendment was to enable the Federal Government to maintain the public security. (*Presser v. Illinois, supra*.) Again, the Supreme Court of the United States has held that the right to keep and bear arms is not infringed by laws prohibiting the carrying of concealed weapons (*Robertson v. Baldwin*, 165 U.S. 275, 281, 282)....

Matter of Moore v. Gallup, 267 A.D. 64, 67-68 (3rd Dep't 1943), affirmed, 293 N.Y. 846 (1944).

Despite the U.S. Supreme Court's recent decision in District of Columbia v. Heller, 128 S.Ct.

2783 (2008), that the Second Amendment provides a right for an individual to own a handgun,

that case was limited to the narrow question of whether an outright prohibition on gun ownership

was constitutional. In fact, the Supreme Court held in Heller that the Second Amendment did not

guarantee a "right to keep and carry any weapon whatsoever in any manner whatsoever and for

whatever purpose". See id. at 2816. Currently New York law requires the licensing of

individuals seeking to possess a handgun within its jurisdiction and a showing of proper cause

for an unrestricted full carry pistol license. Clearly, that is both the prevailing law and the law to

be applied in this proceeding. See, e.g., Eddy v. Kirk, 195 A.D.2d 1009, 1010 (4th Dep't 1993),

aff'd sub. nom. O'Connor v. Scarpini, 83 N.Y.2d 919 (1994)(licensing officer possesses

exceptionally broad authority under Penal Law § 400.00 which is the exclusive statutory

mechanism that governs the licensing of firearms in New York State). In the instant case,

petitioner's failure to demonstrate a need different from that of the general public for self-

protection is clearly a reasonable basis upon which to deny him a pistol license. See Petition,

Exhibits 1 and 2.

7

**Mandamus Does Not Lie to Compel the Issuance of
A Pistol Permit to Petitioner**

21.  It is well settled that mandamus is an extraordinary remedy that lies only "to compel the performance of a purely ministerial act where there is a clear legal right to the relief sought." Matter of Legal Aid Society of Sullivan County v. Scheinman, 53 N.Y.2d 12, 16 (1981). See also Harper v. Angiolillo, 89 N.Y.2d 761, 765 (1997). It will not be awarded to compel an act involving the exercise of judgment or discretion. Klostermann v. Cuomo, 61 N.Y.2d 525, 539 (1984).

22.  "A ministerial act ... has been defined as a specific act which the law requires a public officer to do in a specified way." Matter of Posner v. Levitt, 37 A.D.2d 331, 332 (3d Dep't 1971). The relief demanded in the petition must be specifically and "clearly imposed by law . . . It is not enough that the act, performance of which is sought, is not prohibited, its performance must be directed." Matter of Burr v. Voorhis, 229 N.Y. 382, 387 (1920).

23.  In fact, "[m]andamus is available only where the petitioner's right to performance is so clear as to admit of no doubt or controversy." Coastal Oil New York Inc. v. Newton, 231 A.D.2d 55, 57 (1st Dep't), appeal dism'd 91 N.Y.2d 848 (1997), appeal denied 91 N.Y.2d 808 (1998). To demonstrate a "clear legal right" to the relief requested, the petitioner must show "a clear and unequivocal expression of intent from the Legislature . . .." Harper v. Angiolillo, 89 N.Y.2d at 767. Without a clear statutory direction, mandamus will not lie. Id.; Anonymous v. Grievance Committee, 244 A.D.2d 549, 550 (2d Dep't 1997), appeal denied 91 N.Y.2d 808 (1998) (mandamus does not lie to compel an act which involves the exercise of discretion).

8

24. Here, petitioner does not have a clear right to an unrestricted full carry pistol permit. See Williams v. Bratton, 238 A.D.2d at 270 (issuance of license to carry a gun is a privilege not a right).

WHEREFORE, Judge Cacace respectfully requests that this Court dismiss petitioner's Article 78 proceeding in its entirety and grant such other and further relief as the Court deems just and proper.

Dated:      New York, New York
            March 13, 2009

                                    ANDREW M. CUOMO
                                    Attorney General of the
                                      State of New York
                                    Attorney for Judge Susan Cacace
                                    By:

                                    CHARLES F. SANDERS
                                    MICHAEL J. SIUDZINSKI
                                    Assistant Attorney General
                                    120 Broadway, 24th Floor
                                    New York, New York 10271
                                    (212) 416-8594/8552/8610

9

STATE OF NEW YORK     )
                      : ss.:
COUNTY OF NEW YORK    )

        CHARLES F. SANDERS, being duly sworn, deposes and says:

        I am of Assistant Attorney General and of counsel to the
Attorney General of the State of New York, attorney for respondent
Justice Cacace, a justice of the County Court of Westchester County,
New York State.

        I am familiar with the facts of this proceeding and make
this verification pursuant to § 3020(d)(2) of the Civil Practice Law
and Rules because respondent is an officer of the State of New York.

        I have read the foregoing Answer and Affirmation and am
familiar with its contents.  The statements made therein are true to
the best of my knowledge, and are based upon the proceedings, record,
and decisions involving the petitioner's pistol permit application.
As to those matters therein stated on information and belief, I
believe them to be true based upon the same review and conversations.

                                    CHARLES F. SANDERS

Sworn to before me this
13th day of March, 2009

Assistant Attorney General
of the State of New York

10

STATE OF NEW YORK      )
                       :  SS.:
COUNTY OF NEW YORK     )

      CHARLES F. SANDERS, being duly sworn, deposes and says:

      That he is an Assistant Attorney General in the office of the Attorney General of the State of New York, Attorney for respondent Justice Cacace, a justice of the County Court of Westchester County, New York State.  On the 13th day of March, 2009, he served the annexed Answer and Affirmation in Opposition upon the following named person:

          Mr. Alan Kachalsky, Esq.
          800 Westchester Avenue, Suite S-608
          Rye Brook, New York 10573

petitioner pro se in the within entitled proceeding by depositing a true and correct copy thereof, properly enclosed in a post-paid regular mail wrapper, in a post-office box regularly maintained at 120 Broadway, New York, New York 10271 directed to said petitioner pro se at the address within the State designated by him for that purpose.

                                  _____
                                CHARLES F. SANDERS

Sworn to before me this
13th day of March, 2009

_____
Assistant Attorney General
  of the State of New York

11

SUPREME COURT OF THE STATE OF NEW
YORK APPELLATE DIVISION:
SECOND DEPARTMENT

In the Matter of
ALAN KACHALSKY,

                                    Petitioner,

For a judgment under Article 78 of
Civil Practice Law and Rules

        - against -

HON. SUSAN CACACE, Westchester County
Court Judge of the State of New York
                                    Respondant.

**ANSWER AND AFFIRMATION IN
OPPOSITION TO ARTICLE 78 PETITION**

ANDREW M. CUOMO
Attorney General of the State of
New York

**ATTORNEY FOR DEFENDANTS**

BY:  CHARLES F. SANDERS
MICHAEL SIUDZINSKI (*admission pending*)
Assistant Attorneys General
120 Broadway, 24th Floor
New York, New York 10271

Tel. No.: (212) 416-8594/8552

Fax Nos.: 212-416-6075/6009/6076
(Not for Service of Papers)
*Due Service of a copy of the within is
admitted this _____ day of _____, 2008*

# ALAN KACHALSKY, ESQ.

800 Westchester Avenue, Ste S608 ● Rye Brook, New York 10573 ● (914) 220-5324 ● E-mail: catchsky@earthlink.net

November 27, 2009


COURT OF APPEALS
Court of Appeals Hall
20 Eagle Street
Albany, NY 12207-1095
      **Attn: STUART M. COHEN**

      **RE:   In the Matter of Alan Kachalsky v. SUSAN CACACE, as Justice of the
           County Court**
      **Docket #**

### Comments Justifying the Retention of Subject Matter Jurisdiction

Dear Sir/Madam:

      This letter constitutes my response to your request for my comments justifying the retention of subject matter jurisdiction of the above-referenced appeal, as requested in Stuart M. Cohen's letter dated November 18, 2009.

      The appeal involves the fundamental question of whether New York's handgun licensing statute (§400.00) of the Penal Law is Constitutional or whether, as alleged by appellant, it violates the Second Amendment right to keep **and bear arms**.

      It is respectfully contended that the right to keep and bear arms is fundamental to the exercise of all other rights, but especially the right to life, liberty and the pursuit of happiness.

      Without the right to defend oneself, a person's very life, not to mention liberty, is subject to the whim and caprice of any person who is stronger, larger, or better armed. As has occurred countless times throughout history, a stronger or better-armed person can deprive an unarmed man or woman of life and/or liberty.

      The drafters of the Bill of Rights, in recognition of the inherent right of self-defense, enacted the Second Amendment, which provides that "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."

      This appeal raises the issue of whether §400.00(2)(f) of the Penal Law violates the Second Amendment of the Constitution of the United States in that it requires that applicants for carry (pistol) permits to demonstrate that "proper cause exists for the issuance thereof."

As appellant argued in his Article 78 petition to the Second Department, a 'right' is not something one must demonstrate a need for, in order to exercise the right. It is there to be exercised if and when the individual chooses to exercise the right. No one is required to demonstrate, to the satisfaction of a bureaucrat, 'a need' for one's Right to Free Speech prior to exercising this right; one should not be required to 'demonstrate' that they meet some vague, subjective threshold in order to exercise their Second Amendment right (which as the Supreme Court said in *Heller*, merely "codified a pre-existing right."[1]

This requirement (to demonstrate that "proper cause exists for the issuance thereof), when applied to persons who meet the requirements of subdivision 1 of § 400.00[2] is nothing more than a means to limit the exercise of the Constitutional Right to those persons privileged to 'know the right people,' Appellant is unaware of any objective guidelines for determining what constitutes 'proper cause.' A review of case law confirming the denial of carry permits shows that persons who meet the requirements of subdivision 1 of § 400.00 are routinely denied the right to bear arms based on their failure to "demonstrate that "proper cause exists for the issuance thereof."

The imposition of this subjective and Unconstitutional standard creates the danger of the perception that the granting of Carry Permits is based on membership in the 'privileged class;' members of 'the club,' so to speak; which again, is further evidence that to allow applicants to be denied without any specific reason (other than failure to meet the aforesaid vague threshold of "proper cause exists for the issuance thereof") being stated is of itself arbitrary and capricious. In fact, the perception is entirely valid!

One egregious example of the denial of a carry permit to a law-abiding woman surgeon who wished to defend herself, is found in *Kaplan v. Bratton*, 249 A.D.2d 199, 673 N.Y.S.2d 66

---

[1] "it has always been widely understood that the Second Amendment, like the First and Fourth Amendments, codified a pre-existing right. The very text of the Second Amendment implicitly recognizes the pre-existence of the right and declares only that it "shall not be infringed." 128 S.Ct. @ 2797

[2] subdivision 1 of § 400.00 provides that "No license shall be issued or renewed except for an applicant
- (a) twenty-one years of age or older,
- (b) of good moral character;
- (c) who has not been convicted anywhere of a felony or a serious offense;
- (d) who has stated whether he or she has ever suffered any mental illness or been confined to any hospital or institution, public or private, for mental illness;
- (e) who has not had a license revoked or who is not under a suspension or ineligibility order issued pursuant to the provisions of section 530.14 of the criminal procedure law or section eight hundred forty-two-a of the family court act;
- (f) in the county of Westchester, who has successfully completed a firearms safety course and test * * *; and
- (g) concerning whom no good cause exists for the denial of the license."

(1st Dept.,1998). The Court in *Kaplan*, justified the denial of Dr. Susan Kaplan's carry permit thusly:

> "When the proper standard of proof is applied, it is clear that respondent's decision has a rational basis. The License Division correctly required petitioner to show an **extraordinary threat to her safety and, pursuant to its own regulations as interpreted by this court**, rationally concluded that petitioner's general allegations about her work hours and location were insufficient." 673 N.Y.S.2d @ 68.

*Kaplan* demonstrates the three-card monty game nature of the pistol licensing statute. Dr. Susan Kaplan, a urologist applied for a 'Carry Pistol License.' In an attempt to meet the (apparently impossible) burden of demonstrating her need for the license, she alleged that she traveled at night in New York City to meet with patients or to attend to emergencies at the hospitals with which she was affiliated (Columbia Presbyterian, St. Luke's-Roosevelt and St. Vincent's), and that she feared for her personal safety.

The decision reiterated the shifting requirements (apparently designed to permit only the privileged, elite or friends of the privileged or elite to obtain permits) as follows:

> "In fact, Penal Law § 400.00(2)(f) requires the petitioner to show "proper cause" for issuance of the permit, which this court has interpreted to mean **"a special need for self-protection distinguishable from that of the general community or of persons engaged in the same profession"** (citations omitted). The Police Department's regulations regarding Carry Pistol Licenses, at 38 RCNY § 5-03(b), also require a showing of "extraordinary personal danger, **documented by proof of recurrent threats to life or safety,"** and add that "the mere fact that an applicant ... resides or is employed in a 'high crime area' does not establish 'proper cause' ".

Requiring this concerned, law-abiding citizen to show **"extraordinary** personal danger, **documented by proof of recurrent threats to life or safety,"** in order to get a license to carry a handgun, demonstrates that the real purpose of the statute is nothing less than to deny ordinary, law-abiding citizens the fundamental right to defend themselves with a handgun, a weapon which the Supreme Court in *District of Columbia v. Heller*, 128 S.Ct. 2783, 171 L.Ed.2d 637, 76 USLW 4631, described as a "class of "arms" that is overwhelmingly chosen by American society for that lawful purpose."

In my application for the carry-permit, I stated (in relevant part), in response to the question "List all factors which you believe to be relevant to your application and which establish proper cause for the issuance of a firearm license for the purpose of Full Carry" as follows:

> "[W]e live in a world sporadic random violence might at any moment place one in a position where one needs to defend oneself or possibly others, e.g. random shootings in universities (Virginia Tech), post offices. airline check-in counters, malls, road rage. as well as the run-of-the-mill street muggings and robberies. While the odds of finding oneself in a Virginia Tech type situation are remote, one must reflect that had there been even one armed person, the death toll might have been considerably less than 31 dead. While one never knows what one might do in such situations. It is my belief that it is better to have the option to defend oneself (and others) than not to have the option."

In fact, once again, on Saturday, November 21, 2009, a man pulled a knife on the D train (subway) and, killed an unarmed man (Dwight Johnson) with a knife by severing his carotid artery, on a crowded subway car, in front of (according to the New York Post, November 23, 2009) 20 to 30 witnesses on the subway. Not one of these 'witnesses' had the courage to attempt to stop the attack, or the courage to attempt to stop the perpetrator after the attack. One must wonder how many of those people on the train, perhaps even the deceased victim, been turned down for carry permits because they were unable to demonstrate "a special need for self-protection distinguishable from that of the general community or of persons engaged in the same profession" or to make the requisite showing of "extraordinary personal danger, **documented by proof of recurrent threats to life or safety.**" One must wonder whether the victim of this attack would be able to meet this threshold, as he only sustained one threat to life or safety, rather than 'recurrent threats.' Unfortunately for Mr. Johnson, his first threat to life or safety was also his last.

It is clear that one cannot rely on the police for personal protection. As long as the State of New York continues to allow bureaucrats to deny carry permits to law-abiding persons who meet the criteria of subdivision 1 of § 400.00, on the grounds that they did not demonstrate, to the subjective standards of some bureacrat, "that "proper cause exists for the issuance (of a carry-permit)," then people like Dwight Johnson, the deceased victim of the subway knifing, can do very little more than attempt to appease men like Gerardo Sanchez, or attempt to protect themselves with their bare hands. As history has proven time and time again, oftentimes, attempting to appease a criminal doesn't keep you alive.

This Court should note that the Supreme Court, in *Heller,* recently held that:
(1)   the Second Amendment conferred an individual right to keep and bear arms;
(2)   statutes banning handgun possession in the home violated Second Amendment; and
(3)   statute containing prohibition,against rendering any lawful firearm in the home operable for purpose of immediate self-defense violated Second Amendment.

On September 30, 2009, the Supreme Court announced that it would hear the case of *McDonald v. City of Chicago*, where it would decide whether the Second Amendment applies to the States.

Based upon the Supreme Court's recent decision in *Heller*, and as well as their decision to hear *McDonald*, it is clear that the issue of the Constitutionality of New York's handgun licensing law (§400.00 of the Penal Law) is an extremely significant and timely issue which should justify the Court of Appeals retention of subject matter jurisdiction.

Very truly yours,

ALAN KACHALSKY

cc:

ANDREW M. CUOMO
Attorney General of the State of New York
120 Broadway, 24th Floor
New York, NY 10271

The Solicitor General
Department of Law
The Capitol
Albany, New York 12224

RECEIVED BY MAIL/HAND
NYS OFFICE OF THE ATTORNEY GENERAL

DEC 0 1 2009

DIV. OF APPEALS & OPINIONS-NYC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------X
Alan Kachalsky, Christina Nikolov, and  :
Second Amendment Foundation,            :
                                        :
                    Plaintiffs,         :      **Civil Action Number:**
                                        :      **10-cv-5413**
-against-                               :
                                        :      **(Hon. Cathy Seibel)**
Susan Cacace, Jeffrey A. Cohen, and     :
County of Westchester,                  :
                                        :
                    Defendants.         :
------------------------------------------------------X

        Philip J. Cook, declares and states as follows, under penalties of perjury:

## I. Credentials

1. My current academic appointment is at Duke University, where I am ITT/Sanford

   Professor of Public Policy, Professor of Economics and Sociology, and Senior Associate

   Dean of the Sanford School of Public Policy.   I began my research program on firearms

   violence in 1975, and since then have co-authored scholarly books and articles on a

   variety of related topics, including the economic costs of gun violence, the illicit markets

   for guns, the consequences of weapon choice in robbery and assault, the influence of gun

   availability on gun use in crime, the use of guns in self-defense, and the effectiveness of

   gun control regulations.   I have served on expert panels for the National Academy of

   Sciences that dealt with violence prevention, "smart" guns, rampage shootings in schools,

   and injury control.   I also served as Consultant to the Enforcement Division of the United

   States Department of Treasury (1999-2000), which at that time included the Bureau of

   Alcohol, Tobacco and Firearms.   I was elected fellow of the American Society of

Criminology in 2000, and elected Member of the Institute of Medicine of the National

Academies in 2001. A full curriculum vitae is Appendix A of this declaration.

## II. Summary

2.  This declaration will present empirical evidence and my expert opinions concerning
    several issues arising out of this litigation:
    a.  Gun violence is a serious public health and safety problem that has social and
        economic consequences.
    b.  The type of weapon used by a perpetrator of violent crime is an important
        determinant of whether the victim is killed.
    c.  Weapon choice by violent offenders is influenced by the availability of firearms and
        has a direct effect on the criminal homicide rate
    d.  The prevalence of firearms does not affect rates of assault, robbery, or rape but has a
        direct positive effect on the lethality of criminal assault.
    e.  Most crime guns are handguns.
    f.  Gun carrying away from home contributes directly to the use of guns in violent crime.
    g.  Westchester County issues relatively few concealed-carry licenses.
    h.  The assertion that a more lenient system for issuing concealed carry permits would
        result in less crime lacks empirical support and has been discredited by an expert
        panel of the National Academy of Sciences.
    i.  If law enforcement officials were required to issue CCW licenses to all adult
        applicants without a serious criminal record, a majority of future felony arrestees
        would qualify to carry concealed handguns in public.

## III. Opinions

### a. Gun Violence is a Serious Public Health and Safety Problem that has Social and Economic Consequences.

3.  A great many Americans die by gunfire. The gun deaths from homicide, accident and

    suicide have totaled close to one million during the last three decades. Firearms play a

    dominant role in the most serious violent crimes. In 2007, the most recent year for which

    the National Center for Health Statistics provides data on injury deaths, there were

2

18, 361 criminal homicides, of which 69% were committed with guns. Emergency rooms treated nearly 50,000 nonfatal gunshot injuries from assaults. And there were a total of over 300,000 assaults and robberies in that year in which the perpetrator used a gun.[1]

4. Criminal homicide is not evenly distributed across the population, but highly concentrated among youthful minority males. In 2007, homicide victimization rates were 15 times as high for black men aged 15-34, as for white non-Hispanic men in this age group. Homicide is the leading cause of death for black males age 15-34, and the second-leading cause of death for Hispanic males in this age group.

5. Firearms also pose a particular threat to public officials and law enforcement officers. Fourteen of the 15 direct assaults against Presidents, Presidents-elect, and presidential candidates in United States history were perpetrated with firearms, including the five resulting in death. (The one exception, a failed attack with a hand grenade against President George W. Bush, occurred overseas.)[2] Of the 536 law enforcement officers who were feloniously killed between 2000 and 2009, 490 (91%) were assaulted with a firearm and 73 % of those were with a handgun.[3]

6. I have conducted extensive research on the societal costs of gun violence and the threat of gun violence. The costs of gun violence to society are more evenly distributed across the population than victimization statistics would suggest. I and my colleagues estimated the costs of treating gunshot wounds to be $2 billion per year.[4]

---

1 http://www2.fbi.gov/ucr/cius2009/data/table_19.html accessed January 17, 2011.

2 http://www.fas.org/sgp/crs/misc/RS20821.pdf accessed 1/10/11. Congressional Research Service Report to Congress, "Direct Assaults on Presidents, Presidents-Elect, and Candidates" Jan 7, 2008.

3 http://www2.fbi.gov/ucr/killed/2009/data/table_27.html
4 PJ Cook, B Lawrence, J Ludwig, and T Miller, "The Medical Costs of Gunshot Wounds" Journal of the American Medical Association 282(5), August 4, 1999, 447-454.

7. The threat of being shot causes private citizens and public institutions to undertake a variety of costly measures to reduce this risk. Furthermore, the threat of gun violence is in some neighborhoods an important disamenity, causing residents to be fearful and to take special precautions to protect themselves and their children. That threat depresses property values and puts a drag on economic development. Together with economist Jens Ludwig, I quantified the overall magnitude of these social costs by conducting a contingent-valuation survey that asked individuals what they would be willing to pay to reduce gun violence somewhat in their community. Based on their responses we estimated an overall cost of assault and homicide to be $80 billion in 1995.[5]

**b. The Type of Weapon Used by a Perpetrator of Violent Crime is an Important Determinant of Whether the Victim is Killed.**

8. The government has an interest in reducing the number of guns used in violent crime in order to reduce the number of deaths and life-threatening injuries that are produced when guns rather than less deadly weapons are used in crime.

9. Guns are intrinsically more deadly than other weapons that are commonly used in criminal assault, in that they provide a means of inflicting a fatal wound quickly, from a distance, with little personal risk, determination, involvement, or strength required. Gun use in an assault increases the likelihood of death by making it easier to kill. As a result, while only a small fraction (5 percent) of criminal assaults are perpetrated with guns, over two-thirds of fatal assaults (murders and non-negligent homicides) are perpetrated with guns.

---

5. J Ludwig and PJ Cook, "The Benefits of Reducing Gun Violence: Evidence from Contingent-Valuation Survey Data" Journal of Risk and Uncertainty 22(3), 2001: 207-226.

4

10. In two seminal articles, Franklin Zimring provided systematic evidence that the weapon type used in an assault affects the likelihood the victim will be killed.[6] Zimring drew on crime data from Chicago to show that case-fatality rates in gun attacks are a multiple of those in knife attacks, despite the fact that the circumstances are generally quite similar. In serious attacks, he concluded, the difference between whether the victim lived or died was often a matter of chance rather than a difference in intent, and the chances of a fatality were higher with a gun than a knife. Zimring found further confirmation in comparing the case-fatality rates among shootings involving guns of different caliber.[7] He demonstrated that victims were more likely to die in larger-caliber shootings, again suggesting that the intrinsic lethality of the weapon, and not just the assailant's intent, affected the outcome – a result that I have dubbed the "instrumentality effect."[8]

11. Research on the specific crime of robbery provides further confirmation for the instrumentality effect. About half of victims of non-commercial robbery included in the National Crime Victimization Survey ("NCVS") report being physically attacked by the robber (rather than just threatened), and one-fifth require medical treatment. Some victims are seriously wounded or killed. In 2005 the FBI classified 921 murders as robbery-related (6 percent of all murders), implying that on the order of 1 in 1,000 robberies resulted in death that year. Since the most serious potential outcome of a robbery is the victim's death, it is of considerable interest to know what distinguishes

---

6 Zimring, F.E. (1968). "Is gun control likely to reduce violent killings?" University of Chicago Law Review, 35, 21-37; Zimring, F.E. (1972). "The medium is the message: Firearm caliber as a determinant of death from assault." Journal of Legal Studies, 1, 97-124.

7 Id., 1972

8 Cook, P.J. "The Technology of Personal Violence" in Michael Tonry, ed. Crime and Justice: An Annual Review of Research Vol. 14, University of Chicago Press, 1991.

fatal robberies from the great majority in which the victim survives. One of my studies compared robbery murders (as documented by the FBI's Supplementary Homicide Reports) to non-fatal robberies, finding similar statistical patterns with respect to the characteristics of the offenders.[9] The most prominent *difference* between robbery and robbery murder was with respect to the types of weapons used. About two-thirds of robbery murders are committed with guns, while less than *one*-third of robberies involve guns. Gun robberies are three times more likely to result in the death of the victim than knife robberies, and knife robberies three times more likely to result in death than robberies with other weapons.[10] A regression analysis of changes in robbery-murder rates in 43 cities found a close relationship between the robbery rate and the robbery murder rate, as if the latter were simply a probabilistic byproduct of the former. Every additional 1,000 gun robberies added 4 robbery murders to the city's total, while an additional 1,000 nongun robberies added just one murder.[11] The conclusion is that whether the victim of an assault or robbery dies is not just a reflection of the offender's intentions. The type of weapon used by the offender in an assault or robbery has a causal effect on whether the victim lives or dies. If the weapon used is a loaded firearm, the victim is much more likely to die than if the weapon is a knife or club. If the fraction of assaults or robberies involving guns increases, then the death rate will also increase.

