# 11-3642-cv(L)
## 11-3962-cv(XAP)

IN THE

# United States Court of Appeals

### FOR THE SECOND CIRCUIT

————— ▶▶ ◀◀ —————

ALAN KACHALSKY, CHRISTINA NIKOLOV, JOHNNIE NANCE, ANNA MARCUCCI-NANCE, ERIC DETMER, SECOND AMENDMENT FOUNDATION, INC.,

*Plaintiffs-Appellants-Cross-Appellees,*

*v.*

COUNTY OF WESTCHESTER,

*Defendant-Appellee-Cross-Appellant,*

*and*

SUSAN CACACE, JEFFREY A. COHEN, ALBERT LORENZOR, ROBERT K. HOLDMAN,

*Defendants-Appellees.*

———————————

*On Appeal from the United States District Court
for the Southern District of New York (White Plains)*

## JOINT APPENDIX
## VOLUME III OF III
## Pages A558 to A724

WESTCHESTER COUNTY
    ATTORNEY'S OFFICE
Thomas Gardiner
Assistant County Attorney
*Attorneys for Defendant-Appellee-
    Cross-Appellant*
148 Martine Avenue, Room 600
White Plains, New York 10601
914-995-3652

Alan Gura
GURA & POSSESSKY, PLLC
*Attorneys for Plaintiffs-Appellants-
    Cross-Appellees*
101 North Columbus Street, Suite 405
Alexandria, Virginia 22314
703-835-9085

ERIC T. SCHNEIDERMAN
ATTORNEY GENERAL OF THE
    STATE OF NEW YORK
Simon Heller
Assistant Solicitor General
*Attorneys for Defendants-Appellees*
120 Broadway
New York, New York 10271
212-416-8025

JOINT APPENDIX

TABLE OF CONTENTS

<u>Volume I</u>:

District Court Docket Entries . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

First Amended Complaint [18] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Motion to Dismiss by Individual Defendants [30] . . . . . . . . . . . . . . . . 27

Motion to Dismiss by County of Westchester [33] . . . . . . . . . . . . . . . 29

Rotini Affidavit in Support of Motion to Dismiss [33-1] . . . . . . . . . . . 30
    Exhibit A, Cacase Decision re: Kachalsky Application . . . . . . . . 32
    Exhibit B, Cohen Decision re: Nikolov Application . . . . . . . . . . 35
    Exhibit C, Lorenzo Decision re: Detmer Application . . . . . . . . . 38
    Exhibit D, Holdman Decision re: Nance Application . . . . . . . . . 40
    Exhibit E, Holdman Decision re: Marcucci-Nance Application . 45

Tomari Declaration re: State Defendants' Motion to Dismiss [34] . . . 51
    Exhibit 2, Tomari Letter to Court, 11/5/2010 . . . . . . . . . . . . . . 54
    Exhibit 3, Rotini Letter to Court, 11/5/2010 . . . . . . . . . . . . . . . 57
    Exhibit 4, Gura Letter to Court, 11/5/2010 . . . . . . . . . . . . . . . . 60
    Exhibit 5, Tomari Letter to Court #2, 11/5/2010 . . . . . . . . . . . . 64
    Exhibit 6, Endorsed Letter, 11/8/2010 . . . . . . . . . . . . . . . . . . . . 68

Plaintiffs' Motion for Summary Judgment [39] . . . . . . . . . . . . . . . . . . 72
    Alan Kachalsky Declaration [39-9] . . . . . . . . . . . . . . . . . . . . . . 74
    Anna Marcucci-Nance Declaration [39-10] . . . . . . . . . . . . . . . . 76
    Eric Detmer Declaration [39-11] . . . . . . . . . . . . . . . . . . . . . . . . 78
    Christina Nikolov Declaration [39-12] . . . . . . . . . . . . . . . . . . . 80
    Johnnie Nance Declaration [39-13] . . . . . . . . . . . . . . . . . . . . . . 82
    Julianne Versnel Declaration [39-14] . . . . . . . . . . . . . . . . . . . . 84

Plaintiffs' 56.1 Separate Statement of Undisputed Facts [41] . . . . . . 86

State Defendants' Cross-Motion for Summary Judgment [42] . . . . . . 94

State Defendants' 56.1 Separate Statement of
    Undisputed Facts [44] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 96

Rotini Declaration Opposing Plaintiffs'
    Summary Judgment Motion [45] . . . . . . . . . . . . . . . . . . . . . . . . 132
    Exhibit A, Bruce Bellom Declaration . . . . . . . . . . . . . . . . . . . . 134
    Exhibit B, Blank Pistol Permit Forms . . . . . . . . . . . . . . . . . . . 139

Plaintiffs' 56.1 Statement Opposing Defendants'
    Summary Judgment Motion [47.1] . . . . . . . . . . . . . . . . . . . . . . 151

Westchester County's Response to Plaintiffs' 56.1 Statement [48] . . 193

Tomari Declaration in Support of State Defendants'
    Summary Judgment Motion [49] . . . . . . . . . . . . . . . . . . . . . . . . 205
    Exhibit F, Kachalsky Investigative File [49-6] . . . . . . . . . . . . . 210
    Exhibit H, Detmer Investigative File [49-8]* . . . . . . . . . . . . . . 248

Volume II:

Additional Exhibits to Tomari Declaration in
    Support of Summary Judgment
    Exhibit G, Nikolov Investigative File [49-7] . . . . . . . . . . . . . . 266
    Exhibit I, Nance Investigative File [49-9]* . . . . . . . . . . . . . . . . 343
    Exhibit J, Marcucci-Nance Investigative File [49-10]* . . . . . . . 380
    Exhibit L, Kachalsky Article 78 Petition [51-2]* . . . . . . . . . . . 413
    Exhibit M, Answer, Affirmation Opposing
        Article 78 Petition [51-3]* . . . . . . . . . . . . . . . . . . . . . . . . 428
    Exhibit N, Kachalsky Letter to Court of Appeals [51-4] . . . . . . 440

Philip Cook Declaration [52] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 446

Franklin Zimring Declaration [53] . . . . . . . . . . . . . . . . . . . . . . . . . . 486

Susan Cacase Declaration [54] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 509

Jeffrey Cohen Declaration [55] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 512

Albert Lorenzo Declaration [56] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 514

Robert Holdman Declaration [57] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 517

David Roefaro Declaration [58] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 521

Stephanie Miner Declaration [59] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 524

Thomas Fazio Declaration [60] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 526

James Sherman Declaration [61] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 531

Andrew Lunetta Declaration [62] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 542

Bruce Bellom Declaration [63] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 549

Marge Cohen Declaration [64] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 554

Volume III:

Additional Exhibits to Tomari Declaration in
     Support of Summary Judgment
     Exhibit S1, Laws of New York, Chapter 195,
          §1897 (1911) [65-2] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 558
     Exhibit S2, New York Times article, 1911 [65-2] . . . . . . . . . . . 563
     Exhibit S3, New York Tribune article, 1911 [65-2] . . . . . . . . . . 566
     Exhibit S4, "Topics of the Time," 1911 [65-2] . . . . . . . . . . . . . . 568
     Exhibit S5, New York Tribune Article, 1911 [65-2] . . . . . . . . . 571
     Exhibit S6, New York Times Article, 1911 [65-2] . . . . . . . . . . . 573
     Exhibit S7, Laws of New York, Chapter 608,
          §1897 (1913) [65-2] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 576

Exhibit S8, Laws of New York, Chapter 297,
    §1897 (1921) [65-2] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 581
Exhibit S9, 1962 Legislative Committee Report [65-3] . . . . . . 586
Exhibit S10, 1963 Legislative Committee Report [65-3] . . . . . 616
Exhibit S11, 1963 Legislative Annual Report [65-3] . . . . . . . . 622
Exhibit S12, Laws of New York, Chapter 136,
    §1903 (1963) [66-1] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 627
Exhibit S13, 1965 Legislative Committee Report [66-1] . . . . . 648
Exhibit S14, 1987 New York Senate Debate
    on Senate Bill 3409 [66-2] . . . . . . . . . . . . . . . . . . . . . . . . . 682

Notice of Appeal [82] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 719

Amended Notice of Appeal [83] . . . . . . . . . . . . . . . . . . . . . . . . . . . 721

Notice of Appeal [85] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 724

*Duplicative material in this exhibit redacted.

iv

# S (1)

THIS PAGE INTENTIONALLY LEFT BLANK

Case 7:10-cv-05413-CS   Document 65-2   Filed 02/23/11   Page 2 of 24

# Chap. 195.

## AN ACT to amend the penal law, in relation to the sale and carrying of dangerous weapons.

Became a law May 25, 1911, with the approval of the Governor. Passed, three-fifths being present.

*The People of the State of New York, represented in Senate and Assembly, do enact as follows:*

L. 1909,
ch. 88,
§§ 1896,
1897, 1899
amended.

Section 1. Sections eighteen hundred and ninety-six, eighteen hundred and ninety-seven and eighteen hundred and ninety-nine of chapter eighty-eight of the laws of nineteen hundred and nine, entitled "An act providing for the punishment of crime, constituting chapter forty of the consolidated laws," are hereby amended to read as follows:

§ 1896. **Making and disposing of dangerous weapons.**   A person who manufactures, or causes to be manufactured, or sells or keeps for sale, or offers, or gives, or disposes of any instrument or weapon of the kind usually known as a blackjack,[1] slung-shot, billy, sandclub, sandbag, bludgeon,[2] or metal knuckles, to any person; or a person who offers, sells, loans, leases, or gives any gun, revolver, pistol or other firearm or any airgun, spring-gun or other instrument or weapon in which the propelling force is a spring or air or any instrument or weapon commonly known as a toy pistol or in or upon which any loaded or blank cartridges are used, or may be used, or any loaded or blank cartridges or ammunition therefor, to any person under the age of sixteen years, is guilty of a misdemeanor.

§ 1897. **Carrying and use of dangerous weapons.**   A person who attempts to use against another, or who carries, or possesses, any instrument or weapon of the kind commonly known as a blackjack,[1] slungshot, billy, sandclub, sandbag,[2] metal knuckles or bludgeon,[2] or who, with intent to use the same unlawfully[3] against another, carries or possesses a dagger, dirk, dangerous knife, razor, stiletto, or any other dangerous or deadly instrument or weapon,[4] is guilty of a felony.

---

[1] Word "blackjack" new.
[2] Words "sandbag, bludgeon" new.
[3] Word "unlawfully" new.
[4] Words "razor, stiletto, or any other dangerous or deadly instrument or weapon," new.

Any
carry,
describ
offer, s
meanor

[6]Any
his poss
revolve:
the per
police i
peace o
ordinan
demean

Any
carry c
this sta
license
of such
in such
village c

[8]Any
have or
any pub
section
of firear
duly ap
civil or
when g
organiza

§ 18
rying of
weapon
shot, bi

---
[*] So in
[5] Word
[6] Follo
[7] Form
[8] Follo
United S
public p
[9] Word
[10] Wor
[11] Wor
[12] Wor

Case 7:10-cv-05413-CS    Document 65-2    Filed 02/23/11    Page 3 of 24

Any person under the age of sixteen years, who shall have, carry, or have in his possession,[5] any of the articles named or described in the last section, which it is forbidden therein to offer, sell, loan, lease or give to him, shall be guilty of a misdemeanor.

[6]Any person over the age of sixteen years, who shall have in his possession in any city, village or town of this state, any pistol, revolver or other firearm of a size which may be concealed upon the person, without a written license therefor, issued to him by a police magistrate of such city or village, or by a justice of the peace of such town, or in such manner as may be *prescribel by ordinance in such city, village or town, shall be guilty of a misdemeanor.

Any person over the age of sixteen years, who shall have or carry concealed upon his person in any city, village, or town of this state, any pistol, revolver, or other firearm without a written license therefor, theretofore issued to him by a police magistrate of such city or village, or by a justice of the peace of such town, or in such manner as may be prescribed by ordinance of such city, village or town, shall be guilty of a felony.[7]

[8]Any person not a citizen of the United States, who shall have or carry firearms, or any dangerous or deadly weapons in any public place, at any time, shall be guilty of a felony. This section shall not apply to the regular and ordinary transportation of firearms as merchandise, nor to sheriffs, policemen, or to other duly appointed peace officers, nor to duly authorized military or civil organizations, when parading, nor to the members thereof when going to and from the places of meeting of their respective organizations.

§ 1899. **Destruction of dangerous weapons.** The unlawful[9] carrying of a pistol, revolver, or other firearm[10] or of an instrument or weapon of the kind usually known as blackjack, bludgeon,[11] slungshot, billy, sandclub, sandbag,[12] metal knuckles, or of a dagger,

---

* So in original.
[5] Words " in any public place" omitted.
[6] Following sentence new.
[7] Formerly "misdemeanor."
[8] Following sentence formerly read: "No person not a citizen of the United States, shall have or carry firearms or dangerous weapons in any public place at any time."
[9] Word "unlawful" new.
[10] Words "or other firearm" new.
[11] Words "blackjack, bludgeon" new.
[12] Word "sandbag" new.

dirk, dangerous knife, or any other dangerous or deadly weapon,[13] by any person save a peace officer, is a nuisance, and such weapons are hereby declared to be nuisances, and when any one or more of the above described instruments or weapons shall be taken from the possession of any person the same shall be surrendered to the sheriff of the county wherein the same shall be taken, except that in cities of the first class the same shall be surrendered to the head of the police force or department of said city. The officer to whom the same may be so surrendered shall, except upon certificate of a judge of a court of record, or of the district attorney, that the nondestruction thereof is necessary or proper in the ends of justice, proceed at such time or times as he deems proper, and at least once in each year, to destroy or cause to be destroyed any and all such weapons or instruments, in such manner and to such extent that the same shall be and become wholly and entirely ineffective and useless for the purpose for which destined and harmless to human life or limb.

§ 1914 added.

§ 2. Such chapter is hereby amended by adding at the end of article one hundred and seventy-two thereof a new section to be section nineteen hundred and fourteen and to read as follows:

§ 1914. **Sale of pistols, revolvers and other firearms.** Every person selling a pistol, revolver or other firearm of a size which may be concealed upon the person whether such seller is a retail dealer, pawnbroker or otherwise, shall keep a register in which shall be entered at the time of sale, the date of sale, name, age, occupation and residence of every purchaser of such a pistol, revolver or other firearm, together with the calibre, make, model, manufacturer's number or other mark of identification on such pistol, revolver or other firearm. Such person shall also, before delivering the same to the purchaser, require such purchaser to produce a permit for possessing or carrying the same as required by law, and shall also enter in such register the date of such permit, the number thereon, if any, and the name of the magistrate or other officer by whom the same was issued. Every person who shall fail to keep a register and to enter therein the facts required by this section, or who shall fail to exact the production of a permit to possess or carry such pistol, revolver or other firearm, if such permit is required by law, shall be guilty of a misdemeanor. Such register shall be open at all reasonable hours for

---

[13] Words, " or any other dangerous or deadly weapon," new. Words " without lawful permission, license or authority so to do," omitted.

Case 7:10-cv-05413-CS    Document 65-2    Filed 02/23/11    Page 5 of 24

the inspection of any peace officer.  Every person becoming the lawful possessor of such a pistol, revolver or other firearm, who shall sell, give or transfer the same to another person without first notifying the police authorities, shall be guilty of a misdemeanor.  This section shall not apply to wholesale dealers.

§ 3. This act shall take effect September first, nineteen hundred and eleven. *In effect Sept. 1, 1911.*

---

# Chap. 196.

AN ACT to amend chapter fifty-two, laws of nineteen hundred and nine, entitled "An act relating to real property, constituting chapter fifty of the consolidated laws," in relation to officers taking acknowledgments.

Became a law May 20, 1911, with the approval of the Governor.  Passed, three-fifths being present.

*The People of the State of New York, represented in Senate and Assembly, do enact as follows:*

Section 1. Section three hundred and ten of chapter fifty-two of the laws of nineteen hundred and nine, entitled "An act relating to real property, constituting chapter fifty of the consolidated laws," is hereby amended so as to read as follows: *L. 1909, ch. 52, § 310 amended.*

§ 310.[1] A certificate of acknowledgment or proof, made within the state, by a commissioner of deeds, justice of the peace, or, except as otherwise provided by law, by a notary public, does not entitle the conveyance to be read in evidence or recorded, except within the county in which the officer making the same is authorized to act[2] at the time of making such certificate, unless authenticated by a certificate of the clerk of the same county; provided, however, that all certificates of acknowledgments or proof, made by or before a commissioner of deeds of the city of New York residing in any part therein, shall be authenticated by the[3] clerk of any county within said city, in whose office such commissioner of deeds shall have filed a certificate under the hand and seal of the city clerk of said city, showing the appointment and *When county clerk's authentication necessary.*

[1] Section heading amended out.
[2] Words "making the same is authorized to act" substituted for word "resides."
[3] Words "city clerk of said city, that the said commissioner of deeds was duly appointed and qualified as such," omitted.

# S (2)

REVOLVER KILLINGS FAST INCREASING
New York Times (1857-1922); Jan 30, 1911;
ProQuest Historical Newspapers The New York Times (1851 - 2007)
pg. 4

# REVOLVER KILLINGS FAST INCREASING

## Legislative Measure to be Urged for Curbing the Sale of Firearms.

## LAW NOT NOW ADEQUATE

### Carrying of Concealed Weapons May Be Made a Felony—What Criminal Statistics Show.

A marked increase in the number of homicides and suicides in this city, by shooting has led officials of the Coroner's office to start a movement which they hope will result in new legislation restricting the sale of firearms, especially revolvers. Based upon a study of conditions concerning homicides and suicides for the last thirteen years, George P. Le Brun, one of the Coroner's clerks, has just completed a list of recommendations to the Legislature, which he and his fellow officials believe will result in materially decreasing acts of violence in which revolvers figure.

These recommendations will be embodied in a bill to be prepared shortly probably by State Senator Timothy D. Sullivan, who is deeply interested in the subject. He announced before election that during the present session of the Legislature he would introduce a bill making it a State prison offense to carry concealed weapons.

"The increase of deaths by shooting in murder and suicide cases in this city, according to the statistics of the Coroner's office for the past year, the shooting down of Mayor Gaynor, and the recent murder of David Graham Phillips, should arouse the public to the immediate necessity of a law governing the sale of revolvers," said Mr. le Brun yesterday. "The law applying to the carrying of concealed weapons is farcical, and does not meet present conditions.

"The other day we had an example of that, when a man ran out of his house, one of the crowded avenues, shooting off a revolver at imaginary foes, but fortunately no one was hurt. He was arrested and fined $10 by a Magistrate. Had the revolver been found concealed on the man's person, he could have been punished by not only a fine, but a jail sentence.

"We should have a law, whereby a person having a revolver in his possession, either concealed or displayed, unless for some legitimate purpose, could be punished by a severe jail sentence.

"Thirteen years' experience in the Coroner's office, where I have personally investigated hundreds of homicide and suicide cases, convinces me that a rigid law, making it difficult to buy revolvers, would be the means of saving hundreds of lives. From statistics compiled in the Coroner's office we find that in 1909, 183 persons committed suicide by carbolic acid.

"Within the last few years, since the sale of poisons has been regulated by law and they cannot be purchased as easily

name and address, and be questioned as to what use he would make of the revolver."

The annual report of the Coroner's office, made public yesterday, also urges action against the indiscriminate sale of firearms.

"The increase of homicide by shooting," says the report, "indicates the urgent necessity of the proper authorities taking some measures for the regulation of the indiscriminate sale and carrying of firearms."

The total number of Manhattan homicides in 1910, as shown by the report, was 180, an increase of 15 over those of 1909, and the number of those who committed suicide was 450, an increase of only 2 over the number in 1909. Gas was used by 142 of the suicides and 133 took their lives by shooting. Fifty leaped from windows and 23 used poison.

The total number of deaths from all causes reported to the Coroners in 1910 was 5,408, an increase of 180 over 1909, and of this total 2,485, were of a violent character, following wounds by shooting, stabbing, assaults, and self-inflicted wounds (suicidal and accidental) and injuries received by falls and other mishaps.

There were also 351 deaths from accident during the year, which were originally charged to the acts of others. The largest percentage of these were caused by automobiles.

## FINED FOR SAVING A LIFE.

### Tourist Tells What Happened to a Humane German Subject.

Walter Hallamby, a Chicago broker, just returned from Europe, who was at the Waldorf-Astoria yesterday, said that, while Germany had made great strides commercially, he found much red tape in the Government service.

"Here is an instance," Mr. Hallamby said, "that came under my notice while I was in Berlin. A workman going home caught sight of a man lying on the railroad tracks, evidently with the intention of committing suicide. A train was rapidly approaching, and if the man was to be saved immediate action was necessary.

"Waving his handkerchief to stop the train, the workman threw down his basket of tools, climbed a fence, ran along the track, and dragged the would-be suicide out of danger. Then, feeling, no doubt, that he had done his duty to his fellow-man, the workman shouldered his bag and went home.

"Two days afterward he received a letter from the police. It did not contain a medal, a testimonial to his courage and presence of mind, or words of thanks. What it did contain was a schedule of fines to which the humane workman had made himself liable. It read:

| | Marks. |
|---|---|
| Damaging fence by climbing over it........... | 3 |
| Trespassing on railway....................... | 3 |
| Stopping express train without first informing station master or the signalman on duty.... | 10 |
| Leaving bag of tools to the danger of the public ....................................... | 3 |
| | |
| Total ........................................ | 19 |

"The mark is about equal to 25 cents of United States currency, so that the fines amounted to about $4.75 for saving the life of a fellow-being, and in Germany the police have supreme power over the life and property of the law-abiding citizen. A German friend who related the incident to me prided himself on the fact that his nation was so businesslike in its methods, and gave the above incident as an apt illustration."

## Chinatown Celebrates Its New Year.

Yesterday was New Year's Day in Chinatown. The festivities inaugurated at midnight on Saturday will be continued

APPX. 564

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

0072

for a week. Dating from the birth of Confucius as they do, 551 B. C., the Chinese are now celebrating the birth of the New Year 2462. All day the heads of the various Chinese firms were exchanging visits. The visitors followed their usual formal customs, presenting colored strips of paper with New Year's greetings written on them in India ink, and entering the inner rooms of their hosts with hands clasped as in prayer. Extra police were detailed to the quarter last night.

they were some years ago, there has been a marked decrease in suicide by poison. "I would recommend, first, that a shopkeeper selling revolvers should be made to pay a high license. Second, any one desiring to purchase a revolver should be compelled to go to the police to get a permit. He would there have to give his

K. 565
0073

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

# S (3)

New York Tribune (1911-1922); Feb 17, 1911;
ProQuest Historical Newspapers The New York Tribune (1841-1922)
pg. 5

# INCREASE IN HOMICIDES

## Argument in Favor of Anti-Dangerous Weapon Bill.

**(By Telegraph to The Tribune.)**

Albany, Feb. 16.—At the hearing this afternoon on the anti-dangerous weapon bill of Senator "Tim" Sullivan before the Senate Codes Committee, G. P. Lebrun, representing the New York City coroners' office, gave statistics showing that in 1910 there was an increase of 20 per cent in homicides in New York over 1909. The biggest part of these homicides, he said, took place in gang fights. He declared that many of these shootings could have been prevented under the provisions of the Sullivan bill, amended to require a person to obtain a license before he can purchase a revolver and the registration of the purchase by the store selling it. Mr. Lebrun submitted to the committee letters favoring the measure from Dr. Lyman Abbott, Henry Clews, Jacob H. Schiff, Marcus M. Marks, Bishop Greer, Isaac N. Seligman, Hudson Maxim and other prominent citizens.

In his letter Mr. Maxim said that since the shooting of Mayor Gaynor and the murder of his friend, David Graham Phillips, he had been paying a good deal of attention to proposed legislation to regulate and restrict carrying and possessing firearms and other ▓▓▓▓▓ ▓▓▓▓. He believed the Sullivan bill would bring about a much needed reform.

Dr. Albert T. Weston, coroners' physician in New York City, gave many incidents to show that persons guilty of murder could not have escaped punishment if the sale of the revolver had been registered. He referred particularly to the murder of Cæsar Young, for which Nan Patterson was tried and acquitted. He declared that if the sale of the gun found in the cab in which Young was shot could have been traced the person responsible for his death could easily have been convicted.

A number of representatives of hardware stores and arms manufacturing companies appeared against the measure. The objections of the hardware men were directed against both the licensing and registration features, while the attorneys for the manufacturers confined themselves to protesting against the requiring of licenses. They held that this requirement would not reach those whom it sought to prevent from carrying ▓▓▓▓▓▓ that is, the burglars and thugs--but that it would deter from purchasing revolvers men who sought only to protect their homes with them. The result would be, they said, that the criminals would have a greater advantage over the law abiding householder than they do now.

Ex-District Attorney Willis, of Utica, said:

"You cannot legislate murder out of a man's heart. There are seven thousand murders in the United States each year, while in Germany, where there is no restriction on the sale or possession of firearms, the average is only six hundred. But in Germany the percentage of convictions is much higher."

He contended that the men who shot Mayor Gaynor, the murderer of David Graham Phillips or the assassin of President McKinley would have carried out their purpose by some other means even if they had had no revolvers.

It was brought out at the hearing that there is now being prepared in New York by Chief Magistrate McAdoo and the Merchants' Association a bill even more drastic than the Sullivan measure. Among other things, this would require that an applicant for a license to procure a revolver whose character would have to be vouched for

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

# S (4)

TOPICS OF THE TIMES.
New York Times (1857-1922); May 17, 1911;
ProQuest Historical Newspapers The New York Times (1851 - 2007)
pg. 12

tion of significance had the speaker chosen to do so.

That's as may be, and if Dr. ADLER was troubled by the substitution, we are troubled by his trouble, and find our only consolation in the fact that he has evidently taken it lightly. But "only" is something of an exaggeration. We are, to be frank, consoled in some measure by another fact—the fact that by Dr. ADLER's own admission the report, with slight—he might have said equally slight—exceptions, was otherwise "singularly correct." We yearn for praise like that, particularly from men like Dr. ADLER, who are in the habit of saying things worth reporting and have the best of rights to complain when they are not reported with accuracy. Fortunately, he, unlike some other people we know, doesn't rage or tear his hair or ours when mistakes occur, as they will, even in meticulously careful journalism, and still more fortunately he retains his sense of humor even when asking for a correction—which is a mark of true greatness if ever there was one. (Also, it much increases the likelihood of getting the said correction printed in precisely the desired form.)

As for the substance of Dr. ADLER's address—that his society is in some sort of danger from its younger and more venturesome members—we can believe as well as hope that his alarm is needless. He should remember that he himself, not so long ago, as history counts time, was counted among the dangerously venturesome ones. This should give him understanding of, if not sympathy with, those who would go faster and further than he, in the conservatism that so often comes with years, now cares to advance. Orthodoxy and heterodoxy are interchangeable terms—if only one gives them leisure for the transposition, and Dr. ADLER has said so more than once.

## TOPICS OF THE TIMES.

**Linguistics from the Court.**

Among the other consequences, more or less momentous, of the Supreme Court's decision in the Standard Oil case will be the turning of at least a little studious attention upon three words that have undergone curious vicissitudes since the olden days when they were happily and familiarly at home in legal vocabularies. For in reviewing the history of monopolies, Chief Justice WHITE referred to the time when "it came to be that laws were passed relating to offenses such as forestalling, regrating, and en-

569

Reproduced with permission of the copyright owner.  0082  Further reproduction prohibited without permission.

crossing, by which prohibitions were placed upon the power of individuals."

Of these words, two, "forestalling" and "engrossing," have survived, though now, even for a lawyer, unless he finds them in an old book or a citation from one, their significance involves no suggestion of monopoly. It is easy enough to see how and why they had that meaning formerly, for the monopolist does forestall and he does engross. Both words, however, have long since been put to other uses, and "engross," as a transitive verb, has come to mean hardly anything except the writing out by a master penman of a formal document in a fair, large, round hand, more or less elaborately decorated with scrolls and other chirographic curlycues.

"Regrating" seems to have perished utterly from both written and spoken English, and of it there remains only a shriveling corpse in the larger dictionaries. There one learns that formerly it meant "to buy up, as provisions, in a market, for the purpose of selling them at a higher price in or near the same market." To make the poor thing mean all that was a typical example of mediaeval cruelty, and at the infliction of such a strain upon an inoffensive word etymology shudders with us. We are asked to believe that the "grate" came from "capto," and that from "capio," and while the ideas of chasing and taking do help somewhat to understanding, they do not do so very much—certainly not enough to make probable the revival of the word, even though it has behind it the potent push of the United States Supreme Court.

We might, if properly approached, consent to the regrating of a cook stove, or of a locomotive, but as the name of a crime there is no hope for it. Unless, of course, it happens to take the popular fancy. That makes anything linguistic possible. Yes, and right.

**Few Votes for the Revolver.** By a larger majority than the Senate's, and with only two more opposing votes, the Assembly has passed the Sullivan bill making felonious the unauthorized carrying of concealed weapons of the deadlier sorts, and forbidding the dealers in firearms to sell them to other than authorized persons. Evidently the antagonists of the bill—we have heard of few others than the manufacturers of pistols and those who, whether consciously or not we do not know, chose to defend the interests of those manufacturers—deemed it better to be discreet than valorous. At any rate, the expected opposition did not develop, and the bill now goes to the Governor and his signature is assured.

We do not expect, and none should, that the result of its passage will be the ushering in of the millennium—that no more murders will be committed. What can be hoped and, with some confidence, is that the evil habits of pistol-owning and pistol-carrying will gain a new odium and will be abandoned by more and more, by nearly everybody outside of the distinctly criminal class. This cannot fail to decrease appreciably the number of homicides, accidental and impulsive, while some restraint will be imposed even upon the criminals. They will not get their weapons quite as easily as in the past, and will carry them with something less of impunity. Of course the efficiency of the new law will depend upon the energy and intelligence with which it is enforced. Greatest trust, we think, can be placed in the provision requiring dealers to keep records of their sales.

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

0083

# S (5)

CALLS BILL LIFE SAVER
Telegraph to The Tribune
New-York Tribune (1911-1922); Mar 10, 1911;
ProQuest Historical Newspapers The New York Tribune (1841-1922)
pg. 4

# CALLS BILL LIFE SAVER

## Weston Says Sullivan's Will Prevent 50 Homicides Here a Year.

## PLAN TO AMEND MEASURE

### George Lebrun Declares New York Police Can Round Up 1,500 to 2,000 Revolvers.

[By Telegraph to The Tribune.]

Albany, March 9.—At a third hearing this afternoon before the Senate Codes Committee on the anti-dangerous weapon bill of Senator "Tim" ▓▓▓▓ Dr. A. T. Weston, who has had a wide experience as a coroner's physician, estimated that with this bill on the statute books at least fifty lives a year would be saved in New York City alone.

"The argument against this measure," he said, "is merely making a few dollars' profits for the hardware dealers against human lives."

George Lebrun, representing a committee of citizens and the New York Coroner's office, expressed the belief that the S▓▓▓▓ bi▓ would have the effect of enabling the New York police to round up between 1,500 and 2,000 revolvers, now being carried in the city by men of criminal tendencies. These men would then be unable to buy other revolvers, at least in this state, as men of that character could not procure licenses. He said that even if they did buy them outside the state the tendency to carry them here would be greatly lessened, as the bi▓ makes it a felony to carry a revolver and a misdemeanor to have a revolver in one's house without a license.

It is intended to amend the bi▓ ▓o it will be a misdemeanor for a person having a license to carry a revolver to transfer the weapon without giving notice to the proper authorities.

Representatives of manufacturers and dealers appeared again to oppose the bill. They also presented for the consideration of the committee a bi▓ the provisions of which were less rigid than the Su▓▓▓▓▓ bill. It is expected that the committee will report the Sullivan measure early next week.

The hearing which was to be given this afternoon on Senator Stilwell's bi▓ preventing short sales and stock speculation, was postponed for two weeks.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

# S (6)

THE NEW PISTOL LAW.
HENRY W. POLLOCK
New York Times (1857-1922); Sep 1, 1911;
ProQuest Historical Newspapers The New York Times (1851 - 2007)
pg. 6

# THE NEW PISTOL LAW.

## Senator Pollock from First-Hand Knowledge Explains Its Purposes.

*To the Editor of The New York Times:*

A part of your editorial comment on Senator Sullivan's Pistol bill conveys to the reader an impression that, through carelessness and haste in the drafting and passage of this bill, its effectiveness is doubtful. In view of the support which THE TIMES gave to this measure, and which was appreciated by me as a member of the Senate Codes Committee and as one interested in this reform, I wish to call your readers' attention to the following:

This bill received undoubtedly as much consideration and deliberation in the Senate as any other measure which it passed. The bill was introduced by Senator Sullivan on Jan. 4, and was reported out of the Codes Committee March 31; in the interim numerous public hearings were given by the Codes Committee. The bill was amended three times to conform to various suggestions made by persons in interest and by members of the Codes Committee in executive session. Similar careful deliberation was given to the bill in the Assembly, and likewise by the Governor before his approval was given thereto.

The bill had two objects. One object was to punish for the unlawful possession of dangerous firearms. In addition, the bill served the equally important object of aiding the authorities in the identification of the owner of a firearm used in the commission of a crime.

In order to bring this about, it was necessary that the law provide for an immediate registration of every firearm in the State, and not merely firearms purchased subsequently to Sept. 1, the date when the law goes into effect. It is for the former object that the carrying of a firearm concealed on one's person without a license was made a felony, thereby giving the power to our courts to impose a severer penalty for this offense than in the past, when such unlawful carrying was a misdemeanor. To accomplish the second object of the bill, the possession of a concealable firearm on one's premises was made a misdemeanor. There is no danger that any one desiring to have a revolver in his house for his protection need subject himself to prosecution for a misdemeanor. A citizen will have no more difficulty in obtaining a permit to keep a pistol on his premises than he has had in the past in obtaining a dog license for the privilege of having a dog on his premises to protect them against intruders.

The provisions of the Sullivan bill as to registration and its regulations as to the sale or other disposition of revolvers and pistols will enable our police authorities to trace firearms used in the commission of crimes, which could not be done if no provision had been made for their registration if in the possession of individuals on the 1st day of September. Statistics will perhaps show that the average life of a firearm in the hands of a citizen is a great number of years, and therefore if those now owned by citizens were not registered the full benefit of the Sullivan bill would not be appre-

Reproduced with permission of the copyright owner.   Further reproduction prohibited without permission.

ciated for many years to come.

I might say that the only opposition to any of the provisions of this bill urged before either of the committees of the Legislature was that of representatives of manufacturers and dealers in firearms.

HENRY W. POLLOCK.

New York, Aug. 30, 1911.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

APPX. 575

0071

# S (7)

Case 7:10-cv-05413-CS    Document 65-2    Filed 02/23/11    Page 20 of 24

*[left margin fragments]*
the respective ove
s of the poor of su
sum exceeding
s during any y
ereof may conse
er orders be give
e payment of su

ation to sentence
d New York St

he Governor. Pass

resented in Senat

ed and eighty-fou
hundred and nine
t of crime, consti
is hereby amended

Industrial Schoo
ls.  When a male
victed of a crimi
male person
sixteen years
may, instead o
ate prison or i
use of refuge unde
Where the convi
rst, second, third
must be a house o
ty for the reform
w York; where th
any other distric
e industrial schoo

*[main column]*

Where a male person of the age of sixteen years and under the age of eighteen years has been convicted of juvenile delinquency or of a misdemeanor, the trial court may, instead of sentencing him to imprisonment in a state prison or in a penitentiary, direct him to be confined in a house of refuge established by the managers of the society for the reformation of juvenile delinquents in the city of New York; under the provisions of the statute relating thereto. Where a female person not over the age of twelve years is convicted of a crime amounting to felony, or where a female person of the age of twelve years and not over the age of sixteen years is convicted of a crime, the trial court may, instead of sentencing her to imprisonment in a state prison or in a penitentiary, direct her to be confined in the New York State Training School for Girls, under the provisions of the statute relating thereto, but nothing in this section shall affect any of the provisions contained in section twenty-one hundred and ninety-four.

§ 2. All acts or parts of acts inconsistent with this act are hereby repealed.

§ 3. This act shall take effect immediately.

---

## Chap. 608.

AN ACT to amend the penal law generally, in relation to the carrying, use and sale of dangerous weapons.

Became a law May 21, 1913, with the approval of the Governor. Passed, three-fifths being present.

*The People of the State of New York, represented in Senate and Assembly, do enact as follows:*

Section 1. Section eighteen hundred and ninety-seven of chapter eighty-eight of the laws of nineteen hundred and nine, entitled "An act providing for the punishment of crime, constituting chapter forty of the consolidated laws," as amended by chapter one hundred and ninety-five of the laws of nineteen hundred and eleven, is hereby amended to read as follows:

*[right margin notes]* L. 1909, ch. 88, § 1897, as amended by L. 1911, ch. 195, amended.

§ 1897. **Carrying and use of dangerous weapons.** A person who attempts to use against another, or who carries, or possesses, any instrument or weapon of the kind commonly known as a blackjack,

---

1 Following sentence new.

slungshot, billy, sandclub, sandbag, metal knuckles, bludgeon
bomb or bombshell,[1] or who, with intent to use the same unlawfully
against another, carries or possesses a dagger, dirk, dangerous
knife, razor, stiletto, or any other dangerous or deadly instrument
or weapon, is guilty of a felony.

Any person under the age of sixteen years, who shall have
carry, or have in his possession, any of the articles named or
described in the last section, which is forbidden therein to offer
sell, loan, lease or give to him, shall be guilty of a misdemeanor.

Any person over the age of sixteen years, who shall have in
his possession in any city, village or town of this state, any pistol
revolver or other firearm of a size which may be concealed upon
the person, without a written license therefor, issued to him[2] a
hereinafter prescribed, shall be guilty of a misdemeanor.

Any person over the age of sixteen years, who shall have or
carry concealed upon his person in any city, village, or town of
this state, any pistol, revolver, or other firearm without a written
license therefor, [3] issued as hereinafter prescribed and licensin
such possession and concealment, shall be guilty of a felony.

Any person not a citizen of the United States, who shall have
or carry firearms, or any dangerous or deadly weapons in any
[4]place, at any time, shall be guilty of a felony, [5]unless authorized
by license issued as hereinafter prescribed.