### c. Weapon Choice by Violent Offenders is Influenced by the Availability of Firearms and Has a Direct Effect on the Criminal Homicide Rate.

---

9 Cook, P.J. (1987) "Robbery Violence." Journal of Criminal Law & Criminology. 78(2), 1987, 366.

10 *Id.*

11 *Id.*, 373. See also William Wells and Julie Horney, Weapon effects and individual intent to do harm; influences on the escalation of violence" Criminology 40(2), May 2002, 265-296.

12. The likelihood that a gun will be used in crime is closely linked to the general availability of guns, and especially handguns. Currently about one in three households nationwide are in possession of at least one firearm, and one in five households are in possession of a handgun.  The prevalence of gun ownership differs widely across the counties and states, and is lower in New York State, and Westchester County in particular, than is true for the United States as a whole.

13. On average it is easier for youths and criminals to obtain guns in jurisdictions in which gun ownership is common than when gun ownership is relatively rare.  The types of transactions by which youths and felons obtain guns include thefts from homes and vehicles, loans from family members and friends, and off-the-books sales.  In a high-prevalence area, the informal off-the-books transactions of this sort are easier to arrange and may well be cheaper than in markets where gun ownership is relatively rare.[12]  That is true even though in jurisdictions with low prevalence and relatively tight controls, traffickers supply the underground market with guns acquired in other jurisdictions that have looser controls.[13]

**d. The prevalence of firearms does not affect rates of assault, robbery, or rape but has a direct positive effect on the lethality of criminal assault.**

14. My research has provided strong evidence that the prevalence of gun ownership is closely linked to the likelihood that robbers or assailants will use a gun as opposed to a knife or other weapon.  In articles published in scientific journals, I and my coauthors have

---

12 Cook, P.J., Ludwig, J., Venkatesh S.A., and Braga, A.A. (2007) "Underground Gun Markets" The Economic Journal, 117 (524), 588-618.

13 PJ Cook and A Braga, "Comprehensive Firearms Tracing: Strategic and Investigative Uses of New Data on Firearms Markets" Arizona Law Review 43(2) 2001:277-309.

7

analyzed the effect of changes in the prevalence of gun ownership in the states or 200 largest counties on several crime-related outcomes.

     i. In a cross-section analysis of data from a survey of adolescent males, I found that the prevalence of gun ownership has a strong positive relationship to the probability of gun carrying by adolescent males.[14] Thus an increase in gun prevalence is associated with an increase in gun carrying by adolescent males. (Gun prevalence has no effect on the likelihood of carrying a knife or other type of weapon.)

     ii. In an analysis of Uniform Crime Reports data for the 200 largest counties over 20 years, we found that an increase in the prevalence of gun ownership also increases the percentage of robberies committed with a gun.[15]

     iii. The prevalence of firearms does not affect rates of assault, robbery, or rape.[16]

15. I conclude that an increase in gun ownership has on balance no deterrent effect on violent crime. Thus the prevalence of firearms does not affect the *volume* of violence, but has a positive effect on the death rate in assault and robbery (e.g., the criminal homicide rate).

16. These results help explain international differences in violence. The rates of assault and robbery in the United States are similar to those in Canada, Western Europe, and Australia. But our criminal homicide rate is far higher. The difference is that firearms are more prevalent and readily available in the United States, and as a result violent offenders in the United States are far more likely to use a firearm. As a result, the death rates in the United States are higher.[17]

---

14 Cook, P.J., and Ludwig, J. "Does Gun Prevalence Affect Teen Gun Carrying After All?" Criminology 42(1), 27-54.

15 Cook, Ludwig and Venkatesh 2007; *and* PJ Cook "The Effect of Gun Availability on Robbery and Robbery Murder: A Cross-Section Study of Fifty Cities" Policy Studies Review Annual, Volume 3, Sage Publications, 1979, pp. 743-781.

16 *Id.,* Cook 1979; *and* PJ Cook and J Ludwig "The Social Costs of Gun Ownership" Journal of Public Economics 90(1-2), January 2006: 379-391

17 Zimring, F.E., & Hawkins, G. (1997). Crime is not the problem: Lethal violence in America. New York: Oxford

### e. Most Crime Guns are Handguns.

17. While only about one third of the firearms in private possession are handguns (pistols or revolvers, as opposed to rifles or shotguns), the vast majority of gun assaults and robberies are perpetrated with handguns. For example, in 2009, 88% of all criminal homicides involving guns were committed with handguns.[18] Over 90% of gun robberies involve handguns. Assailants choose handguns over long guns in part because handguns are smaller and more conveniently carried on the person or in a vehicle and can be readily concealed from law enforcement officers, potential victims, and the public at large. Because handguns pose a particular hazard to public safety, they have traditionally been subjected to more stringent regulation than rifles and shotguns (which are commonly used for hunting and other sporting purposes). For example, the federal Gun Control Act limits sales of handguns by dealers to those age 21 or older, whereas the minimum age for long gun sales is 18. A number of states require that anyone intending to acquire a handgun first obtain a special license or permit from state or local authorities; for seven states, including New York State, that requirement only applies to handguns. Similarly, six states limit the purchase of handguns (but not rifles or shotguns) to one per month.

### f. Gun Carrying Away from Home Contributes Directly to the Use of Guns in Violent Crime.

18. For an offender to use a gun logically requires that the offender is carrying a gun or has ready access to one at the time of the commission of a crime.[19] For that reason the state

---

University Press.
18 FBI, Crime in the United States, 2009: Table 8.

19 Sherman, L. (2000). "Gun carrying and homicide prevention." Journal of the American Medical Association, 283(9), 1193-1195.

has a legitimate interest in the regulation of whether and how guns are carried in public, and by whom.

19. Concern about the criminal use of guns in public has engendered state and local regulations that limit carrying. In many cities, police departments have adopted targeted patrol against illegal gun carrying in an effort to reduce gun misuse.[20]

20. Targeted patrol against illicit gun carrying has been shown to be effective. In 1998, the Pittsburgh Police Department instituted a Firearm Suppression Patrol against illegal carrying. This program involved expansion of patrol activities during high crime periods of the week, in two high crime areas of the city. A careful analysis found that the program, which increased the number of stops of suspicious vehicles and pedestrians, had the effect of reducing gun misuse, including "shots fired" calls and gunshot injuries.[21]

21. All but three states currently ban carrying a concealed firearm or (more commonly) restrict carrying to those who have obtained a license or permit for that purpose. In 33 states the statute requires the relevant authority to issue a license to any applicant who meets certain minimum requirements and pays the required fee; both the requirements and the fee differ among these "shall issue" states. In other states the issuing authority has some discretion in responding to an application. These "may issue" states, including New York State, generally require that the applicant, in addition to meeting minimum requirements and paying a fee, demonstrate a special need to carry a concealed weapon.

---

20 PJ Cook, J Ludwig, SA Venkatesh, and AA Braga  "Underground Gun Markets" The Economic Journal, 117 (524) November, 2007: 588-618; Cook, P.J. and Ludwig, J. "The Social Costs of Gun Ownership." Journal of Public Economics 90(1-2), 2006, 379-391; Braga, AA and DL Weisburd Policing Problem Places: Crime Hot Spots and Effective Prevention 2010.

21 Cohen, J., & Ludwig, J. (2003). "Policing gun crimes." In J. Judwig & P.J. Cook (eds), Evaluating gun policy. 217-239. Washington, DC: Brookings Institution Press.

10

g. **Westchester County Issues Relatively Few CCW licenses.**

22. May-issue jurisdictions tend to issue fewer concealed-carry (CCW) licenses per capita than shall-issue jurisdictions.  In particular, in 2010 Westchester County issued just 139 unlimited permits to carry concealed, and an additional 41 permits for employment-related carrying, for an overall rate of issuance of 0.2 per 1,000 residents per year.  In 2008 and 2009, by comparison, Pennsylvania (a shall-issue state) issued permits to carry concealed at a rate of 12 per 1,000 residents per year.  (In both New York and Pennsylvania, a permit is valid for five years once issued.)  Ohio, another shall-issue state, issued permits at a rate of 5 per 1,000 residents in 2009.

h. **The Assertion that a More Lenient System for Issuing Concealed Carry Permits Would Result in Less Crime Lacks Empirical Support and has been Discredited by an Expert Panel of the National Academy of Sciences.**

23. During the last three decades many states have eased their restrictions on concealed carry, replacing a "may issue" statute (or outright ban) with a "shall issue" statute.  These changes have had the effect of increasing the number of private citizens who are legally entitled to carry a conceal firearm.  These changes in law and practice provide a sort of policy "experiment" that has been analyzed by scholars to determine whether it has affected crime rates or patterns.

24. This research has been conducted by economists, statisticians, and other social scientists. I have reviewed this research in several published articles.[22]  The first prominent study of the effect of the adoption of "shall issue" laws was by John Lott and David Mustard,

---

22 PJ Cook, MH Moore, and A Braga, "Gun Control" in James Q. Wilson and Joan Petersilia, eds. Crime: Public Policies For Crime Control, ICS Press, Oakland CA., 2002: 291-329; *op. cit.* Cook and Ludwig 2006.

published in 1997.[23]  They reported that these laws had a net deterrent effect on homicide rates, but actually had the effect of increasing property crime rates.  For the crime of robbery, a crime that typically occurs in public places, their results were mixed.  Since the publication of that article,  John Lott has published revised estimates that purport to demonstrate that shall issue laws have a deterrent effect on both violent and property crime (including robbery).[24]  Other economists and social scientists have reached different conclusions.

25. Based on my reviews of this literature, my conclusion is the same as the conclusion of the expert panel assembled by the National Research Council of the National Academies, the Committee to Improve Research Information and Data on Firearms. "The evidence to date does not adequately indicate either the sign or the magnitude of a causal link between the passage of right-to-carry [shall-issue] laws and crime rates (p. 7)."25   In other words, if a state liberalizes its concealed carry law by adopting a "shall issue" provision, there is no scientific consensus for predicting whether the result would  be to increase or reduce the rates of homicide and other crime.   That does not mean that there would be no effect in fact – only that the current state of the science does not support a prediction of what that effect would be.

---

23 Lott, John R., Jr., and David B. Mustard. 1997. "Crime, Deterrence, and Right-to-Carry Concealed Handguns." Journal of Legal Studies 26, 1: 1–68

24 Lott, J. (2000). More guns, less crime (2nd ed.). Chicago: University of Chicago Press.

25 Charles F. Wellford, John V. Pepper, and Carol V. Petrie, editors Firearms and Violence: A Critical Review Washington, DC: National Academies Press, 2005.

APPX. 457

26. It is worth emphasizing that this expert committee considered all of the empirical

literature that had been published prior to 2005, and also performed its own analysis of

the data. There have been numerous studies published, some reporting positive results,

and some negative. The conclusion of this panel should be viewed as authoritative in my

judgment. The National Research Council of the National Academies was chartered by

President Wilson during World War I to provide expert advice to the nation. Since then

its committees, including the Committee to Improve Research Information and Data on

Firearms, have been appointed from among the leading scholars in the relevant field who

have no serious conflicts of interest with respect to the topic at hand. (The experts are not

compensated for their service.) The assessment of this neutral group of experts provides

the most trustworthy conclusion possible.

i. **If Law Enforcement Officials Were Required to Issue Concealed Carry Licenses to All Adult Applicants Without a Serious Criminal Record, a Majority of Future Felony Arrestees Would Qualify to Carry Concealed Handguns in Public.**

27. In shall-issue states where authorities are required to issue concealed-carry permits to all

applicants who meet certain minimum conditions, the list of conditions typically includes

a minimum age provision (usually 21) and the list of provisions of the federal Gun

Control Act that limit lawful possession. Those provisions include a prior felony

conviction, a misdemeanor conviction for domestic violence, an involuntary commitment

for mental illness, and a current felony indictment. Of those provisions, the one that is

most consistently documented in computerized databases that are available to law

enforcement authorities in New York State is felony conviction.

28. It is sometimes alleged that most gun crimes are committed by active criminals who can

be readily identified as such. For that reason, it is claimed that issuing concealed-carry

13

permits to applicants who are not identified criminals poses no risk to the public safety. But this claim is false. In particular, the evidence demonstrates that a majority of criminal homicides and other serious crimes are committed by individuals who have not been convicted of a felony.

29. One of the first systematic studies of this subject was conducted using data from Illinois. I, together with two colleagues, found that just 43% of adults arrested for criminal homicide during the 1990s had a felony conviction on their record.[26]

30. Likewise, recent statistics for Westchester County demonstrate that most adults arrested for felony homicide in those counties do not have a prior felony conviction. Over the decade 2000 – 2009, 273 adults were arrested in Westchester County for completed or attempted felony homicide (PL 125), of whom just 111 (41%) had a prior felony conviction. Thus the clear majority of those arrested for felony homicide would have qualified for a concealed-carry permit prior to that arrest *if* the only meaningful condition was the lack of prior felony conviction.

31. I expanded this statistical inquiry to include all adults (age 21 and over) arrested for a felony in Westchester County, and in New York State overall. In 2009, 3,644 individuals were arrested for a felony in Westchester County. Of those, just 1,084 (30%) had a prior felony conviction. One implication is that if Westchester County were required to issue concealed-carry permits to all adult applicants who lacked a felony conviction, then most (70%) of those arrested for a felony in 2009 would have qualified prior to their arrest.

---

26 PJ Cook, J Ludwig, and A Braga "Criminal Records of Homicide Offenders" Journal of the American Medical Association  294(5), August 3, 2005: 598-601.

For all of New York State, just 33% of the 109,705 adults arrested for a felony had a prior felony conviction.

32. These statistics demonstrate that most adults who are arrested for felony homicide would not have been barred from obtaining a permit to carry a concealed firearm prior to that arrest, *if* the only requirements for obtaining a permit were a lack of prior felony conviction (and minimum age). The same conclusion holds for those who are arrested for other felonies.

33. In other words, if the goal is to protect the public against dangerous criminals, then it is not enough to just screen out those with felony convictions. That group constitutes only a minority of future arrestees for serious crimes, including felony homicide.

34. Concealed-carry permit systems in shall-issue states are intended to screen out some other groups besides those with a felony conviction record. Following the federal Gun Control Act requirements for legal gun possession, they typically deny a permit to applicants who are known to have been convicted of misdemeanor domestic violence (or subject to a domestic restraining order), are under indictment for a felony or a fugitive, have been involuntarily committed to a mental institution, are an illegal alien, or are a user of illicit drugs. Unfortunately there are no systematic studies of the prevalence of these disqualifying characteristics among those arrested for serious crime. Furthermore, local officials have only limited access to public records that would identify which applicants have been convicted of domestic violence, or have been involuntarily committed to a private mental institution.

35. In any event, there is good reason to believe that of all the disqualifying conditions, felony conviction is the most common. Statistics from the US Bureau of Justice Statistics

indicate that a felony record is by far the most common characteristic that blocks firearms transfers by firearms dealers when they conduct background checks of buyers.[27]

### j.   Conclusion

36. I conclude that there is a legitimate public purpose in restricting the issuance of permits to carry concealed firearms, and providing local law enforcement officials with some discretion in this regard.  This public purpose is to reduce the incidence of firearms use in violent crime, and thereby reduce the rate of criminal homicide.  A more lenient permit system that entitles all adults who lack a felony record to obtain a permit would qualify the majority of those who are later arrested for a felony.   It is reasonable to conclude that future felons will have greater access to firearms in a shall-issue regime, than in a may-issue regime.

Pursuant to 28 U.S.C. §1746 I declare under penalty of perjury that the foregoing is true and correct.  Executed on January 24th, 2011.

*Php. Cook*
PHILIP J. COOK

---

27 http://bjs.ojp.usdoj.gov/content/pub/html/bcft/2009/bcft09st.pdf, Table 4, accessed January 9, 2011.

# Appendix A

April 17, 2009

## PHILIP JACKSON COOK

ITT/Terry Sanford Professor of Public Policy Studies   Telephone: 919 613-7360
Professor of Economics and Sociology                   FAX:  919 681-8288
Terry Sanford Institute of Public Policy
Box 90245
Duke University                                         E-mail: pcook@duke.edu
Durham, NC 27708

Education:

> B.A. (with high distinction) University of Michigan,1968
> Ph.D. (Economics) University of California, Berkeley, 1973

Positions held:

| | |
|---|---|
| 2008-9 | Schelling Visiting Professor of Public Policy, University of Maryland |
| 2003 | Residency, Bellagio Study and Conference Center (September-October) |
| 2000 | Visiting Scholar, Kennedy School of Government, Harvard University |
| 1997-99 | Director, Sanford Institute of Public Policy; Chair, Department of Public Policy Studies |
| 1994- | ITT/Terry Sanford Professor of Public Policy Studies |
| 1992- | Professor of Public Policy Studies, Economics, & Sociology, Duke University |
| 1989-90 | Visiting Professor, Fuqua School of Business, Duke University |
| 1985-89 | Director, Institute of Policy Sciences and Public Affairs, Duke University and Chairman, Department of Public Policy Studies |
| 1984- | Professor of Public Policy and Economics, Duke University |
| 1979-84 | Associate Professor; 1973-79  Assistant Professor, Duke University |
| 1982 | Expert (part time) Office of Policy and Management Analysis, Criminal Division, U.S. Department of Justice |

Fall 1980          Visiting Scholar, Institute for Research in Social Science, University of
                   North Carolina, Chapel Hill

Fellowships and Academic Honors:
Raymond Vernon Memorial Prize for best paper in *JPAM*, 2008
Richard A. Stubbing Teacher Mentor Award, 2008
Member, Institute of Medicine, National Academy of Sciences, 2001-
*Who's Who in America 2001 and subsequent issues*
Fellow of the American Society of Criminology, 2000-
Vernon Prize for best paper in *Journal of Policy Analysis & Management* (v. 16), 1997
Research Associate, National Bureau of Economic Research 1996-
*Who's Who in Economics* 3rd edition (1996)
Kenneth J. Arrow Award (for best paper published in health economics), 1994
National Science Foundation Fellowship, 1968-1970
Special Career Fellowship (Ford Foundation), 1968-1972
National Merit Scholar, 1964-1968
Sims Award, Economics Department, University of Michigan, 1967
Phi Beta Kappa

<u>Publications</u>

A. Health and Safety Regulation

 1. Books and Edited Volumes

>PJ Cook and JW Vaupel, eds. <u>Law and Contemporary Problems</u>, Autumn 1976.  Issue entitled "Valuing Lives: When and How Should Society Spend its Scarce Resources to Decrease Mortality"

>       <u>Law and Contemporary Problems</u>, Winter 1988.  Editor for issue entitled "Vice."

>       PJ Cook and A Scharff <u>Recommendations Concerning Administration and Rate Structure for Excise Taxation in Romania</u> Distributed by Tax Advisory Program, US Treasury Department, August 1994.

>       <u>Paying the Tab: The Economics of Alcohol Policy</u>  Princeton, NJ: Princeton University Press, 2007.
>       Chapters 10 and 12 serialized in <u>Milken Economic Review</u>  10(1) First Quarter, 2008)

 2. Articles

>       PJ Cook and D Graham "The Demand for Insurance and Protection: The Case of Irreplaceable Commodities" <u>Quarterly Journal of Economics</u>, February 1977, 143-156.  Reprinted in Georges Dionne and Scott Harrington (eds.) <u>Foundations of Insurance Economics</u> Kluwer Academic Press, 1991.

>       "The Value of Human Life in the Demand for Safety: Comment" <u>The American Economic Review</u>, September 1978, 710-711.

>       "Discussion" (on Martin Bailey's paper on Safety Decisions and Insurance) <u>American Economics Association Papers and Proceedings</u>, May 1978, 300.

>       "The Effect of Liquor Taxes on Drinking, Cirrhosis, and Auto Fatalities," in Mark Moore and Dean Gerstein, eds. <u>Alcohol and Public Policy:  Beyond the Shadow of Prohibition</u>, National Academy of Sciences, 1981, 255-285; and in Richard Zeckhauser and Derek Leebaert, eds. <u>What Role for Government</u>? Duke University Press, 1983, 203-220.

>       PJ Cook and G Tauchen "The Effect of Liquor Taxes on Heavy Drinking" <u>Bell Journal of Economics</u>, Autumn 1982, 379-390.

>       "Alcohol Taxes as a Public Health Measure" <u>British Journal of Addiction</u>, September 1982, 245-250; and in Marcus Grant, Martin Plant, and Alan Williams, eds. <u>Economics and Alcohol</u>, Croom Helm Ltd., 1983.

PJ Cook and G Tauchen, "The Effect of Minimum Drinking Age Legislation on Youthful Auto Fatalities, 1970-77" Journal of Legal Studies 13, January 1984, 169-190. *reprinted in* The Economics of Health Behaviours, John H. Cawley and Donald S. Kenkel, eds., Cheltenham, UK: Edward Elgar Publishing Ltd., 2008.

"Increasing the Federal Alcohol Excise Tax" in Dean Gerstein, ed. Toward the Prevention of Alcohol Problems:  Government, Business, and Community Action, National Academy Press, Washington, DC, 1984, 24-32.

"The Economics of Alcohol Consumption and Abuse" in Louis Jolyon West, ed. Alcoholism and Related Problems:  Issues for the American Public, Prentice-Hall, 1984, 56-77.

"The Impact of Distilled Spirits Taxes on Consumption, Auto Fatalities and Cirrhosis Mortality"  Control Issues in Alcohol Abuse Prevention:  Strategies for States and Communities  in Harold D. Holder, ed., Advances in Substance Abuse, Suppl: 1, Jai Press, Greenwich, CT, 1987, Pages 159-167.

"Comment" in John D. Graham (ed.) Preventing Automobile Injury:  New Findings for Evaluation Research, Dover, MA:  Auburn House Publishing Company, 1988, pp. 181-183.

DC Chapman, PJ Cook *et al.* "The Cultural Dimensions of Alcohol Policy Worldwide", Health Affairs, summer 1989, 48-62.

"The Social Costs of Drinking," in The Expert Meeting on the Negative Social Consequences of Alcohol Abuse Norewegian Ministry of Health and Social Affairs, Oslo, Norway, 1991.

PJ Cook and MJ Moore "Taxation of Alcoholic Beverages" in M. Hilton and G. Bloss, eds. Economic Research on the Prevention of Alcohol-Related Problems, NIAAA, NIH Publication No. 93-3513, 1993, 33-58.

PJ Cook and MJ Moore "Economic Perspectives on Reducing Alcohol-Related Violence" in Susan E. Martin, ed. Alcohol and Interpersonal Violence: Fostering Multidisciplinary Perspectives NIH Publication No. 93-3496, 1993, 193-212.

PJ Cook and MJ Moore "Violence Reduction through Restrictions on Alcohol Availability" Alcohol Health & Research World 17(2), 1993, 151-156.

PJ Cook and MJ Moore "Drinking and Schooling" Journal of Health Economics, 12, 1993, 411-429. *reprinted in* The Economics of Health Behaviours, John H. Cawley and Donald S. Kenkel, eds., Cheltenham, UK: Edward Elgar Publishing Ltd., 2008.

P.J. Cook and O-J Skog, "*Alcool, alcoolisme, alcoolisation*" by S. Ledermann" Alcohol Health & Research World 19(1), 1995, 30-32.

"Social Costs of Alcohol, Tobacco and Drug Abuse" and  "Tax Laws, Alcohol" in J.H. Jaffe, ed. The Encyclopedia of Drugs and Alcohol, New York: Macmillan Publishing Co, 1996.

"Comment" in Brookings Papers on Economic Activity: Microeconomics, 1994 162-166.

PJ Cook and MJ Moore "This Tax's for You" National Tax Journal September 1994, pp. 559-573.

KE Warner, PJ Cook, et al. "Criteria for Determining an Optimal Cigarette Tax: the Economists' Perspective" Tobacco Control Winter 1995 4(4), 380-86.

PJ Cook, A Parnell, MJ Moore, D Pagnini. "The Effects of Short-Term Variation in Abortion Funding on Pregnancy Outcomes" Journal of Health Economics 1999 18(2), 241-258. reprinted in The Economics of Health Behaviours,  John H. Cawley and Donald S. Kenkel, eds., Cheltenham, UK: Edward Elgar Publishing Ltd., 2008.

PJ Cook and MJ Moore, "Alcohol" in AJ Culyer and JP Newhouse, eds. Handbook of Health Economics Vol 1B (New York: North-Holland) 2000, 1629-1673.

PJ Cook and MJ Moore, "Environment and Persistence in Youthful Drinking Patterns" in J Gruber, ed. Risky Behavior Among Youths: An Economic Analysis (Chicago: University of Chicago Press), 2001, 375-437.

PJ Cook and MJ Moore, "The Economics of Alcohol Abuse and Alcohol-Control Policies" Health Affairs 21(2), March/April 2002: 120-133.

"Pricing and Taxation of Alcohol: What is the 'Right' Tax Rate?  Comment on Alcohol: No Ordinary Commodity" Addiction, 98 (10), October 2003: 1356-7.