[6] It shall be the duty of any magistrate in this state to whom an
application therefor is made by a commissioner of correction of a
city or by any warden, superintendent or head keeper of any state
prison, penitentiary, workhouse, county jail or other institution
for the detention of persons convicted of or accused of crime, or
offences, or held as witnesses in criminal cases, to issue to each of
such persons as may be designated in such applications, and who
is in the regular employ of such institution of the state, or of any
county, city, town or village therein, a license authorizing such

---

[1] Inclusion of bomb and bombshell, new.
[2] Remainder of sentence formerly read: "by a police magistrate of such
city or village, or by a justice of the peace of such town, or in such manner
as may be prescribed by ordinance in such city, village or town, shall be
guilty of a misdemeanor."
[3] Remainder of sentence formerly read: "theretofore issued to him by a
police magistrate of such city or village, or by a justice of the peace of
such town, or in such manner as may be prescribed by ordinance of such city,
village or town, shall be guilty of a felony."
[4] Word "public" omitted.
[5] Remainder of sentence new
[6] Following paragraph new.

ĸ, 1913.    [CHAP

metal knuckles, bludgeon
to use the same unlawfull
a dagger, dirk, dangerou
erous or deadly instrumen

en years, who shall have
of the articles named o
forbidden therein to offe
uilty of a misdemeanor.
years, who shall have i
vn of this state, any pisto
ch may be concealed upo
erefor, issued to him
of a misdemeanor.
years, who shall have o
city, village, or town o
firearm without a writte
prescribed and licensin
e guilty of a felony.
ed States, who shall have
r deadly weapons in an
felony, [5]unless authorize
d.
e in this state to whom an
issioner of correction of
r head keeper of any state
jail or other institution
f or accused of crime, or
cases, to issue to each o
ch applications, and wh
ion of the state, or of an
license authorizing suc

a police magistrate of su
such town, or in such manne
ty, village or town, shall
eretofore issued to him by
by a justice of the peace of
bed by ordinance of such cit

person to have and carry concealed a pistol or revolver while such person remains in the said employ.

[6] It shall be the duty of any magistrate in this state, upon application therefor, by any householder, merchant, storekeeper or messenger of any banking institution or express company in the state, and provided such magistrate is satisfied of the good moral character of the applicant, and provided that no other good cause exists for the denial of such application, to issue to such applicant a license to have and possess a pistol or revolver, and authorizing him (a) if a householder, to have such weapon in his dwelling, and (b) if a merchant, or storekeeper, to have such weapon in his place of business, and (c) if a messenger of a banking institution or express company, to have and carry such weapon concealed while in the employ of such institution or express company.

[6] In addition, it shall be lawful for any magistrate, upon proof before him that the person applying therefor is of good moral character, and that proper cause exists for the issuance thereof, to issue to such person a license to have and carry concealed a pistol or revolver without regard to employment or place of possessing such weapon, provided, however, that no such license shall be issued to any alien, or to any person not a citizen of and usually resident in the state of New York, except by a judge or justice of a court of record in this state, who shall state in such license the particular reason for the issuance thereof, and the names of the persons certifying to the good moral character of the applicant.

[6] Any license issued in pursuance of the provisions of this section may be limited as to the date of expiration thereof and may be vacated and cancelled at any time by the magistrate, judge or justice who issued the same or by any judge or justice of a court of record. Any license issued in pursuance of this section and not otherwise limited as to place or time or possession of such weapon, shall be effective throughout the state of New York, notwithstanding the provisions of any local law or ordinance.

[6] This section shall not apply to the regular and ordinary transportation of firearms as merchandise, nor to sheriffs, policemen, or to other duly appointed peace officers, nor to duly authorized military or civil organizations, when parading, nor to the members thereof when going to and from the place of meeting of their respective organizations.

[5] So in original.
[6] Following paragraph new.

1630                    LAWS OF NEW YORK, 1913.

§ 1914, as added by L. 1911, ch. 195, amended.

§ 2. Section nineteen hundred and fourteen of such as added by chapter one hundred and ninety-five of this nineteen hundred and eleven, is hereby amended to read

§ 1914. **Sale of pistols, revolvers and other firearms.** No revolver or other firearms of a size which may be upon the person, shall be sold, or given away, or otherwise posed of, except to a person expressly authorized under provisions of section eighteen hundred and ninety-seven of the law to possess and have such firearm.

[7]Any person selling or disposing of such firearm in violation of this provision of this section shall be guilty of a misdemeanor.

Every person selling a pistol, revolver or other firearm which may be concealed upon the person, whether such a retail dealer, pawnbroker, or otherwise, shall keep a register which shall be entered at the time of sale, the date of sale age, occupation and residence of every purchaser of such revolver or other firearm, together with the calibre, make, manufacturer's number or other mark of identification on pistol, revolver or other firearm. Such person shall also delivering the same to the purchaser, require such purchaser produce a license[8] for possessing or carrying the same required by law, and shall also enter in such register the date such permit, the number thereof, if any, and the name of magistrate or other officer by whom the same was issued. Any person who shall fail to keep a register and to enter therein facts required by this section or who shall fail to exact production of a permit to possess or carry such pistol, revolver or other firearm, if such permit is required by law, shall guilty of a misdemeanor. Such register shall be open at reasonable hours for the inspection of any peace officer. Every person becoming the lawful possessor of such a pistol, revolver or other firearm, who shall sell, give or transfer the same to other person without first notifying the police authorities, shall be guilty of a misdemeanor. This section shall not apply wholesale dealers.

In effect Sept. 1, 1913.

§ 3. This act shall take effect September first, nineteen hundred and thirteen.

---

[7] Following sentence new.
[8] Word "license" substituted for word "permit."

# S (8)

Case 7:10-cv-05413-CS    Document 65-3    Filed 02/23/11    Page 2 of 46

siding justice may direct, and
· of being heard in his defense.
attorney within a department,
ding justice of the appellate
prosecute all proceedings for
orneys and counsellors at law
, in a county wholly included
a population of over five hun-
at an attorney and counsellor
rated bar association approved
eedings and, upon the termina-
ne compensation to be paid to
aw for the services rendered
mpensation shall be a charge
certificate and shall be paid

nmediately.

_____

**296.**

in relation to jail liberties in
estchester.

pproval of the Governor.  Passed,
· present.

*York, represented in Senate*

d and fifty-seven of chapter
hundred and nine, entitled
tuting chapter forty-three of
by chapter one hundred and
hundred and eleven, chapter
dred and fifteen and chapter
aws of nineteen hundred and
d as follows:

ounties.   The following are
he counties specified, to wit:
hole of said county; for the

_____

ion of over five hundred thousand

county of the Bronx, the whole of said county; for the county
of Onondaga, the whole of the city of Syracuse; for the county
of Monroe, the whole of the city of Rochester; for the county of
Erie, the whole of the city of Buffalo; for the county of West-
chester, the whole of the city of White Plains;[1] for the county of
Dutchess, the whole of the city of Poughkeepsie; for the county
of Kings, the whole of that county; for the county of Albany,
the whole of the city of Albany; for the county of Schenectady,
the whole of the city of Schenectady; for the county of Jefferson,
the whole of the city of Watertown; for the county of Herkimer,
the whole of the village of Herkimer; for the county of Rensse-
laer, the whole of the city of Troy; for the county of Niagara,
the whole of the city of Lockport; for the county of Steuben,
the whole of the village of Bath; for the county of Nassau, the
whole of the town of Hempstead; for the county of Broome, the
whole of the city of Binghamton; for the county of Genesee, the
whole of the village of Batavia.

§ 2. This act shall take effect immediately.

_____

## Chap. 297.

AN ACT to amend the penal law, in relation to licenses to have,
possess or carry a pistol or revolver.

Became a law April 21, 1921, with the approval of the Governor.  Passed,
three-fifths being present.

*The People of the State of New York, represented in Senate
and Assembly, do enact as follows:*

Section 1.  Section eighteen hundred and ninety-seven[1a] of the
penal law is hereby amended to read as follows:[2]

§ 1897.  **Carrying and use of dangerous weapons.**   1.  A person
who attempts to use against another, or who carries, or pos-
sesses any instrument or weapon of the kind commonly known as
a blackjack, slungshot, billy, sand club, sandbag, metal knuckles,
bludgeon, or who, with intent to use the same unlawfully against

L. 1909,
ch. 88,
§ 1897
amended.

_____

[1] Words "for the county of Westchester, the whole of the city of White
Plains," new.
[1a] As amended by L. 1911, ch. 195; L. 1913, ch. 608; L. 1915, ch. 390;
L. 1917, ch. 580; L. 1919, ch. 413.
[2] Division of section into subdivisions new.

APPX. 582

another, carries or possesses a dagger, dirk, dangerous knife, razor, stiletto, or any other dangerous or deadly instrument, or weapon, is guilty of a misdemeanor, and if he has been previously convicted of any crime he is guilty of a felony.

2. A person who carries or possesses a bomb or bombshell, or who, with intent to use the same unlawfully against the person or property of another, carries or possesses any explosive substance, is guilty of a felony.

3. Any person under the age of sixteen years, who shall have, carry, or have in his possession, any of the articles named or described in the last section, which is forbidden therein to offer, sell, loan, lease or give to him, shall be guilty of juvenile delinquency.

4. Any person over the age of sixteen years, who shall have in his possession in any city, village or town of this state, any pistol, revolver or other firearm of a size which may be concealed upon the person, without a written license therefor, issued to him as hereinafter prescribed, shall be guilty of a misdemeanor, and if he has been previously convicted of any crime he shall be guilty of a felony.

5. Any person over the age of sixteen years, who shall have or carry concealed upon his person in any city, village or town of this state, any pistol, revolver, or other firearm without a written license therefor, issued as hereinafter prescribed and licensing such possession and concealment, shall be guilty of a misdemeanor, and if he has been previously convicted of any crime he shall be guilty of a felony.

6. Any person not a citizen of the United States, unless authorized by license issued as hereinafter prescribed, who shall have or carry firearms, or any dangerous or deadly weapons in any place, at any time, shall be guilty of a misdemeanor, and if he had been previously convicted of any crime he shall be guilty of a felony.

7. It shall be the duty of the police commissioner in the city of New York and of any magistrate elsewhere in this state to whom an application therefor is made by a commissioner of correction of the city or by any warden, superintendent or head keeper of any state prison, penitentiary, workhouse, county jail or other institution for the detention of persons convicted of or accused of crime, or offenses, or held as witnesses in criminal cases, to issue to each of such persons as may be designated in such applications

r, dirk, dangerous knife, razor,
eadly instrument, or weapon,
he has been previously con-
felony.

sses a bomb or bombshell, or
awfully against the person or
sses any explosive substance,

xteen years, who shall have,
of the articles named or de-
forbidden therein to offer,
ll be guilty of juvenile de-

een years, who shall have in
own of this state, any pistol,
iich may be concealed upon
therefor, issued to him as
· of a misdemeanor, and if
ny crime he shall be guilty

en years, who shall have or
ny city, village or town of
: firearm without a written
: prescribed and licensing
e guilty of a misdemeanor,
d of any crime he shall be

United States, unless au-
prescribed, who shall have
·r deadly weapons in any
iisdemeanor, and if he had
e he shall be guilty of a

ommissioner in the city of
iere in this state to whom
immissioner of correction
endent or head keeper of
ise, county jail or other
:onvicted of or accused of
n criminal cases, to issue
ated in such applications

and who is in the regular employ in such institution of the state,
or of any county, city, town or village therein, a license author-
izing such person to have and carry concealed a pistol or revolver
while such person remains in the said employ.

8. It shall be the duty of the police commissioner in the
city of New York and[3] elsewhere of a judge or justice of a
court of record[4] in this state, upon application therefor, by
any householder, merchant, storekeeper or messenger of any
banking institution or express company in the state, and pro-
vided such police commissioner, judge or justice[5] is satisfied
of the good moral character of the applicant, and provided that no
other good cause exists for the denial of such application, to issue
to such applicant a license to have and possess a pistol or revolver,
and authorizing him (a) if a householder, to have such weapon in
his dwelling, and (b) if a merchant, or storekeeper, to have such
weapon in his place of business, and (c) if a messenger of a bank-
ing institution, or express company, to have and carry such weapon
concealed while in the employ of such institution or express
company.

9. In addition, it shall be lawful for the police commissioner
in the city of New York or[6] elsewhere in this state, for a
judge or justice of a court of record,[7] upon proof before him
of[*] the person applying therefor is of good moral character,
and that proper cause exists for the issuance thereof, to issue to
such person a license to have and carry concealed a pistol or
revolver without regard to employment or place of possessing
such weapon, provided, however, that no such license shall be
issued to any alien, or to any person not a citizen of and usually
a resident in the state of New York, except by the police commis-
sioner in the city of New York and elsewhere by a judge or
justice of a court of record in this state, who shall state in such
license the particular reason for the issuance thereof, and the
names of the persons certifying to the good moral character of the
applicant.

10. Any license issued in pursuance of the provisions of this
section may be limited as to the date of expiration thereof and
may be vacated and canceled at any time by the police commis-

* So in original.  [Should be " that."]
³ Words " of any magistrate " omitted.
⁴ Words " of a judge or justice of a court of record," new.
⁵ Words " judge or justice " substituted for words " or magistrate."
⁶ Words " any magistrate " omitted.
⁷ Words " for a judge or justice of a court of record," new.

sioner[2] or elsewhere than in the city of New York, by any judge or justice of a court of record.

11. The conviction of a licensee of a felony in any part of the state shall operate as a revocation of the license. Any license issued in pursuance of this section and not otherwise limited as to place or time of possession of such weapon, shall be effective throughout the state of New York, notwithstanding the provisions of any local law or ordinance.

12. All licenses issued pursuant to the provisions of this section shall be in such form that there shall be attached to the body of such license a coupon which shall be removed and retained by any person who sells or otherwise provides the licensee with any weapon contemplated in such license. Any dealer or other person who sells, gives, or otherwise provides a person with any pistol, revolver or other firearm except upon the presentation, removal and retention of such coupon, shall be guilty of a misdemeanor.

13. This section shall not apply to the regular and ordinary transportation of firearms as merchandise, nor to sheriffs, policemen, or to other duly appointed peace officers, nor to duly authorized military or civil organizations when parading, nor to the members thereof when going to and from the place of meeting of their respective organizations.

§ 2. This act shall take effect immediately.

---

## Chap. 298.

An ACT to amend the penal law, in relation to discrimination in leasing apartments.

Became a law April 21, 1921, with the approval of the Governor. Passed, three-fifths being present.

*The People of the State of New York, represented in Senate and Assembly, do enact as follows:*

§ 2041 added.

Section 1. Chapter eighty-eight of the laws of nineteen hundred and nine, entitled "An act providing for the punishment of crime, constituting chapter forty of the consolidated laws," is hereby amended by inserting therein a new section, to be section twenty hundred and forty-one, to read as follows:

[2] Words ", magistrate, judge or justice who issued the same," omitted.

# S (9)

Legislative Document (1962)                                    No. 29

aws, rules and regula-
ould constitute a very
ed by State and local
he enforcement would
ossible to print all of
s, but it is possible to
ndex which could be
y when necessary.    I
ho are working in the

ing as Counsel to the
ince June, 1955, when
onsultant to the Divi-
of Audit and Control.
nded that its research
overnment on April 1,
ated Assistant Counsel
vember, but have con-
ee on Fire Laws.   It is
ocal Government on a
position I will again
of my old friends in
intances.

# STATE OF NEW YORK

---

# REPORT

## OF THE

# NEW YORK STATE
# JOINT LEGISLATIVE COMMITTEE

## ON

# FIREARMS AND AMMUNITION



1962

## COMMITTEE PERSONNEL

SENATOR ALBERT BERKOWITZ, *Chairman*

ASSEMBLYMAN JULIUS VOLKER, *Vice-Chairman*

SENATOR FRANK J. PINO, *Secretary*
SENATOR WALTER VAN WIGGEREN
SENATOR JANET HILL GORDON
SENATOR HENRY A. WISE
SENATOR JULIAN B. ERWAY
ASSEMBLYMAN HYMAN E. MINTZ
ASSEMBLYMAN LEO A. LAWRENCE
ASSEMBLYMAN ROBERT M. QUIGLEY
ASSEMBLYMAN JOHN J. RYAN
ASSEMBLYMAN THOMAS V. LaFAUCI
FREDERICK J. LUDWIG, *Legal Consultant*

### Ex Officio

SENATOR WALTER J. MAHONEY, *President Pro Tem.,* The Senate
ASSEMBLYMAN JOSEPH E. CARLINO, *Speaker,* The Assembly
SENATOR JOSEPH ZARETZKI, *Minority Leader,* The Senate
ASSEMBLYMAN GEORGE L. INGALLS, *Majority Leader,* The Assembly
ASSEMBLYMAN ANTHONY J. TRAVIA, *Minority Leader,* The Assembly
SENATOR AUSTIN W. ERWIN, *Finance Committee Chairman,* The Senate
ASSEMBLYMAN FRED W. PRELLER, *Ways and Means Committee Chairman,* The Assembly

[3]

## LETTER OF TRANSMITTAL

*To the Legislature of the State of New York:*

Pursuant to concurrent resolution adopted by the Senate and the Assembly on March 31, 1960, and to similar resolution thus adopted on March 31, 1961, the Joint Legislative Committee on Firearms and Ammunition respectfully submits this report covering the work and product of its investigation to and including the present date.

ALBERT BERKOWITZ, *Chairman*

JULIUS VOLKER, *Vice-Chairman*

FRANK J. PINO, *Secretary*

WALTER VAN WIGGEREN

JANET HILL GORDON

HENRY A. WISE

JULIAN B. ERWAY

HYMAN E. MINTZ

LEO A. LAWRENCE

ROBERT M. QUIGLEY

JOHN J. RYAN

THOMAS V. LaFAUCI

March 5, 1962.

[5]

## SUMMARY OF CONTENTS

INTRODUCTION .................................................. 9

HISTORICAL BACKGROUND ...................... ................. 10

COMPARATIVE LAWS ............................................ 11

ANALYSIS OF THE NEW YORK STATUTES........................ 16

THE PROPOSED STATUTE........................................ 19

RECOMMENDATIONS ............................................ 24

APPENDIX
    A. Resolution Creating the Committee............................ 25
    B. Questionnaire .............................................. 27
    C. Tabulation of Responses...................................... 33

LIST OF TABLES
    1. Estimated Offenses Involving Weapons Committed in the United
       States, 1960 .............................................. 11
    2. Restrictions on Carrying Firearms Concealed.................... 13
    3. Types of Licensing Authority for Possession.................... 14
    4. Proposed and Existing Statute Compared As to Form............ 17
    5. Explanation of Modification of Content of Existing Law by Proposed
       Statute .................................................. 21

[7]

Case 7:16-cv-05415-CS   Document 65-3   Filed 02/23/11   Page 11 of 46

# INTRODUCTION

This is the initial report of the Joint Legislative Committee on Firearms and Ammunition. The Committee was created by concurrent resolution on March 31, 1960, "to undertake a comprehensive examination and study of all laws pertaining or in any way relating to or affecting the sale, possession and regulation of firearms and ammunition and the administration of such laws, and to make appropriate recommendations relating thereto" (Appendix A, *post*, p. 25). Under the resolution, the Committee is "to make appropriate recommendations relating thereto," and, in addition, the Committee shall report to the Legislature "the results of its examination and study and shall include therein such legislative proposals as it deems necessary to make the recommendations effective." By similar resolution (No. 38, 1961), the Committee was extended until March 31, 1962.

The Committee held numerous full working meetings, including one for two days (September 13–15, 1961). Frequent staff consultations were conducted. As of this date, the following work of the Committee has been completed:

Historical background of Anglo-American regulation of firearms, weapons and the like. Common law experience in this field is more than six centuries old. There had been at least a century of legislative experience in other American states when New York entered the field in 1911.

Comparative laws of fifty states, the District of Columbia and the Federal Government. Wide diversity of legislation on firearms, weapons and the like, is primarily due to differences in density of population of the regulated areas.

Intensive analysis of New York statutes in the field. A detailed fifty-point questionnaire was sent to each of the sixty-two district attorneys, nearly all criminal court judges (83 County Judges and General Session Justices), police chiefs (87) and numerous rod-and-gun associations of the State. The questionnaire sought to elicit expert opinion on specific, concrete proposals to reorder, rearrange, standardize and conform to judicial construction existing New York statutes. Both the questionnaire and tabulation of responses are set forth (Appendix, B, *post*, p. 27; C. p. 33).

A comprehensive bill embodying the reordering, rearrangement, standardization and conformation to judicial construction of the New York statutes dealing with firearms, ammunition, weapons, dangerous appliances, instruments and substances has been pre-filed and introduced on behalf of the Joint Legislative Committee (Sen. Pr. No. 2, Int. No. 2; A. Pr. No. 551, Int. No. 551). This bill is the heart of the work of the Committee. The bill is the first and only comprehensive measure dealing with weapons recommended by a State

APPX. 591

10

committee or commission in the more than half-century since enactment of the original statute. The bill is certainly the most comprehensive of any of the more than five hundred amendments to the original statute proposed during this period. The bill is also the most concise restatement of existing provisions of law: its ten consecutive sections are fully one-third fewer than the discrete ones in the existing law and its language is about one-third shorter. As directed by the resolution creating the Committee, the bill is made part of this Report.

Recommendations for continuance of the Joint Legislative Committee in order to appraise informed opinion of public officials and others interested in the enforcement of the provisions of the bill; to integrate more fully, if possible, miscellaneous provisions of law relating to the use and attempted use of weapons contained in the bill; and to consider meritorious substantive changes in the law.

Each of these points shall be treated as concisely as possible.

## HISTORICAL BACKGROUND

"No one shall come before the justices, or go, or ride armed." (Statute of Northumberland, 1328, 2 Edw. III, c. 3.) This statute is still in force in England. Similar prohibition on carrying offensive weapons in public places appeared in colonial Massachusetts (Criminal Code of the Province of Mass., c. 18, § 6), and was re-enacted after the American Revolution (2 Mass. Laws, 1780–1800, § 653).

Curiously enough, the first statute to prohibit carrying concealed weapons was enacted in a frontier state (Kentucky Acts 1812–1813, c. 89). The statute was held unconstitutional (*Bliss v. Commonwealth*, 2 Litt. 90 (Ky. 1822)). Notwithstanding savages and wild animals, the struggle for law and order against self-help and vigilantism continued. The State Constitution was amended (Ky. Const., Art. XIII, § 25 (1850)) and another statute prohibiting the carrying of concealed weapons was enacted (Ky. Rev. Stat., v. I, p. 414 (Stanton, 1860)). This statute was sustained under the amended Constitution (*Hopkins v. Commonwealth*, 3 Bush. 480 (Ky. 1868)).

Under the English common law, it was a misdemeanor to go armed in public places but not criminal to carry a concealed weapon. Early American legislative and judicial experience was precisely opposite to the English view. The early statutes prohibited concealed rather than openly carried weapons (Ky. Acts 1812–1813, c. 89, *supra*; Ind. Laws 1819, c. 23; Ark. Rev. Stat., c. 44, div. 8, art. I, § 37 (1837)). When a statute undertook prohibition of weapons carried both concealed and openly, (Ga. Laws 1837, p. 90), the court sustained the statute for concealed weapons but held it invalid for openly carried ones (*Nunn v. State*, 1 Ga. 243 (1846)).

The Constitution of the United States provides that "a well-regulated militia being necessary to the security of a free state, the

Case 7:10-cv-05413-CS   Document 65-3   Filed 02/23/11   Page 13 of 46

right of the people to keep and bear arms shall not be infringed'' (Amend. II). Like all of the provisions in the Bill of Rights, this has been held to be a restriction only on the power of Congress and the Federal Government, and not on the power of the states (*Presser* v. *Illinois*, 116 U. S. 252; *United States* v. *Cruikshank*, 92 U. S. 542, 553). Similar or identical provisions in numerous state constitutions have been repeatedly held to confer a collective and not an individual right to bear arms. Such provisions guarantee the arming of a state militia for the common defense and for warfare. They do not restrict a state from requiring an individual to obtain a license to carry a firearm. They do not prevent a state from regulating an individual in the manufacture, transport, disposition and possession of weapons in order to preserve the peace and prevent crime (*People* v. *Persce*, 204 N. Y. 397; *People* v. *Warden of City Prison*, 154 App. Div. 413; *Commonwealth* v. *Patsone*, 231 Pa. 46, affirmed, 232 U. S. 138).

## COMPARATIVE LAWS

More than a quarter of a million serious crimes are committed with weapons annually in the United States, and the number is on the increase.

TABLE 1.   ESTIMATED OFFENSES INVOLVING WEAPONS COMMITTED IN THE UNITED STATES, 1960

| Crime | Estimated Number | | Change: 1960 over 3 year average | |
|---|---|---|---|---|
| | 1960 | 1957–1959 average | Number | Percent |
| TOTAL | 228,340 | 196,850 | +31,490 | +16 |
| Murder | 9,140 | 8,290 | + 850 | +10 |
| Robbery | 88,970 | 72,540 | +16,430 | +23 |
| Aggravated Assault | 130,230 | 116,020 | +14,210 | +12 |

—*Uniform Crime Reports* (1960) p. 2.

Excluded are the following crimes or occurrences usually or always involving weapons:

| Crime or Occurrence | Number, 1960 | Change, 1960 |
|---|---|---|
| Forcible rape | 15,560 [est.] | +1,320, or +9 percent over 3 year average |
| Weapons, carrying, possessing | 38,120 [actual arrests] | |
| Fatal accidents with firearms | 2,300 | + 42, or +2 percent over preceding year |
| Suicides | 19,450 | +1,120, or +6 percent over preceding year |

The legislative problem posed for the fifty-one American jurisdictions (fifty states and the District of Columbia), charged with the major responsibility of criminal law enforcement in the United States, suggests itself: to enact statutes adapted to prevent these crimes and occurrences before they happen, and, at the same time, preserve the legitimate interests of individual liberty, training for

12

national defense, hunting, target shooting and trophy collecting. The divergency of state solutions to this problem is perhaps best illustrated by the statutes of our two newest states.

The State of Hawaii has a comprehensive, consecutive and concise group of provisions entitled, ''Firearms and Ammunition'' (Rev. Laws Hawaii (1955) c. 157). Firearms are defined to include rifles and shotguns (§ 157-1). Visitors to the state must register their weapons with a local police chief within forty-eight hours (§ 157-2). A permit from the police chief is required for possession on the premises of any firearm with a barrel less than eighteen inches in length. Licensees must either be citizens over twenty years of age or duly accredited foreign representatives. For an on-premises permit, there is no fee (§ 157-3). Rifles and shotguns having barrels more than eighteen inches in length, as well as ammunition therefor, must be kept on the premises, except when being transported from the place of purchase in a wrapper, or when actually being used for hunting or target shooting (§ 157-6). Persons convicted of a crime involving violence or narcotics may not lawfully possess such rifles, shotguns or ammunition (§ 157-7); neither may anyone under twenty years of age, except when actually engaged in hunting or target shooting, and then only if over the age of sixteen, accompanied by an adult and duly licensed as a hunter (§ 157-4). The manufacture, possession and disposition of machine-guns, submachine-guns, automatic rifles, cannons, firearm silencers, bombs and bombshells are outlawed (§ 157-8). So also is the defacement of firearms (§ 157-10). Permits to carry a pistol, revolver or ammunition therefor, as distinguished from on-premises possession of a firearm, may be issued by the police only in cases of fear of injury to person or property. Persons under twenty and those previously convicted of a felony or adjudged insane are ineligible. The fee for this permit to carry is ten dollars (§ 157-9). Manufacture and sale of firearms similarly require licensing by the same authority and at the same fee (§§ 157-30, 157-31). Exemptions from these provisions are made for police departments, sheriffs, military and naval forces of the state and the United States, mail carriers, law enforcement officers and duly authorized organizations (§ 157-11).

The State of Alaska, on the other hand, has no statute regulating manufacture, transport, disposition, possession or defacement of firearms, or other weapons. A single statute makes criminal careless use of firearms, and then apparently only when injury results (Alaska Comp. Laws Ann. (1949), c. 4, § 65-4-20).

If a single explanation for such divergence is possible, then it must be in terms of difference in density of population. Alaska, with virtually no regulation of firearms and weapons, is by far the least densely populated state with only 0.4 persons per square mile. Hawaii, with comprehensive regulation, has a density of population almost double the national average (50.5) with 98.6. The State of New York, with 350.1, has a density of population almost seven times the national average. The significance of density of population for firearms regulation in the United States is apparent in the

13

l trophy collecting.
em is perhaps best
.tes.

nsecutive and con-
and Ammunition"
e defined to include
state must register
l forty-eight hours
equired for posses-
l less than eighteen
tizens over twenty
entatives. For an
Rifles and shotguns
length, as well as
nises, except when
in a wrapper, or
hooting (§ 157–6).
: or narcotics may
unition (§ 157–7);
except when actu-
then only if over
duly licensed as a
and disposition of
:, cannons, firearm
§ 157–8). So also
ermits to carry a
aguished from on-
by the police only
y. Persons under
lony or adjudged
:arry is ten dollars
similarly require
e fee (§§ 157–30,
e made for police
l of the state and
t officers and duly

statute regulating
or defacement of
kes criminal care-
hen injury results
:0).

: possible, then it
pulation. Alaska,
bons, is by far the
s per square mile.
ensity of popula-
h 98.6. The State
ition almost seven
density of popu-
is apparent in the

stringency of statutes controlling the carrying of concealed firearms.

Forty-four of the fifty-one American jurisdictions flatly prohibit the carrying of pistols and revolvers concealed, and an additional state prohibits such carrying in settled parts. Of these jurisdictions, twenty-eight provide for licensing such carrying. The significance of density of population is apparent in this distribution. Of the half-dozen states that do not prohibit such carrying, only two have a density of population equal to or greater than the national average. Of the forty-five jurisdictions prohibiting such carrying, twenty-seven have such density.

TABLE 2. RESTRICTIONS ON CARRYING FIREARMS CONCEALED

[Jurisdictions with density of population equal to or greater than national average appear in bold]

NO LICENSE REQUIRED

| REQUIRE LICENSE | | | Prohibit Generally | Prohibit in Settlem'nts | Allow Pistols | Allow if no Intent | No Prohibition |
|---|---|---|---|---|---|---|---|
| TOTAL: 28 | | | 16 | 1 | 2 | 2 | 2 |
| Ala. | Iowa | N. D. | Ariz. | Neb. | N. M. | Ark. | Minn. | Alaska |
| Calif. | Me. | Ore. | Idaho | Ohio | | La. | Vt. | N. C. |
| Colo. | Mass. | Pa. | Ill. | Okla. | | | | |
| Conn. | Mich. | R. I. | Kan. | S. C. | | | | |
| Del. | Miss. | S. D. | Ky. | Tenn. | | | | |
| D. C. | Nev. | Va. | Md. | Tex. | | | | |
| Fla. | N. H. | Wash. | Mo. | Utah | | | | |
| Ga. | N. J. | W. Va. | Mont. | Wisc. | | | | |
| Haw. | N. Y. | Wyo. | | | | | | |
| Ind. | | | | | | | | |

In these regulations, the historic factor of whether the firearm is carried openly or concealed has frequently been decisive. Apparently in only nine (Conn., D. C., Hawaii, Ind., Mass., N. M., N. Y., Tex., W. Va.) of the forty-five prohibiting jurisdictions, does the prohibition extend to openly carried firearms. It is usual in such jurisdictions to exclude possession on premises (place of business or abode, or one's own property), as distinguished from carrying on or about one's person, for certain well-defined categories of persons, such as aliens, drug addicts or peddlers, ex-felons or persons convicted of crimes of violence, habitual drunkards, incompetents, or minors. Only two states require licenses for such possession, Hawaii in the case of rifles and shotguns as well as pistols and revolvers, and New York in the case of pistols and revolvers. A third state (Mich.) requires inspection by a peace officer of such firearms in order to assure safety.

The appropriate authority for licensing has been the subject of considerable comment, particularly by the county judges in fifty-six counties of New York, in the responses to the questionnaire of the Joint Legislative Committee. New York has a dual authority: in the city of New York and county of Nassau, the police commissioner; in the remaining fifty-six counties, the county judge having his office in the county in which application may duly be made.

Case 7:10-cv-05413-CS Document 65-3 Filed 02/23/11 Page 16 of 46

What is the comparative law in jurisdictions that license possession of firearms?

TABLE 3. TYPES OF LICENSING AUTHORITY FOR POSSESSION

| Police | Judicial | Other Admin. | Either of Three | Either Police or Judicial | Either Police or Admin. |
|---|---|---|---|---|---|
| Ala. | Del. | Fla. | Colo. | N. D. | Conn. |
| Calif. | Ga. | Mich. | Mass. | S. D. | Me. |
| D. C. | N. Y. [56 co's] | R. I. | | Wash. | Miss. |
| Haw. | Va. | | | | N. H. |
| Ind. | W. Va. | | | | |
| Iowa | | | | | |
| Nev. | | | | | |
| N. J. | | | | | |
| N. Y. [6 co's] | | | | | |
| Ore. | | | | | |
| Pa. | | | | | |
| Wyo. | | | | | |

The usual term of such license is one year with three states providing expiration at the end of the succeeding year (Iowa, Maine, N. Y.) and one state three years (Ga.). License fees vary from fifty-cents (Ga., Mass., Ore., S. D.) to ten dollars (Hawaii) and even twenty dollars (W. Va.). Customarily, full age, good character and absence of a criminal record are required. The latter is variously defined, ranging from conviction of a felony, through conviction of a crime of violence, to conviction of any crime. Notwithstanding this requirement, only three states make the taking of fingerprints compulsory (Calif., N. J., N. Y.), and in only two others is such practice discretionary with the licensing authority (Conn., Ind.). Nearly all of these jurisdictions provide that the license be carried with the weapon and produced on demand by a peace officer. This requirement, omitted from the existing law in New York, has been supplied in the bill introduced in behalf of the Joint Legislative Committee. About half of the states with a judicial licensing authority require publication by the applicant of his notice to apply (Del., W. Va.).

In two respects, the licensing requirements in New York are notably less stringent than a representative group of other states. In eight states, a proper purpose, usually fear of injury to person or property, must be established (Del., Hawaii, Ind., Mass., N. H., N. D., R. I., Va.). Two of these states also make target shooting a proper purpose (Ind., Mass.) and one both target shooting and hunting (N. H.). Five states that license possession require the posting of security, amounting to either $100 (Fla., Ga.), $300 (R. I.), $2,000 (certain licenses, Miss.) or $3,500 (W. Va.). The bond in West Virginia accrues to any person damaged by accidental, negligent, improper or unlawful use of the weapon.

The most strategic control of firearms by a state is effective regulation of their transfer. Three methods are in current use: licensing of dealers; permits for purchasers; and the keeping of a register by dealers. Probably, the licensing of dealers is most effective of the three methods: any violation imperils a business investment. Yet

ise possession

OSSESSION

ce   Either Police
l        or Admin.

Conn.
Me.
Miss.
N. H.

ree states pro-
(Iowa, Maine,
ees vary from
(Hawaii) and
good character
latter is vari-
, through con-
rime. Notwith-
the taking of
only two others
thority (Conn.,
t the license be
a peace officer.
New York, has
e Joint Legisla-
idicial function
notice to apply

New York are
of other states.
njury to person
l., Mass., N. H.,
arget shooting a
et shooting and
sion require the
Fla., Ga.), $300
(W. Va.). The
ed by accidental,
a.
is effective regu-
ent use: licensing
g of a register by
it effective of the
investment. Yet

less than half of the jurisdictions that license possession also seek control of transfer by licensing dealers (Ala., Calif., D. C., Haw., Ind., Iowa, N. H., N. J., N. Y., N. D., S. D., Wash., Pa), with only a handful requiring permits of purchasers (Mass., Mich., N. J.) or the keeping of a register (R. I., Wyo.). A few states that do not license possession nevertheless undertake control of transfer either by licensing dealers (N. C., Tenn.), requiring permits of purchasers (N. C.), or providing for a register (Ill., La., Mo., N. C., Utah, Vt.). The significance of state control of transfer by license transcends state boundaries. So long as a state has such licensing requirement, it is a Federal crime to ship any firearm, firearm silencer, or revolver or pistol ammunition, from outside the state to anyone within it not licensed to purchase (15 U. S. C., § 902 (c)).

About a third of the American jurisdictions prohibit defacement of firearms and about half outlaw machine-guns. Most jurisdictions provide for confiscation and destruction of contraband weapons, although some states auction such confiscated weapons and others retain them for use by peace officers. A universal exemption covers peace officers and military personnel. Additional penalties for the use of firearms in the commission of crime is a frequent provision. By far, less frequent are statutory presumptions, either of possession of a weapon arising from presence in a place (usually an automobile) where such weapon is found, or of defacing a weapon arising from possession of the same, or of unlawful intent arising from unlicensed possession of a firearm. When such presumptions have been enacted, grave constitutional questions concerning the reasonableness of the relationship between the fact presumed and the fact proven has caused many courts to hold such statutes invalid (see, e.g., People v. Murquia, 6 Cal. 2d 190, 57 P. 2d 115; Everett v. State, 208 Ind. 145, 195 (N. E. 77)). The recommendations of the National Conference of Commissioners on Uniform Acts (Uniform Pistol Act, Uniform Firearm Act, Uniform Machine Gun Act) have met with acceptance in toto only by a handful of jurisdictions.

Unlike the states which have residual police power, the capability of the Federal Government in domestic affairs is limited to powers delegated by the Constitution. The most formidable of these powers in the control of crime is the power to tax: considerations of state boundaries are irrelevant to its exercise and it may operate on purely local and intrastate situations. Moreover, the fact that the effect of a given tax, e.g., on narcotics, or on bookmakers and wagers, is primarily regulatory and only incidentally productive of revenue, does not invalidate the tax. Yet Congress has used this power with much more restraint than it has exercised others in the control of firearms and ammunition.