PJ Cook, J Ostermann, and FA Sloan "The Net Effect of an Alcohol Tax Increase on Death Rates in Middle Age" American Economic Review 95(2), May 2005: 278-281.

PJ Cook and P Reuter "When is Alcohol Just Another Drug" Addiction 102, June 2007: 1182-88.

PJ Cook and R Hutchinson "Smoke Signals: Adolescent Smoking and School Continuation" in Marina Bianchi (ed.) Advances in Austrian Economics Vol. 10, The Evolution of Consumption: Theories and Practices  2007: 157-188.

C Carpenter and PJ Cook "Cigarette Taxes and Youth Smoking: New Evidence from National, State, & Local Youth Risk Behavior Surveys" Journal of Health Economics 27(2), March 2008: 287-299.

"A Free Lunch" Journal of Drug Policy Analysis 1(1), article 2.

http://www.bepress.com/jdpa/vol1/iss1/art2

Comment on "Explaining change and stasis in alcohol consumption"
17:6 of Addiction Research & Theory Journal 17:6, December 2009.

"Leave the minimum drinking age to the states" in Natasha A. Frost, Joshua D. Freilich,
and Todd R. Clear (eds.) Contemporary Issues in Criminal Justice Policy Belmont, MA:
Wadsworth: 99-106.

3. Editorial

"Increasing the Federal Excise Taxes on Alcoholic Beverages" Journal of Health
Economics 7(1), March 1988, 89-91.

B. Economics of State Lotteries

1. Book

CT Clotfelter and PJ Cook Selling Hope:  State Lotteries in America Harvard University
Press, 1989. Paperback edition, 1991.

2. Articles

CT Clotfelter and PJ Cook "Implicit Taxation in Lottery Finance" National Tax Journal,
December, 1987

CT Clotfelter and PJ Cook "Redefining 'Success' in the State Lottery Business" Journal
of Policy Analysis and Management 9(1), Winter 1990, 99-104.

CT Clotfelter and PJ Cook "On the Economics of State Lotteries" Journal of Economic
Perspectives, Fall, 1990, 105-120.
Reprinted (in shorter version) in The Conference Board Economic Times 2(4), April
1991.  Reprinted (in revised version) in Samuel H. Baker and Catherine S. Elliott, eds.
Readings in Public Finance 2nd ed., Cincinnati: South-Western College Publishers, 1997,
457-472.

CT Clotfelter and PJ Cook "What Kind of Lottery for North Carolina?" Popular
Government 56(4), Spring 1991, pp. 25-29.

CT Clotfelter and PJ Cook "Lotteries in the Real World", Journal of Risk and Uncertainty
4(3), July 1991, 227-232.

CT Clotfelter and PJ Cook "Lotteries", in Peter Newman, Murray Milgate, and John
Eatwell, eds. The New Palgrave Dictionary of Money and Finance Macmillan Press,
London, 1992.

PJ Cook and CT Clotfelter "The Peculiar Scale Economics of Lotto" <u>American Economic Review</u>, June 1993, 634-643.

CT Clotfelter and PJ Cook "The Gambler's Fallacy in Lottery Play", <u>Management Science</u>, December 1993.

CT Clotfelter, PJ Cook, J Edell, and M Moore, State Lotteries at the Turn of the Century: Report to the National Gambling Impact Study Commission. June 1, 1999.

CT Clotfelter and PJ Cook, "Ends and Means in State Lotteries: The Importance of a Good Cause" in Alan Wolfe and Erik C. Owens, eds. <u>Gambling: Mapping the American Moral Landscape</u> Waco: Baylor University Press, 2009, 11-38.

3. OpEd. Pieces (with Charles T. Clotfelter)

<u>New York Times</u>, August 20, 1987;
<u>The Atlanta Constitution</u>, February 12, 1989;
<u>The News and Observer</u> (Raleigh), May 27, 1990;
<u>Newsday</u>, July 24, 1990;
<u>San Diego Union</u>, April 1991.
<u>The News & Observer</u> (Raleigh), February 14, 1999
<u>The News & Observer</u> (Raleigh), March 1, 2007

C. Crime and Criminal Justice Policy

1. Monographs

<u>Robbery in the United States</u>, National Institute of Justice, September 1983.

PJ Cook and D Slawson <u>The Costs of Adjudicating Murder Cases in North Carolina</u> Administrative Office of the Courts, Raleigh, NC, 1993.

2. Symposium editor

"Explaining the growth in the prison population" <u>Criminology and Public Policy</u> 8(1), February 2009.

2. Articles

"The Correctional Carrot: The Prospect of Reducing Recidivism through Improved Job Opportunities" <u>Policy Analysis</u>, January 1975, 11-54.
*Reprinted* in *The Economics of Crime*, edited by Isaac Ehrlich and Zhiquiang Liu Northampton, MA: Edward Elgar Publishing, Inc., 2006.

"Punishment and Crime: A Critique of Recent Findings on the Preventive Effects of Punishment" <u>Law and Contemporary Problems</u>, Winter 1977, 164-204; and in Ralph Andreano and John Siegfried, eds. <u>The Economics of Crime</u>, John Wiley, 1980, 137-180.

"The Clearance Rate as a Measure of Criminal Justice System Effectiveness" <u>Journal of Public Economics</u> 11, 1979, 135-142; and in Egon Bittner and Sheldon L. Messinger, eds. <u>Criminology Review Yearbook</u>, Volume 2, Sage Publications, 1980.

"The Implications of Deterrence and Incapacitation Research for Policy Evaluation" in Cleon Foust and Robert Webster, eds. <u>An Anatomy of Criminal Justice</u>, D.C. Health, Lexington, 1980, 55-77.

"Research in Criminal Deterrence: Laying the Groundwork for the Second Decade" in Norval Morris and Michael Tonry, eds.  <u>Crime and Justice:  An Annual Review of Research, Volume 2</u>, University of Chicago, 1980, 211-268.

"Costs of Crime" in Sanford H. Kadish, ed. <u>Encyclopedia of Crime and Justice,</u> Macmillan Publishing Company, 1983.

"The Use of Criminal Statutes to Regulate Product Safety: Comment on Wheeler" <u>Journal of Legal Studies</u>, August 1984, 619-622.

PJ Cook and G Zarkin "Crime and the Business Cycle" <u>Journal of Legal Studies</u>, January 1985.

JQ Wilson and PJ Cook "Unemployment and Crime--What is the Connection?" <u>The Public Interest</u>, 79, Spring, 1985, 3-8.

PJ Cook and G Zarkin "Homicide and Economic Conditions" <u>Journal of Quantitative Criminology</u>, March 1986, Vol. 2, No. 1.

"The Demand and Supply of Criminal Opportunities" in Michael Tonry and Norval Morris, eds. <u>Crime and Justice:  An Annual Review of Research</u>, Vol. 7, University of Chicago Press, 1986, 1-28.

"Criminal Incapacitation Effects Considered in an Adaptive Choice Framework" in Derek Cornish and Ron Clarke, eds. <u>The Reasoning Criminal</u>, New York: Springer-Verlag, 1986, 202-216.

PJ Cook and JH Laub "The (Surprising) Stability of Youth Crime Rates" <u>Journal of Quantitative Criminology</u> 2 (3) September 1986, 265-278.

"The Economics of Criminal Sanctions" in Martin L. Friedland (ed.) <u>Sanctions and Rewards in the Legal System</u>, University of Toronto Press, 1987.

PJ Cook and JH Laub "Trends in Child Abuse and Juvenile Delinquency" in Francis X. Hartman, ed. <u>From Children to Citizens:  The Role of the Juvenile Court</u>, Springer-Verlag, New York, 1987, Vol. II, Chapter 7, pp.109-127.

"Notes on an Accounting Scheme for a Juvenile Correctional System" in Francis X. Hartman (ed.) From Children to Citizens: The Role of the Juvenile Court, Springer-Verlag, New York, 1987, Vol. II, Chapter 19, pp. 362-370.

PJ Cook and J Laub, "The Unprecedented Epidemic in Youth Violence" in Michael Tonry and Mark H. Moore eds., Youth Violence University of Chicago Press, 1998, 101-138.

PJ Cook, "The Epidemic of Youth Gun Violence" Perspectives on Crime and Violence: 1997-1998 Lecture Series (Washington, DC: National Institute of Justice), 1998, 107-125.

"Forward" to BC Welsh, DP Farrington, and LW Sherman (eds.) Costs and Benefits of Preventing Crime (Boulder, CO; Westview Press) 2001.

PJ Cook and JH Laub, "After the Epidemic: Recent Trends in Youth Violence in the United States" in Michael Tonry ed. Crime and Justice: A Review of Research Chicago, University of Chicago Press, 2002: 117-153.

"Meeting the Demand for Expert Advice on Drug Policy" Criminology and Public Policy 2(3), July 2003: 565-570.

"Comment" on "Catching Cheating Teachers" in William G. Gale and Janet Rothenberg Pack, eds., Brookings-Wharton Papers on Urban Affairs 2003 Washington, DC: Brookings Institution Press, 2003: 210-215.

PJ Cook and N Khmilevska, "Cross-National Patterns in Crime Rates" in Michael Tonry and David P. Farrington, eds. Crime and Punishment in Western Countries, 1980-1999 Chicago: University of Chicago Press, 2005: 331-345.

PJ Cook and J Ludwig "Assigning Youths to Minimize Total Harm" in Kenneth A. Dodge, Thomas J. Dishion, and Jennifer E. Lansford (eds.) Deviant Peer Influences in Programs for Youth: Problems and Solutions The Guilford Press, 2006: 67-89.

"Symposium on Deterrence: Editorial Introduction" Criminology & Public Policy 5(3), August       2006: 413-416.

"Crime" in Robert P. Inman, ed. MAKING CITIES WORK: Prospects and Policies for Urban America Princeton University Press, 2009: 297-327.

"Robbery" in Michael Tonry (ed.) Handbook on Crime and Justice Oxford University Press, 2009.

Crime Control in the City: A Research-Based Briefing on Public and Private Measures Cityscape: A Journal of Policy Development and Research 11(1), March, 2009: 53-80.

Potential Savings from Abolition of the Death Penalty in North Carolina  <u>American Law and Economics Review</u> 10, 2009: doi: 10.1093/aler/ahp022.

D.   Weapons and Violent Crime
1.   Monographs and Edited Volumes

PJ Cook and D Nagin <u>Does the Weapon Matter?  An Evaluation of a Weapon - Emphasis Policy in the Prosecution of Violent Offenders</u> Institute of Law and Social Research, Washington, DC, 1979.

<u>Annals</u> of the American Academy of Political and Social Science, May 1981.  Issue entitled "Gun Control" (special editor).

PJ Cook and J Ludwig <u>Guns in America: Results of a Comprehensive National Survey on Firearms Ownership and Use</u> Washington, D.C.: The Police Foundation, 1997.

<u>Law and Contemporary Problems</u> (special editor) "Kids, Guns, and Public Policy" 59(1): Winter 1996.

PJ Cook and J Ludwig <u>Gun Violence: The Real Costs</u> New York: Oxford University Press, 2000.

J Ludwig and PJ Cook (eds.) <u>Evaluating Gun Policy: Effects on Crime and Violence</u> Washington, DC: Brookings Institution Press, 2003.

2.   Articles

"A Strategic Choice Analysis of Robbery" in Wesley Skogan (ed.) <u>Sample Surveys of the Victims of Crimes</u>, Ballinger, 1976, 173-187.

"Causal Linkages between Gun Control Ordinances and Crime: A Conceptualization and Review of the Literature" <u>Hearings</u> on the Treasury Department's proposed gun regulations, before the Subcommittee on Crime, Committee on the Judiciary, U.S. House of Representatives, 95th Congress, 2nd Session, Appendix 4, May 4 and 18, 1978.

"The Effect of Gun Availability on Robbery and Robbery Murder:  A Cross-Section Study of Fifty Cities" <u>Policy Studies Review Annual</u>, Volume 3, Sage Publications, 1979, pp. 743-781.  Also published in <u>Hearings</u>; see above.

"Reducing Injury and Death Rates in Robbery" <u>Policy Analysis,</u> 6(1) Winter 1980, 21-45.

PJ Cook and J Blose "State Programs for Screening Handgun Buyers" <u>Annals</u> of the American Academy of Political and Social Science, May 1981, 80-91. Reprinted in M. Gittell, ed. <u>State Politics and the New Federalism</u> ( NY: Longman, 1986).

"The Effect of Gun Availability on Violent Crime Patterns," Annals of the American Academy of Political and Social Science, May 1981; and in Federal Regulation of Firearms (A Report prepared by Congressional Research Service for the U.S. Senate Judiciary Committee) USGPO, May 1982; and in Neil Alan Weiner, Margaret A. Zahn and Rita J.Sagi, eds., Violence: Patterns, Causes, Public Policy (San Diego: Harcourt Brace Jovanovich, 1990).

PJ Cook and K Hawley "North Carolina's Pistol Permit Law: An Evaluation" Popular Government, May 1981, 1-6.

"Guns and Crime: the Power of Long Division" Journal of Policy Analysis and Management, Fall 1981, 120-125.

"The 'Saturday Night Special': An Assessment of Alternative Definitions from a Policy Perspective" Journal of Criminal Law and Criminology 72:4, Winter 1981, 1735-1745.

"The Role of Firearms in Violent Crime" in Marvin E. Wolfgang and Neil A. Weiner, eds. Criminal Violence (Sage Publications, 1982), 236-289; also titled "The Influence of Gun Availability on Violent Crime Patterns" in Norval Morris and Michael Tonry, eds. Crime and Justice: An Annual Review of Research, Volume 4, University of Chicago Press, 1983, 49-90.

"The Case of the Missing Victims: Gunshot Woundings in the National Crime Survey" Journal of Quantitative Criminology, March 1985, 91-102.

"Is Robbery Becoming More Violent? An Analysis of Robbery Murder Trends Since 1968" Journal of Criminal Law and Criminology, 76 (2), Summer 1985, 480-489.

"The Relationship Between Victim Resistance and Injury in Noncommercial Robbery" Journal of Legal Studies, XV (1), June 1986, 405-416.

"Robbery Violence" Journal of Criminal Law & Criminology, 70(2), 1987, 357-376. Reprinted in Robert Hornsby and Richard Hobbs (eds.) Gun Violence Ashgate Publishing Ltd. Forthcoming.

"The Technology of Personal Violence" in Michael Tonry, ed. Crime and Justice: An Annual Review of Research Vol. 14, University of Chicago Press, 1991. Reprinted (in part) in Lee Nisbet (ed.) The Gun Control Debate: You Decide 2nd ed. (Chicago: Prometheus Books, 2001).

"Notes on the Availability and Prevalence of Firearms" American Journal of Preventive Medicine 9(3,supp), 1993.

PJ Cook and MH Moore "Gun Control" in James Q. Wilson and Joan Petersilia, eds. Crime (San Francisco: ICS Press, 1995), 267-294.

PJ Cook, S Molliconi, and T Cole "Regulating Gun Markets" Journal of Criminal Law & Criminology 86(1), 1995, 59-92.

PJ Cook and T Cole "Editorial: Strategic Thinking About Gun Markets and Violence" Journal of the American Medical Association 275(22), June 12, 1996, 1765-7.

PJ Cook and J Leitzel "Perversity, Futility, Jeopardy: An Economic Analysis of the Attack on Gun Control" Law and Contemporary Problems 59(1): Winter 1996: 91-118.

PJ Cook, J Ludwig, and D Hemenway, "The Gun Debate's New Mythical Number: *How* Many Defensive Uses Per Year" Journal of Policy Analysis and Management 16(3) Summer 1997, 463-9.

PJ Cook and J Leitzel, "Gun Control" New Palgrave Dictionary of Economics and Law, 1998.

J Ludwig, PJ Cook, and TW Smith, "The Gender Gap in Reporting Household Gun Ownership" American Journal of Public Health, v. 88, no. 11, Nov. 1998: 1715-1718.

PJ Cook and MH Moore, "Guns, Gun Control, and Homicide: A Review of Research and Public Policy" in M. Dwayne Smith and Margaret A. Zahn, eds., Homicide: A Sourcebook of Social Research Sage Publications, 1998, 277-296. Also in M. Dwayne Smith and Margaret A. Zahn, eds., Studying and Preventing Homicide: Issues and Challenges, Sage Publications, 1998, 246-273.

PJ Cook and J Ludwig, "Defensive Gun Uses: New Evidence from a National Survey" Journal of Quantitative Criminology 14(2), 1998: 111-131 .

SP Teret, DW Webster, JS Vernick, TW Smith, D Leff, GJ Wintemute, PJ Cook, DF Hawkins, AL Kellermann, SB Sorenson, S DeFrancesco, "Support for New Policies to Regulate Firearms: Results of two national surveys" New England Journal of Medicine 339, Sept. 17, 1998: 813-818.

AL Kellermann and PJ Cook, "Armed and Dangerous: Guns in American Homes" in MA Bellesiles, ed., Lethal Imagination: Violence and Brutality in American History New York University Press, 1999, 425-440.

PJ Cook, B Lawrence, J Ludwig, and T Miller, "The Medical Costs of Gunshot Wounds" Journal of the American Medical Association 282(5), August 4, 1999, 447-454.

J Ludwig and PJ Cook, "Homicide and Suicide Rates Associated with Implementation of the Brady Handgun Violence Prevention Act" Journal of the American Medical Association 284(5), August 2, 2000: 585-591.

J Ludwig and PJ Cook, "The Benefits of Reducing Gun Violence: Evidence from Contingent-Valuation Survey Data" Journal of Risk and Uncertainty 22(3), 2001: 207-226.

PJ Cook, MH Moore, and A Braga, "Gun Control" in James Q. Wilson and Joan Petersilia, eds. Crime: Public Policies For Crime Control, ICS Press, Oakland CA., 2002: 291-329.

PJ Cook and A Braga, "Comprehensive Firearms Tracing: Strategic and Investigative Uses of New Data on Firearms Markets" Arizona Law Review 43(2) 2001:277-309. *Reprinted with minor changes as* "New Law Enforcement Uses for Comprehensive Firearms Trace Data" in Bernard E Harcourt (ed.) Guns, Crime, and Punishment New York: NYU Press, 2003: 163-187.

PJ Cook and JA Leitzel, "'Smart' Guns: A Technological Fix for Regulating the Secondary Gun Market" Contemporary Economic Problems 20(1) January 2002: 38-49.

PJ Cook and J Ludwig, "The Costs of Gun Violence Against Children" The Future of Children 12(2), Summer/Fall 2002: 87-99.

PJ Cook and J Ludwig, "Litigation as Regulation: Firearms" WK Viscusi, ed. Regulation Through Litigation Washington, DC: Brookings Institution Press, 2002: 67-93
AA Braga, PJ Cook, DM Kennedy, and MH Moore "The Illegal Supply of Firearms" in Michael Tonry ed. Crime and Justice: A Review of Research Chicago, University of Chicago Press, 2002: 229-262.

PJ Cook and J Ludwig, "The Effects of Gun Prevalence on Burglary: Deterrence vs Inducement" in J Ludwig and PJ Cook (eds.) Evaluating Gun Policy Washington, DC: Brookings Institution Press, 2003: 74-118.

PJ Cook and J Ludwig, "Pragmatic Gun Policy" in J Ludwig and PJ Cook (eds.) Evaluating Gun Policy Washington, DC: Brookings Institution Press, 2003: 1-37.

PJ Cook and J Ludwig, "The Effects of the Brady Act on Gun Violence" in BE Harcourt (ed.) Guns, Crime, and Punishment in America New York: NYU Press, 2003: 283-298. *reprinted in* Steven D. Levitt and Thomas J. Miles (eds.) Economics of the Criminal Law Edward Elgar Publishing, 2007.

PJ Cook and Jens Ludwig "Fact-Free Gun Policy" University of Pennsylvania Law Review 151(4), April 2003: 1329-1340.

D Azrael, PJ Cook, and M Miller "State and Local Prevalence of Firearms Ownership: Measurement, Structure, and Trends" Journal of Quantitative Criminology 20(1) March 2004: 43-62.

PJ Cook and J Ludwig "Does Gun Prevalence Affect Teen Gun Carrying After All?" Criminology 42(1) February 2004: 27-54.

"Youths' Involvement with Guns: Motivation vs. Availability" Archives of Pediatrics & Adolescent Medicine July, 2004: 705.

PJ Cook and J Ludwig "Principles for Effective Gun Policy" Fordham Law Review 73(2), November, 2004: 589-613.

PJ Cook, J Ludwig, and A Braga "Criminal Records of Homicide Offenders" Journal of the American Medical Association 294(5), August 3, 2005: 598-601.

GJ Wintemute, PJ Cook, and M Wright "Risk Factors among Handgun Retailers for Frequent and Disproportionate Sales of Guns Used in Violent and Firearm-Related Crimes" Injury Prevention December, 2005: 357-363.

PJ Cook and J Ludwig "The Social Costs of Gun Ownership" Journal of Public Economics 90(1-2), January 2006: 379-391.

PJ Cook and SB Sorenson "The Gender Gap Among Teen Survey Respondents: Why are Boys more Likely to Report a Gun in the Home than Girls?" Journal of Quantitative Criminology 22(1) March, 2006: 61-76.

PJ Cook and J Ludwig "Aiming for evidence-based gun policy" Journal of Policy Analysis and Management 25(3), Summer 2006: 691-735.

"Use and Control of Firearms" Encyclopedia of Law & Society, Sage Publications, Inc., 2007.

PJ Cook, J Ludwig, SA Venkatesh, and AA Braga "Underground Gun Markets" The Economic Journal, 117 (524) November, 2007: 588-618.

SB Sorenson and PJ Cook "'We've Got a Gun?': Comparing Reports of Adolescents and their Parents about Household Firearms" Journal of Community Psychology 36(1), January 2008: 1-19.

PJ Cook and J Ludwig "Firearms Violence" in Michael Tonry (ed.) Handbook on Crime and Justice Oxford University Press, 2009.

PJ Cook, J Ludwig, and AM Samaha "Gun Control After Heller: Threats and Sideshows from a Social Welfare Perspective" UCLA Law Review 56(5), June 2009: 1041-1093.

PJ Cook, W Cukier, and K Krause "The Illicit Firearms Trade in North America" Criminology and Criminal Justice 9(3) 2009: 265-286.

3. OpEd Pieces

"Making Handguns Harder to Hide, <u>The Christian Science Monitor</u>, May 29, 1981.

PJ Cook and J Ludwig "Has the Brady Act Been Successful?" <u>The Charlotte Observer</u> August 15, 2000.

PJ Cook and J Ludwig "Toward Smarter Gun Laws" <u>The Christian Science Monitor</u> Feb. 6, 2001.

PJ Cook and J Ludwig "Protecting the Public in Presidential Style" <u>News & Observer</u> June 10, 2001.

PJ Cook and J Ludwig "What did the sniper case teach us?  Lessons in Gun Control" <u>News & Observer</u> Nov. 3, 2002, 25A.

PJ Cook and J Ludwig  "Will wider availability of guns improve public safety?  No" <u>CQ Researcher</u> Oct. 31, 2008.

E. Income Distribution

1. Book

RH Frank and PJ Cook <u>The Winner-Take-All Society</u> (New York: The Free Press, 1995). Named a "Notable Book of the Year, 1995" by the *New York Times Book Review;* named one of the ten Best Business Books of 1995 by *Business Week*; given The Critics' Choice Award 1995-96 by the *San Francisco Review of Books*.  Paperback edition (Penguin Books, 1996). Named "One of Ten best books of the year, 1996" by *The China Times*. Portuguese, Korean, Chinese, and Japanese editions.

RH Frank and PJ Cook  "Preface to the new edition"  <u>The Winner-Take-All Society</u> (London:  Virgin Books, Random House, 2010).

2. Article

PJ Cook and RH Frank "The Growing Concentration of Top Students at Elite Schools" in Charles T. Clotfelter and Michael Rothschild, eds. <u>Studies of Supply and Demand in Higher Education</u> (Chicago: University of Chicago Press, 1993).

PJ Cook and RH Frank "The Economic Payoff of Attending an Ivy-League Institution" in Richard Delgado and Jean Stefancic, eds., <u>Critical White Studies: Looking Behind the Mirror</u> Temple University Press, 1997.

RH Frank and PJ Cook "The winner-take-all society" in William Darity, ed., The International Encyclopedia of the Social Sciences, 2nd ed. Gale, 2007.

3. OpEd and Magazine Articles (with Robert Frank)
    *USA Today*, October 9, 1995, p. 13A
    *Washington Post*, November 12, 1995
    *Washington Monthly*, December 1995
    *Chronicle of Higher Education*, January 5, 1996

F. Other topics

"A 'One Line' Proof of the Slutsky Equation" The American Economic Review, March 1972, 139.

PJ Cook and Robert H. Frank "The Effect of Unemployment Dispersion on the Rate of Wage Inflation" Journal of Monetary Economics 1, 1975, 241-249.

PJ Cook and JW Vaupel "What Policy Analysts Do: Three Research Styles" Journal of Policy Analysis and Management, 4 (3) Spring, 1985, 427-8.

PJ Cook and J Ludwig "Weighing the Burden of 'Acting White'; Are there Race Differences in Attitudes Towards Education?" Journal of Policy Analysis and Management 16(2), Spring 1997, 256-278. (Winner of the Vernon Prize for best paper in Volume 16)

PJ Cook and Jens Ludwig "The Burden of 'Acting White:' Do Black Adolescents Disparage Academic Achievement?" in Christopher Jencks and Meredith Phillips (eds.) The Black-White Test Score Gap Brookings Institution Press, Washington DC, 1998: 375-400. Reprinted in Minority status, Oppositional Culture and Academic Engagement John U. Ogbu, Ed. New York: RoutledgeFarmer, forthcoming.