In 1927, under the postal power, pistols and revolvers were declared nonmailable, except to certain Federal agencies and officers (18 U. S. C. § 1715). When Congress exercised its taxing power in the National Firearms Act of 1934 (26 U. S. C. §§ 2720–2733, 3260–3266), pistols and revolvers—included in the original draft of the bill—were deleted from the definition of a firearm. "Firearms" were defined to include only the sensational weapons of gang war-

16

fare, machine guns, firearm silencers and sawed-off shotguns, *i.e.*, ones with barrels less than eighteen inches (unless .22 calibre, in which case the exempt barrel length could be sixteen inches). For such "firearms", steep annual taxes were imposed on dealers ($200), pawnbrokers ($300) and manufacturers ($500) (26 U. S. C. § 3260), and a tax of $200 levied on anyone transferring them (26 U. S. C. § 2720). Pistols and revolvers were relegated to the usual 10 percent excise or duty levied on manufacturers or importers, with the usual exemptions for purchases by Federal, state or local authorities (26 U. S. C. § 2700). Yet in 1938 when Congress sought to regulate the interstate and foreign transport of firearms in the so-called Federal Firearms Act (15 U. S. C. §§ 901–909), the term "firearm" was broadly defined to include "any weapon, by whatever name known, which is designed to expel a projectile or projectiles by the action of an explosive and a firearm muffler or firearm silencer, or any part or parts of such weapon" (15 U. S. C. § 901 (3)). Pistol and revolver ammunition were also brought within the act (15 U. S. C. § 901 (7)). Under this act, manufacturers and dealers were licensed for shipment and receipt of firearms and such ammunition, and such shipment or receipt to or by convicts, persons under indictment and fugitives from justice was prohibited. By requiring a license to purchase firearms or such ammunition, a state would automatically make a Federal crime of shipments from outside its borders to unlicensed manufacturers and dealers within them (15 U. S. C. § 902 (e)).

## ANALYSIS OF THE NEW YORK STATUTES

One commission has reported that "no area of the Penal Law is more bogged down in a logomachy of confusion than those sections dealing with weapons" (*Report of N. Y. Temp. Comm. on Youth & Delinquency* (1955) p. 39). More than three-score amendments in the half century since enactment of the original statute have contributed to the confusion. A number of deficiencies are apparent on the face of the statute.

[1] As to form, the sections of the Penal Law dealing with weapons, and dangerous instruments, appliances and substances, are not only not consecutive but actually scattered through almost a hundred numbered provisions. The numbering system is not uniform: some sections are designated by number only; others, by a number and letter hyphenation. The same is true of the designations of subdivisions: some have both number and letter in hyphenated form; others, a letter only in parentheses. Spelling of identical terms varies; *e.g.*, a "slungshot" appearing in several enumerations of weapons suddenly becomes a "slingshot" in an additional otherwise identical enumeration. One lengthy subdivision (§ 1897 (10.b)) was so confused that it was set forth in three complete and separate versions, a condition that has been corrected since the Committee began its work.

[2] With respect to order and arrangement of content, the accumulation of amendments over fifty years has buried much of the

17

off shotguns, *i.e.*,
∴ss .22 calibre. in
een inches). For
posed on dealers
$500) (26 U. S. C.
sferring them (26
gated to the usual
∴rs or importers,
∴ral, state or local
n Congress sought
of firearms in the
01–909), the term
weapon, by what-
projectile or pro-
rm muffler or fire-
∴on'' (15 U. S. C.
were also brought
this act, manufac-
nd receipt of fire-
or receipt to or by
s from justice was
∴ firearms or such
a Federal crime of
manufacturers and


∴TATUTES

∴f the Penal Law is
than those sections
∴. Comm. on Youth
e-score amendments
∴al statute have con-
∴encies are apparent


∴w dealing with wea-
and substances, are
d through almost a
g system is not uni-
r only; others, by a
s true of the .desig-
∴mber and letter in
∴renteses. Spelling
appearing in several
a ''slingshot'' in an
One lengthy subdi-
was set forth in three
∴at has been corrected


of content, the accu-
∴ buried much of the

form and structure of the statute. Definitions of terms are scattered through many subdivisions of four sections. Definitions of criminal conduct have no particular systematization: possession, manufacture, transport, disposition and even use are variously commingled, and in most cases distributed through several non-consecutive sections. Presumptions are scattered through four sections, provisions governing exemptions and immunity through five, and those relating to forwarding information through three sections and more than half-dozen subdivisions. Several subdivisions of Section 1897 of the Penal Law are devoted to lengthy provisions on licensing; many of these are repeated almost verbatim and with equal prolixity in Section 1914. Specification of criminal use and attempted use of weapons are scattered through almost a hundred sections of the Penal Law, ranging from Section 1897 to 1991. Table 4, *infra*, indicates with particularity these defects that appear on the face of the existing law, and also points out how they are remedied in the proposed statute introduced on behalf of the Joint Legislative Committee.

TABLE 4. PROPOSED AND EXISTING STATUTE COMPARED AS TO FORM

| | Item | Proposed Statute | Existing Statute |
|---|---|---|---|
| LENGTH | Number of sections | 10 | 15 |
| | Number of lines | 577 | 830 |
| SEQUENCE | Sections | Consecutive [§§1896–1905] | Distributed [§§1896–1899; 1906; 1914; 1915; 1919; 1944; 1991] |
| NUMBERING SYSTEM | Sections | Numbered without letters | Several hyphenated with letters [§§1897-a; 1897-b; 1897-c; 1898-a] |
| | Subdivisions | Uniformly numbered or lettered | Irregularly designated [e.g., §1897 has subdivision "9", and also "9-a" and "9-b"; there is a subdivision "10-a" and "10-b", but no subdivision 10. Subdivision 13 appears in two parts, designated "(a)" and "(b)"] |
| | I. Definition of Terms | All in §1896 | Distributed [§§1897(1-a), (9-a); 1897-a; 1897-b; 1914 (2), (3), (6)] |
| | II. Definition of Criminal Conduct: | | |
| | —Possession | All in §1897 | Distributed [§§1897(1), (1-a), (2), (3), (4), (5), (6); 1897-a] |
| | —Manufacture | All in §1898(1) | In §1896 |

18

TABLE 4. PROPOSED AND EXISTING STATUTE COMPARED AS TO FORM
—(Concluded)

| | Item | Proposed Statute | Existing Statute |
|---|---|---|---|
| | —Transport | All in §1898(2) | Distributed [§§1896; 1897 (13 (a))] |
| | —Disposition | All in §1898(3), (4), (5) | Distributed [§§1896; 1897-b(1), (2)] |
| | —Defacement | All in §1898(6) | In §1897-b |
| | III. Presumptions | All in §1899 | Distributed [§§1897(1-a); 1897-b (4); 1898; 1898-a] |
| | IV. Exemptions and Immunity | All in §1900 | Distributed [§§1896; 1897(1-a), (3), (6-a), (13(a)), (13(b)), (15); 1897-a; 1898-a; 1899(4)] |
| ORDER AND ARRANGE-MENT | V. Destruction | All in §1901 | In §1899 |
| | VI. Forwarding Information | All in §1902 | Distributed [§§1897(14); 1897-c (1), (2); 1915(1), (2), (3), (4)] |
| | VII. Licensing | All in §1903 | Distributed [§§1897(7), (8), (9), (9-a), (9-b), (10-a), (10.b), (11), (12); 1914] |
| | VIII. Prohibited Uses | All in §1904 | Distributed [§§1897(1), (1-a), (6-b); 1906; 1919; 1991] |
| | IX. Committing Crime While Armed | All in §1905 | In §1944 |

But other defects, perhaps not so apparent, contribute to the confusion surrounding the weapons law of this State. Dozens of provisions are vague and in need of clarification. Others are inconsistent, or flatly contradictory, and in need of standardization. Still others are absurd and unnecessary, or duplicative and overlapping, and in need of elimination. Many of these provisions are pointedly illustrated in the Questionnaire (Appendix B, *post*, pp. 27–32). Precisely how the proposed statute of the Joint Legislative Committee undertakes to remedy these defects is set forth in Table 5, *post*.

The detailed fifty-point Questionnaire of the Joint Legislative Committee sought to drain the most informed opinion in the State on the resolution of concrete problems posed by the present law. All of the district attorneys, nearly all of the criminal court judges and police chiefs and most of the representative rod-and-gun associ-

Case 7:10-cv-05413-CS   Document 65-3   Filed 02/28/11   Page 21 of 48

MPARED AS TO FORM

| :e | Existing Statute |
|---|---|
| | Distributed [§§1896; 1897 (13 (a))] |
| (4), | Distributed [§§1896; 1897-b(1), (2)] |
| | In §1897-b |
| | Distributed [§§1897(1-a); 1897-b (4); 1898; 1898-a] |
| | Distributed [§§1896; 1897(1-a), (3), (6-a), (13(a)), (13(b)), (15); 1897-a; 1898-a; 1899(4)] |
| | In §1899 |
| | Distributed [§§1897(14); 1897-c (1), (2); 1915(1), (2), (3), (4)] |
| | Distributed [§§1897(7), (8), (9), (9-a), (9-b), (10.a), (10.b), (11), (12); 1914] |
| | Distributed [§§1897(1), (1-a), (6-b); 1906; 1919; 1991] |
| | In §1944 |

contribute to the con-
State. Dozens of pro-
n. Others are incon-
d of standardization.
duplicative and over-
of these provisions are
Appendix B, *post*, pp.
of the Joint Legislative
ts is set forth in Table

the Joint Legislative
d opinion in the State
d by the present law.
criminal court judges
ive rod-and-gun associ-

ations were canvassed. A tabulation of their responses appears in Appendix C, *post*, p. 33. In a field fraught with divergence of opinion, there was preponderant agreement on practically every item. Actual 100 percent unanimity occurred in three instances. One of these [Item No. 1] asked whether, in the name of clarity and orderly arrangement, the sections and subdivisions of the weapons law should be rearranged and regrouped. Another sought approval, disapproval or the respondent's own variation, for a general order and arrangement of the Joint Legislative Committee. [Item No. 7]. This general order and arrangement has been embodied in the statute introduced on behalf of the Committee, and to this we now turn.

## THE PROPOSED STATUTE

It is not likely that a criminal will carefully consider the text of the law before he murders or steals. Yet it is important that a fair warning should be given to everyone, in language that everyone will understand, of what the law proposes to do after a certain line is overstepped. To make the warning effective, the line should be clear and unmistakable. One reason for the importance of such fair warning is that the criminal law is an instrument of moral education. Consider the weapons laws of one of our most sparsely inhabited states. This state prohibits the carrying of firearms, openly or concealed, in its settled parts. But this state also requires that its clearly-worded statute in eighteen consecutive sections be posted in both English and Spanish in hotels, boardinghouses, barrooms, drinking saloons and dance halls. Persons in charge of such places must, under specified penalties, immediately call the attention of anyone in observable violation of the weapons law to the posted statute.

The heart of the work of this Committee has been the bill introduced on its behalf. The bill is made part of this report. The bill contains tables giving a sentence-by-sentence distribution of provisions of the present law in the proposed statute. It also contains an explanatory note. The bill is the first and only comprehensive measure dealing with weapons recommended by a State committee or commission in more than fifty years since enactment of the original statute. The bill is certainly the most comprehensive of any of the more than five hundred amendments to the original statute proposed during this period. It is also the most concise restatement of existing law yet proposed: its ten consecutive sections are fully one-third fewer than the existing ones scattered through almost one hundred sections of the Penal Law; and its language is about one-third shorter. This is so although only three provisions of existing law have been dropped: one that expired on December 31, 1937, but for some unknown reason was retained during the past quarter-century; and two others, similarly retained, that expired on July 1, 1955.

The bill undertakes to reorder and rearrange in standardized manner all of the present provisions of the Penal Law relating to weapons and dangerous instruments, appliances and substances in

20

ten consecutive sections. There are certain intended omissions to this comprehensive plan. So far as instruments, appliances and substances are concerned, the bill leaves undisturbed other sections of the Penal Law dealing with fireworks and explosives. So far as weapons are concerned, four provisions of the Penal Law are not incorporated: extortion by threats to use a weapon (§ 851 (6)), manslaughter by use of a weapon (§ 1050 (2)), pawnbrokers accepting a firearm in pawn (§ 1593), and tramps carrying weapons under certain circumstances (§ 2371). The reasons for these exclusions are self-evident: integrated articles of the Penal Law, organized according to the essential characteristic of the criminal conduct involved, such as homicide, extortion, pawnbrokers, tramps, ought not to be emasculated in the name of clarifying and reordering a single other article on weapons.

The order and arrangement of the proposed ten consecutive sections are essentially those that met with absolute unanimous acceptance in the responses to the Questionnaire. The first of the sections, 1896, defines ten terms frequently used in the nine succeeding sections. Section 1897 defines all criminal conduct relating to possession and arranges such conduct according to the order of severity of treatment. The first five subdivisions deal with conduct that requires no particular state of mind for criminality and the remaining three with conduct that makes such requirement. Section 1898, continuing the arrangement according to severity of treatment, defines criminal conduct with respect to manufacture, transport, disposal and defacement, in that order. Section 1899 creates six presumptions. The first three are presumptions of possession arising from presence of weapons and persons in the same places. The next two are of unlawful intent arising from possession. The final one is a presumption of defacing a firearm arising from knowingly possessing it. Section 1900 delineates all exemptions and immunity with respect to the preceding three sections. These provisions are arranged according to the conduct (and not the person) covered by the exemption in the identical order previously used of possession, manufacture, transport and disposal. The broadest exemption precedes the more limited one, and accordingly the first nine subdivisions exempting from prosecution precede the final subdivision that exempts only from arrest. Section 1901 covers destruction. Section 1902 collates all instances when information must be forwarded. Section 1903 combines the licensing of possession with that of gunsmiths and dealers in firearms. Sections 1904 and 1905 are concerned with all conduct relating to use, attempted use and additional punishment covered in the proposed ten sections. Precisely how the order and arrangement of the proposed statute compares with that of the existing law is set forth in Table 4, *ante*.

In effecting the proposed new order and arrangement, certain modifications in content were necessary in order to attain desired standardization, clarity, conformity to judicial interpretations, various constitutional provisions and current practices. About thirty such modifications were made. These are set forth in detail, together with an explanation for each one, in Table 5, *post*.

21

ed omissions to
appliances and
d other sections
ives. So far as
al Law are not
n (§ 851 (6)),
nbrokers accept-
rrying weapons
for these exclu-
nal Law, organ-
riminal conduct
, tramps, ought
and reordering

consecutive sec-
1animous accept-
1t of the sections,
nine succeeding
duct relating to
to the order of
1eal with conduct
minality and the
quirement.  Sec-
g to severity of
to manufacture.
r.   Section 1899
presumptions of
d persons in the
1ent arising from
efacing a firearm
900 delineates all
eceding three sec-
the conduct (and
he identical order
sport and disposal.
d one, and accord-
rosecution precede
est.  Section 1901
tances when infor-
1es the licensing of
firearms.   Sections
t relating to use,
ed in the proposed
1gement of the pro-
law is set forth in

rangement, certain
er to attain desired
ial interpretations.
practices.   About
set forth in detail,
able 5, post.

TABLE 5.   EXPLANATION OF MODIFICATION OF CONTENT OF
EXISTING LAW BY PROPOSED STATUTE

SECTION & SUBDIVISION

| TOPIC | Existing Law | Proposed Statute | CHANGE | EXPLANATION |
|---|---|---|---|---|
| DEFINITIONS | 1897(1) | 1896(3); 1897(2), (3). | "Sawed-off shotgun" classed as "firearm" so that possession is criminal regardless of intent. | Standardization: by its self-evident adaptation, this weapon can be "concealed upon the person." Even the narrow definition of "firearm" that excludes pistols and revolvers for tax purposes in the National Firearm Act, includes a sawed-off shotgun. |
| PENALTY | 1897-a | 1897(1); 1898(2). | Prescription of maximum penalty in case of firearm silencers omitted. | Standardization: no maximum penalties prescribed throughout the ten sections, except for committing crime while armed [§1906]. |
| PRESUMPTION: OF POSSESSION ARISING FROM PRESENCE IN AUTOMOBILE | 1808-a | 1899(3) | 1. Makes presumption inapplicable to stolen automobiles. | Standardization: avoid duplication and overlap with broader presumption applicable solely to stolen vehicles in §1899(3). |
| | | | 2. Makes presumption inapplicable to other occupants of automobile if weapon actually found on person of one occupant. | Conformity to judicially construed constitutional requirement of reasonableness in relation between presumed fact and proven one. |
| | | | 3. Restricts present exemption from presumption of drivers of automobiles for hire to case in which weapon is found in rear or passenger's portion of automobile. | Conformity to judicially construed constitutional requirement of equal protection of the laws that demands a reasonable basis for classifying persons to whom a statute does and does not apply. |
| | | | 4. Makes presumption inapplicable to machine-guns. | Standardization: avoid duplication and overlap with broader presumption applicable solely to machine-guns in §1899(1). |
| | | | 5. Includes defaced firearm and bomb-shell in class of weapons to which presumption applies. | Standardization: conforms with conduct made criminal in §§1897(1),(3);1898(3). |
| PRESUMPTION: OF UNLAWFUL INTENT ARISING FROM POSSESSION | 1898 | 1899(4) | 1. Restricts application of presumption from present inclusion of all weapons to only those whose possession is made criminal upon proof of unlawful intent. | Standardization: avoid unnecessary presumption in area of constitutional sensitivity by limiting it to situations in which proof of intent is actually required for conviction [§1897(6), (8)]. |
| | | | 2. Restricts catch-all phrase describing articles to which presumption applies to ones designed, made or adapted for use primarily as a weapon. | Conformity to judicially construed constitutional requirement of a reasonableness in presumptions. A housewife with frying pan and kitchen paring knife ought not to be presumed a criminal. |

Case 7:10-cv-05413-CS Document 65-3 Filed 02/23/11 Page 24 of 46

TABLE 5. EXPLANATION OF MODIFICATION OF CONTENT OF
EXISTING LAW BY PROPOSED STATUTE [continued]

SECTION & SUBDIVISION

| TOPIC | Existing Law | Proposed Statute | CHANGE | EXPLANATION |
|---|---|---|---|---|
| EXEMPTIONS AND IMMUNITY | 1896; 1897(13(b)); 1897(1-a). | 1900 (a.1(b)) | Extends exemption for possession to non-military personnel duly authorized by Federal law, regulation or order to possess weapons (e.g., FBI, Federal Marshals, Secret Service, Customs). | Conformity to Federal constitutional requirement of supremacy of Federal law in U. S. Const. Art. VI, cl. 2. |
| | 1897(15) | 1900(a.1(c)) | Extends exemption for possession by defense contract employees from installation and testing to include manufacture and transport. | Standardization. |
| | 1899(4) | 1900(a.1(d)) | On amnesty for voluntary surrender during the month of June, "written acknowledgment" by police of required prior notice changed to "acknowledgment". | Conformity to police practice |
| | 1896; 1897(13(b)) | 1900(a.2) | Extends exemption for possession of billy and blackjack to jailkeepers. | Conformity to penal practice. |
| | none | 1900(a.3) | Extends exemption for possession of firearm to peace officer of another State present on matter of interstate rendition. | Conformity to supremacy of Federal law in interstate rendition [U. S. Const. Art. IV, Sec. 2, cl. 2; 18 U.S.C. §662]. |
| | 1897(3) | 1900(a.5) | States exemption for possession of switchblade or gravity knife by licensed person while hunting, trapping or fishing in the disjunctive instead of the conjunctive. | Standardization. |
| | 1896 | 1900(a.7) | Extends exemption for manufacture and disposal to include billies and blackjacks directly shipped to police and jailkeepers. | Conformity to police and penal practice. |
| DESTRUCTION | 1899 | 1901(1) | Extends requirement of destruction to all prohibited weapons and substances, including machineguns, bombs and bombshells. | Standardization. |
| FORWARDING INFORMATION | 1897-c | 1902 | Requires identification of firearms by information on make and other distinguishing number or identification mark if there is no manufacturer's name or serial number. [This requirement made uniform throughout. §1903(7), (12)]. | Standardization. |

TABLE 5
E

TOPIC

LICENSING:

Eligibility and Investigation

Application and Investigation

Exhibition of License

Notification of Change of Address

Expiration

Renewal

Surrender on Revocation and Expiration

23

F CONTENT OF
[continued]

TABLE 5.  EXPLANATION OF MODIFICATION OF CONTENT OF
EXISTING LAW BY PROPOSED STATUTE [continued]

SECTION & SUBDIVISION

| EXPLANATION | TOPIC | Existing Law | Proposed Statute | CHANGE | EXPLANATION |
|---|---|---|---|---|---|
| on in- ial by la- e- g. ar- ce, | LICENSING: | 1897(9-b); 1914. | 1903(1), (4) | 1. Requires licensing officer to be satisfied about applicant's background relating to mental illness as a condition of eligibility. | Clarification |
| ion by m- lia- to ure | Standardisation. | Eligibility and Investigation | | | 2. Extends requirement of investigation of applicant's background relating to mental illness to include gunsmiths and dealers in firearms as well as applicants for licenses to possess and carry. | Standardisation. |
| ol- der s of ac- by ired ged | Conformity to police practice | | 1897(10.b); 1914(5) | 1903(3) | 1. Requires that photographs submitted be one of applicant. | Clarification. |
| tion illy to | Conformity to penal practice. | Application and Investigation | | | 2. Makes uniform size, number of copies and recency of taking photographs both for licenses to carry and possess, and those for gunsmiths and dealers in firearms. | Standardisation. |
| tion fire- ficer ores- of | Conformity to supremacy of Federal law in interstate rendition [U. S. Const. Art. IV, Sec. 2, cl. 2; 18 U.S.C. §662]. | Exhibition of License | none | 1903(8) | Requires that licensee to carry firearm to have license on person when so carrying and to exhibit same to peace officer on demand. | Conformity to requirements of enforcement. |
| n for itch- ivity t per- ting, hing ctive con- | Standardisation. | Notification of Change of Address | none | 1903(9) | Requires immediate written notification to licensing officer by licensee of change in residence, place of employment or business, or location of licensed premises. | Conformity to requirements of enforcement. |
| ption e and clude jacks d to r | Conformity to police and penal practice. | Expiration | 1897(10.b); 1914(5). | 1903(10) | 1. Makes uniform expiration date for both licenses to carry and possess and those for gunsmiths and dealers in firearms, with certain existing exceptions. | Standardisation. |
| ment to all apons s, in- u- and | Standardisation. | Renewal | | | 2. Makes uniform extension of date of expiration until application for renewal has been disposed of for all licenses. | Standardisation. |
| itifica- ms by make distin- ber or mark manu- me or . [This made ighout. ]. | Standardisation. | Surrender on Revocation and Expiration | 1897(10.b), (11); 1914(5). | 1903(11) | Requires immediate notification to local police authority of revocation of license so that surrender of firearms, license and records may be effected. Similar requirement on expiration of license. | Conformity to requirements of enforcement. |

24

TABLE 5.  EXPLANATION OF MODIFICATION OF CONTENT OF
EXISTING LAW BY PROPOSED STATUTE [concluded]

SECTION & SUBDIVISION

| TOPIC | Existing Law | Proposed Statute | CHANGE | EXPLANATION |
|---|---|---|---|---|
| Purchase of Firearms | 1914(6) | 1908(12) | Relieves peace officers and others authorized to possess firearms without licenses from requirement of producing a license and coupon in order to purchase firearm, and requires dealer to record certain information concerning exempt person in such cases. | Standardization. |
| Fees | 1897(10.b); 1914(5). | 1908(11) | 1. Adjusts license fees to standardized increased period of licenses. | Standardization. |
| | | | 2. Permits city council in New York city to fix fee for dealers in firearms and gunsmiths. | Standardization. |

## RECOMMENDATIONS

The modifications of content effected by the proposed new statute remain to be appraised by informed opinion.  In addition, the feasibility of more intensive standardization must be explored. Would a single type (police or judicial) of licensing authority be desirable and workable throughout the State (see Table 2, *ante*)? Should Suffolk County have fee schedules for licenses different from those in every other county outside the city of New York? Should the law prohibit firing a gun within a quarter of a mile of a school in Putnam County but not in fifty-six other counties?

Finally, substantive changes that may or may not be meritorious remain to be considered.  Some of these are suggested by the comparative laws of other states.  Many representative states provide a waiting period between the time of ordering a firearm and its delivery to the purchaser.  Many exempt antique weapons from the operation of their laws.  Some undertake control of rifles, shotguns and ammunition.  A myriad of other reforms of a substantive nature are still to be explored.

The Committee is confident that its work thus far has demonstrated that state regulation of firearms and ammunition poses problems that are not susceptible to quick and easy solutions.

RES

By Committ

Whereas, and sale of fi in piecemeal

Whereas, in recent yea longer be ad under which

Whereas, Assembly tha study be mad of the Penal possession a of bringing

Whereas, on Codes an mittees of th possess a sp take the exa be it

Resolved of the Senat members of three membe Senate and authorized on Codes of mittee on C hensive exa way relating firearms and to make app further

Resolved majority of

ONTENT OF
:luded]

EXPLANATION
tandardization.

Itandardization.

Itandardization.

sed new statute
n addition, the
st be explored.
ng authority be
Table 2, *ante*)?
's different from
v York? Should
mile of a school
es?
t be meritorious
ited by the com-
e states provide
firearm and its
eapons from the
f rifles, shotguns
f a substantive

far has demon-
amunition poses
r solutions.

# APPENDIX A.

## RESOLUTION CREATING THE COMMITTEE
## STATE OF NEW YORK

### IN ASSEMBLY

ALBANY, *March* 17, 1960

BY COMMITTEE ON RULES:

WHEREAS, The existing provisions of law relating to the possession and sale of firearms and ammunition have developed over the years in piecemeal fashion; and

WHEREAS, The numerous proposals introduced in the Assembly in recent years to amend such provisions suggest that they may no longer be adequate or effective for the changed social conditions under which we live; and

WHEREAS, It is a matter of importance and vital concern to the Assembly that a comprehensive and constructive examination and study be made of the provisions of article one hundred seventy-two of the Penal Law and of any other law in any way relating to the possession and sale of firearms and ammunition, for the purpose of bringing the same up to date: and

WHEREAS, The members of the standing committees of the Senate on Codes and Conservation and the members of the standing committees of the Assembly on Codes and Conservation, respectively, possess a special knowledge, experience and competence to undertake the examination and study herein proposed; now, therefore, be it

RESOLVED (if the Senate concur), That the President Pro Tempore of the Senate be, and he hereby is, authorized to designate three members of the standing committee on Codes of the Senate and three members of the standing committee on Conservation of the Senate and that the Speaker of the Assembly be, and he hereby is, authorized to designate three members of the standing committee on Codes of the Assembly and three members of the standing committee on Conservation, of the Assembly, to undertake a comprehensive examination and study of all laws pertaining or in any way relating to or affecting the sale, possession and regulation of firearms and ammunition and the administration of such laws, and to make appropriate recommendations relating thereto; and be it further

RESOLVED (if the Senate concur), That such members, or a majority of them, may employ such assistants as may be necessary

[25]

26

and fix their compensation within the amount or amounts made available therefor any vacancies which may occur shall be filled by the President Pro Tempore of the Senate if the vacancy is in the Senate and by the Speaker of the Assembly if the vacancy is in the Assembly, and such members shall receive no compensation for their services but shall be entitled to their actual and necessary expenses incurred in the performance of their duties; and be it further

RESOLVED (if the Senate concur), That such members, or a majority of them, may sit at any place within the state, may hold public or private hearings and shall have generally all the powers of a legislative committee as prescribed by the Legislative Law; and be it

RESOLVED (if the Senate concur), That such members shall report to the Legislature not later than February fifteenth, nineteen hundred sixty-one, the results of its examination and study and shall include therein such legislative proposals as it deems necessary to make the recommendations effective; and be it further

RESOLVED (if the Senate concur), That the sum of ten thousand dollars ($10,000) or so much thereof as may be necessary, be, and the same hereby is, appropriated from the legislative contingent fund and made immediately available for the use of such committees for the necessary expenses of such committees in carrying out their duties hereunder. Such moneys shall be payable on the audit and warrant of the comptroller on vouchers certified and approved in the manner provided by law.

ADOPTED MARCH 29: SENATE CONCURS MARCH 31.

The purpose of thi
to the Joint Legisl
fication of existing
Reference to a curre
Bear in mind that
Because of your ex
to fill out and retu
September 10, 1961

SI

IDENTITY OF R:

(a) Name
(c) Office or Organiz
(d) (check one)  ☐ A
  ☐ I

PART O

ITEM #
1. The present
   consecutive
   1898-a, 189
   These sectio
   the numberi
   subdivision
   number "13
   is the result
   half-century
   appears in
   surrender of
   also appears
   and inconsis
   ones, whose
   the law, sh
   arrangement
   rearranged s
2. If yes, do yo
3. If yes, do yo
   the number
4. If yes, do yo
   the number
5. The weapon
   "Machine g
   hyphenated.
   ing and hyp
6. When more
   exists (e.g.,
   favor adopti

r amounts made
ir shall be filled
he vacancy is in
if the vacancy is
no compensation
ial and necessary
luties; and be it

. members, or a
e state, may hold
ly all the powers
Legislative Law;

abers shall report
th, nineteen hun-
l study and shall
ems necessary to
irther

i of ten thousand
lecessary, be, and
llative contingent
ase of such com-
ittees in carrying
be payable on the
iers certified and

31.

## APPENDIX B.

### STATE OF NEW YORK

### JOINT LEGISLATIVE COMMITTEE
### ON
### FIREARMS AND AMMUNITION

## QUESTIONNAIRE

The purpose of this Questionnaire is to provide necessary information and guidance to the Joint Legislative Committee on Firearms and Ammunition in its task of recodification of existing statutes on weapons. The Questionnaire is necessarily technical. Reference to a current copy of the Penal Law must be made, but no research is required. Bear in mind that recodification, and not substantive revision, is the task at hand. Because of your experience in connection with these statutes, you have been selected to fill out and return this Questionnaire. Would you kindly do so, not later than September 10, 1961. Please mail the completed Questionnaire to:

SENATOR ALBERT BERKOWITZ, Chairman
43 Main Street
Granville, N. Y.

IDENTITY OF REPORTER:

(a) Name _____ (b) Address _____

(c) Office or Organization _____

(d) (check one)  ☐ All replies confidential          ☐ Only replies circled confidential
                 ☐ No replies confidential

### PART ONE: GENERAL ORDER AND ARRANGEMENT
(check appropriate box)

| ITEM # | | YES | NO |
|---|---|---|---|
| 1. | The present law consists of nine sections, eight of them consecutive (§§1896, 1897, 1897-a, 1897-b, 1897-c, 1898, 1898-a, 1899) and one (§1914) separate from the rest. These sections contain 41 numbered subdivisions, but the numbering scheme varies; e.g., in §1897, there is a subdivision "1" and "1-a"; there is no subdivision number "13", but there is "13(a)". The present law is the result of more than sixty amendments over the past half-century. Matter dealing with the same subject appears in widely separated places; e.g., immunity for surrender of weapons appears in §1897, subd. 6-a, but it also appears in §1899, subd. 4. Numerous overlapping and inconsistent provisions occur. Some unnecessary ones, whose omission would neither add nor subtract from the law, also occur. To provide clarity and orderly arrangement, should these sections and subdivisions be rearranged and regrouped? | ☐ | ☐ |
| 2. | If yes, do you favor making these sections consecutive? | ☐ | ☐ |
| 3. | If yes, do you favor dropping the alphabetical letter after the number of the section? | ☐ | ☐ |
| 4. | If yes, do you favor dropping the alphabetical letter after the number of those subdivisions that are numbered? | ☐ | ☐ |
| 5. | The weapon, "slungshot", also appears as "slingshot". "Machine gun" and "sub-machine gun" are variously hyphenated. Do you favor unitary and consistent spelling and hypenation throughout? | ☐ | ☐ |
| 6. | When more than a single version of a statutory provision exists (e.g., three versions of §1897, subd. 10-b), do you favor adoption of a single version? | ☐ | ☐ |

[27]

## 28

## APPENDIX B [continued]

### PART ONE: GENERAL ORDER AND ARRANGEMENT (continued)

*(check appropriate box)*

| | | YES | NO | Some Variation |
|---|---|---|---|---|
| 7. | If your answer to Item #1 is yes, do you favor the following general order and arrangement of these statutory provisions: | ☐ | ☐ | ☐ |

**I. PROVISIONS DEFINING CRIMINAL CONDUCT RELATING TO WEAPONS**
   A. Manufacture
   B. Transport and Shipment
   C. Possession and Use
   D. Defacement
   E. Disposition and Sale

**II. PROVISIONS CREATING PRESUMPTIONS**
   A. Of Unlawful Intent Arising from Possession
   B. Of Possession Arising from Presence of Weapons in Certain Places

**III. PROVISIONS DEALING WITH EXEMPTIONS AND IMMUNITY**

**IV. PROVISIONS GOVERNING LICENSING**
   A. Of Possession
   B. Of Gunsmiths and Dealers

**V. PROVISIONS RELATING TO DESTRUCTION OF WEAPONS**

8. If your answer to Item #7 is no, or some variation, kindly indicate the variations, or your own suggested order and arrangement:

_____
_____
_____
_____
_____
_____

### PART TWO: SPECIFIC PROVISIONS

ITEM #    *(check appropriate box)*      YES    NO

**I. DEFINITION OF CRIMINAL CONDUCT**

| | | YES | NO |
|---|---|---|---|
| 9. | Do you favor regrouping existing provisions into a single section with numbered subdivisions or into a series of consecutively numbered sections, according to the activity (e.g. manufacture, transport, etc.) made criminal and the weapons or instruments to which such activity specifically applies? | ☐ | ☐ |

A. Manufacture

| | | YES | NO |
|---|---|---|---|
| 10. | Peace officers may lawfully possess a weapon known as a "billy" (§1897, subd. 13(b), but its manufacture and sale to them is prohibited (§1896). Is a billy prescribed or optional equipment for your organisation? | ☐ | ☐ |
| 11. | Same as Item #10 for a blackjack? | ☐ | ☐ |
| 12. | Do you favor authorization of manufacture of a billy, subject to the same restrictions that presently apply to a machine gun and sub-machine gun? | ☐ | ☐ |
| 13. | Same as Item #11 for a blackjack? | ☐ | ☐ |

ITEM #

14. Same as Item #12

15. Same as Item #13

16. Carriers of valid [...] fully possess gra[...] purposes (§1897, [...] such cases are unl[...] tion of transport [...]

17. Should the restric[...] of machine guns [...] gravity knives (§[...] (§1897-a)?

18. If your answer to [...] on transport and [...] firearm" (§1897, [...]

19. Do you favor pro[...] weapons?

20. Do you favor sub[...] revolver, sawed-o[...] which may be c[...] present, "pistol, [...]

21. Should firearms r[...] vided firearms un[...] in working order, [...] ing order" is app[...]

22. Carrying a loaded [...] felony (§1897, su[...] in one's hand res[...] there is a crimina[...] distinction be dra[...]

23. A section (§1897 [...] possession of fire[...] meanor (unless t[...] nothing to crimi[...] persons, and inde[...] from felonious re[...] loaded firearm (a[...]

24. Some provisions r[...] define mitigated [...] Juvenile delinqu[...] gories of respons[...] way applicable to [...] Should such prov[...] redundant?