PJ Cook, R MacCoun, C Muschkin, and J Vigdor "The Negative Impacts of Starting Middle School in Sixth Grade" Journal of Policy Analysis and Management Winter 2008, 104-121. (winner of the Raymond Vernon Memorial Prize, 2008)

"Acting White" in William Darity, ed. International Encyclopedia of the Social Sciences, 2nd ed. Gale, 2007.

R MacCoun, PJ Cook, C Muschkin, and J Vigdor "Distinguishing Spurious and Real Peer Effects: Evidence from Artificial Societies, Small-Group Experiments, and Real Schoolyards" Review of Law and Economics 4(3), 2008: 695-714.

Book reviews

Of Jack P. Gibbs, Crime, Punishment, and Deterrence in Contemporary Psychology 21:5, 1976.

Of Kenneth Dolbeare (ed.) Public Policy Evaluation in Policy Analysis, Fall 1977, 604-606.

Of David T. Stanley, Prisoners Among Us in Policy Analysis, Winter 1978, 139-141.

Of John Heineke, Economic Models of Criminal Behavior in Southern Economic Journal, April 1980, 1255-1257 (with Anne Witte).

Of Laurence Ross, Deterring the Drinking Driver in Journal of Health Politics, Policy, and Law, Winter 1983, 958-961; and in Popular Government, Winter 1983, 37-38.

Of Robert H. Frank, Choosing the Right Pond: Human Behavior and the Quest for Status in Journal of Policy Analysis and Management, Fall 1986.

Of Michael D. Laurence, John R. Snortum, and Franklin Zimring. eds., Social Control of the Drinking Driver, in Science, July 29, 1988.

Of Michael Tonry and Norval Morris, eds., Drugs and Crime in Journal of Policy Analysis and Management 10(3), Summer 1991.

Of Mark A.R. Kleiman, Against Excess: Drug Policy for Results; and Franklin E. Zimring and Gordon Hawkins, The Search for Rational Drug Control Policy in Journal of Policy Analysis and Management 11(4), Fall 1992.

Of H. Laurence Ross, Confronting Drunk Driving: Social Policy for Saving Lives in Journal of Health Politics, Policy and Law 18(1) Spring 1993, 235-237.

Of Willard Manning et al, The Costs of Poor Health Habits in Policy Currents 2(4), Nov. 1992.

Of Gary Kleck, Point Blank: Guns and Violence in America in New England Journal of Medicine February 3, 1994.

Of Robert L. Rabin and Stephen D. Sugarman, eds., Smoking Policy: Law Politics and Culture in Science 262, December 10, 1993.

Of Trudy Ann Karlson and Stephen W. Hargarten, Reducing Firearm Injury and Death: A public health sourcebook on guns in New England Journal of Medicine, February 5, 1998.

Of Tyler Cowen, <u>What Price Fame?</u> in <u>Journal of Economic Literature</u> September 2001, 933-935.

Of Felix Gutzwiller and Thomas Steffen, <u>Cost-Benefit Analysis of Heroin Maintenance Treatment</u> in <u>Addiction</u> 2001, v. 96, 1071-2.

Of Robert J. MacCoun and Peter Reuter <u>Drug War Heresies</u> in <u>Journal of Policy Analysis and Management</u> v. 21(2), Spring 2002, 303-306.

Of James B. Jacobs <u>Can Gun Control Work?</u> in <u>Journal of Policy Analysis and Management</u> 23(1), Winter 2004, 198-201.

Of S. Selvanathan and E.A. Selvanathan <u>The Demand for Alcohol, Tobacco, and Marijuana: International Evidence</u> in <u>Addiction</u> 102, 2007: 830.

Of Harold Winter <u>The Economics of Crime: An introduction to rational crime analysis</u> in <u>Journal of Economic Literature</u> v. 47: Sept. 2009.

<u>Unpublished monographs</u>

"The Effect of Legitimate Opportunities on the Probability of Parolee Recidivism," Institute of Policy Sciences and Public Affairs, Duke University, 1973.

"Citizen Cooperation with the Criminal Justice System," Institute of Policy Sciences and Public Affairs, Duke University, 1976.

"A Summary of State Legal Codes Governing Juvenile Delinquency Proceedings" (with Joseph Austin and Richard Levi), Institute of Policy Sciences and Public Affairs, Duke University, 1977.

"Life, Liberty, and the Pursuit of Self Hazardous Behavior" (with James Vaupel), Institute of Policy Sciences and Public Affairs, Duke University, 1978.

"Regulating Handgun Transfers: Current State and Federal Procedures, and an Assessment of the Feasibility and Cost of the Proposed Procedures in the Handgun Crime Control Act of 1979" (with James Blose), Institute of Policy Sciences and Public Affairs, Duke University, 1980.

<u>Selected Research grants</u>

Principal investigator, "Evaluating Policy Options to Increase Citizen Cooperation in Urban Law Enforcement," A Durham Observatory Project, 1975.

Principal investigator, "The Processing of Gun Crimes in D.C. District Court," Institute of Law and Social Research, 1977.

Principal investigator, "Empirical Studies of Robbery and Handgun Control," U.S. Department of Justice.

Principal investigator, "Evaluating Alternative Policy Strategies for Controlling the Distribution of Handguns" (with Mark Moore), Ford Foundation, 1977-79.

Principal investigator, "A Review of the Major Gun Regulation Proposals," Center for the Study and Prevention of Handgun Violence, 1979-80.

Principal investigator, "A Review of Robbery Literature," National Institute of Justice, 1981.

Principal investigator, "Robbery Violence," National Institute of Justice, 1983-85.

Principal investigator, "Vice,"  The Chicago Resource Center, 1987

Principal investigator, "Costs of the Death Penalty in North Carolina," NC Administrative Office of the Courts, 1991-93.

Principal investigator, "Causes and Effects of Youthful Drinking," National Institute on Alcohol Abuse and Alcoholism, 1992-1994.

Principal investigator, "Markets for Stolen Guns," Harry Frank Guggenheim Foundation, 1993-4.

Principal investigator, "The Costs of Gunshot Wounds," The Joyce Foundation, 1997-99.

Principal investigator, "Community Gun Prevalence and Crime," The Joyce Foundation, 2000-2003.

Investigator Award In Health Policy Research, Robert Wood Johnson Foundation, 2003-4.

Principal Investigator, "evaluations of two programs in Milwaukee designed to reduce serious criminal violence" Joyce Foundation, 2007-2008.

Principal Investigator, "Fiscal Costs of Capital Punishment in NC" Z. Smith Reynolds Foundation, 2007-2008.

Principal Investigator, "An Experimental Evaluation of the Milwaukee Prisoner Re-entry Program" Smith Richardson Foundation, 2008-2011.

Service and Administrative Activities at Duke University

Director of Undergraduate Studies, Institute of Policy Sciences and Public Affairs, 1974-75, 1992.

Director of Graduate Studies, Institute of Policy Sciences and Public Affairs, 1977-79, 1984, and 1994-95.

Chairman, Graduate Curriculum Committee, Institute of Policy Sciences and Public Affairs, 1977-79.

Member, Undergraduate Faculty Council of Arts and Sciences, 1977-78, 1991-93.

Author of an evaluation of undergraduate admission policy, commissioned by the Undergraduate Faculty Council, 1978.

Member, Academic Council, Duke University, 1978-79, 1982-84, 1993-95, 1998-2000 Elected to the Executive Committee of the Academic Council, 1982-83.

Associate Director, Institute of Policy Sciences and Public Affairs, 1979-1985, 2005-.

Pre-Major Advisor, 1981-85.

Member, UFCAS Committee on Admissions, 1984-86.

Member, University Committee on Undergraduate Admissions and Financial Aid, 1986 - 87.

Author of a special report on predicting yields from undergraduate admissions, 1987.

Member, Dean White's Ad Hoc Committee on Undergraduate Internships, 1987.

Member, President's Administrative Oversight Committee, 1987-90.

Chairman, Public Policy Studies Committee on Appointments and Promotion, 1990-93.

Chair, Provost's committee to review Dean Earl Dowell for reappointment, 1992.

Member, Arts and Sciences Committee on Planning and Priorities, 1993-95. Chair, 1994-95.

Member, Dean Search Committee, Fuqua School of Business, 1994.

Chair, PPS Diversity Committee, 1994-95.

Member, Executive Committee of the Graduate School, 1995-96

Member, steering committee, Child and Family Policy initiative, 1999

Member, Dean's Search Committee, Duke Law School, 1999

Member, Planning Committee, Institute for Genome Sciences and Policy, 1999

Chair, Arts & Sciences Council Task Force on the Budget, 2001-2

Public and Professional Service

Chairman, Weapons and Violent Crime Workshop, NILECJ, LEAA, U.S. Department of Justice, February 1978.

Presenter, N.C. Governor's Crime Commission, June and September, 1979.

Panel member, National Research Council Study of Alternative Policies Affecting the Prevention of Alcohol Abuse and Alcoholism, 1978-1981.

Member, N.C. Governor's Task Force on Drunken Driving, 1982.

Member, Ad Hoc Workshop on the Future of Criminal Justice Research, U.S. Department of Justice and National Research Council, March 1982.

Testified on alternative gun-control policies before the U.S. Senate Criminal Law Subcommittee, March 4, 1982.

Testified on alcohol tax policy before the Social Security Advisory Council, May 25, 1982.

Participant, Sixty-Sixth American Assembly (Public Policy on Alcohol Problems), Harriman, NY, April 26-29, 1984.

Member, Executive Session on the Juvenile Justice System, Harvard University, 1984-85.

Member, Policy Council of the American Society of Criminology, 1985-86, and 1990-91.

Invited participant, Conference on the Cigarette Excise Tax sponsored by the Harvard Institute for the Study of Smoking Behavior, Washington, DC, April 17, 1985.

Member, "Crime and Violence" working group of the NAS Committee on Basic Research, 1985.

Member, Research Advisory Committee of the U.S. Sentencing Commission, 1986-91 (Chair, 1986).

Associate, Canadian Institute of Advanced Research, 1986.

Member, Board of Advisors, Public Policy Program, College of William & Mary, 1987-1992.

Member, National Academy of Sciences Committee on Law and Justice, 1987-1993.

Treasurer, Association of Public Policy Analysis and Management, 1987-1994.

Testified on the use of alcohol taxation as a public-health measure before the U.S. Senate Committee on Governmental Affairs, September 27, 1988.

Member, Workshop on Health Economics, National Institute of Alcohol Abuse and Alcoholism, September 1988.

Member, National Research Council's Panel on the Understanding and Control of Violent Behavior, 1988-91.

Member, Advisory Board to the Injury Prevention Research Center, University of North Carolina, 1990-.

Witness, "Problems and Prospects for a N.C. Lottery" North Carolina Economic Future Commission, December 5, 1990.

Invited participant, CDC's Forum on Youth Violence in Minority Communities, Atlanta, December 10-12, 1990.

Member, President's Advisory Board of the H. John Heinz III School of Public Policy and Management, Carnegie Mellon University, 1992-96 and subsequently (including 2007).

Consultant, Tax Advisory Program, US Department of Treasury, 1994-95.

Steering Committee, National Consortium on Violence Research, 1995-1997.

Member, Center for Gun Policy Research, Johns Hopkins University, 1995-.

Invited participant, White House Leadership Conference on Youth, Drug Use, and Violence, March 7, 1996.

Invited speaker, U.S. Senate Democratic Policy Council, Wilmington, DE, April 26, 1996.

Member, National Academy of Sciences (IOM) Committee on Injury Prevention and Control, 1997-8.

Member, Advisory Committee to the Harvard Injury Control Research Center, 1998-.

Consultant, US Department of Treasury, Enforcement Division, 1999-2000.

Member, National Academy of Sciences (NRC) Case Studies of School Violence Committee, 2001-2002.

Member, Division Committee for the Behavioral and Social Sciences and Education, National Research Council, 2001-2004.

Member, "Committee to Develop a Strategy to Prevent and Reduce Underage Drinking", Institute of Medicine 2002-3.

Member, Panel on Assessing the Feasibility, Accuracy, and Technical Capability of a National Ballistics Database, The National Academies 2004-5.

Member, *Crime and Justice* editorial board, 2007-1010.

Member, National Research Council Workshop on Understanding Crime Trends, 2007-8

Vice Chair, National Academy of Sciences Committee on Law and Justice, 2006-2009.

Vice President, Association of Public Policy and Management, 2008-2009.

Refereeing

Associate editor, Law and Contemporary Problems, 1974-78.

Editorial consultant, Journal of Criminal Law and Criminology, 1982-.

Member, Editorial Board, Journal of Policy Analysis and Management, 1986- 2002.

Associate Editor, Criminology, 1987-91.

Occasional refereeing: American Economic Review, Journal of Political Economy, Journal of Public Economics, Economic Inquiry, Journal of Legal Studies, Journal of Law and Economics, New England Journal of Medicine, Journal of the American Medical Association, Criminology and other professional journals.

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------X

Alan Kachalsky, Christina Nikolov, and     :
Second Amendment Foundation,           :

                                  :

                Plaintiffs,         :    **Civil Action Number:**

                                  :     **10-cv-5413**

          -against-             :

                                  :     **(Hon. Cathy Seibel)**

Susan Cacace, Jeffrey A. Cohen, and     :
County of Westchester,               :     **DECLARATION OF**

                                  :     **FRANKLIN E. ZIMRING**

                Defendants.       :
-------------------------------------------------X

Franklin E. Zimring, declares and states as follows, under penalties of perjury:

1.       I am the William G. Simon Professor of Law, Wolfen Distinguished Scholar and Chair of the Criminal Justice Research Program at the University of California, Berkeley.

2.       I have been studying the relationship between firearms and violence, strategies of firearms control, and patterns of gun commerce and civilian gun usage since 1967. I have served as director of research of the task force on firearms of the National Commission on the Causes and Prevention of Violence in 1968-1969 and as a firearms and federal criminal law expert for the National Commission on Reform of Federal Criminal Laws. I have published several empirical studies of firearms and violence and on gun control, and I have co-authored three books with firearms issues at their center, in 1969, 1986 and 1997. I was elected a Fellow of the American Academy of Criminology in 1993 and to the American Academy of Arts and Sciences in 1990. I have served as an expert on two topics: (1) the relationship between firearms and violence and (2) the

design and evaluation of firearms control.   This declaration is on both topics. A full
curriculum vitae is annexed hereto as Exhibit A.

3.      I make this declaration in support of the State Defendants' cross-motion
for summary judgment.

4.      This declaration will summarize the empirical evidence and my expert
opinions concerning the special risks of handguns and the external dangers of concealed
weapons in public spaces.

**The Special Risks of Handguns.**

5.      All forms of firearms are dangerous to life if they are used in assaults and
robberies, but the handgun is the major hazard, particularly in big cities, because
handguns are much more likely to be used in criminal violence than shotguns and rifles.
Handguns are slightly more than one-third of all firearms owned by civilians in the
United States, but they are used in more than 75% of all gun killings and in even larger
portions of robberies. The handgun is small, easy to carry and conceal, and deadly at
short range. Handguns are the priority concern of law enforcement everywhere.[1]

6.      Most firearms assaults and almost all firearms robberies take place outside
the offender's home, so that using a firearm in crime requires transporting it outside the
home.  But carrying a loaded shotgun to a commercial location for a robbery or to
somebody else's home or on the street while looking for a target is a warning to potential

---

[1] Zimring, Franklin E. and Gordon Hawkins, <u>Crime Is Not the Problem: Lethal Violence in America</u>, New York: Oxford University Press (1997), Chapters 1, 3 and 7.  See also Zimring, Franklin E. and Gordon Hawkins, <u>The Citizen's Guide to Gun Control</u>, New York: McMillan (1986), at Chapter 5, p. 38.

victims and a red flag to passersby and to any law enforcement personnel that the armed

pedestrian is not on an ordinary errand. Other pedestrians and motorists can avoid the

visibly armed person and police can ask questions and subject the visibly armed person to

identity checks and surveillance.

7.    The person with a concealed handgun in his pocket generates no special

notice until the weapon appears at his criminal destination. The robber or assaulter looks

no different from any other user of common public spaces. And this ability to escape

special scrutiny is the advantage that makes the concealed handgun into the dominant

weapon of choice for gun criminals and a special danger to government efforts to keep

public spaces safe and secure.

8.    The necessity of carrying guns to crime sites without detection is one

reason why the National Violence Commission research reported that 86% of all the

firearms used in all assaults were handguns and an astonishing 96% of all firearms

robberies were committed with handguns in the ten large cities the task force surveyed.[2]

What that robbery percentage means is that the problem of gun robbery in American

cities is almost exclusively a problem of concealable handguns.

9.    The special dangers of handgun use in violence have produced a wide

variety of different legal strategies to minimize the rate of handgun misuse. Many nations

attempt to restrict both the number of such firearms owned by citizens and reasons why

citizens might be permitted to own them.  New York, outside New York City, allows

most competent adults to own handguns if they have no major record of criminal

conviction or mental health-related disqualification.  Because New York does not restrict

---

[2] Newton, George and Franklin E. Zimring (1969), *Firearms and Violence in American Life*, at Figure 8-1, p. 49.

eligibility of most citizens to own handguns or the volume of guns owned, the state's first line of defense against the use of such weapons in street crime is a series of restrictions on the time, place and manner of handgun use.

      10.    New York law prohibits the carrying of concealed handguns without a license. The state law delegates the authority to establish standards and make individual decisions to county licensing officials who, throughout most of the state are state court judges. The goal of this and other such provisions is to distinguish uses of handguns that do not pose a special threat to the public (such as storage and use in the owner's home) from uses that pose greater threats to public safety (such as the carrying of concealed weapons in streets and public places). The special danger of a hidden handgun is that it can be used against persons in public robbery and assault. The concealment of a handgun means that other citizens and police don't know it is in their shared space until it is brandished.

      11.    Not all of those carrying concealed handguns intend to use them as instruments of public harm. But the existence of a loaded handgun in public is a hidden danger which New York attempts to address by controlling the number of guns carried and screening those who are licensed to carry handguns in public.   A critical dimension of the policy is restricting the population of hidden guns.

**The External Dangers of Concealed Weapons in Public Spaces.**

      12.    The right of home possession announced by the Supreme Court does not require citizens to purchase and own handguns in their houses but rather confers on individuals the right to decide for themselves if the benefits of gun possession in the home outweigh the risks. So the Second Amendment liberty announced in Heller puts the

homeowner in a position of power to determine what risks to take. As long as the guns owned in the home stay there, Mr. Smith's gun is no risk to his neighbors. But the presence of loaded and concealed guns in public spaces is an act where Mr. Smith's decision will generate risks to others who use the streets, and go to public accommodations. And if the guns are concealed, the people who are exposed to the public place risks won't have notice or any ability to avoid the armed persons they may confront.

13.   This extension of hidden guns into shared public environments means that the implications of concealed carrying are spread over the community of users of public space, and the best method of deciding policy is a collective determination of whether concealed weapon carrying should be allowed and under what circumstances.

14.   So government must be involved in public space regulation in a way that is not necessary in the privacy of individual homes.  When armed citizens carry guns in public, they alter the public environment for all other users.  This is why concealed weapons laws are the oldest form of legal regulation of gun use and the most common. There is a public choice that must be made about whether to reduce the number of persons carrying concealed weapons by limiting licenses. Without a definitive rule on the standards for licenses, there is no way that public preferences for or against high rates of hidden guns in public can be translated into a regulatory framework.

I declare under penalty of perjury that the forgoing is true and correct. Executed at New York, N.Y., this 25th day of January, 2011.

FRANKLIN E. ZIMRING

# FRANKLIN E. ZIMRING
13 October 2008

**PERSONAL**   Born 1942, Los Angeles, California; married; two adult children.

**EDUCATION**   Los Angeles Public Schools; B.A. with Distinction, Wayne State University (1963); J.D. *cum laude*, University of Chicago (1967).

**PRESENT POSITION**   **WILLIAM G. SIMON PROFESSOR OF LAW; WOLFEN DISTINGUISHED SCHOLAR** and **CHAIR**, Criminal Justice Research Program, Institute for Legal Research (formerly the Earl Warren Legal Institute), Boalt Hall School of Law, University of California, Berkeley.

**OTHER WORK**   **DIRECTOR**, Earl Warren Legal Institute (1983-2002).

**FACULTY OF LAW**, University of Chicago (1967-85): **KARL N. LLEWELLYN PROFESSOR OF JURISPRUDENCE** (1982-85) and **DIRECTOR**, Center for Studies in Criminal Justice (1975-85).

**MEMBER,** MacArthur Foundation Research Program on Adolescent Development and Juvenile Justice (1997-2007).

**FELLOW**, Center for Advanced Studies in the Behavioral Sciences, Stanford, California (1979-80).

**RAPPORTEUR**, Task Force on Sentencing Policy for Young Offenders, Twentieth Century Fund (1978).

**VISITING PROFESSOR OF LAW**, University of California, Irvine (2004), University of South Africa (1993), University of California, Berkeley (1983-85), Yale University (1973), and University of Pennsylvania (1972).

**DIRECTOR OF RESEARCH**, Task Force on Firearms, National Commission on the Causes and Prevention of Violence (1968-69).

**CONSULTANT:**   American Bar Foundation, Police Foundation, National Commission on Reform of Federal Criminal Laws, Institute for Defense Analysis, Department of Justice, Rand Corporation, Abt Associates, Federal Parole Commission, Federal Bureau of Prisons, Federal Bureau of Investigation, General Accounting Office, Canadian Institute for Advanced Studies, States of Alaska, California, Nebraska, Illinois, Virginia, and Washington, Cities of Chicago, New York and San Francisco.

**ADVISORY POSTS**   CURRENT: Campaign for Youth Justice (2007-); California Attorney General's Office (2001-); National Policy Committee, American Society of Criminology (1989-91 and 1993-); Board of Directors, Illinois Youth Services Association (Honorary) (1977-); Advisory Committee, National Pre-Trial Services Association (1975-).

PAST:  Asian Pacific Violence Prevention Center, National Council on Crime and Delinquency (2001-2005); Advisory Committee, Sentencing Project, American Law Institute (2001-2003); Criminal Justice Policy Group, Advisory Board, National Campaign Against Youth Violence (2000-2002); Expert Panel Member, U.S. Department of Transportation, National Highway Traffic Safety Administration Panel on Crash Risk of Alcohol-Involved Driving (1994-2002); Expert Panel Member, U.S. Department of Education Panel on Safe, Disciplined,  and Drug-Free Schools (1998-2001); National Research Council Panel on Juvenile Crime:  Prevention, Intervention, and Control (1998-2001); Advisory Board, Center on Crime, Communities, and Culture, Open Society Institute (1998-2000); Affiliated Expert, Center for Gun Policy and Research, Johns Hopkins University (1995-98); Gun Violence Advisory Group, American College of Physicians (1995-98); Advisory Committee, Violent and Serious Juvenile Offender Project, National Council on Crime and Delinquency (1994-1997); Panel on NIH Research on Anti-Social, Aggressive, and Violence-Related Behaviors and their Consequences (1997-); Task Force on Future Directions for the National

Archive of Criminal Justice Data, Bureau of Justice Statistics, Department of Justice (1995); Panel on Antisocial, Aggressive, and Violence-Related Behaviors and Their Consequences, National Institute of Health (1993-94); Panel on Understanding and Control of Violent Behavior, National Research Council, National Academy of Sciences (1989-91); Research Advisory Committee, California Attorney General (1983-1990); Law Enforcement Committee, California Governor's Policy Council on Drug and Alcohol Abuse (1989-91); National Research Council, Working Group Crime and Violence (1985-88); Internal Revenue Service, Advisory Group Taxpayer Compliance Research (1983-87); Board of Directors, Eisenhower Foundation for the Prevention of Violence (1981-84); U.S. Secret Service Advisory Committee on Protection of the President (1981-82); Assembly of Behavioral and Social Sciences, National Academy of Sciences (1977-80); Executive Committee, Illinois Academy of Criminology (1968-71, 1977-78); Advisory Committee, Assessment Center for Alternatives to Juvenile Courts (1977-78) (chairman); Advisory Committee, Law and Social Science Program, National Science Foundation (1976-77); Advisory Committee, Vera Institute of Justice, Court Employment Project Evaluation (1976-77) (chairman); Panel on Deterrence and Incapacitation, National Academy of Sciences (1975-77); Legal Committee, American Civil Liberties Union, Illinois Branch (1967-70).

**EDITORIAL BOARDS**

CURRENT: Punishment and Society (1998-); Crime and Justice: An Annual Review of Research (1979-90, 1998-); Western Criminology Review (1997-); Buffalo Criminal Law Review (1996-); Homicide Studies (1996-); The Prison Journal (1992-); Journal of Research in Crime and Delinquency (1976-84, 1990-); Federal Sentencing Reporter (1988-); Studies in Crime and Justice (1980-); Journal of Criminal Justice (1978-).

PAST: Law and Society Review (1988-1998); British Journal of Criminology (1988-1996); Journal of Quantitative Criminology (1984-1989); Ethics, (1985-87); Encyclopedia of Crime and Justice (1979-83); Evaluation Quarterly (1976-84); Law and Behavior (1976-85).