25. One provision, co[...] arms by dealers a[...] material identica[...] (id., subd. 2). [...] redundant?

29

## APPENDIX B [continued]

*(check appropriate box)*

| | | | YES | NO |
|---|---|---|---|---|
ued)

Some
Variation

□

NO

□

□
□

□
□

ITEM #

### B. Transport and Shipment

14.  Same as Item #12 with respect to transport and shipment?   □   □

15.  Same as Item #13 with respect to transport and shipment?   □   □

16.  Carriers of valid licenses to hunt, trap and fish may lawfully possess gravity and switchblade knives for such purposes (§1897, subd. 3), yet transport and shipment in such cases are unlawful (§1896).  Do you favor authorization of transport and shipment in such cases?   □   □

17.  Should the restrictions governing transport and shipment of machine guns, sub-machine guns, switchblade and gravity knives (§1896), also apply to firearm silencers (§1897-a)?   □   □

18.  If your answer to Item #17 is no, should the restrictions on transport and shipment of a "pistol, revolver, or other firearm" (§1897, subd. 13 (a)) apply to firearm silencers?   □   □

### C. Possession and Use

19.  Do you favor provision for firearms separate from other weapons?   □   □

20.  Do you favor substitution of the enumeration, "pistol, revolver, sawed-off shotgun or other firearm of a size which may be concealed upon the person", for the present, "pistol, revolver or other firearm"?   □   □

21.  Should firearms not in working order be excluded, provided firearms unlawfully possessed be presumed to be in working order, and a satisfactory definition of "working order" is appended?   □   □

22.  Carrying a loaded firearm concealed upon the person is a felony (§1897, subd. 5-a); carrying the identical weapon in one's hand ready for action is a misdemeanor (unless there is a criminal record) (§1897, subd. 4).  Should this distinction be dropped?   □   □

23.  A section (§1897, subd. 6) deals with aliens and makes possession of firearms and dangerous weapons a misdemeanor (unless there is a criminal record).  This adds nothing to criminality for aliens compared with other persons, and indeed might be interpreted to exclude aliens from felonious responsibility in the case of a concealed loaded firearm (see #22.)  Should this be dropped?   □   □

24.  Some provisions (§1897, subd. 4, 5, 5-a) undertake to define mitigated responsibility based on minority ages.  Juvenile delinquency, youthful offenders and other categories of responsibility based on age are dealt with in a way applicable to the entire Penal Law in general sections.  Should such provisions in the weapons laws be dropped as redundant?   □   □

25.  One provision, concerned with possession of defaced firearms by dealers and gunsmiths (§1897, subd. 3), contains material identical with that applicable to "any person" (id., subd. 2).  Should this provision be dropped as redundant?   □   □

30

## APPENDIX B [continued]

*(check appropriate box)*

| ITEM # | | YES | NO |
|---|---|---|---|
| 26. | Should provisions dealing with non-firearm weapons be divided so that those inherently dangerous and having no conceivable lawful use (e.g., metal knuckles) are made criminal to possess regardless of intent, and those having some lawful use (e.g., razor, kitchen paring knife, icepick) are made criminal to possess only upon proof of intent to use unlawfully against another? | ☐ | ☐ |
| 27. | Should Very pistols, used to fire warning flares, and industrial instruments employing explosive force to impregnate slugs and rivets, be explicitly excluded from the category of firearms? | ☐ | ☐ |

### D. Disposition and Sale

| 28. | Enumeration of activity constituting disposition and sale varies (cf. §§1896, 1897, subd. 3 with §1897-a). Should a uniform, comprehensive enumeration be adopted in all such cases? | ☐ | ☐ |
|---|---|---|---|
| 29. | Should the list of weapons prohibited to be disposed of to children overlap the list prohibited to be disposed of to any person (cf. §1896, with §1897, subd. 3)? | ☐ | ☐ |
| 30. | Carriers of valid licenses to hunt, trap and fish may lawfully possess gravity and switchblade knives for such purposes (§1897, subd. 3), yet sale and disposition of such knives to these persons is prohibited (§1896). Should such sale and disposition in this restricted instance be authorized? | ☐ | ☐ |
| 31. | Disposition and sale of defaced firearms under certain conditions is felonious for "dealers in firearms" (§1897-b, subd. 3). Identical behavior for any "person" is made felonious (§1897-b, subd. 2). Should the provision relating to dealers be dropped as redundant? | ☐ | ☐ |

## II. PRESUMPTIONS

### A. Of Unlawful Intent Arising from Possession

| 32. | Almost three dozen weapons and instruments, or categories of these, are specified in the weapons' sections under consideration. A sweeping, blanket presumption (§1898) infers criminal intent from possession of any of these, without regard to whether the weapon involved is a machine gun or a nail file. Accordingly, in specific cases the courts have either disregarded this presumption or declared it unconstitutional. Should this presumption, in its present blind, omnibus form, be dropped? | ☐ | ☐ |
|---|---|---|---|
| 33. | If your answer to Item #32 is yes, would you favor application of this presumption to firearms, such as machine guns, whose knowing possession without regard to intent is made felonious? | ☐ | ☐ |
| 34. | If your answer to Item #32 is yes, would you favor application of this presumption to inherently dangerous weapons, possession of which is made criminal only upon proof of criminal intent, such as a sawed-off shotgun? | ☐ | ☐ |

### B. Of Possession Arising from Presence of Weapons in Certain Places

| 35. | When there are multiple occupants of a stolen vehicle, should presumption of possession arising from presence of a weapon (§1898) apply to an occupant there under duress? | ☐ | ☐ |

ITEM #

36. Same as
37. Do you be differ vehicle other th
38. Should presence to an oc who is u in a glov
39. Three o guns an 1897, su the othe
40. Firearm than any tions on firearm guns an
41. Should the case (§1897, such ra person?
42. Confusi persons this exe sonnel a
43. Only po the Uni the Dep (Secret tration phrased States the we
44. Peace c their de on offi exempt be mad
45. Persons possess this St should
46. For vol with th from a (§1899 only, e surren
47. Should during tended

31

## APPENDIX B [continued]

*(check appropriate box)*

| d] | YES | NO | | | YES | NO |
|---|---|---|---|---|---|---|
| pons be aving no re made e having icepick) ntent to | | | ITEM # | | | |
| | | | 36. | Same as Item #35 for an occupant who is a peace officer? | ☐ | ☐ |
| | | | 37. | Do you know any reason why the list of weapons should be different in the case of the presumption for the stolen vehicle (§1898) from that in the case of an automobile, other than a public omnibus (§1898-a)? | ☐ | ☐ |
| es, and orce to ed from | ☐ | ☐ | 38. | Should the presumption of possession arising from presence of a weapon in an automobile (§1898-a) apply to an occupant who is neither the driver nor owner and who is unaware of the weapon which is kept out of sight, in a glove, trunk or other compartment? | ☐ | ☐ |

### III. EXEMPTIONS AND IMMUNITY

| | | | | | YES | NO |
|---|---|---|---|---|---|---|
| and sale Should d in all | ☐ | ☐ | 39. | Three overlapping sets of exemptions exist for machine guns and sub-machine guns (§§1896, 1897, subd. 1-a, 1897, subd. 13(b)). Should a single one be adopted, and the others dropped? | ☐ | ☐ |
| ed of to d of to | ☐ | ☐ | 40. | Firearm silencers have a set of exemptions more extensive than any other weapon or instrument, e.g., civil organizations on parade (§1897-a). Should the exemptions for firearm silencers be no broader than those for machine guns and sub-machine guns? | ☐ | ☐ |
| ay law- or such ition of Should ance be | ☐ | ☐ | 41. | Should the exemption applicable to children, 12 to 16, in the case of rifles of .22 calibre or less at supervised ranges (§1897, subd. 3) be extended to adult target shooters at such ranges for firearms of a size concealable on the person? | ☐ | ☐ |
| certain 1897-b, is made ovision | ☐ | ☐ | 42. | Confusion surrounds the exemption for military and naval personnel of the State and of the United States. Should this exemption apply only when by regulation such personnel are authorized to possess the weapon in question? | ☐ | ☐ |
| ossession or cate- s under (§1898) these, d is a ic cases tion or tion, in | ☐ | ☐ | 43. | Only postal employees of the non-military personnel of the United States are exempt. No provision is made for the Department of Justice (FBI, Marshalls), Treasury (Secret Service, Customs), Government Services Administration (Guards) and others. Should the exemption be phrased in terms of officers and employees of the United States authorized by Government regulation to possess the weapon in question? | ☐ | ·☐ |
| r appli- achine intent | ☐ | ☐ | 44. | Peace officers of other States, authorized by the law of their domicile State to possess weapons and in this State on official business, e.g., interstate rendition, are not exempt. In the interests of comity, should this exemption be made? | ☐ | ☐ |
| r appli- gerous y upon un? | ☐ | ☐ | 45. | Persons authorized by the State of their domicile to possess a specific firearm and lawfully passing through this State are not exempt. In the interests of comity should this exemption be extended? | ☐ | ☐ |
| s in Certain Places vehicle, resence under | ☐ | ☐ | 46. | For voluntary surrender of weapons, two separate sections with different mechanics of surrender provide immunity from arrest (§1897, subd. 6-a) and from prosecution (§1899, subd. 4), the latter during the month of June only, each year. Should procedure and circumstances of surrender be made uniform? | ☐ | ☐ |
| | | | 47. | Should the immunity granted for voluntary surrender during the month of June only (§1899, subd. 4) be extended to a year round basis? | ☐ | ☐ |

32

## APPENDIX B [concluded]

*(check appropriate box)*

### IV. LICENSING

| | | YES | NO |

48. One provision (§1897, subd. 7) makes the licensing official outside the city of New York and Nassau county, "any magistrate"; other provisions (§§1897, subd. 8; id., subd. 9; id., subd. 9-a) make him a "judge or justice of a court of record". Should the latter provision be made uniform throughout?    ☐ ☐

49. It is the "duty" of the licensing official throughout the State to issue to a householder a license to possess a pistol or revolver (§1897, subd. 8). In populous areas, such as the city of New York, should there be a requirement of good cause to be shown?    ☐ ☐

### V. DESTRUCTION

50. Of some three dozen weapons or instruments specified in these statutes, about 20 are omitted from the list of those whose possession, when unlawful, is declared a nuisance, and the weapons seized subject to destruction. (§1899, subd. 1). Should this list be expanded to include, as a minimum, a bomb, bombshell, explosive substance, firearm silencer, machine gun and sub-machine gun?    ☐ ☐

### PART THREE: APPENDIX

Kindly append any comment, referring whenever appropriate to the particular Item Number.

TA

| Item | Police Chiefs | |
|---|---|---|
| # | Yes | No |
| 1. | 34 | 0 |
| 2. | 34 | 0 |
| 3. | 31 | 2 |
| 4. | 28 | 1 |
| 5. | 34 | 0 |
| 6. | 31 | 2 |
| 7. | 29 | 0 |
| 8. | 0 | 0 |
| 9. | 21 | 1 |
| 10. | 23 | 7 |
| 11. | 22 | 9 |
| 12. | 30 | 4 |
| 13. | 29 | 5 |
| 14. | 31 | 2 |
| 15. | 30 | 3 |
| 16. | 14 | 20 |
| 17. | 33 | 1 |
| 18. | 6 | 2 |
| 19. | 28 | 3 |
| 20. | 28 | 4 |
| 21. | 22 | 11 |
| 22. | 29 | 5 |
| 23. | 29 | 5 |
| 24. | 24 | 10 |
| 25. | 21 | 13 |
| 26. | 26 | 6 |
| 27. | 17 | 14 |
| 28. | 34 | 0 |
| 29. | 18 | 11 |
| 30. | 18 | 19 |
| 31. | 24 | 9 |
| 32. | 24 | 9 |
| 33. | 20 | 2 |
| 34. | 18 | 5 |
| 35. | 3 | 30 |
| 36. | 5 | 25 |
| 37. | 5 | 29 |
| 38. | 13 | 19 |
| 39. | 31 | 3 |
| 40. | 29 | 7 |
| 41. | 13 | 24 |
| 42. | 32 | 1 |
| 43. | 38 | 0 |
| 44. | 38 | 0 |
| 45. | 25 | 16 |
| 46. | 37 | 1 |
| 47. | 32 | 4 |
| 48. | 33 | 4 |
| 49. | 37 | 1 |
| 50. | 38 | 0 |

# APPENDIX C.
## TABULATION OF RESPONSES

| Item # | Police Chiefs | | Co. Judges | | Rod & Gun Clubs | | District Attorneys | |
|---|---|---|---|---|---|---|---|---|
| | Yes | No | Yes | No | Yes | No | Yes | No |
| 1. | 34 | 0 | 21 | 0 | 14 | 0 | 14 | 0 |
| 2. | 34 | 0 | 18 | 1 | 14 | 0 | 14 | 0 |
| 3. | 31 | 2 | 17 | 3 | 12 | 2 | 11 | 3 |
| 4. | 28 | 1 | 13 | 3 | 12 | 1 | 10 | 0 |
| 5. | 34 | 0 | 19 | 0 | 14 | 0 | 13 | 0 |
| 6. | 31 | 2 | 21 | 0 | 14 | 0 | 13 | 0 |
| 7. | 29 | 0 | 20 | 0 | 14 | 0 | 11 | 0 |
| 8. | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 9. | 21 | 1 | 16 | 0 | 13 | 0 | 10 | 2 |
| 10. | 23 | 7 | 2 | 3 | 2 | 8 | 2 | 4 |
| 11. | 22 | 9 | 2 | 3 | 2 | 8 | 1 | 4 |
| 12. | 30 | 4 | 6 | 1 | 8 | 2 | 7 | 4 |
| 13. | 29 | 5 | 12 | 1 | 6 | 4 | 7 | 4 |
| 14. | 31 | 2 | 15 | 1 | 8 | 1 | 8 | 3 |
| 15. | 30 | 3 | 12 | 2 | 8 | 1 | 8 | 3 |
| 16. | 14 | 20 | 10 | 9 | 8 | 4 | 3 | 7 |
| 17. | 33 | 1 | 17 | 3 | 12 | 0 | 10 | 2 |
| 18. | 6 | 2 | 2 | 1 | 2 | 1 | 2 | 0 |
| 19. | 28 | 3 | 17 | 4 | 11 | 3 | 12 | 1 |
| 20. | 28 | 4 | 17 | 4 | 12 | 1 | 12 | 3 |
| 21. | 22 | 11 | 16 | 3 | 13 | 1 | 12 | 4 |
| 22. | 29 | 5 | 16 | 4 | 12 | 5 | 13 | 3 |
| 23. | 29 | 5 | 18 | 3 | 11 | 2 | 13 | 1 |
| 24. | 24 | 10 | 15 | 4 | 13 | 4 | 12 | 3 |
| 25. | 21 | 13 | 12 | 6 | 12 | 2 | 11 | 5 |
| 26. | 26 | 6 | 16 | 3 | 11 | 3 | 14 | 2 |
| 27. | 17 | 14 | 16 | 4 | 12 | 8 | 7 | 6 |
| 28. | 34 | 0 | 21 | 0 | 13 | 0 | 14 | 1 |
| 29. | 18 | 11 | 11 | 9 | 9 | 4 | 9 | 8 |
| 30. | 13 | 19 | 18 | 4 | 8 | 6 | 7 | 11 |
| 31. | 24 | 9 | 15 | 5 | 12 | 1 | 12 | 4 |
| 32. | 24 | 9 | 19 | 3 | 13 | 1 | 13 | 3 |
| 33. | 20 | 2 | 19 | 1 | 12 | 3 | 12 | 1 |
| 34. | 18 | 5 | 16 | 1 | 10 | 3 | 12 | 2 |
| 35. | 3 | 30 | 2 | 19 | 0 | 14 | 1 | 14 |
| 36. | 5 | 25 | 3 | 19 | 0 | 18 | 3 | 12 |
| 37. | 5 | 29 | 0 | 20 | 1 | 12 | 2 | 18 |
| 38. | 13 | 19 | 3 | 19 | 1 | 12 | 7 | 7 |
| 39. | 31 | 3 | 20 | 1 | 14 | 0 | 14 | 1 |
| 40. | 29 | 7 | 15 | 4 | 11 | 2 | 12 | 2 |
| 41. | 13 | 24 | 12 | 11 | 9 | 4 | 9 | 8 |
| 42. | 32 | 1 | 19 | 1 | 15 | 0 | 16 | 2 |
| 43. | 38 | 1 | 23 | 1 | 16 | 0 | 17 | 1 |
| 44. | 38 | 0 | 23 | 1 | 16 | 0 | 18 | 1 |
| 45. | 25 | 16 | 17 | 4 | 16 | 0 | 12 | 6 |
| 46. | 37 | 1 | 23 | 0 | 14 | 0 | 19 | 0 |
| 47. | 32 | 4 | 21 | 3 | 15 | 0 | 16 | 2 |
| 48. | 33 | 4 | 21 | 2 | 16 | 1 | 18 | 1 |
| 49. | 37 | 1 | 15 | 4 | 6 | 9 | 15 | 2 |
| 50. | 38 | 0 | 22 | 2 | 14 | 0 | 16 | 0 |

[33]

# S (10)

Legislative Document (1963)                              No. 35

# STATE OF NEW YORK

---

## REPORT

### OF THE

## JOINT LEGISLATIVE COMMITTEE

### ON

## FIREARMS AND AMMUNITION



1963

## COMMITTEE PERSONNEL

SENATOR ALBERT BERKOWITZ, *Chairman*

ASSEMBLYMAN JULIUS VOLKER, *Vice-Chairman*

SENATOR FRANK J. PINO, *Secretary*
SENATOR WALTER VAN WIGGEREN
SENATOR LEIGHTON A. HOPE
SENATOR HENRY A. WISE
SENATOR JULIAN B. ERWAY
ASSEMBLYMAN HYMAN E. MINTZ
ASSEMBLYMAN LEO A. LAWRENCE
ASSEMBLYMAN ROBERT M. QUIGLEY
ASSEMBLYMAN JOHN J. RYAN
ASSEMBLYMAN GEORGE M. MICHAELS
ASSEMBLYMAN CLARENCE D. LANE
FREDERICK J. LUDWIG, *Legal Consultant*

### Ex-Officio

SENATOR WALTER J. MAHONEY, *President Pro Tem,* The Senate
ASSEMBLYMAN JOSEPH E. CARLINO, *Speaker,* The Assembly
SENATOR JOSEPH ZARETZKI, *Minority Leader,* The Senate
ASSEMBLYMAN GEORGE L. INGALLS, *Majority Leader,* The Assembly
ASSEMBLYMAN ANTHONY J. TRAVIA, *Minority Leader,* The Assembly
SENATOR ELISHA T. BARRETT, *Finance Committee Chairman,* The Senate
ASSEMBLYMAN FRED W. PRELLER, *Ways and Means Committee Chairman,* The Assembly

[3]

# REPORT OF THE NEW YORK STATE JOINT LEGISLATIVE COMMITTEE ON FIREARMS AND AMMUNITION

*To the Legislature of the State of New York:*

Pursuant to concurrent resolution adopted by the Senate and Assembly on March 31, 1960, the Joint Legislative Committee on Firearms and Ammunition was created. By similar resolutions adopted on March 31, 1961 and on March 30, 1962, the Committee has been extended until March 31, 1963. A comprehensive *Report of the New York State Joint Legislative Committee on Firearms and Ammunition,* Leg. Doc. (1962) No. 29, p. 1-33, was submitted to the Legislature on March 5, 1962. This report supplements the comprehensive one.

The comprehensive *Report of the Committee,* among other things, analyzed the original bill introduced in 1962 on behalf of the Committee for study (Sen. Print. 2, Intro. 2; A. Print. 551, Intro. 551). With the bill as the basis of discussion, a two-day meeting was held at Saratoga on June 24-26, 1962. Meeting with the Committee was an advisory council, composed of representatives of various conservation and rod-and-gun groups, and of agencies of law enforcement and administration, viz: New York State Bar Association, County Judges Association, Izaak Walton League, New York State Police, District Attorneys Association, New York State Sheriff's Association, Collectors Group, New York State Conservation Council and New York State Rifle and Pistol Association.

Thereafter, one thousand copies of a modified draft of the original bill, together with explanatory notes and tables of changes, were prepared and sent to district attorneys, criminal court judges, and numerous conservation and rod-and-gun associations. Four public hearings on the modified draft were scheduled and held during 1962 (Buffalo, October 15; Elmira, October 19; Albany, October 22; and New York, October 29). Representatives of district attorneys, police, bar associations and conservation groups in these localities were invited and attended these hearings. In addition, the Chairman of he Committee appeared at more than a dozen meetings of interested groups throughout the State.

Thereupon, a final draft of the bill was prepared, pre-filed in the Senate (Sen. Print 136, Intro. 136) and introduced in the Assembly (A. Print 3849, Intro. 3745). During the current session, the Legislature enacted this bill, scheduled to take effect on July 1, 1963, and the bill was signed by the Governor (L. 1963, ch. 136).

The modifications made in existing law by the original bill of the Committee are fully set forth in the comprehensive *Report of the Committee, supra,* TABLE 5, p. 21-24. The APPENDIX annexed hereto is a supplement to TABLE 5 of the *Report* and indicates what modifications in existing law set forth in that table have been dropped in the enacted bill.

[5]

6

As pointed out in the comprehensive *Report of the Committee*, the work of the Committee in producing the enacted bill has been aimed at reordering and regrouping existing provisions of law for the sake of clarity, brevity and orderly arrangement. Consideration of numerous substantive changes in the law, proposed by various groups and deemed unnecessary to achieve such clarification, has been explicitly deferred by the Committee until after enactment of the bill. It is accordingly recommended that the Committee be continued to explore these proposed substantive changes and dispose of them by recommendation on their merits.

Respectfully submitted,

ALBERT BERKOWITZ, *Chairman*
JULIUS VOLKER, *Vice Chairman*
FRANK J. PINO, *Secretary*
WALTER VAN WIGGEREN
LEIGHTON A. HOPE
HENRY A. WISE
JULIAN B. ERWAY
HYMAN E. MINTZ
LEO A. LAWRENCE
JOHN J. RYAN
GEORGE M. MICHAELS
CLARENCE D. LANE

March 28, 1963.

7

# APPENDIX

## PROPOSED MODIFICATIONS IN EXISTING LAW DROPPED IN THE ENACTED BILL

Supplementing *Report of the New York State Joint Legislative Committee on Firearms and Ammunition*, Leg. Doc. (1962) No. 29, TABLE 5, p. 21-24. Matter in parenthesis ( ) has been dropped from TABLE 5 by the enacted bill.

| Topic | Existing Law | Proposed Statute | Change |
|---|---|---|---|
| PRESUMPTION: OF POSSESSION ARISING FROM PRESENCE IN AUTOMOBILE | 1898-a | 1899(3) | (3. Restricts present exemption from presumption of drivers of automobiles for hire to case in which weapon is found in rear or passenger's portion of automobile.) |
| EXEMPTIONS AND IMMUNITY | none | 1900(a.3) | (Extends exemption for possession of firearm to peace officer of another State present on a matter of interstate rendition.) |
| LICENSING: | 1897(9.b); 1914 | 1903(1), (4) | (Requires licensing officer to be satisfied about applicant's background relating to mental illness as a condition of eligibility.) |
| Applications and Investigations | 1897(10.b); 1914(5) | 1903(3) | 2. Makes uniform (size) number of copies, etc. |
| Surrender on Revocation and Expiration | 1897(10.b), (11); 1914(5) | 1903(11) | Requires immediate notification to local police authority of revocation of license (so that surrender of firearms, license and records may be effected. Similar requirement on expiration of license.) |
| Fees | 1897(10.b); 1914(5) | 1903(14) | (1. Adjusts license fees to standardized increased period of licenses. 2. Permits city council in New York city to fix fee for dealers in firearms and gunsmiths.) |

the Committee,
d bill has been
ions of law for
it. Considera-
, proposed by
such clarifica-
ee until after
that the Com-
antive changes
erits.

*Chairman*
e *Chairman*
*etary*
REN

# S (11)

New York State

# LEGISLATIVE ANNUAL

# 1963

*Published by*

NEW YORK LEGISLATIVE SERVICE, INC.

305 Broadway, New York 7, New York

## NEW YORK STATE LEGISLATIVE ANNUAL - 1963

sufficient to effect the abolition of the justices courts. He maintained that further action by the Legislature was necessary. Attorneys who had prepared the Suffolk County District Court Act and were influential in urging its passage and approval by the voters, maintain that no further legislation is necessary. Other attorneys disagree on this point and it is already apparent that if nothing is done the question of whether or not the office of justice of the peace as relating to those justices whose terms expire in 1963 has been abolished can be settled only by litigation. There can be no doubt, however, that if the proposed bill is enacted into law the question will be definitely settled.

It thus appears that this bill is authorized by Article VI of the Constitution and by the results of the vote on the question submitted at the 1962 election. Passage is urged in order to avoid litigation and to carry out the will of the people in the five western towns of Suffolk County.

Enactment of this legislation has been requested by the Board of Supervisors of Suffolk County by resolution dated February 25, 1963.

## Memorandum of Joint Legislative Committee on Firearms and Ammunition

Firearms, sale, possession                S. L. 136, Pr. 136, Berkowitz   Ch. 136

*Penal Law, generally.* The Joint Legislative Committee on Firearms and Ammunition was created "for the purposes of making a comprehensive and constructive study of all laws pertaining to or directly or indirectly affecting the sale, possession and regulation of firearms and ammunition and the administration of such law."

After the Committee commenced its deliberations, its members soon realized that the laws affecting firearms and ammunition are in a confused state. The sections of the Penal Law dealing with weapons, and dangerous instruments, appliances and substances, are not only not consecutive but actually scattered through almost a hundred numbered provisions. The numbering system is not uniform: Some sections are designated by number only; others, by a number and letter hyphenation. The same is true of the designations of subdivisions: some have both number and letter in hyphenated form; others, a letter only in parentheses. Spelling of identical terms varies; e.g., a "slungshot" appearing in several enumerations of weapons suddenly becomes a "slingshot" in an additional otherwise identical enumeration. One lengthy subdivision (Section 1897 (10.b)) was so confused that it was set forth in three complete and separate versions, a condition that has been corrected since the Committee began its work.

With respect to order and arrangement of content, the accumulation of amendments over fifty years has buried much of the form and structure of the statute. Definitions of terms are scattered through many subdivisions of four sections. Definitions of criminal conduct have no particular systematization: possession, manufacture, transport, disposition and even use are variously com-

mingled, and in most cases distrib
Presumptions are scattered throu
tions and immunity through five,
through three sections and more
divisions of Section 1897 of the
on licensing: many of these are re
in Section 1914. Specification of
scattered through almost a hund
Section 1897 to 1991.

But other defects, perhaps ne
rounding the weapon law of this
need of clarification. Others are
of standardization. Still others
overlapping, and in need of elim

The Committee decided that t
legislation which would only re
firearms and ammunition, but th
present laws. In this connection
conservationist groups, law enf
individuals, covering the entire
exception, the replies favored a

In the interest of clarity and
sial modifications in present l
The members are aware that m
that many such proposals may
changes could be controversial,
to clarify and rearrange prese
emphasized that *this bill has for*
*laws affecting firearms and amm*
*present laws.* Under this bill, as
through 1899 (and the many s
of the present Penal Law are
do not relate to weapons or da
so that there will be ten new co

The order and arrangement
by the bill are as follows: sect
nine succeeding sections. Sec
possession and arranges such
ment. The first five subdivis
state of mind and the remainin
Section 1898, continuing the
defines criminal conduct with
defacement, in that order. Se
are presumptions of possession

## ADMINISTRATION OF JUSTICE

He maintained that further
s who had prepared the
tial in urging its passage
:r legislation is necessary.
ly apparent that if nothing
:ice of the peace as relating
n abolished can be settled
that if the proposed bill is

icle VI of the Constitution
aitted at the 1962 election.
ry out the will of the people

y the Board of Supervisors
1963.

mittee on Firearms

Pr. 136, Berkowitz   Ch. 136

ittee on Firearms and Ammu-
nprehensive and constructive
affecting the sale, possession
administration of such law."
s, its members soon realized
re in a confused state. The
and dangerous instruments,
cutive but actually scattered
he numbering system is not
only; others, by a number
designations of subdivisions:
iorm; others, a letter only in
:, a "slungshot" appearing in
es a "slungshot" in an addi-
hy subdivision (Section 1897
three complete and separate
he Committee began its work.
content, the accumulation of
the form and structure of the
gh many subdivisions of four
no particular systematization:
l even use are variously com-

mingled, and in most cases distributed through several non-consecutive sections.
Presumptions are scattered through four sections, provisions governing exemp-
tions and immunity through five, and those relating to forwarding information
through three sections and more than a half-dozen subdivisions. Several sub-
divisions of Section 1897 of the Penal Law are devoted to lengthy provisions
on licensing: many of these are repeated almost verbatim and with equal prolixity
in Section 1914. Specification of criminal use and attempted use of weapons are
scattered through almost a hundred sections of the Penal Law, ranging from
Section 1897 to 1991.

But other defects, perhaps not so apparent, contribute to the confusion sur-
rounding the weapon law of this State. Dozens of provisions are vague and in
need of clarification. Others are inconsistent, or flatly contradictory, and in need
of standardization. Still others are absurd and unnecessary, or duplicative and
overlapping, and in need of elimination.

The Committee decided that the wisest course to pursue would be to introduce
legislation which would only rearrange and clarify the present laws affecting
firearms and ammunition, but the bill would contain no substantive changes in
present laws. In this connection, it circulated over six hundred questionnaires to
conservationist groups, law enforcement officials, county judges and interested
individuals, covering the entire area in which it is working. Without a single
exception, the replies favored a rearrangement and regroupng of the present laws.

In the interest of clarity and orderly arrangement, some minor non-controver-
sial modifications in present laws were necessarily inserted in the new bill.
The members are aware that many substantive changes have been proposed and
that many such proposals may have merit. They also realize that substantive
changes could be controversial, and the chance of passing sorely needed legislation
to clarify and rearrange present laws would be slim. Therefore, it should be
emphasized that *this bill has for its purpose clarification and rearrangement of present
laws affecting firearms and ammunition, and contains no substantive change in the
present laws.* Under this bill, as indicated by the notes in the bill itself, sections 1896
through 1899 (and the many subdivisions thereof) sections 1914, 1915 and 1919
of the present Penal Law are repealed. Sections 1900 through 1904-a, which
do not relate to weapons or dangerous instruments or appliances, are renumbered
so that there will be ten new consecutively numbered sections, 1896 through 1905.

The order and arrangement of the ten sections of the Penal Law proposed
by the bill are as follows: section 1896 defines ten terms frequently used in the
nine succeeding sections. Section 1897 defines all criminal conduct relating to
possession and arranges such conduct according to the order of severity of treat-
ment. The first five subdivisions deal with conduct that requires no particular
state of mind and the remaining three with conduct that makes such requirement.
Section 1898, continuing the arrangement according to severity of treatment,
fines criminal conduct with respect to manufacture, transport, disposal and
facement, in that order. Section 1899 creates six presumptions. The first three
presumptions of possession arising from presence in certain places. The next

65

## NEW YORK STATE LEGISLATIVE ANNUAL - 1963

two are ones of unlawful intent arising from possession. The final one is a presumption of defacing a firearm arising from possession of the same. Section 1900 defines all exemption and immunity with respect to the preceding three sections. These provisions are arranged according to the conduct (and not the person) covered by the exemption in the identical order previously used of possession, manufacture, transport and disposal. The broadest exemption precedes the more limited one, and accordingly the first nine subdivisions exempting from prosecution precede the final subdivision that exempts only from arrest. Section 1901 covers destruction. Section 1902 collates all instances when information must be forwarded. Section 1903 combines the licensing of possession with that of gunsmith and dealer in firearms. Sections 1904 and 1905 are concerned with all conduct relating to use and attempted use covered in the proposed ten sections.

The present provisions of the Penal Law (sections 1906, 1944 and 1991) proposed to be amended by the bill relate to prohibited uses of firearms and the imposition of additional punishment for committing crime while armed.

This bill cuts down by one-third the reading matter in the present laws. Also, it presents a sensible, orderly arrangement of present laws. Simplification and clarification are the objectives.

The Joint Legislative Committee on Firearms and Ammunition, on whose behalf this bill is introduced, has had many meetings over an eighteen month period, in the preparation of the bill. It is especially indebted to an Advisory Committee composed of representatives of the New York State Bar Association, the New York State Rifle and Pistol Association, the County Judges Association, the New York State Police, the Izaak Walton League, the New York State Conservation Council, the District Attorney's Association, New York State Sheriff's Association, Collectors Group, Chiefs of Police and individuals who are considered experts in this field.

Public hearings have been conducted in New York City, Buffalo, Albany and Elmira, solely for the purpose of determining whether any substantive changes in the present laws were inadvertently contained in the new bill.

The Joint Legislative Committee and its Advisory Committee are satisfied that the new bill simply clarifies and rearranges present laws and that there are no substantive changes therein.

The Committee has been complimented on the proposed bill by many law enforcement and conservationist groups throughout the state. Although all groups feel that substantive changes should be made in present laws (with many contradictory opinions) the District Attorney's Association, County Judges Association and the Criminal Courts' Committees of leading Bar Associations are on record favoring this bill. It is noteworthy that the New York State Conservation Council, which represents hundreds of thousands of sportsmen and to which belong substantially all the responsible conservationist groups in the state, at the State Convention in Lake Placid last October, unanimously adopted a resolution not to oppose this bill, provided that any newly discovered substantive changes would be deleted.

66

The Joint Legislative Comm anxious that this bill become law proposed substantive changes in

Memorand

Parole board authority

*Executive Law, § 242.* The pur the grant of a certificate of good of three of its members (sitting such members; and to vest disc tions for such certificates in th provided by the present law.

Upon its creation in 1930 th Functional decisions were by members in 1946 it acted in bo these boards. The 1946 legisla that decisions would be by a vote of the three members sitti 1960, further enlarged to nine formed by rotation of the nine imous vote of the three mem certificates of good conduct.

In drafting the 1960 legisla to seven, the word "majority" was erroneously left in the la of good conduct shall be grant The error is compounded by be vested with authority for certificate of good conduct. Board as a whole. The prese legislation.

Memoran

N. Y. City clerk, official signa

*Domestic Relations Law, § 1* use of the facsimile signatu signature, on the following d

*Prepared by Bernard J. R

# S (12)

Case 7:10-cv-05413-CS Document 66-1 Filed 02/23/11 Page 2 of 55

Firearms—Possession—Licenses

## CHAPTER 136

An Act to amend the penal law, in relation to the carrying, sale, possession and use of firearms and other dangerous weapons, the issuance of licenses therefor, and the surrendering, destruction, checking and recording of same, and repealing certain sections of such law relating thereto.

Became a law March 25, 1963, with the approval of the Governor.
Effective July 1, 1963.

*The People of the State of New York, represented in Senate and Assembly, do enact as follows:*

Section 1. Section eighteen hundred ninety-six of the penal law, as last amended by chapter one hundred seven of the laws of nineteen hundred fifty-eight, is hereby repealed and a new section eighteen hundred ninety-six is hereby inserted in lieu thereof, to read as follows:

### § 1896. Definitions

As used in sections eighteen hundred ninety-seven, eighteen hundred ninety-eight, eighteen hundred ninety-nine, nineteen hundred, nineteen hundred one, nineteen hundred two, nineteen hundred three, nineteen hundred four and nineteen hundred five, the following terms shall mean and include:

1. "Machine-gun," a weapon of any description, irrespective of size, by whatever name known, loaded or unloaded, from which a number of shots or bullets may be rapidly or automatically discharged from a magazine with one continuous pull of the trigger and includes a sub-machine gun.

2. "Firearm silencer," any instrument, attachment, weapon or appliance for causing the firing of any gun, revolver, pistol or other firearms to be silent, or intended to lessen or muffle the noise of the firing of any gun, revolver, pistol or other firearms.

3. "Firearm," any pistol, revolver, sawed-off shotgun or other firearm of a size which may be concealed upon the person.

4. "Switchblade knife," any knife which has a blade which opens automatically by hand pressure applied to a button, spring or other device in the handle of the knife.

5. "Gravity knife," any knife which has a blade which is released from the handle or sheath thereof by the force of gravity or the application of centrifugal force and which, when released, is locked in place by means of a button, spring, lever or other device.

6. "Dispose of," to dispose of, give, give away, lease, loan, keep for sale, offer, offer for sale, sell, transfer and otherwise dispose of.

7. "Deface," to remove, deface, cover, alter or destroy the manufacturer's serial number or any other distinguishing number or identification mark.

8. "Gunsmith," any person, firm, partnership, corporation or company who engages in the business of repairing, altering, assembling, cleaning, polishing, engraving or trueing, or who performs any mechanical opera-

**148**    Changes or additions in text are indicated by underline

tion on, any pistol or revolver.  Gunsmith shall not include a wholesale dealer.

9.  "Dealer in firearms," any person, firm, partnership, corporation or company who engages in the business of purchasing, selling, keeping for sale, loaning, leasing, or in any manner disposing of, any pistol or revolver.  Dealer in firearms shall not include a wholesale dealer.

10.  "Licensing officer," in the city of New York the police commissioner of that city; in the county of Nassau the commissioner of police of that county; and elsewhere in the state a judge or justice of a court of record having his office in the county of issuance.

§ 2.   Section eighteen hundred ninety-seven of such law, as amended, is hereby repealed and a new section is hereby inserted in lieu thereof, to be section eighteen hundred ninety-seven, to read as follows:

### § 1897. Possession of weapons and dangerous instruments and appliances

1.  Any person who has in his possession any bomb, bombshell, firearm silencer or machine-gun is guilty of a felony.

2.  Any person who has or carries concealed upon his person any firearm which is loaded with ammunition, or who has or carries concealed upon his person any firearm and, at the same time, has or carries upon his person a quantity of ammunition which may be used to discharge such firearm is guilty of a felony.

3.  Any person who has in his possession any firearm, gravity knife, switchblade knife, billy, blackjack, bludgeon, metal knuckles, sandbag, sandclub or slungshot is guilty of a misdemeanor, and he is guilty of a felony if he has previously been convicted of any crime.

4.  Any person under the age of sixteen years who has in his possession any of the weapons, instruments, appliances or substances specified in the first three subdivisions of this section, or any air-gun, spring-gun or other instrument or weapon in which the propelling force is a spring or air, or any gun, or any instrument or weapon commonly known as a toy pistol, or any such instrument or weapon in or upon which any loaded or blank cartridges may be used, or any loaded or blank cartridges or ammunition therefor, or any dangerous knife, shall be adjudged a juvenile delinquent.

5.  Any person not a citizen of the United States who has in his possession any dangerous or deadly weapon other than those prohibited to him in the first two subdivisions of this section is guilty of a misdemeanor, and he is guilty of a felony if he has previously been convicted of any crime.

6.  Any person who has in his possession any explosive substance with intent to use the same unlawfully against the person or property of another is guilty of a felony.

7.  Any person who knowingly has in his possession a machine-gun or firearm which has been defaced for the purpose of concealment or prevention of the detection of a crime or misrepresenting the identity of such machine-gun or firearm is guilty of a felony.

8.  Any person who has in his possession any dagger, dangerous knife, dirk, razor, stiletto, imitation pistol or any other dangerous or deadly

APPX. 629

# Ch. 136    LAWS OF NEW YORK 1963

instrument or weapon with intent to use the same unlawfully against another is guilty of a misdemeanor, and he is guilty of a felony if he has previously been convicted of any crime.

§ 3.  Sections eighteen hundred ninety-seven-a, eighteen hundred ninety-seven-b, eighteen hundred ninety-seven-c and eighteen hundred ninety-eight of such law, as amended, are hereby repealed and a new section, to be section eighteen hundred ninety-eight, is hereby inserted in lieu thereof, to read as follows:

§ 1898. Manufacture, transport, disposition and defacement of weapons and dangerous instruments and appliances

1.  Any person who manufactures or causes to be manufactured any machine-gun is guilty of a felony.  Any person who manufactures or causes to be manufactured any switchblade knife, gravity knife, billy, blackjack, bludgeon, metal knuckles, sandbag, sandclub or slungshot is guilty of a misdemeanor.

2.  Any person who transports or ships any machine-gun or firearm silencer is guilty of a felony.  Any person who transports or ships as merchandise any firearm, switchblade knife, gravity knife, billy, blackjack, bludgeon, metal knuckles, sandbag or slungshot is guilty of a misdemeanor.

3.  Any person who disposes of any machine-gun or firearm silencer is guilty of a felony.  Any person who knowingly buys, receives, disposes of, or conceals a machine-gun or firearm which has been defaced for the purpose of concealment or prevention of the detection of a crime or misrepresenting the identity of such machine-gun or firearm is guilty of a felony.

4.  Any person who disposes of any of the weapons, instruments or appliances specified in subdivision three of the preceding section is guilty of a misdemeanor, and he is guilty of a felony if he has previously been convicted of any crime.

5.  Any person who disposes of any of the weapons, instruments, appliances or substances specified in subdivision four of the preceding section to any other person under the age of sixteen years is guilty of a misdemeanor.

6.  Any person who wilfully defaces any machine-gun or firearm is guilty of a felony.

§ 4.  Sections eighteen hundred ninety-eight-a and eighteen hundred ninety-nine of such law, as amended, are hereby repealed and a new section, to be section eighteen hundred ninety-nine, is hereby inserted in lieu thereof, to read as follows:

§ 1899. Presumptions of possession, unlawful intent and defacement

1.  The presence in any room, dwelling, structure or vehicle of any machine-gun is presumptive evidence of its unlawful possession by all persons occupying the place where such machine-gun is found.

2.  The presence in any stolen vehicle of any weapon, instrument, appliance or substance specified in section eighteen hundred ninety-seven is presumptive evidence of its possession by all persons occupying such vehicle at the time such weapon, instrument, appliance or substance is found.