**HONORS**

Edwin H. Sutherland Award, American Society of Criminology (2007); August Vollmer Award, American Society of Criminology (2006); Notable Book of the Year, *The Economist* (2003); Society of Research on Adolescence, Biannual Book Award (2002); Pass Award, National Council on Crime and Delinquency (1999); Donald Cressey Award, National Council on Crime and Delinquency (1995); Choice, Outstanding Academic Book Citation (1995 and 1982); Paul Tappan Award, Western Society of Criminology (1994); Fellow, American Society of Criminology (1993); Distinguished Alumni Award, Wayne State University (1989); Bustin Prize for Legal Research, University of Chicago (1981); Cooley Lecturer, University of Michigan Law School (1980); National Distinguished Alumnus Award, Delta-Sigma-Rho (1977); Ten Law Professors Who Shape the Future, *Time Magazine* (1977); Civilian Award of Merit for 1975, Chicago Crime Commission; Gavel Award Certificate of Merit, American Bar Association (1973).

**MEMBER**

American Academy of Arts and Sciences (1990-); California Bar Association (1968-); Order of the Coif (1967-); Phi Beta Kappa (1964-).

## BOOKS AND MONOGRAPHS

(Chinese translation) *The Contradictions of American Capital Punishment,* Shanghai Joint Publishing (2008; English version 2003)).

(Chinese translation) *A Century of Juvenile Justice,* Beijing: The Commercial Press (2008; English version 2002).

(with Bernard E. Harcourt) *Criminal Law and the Regulation of Vice,* American Casebook Series, St. Paul: Thompson/West Publishers (2007).

*The Great American Crime Decline,* New York: Oxford University Press (2006).

*American Juvenile Justice,* New York: Oxford University Press (2005).

*An American Travesty: Legal Responses to Adolescent Sexual Offending,* Chicago: University of Chicago Press (2004).

*The Contradictions of American Capital Punishment*, New York: Oxford University Press (2003); paperback edition (2004)..

(with Margaret Rosenheim, David Tanenhaus, and Bernardine Dohrn, eds.) *A Century of Juvenile Justice*, Chicago: University of Chicago Press (2002).

(with Gordon Hawkins and Sam Kamin) *Punishment and Democracy: Three Strikes and You're Out in California*, New York: Oxford University Press (2001).

(with Jeffrey Fagan, ed.) *The Changing Borders of Juvenile Justice: Transfer from Juvenile to Criminal Court*, Chicago: University of Chicago Press (2000).

(with Sam Kamin and Gordon Hawkins) *Crime and Punishment in California: The Impact of Three Strikes and You're Out*, Berkeley: Institute of Governmental Studies (1999).

*American Youth Violence*, New York: Oxford University Press (1998); paperback edition (2000).

(with Gordon Hawkins) *Crime Is Not the Problem: Lethal Violence in America*, New York:  Oxford University Press (1997); paperback edition (1999).

(with Gordon Hawkins) *Incapacitation:  Penal Confinement and the Restraint of Crime*, New York: Oxford University Press (1995); paperback edition (1997).

(with Gordon Hawkins) *Prison Population and Criminal Justice Policy in California*, Berkeley: Institute of Governmental Studies (1992).

(with Gordon Hawkins) *The Search for Rational Drug Control*, New York:  Cambridge University Press (1992); paperback edition (1995).

(with Gordon Hawkins) *The Scale of Imprisonment*, Chicago:  University of Chicago Press (1991); paperback edition (1993).

(with Gordon Hawkins) *Pornography in a Free Society*, New York:  Cambridge University Press (1988); paperback edition (1991).

(with Michael Laurence and John Snortum, eds.) *Social Control of the Drinking Driver*, Chicago: University of Chicago Press (1988).

(with Gordon Hawkins) *The Citizen's Guide to Gun Control*, New York:  Macmillan Publishing Company (1987); paperback edition (1992).

(with Gordon Hawkins) *Capital Punishment and the American Agenda*, New York:  Cambridge University Press (1987); paperback edition (1989).

(with Mark Siegler, Steven Toulman, Kenneth Schaffner, eds.) *Medical Innovation and Bad Outcomes:  Legal, Social, and Ethical Responses*, Ann Arbor, MI:  Health Administration Press (1987).

(with Gordon Hawkins, ed.) *The Pursuit of Criminal Justice:  Essays From the Chicago Center*, Chicago:  University of Chicago Press (1984); Midway reprint edition (1986).

(with Michael Tonry, ed.) *Reform and Punishment:  Essays on Criminal Sentencing*, Chicago: University of Chicago Press (1983).

*The Changing Legal World of Adolescence*, New York:  The Free Press (1982); paperback edition (1985).

(with Richard Frase) *The Criminal Justice System:  Materials on the Administration and Reform of the Criminal Law*, Boston:  Little, Brown and Company (1980).

*Confronting Youth Crime:  Report of the Twentieth Century Fund Task Force on Sentencing Policy Toward Young Offenders*, New York:  Holmes and Meier (1978).

(with Gordon Hawkins) *Deterrence:  The Legal Threat in Crime Control*, Chicago:  University of Chicago Press (1973); Phoenix edition (1976).

*Perspectives on Deterrence*, Washington, D.C.: National Institute of Mental Health (1971).

(with George P. Newton) *Firearms and Violence in American Life*, Task Force Report to the National Commission on the Causes and Prevention of Violence, Washington, D.C.: U.S. Government Printing Office (1969).

## SCHOLARLY ARTICLES

Public Sentiment, Political Action, and Governmental Crime Policy–On the Origins and Significance of Mixed Feelings, *Criminology and Public Policy* 7:467 (August 2008).

Preface to the Chinese edition, *The Contradictions of American Capital Punishment,* Shanghai Joint Publishing, pp. 4-7 (2008).

Preface to the Chinese edition, *A Century of Juvenile Justice,* Beijing: The Commercial Press (2008).

Criminology and Its Discontents: The American Society of Criminology 2007 Sutherland Address, *Criminology* 46:255 (May 2008)

Violence and Drugs: Divide, Then Conquer? *Berkeley Review of Latin American Studies* pp. 40-41 (Spring 2008).

Handgun Control, The Second Amendment and Judicial Legislation in the D.C. Circuit: A Vote on *Parker v. District of Columbia, New Criminal Law Review* 2:312 (2008).

(with David Johnson) Law, Society and Capital Punishment in Asia, *Punishment & Society* 10:103 (2008); also published in *Criminal Law Review* 19:109, (translated into Chinese by Richard Chiang for Peking University Press)  (2006).

(with Gordon Hawkins) Crime Is Not the Problem: Lethal Violence in America, in Mary E. Vogel, ed., *Crime, Inequality and the State*, Routledge (2007).

Protect Individual Punishment Decisions from Mandatory Penalties, *Criminology and Public Policy* 6:881 (November 2007).

(with Alex Piquero and Wesley Jennings) Sexual Delinquency in Racine: Does Early Sex Offending Predict Later Sex Offending in Youth and Young Adulthood? *Criminology and Public Policy* 6:507 (August 2007).

Vollmer Award Address: The Necessity and Value of Transnational Comparative Study--Some Preaching from a Recent Convert, *Criminology and Public Policy* 5:615 (November 2006).

(with David Johnson) Taking Capital Punishment Seriously, *Asian Criminology* 1:89 (2006).

(with Cheryl Marie Webster and Anthony N. Doob) Proposition 8 and Crime Rates in California: The Case of the Disappearing Deterrent, *Criminology and Public Policy* 5:1501 (August 2006).

(with Jeffrey Fagan and Amanda Geller) Capital Punishment and Capital Murder: Market Share and the Deterrent Effects of the Death Penalty, *Texas Law Review* 84:1803 (June 2006).

(with David Johnson) Public Opinion and the Governance of Punishment in Democratic Political Systems, *The Annals of The American Academy of Political and Social Science* 605:266 (May 2006).

(with David Johnson) On the Comparative Study of Corruption, *British Journal of Criminology* 45:793 (2005); also in the *Pacific McGeorge Global Business and Development Law Journal* 20:243 (2007) and in K. Padmaja, ed., *Corruption: Socio Legal Dimensions*, The ICFAI University Press (2008).

Penal Policy and Penal Legislation in Recent American Experience, *Stanford Law Review* 58:323 (2005).

Path Dependence, Culture and State-Level Execution Policy: A Reply to David Garland, *Punishment and Society* 7:377 (2005).

Minimizing Harm from Minority Disproportion, in Darnell F. Hawkins and Kimberly Kempf-Leonard, eds., *Our Children, Their Children: Confronting Racial and Ethnic Differences in American Juvenile Justice*, University of Chicago Press (2005).

Política Criminal y Legislación Penal en la Experiencia Estadounidense Reciente [Criminal Policy and Penal Legislation in the Recent American Experience], in José Luis Díez Ripollés, Ana María Prieto del Pino and Susana Soto Navarro, eds., *La Política Legislative Penal en Occidente: Una Perspectiva Comparada* [Legislative Penal Policy in the West: A Comparative Perspective], Tirant lo Blanch (2005).

In Memoriam: Norval Morris (1923-2004), *The University of Chicago Law Review* 72:459 (2005).

The Unexamined Death Penalty: Capital Punishment and Reform of the Model Penal Code, *Columbia Law Review* 105:1396 (2005).

Symbol and Substance in the Massachusetts Commission Report, *Indiana Law Journal* 80:115 (2005).

(with Michael Vitiello, Clark Kelso, Erwin Chemerinsky, Kevin Reitz, and Jonathan Turley) A Proposal for a Wholesale Reform of California's Sentencing Practice and Policy, *Loyola of Los Angeles Law Review* 38:903 (2004).

The Discrete Character of High-Lethality Youth Violence, *Youth Violence: Scientific Approaches to Prevention, Annals of the New York Academy of Sciences* 1036:290 (2004).

The Weakest Link: Human Rights and the Criminal Offender in Modern Democratic Government, in Gerben Bruinsma, Henk Elffers, and Jan de Keijser, eds., *Punishment, Places, and Perpetrators: Developments in Criminology and Criminal Justice Research,* Wilan Publishing (2004).

Firearms, Violence, and the Potential Impact of Firearms Control, *The Journal of Law, Medicine, and Ethics* 32:34 (2004).

(with Gordon Hawkins) Democracy and the Limits of Punishment: A Preface to Prisoners' Rights, in Michael Tonry, ed., *The Future of Imprisonment,* Oxford University Press (2004).

Continuity and Change in the American Gun Debate in Jens Ludwig and Philip J. Cook, eds., *Evaluating Gun Policy: Effects on Crime and Violence*, Washington, DC: Brookings Institution Press (2003); also as Chapter 1 in Bernard E. Harcourt, ed., *Guns, Crime, and Punishment in America*, New York: New York University Press (2003).

The Peculiar Present of American Capital Punishment in Stephen P. Garvey, ed., *Beyond Repair? America's Death Penalty*, Durham, NC: Duke University Press (2003).

(with Sam Kamin) Facts, Fallacies, and California's Three Strikes, *Duquesne Law Review* 40:605 (2002).

(with Gordon Hawkins) Capital Punishment, in *Oxford Companion to American Law*, New York: Oxford University Press (2002).

The New Politics of Criminal Justice: Of "Three Strikes," Truth-in-Sentencing, and Megan's Laws, *National Institute of Justice Research Report, Perspectives on Crime and Justice: 1999-2000 Lecture Series, Washington, DC*, Volume 4 (March 2001).

Crime, Criminal Justice, and Criminology for a Smaller Planet: Some Notes on the 21st Century (Noriyoshi Takemura, translator), *Toin Law Review* 8:75 (2001)

Crime, Criminal Justice, and Criminology for a Smaller Planet: Some Notes on the 21st Century, *The Australian and New Zealand Journal of Criminology* 34:213 (2001)

Imprisonment Rates and the New Politics of Criminal Punishment, *Punishment and Society* 3:161 (2001); also as Chapter 10 in David Garland, ed., *Mass Imprisonment: Social Causes and Consequences*, London: Sage Publications (2001).

The Common Thread: Diversion in Juvenile Justice, *California Law Review* 88:2477 (2000); also as Chapter 5 in (with Margaret Rosenheim, David Tanenhaus, and Bernardine Dohrn, eds.) *A Century of Juvenile Justice*, Chicago: University of Chicago Press (2002).

(with Jeffrey Fagan) The Search for Causes in an Era of Declining Crime Rates: Some Lessons from the Study of New York City Homicide, *Crime and Delinquency* 46:446  (2000).

Incarceration Patterns, in *Mass Incarceration: Perspectives on U.S. Imprisonment, University of Chicago Law School Roundtable, A Journal of Interdisciplinary Legal Studies*, Volume 7 (2000).

Penal Proportionality and the Young Offender: Notes on Immaturity, Capacity, and Diminished Responsibility, in Thomas Grisso and Robert G. Schwartz, eds., *Youth on Trial*, Chicago: University of Chicago Press (2000).

The Punitive Necessity of Waiver, Chapter 6 in Fagan and Zimring, eds., *The Changing Borders of Juvenile Justice,* Chicago: University of Chicago Press (2000).

(with Jeffrey Fagan) Transfer Policy and Law Reform, Chapter 12 in Fagan and Zimring, eds., *The Changing Borders of Juvenile Justice*, Chicago: University of Chicago Press (2000).

American Youth Violence:  Implications for National Juvenile Justice Policy, *Update on Law-Related Education* (American Bar Association publication) 23:6 (1999).

The Hardest of the Hard Cases: Adolescent Homicide in Juvenile and Criminal Courts, *Virginia Journal of Social Policy and the Law*, 6:437 (1999).

The 1990s Assault on Juvenile Justice: Notes from an Ideological Battleground, *Federal Sentencing Reporter* 11:260 (1999).

(with Jeffrey Fagan and June Kim) Declining Homicide in New York City: A Tale of Two Trends, *Journal of Criminal Law and Criminology* 88:1277 (1998); also (with Jeffrey Fagan) as Le Cause Della Diminuzione Dei Reati: Alcune Riflessioni Sull'Analisi Degli Omicidi a New York, in Marzio Barbagli, ed., *Perché È Diminuita La Criminalità Negli Stati Uniti?* Società Editrice Il Mulino (2000).

The Executioner's Dissonant Song:  On Capital Punishment and American Legal Values, Chapter 6 in Austin Sarat, ed., *Killing State:  Capital Punishment in Law, Politics, and Culture*, Oxford University Press (1999); also in *Institute for Philosophy and Public Policy Report*19:1 (1999).

(with Gordon Hawkins) Public Attitudes Toward Crime:  Is American Violence A Crime Problem? in Edward Rubin, ed., *Minimizing Harm:  A New Crime Policy for Modern America*, Westview Press (1999).

Toward a Jurisprudence of Youth Violence, in Michael Tonry and Mark Moore, eds., *Youth Violence. Crime and Justice:  A Review of Research*, University of Chicago Press (1998).

The Youth Violence Epidemic:  Myth or Reality?, *Wake Forest Law Review* 33:727 (1998).

(with Gordon Hawkins) Crime Is Not the Problem:  A Reply, *University of Colorado Law Review* 69:1177 (1998).

(with Gordon Hawkins) Lethal Violence and the Overreach of American Imprisonment, *National Institute of Justice Research Report, Presentations from the 1996 Annual Research and Evaluation Conference, Washington, DC*, July 1997.

Juvenile Violence in Policy Context, *Valparaiso University Law Review* 31:419 (1997).

The Doom of a Good Intention, *Politics and the Life Sciences* 16:44 (1997).

(with Gordon Hawkins) Concealed Handguns:  The Counterfeit Deterrent, *The Responsive Community*, Spring 1997, p. 46.

Kids, Guns, and Homicide:  Policy Notes on an Age-Specific Epidemic, *Law and Contemporary Problems* 59:25 (1996).

Populism, Democratic Government, and the Decline of Expert Authority:  Some Reflections on "Three Strikes" in California, *Pacific Law Journal* 28:243 (1996).

(with Gordon Hawkins) Is American Violence a Crime Problem?, *Duke Law Journal* 46:43 (1996); also in Edward Rubin, ed., *Minimizing Harm as a Goal for Crime Policy in California*, California Policy Seminar Policy Research Program Report (1997).

The Wages of Ambivalence:  On the Context and Prospects of New York's Death Penalty, *Buffalo Law Review* 44:303 (1996).

(with Adolfo Ceretti and Luisa Broli) Crime Takes a Holiday in Milan, *Crime and Delinquency* 42:269 (1996).

The Genetics of Crime, *Politics and the Life Sciences* 15:105 (1996).

(with Gordon Hawkins) Toward a Principled Basis for Federal Criminal Legislation, *The Annals of the American Academy of Political and Social Science* 543:15 (1996).

Firearms Control in Federal Law in the United States:  Current Conditions and Further Choices, *UNAFEI Resource Materials Series*, No. 46 (Materials Produced during the 96th International Seminar Course on the "Promotion of International Cooperation in Criminal Justice Administration), p. 117 (1995).

Reflections on Firearms and the Criminal Law, *Journal of Criminal Law and Criminology* 86:1 (1995).

(with William Nelson) Cigarette Taxes as Cigarette Policy, *Tobacco Control* 4:S25 (1995).

(with Gordon Hawkins and Hank Ibser) Estimating the Effects of Increased Incarceration on Crime in California, *California Policy Seminar Brief*, Volume 7, July 1995.

(with Johannes van Vuren and Jan van Rooyen) Selectivity and Racial Bias in a Mandatory Death Sentence Dispensation:  A South African Case Study, *Comparative and International Law Journal of Southern Africa* 28:107 (1995); Misleading Statistics and the Death Penalty -- Two Authors Reply to Henry Lever, *Comparative and International Law Journal of Southern Africa* 30:364 (1997).

(with Gordon Hawkins) The Growth of Imprisonment in California, *British Journal of Criminology* 34:83 (1994).

Policy Research on Firearms and Violence, *Health Affairs* 12:109 (1993).

(with Gordon Hawkins) Crime, Justice, and the Savings and Loan Crisis, *Crime and Justice* 18:247 (1993).

(with Gordon Hawkins) Continuity and Focus in Criminal Justice Research, *Journal of Research in Crime and Delinquency* 20:525 (1993).

Comparing Cigarette Policy and Illicit Drug and Alcohol Control, in Robert Rabin and Stephen Sugarman, eds., *Smoking Policy:  Law, Politics, and Culture*, Oxford University Press (1993).

On the Liberating Virtues of Irrelevance, *Law and Society Review* 27:9 (1993).

Drug Treatment as a Criminal Sanction, *University of Colorado Law Review* 64:809 (1993).

Prison Population and Criminal Justice Policy in California, *California Policy Seminar Brief*, Volume 4, August 1992.

Inheriting the Wind:  The Supreme Court and Capital Punishment in the 1990s, *Florida State University Law Review* 20:1 (1992).

The Jurisprudence of Teenage Pregnancy, in Margaret Rosenheim and Mark Testa, eds., *Early Parenthood and Coming of Age in the 1990s*, Rutgers University Press (1992).

The Multiple Middlegrounds Between Civil and Criminal Law, *Yale Law Journal* 101:1901 (1992).

(with Gordon Hawkins) What Kind of Drug War?, *Social Justice* 18:104 (1991).

Firearms, Violence, and Public Policy, *Scientific American*, November 1991, p. 48; also in Robert K. Miller, ed., *The Informed Argument*, Harcourt Brace (1995); K. Ackley, ed., *Perspective on Contemporary Issues*, Harcourt Brace (1996).

Ambivalence in State Capital Punishment Policy:  An Empirical Sounding, *New York University Review of Law and Social Change* 18:729 (1991).

(with Gordon Hawkins) The Wrong Question:  Critical Notes on the Decriminalization Debate, in Melvyn Krauss and Edward Lazear, eds., *Search for Alternatives:  Drug-Control Policy in the United States*, Hoover Institution Press (1991).

The Limits of Criminal Punishment:  Some Ethical Issues for the 1990s, in David Gordis, ed., *Crime, Punishment, and Deterrence:  An American-Jewish Exploration*, University of Judaism (1991).

The Treatment of Hard Cases in American Juvenile Justice:  In Defense of Discretionary Waiver, *Notre Dame Journal of Law, Ethics and Public Policy* 5:267 (1991).

Punishing the Drinking Driver:  Toward an Experimental Design, *Alcohol, Drugs, and Driving* 6:199 (1990).

(with Gordon Hawkins) On the Scale of Imprisonment:  Downes's *Contrasts in Tolerance*, *Journal of the American Bar Foundation* 14:527 (1989).

The Problem of Assault Firearms, *Crime and Delinquency* 35:538 (1989).

Methods for Measuring General Deterrence:  A Plea for the Field Experiment, in Martin Friedland, ed., *Sanctions and Rewards in the Legal System*, University of Toronto Press (1989).

(with Gordon Hawkins) The Path Toward the Abolition of Capital Punishment in the Industrial West, *Revue Internationale de Droit Penal* 58:669 (1988).

(with Gordon Hawkins) The New Mathematics of Imprisonment, *Crime and Delinquency* 34:425 (1988); Response to Zedlewski, *Crime and Delinquency* 35:316 (1989).

(with Gordon Hawkins) Murder, the Model Code, and the Multiple Agendas of Reform, *Rutgers Law Journal* 19:733 (1988).

Law, Society, and the Drinking Driver:  Some Concluding Reflections, in Michael Laurence, John Snortum, and Franklin Zimring, eds., *Social Control of the Drinking Driver*, University of Chicago Press (1988).

Principles of Criminal Sentencing, Plain and Fancy, *Northwestern University Law Review* 82:73 (1987).

Legal Perspectives on Family Violence, *California Law Review* 75:521 (1987); also as Toward a Jurisprudence of Family Violence, in Lloyd Ohlin and Michael Tonry, eds., *Family Violence*, University of Chicago Press (1989).

(with Gordon Hawkins) Dangerousness and Criminal Justice, *Michigan Law Review* 85:481 (1987).

Some Social Bases for Compensation Schemes, in Mark Siegler, Steven Toulman, Franklin Zimring, and Kenneth Schaffner, eds., *Medical Innovation and Bad Outcomes:  Legal, Social, and Ethical Responses*, Health Administration Press (1987).

(with Gordon Hawkins) A Punishment in Search of a Crime:  Standards for Capital Punishment in the Law of Criminal Homicide, *Maryland Law Review* 46:1001 (1986).

Gun Control, *Bulletin of New York Academy of Medicine* 62:5 (1986).

(with James Zuehl) Victim Injury and Death in Urban Robbery:  A Chicago Study, *Journal of Legal Studies* 15:1 (1986).

(with Gordon Hawkins) Cycles of Reform in Youth Corrections:  The Story of Borstal, in Peter Greenwood, ed., *The Juvenile Rehabilitation Reader*, Rand Corporation (1985).

(with Gordon Hawkins) Western European Perspectives on the Treatment of Young Offenders, in Peter Greenwood, ed., *The Juvenile Rehabilitation Reader*, Rand Corporation (1985).

(with Gordon Hawkins) Capital Punishment and the Eighth Amendment: Furman and Gregg in Retrospect, *UC Davis Law Review* 18:927 (1985).

Violence and Firearms Policy, in Lynn Curtis, ed., *American Violence and Public Policy*, Yale University Press (1985).

(with Rayman Solomon) The Principle of the Thing: Goss v. Lopez, Student Rights, and Litigation in the Public Interest of Children, in Robert Mnookin, ed., *In the Interest of Children: Advocacy, Law Reform, and Public Policy*, Part VI, W.H. Freeman (1985).

Youth Homicide in New York: A Preliminary Analysis, *Journal of Legal Studies* 13:81 (1984).

Sentencing Reform in the States, in Franklin Zimring and Michael Tonry, eds., *Reform and Punishment: Essays on Criminal Sentencing*, University of Chicago Press (1983).

(with Satyanshu K. Mukherjee and Barrik Van Winkle) Intimate Violence: A Study of Intersexual Homicide in Chicago, *University of Chicago Law Review* 50:910 (1983).

Kids, Groups, and Crime: Some Implications of a Well-Known Secret, *Journal of Criminal Law and Criminology* 72:867 (1981).

Handguns in the Twenty-First Century: Alternative Policy Futures, *The Annals of the American Academy of Political and Social Sciences* 455:1 (1981).

Secret Service "Dangerousness" Research, in Jane Takeuchi, Frederic Solomon, and W. Walter Menniger, eds., *Behavioral Science and the Secret Service: Toward the Prevention of Assassination*, National Academic Press (1981).

Notes Toward a Jurisprudence of Waiver, in John Hall, Donna Hamparian, John Pettibone, and Joseph White, eds., *Issues in Juvenile Justice Information and Training*, Academy of Contemporary Problems (1981).

Privilege, Maturity, and Responsibility: Notes on the Emerging Jurisprudence of Adolescence, in Lamar Empey, ed., *The Future of Childhood and Juvenile Justice*, University Press of Virginia (1980).

American Youth Violence: Issues and Trends, in Norval Morris and Michael Tonry, eds., *Crime and Justice: A Review of Research*, University of Chicago Press (1979).

(with Gordon Hawkins) Ideology and Euphoria in Crime Control, *Toledo Law Review* 10:370 (1979).

Pursuing Juvenile Justice: Comments on Some Recent Reform Proposals, *University of Detroit Journal of Urban Law* 55:631 (1978).

Policy Experiments in General Deterrence, 1970-1975, in Alfred Blumstein, Jacqueline Cohen, and Daniel Nagin, eds., *Deterrence and Incapacitation: Estimating the Effects of Criminal Sanctions on Crime Rates*, National Academy of Science (1978).

Bad Checks in Nebraska: A Study of Complex Threats, in Greenburg, ed., *Punishment and Corrections*, Sage Publications (1977).