**150**                    Changes or additions in text are indicated by underline

3. The presence in an automobile, other than a stolen one or a public omnibus, of any firearm, defaced firearm, firearm silencer, bomb, bombshell, gravity knife, switchblade knife, dagger, dirk, stiletto, billy, blackjack, metal knuckles, sandbag, sandclub or slungshot is presumptive evidence of its possession by all persons occupying such automobile at the time such weapon, instrument or appliance is found, except under the following circumstances: (a) if such weapon, instrument or appliance is found upon the person of one of the occupants therein; (b) if such weapon, instrument or appliance is found in an automobile which is being operated for hire by a duly licensed driver in the due, lawful and proper pursuit of his trade, then such presumption shall not apply to the driver; or (c) if the weapon so found is a pistol or revolver and one of the occupants, not present under duress, has in his possession a valid license to have and carry concealed the same.

4. The possession by any person of the substance as specified in subdivision six of section eighteen hundred ninety-seven is presumptive evidence of possessing such substance with intent to use the same unlawfully against the person or property of another. The possession by any person of any dagger, dirk, stiletto, dangerous knife or of any other weapon, instrument, appliance or substance designed, made or adapted for use primarily as a weapon, is presumptive evidence of intent to use the same unlawfully against another.

5. The possession by any person of a defaced machine-gun or firearm is presumptive evidence that such person defaced the same.

§ 5. Section nineteen hundred of such law, subdivision one having been amended by chapter five hundred seventy of the laws of nineteen hundred thirty, is hereby renumbered section nineteen hundred six and a new section is hereby inserted in lieu thereof, to be section nineteen hundred, to read as follows:

§ 1900. Exemptions and immunity

a. Sections eighteen hundred ninety-seven, eighteen hundred ninety-eight and eighteen hundred ninety-nine shall not apply to:

1. Possession of any of the weapons, instruments, appliances or substances specified in section eighteen hundred ninety-seven by the following:

(a) Persons in the military service of the state of New York and sheriffs, policemen or other peace officers thereof.

(b) Persons in the military or other service of the United States, in pursuit of official duty or when duly authorized by federal law, regulation or order to possess the same.

(c) Persons employed in fulfilling defense contracts with the government of the United States or agencies thereof when possession of the same is necessary for manufacture, transport, installation and testing under the requirements of such contract.

(d) During the month of June only each year, a person voluntarily surrendering such weapon, instrument, appliance or substance, provided that such surrender shall be made to the sheriff of the county in which such person resides and in the county of Nassau to the commissioner of police or a member of the police department thereof designated by him, or if such person resides in a city having a population of seventy-five

deletions by ~~strikeouts~~ **151**

## Ch. 136   LAWS OF NEW YORK 1963

thousand or more to the police commissioner or head of the police force or department, or to a member of the force or department designated by such commissioner or head; and provided, further, that the same shall be surrendered by such person only after he gives notice in writing to the appropriate authority, stating his name, address, the nature of the weapon to be surrendered, and the approximate time of day and the place where such surrender shall take place. Such notice shall be acknowledged immediately upon receipt thereof by such authority. Nothing in paragraph (d) of subdivision one hereof shall be construed as granting immunity from prosecution for any crime or offense except that of unlawful possession of such weapons, instruments, appliances or substances surrendered as herein provided.

2.  Possession of a machine-gun, firearm, switchblade knife, gravity knife, billy or blackjack by a warden, superintendent, headkeeper or deputy of a state prison, penitentiary, workhouse, county jail or other institution for the detention of persons convicted or accused of crime or detained as witnesses in criminal cases, in pursuit of official duty or when duly authorized by regulation or order to possess the same.

3.  Possession of a pistol or revolver by a person to whom a license therefor has been issued as provided under section nineteen hundred three.

4.  Possession of a switchblade or gravity knife for use while hunting, trapping or fishing by a person carrying a valid license issued to him pursuant to article four, part four of the conservation law.

5.  Possession, at an indoor or outdoor rifle range for the purpose of loading and firing the same, of a rifle of not more than twenty-two calibre rim fire, the propelling force of which may be either gunpowder, air or springs, by a person under sixteen years of age but not under twelve, who is a duly enrolled member of any club, team or society organized for educational purposes and maintaining as a part of its facilities, or having written permission to use, such rifle range under the supervision, guidance and instruction of (a) a duly commissioned officer of the United States army, navy, marine corps or coast guard, or of the national guard of the state of New York; or (b) a duly qualified adult citizen of the United States who has been granted a certificate as an instructor in small arms practice issued by the United States army, navy or marine corps, or by the adjutant general of this state, or by the national rifle association of America, a membership corporation duly organized under the laws of this state.

6.  The manufacturer of machine-guns, switchblade or gravity knives, billies or blackjacks as merchandise and the disposal and shipment thereof direct to a regularly constituted or appointed state or municipal police department, sheriff, policeman or other peace officer, or to a state prison, penitentiary, workhouse, county jail or other institution for the detention of persons convicted or accused of crime or held as witnesses in criminal cases, or to the military service of this state or of the United States.

7.  The regular and ordinary transport of firearms as merchandise, provided that the person transporting such firearms, where he knows or has reasonable means of ascertaining what he is transporting, notifies in

**152**                    Changes or additions in text are indicated by <u>underline</u>

writing the police commissioner, police chief or other law enforcement officer performing such functions at the place of delivery, of the name and address of the consignee and the place of delivery, and withholds delivery to the consignee for such reasonable period of time designated in writing by such police commissioner, police chief or other law enforcement officer as such official may deem necessary for investigation as to whether the consignee may lawfully receive and possess such firearms.

8. Engaging in the business of gunsmith or dealer in firearms by a person to whom a valid license therefor has been issued pursuant to section nineteen hundred three.

b. At any time, any person who voluntarily delivers to a peace officer any weapon, instrument, appliance or substance specified in section eighteen hundred ninety-seven, under circumstances not suspicious, peculiar or involving the commission of any crime, shall not be arrested. Instead, the officer who might make the arrest shall issue or cause to be issued in a proper case a summons or other legal process to the person for investigation of the source of the weapon, instrument, appliance or substance.

§ 6. Section nineteen hundred one of such law, as amended by chapter two hundred twenty-nine of the laws of nineteen hundred forty-nine, is hereby renumbered section nineteen hundred fourteen and a new section is hereby inserted in lieu thereof, to be section nineteen hundred one, to read as follows:

§ 1901. Destruction of weapons and dangerous instruments, appliances and substances

1. Any weapon, instrument, appliance or substance specified in section eighteen hundred ninety-seven, when unlawfully possessed, manufactured, transported or disposed of, or when surrendered or voluntarily delivered pursuant to the preceding section, is hereby declared a nuisance. When the same shall come into the possession of any peace officer, it shall be surrendered immediately to the official mentioned in paragraph (d) of subdivision one of the preceding section, except that such weapon, instrument, appliance or substance coming into the possession of the state police shall be surrendered to the superintendent of state police.

2. The official to whom the weapon, instrument, appliance or substance is so surrendered shall, at any time but at least once each year, destroy the same or cause it to be destroyed, or render the same or cause it to be rendered ineffective and useless for its intended purpose and harmless to human life.

3. Notwithstanding subdivision two of this section, the official to whom the weapon, instrument, appliance or substance is so surrendered shall not destroy the same if (a) a judge or justice of a court of record, or a district attorney, shall file with the official a certificate that the non-destruction thereof is necessary or proper to serve the ends of justice; or (b) the official directs that the same be retained in any laboratory conducted by any police or sheriff's department for the purpose of research, comparison, identification or other endeavor toward the prevention and detection of crime.

deletions by strikeouts

153

# Ch. 136    LAWS OF NEW YORK 1963

§ 7.   Section nineteen hundred two of such law is hereby renumbered section nineteen hundred fifteen and a new section is hereby inserted in lieu thereof, to be section nineteen hundred two, to read as follows:

§ 1902. Forwarding information on firearms, convictions and certain wounds inflicted by weapons, instruments, appliances and substances

1.   In the case of any machine-gun or firearm taken from the possession of any person, the official to whom such weapon is surrendered pursuant to subdivision one of the preceding section shall immediately notify the executive department, division of state police, Albany, giving the calibre, make, model, manufacturer's name and serial number, or if none, any other distinguishing number or identification mark.   A search of the files of such division and notification of the results of the search to such official shall immediately be made.

2.   Before any machine-gun or firearm is destroyed pursuant to subdivision two of the preceding section, (a) the official to whom the same has been surrendered shall forward to the executive department, division of state police, Albany, a notice of intent to destroy and the calibre, make, model, manufacturer's name and serial number, or if none, any other distinguishing number or identification mark of the machine-gun or firearm;   (b) such division shall make and keep a record of such description together with the name and address of the official reporting the same and the date such notice was received;   and (c) a search of the files of such division and notification of the results of the search to such official shall be made without unnecessary delay.

3.   Any person, other than a wholesale dealer, or gunsmith or dealer in firearms duly licensed pursuant to section nineteen hundred three, lawfully in possession of a firearm, who disposes of the same without first notifying in writing the licensing officer in the city of New York and county of Nassau and elsewhere in the state the executive department, division of state police, Albany, is guilty of a misdemeanor.

4.   Every case of a bullet wound, gunshot wound, powder burn or any other injury arising from or caused by the discharge of a gun or firearm, and every case of a wound which is likely to or may result in death and is actually or apparently inflicted by a knife, icepick or other sharp or pointed instrument, shall be reported at once to the police authorities of the city, town or village where the person reporting is located by: (a) the physician attending or treating the case; or (b) the manager, superintendent or other person in charge, whenever such case is treated in a hospital, sanitarium or other institution.   Failure to make such report is a misdemeanor.   This subdivision shall not apply to such wounds, burns or injuries received by a member of the armed forces of the United States or the state of New York while engaged in the actual performance of duty.

5.   Every conviction under sections eighteen hundred ninety-seven, eighteen hundred ninety-eight, nineteen hundred two, nineteen hundred three or nineteen hundred four of a person who is not a citizen of the United States, shall be certified to the proper officer of the United States government by the district attorney of the county in which such conviction was had.

**154**                    Changes or additions in text are indicated by underline

§ 8. Section nineteen hundred three of such law is hereby renumbered nineteen hundred nineteen and a new section is hereby inserted in lieu thereof, to be section nineteen hundred three, to read as follows:

§ 1903. Licenses to carry, possess, repair and dispose of firearms

1. Eligibility. No license shall be issued or renewed pursuant to this section except by the licensing officer, and then only after investigation and finding that all statements in a proper application for a license are true. No license shall be issued or renewed except for an applicant (a) of good moral character; (b) who has not been convicted anywhere of a felony or any one of the misdemeanors or offenses mentioned in section five hundred fifty-two of the code of criminal procedure; (c) who has stated whether he has ever suffered any mental illness or been confined to any hospital or institution, public or private, for mental illness; and (d) concerning whom no good cause exists for the denial of the license. No person shall engage in the business of gunsmith or dealer in firearms unless licensed pursuant to this section. An applicant to engage in such business shall also be a citizen of the United States, more than twenty-one years of age and maintain a place of business in the city or county where the license is issued. For such business, if the applicant is a firm or partnership, each member thereof shall comply with all of the requirements set forth in this subdivision and if the applicant is a corporation, each officer thereof shall so comply.

2. Types of licenses. A license for gunsmith or dealer in firearms shall be issued to engage in such business. A license for a pistol or revolver shall be issued to (a) have and possess in his dwelling by a householder; (b) have and possess in his place of business by a merchant or storekeeper; (c) have and carry concealed while so employed by a messenger employed by a banking institution or express company; (d) have and carry concealed while so employed by a regular employee of an institution of the state, or of any county, city, town or village, under control of a commissioner of correction of the city or any warden, superintendent or head keeper of any state prison, penitentiary, workhouse, county jail or other institution for the detention of persons convicted or accused of crime or held as witnesses in criminal cases, provided that application is made therefor by such commissioner, warden, superintendent or head keeper; and (e) ~~have and carry concealed without regard to employment or place of possession, by any person when proper cause exists for the issuance thereof.~~

3. Applications. Applications shall be made and renewed, in the case of a license to carry or possess a pistol or revolver, to the licensing officer in the city or county, as the case may be, where the applicant resides, is principally employed or has his principal place of business as merchant or storekeeper; and, in the case of a license as gunsmith or dealer in firearms, to the licensing officer where such place of business is located. Blank applications shall, except in the city of New York, be approved as to form by the superintendent of state police. An application shall state the full name, date of birth, residence, present occupation of each person or individual signing the same, whether or not he is a citizen of the United States, whether or not he complies with each requirement for eligibility

deletions by ~~strikeouts~~       **155**

Case 7:10-cv-05413-CS   Document 66-1   Filed 02/23/11   Page 10 of 55

specified in subdivision one of this section and such other facts as may be required to show the good character, competency and integrity of each person or individual signing the application. An application shall be signed and verified by the applicant. Each individual signing an application shall submit one photograph of himself and a duplicate for each required copy of the application. Such photographs shall have been taken within thirty days prior to filing the application. In the case of a license as gunsmith or dealer in firearms, the photographs submitted shall be two inches square, and the application shall also state the previous occupation of each individual signing the same and the location of the place of such business, or of the bureau, agency, subagency, office or branch office for which the license is sought, specifying the name of the city, town or village, indicating the street and number and otherwise giving such apt description as to point out reasonably the location thereof. In such case, if the applicant is a firm, partnership or corporation, its name, date and place of formation, and principal place of business shall be stated. For such firm or partnership, the application shall be signed and verified by each individual composing or intending to compose the same, and for such corporation, by each officer thereof.

4. Investigation. Before a license is issued or renewed, there shall be an investigation of all statements required in the application by the duly constituted police authorities of the locality where such application is made. For that purpose, the records of the department of mental hygiene concerning previous or present mental illness of the applicant shall be available for inspection by the investigating officer of the police authority. In order to ascertain any previous criminal record, the investigating officer shall take the fingerprints and physical descriptive data in quadruplicate of each individual by whom the application is signed and verified. Two copies of such fingerprints shall be taken on standard fingerprint cards eight inches square, and one copy may be taken on a card supplied for that purpose by the federal bureau of investigation. When completed, one standard card shall be forwarded to and retained by the division of criminal identification, department of correction, at Albany. A search of the files of such division and written notification of the results of the search to the investigating officer shall be made without unnecessary delay. Thereafter, such division shall notify the licensing officer and the executive department, division of state police, Albany, of any criminal record of the applicant filed therein subsequent to the search of its files. A second standard card, or the one supplied by the federal bureau of investigation, as the case may be, shall be forwarded to that bureau at Washington with a request that the files of the bureau be searched and notification of the results of the search be made to the investigating police authority. Of the remaining two fingerprint cards, one shall be filed with the executive department, division of state police, Albany, within ten days after issuance of the license, and the other remain on file with the investigating police authority. No such fingerprints may be inspected by any person other than a peace officer, except on order of a judge or justice of a court of record either upon notice to the licensee or without notice, as the judge or justice may deem ap-

Changes or additions in text are indicated by <u>underline</u>

APPX 636

Case 7:10-cv-05413-CS Document 66-1 Filed 02/23/11 Page 11 of 55

*(left margin fragments:)*
is may be
y of each
shall be
applica-
r each re-
een taken
f a license
l shall be
evious oc-
the place
or branch
f the city,
ise giving
ereof. In
, its name,
all be stat-
d and ver-
the same,

there shall
ion by the
application
of mental
e applicant
f the police
, the inves-
iptive data
n is signed
n standard
taken on a
vestigation.
nd retained
rrection, at
tification of
ade without
he licensing
ice, Albany,
nent to the
plied by the
e forwarded
f the bureau
made to the
rprint cards,
state police,
the other re-
such finger-
officer, except
upon notice
nay deem ap-

d by underline

propriate. Upon completion of the investigation, the police authority shall report the results to the licensing officer without unnecessary delay.

5. Filing of approved applications. The application for any license, if granted, shall be a public record. Such application shall be filed by the licensing officer with the clerk of the county of issuance, except that in the city of New York and county of Nassau, the licensing officer shall designate the place of filing in the appropriate division, bureau or unit of the police department thereof. A duplicate copy of such application shall be filed by the licensing officer in the executive department, division of state police, Albany, within ten days after issuance of the license.

6. License: validity. Any license issued pursuant to this section shall be valid notwithstanding the provisions of any local law or ordinance. No license shall be transferable to any other person or premises. A license to carry or possess a pistol or revolver, not otherwise limited as to place or time of possession, shall be effective throughout the state, except that the same shall not be valid within the city of New York unless a special permit granting validity is issued by the police commissioner of that city. A license as gunsmith or dealer in firearms shall not be valid outside the city or county, as the case may be, where issued.

7. License: form. Any license issued pursuant to this section shall, except in the city of New York, be approved as to form by the superintendent of state police. A license to carry or possess a pistol or revolver shall have attached the licensee's photograph, and a coupon which shall be removed and retained by any person disposing of a firearm to the licensee. Such license shall specify the weapon covered by calibre, make, model, manufacturer's name and serial number, or if none, by any other distinguishing number or identification mark, and shall indicate whether issued to carry on the person or possess on the premises, and if on the premises shall also specify the place where the licensee shall possess the same. If such license is issued to an alien, or to a person not a citizen of and usually a resident in the state, the licensing officer shall state in the license the particular reason for the issuance and the names of the persons certifying to the good character of the applicant. Any license as gunsmith or dealer in firearms shall mention and describe the premises for which it is issued and shall be valid only for such premises.

8. License: exhibition and display. Every licensee while carrying a pistol or revolver shall have on his person a license to carry the same. Every person licensed to possess a pistol or revolver on particular premises shall have the license for the same on such premises. Upon demand, the license shall be exhibited for inspection to any peace officer. A license as gunsmith or dealer in firearms shall be prominently displayed on the licensed premises. Failure of any licensee to so exhibit or display his license, as the case may be, shall be presumptive evidence that he is not duly licensed.

9. License: amendment. Elsewhere than in the city of New York, a person licensed to carry or possess a pistol or revolver may apply at any time to his licensing officer for amendment of his license to include one or more such weapons or to cancel weapons held under license. If granted, a record of the amendment describing the weapons involved

deletions by strikeouts

**157**

APPX. 637

## Ch. 136    LAWS OF NEW YORK 1963

shall be filed by the licensing officer in the executive department, division of state police, Albany.

10.  License: expiration and renewal.  Any license for gunsmith or dealer in firearms and, in the city of New York and the counties of Nassau and Suffolk, any license to carry or possess a pistol or revolver, issued at any time pursuant to this section or prior to the first day of July, nineteen hundred sixty-three and not limited to expire on an earlier date fixed in the license, shall expire on the first day of the second January after the date of issuance.  Elsewhere than in the city of New York and the counties of Nassau and Suffolk, any license to carry or possess a pistol or revolver, issued at any time pursuant to this section or prior to the first day of July, nineteen hundred sixty-three and not previously revoked or cancelled, shall be in force and effect until revoked as herein provided. Any application to renew a license that has not previously expired, been revoked or cancelled shall thereby extend the term of the license until disposition of the application by the licensing officer.  In the case of a license for gunsmith or dealer in firearms, in counties having a population of less than two hundred thousand inhabitants, photographs and fingerprints shall be submitted on original applications and, upon renewal thereafter only at six year intervals.

11.  License: revocation.  The conviction of a licensee anywhere of a felony or any one of the misdemeanors or offenses mentioned in section five hundred fifty-two of the code of criminal procedure shall operate as a revocation of the license.  A license may be revoked and cancelled at any time in the city of New York and county of Nassau by the licensing officer, and elsewhere than in the city of New York by any judge or justice of a court of record.  The official revoking a license shall give written notice thereof without unnecessary delay to the executive department, division of state police, Albany, and shall also notify immediately the duly constituted police authorities of the locality.

12.  Records required of gunsmiths and dealers in firearms.  Any person licensed as gunsmith or dealer in firearms shall keep a record book approved as to form, except in the city of New York, by the superintendent of state police.  In the record book shall be entered at the time of every transaction involving a firearm the date, name, age, occupation and residence of any person from whom a firearm is received or to whom a firearm is delivered, and the calibre, make, model, manufacturer's name and serial number, or if none, any other distinguishing number or identification mark on such firearm.  Before delivering a firearm to any person, the licensee shall require him to produce either a license valid under this section to carry or possess the same, or proof of lawful authority as a peace officer or other exempt person pursuant to section nineteen hundred.  The licensee shall remove and retain the attached coupon and enter in the record book the date of such license, number, if any, and name of the licensing officer, in the case of the holder of a license to carry or possess, or the shield or other number, if any, assignment and department or unit, in the case of an exempt person.  The record book shall be maintained on the premises mentioned and described in the license and shall be open at all reasonable hours for inspection by any

**158**                    Changes or additions in text are indicated by underline

peace officer. In the event of cancellation or revocation of the license for gunsmith or dealer in firearms, or discontinuance of business by a licensee, such record book shall be immediately surrendered to the licensing officer in the city of New York and county of Nassau, and elsewhere in the state to the executive department, division of state police.

13. Expenses. The expense of providing a licensing officer with blank applications, licenses and record books for carrying out the provisions of this section shall be a charge against the county, and in the city of New York against the city.

14. Fees. In the city of New York, the annual license fee shall be twenty-five dollars for gunsmiths and fifty dollars for dealers in firearms. In such city, the city council shall fix the fee to be charged for a license to carry or possess a pistol or revolver and provide for the disposition of such fees. Elsewhere in the state, the licensing officer shall collect and pay into the county treasury the following fees: for each license to carry or possess a pistol or revolver, not less than three dollars nor more than five dollars as may be determined by the board of supervisors of the county; for each amendment thereto, one dollar, and two dollars in the county of Suffolk; and for each license issued to a gunsmith or dealer in firearms, four dollars.

15. Any violation by any person of any provision of this section is a misdemeanor.

§ 9. Section nineteen hundred four of such law is hereby renumbered section nineteen hundred twenty-two.

§ 10. Section nineteen hundred six of such law, as amended by chapter eight hundred ninety-one of the laws of nineteen hundred fifty-three, paragraph a of subdivision one thereof having been last amended by chapter five hundred seventy-six of the laws of nineteen hundred fifty-eight, is hereby renumbered section nineteen hundred four and amended to read as follows:

§ 1906. Discharging fire-arms

1. A person who, otherwise than in self defense, or in the discharge of official duty;

a. Wilfully discharges any species of firearms, air-gun or other weapon, or throws any other deadly missile

(1) in a public place or in any place where there is any person to be endangered thereby, or,

(2) in Putnam county within one-quarter mile of any occupied school building other than under supervised instruction by properly authorized instructors, although no injury to any person ensues; or,

b. Intentionally, without malice, points or aims any fire-arm at or toward any other person; or,

c. Discharges, without injury to any other person, fire-arms, while intentionally without malice, aimed at or toward any person; or,

d. Maims or injures any other person by the discharge of any fire-arm pointed or aimed intentionally, but without malice, at any such person,

Is guilty of a misdemeanor.

§ 1904. Prohibited use of weapons

1. Except as permitted in section nineteen hundred, any person who uses a machine-gun is guilty of a felony. Any person who attempts to

deletions by strikeouts

**159**

use against another an imitation pistol is guilty of a misdemeanor, and he is guilty of a felony if he has previously been convicted of any crime.

2. Any person hunting with a dangerous weapon in any county wholly embraced within the territorial limits of a city is guilty of a misdemeanor.

3. Any person who wilfully discharges a loaded firearm or any other gun, the propelling force of which is gunpowder, at an aircraft while such aircraft is in motion in the air or in motion or stationary upon the ground, or at any railway or street railroad train as defined by the public service law, or at a locomotive, car, bus or vehicle standing or moving upon any such railway, railroad or public highway, is guilty of a felony and punishable: first, if thereby the safety of any person is endangered, by not more than twenty years in prison; second, in every other case, by not more than five years in prison.

4. Any person who, otherwise than in self defense or in the discharge of official duty, (a) wilfully discharges any species of firearms, air-gun or other weapon, or throws any other deadly missile, either in a public place, or in any place where there is any person to be endangered thereby, or, in Putnam county, within one-quarter mile of any occupied school building other than under supervised instruction by properly authorized instructors although no injury to any person ensues; (b) intentionally, without malice, points or aims any firearm or any other gun, the propelling force of which is gunpowder, at or toward any other person; (c) discharges, without injury to any other person, firearms or any other guns, the propelling force of which is gunpowder, while intentionally without malice, aimed at or toward any person; or (d) maims or injures any other person by the discharge of any firearm or any other gun, the propelling force of which is gunpowder, pointed or aimed intentionally, but without malice, at any such person, is guilty of a misdemeanor.

3 _5._ A person who leaves the state, with intent to elude any provision of _subdivision four of_ this section, or to commit any act without the state, which is prohibited by _subdivision four of_ this section, or who, being a resident of this state, does any act without the state, which would be punishable by the provisions of _subdivision four of_ this section, if committed within the state, is guilty of the same offense and subject to the same punishment, as if the act had been committed within this state.

3 _6._ In any criminal proceeding before any court, magistrate or grand jury for any of the offenses specified in _subdivision four of_ this section, the court, magistrate or grand jury may confer immunity in accordance with the provisions of section two thousand four hundred forty-seven of this chapter.

§ 11. Section nineteen hundred four-a of such law, as added by chapter three hundred ninety-seven of the laws of nineteen hundred fifty, is hereby renumbered section nineteen hundred twenty-three.

§ 12. Such law is hereby amended by inserting therein a new section, to be section nineteen hundred five, to read as follows:

### § 1905. Committing crime while armed

1. If any person while in the commission or attempted commission of a felony or crime or in leaving the scene of a crime shall be armed with a pistol or any of the weapons or instruments specified in section eighteen

   **Changes or additions in text are indicated by <u>underline</u>**

APPX. 640

hundred ninety-seven, the punishment elsewhere prescribed in this law for the felony of which he is convicted may be increased by imprisonment in state's prison for not less than five nor more than ten years. Upon a second conviction for a felony so committed such period of imprisonment may be increased by not less than ten nor more than fifteen years. Upon a third conviction for a felony so committed such period of imprisonment may be increased by not less than fifteen nor more than twenty-five years.

2.   In no case shall any person punished as provided in subdivision one of this section be put upon probation or have the execution of his sentence suspended, notwithstanding the provisions of section twenty-one hundred eighty-eight, for the increased term of his punishment imposed as above.

§ 13.   Section nineteen hundred forty-four of such law, as last amended by chapter fifty-three of the laws of nineteen hundred thirty-six, is hereby amended to read as follows:

**§ 1944. Committing crime while ~~armed~~ occupant of stolen or other automobile**

If any person while in the act of committing a felony, or attempting to commit a felony, or any person while in the act of committing a crime or attempting to commit a crime shall be an occupant of a stolen automobile or an automobile carrying fictitious license plates or an automobile which has been used in the commission of a crime or in an attempt to commit a crime, ~~or if any person while in the commission or attempted commission of either of such acts or in leaving the scene of a crime shall be armed with a pistol or any of the weapons or instruments specified in sections eighteen hundred and ninety-six, eighteen hundred and ninety-seven or eighteen hundred and ninety-seven-a~~, the punishment elsewhere prescribed in this law for the felony of which he is convicted may be increased by imprisonment in state's prison for not less than five nor for more than ten years.  Upon a second conviction for a felony so committed such period of imprisonment may be increased by not less than ten years nor more than fifteen years;  and upon a third conviction for a felony so committed such period of imprisonment may be increased by not less than fifteen nor more than twenty-five years.  In no case shall any person punished as above provided be put upon probation or have the execution of his sentence suspended, notwithstanding the provisions of section twenty-one hundred and eighty-eight, for the increased term of his punishment imposed as above.

§ 14.   Section nineteen hundred ninety-one of such law, as amended by chapter three hundred of the laws of nineteen hundred forty-one, is hereby amended to read as follows:

**§ 1991. Injuring railroad property and appurtenances;  obstructing tracks**

A person who wilfully:

1.   Displaces, loosens, removes, injures or destroys any rail, sleeper, switch, bridge, viaduct, culvert, embankment or structure or any part thereof, attached, appertaining to or connected with any railway or street railroad as defined by the public service law, or leaves unattended any car, bus or other transit facility or equipment given into his possession or care as an officer, employee or agent of any such privately or publicly owned or operated railroad, street railroad or bus system, or by any other means attempts to wreck, destroy, or so damage any car, bus, tender, locomotive or railway or street railroad train or part thereof, while moving

deletions by ~~strikeouts~~

**161**

Left margin text (partial, cut off):

d he
~~lly~~
~~nor.~~
~~ther~~
while
the
ublic
~~wing~~
~~elony~~
~~ered,~~
~~e, by~~

dis-
arms,
in a
gered
~~upied~~
ly au-
b) in-
r gun,
r per-
or any
~~ntion-~~
or in-
r gun,
tional-
~~eanor.~~

provi-
out the
r who,
would
tion, if
subject
in this

rate or
of this
y in ac-
d forty-

by chap-
fifty, is

section,

~~ission of~~
med with
eighteen

underline

# Ch. 136   LAWS OF NEW YORK 1963

or standing upon any railway or railroad track or public highway in this state, as to render such car, bus, tender, locomotive or railway or street railroad train wholly or partially unfitted for its ordinary use, whether operated by steam, electricity, oil, gasoline or other motive power; or,

2. Places any obstruction upon the track of any such railway or railroad; or,

3. Wilfully destroys or breaks any guard erected or maintained by a railroad corporation or public agency operating a street railroad or bus system as a warning signal for the protection of its employees; or,

4. ~~Wilfully discharges a loaded fire-arm, or projects~~ Projects, or throws a stone or other missile at any such railway or railroad train, or at a locomotive, car, bus or vehicle standing or moving upon any such railway, railroad or highways; or,

5. Wilfully displaces, removes, cuts, injures or destroys any wire, insulator, pole, dynamo, motor, locomotive, or any part thereof, attached, appertaining to or connected with any railway, street railroad operated by electricity or connected with any such street railroad facility or equipment, or wilfully interferes with or interrupts any motive power used in running such road, street railroad or bus system, or wilfully places any obstruction upon the track or in front of such railroad, street railroad or bus, ~~or wilfully discharges a loaded fire-arm,~~ or projects or throws a stone or any other missile at such railway train or street railroad train or locomotive, car or vehicle or bus, standing or moving upon such railway or highway; or,

6. Removes a journal brass from a car while standing upon any railroad or street railroad track in this state, without authority from some person who has a right to give such authority,

Is punishable as follows: First. If thereby the safety of any person is endangered, by imprisonment for not more than twenty years. Second. In every other case by imprisonment for not more than five years.

§ 15.   Sections nineteen hundred fourteen, nineteen hundred fifteen and nineteen hundred nineteen of such law, as amended, are hereby repealed.

§ 16.   Separability clause.   If any provision of this act, or the application thereof to any person or circumstance, is held invalid, the remainder of the act, and the application of such provisions to other persons or circumstances, shall not be affected thereby.

§ 17.   This act shall take effect July first, nineteen hundred sixty-three.

Changes or additions in text are indicated by <u>underline</u>

FIREARMS        **Ch. 136**

**TABLE I**

DISTRIBUTION OF PRESENT PROVISIONS OF THE PENAL LAW
PROPOSED TO BE REPEALED IN THE NEW TEN SECTIONS

| Present Statute | | | Proposed Statute |
|---|---|---|---|
| Section Number | Subdivision Number | Sentence | Section and Subdivision Number |
| 1896 | | 1st | 1896(4) (5);  1898(1) (4) (5) |
| | | 2d | 1898(2) (3) |
| | | 3d | 1900(a.6) |
| 1897 | 1 | 1st first part | 1904(1) |
| | | last part | 1897(8) |
| | | 2d | 1897(1) |
| | 1-a | 1st | 1896(1) |
| | | 2d | 1897(1);  1904(1) |
| | | 3d | 1899(1) |
| | | 4th | 1900(a.6) |
| | | 5th | 1900(a.1(a))  (a.1(b))  (a.2)  (a.6) |
| | 2 | 1st | 1897(1) (6) |
| | 3 | 1st | 1897(1) (2) (3) (4) |
| | | 2d | 1900(a.5) |
| | | 3d | 1900(a.4) |
| | 4 | 1st | 1897(3) |
| | 5 | 1st | 1897(3) |
| | 5-a | 1st | 1897(2) |
| | 6 | 1st | 1897(5) |
| | 6-a | 1st | 1900(b) |
| | 6-b | 1st | 1904(2) |
| | 7 | 1st | 1903(2) |
| | 8 | 1st | 1903(1) (2) |
| | 9 | 1st | 1903(1) (2) |
| | 9-a | 1st | 1896(10);  1903(3) |
| | | 2d | 1896(10);  1903(3) |
| | | 3d | 1903(3) |
| | | 4th | 1903(6) |
| | 9-b | 1st | 1903(1) |
| | | 2d first part | 1903(4) |
| | | last part | 1903(1) |
| | | 3d | 1903(4) |
| | | 4th | Dropped |
| | 10.a | 1st | 1903(13) |
| | | 2d | 1903(14) |
| | | 3d | 1903(14) |
| | | 4th | 1903(5) |
| | | 5th | 1903(7) |
| | 10.b | 1st first part | 1903(9) |
| | | last part | 1903(14) |
| | | 2d | 1903(9) |
| | | 3d | 1903(9) |
| | | 4th | 1903(10) |
| | | 5th | 1903(10) |
| | | 6th | 1903(7) |
| | | 7th | 1903(3) |
| | | 8th | 1903(3) |
| | | 9th | 1903(3) |

deletions by ~~strikeouts~~

**163**

## Ch. 136   LAWS OF NEW YORK 1963

**TABLE I—(Continued)**

DISTRIBUTION OF PRESENT PROVISIONS OF THE PENAL LAW

PROPOSED TO BE REPEALED IN THE NEW TEN SECTIONS

| Present Statute | | | Proposed Statute |
|---|---|---|---|
| Section Number | Subdivision Number | Sentence | Section and Subdivision Number |
| 1897 | | 10th | 1903(3) |
| | | 11th | 1903(3) |
| | | 12th | 1903(3) |
| | | 13th | 1903(3) |
| | | 14th | 1903(3) |
| | | 15th | 1903(4) |
| | | 16th | 1903(1) |
| | | 17th | 1903(11) |
| | | 18th | 1903(11) |
| | | 19th | 1903(11) |
| | | 20th | 1903(10) |
| | 11 | 1st | 1903(11) |
| | | 2d | 1903(4) |
| | 12 | 1st | 1903(7) |
| | | 2d | 1903(12) |
| | 13(a) | 1st | 1900(a.7) |
| | 13(b) | 1st | 1900(a.1(a)) (a.1(b)) |
| | 14 | 1st | 1902(5) |
| | 15 | 1st | 1900(a.1(c)) |
| 1897-a | | 1st | 1896(2); 1897(1) |
| | | 2d | 1900(a.1(a)) (a.1(b)) |
| 1897-b | 1 | 1st | 1896(7); 1898(6) |
| | 2 | 1st | 1898(3) |
| | 3 | 1st | 1898(3) |
| | 4 | 1st | 1899(5) |
| 1897-c | 1 | 1st | 1902(1) |
| | | 2d | 1902(1) |
| | | 3d | 1902(1) |
| | 2 | 1st | 1902(2) |
| | | 2d | 1902(2) |
| | | 3d | 1902(2) |
| 1898 | | 1st | 1899(4) |
| | | 2d | 1899(2) |
| 1898-a | | 1st | 1899(3) |
| | | 2d | 1899(8) |
| | | 3d first part | 1900(a.1(a)) (a.1(b)) (a.2) |
| | | last part | 1899(3) |
| 1899 | 1 | 1st | 1901(1) |
| | | 2d | 1901(1) |
| | | 3d | 1901(2) (3) |
| | | 4th | 1901(3) |
| | 2 | | Dropped |
| | 3 | | Dropped |
| | 4 | | 1900(a.1(d)) |

Changes or additions in text are indicated by <u>underline</u>

## FIREARMS  Ch. 136

**TABLE I—(Continued)**

DISTRIBUTION OF PRESENT PROVISIONS OF THE PENAL LAW
PROPOSED TO BE REPEALED IN THE NEW TEN SECTIONS

AL LAW

TIONS

tute

division

b))

)
(b))
)

.1(b)) (a.2)

ited by <u>underline</u>

| Present Statute | | | Proposed Statute |
|---|---|---|---|
| Section Number | Subdivision Number | Sentence | Section and Subdivision Number |
| 1014 | 1 | 1st | 1903(12) |
| | 2 | 1st | 1896(8) |
| | | 2d | 1896(9) |
| | 3 | 1st | 1903(1) |
| | | 2d | 1896(10); 1903(1) |
| | | 3d | 1896(10); 1903(3) |
| | | 4th | 1896(10); 1903(3) |
| | | 5th | 1903(6) |
| | 4 | 1st | 1903(1) (4) |
| | | 2d | 1903(1) |
| | 5 | 1st first part | 1903(13) |
| | | last part | 1903(3) (7) (12) |
| | | 2d | 1903(1) |
| | | 3d | 1903(5) |
| | | 4th | 1903(3) |
| | | 5th | 1903(3) |
| | | 6th | 1903(3) |
| | | 7th | 1903(4) |
| | | 8th | 1903(4) |
| | | 9th | 1903(4) |
| | | 10th | 1903(4) |
| | | 11th | 1903(4) |
| | | 12th | 1903(4) |
| | | 13th | 1903(4) |
| | | 14th | 1903(10) |
| | | 15th | 1903(4) |
| | | 16th | 1903(1) |
| | | 17th | 1903(11) |
| | | 18th | 1903(11) |
| | | 19th | 1903(3) |
| | | 20th | 1903(1) |
| | | 21st first part | 1903(7) |
| | | last part | 1903(8) |
| | | 22d | 1903(6) |
| | | 23d | 1903(14) |
| | | 24th | 1903(10) |
| | 6 | 1st | 1903(12) |
| | | 2d | 1903(12) |
| | | 3d | 1903(12) (15) |
| | | 4th | 1903(12) |
| | | 5th | 1903(11) |
| | | 6th | 1902(3) |
| | | 7th | 1896(8) (9); 1902(3) |
| | 7 | 1st | 1903(15) |
| 1915 | 1 | 1st | 1902(4) |
| | 2 | 1st | 1902(4) |
| | 3 | 1st | 1902(4) |
| | 4 | 1st | 1902(4) |
| 1919 | | | 1904(3) |

deletions by ~~strikeouts~~

**165**

# Ch. 136   LAWS OF NEW YORK 1963

## TABLE 2

### DISTRIBUTION OF PRESENT PROVISIONS OF THE PENAL LAW
### PROPOSED TO BE AMENDED IN THE NEW TEN SECTIONS

| Present Statute | Proposed Statute |
|---|---|
| Section Number | Section and Subdivision Number |
| 1906 | 1904(4)   (5)   (6) |
| 1944 | 1905 |
| 1991 | 1904(3) |

### NOTES

Note.—This bill is introduced on behalf of the Joint Legislative Committee on Firearms and Ammunition.