The Serious Juvenile Offender: Notes on an Unknown Quantity, in *The Serious Juvenile Offender: Proceedings of a National Symposium Held in Minneapolis, Minnesota on September 19 and 20, 1977*, U.S. Government Printing Office (1978).

Determinants of the Death Rate from Robbery:  A Detroit Time Study, *Journal of Legal Studies* 6:317 (1977).

Making the Punishment Fit the Crime:  A Consumer's Guide to Sentencing Reform, *Hastings Center Reports*, December 1976; also in University of Chicago Law School, *Occasional Papers*, No. 12 (1977); Hyman Gross and Andrew von Hirsch, eds., *Sentencing*, Oxford University Press (1981); Culbertson and Tezak, eds., *Order Under Law*, Waveland Press (1981).

(with Joel Eigen and Sheila O'Malley) Punishing Homicide in Philadelphia:  Perspectives on the Death Penalty, *University of Chicago Law Review* 43:227 (1976); also in Hugo Bedau and Chester Pierce, eds., *Capital Punishment in the United States*, AMS Press (1976); *Civil Rights*, Staff Report of the Sub-Committee on Constitutional Rights of the Committee on the Judiciary, U.S. Senate (1976).

Street Crime and New Guns:  Some Implications for Firearms Control, *Journal of Criminal Justice* 4:95 (1976).

Field Experiments in General Deterrence:  Preferring the Tortoise to the Hare, *Evaluation Magazine*, Volume 3, Russell Sage Publications (1976).

Firearms and Federal Law:  The Gun Control Act of 1968, *Journal of Legal Studies* 4:133 (1975); also in *Evaluation Annual*, Volume 1, Russell Sage Publications (1977); *Improving the Criminal Justice System in the United States*, 94th Congress, 2d Session, Library of Congress Document No. 94-171, at 273.

Measuring the Impact of Pretrial Diversion from the Criminal Justice System, *University of Chicago Law Review* 41:224 (1974); also in *Crime and Justice Annual -- 1974*, Aldine (1975); Povl Boesen and Stanley Grupp, eds., *Community Based Corrections:  Theory, Practice and Research*, Davis Publishing Company (1976).

Threat of Punishment as an Instrument of Crime Control, *Proceedings of the American Philosophical Society* 118:231 (1974).

(with Richard Block) Homicide in Chicago, 1965-70, *Journal of Research in Crime and Delinquency* 10:1 (1973); also in Lee Rainwater, ed., *Deviance and Liberty*, Aldine (1974).

Of Doctors, Deterrence, and the Dark Figure of Crime:  A Note on Abortion in Hawaii, *University of Chicago Law Review* 39:699 (1972).

The Medium is the Message:  Firearms Caliber as a Determinant of the Death Rate from Assault, *Journal of Legal Studies* 1:97 (1972).

(with Gordon Hawkins) The Legal Threat as an Instrument of Social Change, *Journal of Social Issues* 27:33 (1971); also in Ronald Akers and Richard Hawkins, eds., *Law and Control in Society*, Prentice-Hall (1974); June Louin Tapp and Felice Levine, eds., *Law, Justice, and the Individual in Society*, Holt, Rinehart (1977).

Firearms and Federal Criminal Law, *Working Papers of the National Commission on the Reform of Federal Criminal Laws*, Volume II, U.S. Government Printing Office (1970).

(with Norval Morris) Deterrence and Corrections, *Annals of the American Academy of Political Social Sciences* (1969).

(with Gordon Hawkins) Deterrence and Marginal Groups, *Journal of Research in Crime and Delinquency* 5:100 (1968).

Games with Guns and Statistics, *Wisconsin Law Review* 1968:1113 (1968).

Is Gun Control Likely to Reduce Violent Killings?, *University of Chicago Law Review* 35:721 (1968).

(with Edward H. Hunvald) Missouri Implied Consent Statutes, *Missouri Law Review* 33:323 (1968).

"Free Press-Fair Trial" Revisited: Defendant-Centered Remedies as a Publicity Policy, *University of Chicago Law Review* 33:512 (1966).

### GENERAL

Guns: Liberty or Order? *The National Law Journal,* Vol. 30, No. 30, April 7, 2008, p. 23.

What Lies Behind the Case of Lethal Injection? *The Sacramento Bee,* Sunday, December 16, 2007, p. E1; reprinted in *The Police News* (Gulf Coast edition), Vol. V, No. 1, January 2008, p. 14.

A Tale of Two Despots, *The National Law Journal,* Vol. 29, No. 49, August 6, 2007, p. 23.

Little Changes, Big Results, *The New York Times,* April 8, 2007, p. 9.

Foreword to Peter Greenwood, *Changing Lives: Delinquency Prevention as Crime Control Policy,* University of Chicago Press (2005).

Capital Punishment: An American Dilemma, in "Shalt Thou Kill? An In-Depth Look at Capital Punishment," *Christian Networks Journal*, Fall 2005, p. 17.

Terri Schiavo and the Dilemma of "Life or Death" Litigation, *San Francisco Daily Journal,* June 15, 2005, p. 6.; *Los Angeles Daily Journal,* June 15, 2005, p. 6.

A Death Knell for the Death Penalty? *Newsday,* March 4, 2005, p. A47.

Review of Kathleen Auerhahn, *Selective Incapacitation and Public Policy: Evaluating California's Imprisonment Crisis*, *Contemporary Sociology* 34:62 (2005).

Foreword to Thomas Grisso, *Double Jeopardy: Adolescent Offenders with Mental Disorders,* University of Chicago Press (2004).

Three-Ring Capital-Punishment Circus, *Los Angeles Daily Journal,* February 20, 2004, p. 6.

Confessions of a Former Smoker, in Jane E. Aaron, *The Compact Reader: Short Essays by Method and Time* (Seventh Edition), Boston: Bedford/St. Martin's (2003);also as Hot Boxes for Ex-Smokers, *Newsweek*, My Turn, April 20, 1987, p. 12.

Train an Impartial Eye on Police Behavior, *Los Angeles Times*, July 12, 2002, p. A17.

(with Gordon Hawkins) The Ethics of Criminal Justice: Aspects of Human Dignity, *International Encyclopedia of the Social and Behavioral Sciences*, Volume 5, p. 2949 (2002).

Review of David Garland, *The Culture of Control: Crime and Social Order in Contemporary Society*, *Criminal Justice* 1:465 (2001).

McVeigh's Execution Will Heal Neither Survivors Nor Public, *Los Angeles Times*, May 11, 2001, p. B17.

The Walking Plea of Wen Ho Lee, *San Francisco Chronicle*, October 2, 2000, p. A21

Contributor to M. Dwayne Smith, *A New Era of Homicide Studies? Visions of a Research Agenda for the Next Decade*, *Homicide Studies* 4:1 (2000).

It's Violence by All, Not Just Teen Violence, *Los Angeles Times*, August 8, 2000, p. B9.

Bring Courage Back into Fashion, *Los Angeles Times*, January 16, 2000, p. M5.

Capital Punishment, *Microsoft's Encarta Encyclopedia* (CD-ROM) (1999).

Gun Control, *Microsoft's Encarta Encyclopedia* (CD-ROM) (1999).

Criminal Investigation Is Just a Human Art, *Los Angeles Times*, August 1, 1999, p. M5.

Curb Imperial Power of Prosecutors, *Los Angeles Times*, April 20, 1999, p. A15.

Mystery Terms, *Boston Review*, New Democracy Forum, April/May 1999, p. 17.

Marking Time on Death Row, *The 1999 World Book Year Book*, World Book, Inc. (1999).

What is the Aim of Criminal Law? *Los Angeles Times*, January 14, 1999, p. A15.

The Buck Stops with Prison Managers:  Perspective on the Corcoran Report, *Los Angeles Times*, November 28, 1998, p. M5.

(with Gordon Hawkins) Review of Jacob Sullum, *For Your Own Good: The Anti-Smoking Crusade and the Tyranny of Public Health*, *The Responsive Community* 8:75 (1998).

A Gulag Mentality in the Prisons, *Los Angeles Times*, July 15, 1998, p. B9.

Thank You for Not Sneezing, *Los Angeles Times*, February 1, 1998, p. M5.

The Truth About Repeat Sex Offenders, *Los Angeles Times*, May 5, 1997, p. B5.

Review of Ugljesa Zvekic and Anna Alvazzi del Frate, eds., *Criminal Victimization in the Developing World*, *Contemporary Sociology* 25:663 (1996).

Paranoia on the Playground, *Los Angeles Times*, November 11, 1996, p. B5.

Crying Wolf over Teen Demons, *Los Angeles Times*, August 19, 1996, p. B5.

Gun Control, *Microsoft's Encarta Encyclopedia* (CD-ROM) (1996).

Crime Is Not the Problem, *Iowa Advocate*, Spring/Summer 1996, p. 34.

Deadly Force:  South Africa's Brave and Necessary Gamble with Its Death Penalty, *Chicago Tribune*, July 6, 1995, p. 19.

Will Success Spoil James Q. Wilson?, *Journal of Criminal Law and Criminology* 85:828 (1995).

Introduction to David Indermaur, *Violent Property Crime*, The Federation Press (1995).

For Gun Control, Give Big Cities Local Control, *Los Angeles Times*, May 17, 1995, p. B7.

Death Penalty, *jungeWelt*, April 1, 1995, p. 2.

Don't Bet on Executions Here Any Time Soon, *Newsday*, February 21, 1995, p. A27; also as Executions in New York?  Don't Bet on It, *New York Law Journal*, February 27, 1995.

Clouding the Issue:  Tobacco Industry Tries to Choke Off a Lawsuit, *Los Angeles Daily Journal*, December 12, 1994, p. 4.

The Voodoo Economics of California Crime, *Overcrowded Times*, October 1994, p. 3.

(with Gordon Hawkins) Policy on Crime, in Leonard Levy and Louis Fisher, eds., *Encyclopedia of the American Presidency*, Simon and Schuster (1994).

Tough Crime Laws Are False Promises, *Insight on the News* 10:21 (1994); also in *Federal Sentencing Reporter* 6:61 (1994).

"Three Strikes" Law Is Political Fool's Gold, *The Christian Science Monitor*, April 11, 1994, p. 23.

New Senate, Same Old Crime Debate, *The American Lawyer*, March 1994, p. 25.

To Punish Genocide with Death Is Overkill, *Los Angeles Times*, December 2, 1993, p. B7.

Introduction to Harry Kalven, Jr. and Hans Zeisel, *The American Jury*, Gryphon Editions (1993).

A Country Where There Is No Status Quo, *Los Angeles Times*, June 30, 1993, p. B7.

Hanged If We Do, Or We Don't, *Johannesburg Star*, April 5, 1993.

The Color of Murder, *Legal Times*, February 22, 1993, p. 34.

Intercept Migrating Guns, *Christian Science Monitor*, September 10, 1992, p. 18.

Are State Prisons Undercrowded?, *Federal Sentencing Reporter* 4:347 (1992).

Politics Dictate Wilson's Verdict, *Los Angeles Times*, April 12, 1992, p. M5.

Tribute to Sheldon Messinger, *California Law Review* 80:307 (1992).

(with Gordon Hawkins) Review of Samuel Gross and Robert Mauro, *Death and Discrimination: Racial Disparities in Capital Sentencing, Constitutional Commentary* 9:135 (1992).

(with Gordon Hawkins) Why the S&L Gang Isn't in Jail, *Los Angeles Times*, February 3, 1992, p. B5.

(with Michael Laurence) Capital Punishment, in Leonard Levy, ed., Supplement to the *Encyclopedia of the American Constitution*, Macmillan (1991).

More Jail Cells, Fewer Classrooms, *Los Angeles Times*, May 31, 1991, p. B5.

The Speaking Engagement as One-Night Stand, *California Monthly*, April 1991, p. 17.

The Great American Lockup, *Washington Post*, February 28, 1991, p. A19.

Strategies for Arms Control:  Trace Illegal Firearms, *New York Times*, January 4, 1991, p. A13.

Foreword to Stephen Sugarman and Herma Hill Kay, eds., *Divorce Reform at the Crossroads*, Yale University Press (1990).

Greenmail Goes Transnational, *Los Angeles Times*, March 23, 1990, p. B7; also as Can East Germany Leverage Its Way to Wealth?, *Newsday*, April 9, 1990, p. 43.

A Solitary Symbol in a Deadly Tug of War, *Los Angeles Times*, January 29, 1990, p. B5.

Review of Donald Downs, *The New Politics of Pornography*, *New York Times Book Review*, January 28, 1990, p. 18.

(with Gordon Hawkins) Bennett's Sham Epidemic, *New York Times*, January 25, 1990, p. A23.

Hardly the Trial of the Century, *Michigan Law Review* 87:1307 (1989).

Foreword to James Jacobs, *Drunk Driving: An American Dilemma*, University of Chicago Press (1989).

Review of Jack Katz, *Seductions of Crime*, New York Times Book Review, November 20, 1988, p. 50.

Drug Death Penalty: A Federal Tantrum, *New York Times*, September 16, 1988, p. 19; also as A Temper Tantrum Masquerading as an Act of Government, *Los Angeles Daily Journal*, September 20, 1988.

Pint-Sized Debate on Child Executions: More Jurisprudence from the Briar Patch, *Legal Times*, July 18, 1988, p. 14; also as Can the Bad Die Young?, *The Connecticut Law Tribune*, July 18, 1988, p. 10; Justices Waffle on Death Penalty, *Fulton County Daily Report*, July 19, 1988, p. 2; Decision on Executing Youths Highlights Death Penalty Dilemma, *Manhattan Lawyer*, July 19, 1988, p. 12; The Court's Death Sentence Schizophrenia, *The Texas Lawyer*, July 25, 1988, p. 29; A Stumble at the Finish Line, *The Recorder*, July 28, 1988, p. 4.

If We Have Reached a Landmark in Our Execution Policy, It Is Still One of Confusion, *Los Angeles Times*, March 18, 1988, Part II, p. 7.

NRA's Latest Advice Can Get You Killed, *Los Angeles Times*, December 6, 1987, Part V, p. 5.

Review of James Wright and Peter Rossi, *Armed and Considered Dangerous: A Survey of Felons and Their Firearms*, American Journal of Sociology 93:224 (1987).

Why the Goetz Verdict Was Not a Landmark Precedent, *New York Times*, June 21, 1987, p. 25.

Is Court Too Split To Sanction Death?, *Los Angeles Times*, April 27, 1987, Part II, p. 5.

A Frequent Flier Explains the Thrill, *New York Times*, April 20, 1987, p. 19; also as Rewarding the Pinball for Its Tos and Fros, *International Herald Tribune*, April 23, 1987, p. 5; Confessions of a Frequent Flier, *Chemtech*, June 1988, p. 386.

Beyond Solomon: The "Tragic Choice" Cases, *Los Angeles Times*, March 16, 1987, Part II, p. 5.

EF Hutton Goes South, *Michigan Law Review* 85:397 (1987).

Is Retribution Only for a Few?, *Los Angeles Times*, December 4, 1986, Part II, p. 7.

Facing the Threat of a Crippled UC, *Los Angeles Times*, September 3, 1986, Part II, p. 5.

The Death Penalty: Ten Dark Years, *New York Times*, June 19, 1986, p. 27.

Gun Lobby's Victory Can Help Handgun Control, *Los Angeles Times*, April 28, 1986, Part II, p. 5.

Justice Teeters on the Fine Points, *Los Angeles Times*, January 29, 1986, Part II, p. 5.

Review of Henry Pontell, *A Capacity to Punish*, American Journal of Sociology 91:724 (1985).

Two New Books on Guns, *Michigan Law Review* 83:954 (1985).

Lessons for the Urban Jungle, *Los Angeles Times*, March 15, 1985, Part II, p. 5.

Smoking and Public Policy, *Chicago Tribune*, Perspective Section, January 18, 1985, p. 27.

Research Agendas, Information Policies and Program Outcomes, in Alan Westin, ed., *Information Policy and Crime Control Strategies: Proceedings of a Bureau of Justice Statistics/Search Conference*, U.S. Government Printing Office (1984).

Is Crime Going Out of Style?, *Los Angeles Times*, July 12, 1984; also as Is American Crime Up or Down?, *Newsday*, August 30, 1984, p. 89.

The Dan White Case:  Justice Is a Victim, *Los Angeles Times*, January 6, 1984, Part II, p. 5.

The Death Penalty's Iron Law, *New York Times*, October 12, 1983, p. 27; also in *Los Angeles Times*, September 21, 1983, Part II, p. 7.

Where Do the New Scholars Learn New Scholarship?, *Journal of Legal Education* 33:453 (1983).

(with Gordon Hawkins) Crime Commissions, in Sanford Kadish, ed., *Encyclopedia of Crime and Justice*, Volume 1, The Free Press, Macmillan (1983).

(with James Lindgren) Regulation of Guns, in Sanford Kadish, ed., *Encyclopedia of Crime and Justice*, Volume 2, The Free Press, Macmillan (1983).

Foreword to John Kaplan, *The Hardest Drug:  Heroin and Social Policy*, University of Chicago Press (1983).

Review of Arnold Trebach, *The Heroin Solution*, and John Kaplan, *The Hardest Drug:  Heroin and Social Policy*, *The Times Literary Supplement*, June 10, 1983, p. 610.

Choosing the Right Camp for the Children, *Institutions Etc.* 6:21 (1983).

Idealizing the "Angels" on Death Row, *Los Angeles Times*, February 24, 1983, Part II, p. 7.

Uncle Sam's Wars on Crime, *The New Republic* 186:38 (1982).

Poland's "Real" Problem, *Chicago Tribune*, September 28, 1982, Perspective Section, p. 25.

Will the 21st Century Be Safer?, *Chicago Tribune*, April 13, 1982, Section 1, p. 22.

Crime:  The 120-Day Solution, *Chicago Tribune*, September 28, 1981, Perspective Section, p. 25.

Review of Peter Prescott, *The Child Savers:  Juvenile Justice Observed*, *New York Times Book Review*, June 14, 1981, p. 24.

(with Gordon Hawkins) Review of Walter Berns, *For Capital Punishment:  Crime and the Morality of the Death Penalty*, *American Journal of Sociology* 86:1171 (1981).

Portnoy's Real Complaint, *Moment* 6:58 (1980).

Taking a Tour of America's Prisons, *Chicago Tribune*, September 14, 1980, Perspective Section, p. 4.

Foreword to Philip Cook and Daniel Nagin, *Does the Weapon Matter?*, Institute for Law and Social Research (1979).

Comment, Current Developments in Judicial Administration, *Federal Rules Decisions* 80:147 (1979).

Crime in the Streets, *Chicago Sun Times Bookweek*, November 27, 1978, p. 14.

Review of The Institute of Judicial Administration and the American Bar Association, *Juvenile Justice Standards Project*, *Harvard Law Review* 91:1934 (1978).

Review of Charles Silberman, *Criminal Justice, Criminal Violence*, *Chicago Tribune*, November 5, 1978, Section 7, p. 1.

Review of John Allen, *Crime in the Streets: Assault with a Deadly Weapon*, Chicago Sun Times, November 27, 1977.

Foreword to Richard Block, *Violent Crime: Environment, Interaction, and Death*, Heath, Lexington (1977).

Comment, *Hastings Center Report*, p. 44 (1977).

Review of Mark Lane and Dick Gregory, *Code Name Zorro*, *Chicago Sun Times*, May 1, 1977.

Illegally Seized Evidence:  Exclude It?, *Los Angeles Times*, April 20, 1976.

Review of Pretrial Intervention, in Abt Associates, *Pretrial Services:  An Evaluation of Policy Related Research*, p. 152 (1975).

A Tale of Two Cities, *Wall Street Journal*, December 20, 1974, p. 12; also in *Hearings of Senate Subcommittee to Investigate Juvenile Delinquency, Oversight of 1968 Gun Control Act*, Volume 1, p. 11 (1975).

Eight Myths About Gun Control in the United States, *Christian Science Monitor*, July 24, 1972.

Getting Serious About Guns, *The Nation* 214:457 (1972).

Some Facts About Homicide, *The Nation* 214:303 (1972).

Firearms Control:  Hard Choices, *Trial*, p. 53 (1972).

## REPORTS TO GOVERNMENTAL AGENCIES

(with Peter W. Greenwood) *One More Chance:  The Pursuit of Promising Intervention Strategies for Chronic Juvenile Offenders*, Rand Corporation (1985).

(with Peter W. Greenwood and Allan Abrahamse) *Factors Affecting Sentence Severity for Young Adult Offenders*, Rand Corporation (1984).

(with Peter W. Greenwood and Marvin Lavin) *The Transition From Juvenile to Adult Court*, Rand Corporation (1984).

(with Peter W. Greenwood, Albert J. Lipson, and Allan Abrahamse) *Youth Crime and Juvenile Justice: A Report to the California Legislature*, Rand Corporation (1983).

(with Peter W. Greenwood and Joan Petersilia) *Age, Crime, and Sanctions:  The Transition From Juvenile To Criminal Court*, Rand Corporation (1980).

*Dealing with Youth Crime:  National Needs and Federal Priorities*, a policy paper prepared for the Federal Coordinating Council on Juvenile Justice and Delinquency Prevention (1975) (mimeo).

*The Court Employment Project:  A Report to the City of New York* (1974) (mimeo).

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
Alan Kachalsky, Christina Nikolov, Eric Detmer,  :
Johnnie Nance, Anna Marcucci-Nance,         :
and  Second Amendment Foundation, Inc.,     :
                                      :

                 Plaintiffs,      :     **Civil Action Number:**
                                      :     **10-cv-5413**
-against-                          :
                                      :     **(Hon. Cathy Seibel)**
Susan Cacace, Jeffrey A. Cohen,         :
Albert Lorenzo, Robert K. Holdman     :
and County of Westchester,           :
                                      :

                Defendants.     :
-------------------------------------------------------------X

## DECLARATION OF THE HONORABLE SUSAN CACACE

      The undersigned declares under penalty of perjury and in accordance with 28

U.S.C. §1746 as follows:

      1.     I am a Defendant herein and submit this declaration in support of the State

Defendants' Cross-Motion for Summary Judgment and in opposition to the Plaintiffs'

Motion for Summary Judgment based on my personal knowledge.

      2.     I am a County Court judge for Westchester.  I have been on the bench for

5 years.  Pursuant to New York State Penal Law § 265.00 (10) one of my duties as a

county judge is to act as a Westchester County handgun licensing officer.  As such, I am

familiar with the practices and procedures regarding the application for, and issuance of,

pistol, or handgun, permits in Westchester.  I rendered a Decision and Order dated

October 8, 2008 denying the application of plaintiff, Alan Kachalsky for a "full carry"

pistol license.

3.     In my role as a handgun licensing officer, I am presented with a packet of materials, including the application and the applicant's supporting documents; the results of any and all criminal and mental health background checks performed by the Department of Public Safety for Westchester, who, pursuant to Penal Law § 400.00 (4) is charged with investigating an applicant's background and application statements; and the recommendations of the various levels of the Department of Public Safety.  The materials I reviewed in connection with Kachalsky's application are annexed to the Affirmation of Anthony J. Tomari, sworn to January 26, 2011, submitted in support of the State Defendants' Cross-Motion for Summary Judgment ("Tomari Aff.") as Exhibit F.

4.     After reviewing the materials related to Mr. Kachalsky's application, I issued a decision and order denying Mr. Kachalsky's application, dated October 8, 2008, noting "the State has a substantial and legitimate interest and grave responsibility for ensuring the safety of the general public" and that licensing officers, such as myself, "are vested with broad discretion in determining applications for an unrestricted pistol license and are required to exercise their judgment on the basis of a total evaluation of relevant factors".  A copy of my October 8, 2008 Order and Decision is annexed to the Tomari Aff. as Exhibit K.

5.     I denied Mr. Kachalsky's application for an unrestricted, full carry pistol permit, as he failed to state "any facts which would demonstrate a need for self protection distinguishable from that of the general public", and because "based upon all the facts and circumstances of this application, it is my opinion that proper cause does not exist for the issuance of an unrestricted 'full carry' pistol license" to Mr. Kachalsky.

7.    Rendering the October 8, 2008 Decision and Order was my only

involvement in this controversy.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: January 18, 2011
       White Plains, New York

*Susan Cacace*

Susan Cacace

3

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
_____X

Alan Kachalsky, Christina Nikolov, Eric Detmer,     :
Johnnie Nance, Anna Marcucci-Nance,                 :
and Second Amendment Foundation, Inc.,              :
                      Plaintiffs,          :          **Civil Action Number:**
                                :          **10-cv-5413**

-against-                                           :
                                :          **(Hon. Cathy Seibel)**

Susan Cacace, Jeffrey A. Cohen,                     :
Albert Lorenzo, Robert K. Holdman                   :
and County of Westchester,                          :
_____Defendants_____X

### DECLARATION OF THE HONORABLE JEFFREY A. COHEN

The undersigned declares under penalty of perjury and in accordance with 28 U.S.C. §1746 as follows:

1.      I am a Defendant herein and submit this declaration in support of the State Defendants' Cross-Motion for Summary Judgment and in opposition to the Plaintiffs' Motion for Summary Judgment based on my personal knowledge.

2.      I currently serve as a Justice on the bench of the Appellate Division, Second Department. Prior to my appointment to the Appellate Division on December 9, 2010, I served as a County Court judge for Westchester County ("Westchester"), for three (3) years, and a New York State Supreme Court Justice for approximately one (1) year. Pursuant to New York State Penal Law § 265.00 (10) one of my duties as a Westchester county court judge is to act as a Westchester County handgun licensing officer. As such, I am familiar with the practices and procedures regarding the application for, and issuance of, pistol, or handgun, permits in Westchester. As it pertains to this controversy, I rendered a Decision and Order dated October 2, 2008 denying the application of plaintiff, Christina M. Nikolov for a "full carry" pistol license.