Note.—1.  Two sets of present provisions of the penal law are proposed to be repealed by the bill:

(a) One set (§§ 1896, 1897, 1897-a, 1897-b, 1897-c, 1898, 1898-a, 1899 and 1914) makes criminal certain conduct relating to the possession, manufacture, transport and disposal of weapons and dangerous instruments, appliances and substances, and the defacement of firearms.  These provisions create presumptions of various sorts: of possession arising from presence in certain places; of unlawful intent arising from possession; and of defacement of a firearm from possession of the same.  Certain persons are given exemption and immunity throughout these provisions.  These provisions cover destruction of weapons, appliances and instruments, and the forwarding of certain information concerning firearms.  Finally, these provisions cover the licensing of possession of firearms and of gunsmiths and dealers in firearms.  With minor exceptions, every one of these provisions govern conduct relating to weapons and dangerous instruments, appliances and substances, that falls short of their use or attempted use.  The exceptions are the attempted use of an imitation pistol (§ 1897(1)), hunting with a dangerous weapon in certain counties (§ 1897(6-b)) and use of a machine gun (§ 1897(1-a)).

(b) The second set of such provisions (§§ 1915, 1919) relate to required reporting of certain wounds and injuries, and to prohibited uses of firearms.

2.  The present provisions of the penal law (§§ 1906, 1944 and 1991) proposed to be amended by the bill relate to prohibited uses of firearms and the imposition of additional punishment for committing crime while armed.

3.  The present provisions of the penal law proposed to be renumbered by the bill (§§ 1900 to be 1906; 1901 to be 1914; 1902 to be 1915; 1903 to be 1919; 1904 to be 1922; and 1904-a to be 1923) do not relate to weapons or dangerous instruments, appliances or substances.  One additional provision proposed to be renumbered (§ 1906 to be 1904) relates to prohibited uses of firearms and is also the subject of amendment by the bill.  There is no present provision of the penal law for section 1905.  The proposed renumbering of these provisions makes available ten consecutively numbered sections of the penal law, beginning with section 1896 and ending with section 1905, for the provisions proposed in the bill.

4.  The bill undertakes to reorder and rearrange in standardized manner all of the present provisions of the penal law relating to weapons and dangerous instruments, appliances and substances in ten consecutive sections of such law.  The intended omissions to this comprehensive plan, so far as instruments, appliances and substances are concerned, are certain present provisions of the penal law relating to fireworks (§§ 1894, 1894-a and 2151), and explosives (§§ 851(6), 1052(3), 1420, 1894 and 1895).  So far as weapons are concerned, the intended omissions are certain present provisions of the penal law relating to extortion by threats to use a weapon (§ 851(6)), manslaughter by use of a weapon (§ 1050(2)), pawnbrokers accepting a firearm in pawn (§ 1593) and tramps carrying weapons under certain circumstances (§ 2371).

Changes or additions in text are indicated by underline

## SAVINGS AND LOAN ASSOCIATIONS   Ch. 137

PENAL LAW
SECTIONS

ite

n Number

)

islative Com-

are proposed

8-a, 1899 and
ession, manu-
instruments,
. These pro-
arising from
m possession;
ame. Certain
ese provisions.
s and instru-
ning firearms.
n of firearms
eptions, every
s and danger-
rt of their use
of an imitation
rtain counties

ate to required
ibited uses of

and 1991) pro-
of firearms and
g crime while

be renumbered
e 1916; 1903 to
ate to weapons
additional pro-
e to prohibited
the bill. There
The proposed
ecutively num-
896 and ending

n standardized
ting to weapons
n ten consecu-
comprehensive
concerned, are
eworks (§§ 1894,
1894 and 1895).
ure certain pres-
threats to use a
1050(2)), pawn-
ramps carrying

icated by underline

5. The order and arrangement of the ten sections of the penal law proposed by the bill are as follows: section 1896 defines ten terms frequently used in the nine succeeding sections. Section 1897 defines all criminal conduct relating to possession and arranges such conduct according to the order of severity of treatment. The first five subdivisions deal with conduct that requires no particular state of mind and the remaining three with conduct that makes such requirement. Section 1898, continuing the arrangement according to severity of treatment, defines criminal conduct with respect to manufacture, transport, disposal and defacement, in that order. Section 1899 creates six presumptions. The first three are presumptions of possession arising from presence in certain places. The next two are ones of unlawful intent arising from possession. The final one is a presumption of defacing a firearm arising from possession of the same. Section 1900 defines all exemptions and immunity with respect to the preceding three sections. These provisions are arranged according to the conduct (and not the person) covered by the exemption in the identical order previously used of possession, manufacture, transport and disposal. The broadest exemption precedes the more limited one, and accordingly the first nine subdivisions exempting from prosecution precede the final subdivision that exempts only from arrest. Section 1901 covers destruction. Section 1902 collates all instances when information must be forwarded. Section 1903 combines the licensing of possession with that of gunsmith and dealer in firearms. Sections 1904 and 1905 are concerned with all conduct relating to use and attempted use covered in the proposed ten sections.

6. With three minor exceptions, every provision of the penal law proposed to be repealed by the bill is incorporated into the proposed ten new sections. The exceptions relate to one provision that was effective only during the year 1937 (§ 1897 (9-b)) and two that expired on July 1, 1955 (§ 1859(2) (3)). Without exception, the omitted provisions effected by the proposed amendments to three sections of the penal law (§§ 1906, 1944 and 1991), are incorporated into the new ten sections. The two tables above present the distribution in the new ten sections of each provision of the present penal law proposed to be repealed and amended.

### Savings and Loan Associations—Terminology

### CHAPTER 137

An Act to amend the banking law, with respect to terminology of savings and loan associations.

Became a law March 25, 1963, with the approval of the Governor. Effective March 25, 1963.

*The People of the State of New York, represented in Senate and Assembly, do enact as follows:*

Section 1. Subdivision three of section three hundred seventy-eight of the banking law, such subdivision having been added by chapter three hundred forty-one of the laws of nineteen hundred thirty-nine, is hereby repealed.

§ 2. Subdivisions four through ten, inclusive, of section three hundred seventy-eight of such law are hereby renumbered, respectively, as subdivisions three through nine, inclusive.

§ 3. Section three hundred seventy-eight of such law is hereby amended by adding thereto a new subdivision, to be subdivision ten, to read as follows:

10. Notwithstanding any provision of this chapter, a savings and loan association, in its organization certificate, by-laws, advertising matter or any other instrument, document or other writing used in or in connection with its business, may designate its shares as "deposit accounts" or "sav-

deletions by ~~strikeout~~

**167**

# S (13)

# STATE OF NEW YORK

---

# REPORT

## OF THE

## NEW YORK STATE
## JOINT LEGISLATIVE COMMITTEE

### ON

## FIREARMS AND AMMUNITION



## 1965

# COMMITTEE PERSONNEL

SENATOR ALBERT BERKOWITZ, *Chairman*

ASSEMBLYMAN JULIUS VOLKER, *Vice-Chairman*

SENATOR WALTER VAN WIGGEREN
SENATOR THOMAS LAVERNE
SENATOR LEIGHTON A. HOPE
SENATOR SIMON J. LIEBOWITZ
SENATOR JULIAN B. ERWAY
ASSEMBLYMAN HYMAN E. MINTZ
ASSEMBLYMAN LEO A. LAWRENCE
ASSEMBLYMAN GEORGE M. MICHAELS
ASSEMBLYMAN CLARENCE D. LANE
ASSEMBLYMAN JOSEPH R. CORSO
FREDERICK J. LUDWIG, *Legal Consultant*

## Ex Officio

SENATOR WALTER J. MAHONEY, *President Pro Tem.,* The Senate
ASSEMBLYMAN JOSEPH E. CARLINO, *Speaker,* The Assembly
SENATOR JOSEPH ZARETZKI, *Minority Leader,* The Senate
ASSEMBLYMAN GEORGE L. INGALLS, *Majority Leader,* The Assembly
ASSEMBLYMAN ANTHONY J. TRAVIA, *Minority Leader,* The Assembly
SENATOR ELISHA T. BARRETT, *Finance Committee Chairman,* The Senate
ASSEMBLYMAN FRED W. PRELLER, *Ways and Means Committee Chairman,* The Assembly

[3]

# SUMMARY OF CONTENTS

––––––––

INTRODUCTION ................................................... 7

THE OLD SULLIVAN LAW AND THE NEW STATUTE.............. 7

PURPOSE OF LEGISLATION DEALING WITH DANGEROUS WEAP-
    ONS .......................................................... 11

INCIDENCE OF VIOLENT CRIME AND ADEQUATE WEAPONS LEGIS-
    LATION ....................................................... 14

RECOMMENDATIONS ............................................ 17

LIST OF TABLES
    1. Estimated Crimes of Violence Involving Weapons Committed in
       the United States and in New York, 1963..................... 12
    2. Violent and Non-Violent Crimes in the United States and England,
       1962 ...................................................... 14

APPENDIX A—THE NEW STATUTE.............................. 19

APPENDIX B—WHAT HAPPENED TO THE OLD LAW.............. 33

[5]

# INTRODUCTION

At the fateful hour on Friday, November 22, 1963, when an assassin's bullets took the life of the President of the United States in Dallas, a full meeting of the Joint Legislative Committee on Firearms and Ammunition in New York was considering legislation to prevent such tragedy before it could happen. At the identical moment of the event, the chairman and counsel were actually explaining such program to previously invited members of the press in the offices of the Temporary President of the Senate at 270 Broadway, New York City. At such time, only New York, among the fifty states and the District of Columbia, had any apparatus in force and effect for comprehensive revision of laws affecting firearms and weapons. Only New York had achieved comprehensive revision. Only New York had under active consideration extensive substantive changes in the new statute.

The heart of the work of this Committee has been the new statute. In many respects the statute is landmark legislation in the law-making history of New York: first, as a model of draftsmanship in the fields of both criminal and administrative law with respect to clarity, conciseness, definiteness, and order and arrangement; second, line by line, as the most extensive revision of the penal law actually enacted in the twentieth century, rivalled only by the enactments introduced by Caleb Baumes (Assemblyman, 1909–1913; Senator, 1919–1930); and third, as the only revision to succeed in enactment of the concededly most controversial provisions of the penal law in more than fifty years of their existence.

This is a report on the work of the Joint Legislative Committee and supplements two major reports of the Committee, one made in 1962 (*Legislative Document* No. 29, 33 pp.) and the other in 1964 (*Legislative Document* No. 12, 15 pp.).

## THE OLD SULLIVAN LAW AND THE NEW STATUTE

The first requirement of a sound provision of penal law is to draw a line as clear and unmistakable as the best draftsmanship can supply between lawful and unlawful conduct, and then to give fair warning in language that everyone will understand of what the law proposes to do when that line is overstepped. More than sixty amendments to the old Sullivan Law in the half-century of its existence without systematic recodification caused counsel to report that "no area of the Penal Law is more bogged down in a logomachy of confusion than those sections dealing with weapons". (*Report of N. Y. Temp. Comm. on Youth & Delinquency* (1955) p. 39).

The old law contained 145 separate identifiable provisions and these are elsewhere tabulated (Appendix B, *post*, p. 33). These provisions were not only not consecutive but actually scattered

[7]

through almost a hundred numbered sections of the penal law. Even the numbering system was haphazard: some sections were designated by number only; others, by a number and letter hyphenation. The same was true of the designation of subdivisions of sections: some had both number and letter in hyphenated form; others, simply a letter in parentheses. Spelling of identical terms often varied: e.g., a "slungshot" appearing in several enumerations of prohibited weapons suddenly became a "slingshot" in an additional otherwise identical enumeration. Myriads of lines of the old law were verbatim repetitions of itself. Any original form of order and arrangement had long since been buried by an accumulation of amendments over a fifty-year period. The more serious deficiencies of the old law were those of content. Dozens of its provisions were vague and in need of clarification. Others were inconsistent, or flatly contradictory, and in need of standardization. Still others were absurd and unnecessary, or duplicative and overlapping, and in need of elimination.

In the half-century of its existence, the old Sullivan Law was amended more than sixty times. Prior to the enactment of the new statute, more than five hundred amendments had failed of enactment by the Legislature. A handful of these undertook comprehensive revision. A single bill in all of these years succeeded in passing both houses of the Legislature. This bill, introduced in the Senate by Joe R. Hanley (Pr. S. 1815, S. Intro. 656), and in the Assembly by Kenneth W. Fake (Pr. A. 1940, A. Intro. 822), proposed the adoption of provisions acceptable to uniform law commissioners. On March 26, 1932, the bill was vetoed by Governor Franklin D. Roosevelt on the grounds that such uniform provisions fell far below the stringent law enforcement requirements of the State of New York.

The new statute (L. 1963, c. 136, effective July 1, 1963) was introduced in the Senate by the Chairman of the Joint Legislative Committee (S. Intro. 136, Pr. 136 [1963]), passed both houses of the Legislature and was approved by Governor Nelson A. Rockefeller. Of the 145 provisions of the old law, three were dropped outright as anachronistic: one (old law § 1897(9-b), fourth sentence) expired on December 31, 1937, but for some unknown reason was retained for a quarter century thereafter; and two others (old law §§ 1899 (2), (3)), similarly retained, that expired on July 1, 1955. Of the fifteen sections of the old law scattered through almost one hundred sections of the penal law and containing the remaining 142 provisions, twelve were flatly repealed by the new statute and the remaining three amended (Appendix B, post, p. 33). The new statute contains ten consecutive sections. The sections and subdivisions are uniformly numbered. Repetitive language has been dropped. Absurd, unnecessary, duplicative and overlapping provisions have been eliminated. Inconsistent and contradictory provisions have been standardized. Most important, vague provisions have been clarified. Although the new statute retains the force and effect of 142 provisions of the old law, with some additions, its language is fully one-third less.

The order and arrangement of the new statute provides a logical basis for all reform of its substantive content. The first of the ten consecutive sections, 1896, contains definitions of twelve terms (two, on ''rifle'' and ''shotgun,'' added) frequently used in the nine succeeding sections. By contrast, the old law defined only some of these terms and distributed their definition through four separate sections and through five subdivisions of two of these sections.

The heart of the new statute, section 1897, defines all conduct relating to the possession of weapons that is made criminal, and, in addition, specifies each and every weapon involved, including rifles and shotguns. The first six subdivisions deal with possessory conduct that requires no proof of any particular state of mind in order to convict, and the next three with conduct that makes such requirement. These subdivisions are arranged according to the severity of treatment. A tenth subdivision deals with circumstances under which mentally ill persons may not possess rifles or shotguns. By contrast the old law distributed provisions relating to criminal possession through numerous subdivisions of two sections that also dealt with numerous other topics.

Section 1898 of the new statute defines all other conduct relating to weapons that is made criminal short of their use or attempted use: manufacture, transport, disposition and defacement, in that order. As in the preceding section, the subdivisions are arranged according to the severity of treatment. By contrast, this conduct was distributed in the old law through three different sections with little regard to systematic arrangement.

All presumptions involved in the trial of all of this conduct are contained in section 1899: the first three are presumptions of the fact of possession arising from the presence of the actor in certain places; the next two, of unlawful intent arising from possession under certain circumstances; and the final one of the defacement of a firearm arising from its possession in that condition. By contrast in the old law these presumptions were scattered with considerable overlapping through four separate sections.

Every instance of exemption and immunity is delineated in section 1900 of the new statute and arranged according to *conduct* otherwise made criminal, *i.e.*, possession of specific weapons, and then their manufacture, transport and disposal, in that order, rather than according to the *status* of the person engaging in such conduct. The old law, besides confusing the exemption of conduct with status, also distributed these provisions through seven subdivisions scattered through five widely separated sections.

The next three sections of the new statute contain provisions of administrative rather than criminal law: section 1901, controlling destruction of weapons by criminal law administrators; section 1902, governing transmittal of information by and to such administrators; and section 1903, relating to licensing by such administrators. In the old law these provisions were widely distributed among its various sections. Significantly different considerations of draftsmanship must govern provisions of administrative law compared with those of criminal law. For criminal law

10

provisions, exclusive rule-making power is retained by the Legislature. Trial of issues of fact is committed to courts of criminal jurisdiction and such issues must be established by proof beyond a reasonable doubt. On the other hand, in the administrative law provisions the Legislature shares its rule-making power with certain of its designated administrators. Issues of fact are committed by the Legislature to determination by such administrators. Court proceedings are civil and not criminal, review rather than originally determine the rule-making or fact determination of the administrators, and do so according to standards of proof quite different from those required in a criminal trial. To illustrate: in section 1903 of the new statute, the ███████████████████ ████████████████████████████████████████████ ████ ████████████████████████████████████████ tion of "good cause" and "proper ████ Penal Law § 1903 (1), (2), Appendix A, *post*, p. 26-27] Such provision, even penal, would certainly █████████████████████████ rules of judicial construction that limit the meaning of ██████████████ common characteristics of its preceding enumeration. In the instant case of an administrative provision, the language signifies that the licensing officer is not a mere ministerial agent, and the ████████ court may not independently dispose of every case of an applicant denied a license by such officer.

The remaining provisions of the new statute, sections 1904 and 1905, cover conduct that goes beyond that of a mere possessory nature. Section 1904 sets forth all instances in the new statute in which the actual or attempted use of weapons is prohibited. This section replaces provisions distributed through four sections of the old law. Section 1905 covers the matter of additional punishment for committing crime while armed, a provision commingled with other sections in the old law.

The new statute with its amendments to date is fully set forth, Appendix A, *post*, p. 19 to 32.

Simple comparison of the new statute with those of fifty other American jurisdictions (49 States and the District of Columbia) demonstrates its superior clarity, orderly arrangement, comprehensiveness and conciseness. For the first time in the law-enforcement history of the State, personnel charged with the administration of its weapons laws could be and in fact were supplied with the precise content of its provisions: the police of the city of New York in printed Circular No. 13, dated June 28, 1963, before the effective date of the new statute, and again in printed Circular No. 35, dated September 14, 1964, covering the complete statute, as amended; and the State police by mimeographed material of the complete statute, made available in June, 1964.

More careful comparison demonstrates that New York in its new statute imposes restrictions upon weapons that exceed every other American jurisdiction. With respect to pistols and revolvers, only New York and a single other State (Hawaii) require a license for possession in one's home, place of business, or property, as distinguished from carrying the same. Only New York and

two other States (California and New Jersey) make mandatory the taking of fingerprints for the issuance of such license. Only in New York and a handful of the 28 American jurisdictions that require any licensing whatsoever (Connecticut, District of Columbia, Hawaii, Indiana, Massachusetts and West Virginia) does the prohibition against unlicensed carrying include not only concealed pistols or revolvers but also those openly carried. Of the jurisdictions that undertake licensing of pistols or revolvers in some form, less than half also license dealers, and New York is one of these jurisdictions. Apart from pistols and revolvers, New York is the only American jurisdiction to outlaw flatly, without proof of any criminal intent, the gangster sawed-off shotgun and the stealthy switchblade and gravity knife. With respect to rifles and shotguns, New York flatly prohibits their possession by minors, aliens, persons mentally incompetent, and persons convicted anywhere of any felony, or of any of the misdemeanors or offenses sufficient to require bail by a court, unless such person obtains a certificate of good conduct. No other American jurisdiction exceeds these prohibitions.

## PURPOSE OF LEGISLATION DEALING WITH DANGEROUS WEAPONS

Murder and non-negligent manslaughter, robbery, and aggravated assault are serious crimes of violence usually committed with weapons. The traditional criminal law system for controlling crime operates after its commission by arrest, indictment, trial, and punishment of offenders found guilty. Prevention is achieved by restraining behind bars persons who have demonstrated that they are dangerously likely to commit crimes, and, through the example of such unpleasant treatment, by deterring would-be offenders. Despite this system, crimes of violence increase each year; without this system, no sane person doubts that the increase would be enormously greater.

The best method of preventing crimes of violence is to prevent them before they occur. On Saturday evening, March 25, 1911, six hundred employees of the Triangle Shirtwaist Company were leaving the factory eight stories above the ground in a building in lower Manhattan. One exit door had been locked to assure egress through another door under scrutiny of supervisors searching for the tell tale bulge of a stolen shirtwaist. A fire broke out. In less than ten minutes, it was all over. One hundred forty-five employees had lost their lives. The two operators of the company were indicted for manslaughter in the first and second degrees, and tried for these crimes in connection with the death of one female employee. Had the defendants been convicted and punished, the legislative history of labor laws and building codes in this State might well have been different. The defendants were acquitted by a jury, apparently because of insufficient proof of knowledge that a door had been locked. Governor Dix promptly appointed a factory investigation commission. The Legislature enacted stringent provisions that,

12

by licensing, inspection and certification, would prevent such holocausts before they could occur. The Legislature did not undertake any change in the definition of manslaughter or any increase in punishment for its commission. The Legislature did not attempt to outlaw factories but rather their operation under dangerous conditions.

Statutes governing firearms and weapons are not desirable as ends in themselves. Such legislation ~~is desirable only as a means~~ ~~for the worthwhile aim of preventing crimes of violence before they~~ ~~occur.~~ The legislative problem posed for the fifty-one American jurisdictions (fifty States and the District of Columbia) charged with the major responsibility of criminal law enforcement in the United States is this: to ~~provide legislation designed to prevent crimes~~ ~~of violence before they can happen and, at the same time preserve~~ ~~legitimate interests such as training for the national defense, the~~ right of self defense and recreational pursuits of hunting, target shooting and trophy collecting. Solution is simple when these interests are not in conflict; for example, prohibition of machine guns, firearm silencers, sawed-off shotguns and brass knuckles. In areas of conflict, sane solution depends upon careful balancing of the interests involved. The magnitude of the interest of preventing crimes of violence before they occur throughout the nation and in New York for the most recent reported period appears in Table 1 below.

TABLE 1. ESTIMATED CRIMES OF VIOLENCE INVOLVING WEAPONS COMMITTED IN THE UNITED STATES AND IN NEW YORK, 1963

| | UNITED STATES | | NEW YORK | |
|---|---|---|---|---|
| | Number | Rate per 100,000 | Number | Rate per 100,000 |
| TOTAL ......................... | 256,460 | 138.0 | 23,851 | 134.8 |
| Murder and non-negligent manslaughter | 8,500 | 4.5 | 669 | 3.8 |
| Robbery ........................... | 100,160 | 53.1 | 8,131 | 45.9 |
| Aggravated assault ................ | 147,800 | 78.1 | 15,051 | 85.0 |

—*Uniform Crime Reports* (1963) pp. 2, 3, 61.

A ~~firearm was used in~~ 56 percent of the ~~wilful killings in~~ the United States, a knife or cutting instrument in 23 percent, "personal" devices (such as strangulation or beating) in 9 percent, blunt objects in 6 percent, and the weapon or type of weapon unknown in the remainder. The use of a firearm as a weapon was up 4 percent over 1962 (*Uniform Crime Reports* [1963] p. 7).

~~The primary value to~~ law enforcement of adequate statutes ~~dealing with dangerous weapons is prevention of crimes of violence~~ ~~before their consummation.~~ The traditional criminal law requires total enactment of the tragedy and all the infliction of its harm before arrest and prosecution may lawfully begin, with but few carefully circumscribed exceptions. These exceptions largely are conspiracy, which can only cover cases of multiple offenders, and attempt. The efficacy of the law of attempt to prevent tragedies

has many regrettable shortcomings. For example, four men planned to rob another of a payroll. They went by automobile to the bank from which he was supposed to withdraw the money, and then to various other buildings where the employees were scheduled to be paid. By now, they were watched and followed by two police officers. At last, they went to a railroad station to accost the intended victim. Before the victim arrived, all were arrested by the police officers. The highest court of our State unanimously held that no attempted robbery took place and curiously complimented the police for making what amounted to a false arrest. Said the court at the outset of its opinion (*People v. Rizzo*, 246 N. Y. 334):

> "The police of the city of New York did excellent work in this case by preventing the commission of a serious crime. It is a great satisfaction to realize that we have such wide-awake guardians of our peace. Whether or not the steps which the defendant had taken up to the time of his arrest amounted to the commission of a crime, as defined by our law, is, however, another matter. He has been convicted of an attempt to commit the crime of robbery in the first degree and sentenced to State's prison. There is no doubt that he had the intention to commit robbery if he got the chance. * * *

> "In a word, these defendants had planned to commit a crime and were looking around the city for an opportunity to commit it, but the opportunity fortunately never came. Men would not be guilty of an attempt at burglary if they had planned to break into a building and were arrested while they were hunting about the streets for the building not knowing where it was. Neither would a man be guilty of an attempt to commit murder if he armed himself and started out to find the person whom he had planned to kill but could not find him."

So far as the traditional law of attempt goes, the police must postpone intervention until the last act of consummation. In the case of robbery, there are at least sixteen possible configurations upon its consummation with an exchange of bullets between the killer and killed, and these concrete cases have been fully discussed in a previously published law review article (See *Foreseeable Death in Felony Murder*, 18 University of Pittsburgh Law Review 51, 56–59 [1956]). In the absence of adequate weapons legislation, under the traditional law of criminal attempt, lawful action by the police must await the last act necessary to consummate the crime, with anyone of sixteen possible people constituting the killer and killed, as between the victim, his robber, a policeman or passerby, or a companion of any of them. Adequate statutes governing firearms and weapons would make lawful intervention by police and prevention of these fatal consequences, before any could occur.

14

## INCIDENCE OF VIOLENT CRIME AND ADEQUATE WEAPONS LEGISLATION

Law-enforcement officials have expressed the belief that more consistent enforcement of adequate statutes governing firearms and weapons would reduce the incidence of crimes of violence. (*Role of the Police*, IACP Committee on Juvenile Delinquency p. 15; New York Times, September 12, 1956, p. 1.) No one seriously concerned with the advancement of the common good can ignore the startling difference between the incidence of violent crimes in England and the United States, on one hand, and the nature of their laws controlling firearms and weapons, on the other. In 1962, the homicide rate per 100,000 inhabitants in the United States (4.5) was more than eight times that of England (0.56), the rate for robbery in the United States (51.3) more than ten times that of England (5.0), and the rate for aggravated assault in the United States (75.1) more than seventeen times that of England (4.3). On the other hand, for non-violent crime, the difference in rate between the two countries is not only not as great, but also shows greater incidence in England. For example, larceny, other than petty larceny and that involving motor vehicles, actually occurs almost three times less frequently in the United States (290.5) than in England (848.8). The data for the United States is based upon the *Uniform Crime Reports* (1962) and that for England covers England and Wales and has been compiled by the Home Office.

TABLE 2. VIOLENT AND NON-VIOLENT CRIMES IN THE UNITED STATES AND ENGLAND, 1962

|  | UNITED STATES | | ENGLAND & WALES | |
|---|---|---|---|---|
|  | Number | Rate per 100,000 | Number | Rate per 100,000 |
| POPULATION .................... | 185,822,000 | | 46,669,000 | |
| Murder and non-negligent manslaughter | 8,404 | 4.5 | 262 | 0.56 |
| Robbery ......................... | 95,260 | 51.3 | 2,349 | 5.0 |
| Aggravated assault ............... | 139,625 | 75.1 | 2,007 | 4.3 |
| Larceny, other than petty or motor vehicle ........................ | 539,893 | 290.5 | 390,148 | 848.8 |

Weapons statutes in England date from 1328 when the Statute of Northumberland (2 Edw. III, c. 3) was enacted. Under this statute, which is still in force, anyone appearing before the king's justices or ministers, with force and arms, or going armed by night or day in any fair, market or elsewhere in such manner as to terrify the king's subjects, or bringing force "in affray of the peace" is guilty of a misdemeanor. Exempted are the king's servants, ministers and those assisting them in the execution of their duties. ~~Since the Gun License~~ ▓▓▓▓▓▓▓▓▓▓▓▓ Under its most recent revision, the Firearms Act of 1937 (1 Edw. VIII & Geo. VI, c. 12), "no person shall purchase, acquire or have in his possession any

firearm or ammunition to which this Part of the Act applies unless he holds a firearms certificate in force at the time" (*id.* Pt. I, § (1)). "The certificate shall be granted by the chief officer of police if he ░░░░░░░░░░░░░░░░░░░░░░░░░░░░░░░░░░░░░░░░░░░░░░░░░░░░░░ ░░░░░░░░░░░░░░░░░░░░░░░░░░░░░░ firearm or ammunition in respect of which the application is made, and can be permitted to have in his possession that firearm or ammunition without danger to the public safety or to the peace" (*id.* § 2(2)). The certificate may be revoked if "the chief officer is satisfied that the holder is prohibited by this Act from possessing a firearm to which this Part of the Act applies, or is of intemperate habits or unsound mind, or is otherwise unfitted to be entrusted with such a firearm" (*id.*, § 1(7)(a)).

Notwithstanding the Firearms Act, there was an increase in violent crimes in England in recent years. The British bar has attributed this increase to weapons other than firearms in the hands of the Teddy boy—sharpened bicycle chains, "knuckle dusters" and the "flick" knife (28 The Solicitor 223 [1961]). In the Restriction of Offensive Weapons Act of 1959, the British borrowed almost verbatim the provisions contained in the New York statute prohibiting possession of switchblade and gravity knives (Appendix A, *post*, §§ 1896 (4),(5) ; 1897 (3)). Firearm licensing statutes may reduce the incidence of violent crimes committed with guns but such statutes, no matter how stringent, may still be flouted by criminals. On August 8, 1963, the biggest robbery in history, more than £2½ million ($7 million) in currency, was effected by armed, masked men, said to be 15 to 40 in number, from a mail train near Cheddington, northwest of London.

In the United States, primary responsibility for enactment of statutes dealing with weapons rests with the fifty States and the District of Columbia. So far as pistols, revolvers and firearms capable of being concealed are concerned, at least twenty-three States have either no statutes at all or ones with toothless provisions. One of these States borders on New York. Twenty-seven States and the District of Columbia have licensing statutes. These vary widely : only three States make mandatory the taking of fingerprints; less than half undertake any licensing of dealers. In all of them, except Hawaii and New York, unlimited arsenals may lawfully be possessed without license or supervision in the home, place of business or on one's own property. Uniform legislation, striking a median among these statutes, was found insufficient by gubernatorial veto in New York in 1932. In other States in more than two score years, such legislation has been found too stringent. The recommendations of the National Conference of Commissioners on Uniform Acts (Uniform Pistol Act, Uniform Firearm Act, Uniform Machine Gun Act) have thus far met with acceptance in but a handful of States. So far as rifles and shotguns are concerned, but a single State requires licensing and this only for a special repeating action gun. Motivation for this unique statute is protection, not of human, but of wild avian life.

16

Unlike the British Parliament and the States of the United States which have residual and inherent power, the capability of Congress to act in domestic affairs is limited to powers delegated by the Constitution. So far as control of weapons is concerned, two of these powers are important: the power to regulate interstate and foreign commerce and the power to tax. The most formidable of these powers is the power to tax. Consideration of State boundaries does not affect its exercise; it may be used to operate on purely local and intrastate situations in the control of crime. The fact that the effect of a given tax, *e.g.*, on narcotics, or on bookmakers and wagers, is primarily regulatory and only incidentally productive of revenue, does not invalidate it. Moreover, by the power to tax Congress can coerce minimal uniform State legislation in intrastate situations, *e.g.*, social security and agriculture. By its power to tax, Congress could accomplish overnight in the weapons field what uniform State legislation—at the present rate of acceptance—cannot dream of achieving until the third millenium.

When at long last in 1934, the roaring twenties roused Congress to the reality of gangster warfare and organized crime, the taxing power was invoked in the National Firearms Act (26 U.S.C. §§ 2720–2733, 3260–3266). Pistols and revolvers—included in the original draft of the bill—were deleted from its final version. Only the most sensational weapons of gang warfare—machine guns, firearm silencers and sawed-off shotguns—were included. For such "firearms"—excluding pistols, revolvers, automatics, rifles and shotguns above a minimal barrel length—a steep annual tax on manufacturers ($500), pawnbrokers ($300), dealers and anyone transferring such guns ($200) was imposed (26 U.S.C. §§ 2720, 3260). Yet in 1927, when Congress exercised the more limited postal power, pistols and revolvers were declared non-mailable (18 U.S.C. § 1715). When Congress resorted to the commerce power in 1938 (Federal Firearms Act, 15 U.S.C. §§ 901–909), the term "firearm" was broadly defined to include "any weapon, by whatever name known, which is designed to expel a projectile or projectiles by the action of an explosive and a firearm muffler or firearm silencer, or any part or parts of such weapon" (15 U.S.C. § 901(3)), as well as pistol and revolver ammunition (15 U.S.C. § 901(7)). This act, however, does no more than require a license—annually issued for one dollar with blind automaticity—to manufacturers and dealers, and generally prohibits with no implementation shipment to convicts, fugitives and persons under indictment.

Measuring the efficacy of State-wide statutes governing firearms and weapons upon the incidence of violent crime by simple comparison of its rate per 100,000 inhabitants is complicated by several factors. One is that millions of persons are drawn daily as commuters into modern metropolitan complexes from States having widely divergent weapons laws. Another is that a wide variety of weapons lawfully flow across State lines with little or no Federal restriction. Nevertheless, such comparison is fruitful. Our two newest States happen to have the most widely divergent weapons laws, Alaska with virtually no statutes at all, and Hawaii with the

most stringent among the United States. In 1963, the homicide rate per 100,000 inhabitants in Alaska (6.5) was almost four times that of Hawaii (1.7), the robbery rate in Alaska (22.2) about twice that of Hawaii (11.5) and the rate for aggravated assault in Alaska (66.1) more than four times that of Hawaii (15.1). Exactly a half dozen of our States have populations in excess of ten million: New York, California, Pennsylvania, Texas, Illinois and Ohio, in that descending order. In 1963, the homicide rate per 100,000 in Texas (7.3) exceeded that of each of the other large States: New York (3.8); California (3.8); Pennsylvania (2.3); Illinois (5.1); and Ohio (3.0). Under the weapons laws of Texas, possession of a rifle or shotgun is denied to no one, regardless of his background. Possession of pistols and revolvers is not licensed. Under general prohibitory statutes, any one, regardless of his background, may lawfully possess a pistol or revolver in his home. Away from his home, any one may openly carry a pistol or revolver, regardless of his background. To violate the weapons laws of Texas, the defendant must (i) carry concealed (ii) away from his home (iii) a pistol or revolver; (iv) have been convicted of a felony (v) involving a crime of violence, *and* (vi) the particular act of violence must have been committed, not with any weapon, but a firearm.

## RECOMMENDATIONS

The new statute prescribes ~~mandatory minimum requirements for the issuance of a license~~ [redacted] or of any misdemeanor [redacted] town [redacted] and [redacted] positive finding by the licensing authority that [redacted] application are true, including whether or not the applicant has ever suffered any mental illness [redacted] complied with every requirement for eligibility, and a fact showing good moral character competency and integrity, and the absence of good cause for denial in the discretion of the licensing authority. The minimum prescribed investigation by the local police includes the taking of fingerprints and photographs, checking the same with the State Department of Correction and the Federal Bureau of Investigation, investigation of the records of the State Department of Mental Hygiene and verification of each and every statement in the application. These legislatively prescribed standards are uniform throughout the State (Appendix A, *post*, § 1903 (1),(2),(3),(4)). The rule-making power of determining the form of the application is delegated to the police commissioner of the city of New York for that city, and to the superintendent of State Police for the rest of the State (*id*, § 1903(3)). No case has been brought to the attention of this Committee in which an applicant thus screened and approved has committed any crime of violence.

Between the city of New York and the remainder of the State, there are certain variations in licensing. In the city of New York, the police commissioner is the sole issuing and revoking officer;

*[handwritten margin note: Regular gun permit, not carry]*

18

elsewhere in the State, judges of the county of issuance constitute the licensing authority (except in Nassau county in which the issuing officer is the police commissioner), and any judge of a court of record constitutes the revoking authority, a power shared in Nassau county by its police commissioner (*id.* §§ 1896(10); 1903(11)). The duration of the license also varies. In the city of New York (and Nassau and Suffolk counties), the maximum validity of a license is until the second January after the date of issuance and the minimum, any period prescribed by the licensing officer. Elsewhere in the State, the duration of a license depends upon the discretion of a judge of a court of record who may revoke or cancel "at any time" (*id.* § 1903(10),(11)). Licenses issued outside the city of New York have no validity inside that city until approved by its police commissioner (*id.* § 1903(6)).

Upon recommendation of the Committee, effective July 1, 1964, several measures were enacted by the Legislature to assure more careful inventory of pistols and revolvers in this State:

> [i] All holders of pistol licenses must report in writing any change of address to the State Police in Albany within ten days. Failure to do so constitutes a misdemeanor [L. 1964, c. 296; Appendix A, *post*, § 1903(9)];

> [ii] Members of the State Guard may no longer lawfully possess pistols or revolvers when off duty, except upon authorization by explicit regulation issued by the Chief of Staff to the Governor [L. 1964, c. 260; Appendix A, *post*, § 1900(1.a)].

The new statute also contains a provision, effective July 1, 1963, that requires, under penalty of misdemeanor, notification in writing to the police of any sale, gift, loan or transfer of any pistol or revolver [Appendix A, *post*, §§ 1898(5); 1902(3)]. During 1964, members of the Temporary Commission of Investigation met with the Committee, and considered the problem of missing firearms. The Committee has prepared comprehensive legislation dealing with the disposition of firearms of a deceased licensee and the requirement of reporting by a licensee of the loss or theft of any firearm.