3.     In my role as a handgun licensing officer, I am presented with a packet of materials, including the application and the applicant's supporting documents; the results of any and all criminal and mental health background checks performed by the Department of Public Safety for Westchester, who, pursuant to Penal Law § 400.00 (4) is charged with investigating an applicant's background and application statements; and the recommendations of the various levels of the Department of Public Safety.   The materials I reviewed in connection with Nikolov's application are annexed to the Affirmation of Anthony J. Tomari, sworn to January 25, 2011, submitted in support of the State Defendants' Cross-Motion for Summary Judgment ("Tomari Aff.") as Exhibit "G".

4.     After reviewing the materials related to Ms. Nikolov's application, I   issued a decision and order denying her application for a full carry pistol license, dated October 2, 2008. A copy of my October 2, 2008 Order and Decision is annexed to the Tomari Aff as Exhibit "O".

5.     As my October 2, 2008 Order and Decision makes clear, I denied Ms. Nikolov's application for an unrestricted, full carry pistol permit, because she failed to demonstrate "that she has a special need for self-protection distinguishable from that of the general public".

6.     Rendering the October 2, 2008 Decision and Order was my only involvement in this controversy.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: January 18, 2011
       White Plains, New York


_____
JEFFREY A. COHEN

2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------X
Alan Kachalsky, Christina Nikolov, Eric Detmer,      :
Johnnie Nance, Anna Marcucci-Nance,                  :
and  Second Amendment Foundation, Inc.,              :
                                                     :
                              Plaintiffs,            :        **Civil Action Number:**
                                                     :        **10-cv-5413**
-against-                                             :
                                                     :        **(Hon. Cathy Seibel)**
Susan Cacace, Jeffrey A. Cohen,                      :
Albert Lorenzo, Robert K. Holdman                    :
and County of Westchester,                           :
                                                     :
                              Defendants.            :
--------------------------------------------------------------X

## DECLARATION OF THE HONORABLE ALBERT LORENZO

The undersigned declares under penalty of perjury and in accordance with 28

U.S.C. §1746 as follows:

1.      I am a Defendant herein and submit this declaration in support of the State

Defendants' Cross-Motion for Summary Judgment and in opposition to the Plaintiffs'

Motion for Summary Judgment based on my personal knowledge.

2.      I currently serve as an Acting Justice for the Supreme Court of the State

of New York, Westchester County.  I have served as a judge for 8 years.  Pursuant to

New York State Penal Law § 265.00 (10) one of my duties as an Acting Justice in

Westchester, is to act as a Westchester County handgun licensing officer.   As such, I am

familiar with the practices and procedures regarding the application for, and issuance of,

pistol, or handgun, permits in Westchester. As pertains to this controversy, I  rendered a

Decision denying the application of plaintiff, Eric R. Detmer, to amend, or change, his

current pistol permit for target shooting, to a "full carry" license.

3.      In my role as a handgun licensing officer, I am presented with a packet of materials, including the application and the applicant's supporting documents; the results of any and all criminal and mental health background checks performed by the Department of Public Safety for Westchester, who, pursuant to Penal Law § 400.00 (4) is charged with investigating an applicant's background and application statements; and the recommendations of the various levels of the Department of Public Safety. The materials I reviewed in connection with Detmer's amendment application are annexed to the Affirmation of Anthony J. Tomari, sworn to January 25, 2011, submitted in support of the State Defendants' Cross-Motion for Summary Judgment ("Tomari Aff.") as Exhibit H.

4.      After reviewing the materials related to Mr. Detmer's application, I denied his application for a full carry pistol license, and informed him through correspondence dated September 27, 2010. A copy of my September 27, 2010 correspondence to Mr. Detmer is annexed to the Tomari Aff as Exhibit P.

5.      As my September 27, 2010 correspondence stated, I denied Mr. Detmer's application to change his current license which permits target shooting, to an unrestricted, full carry pistol permit, because I saw no justification warranting a "full carry" permit for Mr. Detmer.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: January 19, 2011
       White Plains, New York

                                        _____
                                        ALBERT LORENZO

3

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
Alan Kachalsky, Christina Nikolov, Eric Detmer,     :
Johnnie Nance, Anna Marcucci-Nance,                 :
and  Second Amendment Foundation, Inc.,             :
                                                    :
                       Plaintiffs,                  :     **Civil Action Number:**
                                                    :     **10-cv-5413**
-against-                                           :
                                                    :     **(Hon. Cathy Seibel)**
Susan Cacace, Jeffrey A. Cohen,                     :
Albert Lorenzo, Robert K. Holdman                   :
and County of Westchester,                          :
                                                    :
                       Defendants.                  :
-------------------------------------------------------------X

## DECLARATION OF THE HONORABLE ROBERT K. HOLDMAN

The undersigned declares under penalty of perjury and in accordance with 28

U.S.C. §1746 as follows:

1.      I am a Defendant herein and submit this declaration in support of the State

Defendants' Cross-Motion for Summary Judgment and in opposition to the Plaintiffs'

Motion for Summary Judgment based on my personal knowledge.

2.      I currently serve as a Justice of the Supreme Court of the State of New

York, Bronx County.  Previously, I served as a Justice of the Supreme Court of the State

of New York, Westchester County ("Westchester").  I served in this capacity since June,

2005.  Pursuant to New York State Penal Law § 265.00 (10) one of my duties as a

Supreme Court Justice in Westchester, was to act as a Westchester County handgun

licensing officer.  As such, I am familiar with the practices and procedures regarding the

application for, and issuance of, pistol, or handgun, permits in Westchester.  As pertains

to this controversy, I  rendered two (2) decisions, both dated September 9, 2010 denying

the applications of plaintiffs Johnnie Nance ("Nance"), and Anna L. Marcucci-Nance

("Marcucci-Nance") to amend, or change, their current pistol licenses which permit target

shooting to "full carry" permits.  Each applicant also sought to amend their permits to add

one firearm and delete one firearm from their licenses, each of which was granted.

3.      In my role as a handgun licensing officer, I am presented with a packet of

materials, including the application and the applicant's supporting documents; the results

of any and all criminal and mental health background checks performed by the

Department of Public Safety for Westchester, who, pursuant to Penal Law § 400.00 (4) is

charged with investigating an applicant's background and application statements; and the

recommendations of the various levels of the Department of Public Safety.  The materials

I reviewed in connection with Nance's application are annexed to the Declaration of

Anthony J. Tomari, ("Tomari Decl.") as Exhibit I.   The materials I reviewed in

connection with Marcucci-Nance's application are annexed to the Tomari Decl.  as

Exhibit J.

4.      After reviewing the materials related to Mr. Nance's application, I  issued

a decision dated September 9, 2010, denying his application to amend his license from

target shooting to a full carry, but approving the application to add one firearm and delete

one firearm.  A copy of my September 9, 2010 Decision pertaining to Nance is annexed

to the Tomari Aff as Exhibit Q.

5.      As I noted in my September 9, 2010 Decision, "those charged with the

duty to oversee handgun licensing . . .must . . . recognize and honor the right while at the

same time recognizing the limits to the right to bear arms under the Second Amendment".

6.    My September 9, 2010 Decision further finds that "[t]he burden of establishing 'proper cause' for the issuance of a full-carry permit is upon the applicant to establish a 'special need for self-protection distinguishable from that of the general community or of persons engaged in the same profession' ".

7.    Upon reviewing Mr. Nance's application materials, I found that he had "not provided the court with any information that he faces any danger of any kind that would necessitate the issuance of a full carry firearm license; or [had] demonstrated a need for self-protection distinguishable from that of the general public or of other persons similarly situated". I thus denied his application to amend his license from target shooting to "full carry".

8.    The process and reasoning was exactly the same for Marcucci-Nance. As I noted in the September 9, 2010 Decision denying her application to amend her pistol permit from target shooting to "full carry", she, too, failed to provide "the court with any information that she faces any danger of any kind that would necessitate the issuance of a full carry firearm license; nor [had she] demonstrated a need for self-protection distinguishable from that of the general public or of other persons similarly situated". In fact, neither Mr. Nance nor Ms. Marcucci-Nance indicated that they wanted full-carry license for any self-defense purposes. Instead, the only reason either provided for a full-carry license was the need to carry handguns in connection with handgun training courses. A copy of my September 9, 2010 Decision pertaining to Marcucci-Nance is annexed to the Tomari Decl. as Exhibit R.

9.    Therefore, as with Nance's application, and for all the same reasons, I denied Marcucci-Nance's application to amend her pistol permit from target shooting to a

"full carry" license.  However, as with Nance, I did approve the amendment to the original license noting the deletion of one firearm and adding one firearm.

10.    Rendering the two (2) decisions pertaining to plaintiff Nance and plaintiff Marcucci-Nance, both dated September 10, 2010, was my only involvement in this controversy.

I declare under penalty of perjury that the foregoing is true and correct.

Dated:  January 20, 2011
White Plains, New York

_____
ROBERT K. HOLDMAN

4

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
WHITE PLAINS DIVISION

ALAN KACHALSKY, CHRISTINA NIKOLOV,
ERIC DETMER, JOHNNIE NANCE, ANNA
MARCUCCI-NANCE, and SECOND AMENDMENT
FOUNDATION, INC.,

Plaintiffs,

**Case No. 10-CV-05413**

v.

**(Hon. Cathy Seibel)**

SUSAN CACACE, JEFFERY A. COHEN, ALBERT
LORENZO, ROBERT K. HOLDMAN, AND COUNTY
OF WESTCHESTER,

Defendants.

### DECLARATION OF THE HONORABLE DAVID R. ROEFARO

The Honorable David R. Roefaro, declares under penalty of perjury and in accordance
with 28 U.S.C. §1746 as follows:

1.      I am the Mayor of the City of Utica ("Utica"), having been sworn into office on
January 1, 2008. I make this declaration in support of the motion for summary judgment of
Susan Cacace, Jeffrey A. Cohen, Albert Lorenzo and Robert K. Holdman, ("State Defendants"),
and in opposition to the Plaintiffs' motion for summary in the above captioned proceeding, and to
outline Utica's interest in reducing handgun violence and seeing the "proper cause" requirement
of New York's "full carry" licensing statute upheld.

2.      It would be detrimental to Utica's interests, and the interests of cities like Utica, to
remove the element of proper cause from consideration in issuing permits to carry concealed
weapons. Mayors understand proper cause as a necessary public safety buffer that permits the
reasonable regulation of the issuance of concealed carry licenses, in allowing persons who are
able, to make an appropriate showing to obtain licenses.

APPX. 521

3.      Shortly before I took office in 2008, gun crimes were rising in my city. We had even lost an officer in a shooting involving a concealed handgun during a routine traffic stop that year. In my 2009 State of the City Address, I promised my citizens that I would do my best to eradicate gun violence from our city. I partnered with other mayors in this cause and successfully fought to lower the amount of gun crimes in Utica as well as in our sister cities.

4.      I believe that the licensing laws in New York are fundamental to our efforts to keep Utica safe and to lowering the amount of violence. Other states without a discretionary element in their gun licensing schemes, like New York's proper cause provision, have experienced more guns on the streets and may even supply more guns to cities like mine. I can say with complete confidence that removing the "proper cause" requirement will hurt public safety. Any policy that allows an individual to carry a concealed weapon without substantial screening, beyond mere criminal and mental-health background checks, would increase the danger to both citizens and police officers alike, and propel the false idea that a greater proliferation of gun possession on the streets is somehow desirable and more important than allowing the city to properly use its police force to protect its citizenry.

5.      To understand the magnitude of the challenge we face, it is worth noting that in Utica, we take one illegal gun off the streets every week. Most, nearly 90%, come from other states. Encouraging more public possession of concealed handguns will only intensify our difficulties. In my experience as Mayor, more guns on our streets will increase violence and exacerbate a city culture where the populace would feel unsafe venturing out to our public areas. The growth of a fearful anxiety would undermine our efforts to attract businesses and families to our city to enable it to grow.

6.      In sum, the proper cause requirement is a reasonable and necessary element of a thorough background check for anyone who wishes to carry a concealed weapon in public . It will limit carry concealed weapons to those individuals who have some greater reason than "just

because" and is essential in my office's efforts to make Utica a thriving and vibrant community. It's just that simple.

7.   Respectfully, I humbly request that the Court uphold judicial discretion in seeking proper cause for the issuance of a concealed carry license.

Hon. David R. Roefaro
Mayor of the City of Utica

Sworn before me
this 24th Day of
January 2011

JOHN P. ORILIO
Notary Public in the State of New York
Reg. #01OR4647270
Qualified in Oneida County
My Commission Expires January 31, 20___ 14

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
WHITE PLAINS DIVISION

ALAN KACHALSKY, CHRISTINA NIKOLOV,
ERIC DETMER, JOHNNIE NANCE, ANNA
MARCUCCI-NANCE, and SECOND AMENDMENT
FOUNDATION, INC.,

                      Plaintiffs,                    **Case No. 10-CV-05413**

        v.                                           **(Hon. Cathy Seibel)**

SUSAN CACACE, JEFFERY A. COHEN, ALBERT
LORENZO, ROBERT K. HOLDMAN, AND COUNTY
OF WESTCHESTER,
                      Defendants.

---

## DECLARATION OF THE HONORABLE STEPHANIE A. MINER

The Honorable Stephanie A. Miner declares under penalty of perjury and in accordance
with 28 U.S.C. §1746 as follows:

1.      I am the Mayor of the City of Syracuse ("Syracuse"), having been sworn into
office effective January 1, 2010.  I make this declaration in support of the motion for summary
judgment of Susan Cacace, Jeffrey A. Cohen, Albert Lorenzo and Robert K. Holdman, in
opposition to the Plaintiffs' motion for summary and to outline Syracuse's interest in reducing
handgun violence and seeing the "proper cause" requirement of New York's "full carry" permits
upheld.

2.      I believe the "proper cause" provision of the New York State handgun licensing
statute is helpful in regulating the number of concealed, loaded and operable handguns on the
streets of Syracuse, and that it would be adverse to the interests of Syracuse to remove the
element of proper cause from consideration in issuing permits to carry concealed weapons. In my
belief, the requirement of "proper cause" enhances public safety by allowing the reasonable
regulation of the issuance of concealed carry licenses. It provides that such licenses will issue to

individuals who can show that they have a reasonable self-defense need to carry a concealed handgun in public, while denying licenses to those individuals who are unable to make that showing.

3.     Thus, I believe that the current laws in New York strike an important balance between the right and the responsibility of carrying a concealed handgun on the streets of Syracuse. Eliminating the proper cause provision will inevitably increase the numbers of concealed and loaded handguns in public, placing the Syracuse Police force in greater danger. It may also create a perception that because people believe that there are increased numbers of persons carrying handguns in public, they themselves should also do so, which will over time make the streets of Syracuse more dangerous.

4.     Unfortunately, the prevalence of public gun possession does more than just create a perception of violence. On October 31st of 2010, a twenty-month old toddler was murdered by a member of a criminal gang using a handgun. Gangs are a public health issue in Syracuse, and as Mayor I believe that limiting the number of guns carried in public is a valuable tool I have to control gang violence.

5.     Reasonably regulating the public possession of concealed weapons is important in securing the safety of my city; this is a not unimportant component of our effort to encourage economic growth, and we cannot afford another drain on our ability to create jobs and grow as a city.

6.     For these reasons I support the continued application of the "proper cause" requirement.

Sworn to before me this
25th day of January, 2011

_Catherine E. Carnrike_

Notary Public

Hon. Stephanie A. Miner, Esq.,
Mayor of the City of Syracuse

CATHERINE E. CARNRIKE
Notary Public, State of New York
No. 02CA6112791
Qualified in Onondaga County
Commission Expires July 12, 20/2

2

APPX. 525

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ALAN KACHALSKY, CHRISTINA NIKOLOV, ERIC
DETMER, JOHNNIE NANCE, ANNA MARCUCCI-
NANCE, and SECOND AMENDMENT FOUNDATION,
INC.,

*Plaintiff:*

-against-

SUSAN CACACE, JEFFREY A. COHEN, ALBERT
LORENZO, ROBERT K. HOLDMAN, and COUNTY
OF WESTCHESTER,

*Defendants.*

**DECLARATION**

10-CV-05413

Hon. Cathy Seibel

---

Thomas L. Fazio declares under penalty of perjury pursuant to 28 U.S.C. § 1746:

1.  I have been a member of the New York State Police for over 30 years. During my tenure, I have served in the positions of Trooper, Investigator, Lieutenant, Captain, Major – Troop Commander, Staff Inspector, Assistant Deputy Superintendent – Bureau of Criminal Investigation ("BCI") (which oversees operations for more than 1000 investigators assigned to the investigative branch of the State Police in stations and special details across the state), and now as Deputy Superintendent, with overall responsibility for field operations.   While in the BCI, I was a hostage negotiator in Poughkeepsie.  I hold the rank of Colonel.

2.  Counsel informs me that plaintiffs in this action challenge the constitutionality of the portion of New York's handgun law that prohibits the possession of concealed handguns on the street without a permit.   I submit this declaration in support of

defendants' cross-motion for summary judgment on the grounds that New York's restriction on the right to carry a concealed handgun in public is consistent with the Second Amendment.

3. From a law enforcement perspective, strong reason exists for New York's more demanding regulatory control of pistols and revolvers carried in public than those maintained for self-defense in one's home.

4. The inherent danger of firearms is readily apparent. The easy accessibility of a gun in public can increase the danger associated with emotional confrontations, such as road rage incidents, disputes involving broken relationships, or suicide attempts. One who is depressed or cannot control anger or emotions may pose a greater danger in public if he or she can simply draw a gun from a waistband. Numerous unknown people may be present and the surroundings may be unfamiliar to the shooter. Uninvolved and innocent bystanders can be placed at great risk. Handguns are particularly dangerous. It takes little skill to operate today's semi-automatic pistols. With the flick of a thumb, a shooter can drop a depleted magazine from the pistol grip. In a couple of seconds, he or she can load another magazine and chamber a round. A person wearing clothes containing a few pockets can easily carry enough magazines to supply dozens of rounds of ammunition without detection.

5. The decision of whether to fire a gun in public must be made in only a moment, and yet is enormously complicated. The State Police, for example, imposes rigorous training and qualification standards on its members before they are allowed to carry a gun. During the 26-week academy training, each recruit is educated and tested on

the capabilities and use of firearms. They are subjected to extensive range training, and must pass difficult tests before graduation. Included in the training are sessions devoted to the split-second decision to shoot. Recruits are required to view films of possible perpetrators engaged in a variety of activities and to shoot at the image on the screen when they believe deadly force is necessary. Mistakes made in training are corrected, and innocent lives in public are thereby saved. Initial gun training alone is inadequate. In the absence of unusual circumstance, members of the State Police undergo qualification testing every six months. Life and death decisions in public cannot be made without extensive training and continued reevaluation.

6. Even highly trained police officers, however, can mistake law abiding and well intentioned citizens for armed criminals. From 1981 to 2009, for instance, 26 police officers around the country have been shot and killed by fellow officers who have mistaken them for dangerous criminals. The last two tragedies occurred in New York State. *See* Reducing Inherent Danger: Report of the Task Force on Police-on-Police Shootings (2010). A variety of factors can be responsible for mistaken shootings. Mistaking a non-threatening citizen for a killer is a far greater concern in street situations than those in a home.

7. Concealed gun possession on the street poses special dangers for police officers. About 73 percent (357 of 490) of firearms used in killings of police from 2000 to 2009 were handguns (typically not the officer's own weapon), even though the restrictions on the acquisition of long guns are much less demanding. U.S. Dept. of

3

Justice, FBI, Law Enforcement Officers Killed & Assaulted (LEOKA) 2009, table 27. (fbi.gov/ucr/killed/2009/data/table_27.html; visited Jan. 17, 2011).

8.   Further, like some other states, New York imposes restrictions on police in citizen encounters that are not mandated by the United States Constitution.   Therefore, police in New York must exercise great restraint in determining whether a person is armed, and a proliferation of handguns in public can complicate that task.   New York police officers are instructed that under New York case law, police must have "founded suspicion of criminal activity" before asking questions that may lead a person to believe he or she is suspected of a crime.   Accordingly an officer with a hunch that the person is armed, but with no reasonable suspicion, may not ask if the person is carrying any guns, and may not ask the person for consent to be frisked.   I am informed by counsel that cases illustrating New York law in this area include *People v. DeBour*, 40 N.Y.2d 210 (1976) and *People v. Hollman*, 79 N.Y.2d 181 (1992).

9.   In light of the dangers accompanying handgun possession on the street, background investigations are appropriate before a permit is issued.   This process may yield information suggesting that the applicant is a poor candidate for an unrestricted pistol permit, even if he or she has no criminal or mental health record.   Obligating the state to issue permits for street gun possession to all but those with criminal or mental health records would eliminate the ability of the licensing officer to balance the information disclosed in the background investigation with the need for an unrestricted permit. Applying such a constitutional rule to the entire state would eliminate the ability to distinguish between the dissimilar concerns of a rural county such as Essex from an

urban county such as Brooklyn. It could lead to a proliferation of handguns in the public square, and thereby increase the danger to citizens and police officers alike.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on January 21, 2011, Albany, New York

Thomas L. Fazio

5

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ALAN KACHALSKY, CHRISTINA NIKOLOV, ERIC
DETMER, JOHNNIE NANCE, ANNA MARCUCCI-
NANCE, and SECOND AMENDMENT FOUNDATION,
INC.,

         *Plaintiffs*,

    -against-

SUSAN CACACE, JEFFREY A. COHEN, ALBERT
LORENZO, ROBERT K. HOLDMAN, and COUNTY OF
WESTCHESTER,

         *Defendants.*

**DECLARATION**

10-CV-05413

Hon. Cathy Seibel

---

James Sherman declares under penalty of perjury pursuant to 28 U.S.C. § 1746:

1. I am a member of the New York State Police, holding the rank of Technical Sergeant. I supervise the Pistol Permit Bureau in the agency's Office of Central Records.

2. The Pistol Permit Bureau is the repository for records concerning various classes of firearms and licenses in New York State. It provides assistance and guidance to persons charged with the responsibility of issuing firearms licenses, and to those seeking and holding pistol/revolver licenses.

3. My office gathers and maintains data regarding firearms licenses. Attached as Exhibit A is a summary of firearms license transactions received by the Pistol Permit Bureau from 1999 through 2009. The first substantive column represents the numbers of permit application that were approved at the county level and forwarded to the Bureau. The "Weapon Transaction" column lists the numbers of transactions, such as the purchase and

3.      In my role as a handgun licensing officer, I am presented with a packet of materials, including the application and the applicant's supporting documents; the results of any and all criminal and mental health background checks performed by the Department of Public Safety for Westchester, who, pursuant to Penal Law § 400.00 (4) is charged with investigating an applicant's background and application statements; and the recommendations of the various levels of the Department of Public Safety.   The materials I reviewed in connection with Nikolov's application are annexed to the Affirmation of Anthony J. Tomari, sworn to January 25, 2011, submitted in support of the State Defendants' Cross-Motion for Summary Judgment ("Tomari Aff.") as Exhibit "___'.

4.      After reviewing the materials related to Ms. Nikolov's application, I  issued a decision and order denying her application for a full carry pistol license, dated October 2, 2008. A copy of my October 2, 2008 Order and Decision is annexed to the Tomari Aff as Exhibit "__".

5.      As my October 2, 2008 Order and Decision makes clear, I denied Ms. Nikolov's application for an unrestricted, full carry pistol permit, because she failed to demonstrate "that she has a special need for self-protection distinguishable from that of the general public".