Respectfully submitted,

> ALBERT BERKOWITZ, *Chairman*
> JULIUS VOLKER, *Vice-Chairman*
> LEO A. LAWRENCE
> CLARENCE D. LANE
> WALTER VAN WIGGEREN
> JULIAN B. ERWAY
> LEIGHTON A. HOPE
> THOMAS LAVERNE

# APPENDIX A

## THE NEW STATUTE:

### Ten Consecutive Penal Law Sections Relating to Firearms and Other Dangerous Weapons
#### (as amended by the Laws of 1964)

§ 1896. **Definitions.**   As used in sections eighteen hundred ninety-seven, eighteen hundred ninety-eight, eighteen hundred ninety-nine, nineteen hundred, nineteen hundred one, nineteen hundred two, nineteen hundred three, nineteen hundred four and nineteen hundred five, the following terms shall mean and include:

1. "Machine-gun," a weapon of any description, irrespective of size, by whatever name known, loaded or unloaded, from which a number of shots or bullets may be rapidly or automatically discharged from a magazine with one continuous pull of the trigger and includes a sub-machine gun.

2. "Firearm silencer," any instrument, attachment, weapon or appliance for causing the firing of any gun, revolver, pistol or other firearms to be silent, or intended to lessen or muffle the noise of the firing of any gun, revolver, pistol or other firearms.

3. "Firearm," any pistol, revolver, sawed-off shotgun or other firearm of a size which may be concealed upon the person.

4. "Switchblade knife," any knife which has a blade which opens automatically by hand pressure applied to a button, spring or other device in the handle of the knife.

5. "Gravity knife," any knife which has a blade which is released from the handle or sheath thereof by the force of gravity or the application of centrifugal force and which, when released, is locked in place by means of a button, spring, lever or other device.

6. "Dispose of," to dispose of, give, give away, lease, loan, keep for sale, offer, offer for sale, sell, transfer and otherwise dispose of.

7. "Deface," to remove, deface, cover, alter or destroy the manufacturer's serial number or any other distinguishing number or identification mark.

8. "Gunsmith," any person, firm, partnership, corporation or company who engages in the business of repairing, altering, assembling, cleaning, polishing, engraving or trueing, or who performs any mechanical operation on, any pistol or revolver.   Gunsmith shall not include a wholesale dealer.

9. "Dealer in firearms," any person, firm, partnership, corporation or company who engaged in the business of purchasing, selling, keeping for sale, loaning, leasing, or in any manner disposing of, any pistol or revolver.   Dealers in firearms shall not include a wholesale dealer.

[19]

20

10. "Licensing officer," in the city of New York the police commissioner of that city; in the county of Nassau the commissioner of police of that county; and elsewhere in the state a judge or justice of a court having his office in the county of issuance.

11. "Rifle," a weapon designed or redesigned, made or remade, and intended to be fired from the shoulder and designed or redesigned and made or remade to use the energy of the explosive in a fixed metallic cartridge to fire only a single projectile through a rifled bore for each single pull of the trigger. (Added Ch. 277, L. 1964)

12. "Shotgun," a weapon designed or redesigned, made or remade, and intended to be fired from the shoulder and designed or redesigned and made or remade to use the energy of the explosive in a fixed shotgun shell to fire through a smooth bore either a number of ball shot or a single projectile for each single pull of the trigger. (Added Ch. 277, L. 1964)

§ 1897. **Possession of weapons and dangerous instruments and appliances.** 1. Any person who has in his possession any bomb, bombshell, firearm silencer, machine gun or any other firearm or weapon simulating a machine gun and which is adaptable for such use is guilty of a felony. (As amended Ch. 708, L. 1964)

2. Any person who has in his possession any firearm which is loaded with ammunition, or who has in his possession any firearm and, at the same time, has in his possession a quantity of ammunition which may be used to discharge such firearm is guilty of a felony. Such possession shall not, except as provided in subdivision three of this section, constitute a felony if such possession takes place in such person's home or place of business. (As amended Ch. 521, L. 1964)

3. Any person who has in his possession any firearm, gravity knife, switchblade knife, billy, blackjack, bludgeon, metal knuckles, sandbag, sandclub or slungshot is guilty of a misdemeanor, and he is guilty of a felony if he has previously been convicted of any crime.

4. Any person under the age of sixteen years who has in his possession any of the weapons, instruments, appliances or substances specified in the first three subdivisions of this section, or any airgun, spring-gun or other instrument or weapon in which the propelling force is a spring or air, or any gun or any instrument or weapon in or upon which any loaded or blank cartridges may be used, or any loaded or blank cartridges or ammunition therefor, or any dangerous knife, shall be adjudged a juvenile delinquent. (As amended Ch. 788, L. 1964)

5. Any person not a citizen of the United States who has in his possession any dangerous or deadly weapon other than those prohibited to him in the first two subdivisions of this section is guilty of a misdemeanor, and he is guilty of a felony if he has previously been convicted of any crime.

6. Any person who has in his possession a rifle or shotgun and who has been convicted anywhere of a felony or any one of the misdemeanors or offenses mentioned in section five hundred fifty-two of the code of criminal procedure is guilty of a misdemeanor. (Added Ch. 277, L. 1964)

7. Any person who has in his possession any explosive substance with intent to use the same unlawfully against the person or property of another is guilty of a felony. (Formerly subd. 6, changed to subd. 7, ch. 277, L. 1964)

8. Any person who knowingly has in his possession a machine-gun or firearm which has been defaced for the purpose of concealment or prevention of the detection of crime or misrepresenting the identity of such machine-gun or firearm is guilty of a felony. Formerly subd. 7, changed to subd. 8, ch. 277, L. 1964)

9. Any person who has in his possession any dagger, dangerous knife, dirk, razor, stiletto, imitation pistol or any other dangerous or deadly instrument or weapon with intent to use the same unlawfully against another is guilty of a misdemeanor, and he is guilty of a felony if he has previously been convicted of any crime. (Formerly subd. 8, changed to subd. 9, ch. 277, L. 1964)

10. Whenever the director or physician in charge of any hospital or institution for mental illness, public or private, shall certify to the superintendent of state police or to any organized police department of a county, city, town or village of this state, that a person who has been judicially adjudicated incompetent, or who has been confined to such institution for mental illness pursuant to judicial authority, upon the release of such person from such institution, is not suitable to possess a rifle or shotgun, a member of such police department or of the state police shall forthwith seize any rifle or shotgun possessed by such person. Any such person who refuses to yield possession of such rifle or shotgun to such police officer shall be guilty of a misdemeanor. A rifle or shotgun seized as herein provided shall not be destroyed, but shall be delivered to the headquarters of such police department, or state police, and there retained until the aforesaid certificate has been rescinded by the director or physician in charge, or other disposition of such rifle, or shotgun has been ordered or authorized by a court of competent jurisdiction. (Added Ch. 277, L. 1964)

§ 1898. **Manufacture, transport, disposition and defacement of weapons and dangerous instruments and appliances.** 1. Any person who manufactures or causes to be manufactured any machine-gun is guilty of a felony. Any person who manufactures or causes to be manufactured any switchblade knife, gravity knife, billy, blackjack, bludgeon, metal knuckles, sandbag, sandclub or slungshot is guilty of a misdemeanor.

2. Any person who transports or ships any machine-gun or fire-arm silencer is guilty of a felony. Any person who transports or ships as merchandise any firearm, switchblade knife, gravity knife, billy, blackjack, bludgeon, metal knuckles, sandbag or slungshot is guilty of a misdemeanor.

22

3. Any person who disposes of any machine-gun or firearm silencer is guilty of a felony. Any person who knowingly buys, receives, disposes of, or conceals a machine-gun or firearm which has been defaced for the purpose of concealment or prevention of the detection of a crime or misrepresenting the identity of such machine-gun or firearm is guilty of a felony.

4. Any person who disposes of any of the weapons, instruments or appliances specified in subdivision three of the preceding section is guilty of a misdemeanor, and he is guilty of a felony if he has previously been convicted of any crime.

5. Any person who disposes of any of the weapons, instruments, appliances or substances specified in subdivision four of the preceding section to any other person under the age of sixteen years is guilty of a misdemeanor.

6. Any person who wilfully defaces any machine-gun or firearm is guilty of a felony.

§ 1899. Presumptions of possession, unlawful intent and defacement. 1. The presence in any room, dwelling, structure or vehicle of any machine-gun is presumptive evidence of its unlawful possession by all persons occupying the place where such machine-gun is found.

2. The presence in any stolen vehicle of any weapon, instrument, appliance or substance specified in section eighteen hundred ninety-seven is presumptive evidence of its possession by all persons occupying such vehicle at the time such weapon, instrument, appliance or substance is found.

3. The presence in an automobile, other than a stolen one or a public omnibus, of any firearm, defaced firearm, firearm silencer, bomb, bombshell, gravity knife, switchblade knife, dagger, dirk, stiletto, billy, blackjack, metal knuckles, sandbag, sandclub or slungshot is presumptive evidence of its possession by all persons occupying such automobile at the time such weapon, instrument or appliance is found, except under the following circumstances:

(a) if such weapon, instrument or appliance is found upon the person of one of the occupants therein; (b) if such weapon, instrument or appliance is found in an automobile which is being operated for hire by a duly licensed driver in the due, lawful and proper pursuit of his trade, then such presumption shall not apply to the driver; or (c) if the weapon so found is a pistol or revolver and one of the occupants, not present under duress, has in his possession a valid license to have and carry concealed the same.

4. The possession by any person of the substance as specified in subdivision six of section eighteen hundred ninety-seven is presumptive evidence of possessing such substance with intent to use the same unlawfully against the person or property of another. The possession by any person of any dagger, dirk, stiletto, dangerous knife or of any other weapon, instrument, appliance or substance designed, made or adopted for use primarily as a weapon, is presumptive evidence of intent to use the same unlawfully against another.

5. The possession by any person of a defaced machine-gun or firearm is presumptive evidence that such person defaced the same.

§ 1900. **Exemptions and immunity.** a. Sections eighteen hundred ninety-seven, eighteen hundred ninety-eight and eighteen hundred ninety-nine shall not apply to:

1. Possession of any of the weapons, instruments, appliances or substances specified in section eighteen hundred ninety-seven by the following:

(a) Persons in the military service of the state of New York when duly authorized by regulations issued by the chief of staff to the governor to possess the same, and peace officers as defined in section one hundred fifty-four of the code of criminal procedure. (As amended Ch. 260, L. 1964)

(b) Persons in the military or other service of the United States, in pursuit of official duty or when duly authorized by federal law, regulation or order to possess the same.

(c) Persons employed in fulfilling defense contracts with the government of the United States or agencies thereof when possession of the same is necessary for manufacture, transport, installation and testing under the requirements of such contract.

(d) During the month of June only each year, a person voluntarily surrendering such weapon, instrument, appliance or substance, provided that such surrender shall be made to the sheriff of the county in which such person resides and in the county of Nassau to the commissioner of police or a member of the police department thereof designated by him, or if such person resides in a city having a population of seventy-five thousand or more to the police commissioner or head of the police force or department, or to a member of the force or department designated by such commissioner or head; and provided, further, that the same shall be surrendered by such person only after he gives notice in writing to the appropriate authority, stating his name, address, the nature of the weapon to be surrendered, and the approximate time of day and the place where such surrender shall take place. Such notice shall be acknowledged immediately upon receipt thereof by such authority. Nothing in paragraph (d) of subdivision one hereof shall be construed as granting immunity from prosecution for any crime or offense except that of unlawful possession of such weapons, instruments, appliances or substances surrendered as herein provided.

2. Possession of a machine-gun, firearm, switchblade knife, gravity knife, billy or blackjack by a warden, superintendent, headkeeper or deputy of a state prison, penitentiary, workhouse, county jail or other institution for the detention of persons convicted or accused of crime or detained as witnesses in criminal cases, in pursuit of official duty or when duly authorized by regulation or order to possess the same.

3. Possession of a pistol or revolver by a person to whom a license therefor has been issued as provided under section nineteen hundred three.

24

4. Possession of a rifle or shotgun by a person who has been convicted as specified in section eighteen hundred ninety-seven, subdivision six to whom a certificate of good conduct has been issued pursuant to section two hundred forty-two, subdivision three of the executive law. (Added Ch. 277, L. 1964)

5. Possession of a switchblade or gravity knife for use while hunting, trapping or fishing by a person carrying a valid license issued to him pursuant to article four, part four of the conservation law. (Formerly subd. 4, changed to subd. 5, Ch. 277, L. 1964)

6. Possession, at an indoor or outdoor rifle range for the purpose of loading and firing the same, of a rifle of not more than twenty-two calibre rim fire, the propelling force of which may be either gunpowder, air or springs, by a person under sixteen years of age but not under twelve, who is a duly enrolled member of any club, team or society organized for educational purposes and maintaining as a part of its facilities, or having written permission to use, such rifle range under the supervision, guidance and instruction of (a) a duly commissioned officer of the United States army, navy, marine corps or coast guard, or of the national guard of the state of New York; or (b) a duly qualified adult citizen of the United States who has been granted a certificate as an instructor in small arms practice issued by the United States army, navy or marine corps, or by the adjutant general of this state, or by the national rifle association of America, a membership corporation duly organized under the laws of this state. (Formerly subd. 5, changed to subd. 6, Ch. 277, L. 1964)

7. The manufacturer of machine-guns, switchblade or gravity knives, billies or blackjacks as merchandise and the disposal and shipment thereof direct to a regularly constituted or appointed state or municipal police department, sheriff, policeman or other peace officer, or to a state prison, penitentiary, workhouse, county jail or other institution for the detention of persons convicted or accused of crime or held as witnesses in criminal cases, or to the military service of this state or of the United States. (Formerly subd. 6, change to subd. 7, Ch. 277, L. 1964)

8. The regular and ordinary transport of firearms as merchandise, provided that the person transporting such firearms, where he knows or has reasonable means of ascertaining what he is transporting, notifies in writing the police commissioner, police chief or other law enforcement officer performing such functions at the place of delivery, of the name and address of the consignee and the place of delivery, and withholds delivery to the consignee for such reasonable period of time designated in writing by such police commissioner, police chief or other law enforcement officer as such official may deem necessary for investigation as to whether the consignee may lawfully receive and possess such firearms. (Formerly subd. 7, changed to subd. 8, Ch. 277, L. 1964)

9. Engaging in the business of gunsmith or dealer in firearms by a person to whom a valid license therefor has been issued pursuant to section nineteen hundred three. (Formerly subd. 8, changed to subd. 9, Ch. 277, L. 1964)

b. At any time, any person who voluntarily delivers to a peace officer any weapon, instrument, appliance or substance specified in section eighteen hundred ninety-seven, under circumstances not suspicious, peculiar or involving the commission of any crime, shall not be arrested. Instead, the officer who might make the arrest shall issue or cause to be issued in a proper case a summons or other legal process to the person for investigation of the source of the weapon, instrument, appliance or substance.

§ 1901. **Destruction of weapons and dangerous instruments, appliances and substances.** 1. Any weapon, instrument, appliance or substance specified in section eighteen hundred ninety-seven, when unlawfully possessed, manufactured, transported or disposed of, or when surrendered or voluntarily delivered pursuant to the preceding section, is hereby declared a nuisance. When the same shall come into the possession of any peace officer, it shall be surrendered immediately to the official mentioned in paragraph (d) of subdivision one of the preceding section, except that such weapon, instrument, appliance or substance coming into the possession of the state police shall be surrendered to the superintendent of state police.

2. The official to whom the weapon, instrument, appliance or substance is so surrendered shall, at any time but at least once each year, destroy the same or cause it to be destroyed, or render the same or cause it to be rendered ineffective and useless for its intended purpose and harmless to human life.

3. Notwithstanding subdivision two of this section, the official to whom the weapon, instrument, appliance or substance is so surrendered shall not destroy the same if (a) a judge or justice of a court of record, or a district attorney, shall file with the official a certificate that the non-destruction thereof is necessary or proper to serve the ends of justice; or (b) the official directs that the same be retained in any laboratory conducted by any police or sheriff's department for the purpose of research, comparison, identification or other endeavor toward the prevention and detection of crime.

§ 1902. **Forwarding information on firearms, convictions and certain wounds inflicted by weapons, instruments, appliances and substances.** 1. In the case of any machine-gun or firearm taken from the possession of any person, the official to whom such weapon is surrendered pursuant to subdivision one of the preceding section shall immediately notify the executive department, division of state police, Albany, giving the calibre, make, model, manufacturer's name and serial number, or if none, any other distinguishing number or identification mark. A search of the files of such division and notification of the results of the search to such official shall immediately be made.

2. Before any machine-gun or firearm is destroyed pursuant to subdivision two of the preceding section, (a) the official to whom the same has been surrendered shall forward to the executive department, division of state police, Albany, a notice of intent to destroy and the calibre, make, model, manufacturer's name and

**26**

serial number, or if none, any other distinguishing number or identification mark of the machine-gun or firearm; (b) such division shall make and keep a record of such description together with the name and address of the official reporting the same and the date such notice was received; and (c) a search of the files of such division and notification of the results of the search to such official shall be made without unnecessary delay.

3. Any person, other than a wholesale dealer, or gunsmith or dealer in firearms duly licensed pursuant to section nineteen hundred three, lawfully in possession of a firearm, who disposes of the same without first notifying in writing the licensing officer in the city of New York and county of Nassau and elsewhere in the state the executive department, division of state police, Albany, is guilty of a misdemeanor.

4. Every case of a bullet wound, gunshot wound, powder burn or any other injury arising from or caused by the discharge of a gun or firearm, and every case of a wound which is likely to or may result in death and is actually or apparently inflicted by a knife, icepick or other sharp or pointed instrument, shall be reported at once to the police authorities of the city, town or village where the person reporting is located by: (a) the physician attending or treating the case; or (b) the manager, superintendent or other person in charge, whenever such case is treated in a hospital, sanitarium or other institution. Failure to make such report is a misdemeanor. This subdivision shall not apply to such wounds, burns or injuries received by a member of the armed forces of the United States or the state of New York while engaged in the actual performance of duty.

5. Every conviction under sections eighteen hundred ninety-seven, eighteen hundred ninety-eight, nineteen hundred two, nineteen hundred three or nineteen hundred four of a person who is not a citizen of the United States, shall be certified to the proper officer of the United States government by the district attorney of the county in which such conviction was had.

§ 1903. Licenses to carry, possess, repair and dispose of firearms. 1. Eligibility. No license shall be issued or renewed pursuant to this section except by the licensing officer, and then only after investigation and finding that all statements in a proper application for a license are true. No license shall be issued or renewed except for an applicant (a) of good moral character; (b) who has not been convicted anywhere of a felony or any one of the misdemeanors or offenses mentioned in section five hundred fifty-two of the code of criminal procedure; (c) who has stated whether he has ever suffered any mental illness or been confined to any hospital or institution, public or private, for mental illness; and (d) concerning whom no good cause exists for the denial of the license. No person shall engage in the business of gunsmith or dealer in firearms unless licensed pursuant to this section. An applicant to engage in such business shall also be a citizen of the United States, more than twenty-one years of age and maintain a place of business in the city or county where the license is issued. For such business,

if the applicant is a firm or partnership, each member thereof shall comply with all of the requirements set forth in this subdivision and if the applicant is a corporation, each officer thereof shall so comply.

2. Types of licenses. A license for gunsmith or dealer in firearms shall be issued to engage in such business. A license for a pistol or revolver shall be issued to (a) have and possess in his dwelling by a householder; (b) have and possess in his place of business by a merchant or storekeeper; (c) have and carry concealed while so employed by a messenger employed by a banking institution or express company; (d) have and carry concealed while so employed by a regular employee of an institution of the state, or of any county, city, town or village, under control of a commissioner of correction of the city or any warden, superintendent or head keeper of any state prison, penitentiary, workhouse, county jail or other institution for the detention of persons convicted or accused of crime or held as witnesses in criminal cases, provided that application is made therefor by such commissioner, warden, superintendent or head keeper; and (e) h̶a̶v̶e̶ a̶n̶d̶ c̶a̶r̶r̶y̶ c̶o̶n̶c̶e̶a̶l̶e̶d̶ w̶i̶t̶h̶o̶u̶t̶ r̶e̶g̶a̶r̶d̶ t̶o̶ e̶m̶p̶l̶o̶y̶m̶e̶n̶t̶ o̶r̶ p̶l̶a̶c̶e̶ o̶f̶ p̶o̶s̶s̶e̶s̶s̶i̶o̶n̶ ̶b̶y̶ ̶a̶n̶y̶ ̶p̶e̶r̶s̶o̶n̶ ̶w̶h̶e̶n̶ ̶p̶r̶o̶p̶e̶r̶ ̶c̶a̶u̶s̶e̶ ̶e̶x̶i̶s̶t̶s̶ ̶f̶o̶r̶ ̶t̶h̶e̶ ̶i̶s̶s̶u̶a̶n̶c̶e̶ ̶t̶h̶e̶r̶e̶o̶f̶.

3. Applications. Applications shall be made and renewed, in the case of a license to carry or possess a pistol or revolver, to the licensing officer in the city or county, as the case may be, where the applicant resides, is principally employed or has his principal place of business as merchant or storekeeper; and, in the case of a license as gunsmith or dealer in firearms, to the licensing officer where such place of business is located. Blank applications shall except in the city of New York, be approved as to form by the superintendent of state police. An application shall state the full name, date of birth, residence, present occupation of each person or individual signing the same, whether or not he is a citizen of the United States, whether or not he complies with each requirement for eligibility specified in subdivision one of this section and such other facts as may be required to show the good character, competency and integrity of each person or individual signing the application. An application shall be signed and verified by the applicant. Each individual signing an application shall submit one photograph of himself and a duplicate for each required copy of the application. Such photographs shall have been taken within thirty days prior to filing the application. In the case of a license as gunsmith or dealer in firearms, the photographs submitted shall be two inches square, and the application shall also state the previous occupation of each individual signing the same and the location of the place of such business, or of the bureau, agency, subagency, office or branch office for which the license is sought, specifying the name of the city, town or village, indicating the street and number and otherwise giving such apt description as to point out reasonably the location thereof. In such case, if the applicant is a firm, partnership or corporation, its name, date and place of formation, and principal place of business shall be stated. For such firm or partnership, the application

28

shall be signed and verified by each individual composing or intending to compose the same, and for such corporation, by each officer thereof.

4. Investigation. Before a license is issued or renewed, there shall be an investigation of all statements required in the application by the duly constituted police authorities of the locality where such application is made. For that purpose, the records of the department of mental hygiene concerning previous or present mental illness of the applicant shall be available for inspection by the investigating officer of the police authority. In order to ascertain any previous criminal record, the investigating officer shall take the fingerprints and physical descriptive data in quadruplicate of each individual by whom the application is signed and verified. Two copies of such fingerprints shall be taken on standard fingerprint cards eight inches square, and one copy may be taken on a card supplied for that purpose by the federal bureau of investigation. When completed, one standard card shall be forwarded to and retained by the division of criminal identification, department of correction, at Albany. A search of the files of such division and written notification of the results of the search to the investigating officer shall be made without unnecessary delay. Thereafter, such division shall notify the licensing officer and the executive department, division of state police, Albany, of any criminal record of the applicant filed therein subsequent to the search of its files. A second standard card, or the one supplied by the federal bureau of investigation, as the case may be, shall be forwarded to that bureau at Washington with a request that the files of the bureau be searched and notification of the results of the search be made to the investigating police authority. Of the remaining two fingerprint cards, one shall be filed with the executive department, division of state police, Albany, within ten days after issuance of the license, and the other remain on file with the investigating police authority. No such fingerprints may be inspected by any person other than a peace officer, except on order of a judge or justice of a court of record either upon notice to the licensee or without notice, as the judge or justice may deem appropriate. Upon completion of the investigation, the police authority shall report the results to the licensing officer without unnecessary delay.

5. Filing of approved applications. The application for any license, if granted, shall be a public record. Such application shall be filed by the licensing officer with the clerk of the county of issuance, except that in the city of New York and county of Nassau, the licensing officer shall designate the place of filing in the appropriate division, bureau or unit of the police department thereof. A duplicate copy of such application shall be filed by the licensing officer in the executive department, division of state police, Albany, within ten days after issuance of the license.

6. License: validity. Any license issued pursuant to this section shall be valid notwithstanding the provisions of any local law or ordinance. No license shall be transferable to any other person or premises. A license to carry or possess a pistol or revolver, not otherwise limited as to place or time of possession,

shall be effective throughout the state, except that the same shall not be valid within the city of New York unless a special permit granting validity is issued by the police commissioner of that city. Such license to carry or possess shall be valid within the city of New York in the absence of a permit issued by the police commissioner of that city, provided that (a) the firearms covered by such license are being transported by the licensee in a locked container; and (b) the trip through the city of New York is continuous and uninterrupted; and (c) such licensee exhibits upon demand by a peace officer proof of registration in a pistol match which such licensee is about to attend or has attended and is returning therefrom. A license as gunsmith or dealer in firearms shall not be valid outside the city or county, as the case may be, where issued. (As amended Ch. 318, L. 1964)

7. License: form. Any license issued pursuant to this section shall, except in the city of New York, be approved as to form by the superintendent of state police. A license to carry or possess a pistol or revolver shall have attached the licensee's photograph, and a coupon which shall be removed and retained by any person disposing of a firearm to the licensee. Such license shall specify the weapon covered by calibre, make, model, manufacturer's name and serial number, or if none, by any other distinguishing number or identification mark, and shall indicate whether issued to carry on the person or possess on the premises, and if on the premises shall also specify the place where the licensee shall possess the same. If such license is issued to an alien, or to a person not a citizen of and usually a resident in the state, the licensing officer shall state in the license the particular reason for the issuance and the names of the persons certifying to the good character of the applicant. Any license as gunsmith or dealer in firearms shall mention and describe the premises for which it is issued and shall be valid only for such premises.

8. License: exhibition and display. Every licensee while carrying a pistol or revolver shall have on his person a license to carry the same. Every person licensed to possess a pistol or revolver on particular premises shall have the license for the same on such premises. Upon demand, the license shall be exhibited for inspection to any peace officer. A license as gunsmith or dealer in firearms shall be prominently displayed on the licensed premises. Failure of any licensee to so exhibit or display his license, as the case may be, shall be presumptive evidence that he is not duly licensed.

9. License: amendment. Elsewhere than in the city of New York, a person licensed to carry or possess a pistol or revolver may apply at any time to his licensing officer for amendment of his license to include one or more such weapons or to cancel weapons held under license. If granted, a record of the amendment describing the weapons involved shall be filed by the licensing officer in the executive department, division of state police, Albany. Notification of any change of residence shall be made in writing by any licensee within ten days after such change occurs, and a record of such change shall be inscribed by such licensee on the reverse side of his license. Elsewhere than in the city of New York, such notification

shall be made to the executive department, division of state police, Albany, and in the city of New York to the police commissioner of that city. (As amended Ch. 296, L. 1964)

10. License: expiration and renewal. Any license for gunsmith or dealer in firearms and, in the city of New York and the counties of Nassau and Suffolk, any license to carry or possess a pistol or revolver, issued at any time pursuant to this section or prior to the first day of July, nineteen hundred sixty-three and not limited to expire on an earlier date fixed in the license, shall expire on the first day of the second January after the date of issuance. Elsewhere than in the city of New York and the counties of Nassau and Suffolk, any license to carry or possess a pistol or revolver, issued at any time pursuant to this section or prior to the first day of July, nineteen hundred sixty-three and not previously revoked or cancelled, shall be in force and effect until revoked as herein provided. Any application to renew a license that has not previously expired, been revoked or cancelled shall thereby extend the term of the license until disposition of the application by the licensing officer. In the case of a license for gunsmith or dealer in firearms, in counties having a population of less than two hundred thousand inhabitants, photographs and fingerprints shall be submitted on original applications and upon renewal thereafter only at six year intervals. Upon satisfactory proof that a currently valid original license has been despoiled, lost or otherwise removed from the possession of the licensee and upon application containing an additional photograph of the licensee, the licensing officer shall issue a duplicate license. (As amended Ch. 320, L. 1964)

11. License: revocation. The conviction of a licensee anywhere of a felony or any one of the misdemeanors or offenses mentioned in section five hundred fifty-two of the code of criminal procedure shall operate as a revocation of the license. A license may be revoked and cancelled at any time in the city of New York and county of Nassau by the licensing officer, and elsewhere than in the city of New York by any judge or justice of a court of record. The official revoking a license shall give written notice thereof without unnecessary delay to the executive department, division of state police, Albany, and shall also notify immediately the duly constituted police authorities of the locality.

12. Records required of gunsmiths and dealers in firearms. Any person licensed as gunsmith or dealer in firearms shall keep a record book approved as to form, except in the city of New York, by the superintendent of state police. In the record book shall be entered at the time of every transaction involving a firearm the date, name, age, occupation and residence of any person from whom a firearm is received or to whom a firearm is delivered, and the calibre, make, model, manufacturer's name and serial number, or if none, any other distinguishing number or identification mark on such firearm. Before delivering a firearm to any person, the licensee shall require him to produce either a license valid under this section to carry or possess the same, or proof of lawful authority as a peace officer or other exempt person pursuant to section

nineteen hundred. The licensee shall remove and retain the attached coupon and enter in the record book the date of such license, number, if any, and name of the licensing officer, in the case of the holder of a license to carry or possess, or the shield or other number, if any, assignment and department or unit, in the case of an exempt person. The record book shall be maintained on the premises mentioned and described in the license and shall be open at all reasonable hours for inspection by any peace officer. In the event of cancellation or revocation of the license for gunsmith or dealer in firearms, or discontinuance of business by a licensee, such record book shall be immediately surrendered to the licensing officer in the city of New York and county of Nassau, and elsewhere in the state to the executive department, division of state police.

13. Expenses. The expense of providing a licensing officer with blank applications, licenses, and record books for carrying out the provisions of this section shall be a charge against the county, and in the city of New York against the city.

14. Fees. In the city of New York, the annual license fee shall be twenty-five dollars for gunsmiths and fifty dollars for dealers in firearms. In such city, the city council shall fix the fee to be charged for a license to carry or possess a pistol or revolver and provide for the disposition of such fees. Elsewhere in the state, the licensing officer shall collect and pay into the county treasury the following fees: for each license to carry or possess a pistol or revolver, not less than three dollars nor more than five dollars as may be determined by the board of supervisors of the county; for each amendment thereto, one dollar, and two dollars in the county of Suffolk; and for each license issued to a gunsmith or dealer in firearms, four dollars. The fee for a duplicate license shall be two dollars. (As amended Ch. 320, L. 1964)

15. Any violation by any person of any provision of this section is a misdemeanor.

§ 1904. Prohibited use of weapons. 1. Except as permitted in section nineteen hundred, any person who uses a machine-gun is guilty of a felony. Any person who attempts to use against another an imitation pistol is guilty of a misdemeanor, and he is guilty of a felony if he has previously been convicted of any crime.

2. Any person hunting with a dangerous weapon in any county wholly embraced within the territorial limits of a city is guilty of a misdemeanor.

3. Any person who wilfully discharges a loaded firearm or any other gun, the propelling force of which is gunpowder, at an aircraft while such aircraft is in motion in the air or in motion or stationary upon the ground, or at any railway or street railroad train as defined by the public service law, or at a locomotive, car, bus or vehicle standing or moving upon any such railway, railroad or public highway, is guilty of a felony and punishable: first, if thereby the safety of any person is endangered, by not more than twenty years in prison; second, in every other case, by not more than five years in prison.

32

4. Any person who, otherwise than in self defense or in the discharge of official duty, (a) wilfully discharges any species of firearms, air-gun or other weapons, or throws any other deadly missile, either in a public place, or in any place where there is any person to be endangered thereby, or, in Putnam county, within one-quarter mile of any occupied school building other than under supervised instruction by properly authorized instructors although no injury to any person ensures; (b) intentionally, without malice, points or aims any firearm or any other gun, the propelling force of which is gunpowder, at or toward any other person; (c) discharges, without injury to any other person, firearms or any other guns, the propelling force of which is gunpowder, while intentionally without malice, aimed at or toward any person; or (d) maims or injures any other person by the discharge of any firearm or any other gun, the propelling force of which is gunpowder, pointed or aimed intentionally, but without malice, at any such person, is guilty of a misdemeanor.

5. A person who leaves the state, with intent to elude any provision of subdivision four of this section, or to commit any act without the state, which is prohibited by subdivision four of this section, or who, being a resident of this state, does any act without the state, which would be punishable by the provisions of subdivision four of this section, if committed within the state, is guilty of the same offense and subject to the same punishment, as if the act had been committed within this state.

6. In any criminal proceeding before any court, magistrate or grand jury for any of the offenses specified in subdivision four of this section, the court, magistrate or grand jury may confer immunity in accordance with the provisions of section two thousand four hundred forty-seven of this chapter.

§ 1905. Committing crime while armed. 1. If any person while in the commission or attempted commission of a felony or crime or in leaving the scene of a crime shall be armed with a pistol or any of the weapons or instruments specified in section eighteen hundred ninety-seven, the punishment elsewhere prescribed in this law for th felony of which he is convicted may be increased by imprisonment in state's prison for not less than five nor more than ten years. Upon a second conviction for a felony so committed such period of imprisonment may be increased by not less than ten nor more than fifteen years. Upon a third conviction for a felony so committed such period of imprisonment may be increased by not less than fifteen nor more than twenty-five years.

2. In no case shall any person punished as provided in subdivision one of this section be put upon probation or have the execution of his sentence suspended, notwithstanding the provisions of section twenty-one hundred eighty-eight, for the increased term of his punishment imposed as above.

## APPENDIX B

## WHAT HAPPENED TO THE OLD LAW

### I. DISTRIBUTION OF OLD PROVISIONS OF THE PENAL LAW THAT HAVE BEEN REPEALED IN THE NEW TEN SECTIONS

| Old Statute | | | New Statute |
|---|---|---|---|
| Section Number | Subdivision Number | Sentence | Section and Subdivision Number |
| 1896 | | 1st | 1896(4) (5); 1898(1) (4) (5) |
| | | 2d | 1898(2) (3) |
| | | 3d | 1900(a.6) |
| 1897 | 1 | 1st first part | 1904(1) |
| | | last part | 1897(8) |
| | | 2 | 1897(1) |
| | 1-a | 1st | 1896(1) |
| | | 2d | 1897(1); 1904(1) |
| | | 3d | 1899(1) |
| | | 4th | 1900(a.6) |
| | | 5th | 1900(a.1) (a)) (a.1 (b)) (a.2) (a.6) |
| | 2 | 1st | 1897(1) (6) |
| | 3 | 1st | 1897(1) (2) (3) (4) |
| | | 2d | 1900(a.5) |
| | | 3d | 1900(a.4) |
| | 4 | 1st | 1897(3) |
| | 5 | 1st | 1897(3) |
| | 5-a | 1st | 1897(2) |
| | 6 | 1st | 1897(5) |
| | 6-a | 1st | 1900(b) |
| | 6-b | 1st | 1904(2) |
| | 7 | 1st | 1903(2) |
| 1897 | 8 | 1st | 1903(1) (2) |
| | 9 | 1st | 1903(1) (2) |
| | 9-a | 1st | 1896(10); 1903(3) |
| | | 2d | 1896(10); 1903(3) |
| | | 3d | 1903(3) |
| | | 4th | 1903(6) |
| | 9-b | 1st | 1903(1) |
| | | 2d first part | 1903(4 |
| | | last part | 1903(1) |
| | | 3d | 1903(4) |
| | | 4th | Dropped |
| | 10.a | 1st | 1903(13) |
| | | 2d | 1903(14) |
| | | 3d | 1903(14) |
| | | 4th | 1903(5) |
| | | 5th | 1903(7) |
| | 10.b | 1st first part | 1903(9) |
| | | last part | 1903(14) |
| | | 2d | 1903(9) |
| | | 3d | 1903(9) |

[33]

34

## APPENDIX B

## WHAT HAPPENED TO THE OLD LAW

### DISTRIBUTION OF OLD PROVISIONS OF THE PENAL LAW
### THAT HAVE BEEN REPEALED IN THE NEW TEN SECTIONS—(CONT'D)

| Old Statute | | | New Statute |
|---|---|---|---|
| Section Number | Subdivision Number | Sentence | Section and Subdivision Number |
| | | 4th | 1903(10) |
| | | 5th | 1903(10) |
| | | 6th | 1903(7) |
| | | 7th | 1903(3) |
| | | 8th | 1903(3) |
| | | 9th | 1903(3) |
| | | 10th | 1903(3) |
| | | 11th | 1903(3) |
| | | 12th | 1903(3) |
| | | 13th | 1903(3) |
| | | 14th | 1903(3) |
| | | 15th | 1903(4) |
| | | 16th | 1903(1) |
| | | 17th | 1903(11) |
| | | 18th | 1903(11) |
| | | 19th | 1903(11) |
| | | 20th | 1903(10) |
| | 11 | 1st | 1903(11) |
| | | 2d | 1903(4) |
| | 12 | 1st | 1903(7) |
| | | 2d | 1903(12) |
| | 13(a) | 1st | 1900(a.7) |
| | 13(b) | 1st | 1900(a.1 (a)) (a.1 (b)) |
| | 14 | 1st | 1902(5) |
| | 15 | 1st | 1900(a.1 (c)) |
| 1897-a | | 1st | 1896(2); 1987(1) |
| | | 2d | 1900(a.1 (a)) (a.1 (b)) |
| 1897-b | 1 | 1st | 1896(7); 1898(6) |
| | 2 | 1st | 1898(3) |
| | 3 | 1st | 1898(3) |
| | 4 | 1st | 1899(5) |
| 1897-c | 1 | 1st | 1902(1) |
| | | 2d | 1902(1) |
| | | 3d | 1902(1) |
| | 2 | 1st | 1902(2) |
| | | 2d | 1902(2) |
| | | 3d | 1902(2) |
| 1898 | | 1st | 1899(4) |
| | | 2d | 1899(2) |
| 1898-a | | 1st | 1899(3) |
| | | 2d | 1899(3) |
| | | 3d first part | 1900(a.1 (a)) (a.1 (b)) (a.2) |
| | | last part | 1899(3) |

# APPENDIX B

## WHAT HAPPENED TO THE OLD LAW

### DISTRIBUTION OF OLD PROVISIONS OF THE PENAL LAW

### THAT HAVE BEEN REPEALED IN THE NEW TEN SECTIONS—(CONT'D)

| Old Statute | | | New Statute |
|---|---|---|---|
| Section Number | Subdivision Number | Sentence | Section and Subdivision Number |
| 1899 | 1 | 1st | 1901(1) |
| | | 2d | 1901(1) |
| | | 3d | 1901(2) (3) |
| | | 4th | 1901(3) |
| | 2 | | Dropped |
| | 3 | | Dropped |
| | 4 | | 1900(a.1 (d)) |
| 1914 | 1 | 1st | 1903(12) |
| | 2 | 1st | 1896(8) |
| | | 2d | 1896(9) |
| | 3 | 1st | 1903(1) |
| | | 2d | 1896(10); 1903(1) |
| | | 3d | 1896(10); 1903(3) |
| | | 4th | 1896(10); 1903(3) |
| | | 5th | 1903(6) |
| | 4 | 1st | 1903(1) (4) |
| | | 2d | 1903(1) |
| | 5 | 1st first part | 1903(13) |
| | | last part | 1903(3) (7) (12) |
| | | 2d | 1903(1) |
| | | 3d | 1903(5) |
| | | 4th | 1903(3) |
| | | 5th | 1903(3) |
| | | 6th | 1903(3) |
| | | 7th | 1903(4) |
| | | 8th | 1903(4) |
| | | 9th | 1903(4) |
| | | 10th | 1903(4) |
| | | 11th | 1903(4) |
| | | 12th | 1903(4) |
| | | 13th | 1903(4) |
| | | 14th | 1903(10) |
| | | 15th | 1903(4) |
| | | 16th | 1903(1) |
| | | 17th | 1903(11) |
| | | 18th | 1903(11) |
| | | 19th | 1903(3) |
| | | 20th | 1903(1) |
| | | 21st first part | 1903(7) |
| | | last part | 1903(8) |
| | | 22d | 1903(6) |
| | | 23d | 1903(14) |
| | | 24th | 1903(10) |
| | 6 | 1st | 1903(12) |
| | | 2d | 1903(12) |
| | | 3d | 1903(12) (15) |
| | | 4th | 1903(12) |

36

# APPENDIX B

## WHAT HAPPENED TO THE OLD LAW

### DISTRIBUTION OF OLD PROVISIONS OF THE PENAL LAW
### THAT HAVE BEEN REPEALED IN THE NEW TEN SECTIONS—(CONT'D)

| Old Statute | | | New Statute |
|---|---|---|---|
| Section Number | Subdivision Number | Sentence | Section and Subdivision Number |
| | | 5th | 1903(11) |
| | | 6th | 1902(3) |
| | | 7th | 1896(8) (9); 1902(3) |
| | 7 | 1st | 1903(15) |
| 1915 | 1 | 1st | 1902(4) |
| | 2 | 1st | 1902(4) |
| | 3 | 1st | 1902(4) |
| | 4 | 1st | 1902(4) |
| 1919 | | | 1904(3) |

## II. DISTRIBUTION OF OLD PROVISIONS OF THE PENAL LAW
## THAT HAVE BEEN AMENDED IN THE NEW TEN SECTIONS

| Old Statute | New Section |
|---|---|
| Section Number | Section and Subdivision Number |
| 1906 | 1904(4) (5) (6) |
| 1944 | 1905 |
| 1991 | 1904(3) |

# S (14)

# DEBATES INFO

| Date | Res Chap | Cal# | Senate# | Assembly# | Page# |
|------|----------|------|---------|-----------|-------|
| 6/2/1987 | | 588 | 3409 | 4832 | 2465-2500 |

Memo

36PGS. $9.00

that there are no surprises and the members can

plan accordingly, I propose, Mr. President, that

we take up Senator Volker's bill, Calendar Number

588.  Following that, it is hoped that we will

address the cameras in the courtroom bill of

Senator Stafford, and then we will take up the

agency shop bill, Calendar Number 930, by Senator

Trunzo.