6.      Rendering the October 2, 2008 Decision and Order was my only involvement in this controversy.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: January 18, 2011
       White Plains, New York


                                        JEFFREY A. COHEN

2

# Exhibit A to Declaration of James Sherman

**Ten Year Summary of Firearms License Transactions Received at the New York State Police Pistol Permit Bureau: 1999 – 2009**

| Year | Applications Received By PPB* | Weapon Transactions Received** | Amendments Received | Dealer Gunsmith Licenses Received | Dealer Gunsmith Transaction Reports |
|------|------|------|------|------|------|
| **1999** | 10,388 | 215, 897 | 65,632 | 833 | 77,423 |
| **2000** | 11,297 | 158,036 | 70,473 | 827 | 83,303 |
| **2001** | 10,858 | 174,584 | 69,827 | 829 | 90,477 |
| **2002** | 13,416 | 202,831 | 69,606 | 818 | 91,283 |
| **2003** | 11,989 | 275,122 | 68,970 | 791 | 104,168 |
| **2004** | 12,097 | 156,409 | 64,765 | 805 | 108,630 |
| **2005** | 10,589 | 118,555 | 65,636 | 736 | 86,853 |
| **2006** | 11,344 | 241,347 | 67,117 | 733 | 93,168 |
| **2007** | 12,307 | 278,832 | 71,587 | 701 | 107,052 |
| **2008** | 13,325 | 364,458 | 73,130 | 701 | 110,787 |
| **2009** | 18,577 | 254,543 | 93,028 | 705 | 118,314 |

*Only applications approved at the county level are forwarded to and received by the NYSP Pistol Permit Bureau
**This number can be affected by backlogs existing during that specific calendar year

New York City currently has 36,017 pistol/revolver licenses on file

# Exhibit B to Declaration of James Sherman

# APPLICATIONS RECEIVED BY COUNTY
## 2007

| COUNTY | APPLICATIONS |
|---|---|
| ALBANY | 119 |
| ALLEGANY | 73 |
| BROOME | 204 |
| CATTARAUGUS | 198 |
| CAYUGA | 106 |
| CHAUTAUQUA | 265 |
| CHEMUNG | 106 |
| CHENENGO | 61 |
| CLINTON | 107 |
| COLUMBIA | 105 |
| CORTLAND | 70 |
| DELAWARE | 100 |
| DUTCHESS | 544 |
| ERIE | 961 |
| ESSEX | 91 |
| FRANKLIN | 60 |
| FULTON | 93 |
| GENESEE | 73 |
| GREENE | 54 |
| HAMILTON | 27 |
| HERKIMER | 100 |
| JEFFERSON | 98 |
| LEWIS | 46 |
| LIVINGSTON | 116 |
| MADISON | 77 |
| MONROE | 606 |
| MONTGOMERY | 68 |
| NASSAU | 849 |
| NEW YORK CITY | 2,609 (38,187 Active) |
| NYSP | 75 |
| NIAGARA | 244 |
| ONEIDA | 297 |
| ONONDAGA | 382 |
| ONTARIO | 130 |
| ORANGE | 487 |
| ORLEANS | 48 |
| OSWEGO | 146 |
| OTSEGO | 101 |
| PUTNAM | 199 |
| RENSSELAER | 164 |
| ROCKLAND | 304 |

2

| COUNTY | APPLICATIONS |
|---|---|
| ST. LAWRENCE | 192 |
| SARATOGA | 257 |
| SCHENECTADY | 108 |
| SCHOHARIE | 71 |
| SCHUYLER | 64 |
| SENECA | 38 |
| STEUBEN | 139 |
| SUFFOLK | 1,709 |
| SULLIVAN | 222 |
| TIOGA | 92 |
| TOMPKINS | 67 |
| ULSTER | 321 |
| WARREN | 79 |
| WASHINGTON | 77 |
| WAYNE | 242 |
| WESTCHESTER | 545 |
| WYOMING | 90 |
| YATES | 40 |
|  |  |
| TOTAL | 14,916 |

# APPLICATIONS RECEIVED BY COUNTY
## 2008

| COUNTY | APPLICATIONS |
|--------|--------------|
| ALBANY | 186 |
| ALLEGANY | 109 |
| BROOME | 219 |
| CATTARAUGUS | 277 |
| CAYUGA | 134 |
| CHAUTAUQUA | 271 |
| CHEMUNG | 112 |
| CHENENGO | 93 |
| CLINTON | 109 |
| COLUMBIA | 164 |
| CORTLAND | 83 |
| DELAWARE | 112 |
| DUTCHESS | 606 |
| ERIE | 811 |
| ESSEX | 64 |
| FRANKLIN | 59 |
| FULTON | 83 |
| GENESEE | 76 |
| GREENE | 108 |
| HAMILTON | 34 |
| HERKIMER | 93 |
| JEFFERSON | 195 |
| LEWIS | 85 |
| LIVINGSTON | 108 |
| MADISON | 83 |
| MONROE | 822 |
| MONTGOMERY | 81 |
| NASSAU | 896 |
| NEW YORK CITY | 2,276 (TOTAL ACTIVE – 36,937) |
| NYSP | 78 |
| NIAGARA | 272 |
| ONEIDA | 289 |
| ONONDAGA | 356 |
| ONTARIO | 159 |
| ORANGE | 640 |
| ORLEANS | 76 |
| OSWEGO | 159 |
| OTSEGO | 136 |
| PUTNAM | 197 |
| RENSSELAER | 175 |
| ROCKLAND | 263 |

2

| COUNTY | APPLICATIONS |
|---|---|
| ST. LAWRENCE | 178 |
| SARATOGA | 282 |
| SCHENECTADY | 179 |
| SCHOHARIE | 54 |
| SCHUYLER | 48 |
| SENECA | 55 |
| STEUBEN | 140 |
| SUFFOLK | 1,518 |
| SULLIVAN | 298 |
| TIOGA | 70 |
| TOMPKINS | 47 |
| ULSTER | 319 |
| WARREN | 120 |
| WASHINGTON | 95 |
| WAYNE | 430 |
| WESTCHESTER | 447 |
| WYOMING | 127 |
| YATES | 45 |
|  |  |
| TOTAL | 13,325 |

# APPLICATIONS RECEIVED BY COUNTY
## 2009

| COUNTY | APPLICATIONS |
|---|---|
| ALBANY | 193 |
| ALLEGANY | 178 |
| BROOME | 421 |
| CATTARAUGUS | 336 |
| CAYUGA | 190 |
| CHAUTAUQUA | 681 |
| CHEMUNG | 202 |
| CHENENGO | 116 |
| CLINTON | 120 |
| COLUMBIA | 215 |
| CORTLAND | 118 |
| DELAWARE | 215 |
| DUTCHESS | 678 |
| ERIE | 713 |
| ESSEX | 64 |
| FRANKLIN | 56 |
| FULTON | 139 |
| GENESEE | 185 |
| GREENE | 189 |
| HAMILTON | 37 |
| HERKIMER | 103 |
| JEFFERSON | 117 |
| LEWIS | 94 |
| LIVINGSTON | 216 |
| MADISON | 115 |
| MONROE | 1,239 |
| MONTGOMERY | 78 |
| NASSAU | 1,093 |
| NEW YORK CITY | 2,071 (TOTAL ACTIVE – 36,017) |
| NYSP | 64 |
| NIAGARA | 382 |
| ONEIDA | 372 |
| ONONDAGA | 643 |
| ONTARIO | 281 |
| ORANGE | 917 |
| ORLEANS | 132 |
| OSWEGO | 300 |
| OTSEGO | 226 |
| PUTNAM | 352 |
| RENSSELAER | 248 |
| ROCKLAND | 410 |

2

| COUNTY | APPLICATIONS |
|---|---|
| ST. LAWRENCE | 270 |
| SARATOGA | 393 |
| SCHENECTADY | 214 |
| SCHOHARIE | 98 |
| SCHUYLER | 102 |
| SENECA | 73 |
| STEUBEN | 205 |
| SUFFOLK | 1,956 |
| SULLIVAN | 285 |
| TIOGA | 149 |
| TOMPKINS | 115 |
| ULSTER | 374 |
| WARREN | 137 |
| WASHINGTON | 175 |
| WAYNE | 690 |
| WESTCHESTER | 643 |
| WYOMING | 202 |
| YATES | 68 |
|  |  |
| TOTAL | 18,577 (DOES NOT INCLUDE NYC) |

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------------X
Alan Kachalsky, Christina Nikolov, Eric Detmer, :
Johnnie Nance, Anna Marcucci-Nance, :
and  Second Amendment Foundation, Inc., :
                                         :
                  Plaintiffs, :   **Civil Action Number:**
                                    :   **10-cv-5413**
-against- :
                                    :   **(Hon. Cathy Seibel)**
Susan Cacace, Jeffrey A. Cohen, :
Albert Lorenzo, Robert K. Holdman :
and County of Westchester, :
                                    :
                Defendants. :
-----------------------------------------------------------------X

## DECLARATION OF ANDREW LUNETTA

The undersigned declares under penalty of perjury and in accordance with 28

U.S.C. §1746 as follows:

### EXPERIENCE

1.     I, Andrew Lunetta, am a Deputy Inspector in the New York City Police

Department (NYPD), assigned as the Commanding Officer of the License Division.

2.     I make this Declaration upon information and belief, based upon nearly 24

years in various assignments in the NYPD, near three years in my present assignment in

the License Division, consultation with other members from various commands within

the NYPD, and a review of NYPD records. My career has included a mix of assignments

in which I performed legal work in my capacity as an attorney, and enforcement work,

which has included patrol and supervision of investigations and patrol functions in my

capacity as a sworn member of the NYPD. My years of experience involving

police/citizen interaction in public settings (such as investigating disputes, accidents,

infractions, and crimes, as well as policing to balance rights and competing interests during the exercise of First Amendment rights at demonstrations) in New York City's busy and often stressed environment have led me to conclude that there is a need for reasonable restriction on the number of concealed handguns possessed on the street. This is best accomplished by the investigation of individual applications, subject to an administrative and legal process, in order to balance the rights of those who can demonstrate a need for self protection outside the home distinguishable from that of the general public (i.e. those who can demonstrate "proper cause") with the government interest in maintaining public safety by limiting the number of concealed handguns on the street.

## IMPORTANCE OF LAW ENFORCEMENT DISCRETION IN GUN LICENSING DETERMINATIONS

3.      New York State law gives the NYPD a central role in issuing licenses to carry handguns to persons with a residence or principal place of business within the City of New York. First, the NYPD, like the Westchester County Department of Public Safety, as a duly constituted police authority investigates applicants for handgun licenses as required by Penal Law § 400.00(4). Second, the NYPD Police Commissioner serves as a licensing officer and thus makes decisions to grant or deny licenses under §§ 265.00(10) and 400.00(1) – a role filled by judges with regard to applicants in Westchester County. Furthermore, § 400.00(6) requires a special permit from the commissioner (Special Carry – out-of-city validation – license) to carry a concealed handgun within the City, even if the bearer has a license issued in another county of the state, with certain narrow exceptions. Finally, § 400.00(11) empowers the commissioner to revoke a license at any time.

4.     Those powers are exercised pursuant to relevant chapters within Title 38 of the Rules of the City of New York (38 RCNY), which, consistent with the Penal Law, clarify how those powers will be used.  In particular, decisions on handgun licensing are made by NYPD's License Division.  Application denials can be appealed in writing to the Director of the License Division, and revocation of active licenses can be appealed by a hearing before an administrative law judge with final review by the Director, in either case leading to final agency determination. These decisions are made consistent with both the Penal Law and NYPD's regulations.

5.     Careful investigations, with an even application of standards, into both the applicant and their asserted basis for a showing of proper cause, which is designed to distinguish the applicant's need for self protection outside the home from that of the general public, ensure a precise fit between the "proper cause" requirement and the public safety interest in intelligently limiting full-carry handgun licenses.  These careful investigations take place with each application for a carry license.

6.     The NYPD's discretion over handgun licensing, while necessarily broad, is not absolute. Decisions to deny or revoke a license can be, and often are, challenged in state court under Article 78 of the Civil Practice Law and Rules.  The NYPD's decision is upheld in the majority of such cases but is sometimes overturned.

7.     Based on my and the NYPD's knowledge of handgun license applicants and of gun criminals, eliminating the "proper cause" requirement and thereby limiting the ability to deny a license to carry a handgun to only those circumstances where the applicant is prohibited from possessing a firearm by the specific provisions of federal law (18 U.S.C. § 922(g)) or state law (paragraphs (a), (c), and (e) of Penal Law § 400.00(1))

will be insufficient to prevent the granting of such licenses to potentially dangerous individuals who may commit crimes or endanger themselves. This is because only the review for "proper cause" allows the NYPD to investigate why a particular applicant wishes to carry a gun, how likely he or she is to need it for legitimate self-defense, and whether that need might be satisfied by a more limited class of license.

8.    The Penal Law directs NYPD to issue a license to carry a handgun only (with the rare exceptions noted elsewhere in PL 400.00(2)) after investigating the applicant and finding that he or she has proper cause to carry a concealed firearm in public places outside his/her home or place of business. In order to better inform applicants, NYPD has published a regulation explaining two major forms of proper cause: applicants who have received threats and those who face exceptional personal danger due to their jobs. 38 RCNY 5-03. As the regulation stresses, however, those are not the only forms of proper cause, and "the License Division will consider any proof . . . which document[s] the need for a handgun license." In any case, as required by the Penal Law, NYPD investigates applicants to confirm that they have proper cause. For example, if an applicant claims to need to carry a handgun because s/he carries large quantities of cash for business, NYPD will request records to confirm the size and frequency of the business's cash deposits.

## PROBLEMS FROM PREVALENCE OF CARRIED HANDGUNS

9.    A change to New York's licensing system that would enlarge the number of handguns carried in public, such as removal of the "proper cause" requirement, would based upon my professional experience, increase the dangers to citizens and law enforcement officers and would make it more difficult for the NYPD to do its job of

protecting the public.

10. In particular, increases in the prevalence of carried handguns will, based upon my professional experience, add to the danger facing NYPD officers. Every NYPD officer murdered in the line of duty since at least 2005 has been killed with a handgun (excluding those who died, on September 11, 2001 or thereafter, from the attacks that day).

11. The prevalence of guns poses a similar threat to law enforcement officers across the country. According to the FBI's latest report, *Law Enforcement Officers Killed and Assaulted – 2009*, 48 law enforcement officers were feloniously killed in the line of duty nationwide in 2009. Of those 48, 45 (94%) were killed by a gun, including 28 (58%) who were killed by a handgun.

12. Handgun possession plays a significant role in the commission of many crimes, and the NYPD focuses its attention accordingly. For several years, New York City has been the safest big city in America, according to an analysis of crime data released by the FBI in its *Crime in the United States,* the Uniform Crime Reports. The NYPD has had great success in crime reduction, which has occurred while the reasonable restriction of requiring "proper cause" has been in place. Based upon my experience I find it reasonable to conclude that continued success at crime reduction would be made more difficult if the restriction were removed and more firearms were carried on the street.

13. An increasing prevalence of handgun carrying will pose particular problems for officers in already dangerous situations. It will endanger officers who stop people on the street or who stop motorists during a car stop by making it more likely that

such people are armed with handguns.

14. Police encounters with plain clothes police officers and off-duty police officers have always been an area wrought with difficult tactics and great potential for danger. The tactics and split-second decisions required during these encounters could become more complicated, and therefore more dangerous, if a greater number of individuals were possessing handguns on the street.

15. A key part of the NYPD's strategy for reducing crime has been targeting areas of high crime, especially gun crime, across the City. For example, based upon my review of NYPD records and policies, Operation Impact send large numbers of officers to the precincts with the greatest crime problems. Within each precinct, commanders use data to concentrate patrol and other resources on the areas with the most crime. Not only homicide, but also shootings and other gun crimes are key factors in this targeting.

16. Especially in those targeted areas, but throughout the City, NYPD officers concentrate their efforts against illegal firearms possession. A change in New York's licensing laws that would remove the "proper cause" requirement would have the effect of making the public possession of concealed handguns more common, and would make it more difficult for police officers to distinguish between lawful and unlawful possession and take appropriate action pursuant to law. Likewise, it would make it more dangerous for law enforcement officers to deal with situations where they have reason to believe that concealed handguns are present, or when persons encountered by officers exhibit signs indicating to officers that they may be carrying a concealed handgun. The existing New York State "proper cause" provision for handgun licensing is an important tool in enabling law enforcement to enhance public safety and to provide protection to law

enforcement officers and the public in general in instances involving the potential for violence.

I declare under penalty of perjury that the foregoing is true and correct.

Date: January 26, 2011

Andrew Lunetta
1 Police Plaza
New York, NY 10038

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
Alan Kachalsky, Christina Nikolov, Eric Detmer,   :
Johnnie Nance, Anna Marcucci-Nance,           :
and Second Amendment Foundation, Inc.,      :
                                 :

                Plaintiffs,     :       **Civil Action Number:**
                                 :       **10-cv-5413**
-against-                             :
                                 :       **(Hon. Cathy Seibel)**
Susan Cacace, Jeffrey A. Cohen,           :
Albert Lorenzo, Robert K. Holdman       :
and County of Westchester,             :
                                 :
                Defendants.   :
-------------------------------------------------------------X

## DECLARATION OF BRUCE BELLOM

      The undersigned declares under penalty of perjury and in accordance with 28

U.S.C. §1746 as follows:

      1.      I am a Sergeant within the Westchester County ("County")

Department of Public Safety, assigned to the Pistol Licensing Unit as the Commanding

Officer. I make this declaration in support of the Defendants' Cross-Motion for Summary

Judgment and in Opposition to the Plaintiffs' Motion for Summary Judgment.

      2.      I have been employed by the County of Westchester for 29 years, was

promoted to Sergeant in 1991, and have been the Commanding Officer of the Pistol

License Unit of the Westchester County Department of Public Safety since May 2007.

As such, I am familiar with the practices and procedures of the County regarding the

application for pistol permit licenses within the County, and thus make this declaration

based upon personal knowledge of those practices and procedures as well as upon my

review of records kept in the normal course of business by the County.

3.     The Pistol Licensing Unit conducts the investigations directed by the statutory mandate of Penal Law §400.00(4) for applications made within the geographical location of Westchester County.  In connection with this mandate, the Pistol Licensing Unit investigates each application, compiles an investigative file for each such application, and summarizes the investigation for the New York State Judge acting as licensing officer pursuant to Penal Law §265.00(10). The Pistol License Unit maintains a copy of the applications submitted within the geographical area of Westchester County.

4.     An individual may obtain an application from the County Clerk's Office, which maintains the blank application packets as well as the original completed application files.  An application packet includes the New York State application form (Exhibit B[1]), and the New York State Police approved Pistol License Safety Information Handbook for Westchester County and investigation information forms, including Character Reference Letter forms (Exhibit C).

5.     As Exhibit A indicates, after requiring basic identifying information the applicant must state for which type of pistol/revolver license he/she is applying.  The application form provides three (3) boxes, one of which must be checked, to indicate whether the applicant seeks: a) a "carry concealed" license; b) a "possess on premises" license; or c) "possess/carry during employment" license.  The application form also requires the applicant to set forth the "reason" why he/she claims that "[a] license is required…".

6.     The application form requires the applicant to provide four (4) character references "who by their signature attest to [the applicant's] good morale

_____

[1] All Exhibits referenced herein are attached to the Declaration of Anthony J. Tomari, Esq., sworn to on January 26, 2011.

character" and to disclose whether he/she has "ever been arrested, summoned, charged or indicted anywhere for any offense, including DWI, (except traffic infractions)" and if so, to disclose the date, police agency, charge and disposition, including the court and date of disposition. (Exhibit B).

7.    In addition, the applicant  must disclose whether he/she has ever: a) been discharged from any employment or the armed forces for cause; b)  undergone treatment for alcoholism or drug use; c) suffered from any mental illness; d) had a pistol license; dealer's license; gunsmith license; or any application for such a license disapproved or had such a license revoked or cancelled; e) any physical condition which could interfere with the safe and proper use of a handgun; and f) been charged, petitioned against, a respondent, or otherwise been a subject of a proceeding in family court.  If the "YES" box to any of these questions is checked, the applicant must provide a written explanation. (Exhibit B).

8.    One set of fingerprints is collected in a digital fingerprinting system by the police members Pistol Permit Unit.

9.    The applicant must also complete the investigation information attachment applicable to the type of pistol license requested.  A copy of the investigation information attachment for a full carry pistol permit license entitled "Attachment: Full Carry", Exhibit D.

10.    A separate form is used for individuals seeking to amend a current pistol permit license, entitled "Application for Amended or Duplicate Pistol License" (hereinafter "Amendment Form", Exhibit E). The Amendment Form requests the same identifying information as the initial application form, but requests the original pistol

license number and asks the applicant to circle the reason why an amendment to the license is being sought. The Amendment Form lists as reasons: a) residence change; b) disposal of the gun; c) acquired a new gun; d) name change; e) restriction change; f) transfer; g) a duplicate license; h) surrendering the license; i) requesting a license be suspended; j) or revoked; k) the holder of the license is deceased; and l) some "other" reason.

11.     Depending upon the reason selected, the applicant is directed to provide certain pertinent information. Where the applicant is requesting a current license be changed to a "full" or concealed carry permit, the applicant must complete the same "full carry" attachment as required by an original application. *See* Exhibit C.

12.     Upon receipt of a completed initial application, a police member of the Pistol Permit Unit conducts the investigation as required under Penal Law §400.00(4). For an initial application, this investigation includes a fingerprint based criminal background check with the New York State Department of Criminal Justice Services, the Federal Bureau of Investigation and the National Instant Criminal Background system. When the applicant is filing for a restriction change, the criminal background check is updated by a search of the National Instant Criminal Background system.

13.     As part of the investigation, the applicant's identifying information is forwarded to the New York State Department of Mental Hygiene to determine if the applicant had any hospitalizations for mental illness.

14.     In addition to the background and mental health check, the investigation includes, but is not limited to, a review of the application form, Character Reference Letters submitted with the application form, and the application attachment

completed by the applicant. I review these materials and, once the investigation is deemed complete, I compile an investigation summary for the Judge. I submit this investigation and summary to my superiors. A lieutenant, the Chief Inspector of Administrative Services, and the Commissioner or a Deputy Commissioner also review the materials and return an investigation summary to me for submission to the Judge.

15.    The entire investigation file is submitted to the Judge for review and decision on the application. The role of the Pistol Permit Unit is limited to the investigation described herein. The County has no ability to grant or deny license applications or amendments.

16.    The process described above was used to compile the investigative files for Plaintiffs Alan Kachalsky (Exhibit  F ), Christina Nikolov (Exhibit  G ), Eric Detmer (Exhibit  H ), Johnnie Nance (Exhibit  I ) and Anna Marcucci-Nance (Exhibit  J ), and these are true and accurate copies of the files maintained by the Pistol Permit Unit.

17.    Based upon my review of the unofficial file management system of the Pistol Permit Unit, the Judges granted approximately 130 full carry pistol permit licenses, approximately 471 pistol permit licenses restricted to target shooting, and approximately 41 pistol permit licenses restricted to carrying during the course of employment out of the applications submitted in 2010. Approximately 76 applications from 2010 remain pending.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: White Plains, NY
January 24, 2011

Bruce Bellom

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------X
Alan Kachalsky, Christina Nikolov, and        :
Second Amendment Foundation,                   :
                                               :
                   Plaintiffs,                 :     **Civil Action Number:**
                                               :     **10-cv-5413**
-against-                                      :
                                               :     **(Hon. Cathy Seibel)**
Susan Cacace, Jeffrey A. Cohen, and            :
County of Westchester,                         :
                                               :
                   Defendants.                 :
--------------------------------------------------X

## DECLARATION OF MARGE COHEN

Marge Cohen, declares and states, under penalties of perjury, as follows:

1.      I am a Program Research Specialist in the Office of Justice Research & Performance of the New York State Division of Criminal Justice Services ("DCJS"). In that capacity I am a duly authorized custodian of, and a person authorized by DCJS to certify the authenticity of memoranda, reports, records and data compilations kept by DCJS in the course of its regularly conducted business activities.

2.      DCJS electronically maintains records regarding criminal arrests and convictions within New York as well as criminal history, and the records and data regarding criminal arrests, convictions and criminal history data attached hereto are kept by DCJS in the ordinary course of its business. This information is received at the time of the act, transaction, occurrence or event recorded therein or within a reasonable time thereafter, is recorded as a regular practice of DCJS and the state court system, it is a regular practice of DCJS to make and keep such data, and the data is maintained by DCJS in the regular course of the agency's business.

Pursuant to 28 U.S.C. §1746 I declare under penalty of perjury that the foregoing is true and correct.  Executed on January 19, 2011.

*NYS DIVISION OF CRIMINAL JUSTICE SERVICES*

**2009 FELONY ARRESTEES**
**21 YEARS AND OLDER**

| | Total Arrestees | # with Prior Fel Convs | % |
|---|---|---|---|
| Oneida | 1,005 | 394 | 39.2% |
| Onondaga | 2,396 | 910 | 38.0% |
| Westchester | 3,644 | 1,084 | 29.7% |
| New York State | 109,705 | 36,461 | 33.2% |

Source: DCJS, Computerized Criminal History Oracle file as of 12/20/2010.

*NYS DIVISION OF CRIMINAL JUSTICE SERVICES*

**PRIOR FELONY CONVICTIONS AMONG PERSONS
ARRESTED FOR FELONY PL 125 HOMICIDE
BY YEAR AND ARRESTING COUNTY
21 YEARS AND OLDER**

| Year | | Oneida | Onondaga | Westchester |
|------|------|--------|----------|-------------|
| 2000 | Persons Arrested | 6 | 24 | 47 |
| | # with Prior Fel Conv | 2 | 8 | 19 |
| 2001 | Persons Arrested | 7 | 13 | 40 |
| | # with Prior Fel Conv | 1 | 5 | 15 |
| 2002 | Persons Arrested | 10 | 22 | 34 |
| | # with Prior Fel Conv | 4 | 9 | 13 |
| 2003 | Persons Arrested | 11 | 13 | 32 |
| | # with Prior Fel Conv | 3 | 2 | 17 |
| 2004 | Persons Arrested | 9 | 22 | 20 |
| | # with Prior Fel Conv | 4 | 11 | 7 |
| 2005 | Persons Arrested | 10 | 19 | 30 |
| | # with Prior Fel Conv | 6 | 10 | 13 |
| 2006 | Persons Arrested | 12 | 21 | 17 |
| | # with Prior Fel Conv | 5 | 9 | 5 |
| 2007 | Persons Arrested | 13 | 17 | 28 |
| | # with Prior Fel Conv | 4 | 6 | 14 |
| 2008 | Persons Arrested | 11 | 14 | 9 |
| | # with Prior Fel Conv | 6 | 4 | 3 |
| 2009 | Persons Arrested | 5 | 12 | 16 |
| | # with Prior Fel Conv | 2 | 6 | 5 |

Note: Includes all completed and attempted PL 125 felony arrest charges

Source: DCJS, Computerized Criminal History Oracle file as of 12/20/2010.

JOINT APPENDIX CONTINUED
IN FOLLOWING VOLUME