May I request at this time that

you call up Calendar Number 588.

THE PRESIDENT:  The Secretary will

read.

THE SECRETARY:  On page 8,

Calendar Number 588, by Senator Volker, Senate

Bill Number 3409, an act to amend the Penal Law,

in relation to issuance of licenses to have and

carry pistols.

SENATOR VOLKER:  Mr. President.

This is a noncontroversial bill that -- a form of

which has been around for some time.  It's a bill

that was developed in conjunction with people who

are involved with the sportsmen in this state as

well as people who have pressed for some time

2466

that the issuing of licenses for gun permits in this state has become somewhat ludicrous and have felt that there was -- in some cases, there were violation of rights.

Let me say first of all that as somebody who came from a law enforcement background that I would be the first to admit that in years past I had some misgivings about changing the licensing process.

And I have to tell you that as the years have gone on, and thanks to a bill that was passed in this chamber, which was prompted by the City of New York and certain media people who were convinced that the answer to the criminal justice problem in New York City was to pass a tough gun law. In fact, I remember, Senator Leichter, for some years you pushed a gun amendment. In fact, every time I introduced the death penalty, for years, you were kind enough to introduce an amendment to it that would include gun control and made some very impassioned speeches on the issue of guns; and, finally, the Senate a few years later passed what was touted

2467

to be the toughest gun control bill in the United States of America.

The net result of that, as far as anything I have seen, has been zilch. There has been no indication that I know of that any more criminals are being captured. One thing that I think is fascinating -- and as Chairman of Codes I intend, by the way, to pursue this, because it seems to me that there really hasn't been enough study. I think I know why there hasn't been enough study. That is that one of the things that has been left unsaid in this whole debate is how many people commit crimes with legal handguns. How many of the crimes in the city of New York and the city of Buffalo and the various areas of the state are committed with legal handguns? And the answer is when have you heard that someone was murdered with a legal handgun or when have you heard that someone was held up with a legal handgun? Almost never.

We are not talking, by the way, in this bill that we're going to give guns to criminals. Criminals, unfortunately, are able to

2468

get guns, anyways.  What this bill basically does
is, .s it changes the process.  What the bill
would allow is those who possess a clean criminal,
mental and moral record to acquire a license to
carry a pistol without having to demonstrate
so-called proper cause for the issuance of that
license.  It sets up what amounts to a
presumption, instead of the present situation
where the licensees agents have virtual total
control over the issuing of licenses and in
certain areas of this state just don't issue
licenses.

        So what we're basically saying
here is we're trying to set up what I think is a
rational licensing provision rather than the
so-called special needs provision that is now
used throughout the State of New York and
enablings the licensing agent, the issuer to
virtually determine not to give a license to
someone that they decide not to, almost without
any reason because they just don't deem the
issuance of that license to be in the best
interests of themselves or the person, or whatever.

2469

What you're doing here is using the record to determine the balance between the public good and the individual right. I think that many of us who have some law enforcement background, as I say, who had great misgivings on this issue, have looked at it over the years and have really come to a conclusion that what we were looking at in years past was something that really wasn't there, and what the setting up of a rational licensing program -- and we think that this could be a rational licensing program -- means to the citizens of this state.

Unless there is some reason why they shouldn't have a pistol license, there is no reason why they shouldn't get that pistol license. It doesn't mean that criminals can gets guns. It doesn't mean that mentally incompetent people can get guns. What it means is that we are setting up a system that many of us believe makes a great deal more common sense in the society in which we live.

ACTING PRESIDENT FARLEY: Senator Leichter.

2470

SENATOR LEICHTER:  Mr. President.
We've debated this general issue of whether guns
are going to be made more available in our
society or whether we're going to restrict the
easy access to guns in many different forms in
relation to many different bills, and I know the
outcome in this house is unfortunately
predetermined.  Fortunately, though, for the
bottom line, I think better judgment is shown by
the other house and by the Governor, and I assume
we'll have the opportunity of debating Senator
Volker's bill over and over again just as we seem
to regurgitate most of the bills that come before
us in this house.

But I think, Senator Volker, there
are some things that have to be said, and I
appreciate the sincerity, and I understand your
ideological beliefs, but I think that we've got
to be more careful with the facts, Senator, and
that's really why I rise and try to deal with the
statement that you made that, well, we haven't
shown that people who have been licensed to carry
guns are the ones who commit crimes.  I think,

2471

Senator, what you fail to address and which is
extremely important is, first of all, all of the
accidents that occur in households where there
are licensed guns, and that occurs over and over
and over again.  And certainly one of the
concerns, it seems to me, that any licensing
authority ought to have and which will be lost
under your bill, is some assessment of the
maturity, the responsibility and the ability of
the person who is licensed to safely possess and
use a handgun.

So we are not only talking about
crime, which obviously is important, but we're
also talking about public safety.  And time and
time again in this Legislature, appropriately, we
protect people from themselves.  Now, in this
instance, it's not only protecting a person from
himself but it's protecting innocent people who
get shot every day because handguns are lying
around, and that is something that should be of
concern to all of us.  ) ‹ I'm afraid in your bill
that some of the restrictions and some of the
safeguards that we have are going to be

2472

eliminated.

But there is another whole area
that in your factual analysis you overlooked, and
that is the number of licensed handguns that are
stolen and then are used in the perpetration of a
crime. And in fact, just yesterday, I saw a
study that was made by the Legislative committee,
the Assembly committee I think it is on oversight,
where they cited figures that one-third of all
the crimes with handguns are made or occur where
the offender has stolen or possesses a handgun
that has been stolen. And, here again, by making
handguns more readily and easily accessible and
available in our society, it means inevidentably
that more handguns are going to come into the
hands of criminals; and by loosening your
standards for licensing, it means that people are
going to have handguns who either aren't going to
safeguard them properly or just there's going to
be more handguns available that are going to be
stolen or are going to be used in the commission
of a crime.

Finally, Senator, there are very

2473

compelling statistics that people who try to

protect themselves with handguns -- storekeepers,

for instance -- are more likely to become

victimized and to be injured and to be killed

because they do not know how to use the handgun.

So the idea that in this dangerous society that

it is a safeguard, that it is protection to have

a handgun, is just absolutely wrong, and it's

denied by the statistics.

          In fact, some years ago, the

Police Commissioner of the city of New York came

up and said that their statistics show that in

instances where somebody has tried to protect

themselves with a handgun that -- I forget the

exact odds, but it may have been 2 to 1.  Those

are the odds that the person who's trying to

protect himself with a licensed handgun is more

likely to be injured and even to be killed by the

use of a handgun.

          I think, though, that the

underlying issue here really is whether we want

to have a society where an awful lot of people

are going to have handguns, whether we want to go

2474

back -- maybe we've never left it -- to the
frontier mentality, that everybody is going to
carry a gun and everybody is going to be their
own protector and everybody is going to be their
own vigilante.  I just reject that.

And I think when we take a look at
the bloodletting that occurs in this country, the
high rate of crime so much higher than in western
European countries where the possession of
handguns is strictly limited.  Now, I appreciate
there are a lot of other reasons why the crime
rate in this country and the commission of crimes
with handguns is so much higher than it is in
western European countries; but certainly one
reason is because of the easy access to guns.

And we in the city of New York,
where we have a particularly serious problem,
where not a day goes by that there aren't
shootings that young people who have gotten hold
of guns try to commit crimes or play with guns,
where we have really a battlefield because of the
easy availability of guns, plead with you as has
the Mayor of the City, as has the police

2475

commissioner time and time again. Don't take
away the minimal protection that we now have,
which is licensing. Don't force more guns upon
the people of this state and certainly not upon
the people of the city of New York. We have
enough killings already. Don't increase the
number of people that are going to be killed by
handguns.

ACTING PRESIDENT FARLEY: Senator
Ruiz.

SENATOR RUIZ: Mr. President. I
am in favor of this bill. Coming from New York
City, we realize every day that the criminal
elements has guns. The drug pushers not only
have .38 calibers, .44 magnums, but they have
machine guns of all sorts; and when they are
willing and able, they will use those weapons no
matter who is involved. The only people that are
being victimized right now are the decent working
people, store owners, small business people who
have to go through a whole bunch of red tape
through the police department in order to be able
to get a gun permit.

What happens in the city of New York is that we have no objective standards to decide who gets a gun and who doesn't get a gun. Right now, if you're politically connected, if you have wealth, you can go to the police department and you are issued a gun. But if you are a small store owner, if you have your store in the ghetto, you have been robbed a dozen or a half a dozen times, basically those standards basically will prevent you from getting a gun.

I have tried for two-and-a-half years to try to get a gun permit in the city of New York. I had a real estate business, I had grocery stores, and yet I could not get a permit in the city of New York. Yet I had my stores in neighborhoods where every thug that wanted to rob anybody carried a knife or a gun because these people didn't want to obey the law. To them, carrying a gun is part of their lives. This is what they have to do in order to be in crime, in order to be able to be the bullies in the neighborhood.

But the decent people who want to

2477

be law abiding, that want to go down to Police
Plaza to pick up a gun, then, basically, they
have to come up against this bureaucracy that
says, "Well, we know you are being victimized; we
know you have good reason to have a gun because
you should be able to protect your business; you
should be able to protect yourself; but we aren't
going to give you a gun because we don't want
guns in the street."

So really what is happening
nowadays is that the law and the people that
implement the law are preventing the decent
people, the hard-working people from having
firearms.

We passed legislation, as Senator
Volker said, about three or four years ago making
the penalties for possession of firearms higher
than it ever was. I asked Senator Volker if he
had the statistics as to what kind of sentences
they were imposing on these people.
Unfortunately, he doesn't have them. But the
indication that I'm getting is that judges have
been very lenient when they catch people with

2478

fire arms illegally.  They let them go with
suspended sentences; they let them go with,
basically, six or seven month. jail terms, when
we actually had mandated that we wanted stiff
sentences for people that were caught illegally
in the possession of a gun.

So I think that this is just a
start to try to get municipalities, the city of
New York, to set up some objective standards
where a person goes to get a gun and they will
look at this person's petition in a way that
doesn't say, "Well, if you are politically
connected, if you contributed to the party, if
you are a Donald Trump or you're a Botnick that
works for the city of New York, you can get a
pistol permit right away.  But if you are a store
owner or you're a business American that has to
go into dangerous areas, basically you can't get
a pistol permit.

And I say to Senator Leichter, it
doesn't mean that if you get a pistol permit that
the state or the city can not demand that you be
trained in the use of those weapons.  One of the

2479

problems that we have in the city of New York now
is that even if you do get a weapon, they don't
ask you to be trained in the use of that weapon.
You could go buy an automatic pistol, you could
buy a .38 or a .44, and they don't ask, they
don't demand of you that you be trained in the
use of that particular weapon.  And this is where
I think, Senator Leichter, we have the problem of
people shooting themselves or shooting somebody
else once they do get a permit, and that is
because we don't request -- in the state or the
city, there's not request that these people be
trained.

So I say to you that if you are
going to have these standards that you are going
to be issuing licenses, let's train the people.
But don't prevent the good people from getting
licenses, because the bad element the criminal
element doesn't care about the law.  They are
going to go and they're going to buy the guns.
Because, as Senator Leichter says, pistols,
submachine guns, guns of both types, are easily
available in the city of New York.  So if that's

2480

the case, let's go forward now and get the good element, the hard-working, decent element in our society to be able to get access to a pistol with a permit and with proper training so they can protect their businesses and they can protect themselves.

SENATOR GOLD: Mr. President.

ACTING PRESIDENT FARLEY:  Senator Gold.

SENATOR GOLD: Mr. President.  I must very respectfully disagree with my distinguished colleague from the Bronx.  First of all, while I believe that each of us independently elected have our own rights of thought and do not necessarily have to do the bidding of the Mayor, who's also independently elected, the fact is that the memorandum by the City on this bill is a very important memorandum. It's a very important memorandum.

And I find it distressing that once or twice a month or a few times each session this house becomes divided by those who feel for the poor sportsman and the poor average citizen

2481

who doesn't have an arsenal in his house and those of us who are very, very concerned, just as you are, with safety throughout the state and particularly within the city of New York.

Now, we can all develop our own bumper stickers. Some say, "People don't kill; guns kill." Some say, "Guns don't kill; people kill." And I don't know how you want to look at it, but the fact of the matter is that the proliferation of firearms within an area such as the city of New York must not be healthy for the people who live in the city.

And, Senator Ruiz, that people get hurt because they don't have any training, let me tell you something. There is nothing in this bill that gives the training. So what we are doing is, we're taking a situation where right now, according to Senator Ruiz, we have people obtaining gun permits who are untrained. And this bill will only proliferate it. This bill will only create more people who are untrained, carrying guns.

Now, if Senator Ruiz is correct,

2482

then let's take the first step. Let's get a training program into place, and then we can talk about doing something about the licensing.

In terms of the sentences, Senator Ruiz, let me just say this. I think, most respectfully, you were just incorrect. We have passed mandatory sentencing, and that has caused some problems in the courts because every once in a while, through misunderstanding, we have had people from out of town, out of the state come in and get caught with a firearm that they were licensed for or they had a right to in some way, and they find out they violated New York laws, and our DAs have been stuck with a mandatory prison term. So people aren't receiving light sentences for possession of guns. As a matter of fact, there are mandatory minimums in that regard.

But I suggest to you that one of the most dangerous things that we could do in this legislative session would be to open up the door to untrained people having more and more guns within the city of New York. That is not going to take guns away from the bad guys. It is

2483

not going to keep the criminals off the streets.

It is just going to increase the number of guns

to be stolen, the number of guns that are

available, and the number of innocent people who

now will be injured because they think that

having this gun around is some sort of a benefit.

   The city of New York very strongly

opposes this legislation.  It is dangerous

legislation for the city of New York, and I hope

it gets defeated.

     SENATOR WEINSTEIN:  Mr. President.

     ACTING PRESIDENT FARLEY:  Senator

Stavisky.

     SENATOR STAVISKY:  Senator Volker,

I wonder if you would yield for a question or two.

Would the sponsor yield?

     SENATOR VOLKER:  Yes.

     SENATOR STAVISKY:  Senator, I

heard your persuasive arguments that you are

seeking to establish objective standards before

firearms are issued; and you have suggested that

before a handgun is issued -- a handgun permit is

issued that you check to see if the individual

has a history of mental instability or a history
of conviction for felony, especially for serious
felonies involving attacks upon persons or
property.

I would like to see if we can come
closer to each other. And I ask you, Senator
Volker, would you be willing to consider the
application of these reasonable standards, as you
have described them, to all firearms in the State
of New York, whether handguns or rifles or
shotguns? Maybe we could come up with a
comprehensive piece of responsible firearms
legislation. Would you been willing to defer
this bill and work with us in developing such a
comprehensive firearms bill for all such weapons
in the state?

SENATOR VOLKER: Senator, you
obviously know the answer to that question.

SENATOR STAVISKY:  I would never
pre-judge.

SENATOR VOLKER:  Pardon.

SENATOR STAVISKY:  I would never
pre-judge your answer.

SENATOR VOLKER:  Obviously, what
you are indicating -- first of all, I would
question whether the Mayor of the city of New
York, given the policy of the city of New York,
would in any way, shape, form or manner agree
with you.  Remember that the rational policy of
the city of New York right now is to try in
whatever way they can to avoid the present law
and not issue licenses virtually unless they are
forced to do so.

Secondly, Senator, I know of no
really rational reason why we should include
rifles and shotguns and so forth under a
licensing provision and we should back into
something like that.  First of all, I think it
would be virtually unenforceable.  Secondly, to
go back to that sort of thing, obviously the
sportsmen would vehemently oppose it, and I think
with good reason.

And while I am answering the
question, Senator, I would only point out to you
that the facts have shown that the amount of
recent killings in recent years by knives and

2486

clubs and hands have increased far more
enormously than they have with handguns.  I'd just
like to point that out.

SENATOR STAVISKY:  Senator Volker,
I think that you would not disagree that if one
individual aimed a firearm, long gun or handgun
at another individual and pulled the trigger that
the death or injury would be comparable in either
case; that rifles or shotguns kill exactly in the
same manner as handguns kill.  And I am surprised,
Senator Volker, that you would not accept the
inevidentability of death if someone pointed a
long gun or a handgun at another individual and
pulled the trigger.

I think that what this indicates
is that there is a degree of hypocrisy in the
proposition that we will apply objective
standards to handgun licenses and we will not
apply objective standards to the issuance of
rifles or shotguns anywhere in the state with the
possible exception of the five boroughs where
there is some attempt.  You can purchase a rifle
or a shotgun anywhere in the state.  All they ask

2487

you is, do you have enough money to buy that rifle

or shotgun, and that weapon is as capable of

killing as a handgun.

And the day that you come to us

and say that you will not quake because the

National Rifle Association is lobbying this

Legislature, the day that you come and say, "Let

us reason together with a comprehensive firearms

policy for the entire state where we don't want

any firearms in the hands of individuals who

could kill with those weapons because they have a

record of criminal conviction, because they are

mentally unbalanced, because there are other good

and compelling reasons why these individuals

should not have firearms," then you, Senator

Volker, and those of us who oppose your bill will

have reached a consensus with respect to a

responsible statewide policy.

I don't see that happening here.

There is nothing in your bill that will prevent

the theft of a firearm, which has already been

pointed out on this floor.  There is nothing in

your bill that will prevent the individual given

2488

the handgun from showing it off and accidentally
killing or maiming someone else.  There is
nothing in your bill that will prevent a child
from having access to that legal handgun, and the
child is not licensed but the parent leaves it
around carelessly in the apartment, and the child
has not been trained in the use of a firearm, and
that child kills himself or another child.  There
is nothing in the legislation that prevents that.

And there is nothing in the
legislation that you propose that prevent the
largest cause of death in these United States.
In moments of passion, unreasoning passion,
people kill families and friends with firearms
that are available to them in their homes --
legal firearms or illegal firearms.  The
availability of a firearm including a legal
firearm still leads to death and injury in this
country.

Senator Volker, we have killed
more people in the United States with firearms,
here within our 50 states in the course of
American history than we have lost on all of the

2489

battlefields in all of the wars that the United

States has been involved in in the course of the

past 200 years, and I believe that that issue has

to be addressed, not because we disagree with you

or your desire to have objective standards but

because we wish to reason with you on a truly

comprehensive firearm policy affecting all

weapons in the State of New York.

           For these reasons, Senator Volker,

I will vote against your bill, and I hope that

others do the same thing.

           ACTING PRESIDENT FARLEY:   Senator

Weinstein.

           SENATOR WEINSTEIN:  Mr. President.

I will be brief because everything I wanted to

say on this legislation really has been said

eloquently by my colleagues Senator Gold, Senator

Stavisky, Senator Leichter.  But I did want to

comment just a bit.

           We have the opportunity each day

that we're here to vote on a series of bills,

legislation.  Some of them have some meaning.

Sometimes we have agenda I would label as silly.

2490

But I think that the agenda that we seem to be
facing today, this legislation as well as
legislation we will be debating in a little while,
cameras in the courtroom, can be labeled in my
judgment as dangerous.

This is a dangerous bill, Mr.
President. It is dangerous because it will do
exactly the opposite of that which the sponsor
intends. We have seen it all too often,
especially in the city of New York. Individuals,
even those who are licensed to carry weapons, are
involved in mishaps and accidents that have cost
the lives of family members or have resulted in
unintentional shootings.

We are a strange breed, the human
being, when we can fight over a parking space or a
traffic accident and that can result in the death
of participants because of the anger and emotion
and the outrage. We see it all the time, Senator
Volker, in the city of New York. It's a strange
phenomena, but it happens. And an individual
takes out that licensed weapon in a fit of rage
and causes the death of another individual.

2491

We read in the papers every day of the accidental death of the youngster who finds the gun in the closet and it's loaded, and there are no precautions and there is no safety, and that child kills himself or his brother or a friend. The child brings guns to school. Who knows what could happen in those types of instances.

And it was mentioned before. Licensees may not commit crimes, but their guns ultimately do because they are stolen or they are taken away from them, and that's where the danger lies. The city of New York I think has taken a very strong and positive position against the licensure of weapons. And if we are going to protect lives, then we must stand with them. And I would ask that you respect and recognize the desire of the people of the city of New York to live as best they can in a society, in a civilized society, free from this type of danger, a danger that will only be added to and worsened by the passage of this legislation.

ACTING PRESIDENT FARLEY:   Read the

Case 7:10-cv-05413-CS   Document 66-2   Filed 02/23/11   Page 30 of 37

2492

last section.

     SENATOR GOLD:  Slow roll call.

     THE SECRETARY:  Section 2.  This

act shall take effect on the 1st day of November.

     ACTING PRESIDENT FARLEY:  Slow

roll has been asked for.  There are five standing.

Ring the bell.

     THE SECRETARY:  Senator Anderson.

Aye.  Senator Babbush.

     (There was no response.)

     Senator Bartosiewicz.

     SENATOR BARTOSIEWICZ:  No.

     THE SECRETARY:  Senator Bernstein.

     SENATOR BERNSTEIN:  No.

     THE SECRETARY:  Senator Bruno.

     ACTING PRESIDENT FARLEY:  Senator

Bruno, how do you vote?

     SENATOR BRUNO:  Yes.

     THE SECRETARY:  Senator Connor.

     (There was no response.)

     ACTING PRESIDENT FARLEY:  The

sergeant-at-arms will try to gather up the

Senators.

PAULINE E. WILLIMAN
CERTIFIED SHORTHAND REPORTER
APPX. 711

2493

THE SECRETARY:  Senator Cook.

SENATOR COOK:  Yes.

THE SECRETARY:  Senator Daly,

excused. Senator Donovan.

(There was no response.)

Senator Dunne.

SENATOR DUNNE:  Yes.

THE SECRETARY:  Senator Farley.

SENATOR FARLEY:  Yes.

THE SECRETARY:  Senator Floss.

(There was no response.)

Senator Galiber.

(There was no response.)

Senator Gold.

SENATOR GOLD:  No.

THE SECRETARY:  Senator Goodhue.

SENATOR GOODHUE:  Yes.

THE SECRETARY:  Senator Goodman.

(There was no response.)

Senator Halperin.

SENATOR HALPERIN:  No.

THE SECRETARY:  Senator Hoffmann.

SENATOR HOFFMANN:  Yes.

2494

THE SECRETARY:  Senator Jenkins.

SENATOR JENKINS:  No.

THE SECRETARY:  Senator Johnson.

SENATOR JOHNSON:  Aye.

THE SECRETARY:  Senator Kehoe.

SENATOR KEHOE:  Yes.

THE SECRETARY:  Senator Knorr.

SENATOR KNORR:  Aye.

THE SECRETARY:  Senator Kuhl.

SENATOR KUHL:  Yes.

THE SECRETARY:  Senator Lack.

SENATOR LACK:  Aye.

THE SECRETARY:  Senator LaValle.

(There was no response.)

Senator Leichter.

SENATOR LEICHTER:  No.

THE SECRETARY:  Senator E. Levy.

(There was no response.)

Senator Norman Levy.

SENATOR N. LEVY:  Aye.

THE SECRETARY:  Senator Lombardi.

SENATOR LOMBARDI:  Aye.

THE SECRETARY:  Senator Marchi.

PAULINE E. WILLIMAN
CERTIFIED SHORTHAND REPORTER

2495

(There was no response.)

Senator Marino.

SENATOR MARINO:  Yes.

THE SECRETARY:  Senator Markowitz.

SENATOR MARKOWITZ:  No.

THE SECRETARY:  Senator Masiello.

(There was no response.)

Senator McHugh.

SENATOR McHUGH:  Yes.

THE SECRETARY:  Senator Mega.

SENATOR MEGA:  Yes.

THE SECRETARY:  Senator Mendez.

SENATOR MENDEZ:  No.

THE SECRETARY:  Senator Montgomery.

SENATOR MONTGOMERY:  No.

THE SECRETARY:  Senator Nolan.

(There was no response.)

Senator Ohrenstein.  In the

negative.  Senator Onorato.

SENATOR ONORATO:  No.

THE SECRETARY:  Senator

Oppenheimer.

SENATOR OPPENHEIMER:  Yes.

2496

THE SECRETARY:  Senator Padavan.

SENATOR PADAVAN:  Yes.

THE SECRETARY:  Senator Paterson.

SENATOR PATERSON:  Mr. President.

ACTING PRESIDENT FARLEY:  Senator
Paterson to explain his vote.

SENATOR PATERSON:  This may be a
surprise vote.  No.

ACTING PRESIDENT FARLEY:  Senator
Paterson is in the negative.  Continue the roll.

SENATOR GOLD:  Mr. President.

ACTING PRESIDENT FARLEY:  Senator
Oppenheimer, did you vote in the affirmative?

SENATOR OPPENHEIMER:  I wasn't
paying attention.  If you would excuse me, I
would like to be recorded in the negative with
unanimous consent.

ACTING PRESIDENT FARLEY:  Senator
Oppenheimer is in the negative without objection.

THE SECRETARY:  Senator Perry.

SENATOR PERRY:  No.

THE SECRETARY:  Senator Present.

SENATOR PRESENT:  Aye.

2497

THE SECRETARY:  Senator Quattrociocchi.

SENATOR QUATTROCIOCCHI:  Yes.

THE SECRETARY:  Senator Rolison.

SENATOR ROLISON:  Yes.

THE SECRETARY:  Senator Ruiz.

SENATOR RUIZ:  Yes.

THE SECRETARY:  Senator Schermerhorn.

SENATOR SCHERMERHORN:  Yes.

THE SECRETARY:  Senator Seward.

SENATOR SEWARD:  Yes.

THE SECRETARY:  Senator Skelos.

SENATOR SKELOS:  Yes.

THE SECRETARY:  Senator Solomon.

SENATOR SOLOMON:  No.

THE SECRETARY:  Senator Spano.

(There was no response.)

Senator Stachowski.

SENATOR STACHOWSKI:  Yes.

THE SECRETARY:  Senator Stafford.

(There was no response.)

Senator Stavisky.

2498

SENATOR STAVISKY:  No.

THE SECRETARY:  Senator Trunzo.

SENATOR TRUNZO:  Yes.

THE SECRETARY:  Senator Tully.

(There was no response.)

Senator Velella.

SENATOR VELELLA:  Yes.

THE SECRETARY:  Senator Volker.

SENATOR VOLKER:  Yes.

THE SECRETARY:  Senator Weinstein.

SENATOR WEINSTEIN:  No.

ACTING PRESIDENT FARLEY:

Absentees.

THE SECRETARY:  Senator

Bartosiewicz.  Excuse me.  Senator Babbush.

SENATOR BABBUSH:  No.

THE SECRETARY:  Senator Connor.

(There was no response.)

Senator Donovan.

(There was no response.)

Senator Floss.

(There was no response.)

Senator Galiber.

PAULINE E. WILLIMAN
CERTIFIED SHORTHAND REPORTER

2499

(There was no response.)

Senator Goodman.

SENATOR GOODMAN: No.

THE SECRETARY:  Senator Floss.

SENATOR FLOSS: Aye.

THE SECRETARY:  Senator LaValle.

SENATOR LAVALLE: Yes.

THE SECRETARY:  Senator Eugene

Levy.

SENATOR LEVY: Aye.

THE SECRETARY:  Senator Marchi.

(There was no response.)

Senator Masiello.

SENATOR MASIELLO: No.

THE SECRETARY:  Senator Nolan.

(There was no response.)

Senator Spano.

(There was no response.)

Senator Stafford.

(There was no response.)

Senator Tully.

(There was no response.)

ACTING PRESIDENT FARLEY:  Results.



IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
WHITE PLAINS DIVISION

ALAN KACHALSKY, CHRISTINA NIKOLOV,  :   Case No. 10-CV-05413-CS
ERIC DETMER, JOHNNIE NANCE, ANNA   :
MARCUCCI-NANCE, and SECOND AMENDMENT :
FOUNDATION, INC.,                  :
                                  :
        Plaintiffs,              :
                                    :
       v.                       :
                                    :
SUSAN CACACE, JEFFREY A. COHEN, ALBERT  :
LORENZO, ROBERT K. HOLDMAN, and COUNTY :
OF WESTCHESTER,                :
                                  :
        Defendants.           :
-------------------------------------------------------------------------X

NOTICE OF APPEAL

**NOTICE IS HEREBY GIVEN** that Alan Kachalsky, Christina Nikolov, Eric Detmer,

Johnnie Nance, Anna Marcucci-Nance, and Second Amendment Foundation, Inc., plaintiffs in

the above named case, hereby appeal to the United States Court of Appeals for the Second

Circuit from the order denying plaintiffs' motion for summary judgment, granting the individual

defendants' motion for summary judgment, granting defendant County summary judgment, and

entering final judgment in this action on the 2nd day of September, 2011.

Dated: September 6, 2011          Respectfully submitted,

Alan Gura*                    Vincent Gelardi
Gura & Possessky, PLLC         Gelardi & Randazzo
101 N. Columbus Street, Suite 405    800 Westchester Avenue, Suite S-608
Alexandria, VA 22314           Rye Brook, NY 10573
703.835.9085/Fax 703.997.7665     914.251.0603/Fax 914.253.0909
Lead Counsel                  Local Counsel
*Admitted Pro Hac Vice

                       By: _____

Attorneys for Plaintiffs         Vincent Gelardi

CERTIFICATE OF SERVICE

On this, the 6th day of September, 2011, I served the foregoing Notice of Appeal by placing a true and correct copy of said pleading in the U.S. Mail, first class postage-prepaid, addressed to:

Anthony Tomari
Assistant Attorney General
120 Broadway, 24th Floor
New York, NY 10271

Melissa Rotini
Assistant County Attorney
148 Martine Avenue
White Plains, NY 10601

I declare under penalty of perjury that the foregoing is true and correct.

Executed this the 6th day of September, 2011

Vincent Gelardi

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
WHITE PLAINS DIVISION

ALAN KACHALSKY, CHRISTINA NIKOLOV,     :     Case No. 10-CV-05413-CS
ERIC DETMER, JOHNNIE NANCE, ANNA       :
MARCUCCI-NANCE, and SECOND AMENDMENT   :
FOUNDATION, INC.,                      :

                                       :

              Plaintiffs,              :
                                       :
        v.                             :
                                       :
SUSAN CACACE, JEFFREY A. COHEN, ALBERT :
LORENZO, ROBERT K. HOLDMAN, and COUNTY :
OF WESTCHESTER,                        :
                                       :
              Defendants.              :
-------------------------------------------------------------------X

AMENDED NOTICE OF APPEAL

**NOTICE IS HEREBY GIVEN** that Alan Kachalsky, Christina Nikolov, Eric Detmer,

Johnnie Nance, Anna Marcucci-Nance, and Second Amendment Foundation, Inc., plaintiffs in

the above named case, hereby appeal to the United States Court of Appeals for the Second

Circuit from the order denying plaintiffs' motion for summary judgment, granting the individual

defendants' motion for summary judgment, granting defendant County summary judgment, and

entering final judgment in this action on the 2nd day of September, 2011, and the final judgment

entered September 7, 2011.

Dated: September 13, 2011              Respectfully submitted,

Alan Gura*                            Vincent Gelardi
Gura & Possessky, PLLC                Gelardi & Randazzo
101 N. Columbus Street, Suite 405     800 Westchester Avenue, Suite S-608
Alexandria, VA 22314                     Rye Brook, NY 10573
703.835.9085/Fax 703.997.7665         914.251.0603/Fax 914.251.0909
*Admitted Pro Hac Vice

                              By: _____
Attorneys for Plaintiffs              Vincent Gelardi

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------X

ALAN KACHALSKY, CHRISTINA NIKOLOV, ERIC
DETMER, JOHNNIE NANCE, ANNA MARCUCCI-
NANCE, and SECOND AMENDMENT FOUNDATION,
INC.,

                 **Plaintiffs,**

   -against-

                               **10 CV 05413 (CS)**
                               **JUDGMENT**

SUSAN CACACE, JEFFREY A COHEN, ALBERT
LORENZO, ROBERT K. HOLDMAN, and COUNTY
OF WESTCHESTER,

                 **Defendants.**

-------------------------------------------X

      Whereas the above entitled action having been assigned to the Honorable Cathy
Seibel, U.S.D.J., and the Court thereafter on September 2, 2011, having handed down an
Opinion and Order (Docket #80), denying the State Defendants' and the County's Motions to
dismiss, denying Plaintiffs' Motion for Summary Judgment, and granting the State defendants'
Cross-Motion for Summary Judgment, it is,

      **ORDERED, ADJUDGED AND DECREED**: that the Court denies the State
Defendants' and the County's Motions to Dismiss, denies Plaintiffs' Motion for Summary, and
grants the defendants' Cross-Motion for Summary Judgment, and although the County has not
moved for summary judgment, the Court also grants the County Summary Judgment sua sponte.
Accordingly, Judgment is entered in favor of defendants, and the case is hereby closed.

**Dated: White Plains, New York**
     **September 7, 2011**

                                        _____
                                         **Ruby Krajick - Clerk**

## AFFIDAVIT OF SERVICE

STATE OF NEW YORK )
                         ) ss:
COUNTY OF WESTCHESTER )

       I, Joyce McClay, being duly sworn, say: I am not a party to the action, am over eighteen (18) years of age and am an employee of Gelardi & Randazzo LLP, 800 Westchester Avenue, Suite S-608, Rye Brook, New York 10573.

       On the 14th day of September, 2011 I served a true copy of the within Amended Notice of Appeal by mailing the same in a sealed envelope, with postage prepaid thereon, in an official depository of the U.S. Postal Service within the State of New York, addressed to the last known addresses of the addressees as indicated below:

To:    Anthony Tomari
        Assistant Attorney General
        120 Broadway – 24th Floor
        New York, New York 10271

        Melissa Rotini
        Assistant County Attorney
        148 Martine Avenue
        White Plains, New York 10601

                                         Joyce McClay

Sworn to before me this
14th day of September, 2011

Notary Public

VINCENT GELARDI
Notary Public, State of New York
No. 4897505
Qualified in Westchester County
Commission Expires 6/8/2014

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------x
ALAN KACHALSKY, CHRISTINA NIKOLOV,            10 Civ. 5413 (CS)(GAY)
ERIC DETMER, JOHNNIE NANCE, ANNA
MARCUCCI-NANCE, and SECOND AMENDMENT             NOTICE OF APPEAL
FOUNDATION, INC.,                                IN A CIVIL CASE

                    Plaintiffs,

        -against-

SUSAN CACACE, JEFFREY A. COHEN,
ALBERT LORENZO, ROBERT K. HOLDMAN,
and COUNTY OF WESTCHESTER,

                    Defendants.
---------------------------------------x

        Notice is hereby given that the Defendant County of

Westchester hereby appeals to the United States Court of Appeals

for the Second Circuit from that portion of the Judgment entered

in this action on the 7th day of September, 2011 which denied the

County of Westchester's motion to dismiss.


                                   THOMAS G. GARDINER (TGG 7305)
                                   Sr. Assistant County Attorney
                                   600 Michaelian Office Building
                                   148 Martine Avenue
                                   White Plains, New York  10601
                                   (914) 995-3652

DATED: September 22, 2011