# 11-3642(L)

## 11-3962(XAP)

# United States Court of Appeals
# for the Second Circuit

ALAN KACHALSKY, CHRISTINA NIKOLOV, JOHNNIE NANCE, ANNA MARCUCCI-NANCE, ERIC DETMER, SECOND AMENDMENT FOUNDATION, INC.,

*Plaintiffs-Appellants,*

v.

COUNTY OF WESTCHESTER,

*Defendant-Appellee-Cross-Appellant,*

SUSAN CACACE, JEFFREY A. COHEN, ALBERT LORENZOR, ROBERT K. HOLDMAN,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the Southern District of New York

## BRIEF FOR STATE APPELLEES
## CACACE, COHEN, LORENZOR, AND HOLDMAN

BARBARA D. UNDERWOOD
  *Solicitor General*
RICHARD DEARING
  *Deputy Solicitor General*
SIMON HELLER
  *Assistant Solicitor General*
    *of Counsel*

ERIC T. SCHNEIDERMAN
  *Attorney General of the*
  *State of New York*
Attorney for State Appellees
120 Broadway
New York, New York 10271
(212) 416-8025

Dated: February 8, 2012

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..................................................................iii

PRELIMINARY STATEMENT ......................................................... 1

ISSUE PRESENTED ......................................................................... 4

STATEMENT OF THE CASE ........................................................... 4

    A.   The History of State Laws Prohibiting or Restricting the Carrying of Concealed and Concealable Weapons in Public ........................................................................................ 4

    B.   New York's Current Handgun Licensing Scheme .................. 8

    C.   The Important Public Safety Interests Served By Concealed-Carry Laws ...................................................... 13

    D.   Factual Background ................................................................ 15

    E.   Procedural History ................................................................ 17

        1.   The Amended Complaint ................................................ 17

        2.   The District Court's Grant of Summary Judgment to Defendants ................................................................ 19

SUMMARY OF ARGUMENT ....................................................... 20

ARGUMENT ................................................................................. 23

    NEW YORK'S "PROPER CAUSE" REQUIREMENT IS CONSTITUTIONAL UNDER THE SECOND AMENDMENT ...... 23

A.  Decisions Applying *Heller* and *McDonald* Uniformly Reject Second Amendment Challenges to Laws Restricting the Carrying of Handguns Outside the Home. ..................................................................... 23

B.  New York's "Proper Cause" Requirement For Carrying Concealed Handguns in Public Does Not Burden Conduct That Is Protected Under the Second Amendment. .......................................................... 29

C.  The "Proper Cause" Requirement Would Satisfy Means-End Scrutiny If Such Scrutiny Were Applicable. ...... 39

   1.  The appropriate level of scrutiny would be intermediate scrutiny. ................................... 39

   2.  New York's "proper cause" requirement satisfies intermediate scrutiny. .................................. 45

D.  Plaintiffs' Reliance on First Amendment Prior Restraint Doctrine Is Misplaced and Unavailing. ................ 50

CONCLUSION ........................................................................ 55

# TABLE OF AUTHORITIES

**Cases**                                                                    **Page**

*Andrews v. State*,
50 Tenn. 165 (1871) .............................................................. 36

*Bliss v. Commonwealth*,
12 Ky. 90 (1822) ................................................................... 32

*District of Columbia v. Heller*,
554 U.S. 570 (2008) ..................................................... passim

*English v. State*,
35 Tex. 473 (1871) ........................................................... 35, 36

*Ezell v. City of Chicago*,
651 F.3d 684 (7th Cir. 2011) ............................ 27, 30, 42, 43

*Fife v. State*,
31 Ark. 455 (1876) ............................................................... 36

*Gamble v. United States*,
30 A.3d 161 (D.C. 2011) ..................................................... 26

*Gonzalez v. Vill. of W. Milwaukee*,
No. 10-2356, __ F.3d __, 2012 WL 313572
(7th Cir. Feb. 2, 2012) ........................................................ 38

*Heller v. District of Columbia*,
No. 10-7036, __ F.3d __, 2011 WL 4551558
(D.C. Cir. Oct. 4, 2011) .................................................. 29, 42

*In re Robert T.*,
26 Misc. 2d 292 (Dutchess County Ct. 2009) ...................... 11

*Martinkovich v. Oregon Legislative Body*,
No. 11cv3072, 2011 WL 4738157 (D. Or. Aug. 23, 2011),
*report adopted*, 2011 WL 4738266 (Oct. 6, 2011) ............... 26

**TABLE OF AUTHORITIES (cont'd)**

| Cases | Page |
|---|---|

*Matter of Bando v. Sullivan*,
290 A.D.2d 691 (3d Dep't 2002)..........................................................12

*Matter of Kachalsky v. Cacace*,
65 A.D.3d 1045 (2d Dep't 2009), *appeal dismissed*,
14 N.Y.2d 743 (2010)..................................................................16-17

*Matter of Klenosky v. N.Y City Police Dep't*,
75 A.D.2d 793 (1st Dep't 1980), *aff'd on op. below*,
53 N.Y.2d 685 (1981)...............................................................12, 53

*Matter of O'Connor v. Scarpino*,
83 N.Y.2d 919 (1994)......................................................................12

*McDonald v. City of Chicago*,
130 S. Ct. 3020 (2010)........................................................1, 23, 24

*Moore v. Madigan*,
No. 11-cv-03134, 2012 WL 344760 (C.D. Ill. Feb. 3, 2012) ...............26

*Niemotko v. Maryland*,
340 U.S. 268 (1951) .........................................................................52

*Norton v. Sam's Club*,
145 F.3d 114 (2d Cir. 1998) ...............................................................18

*Nunn v. State*,
1 Ga. 243 (1846) ..............................................................................33

*People v. Mimes*,
2011 Ill. App. (1st) 082747, 953 N.E.2d 55 (2011).............................47

*Peruta v. County of San Diego*,
758 F. Supp. 2d 1106 (S.D. Cal. 2010),
*appeal docketed*, No. 10-56971 (9th Cir. Dec. 16, 2010) .............26, 46

iv

**Cases**          **Page**

*Piszczatoski v. Filko*,
   No. 10-06110, 2012 WL 104917 (D.N.J. Jan. 12, 2012),
   *appeal docketed*, No. 12-1150 (3d Cir. Jan. 24, 2012) ...... 25, 26, 52, 54

*Prayze FM v. FCC*,
   214 F.3d 245 (2d Cir. 2000) ............................................................... 54

*Richards v. County of Yolo*,
   No. 09-cv-1235, 2011 WL 1885641 (E.D. Cal. May 16, 2011) ............ 53

*Robertson v. Baldwin*,
   165 U.S. 275 (1897) ........................................................................... 25

*Schall v. Martin*,
   467 U.S. 253 (1984) ........................................................................... 45

*Schenck v. Pro-Choice Network of W.N.Y.*,
   519 U.S. 357 (1997) ........................................................................... 45

*Shuttlesworth v. City of Birmingham*,
   394 U.S. 147 (1969) ............................................................... 51, 52, 54

*State v. Flowers*,
   2011AP1757-CR, 2011 WL 6156961
   (Wis. App. Dec. 13, 2011) ................................................................. 26

*State v. King*,
   2011-Ohio-3417, 2011 WL 2671937 (Ct. App. 2011) .......................... 27

*State v. Reid*,
   1 Ala. 612 (1840) .............................................................................. 33

*Staub v. City of Baxley*,
   355 U.S. 313 (1958) ........................................................................... 51

*United States v. Barton*,
   633 F.3d 168 (3d Cir. 2011) .............................................................. 28

**Cases**                                                   **Page**

*United States v. Booker*,
  644 F.3d 12 (1st Cir. 2011),
  *pet. for cert. filed*, No. 11-6765 (U.S. Oct. 3, 2011) ................. 28, 39, 40

*United States v. Carey*,
  602 F.3d 738 (6th Cir.), *cert. denied*, 131 S. Ct. 322 (2010) ............... 28

*United States v. Chester*,
  628 F.3d 673 (4th Cir. 2010) ................................................................ 30

*United States v. Hart*,
  726 F. Supp. 2d 56 (D. Mass. 2010) ..................................................... 26

*United States v. Marzzarella*,
  614 F.3d 85 (3d Cir. 2010),
  *cert. denied*, 131 S. Ct. 958 (2011) .............................................. passim

*United States v. Masciandaro*,
  638 F.3d 458 (4th Cir.), *cert. denied*, 132 S. Ct. 756 (2011) ....... passim

*United States v. Reese*,
  627 F.3d 792 (10th Cir. 2010), *cert. denied*, 131 S. Ct. 2476
  (2011) ......................................................................................... passim

*United States v. Rene E.*,
  583 F.3d 8 (1st Cir. 2009), *cert. denied*, 130 S. Ct. 1109 (2010) ......... 26

*United States v. Salerno*,
  481 U.S. 739 (1987) .............................................................................. 45

*United States v. Seay*,
  620 F.3d 919 (8th Cir. 2010),
  *cert. denied*, 131 S. Ct. 1027 (2011) ................................................... 28

*United States v. Skoien*,
  614 F.3d 638 (7th Cir. 2010) (en banc),
  *cert. denied*, 131 S. Ct. 1674 (2011) .............................................. 28, 40

# TABLE OF AUTHORITIES (cont'd)

**Cases**                                                        **Page**

*United States v. Staten*,
No. 10-5318, __ F.3d __, 2011 WL 6016976
(4th Cir. Dec. 5, 2011) ........................................................... 43

*United States v. Williams*,
616 F.3d 685 (7th Cir.), *cert. denied*, 131 S. Ct. 805 (2010) .............. 31

*Williams v. State*,
417 Md. 479, *cert. denied*, 132 S. Ct. 93 (2011) ................................. 26

**Statutes**

*New York*

*Session Laws (by year)*

1884 N.Y. Laws 44, Ch. 46 ....................................................... 6, 7

1889 N.Y. Laws 167, Ch. 140 ........................................................ 7

1905 N.Y. Laws 129, Ch. 92 ......................................................... 7

1908 N.Y. Laws 242, Ch. 93 ......................................................... 7

1911 N.Y. Laws 442, Ch. 195 ........................................................ 7

1913 N.Y. Laws 1627, Ch. 608 ....................................................... 8

1963 N.Y. Laws 626, Ch. 136 ........................................................ 7

*Codification*

Penal Law
§ 265.00................................................................. 9, 10
§ 265.01.............................................................. 8, 9, 37
§ 265.03.............................................................. 9, 37
§ 265.20(a)(3) ............................................................. 9
§ 400.00 .......................................................... passim
§ 400.01 ................................................................. 10

# TABLE OF AUTHORITIES (cont'd)

**Statutes**                                                         **Page**

*N.Y. Codification (cont'd)*

Penal Code (1881)
§ 410 .................................................................................. 6
§ 412, *repealed by* Ch. 384, 1882 N.Y. Laws 540 ................. 6

*Other States (in alphabetical order)*

1839 Ala. Acts 67, Act of Feb. 1, 1839, no. 77 .................... 5, 32

1837 Ark. Acts 280, Act of Feb. 16, 1838, ch. 44 ................. 5, 32

1881 Ark. Acts 191, Act of Apr. 1, 1881, ch. 96 ................ 5, 6, 34

1881 Colo. Sess. Laws 74, Act of Feb. 1, 1881 .................... 5, 32

1885 Fla. Laws 61, Act of Feb. 12, 1885, ch. 3620 ............... 5, 32

1881 Ill. Laws 73, Act of Apr. 16, 1881 ................................. 5

1820 Ind. Acts 39, Act of Jan. 14, 1820, ch. 23 .................... 5, 32

1813 Ky. Acts 100, Act of Feb. 3, 1813, ch. 59 ........................ 5

29 Ky. Gen. Stat. ch. 29 (as amended through 1880) ............... 5

1813 La. Acts 172, Act of Mar. 25, 1813 .................................. 5

Neb. Gen. Stat., ch. 58, ch. 5 (1873) ................................. 5-6, 32

1879 N.C. Sess. Laws 231, Act of Mar. 5, 1879, ch. 127 ........... 6

N.D. Pen. Code § 457 (1895) ................................................. 6

1859 Ohio Laws 56, Act of Mar. 18, 1859 ................................ 5

1885 Or. Laws 33, Act of Feb. 18, 1885 .................................. 6

1881 S.C. Acts 447, Act of Dec. 24, 1880, no. 362 ................... 6

# TABLE OF AUTHORITIES (cont'd)

**Statutes** **Page**

*Other States (in alphabetical order)*

S.D. Terr. Pen. Code § 457 (1883) ............................................................ 6

1870 Tenn. Acts 28, Act of June 16, 1870, ch. 13 ............................... 6, 34

1871 Tex. Gen. Laws 25, Act of Apr. 12, 1871, ch. 34 ........................ 6, 35

1838 Va. Acts 76, Act of Feb. 2, 1838, ch. 101 ................................... 5, 32

1870 Va. Acts 510, Act of Oct. 29, 1870, ch. 349 ..................................... 6

Wash. Code § 929 (1881) ...................................................................... 6, 32

W. Va. Code, ch. 148  (1891) ................................................................ 6, 32

1876 Wyo. Terr. Comp. Laws 352, Act of Dec. 2, 1875, ch. 52 ............... 34

## Miscellaneous Authorities

Joel Stashenko, *Citing Poor Pay, Court of Claims Judge Resigns*,
   n. Y.L.J., Sept. 15, 2011 ..................................................................... 18

## PRELIMINARY STATEMENT

For a century, New York law has required persons seeking an unrestricted license to carry a concealed handgun in public—known as a "full-carry" license—to demonstrate, among other things, that the applicant has "proper cause" for the license. The New York courts have held that proper cause for a full-carry license is shown when the applicant demonstrates a special need for self-protection outside the home distinguishable from that of the general public. The "proper cause" requirement does not apply to a person seeking a handgun license for possession in the home.

The individual plaintiffs in this case, all residents of Westchester County, argue that New York's requirement that an applicant show "proper cause" to obtain a full-carry concealed-handgun license violates the Second Amendment to the United States Constitution, as incorporated against the State by the Fourteenth Amendment. Plaintiffs rely primarily on the Supreme Court's recent decisions in *District of Columbia v. Heller*, 554 U.S. 570 (2008), and *McDonald v. City of Chicago*, 130 S. Ct. 3020 (2010), both of which struck down laws completely banning the possession of handguns, including in the home.

The United States District Court for the Southern District of New York (Seibel, J.), rejected plaintiffs' challenge at the summary judgment stage. The court held that the Second Amendment does not protect the concealed carrying of handguns outside the home, relying both on the Supreme Court's statement in *Heller* that a concealed carrying prohibition is presumptively lawful and on the long history of state law regulation of concealed carrying. In the alternative, the court determined that even if the Second Amendment were implicated by New York's "proper cause" requirement, the proper standard of review would be intermediate scrutiny, and the requirement would survive that scrutiny because it serves the important state interest in public safety.

This Court should affirm. The Supreme Court's holdings in *Heller* and *McDonald* struck down laws imposing complete bans on the possession of handguns in the home for the purpose of self-defense. New York's "proper cause" requirement is sharply different from those laws. The "proper cause" requirement does not apply at all to handgun possession in the home, and, as to possession outside the home, the requirement regulates but does not prohibit concealed carrying of handguns. Moreover, the Court's opinion in *Heller* expressly endorses

bans on concealed carrying of firearms outside the home as among a group of presumptively lawful restrictions on firearms that have deep roots in American history.

Consequently, it is not surprising that courts applying *Heller* have upheld every federal and state restriction on the possession of handguns that does not affect possession in the home, either because the laws were recognized by the Supreme Court as presumptively lawful, or because they pass muster under the appropriate level of judicial scrutiny. These decisions include several federal and state court decisions upholding concealed carrying license requirements like New York's, and broader restrictions on any carrying of handguns outside the home. Thus, whether New York's "proper cause" requirement is viewed as entirely outside the scope of the Second Amendment because of its longstanding historical provenance, or whether it survives constitutional scrutiny because it advances the important state interest in public safety, the requirement does not violate the Second Amendment.

## ISSUE PRESENTED

Whether the district court properly determined that New York's requirement that an applicant for an unrestricted license to carry a concealed handgun in public demonstrate "proper cause" for issuance of the license is constitutional under the Second and Fourteenth Amendments?

## STATEMENT OF THE CASE

### A. The History of State Laws Prohibiting or Restricting the Carrying of Concealed and Concealable Weapons in Public

The States have long prohibited or regulated the ability of persons to carry in public spaces certain deadly weapons, such as handguns, that due to their size are readily concealable and typically concealed. The reason for restricting smaller firearms is clear: "Assailants choose handguns over long guns in part because handguns are smaller and more conveniently carried on the person or in a vehicle and can be readily concealed from law enforcement officers, potential victims, and the public at large." (J.A. 454 (expert witness Philip Cook).) Thus, "concealed weapons laws are the oldest form of legal regulation . . . [of weapons] and the most common." (J.A. 490 (expert witness Franklin

Zimring).)  As of January 2011, all but three States (Alaska, Vermont and Wyoming) either banned or required a license for the carrying of a concealed handgun.  (J.A. 455 (Cook).)

As early as 1813, Kentucky passed a statute prohibiting the wearing of a "pocket pistol, dirk, large knife, or sword in a cane, concealed as a weapon," except when "traveling on a journey."  Act of Feb. 3, 1813, ch. 59, § 1, 1813 Ky. Acts 100, 100.  Louisiana passed a similar ban the same year, Act of Mar. 25, 1813, 1813 La. Acts 172, and several other States soon followed suit.  *See* Act of Feb. 1, 1839, no. 77, 1839 Ala. Acts 67; Act of Feb. 16, 1838, ch. 44, div. 8, § 13, 1837 Ark. Acts 280; Act of Jan. 14, 1820, ch. 23, 1820 Ind. Acts 39; Act of Mar. 18, 1859, 1859 Ohio Laws 56; Act of Feb. 2, 1838, ch. 101, 1838 Va. Acts 76.

Following the Civil War and the ratification of the Fourteenth Amendment, at least fifteen States prohibited the carrying of concealed pistols and deadly weapons, some explicitly covering all firearms or all weapons.  *See* Act of Apr. 1, 1881, ch. 96, § 1, 1881 Ark. Acts 191; Act of Feb. 1, 1881, 1881 Colo. Sess. Laws 74; Act of Feb. 12, 1885, ch. 3620, 1885 Fla. Laws 61; Act of Apr. 16, 1881, 1881 Ill. Laws 73, 74; 29 Ky. Gen. Stat. ch. 29, § 1 (as amended through 1880); Neb. Gen. Stat., ch.

58, ch. 5, § 25 (1873); Act of Mar. 5, 1879, ch. 127, 1879 N.C. Sess. Laws 231; N.D. Pen. Code § 457 (1895); Act of Feb. 18, 1885, 1885 Or. Laws 33; Act of Dec. 24, 1880, no. 362, 1881 S.C. Acts 447; S.D. Terr. Pen. Code § 457 (1883); Act of Apr. 12, 1871, ch. 34, 1871 Tex. Gen. Laws 25; Act of Oct. 29, 1870, ch. 349, 1870 Va. Acts 510; Wash. Code § 929 (1881); W. Va. Code, ch. 148, § 7 (1891). And several nineteenth-century state statutes enacted within a few years of the 1868 ratification of the Fourteenth Amendment prohibited the public carrying, whether openly or in a concealed manner, of deadly weapons that were by their nature readily concealable due to their size. No. 96, 1881 Ark. Acts 191; Act of June 16, 1870, ch. 13, 1870 Tenn. Acts 28; Ch. 34, 1871 Tex. Gen. Laws 25.

In New York, as early as 1881 the Legislature enacted a law making it a misdemeanor for a person to carry concealed "any kind of fire-arms." Penal Code § 412 (1881), *repealed by* Ch. 384, 1882 N.Y. Laws 540, 544. For about two decades thereafter, New York law required a license for persons under the age of eighteen to carry firearms in public within city or village limits. *See* Penal Code § 410 (1881) (*as amended by* Ch. 46, § 8, 1884 N.Y. Laws 44, 47) (city limits);

*id.* (*as amended by* Ch. 140, § 2, 1889 N.Y. Laws 167, 167) (incorporated villages). In 1905, the Legislature amended the statute to prohibit any person over the age of sixteen from having or carrying concealed any firearm within a city or village without a written license and to prohibit altogether the possession or carrying of firearms in cities or villages by a person under sixteen. *Id.* (*as amended by* Ch. 92, 1905 N.Y. Laws 129). Three years later the prohibition was extended to towns within the State. *Id.* (*as amended by* Ch. 93, 1908 N.Y. Laws 242).

In 1911, the New York Legislature enacted what is known as the "Sullivan Law." The Sullivan Law for the first time made it a felony to carry a firearm concealed on one's person in a city, village, or town. (J.A. 560 (reproducing Ch. 195, 1911 N.Y. Laws 442, 443).) The Sullivan Law also made it a misdemeanor to carry in a city, village, or town "any pistol, revolver, or other firearm of a size which may be concealed," thereby requiring a license for open carrying of concealable weapons.[1] The statute was intended to eradicate "the concealed weapon

---

[1] The provision permitting open carrying of licensed *concealable* weapons was eliminated in 1963. *See* Ch. 136, 1963 N.Y. Laws 626.

evil"; limit gang violence; and "decrease appreciably the number of homicides, accidental and impulsive." (J.A. 177.)

In 1913, the statute was amended to impose a statewide standard for the issuance of licenses to have and carry concealable firearms in public. (J.A. 576-580 (reproducing Ch. 608, 1913 N.Y. Laws 1627-30).) The statute authorized a magistrate to issue an unrestricted license for concealed carrying "upon proof . . . that the person applying therefore is of good moral character, and that proper cause exists for the issuance thereof." (J.A. 579.) This "proper cause" requirement has been maintained in New York law until the present day. Statutory amendments have consistently emphasized the importance of the licensing scheme to crime prevention. (SPA 52-53.)

## B. New York's Current Handgun Licensing Scheme

Today, the New York Penal Law makes it a misdemeanor to possess an unlicensed handgun (or other designated firearm), loaded or unloaded, in any location, Penal Law § 265.01, and makes it a class C felony to possess an unlicensed loaded handgun (or other designated

firearm) outside the home, *id.* § 265.03(3). Long guns—including most rifles and shotguns—are excluded from these prohibitions.[2] Consequently, the possession and carrying of long guns, which by their nature are not easily concealable, are not generally prohibited or subject to licensing in New York. (*See also* J.A. 454 (Cook noting that "[b]ecause handguns pose a particular hazard to public safety, they have traditionally been subjected to more stringent regulation than rifles and shotguns (which are commonly used for hunting and other sporting purposes)").)

As reflected above, licensed handguns are also exempted from the Penal Law's prohibitions on possession and carrying of firearms. Penal Law § 265.20(a)(3).[3] Penal Law § 400.00 specifies the standards for issuing licenses authorizing the possession and carrying of a pistol or

---

[2] Penal Law § 265.00(3) defines "firearm" to include pistols and revolvers; shotguns with barrels less than eighteen inches in length; rifles with barrels less than sixteen inches in length; "any weapon made from a shotgun or rifle" with an overall length of less than twenty-six inches; and assault weapons.

[3] Exemptions from the prohibition also exist, *inter alia*, for persons in state and federal military service and for peace and police officers. Penal Law § 265.20(a)(1).

revolver.[4]  Applications for a handgun license under § 400.00 are adjudicated by firearms licensing officers.  In most of New York, state judges serve as licensing officers.  In New York City, Nassau County, and Suffolk County, designated police officials serve as licensing officers.  *Id.* § 265.00(10).  An applicant may obtain judicial review of the denial of a license in whole or in part by filing a proceeding under article 78 of the Civil Practice Law and Rules.

To be eligible for any handgun license under § 400.00, the applicant must (1) be at least twenty-one years old; (2) possess good moral character; (3) have no convictions for "a felony or a serious offense"; (4) not have had a firearms license revoked previously; (5) not be disqualified pursuant to an order of protection; and (6) be a person "concerning whom no good cause exists for denial of the license."  *Id.* § 400.00(1)(a)-(c), (e), (g).  The license application must state whether the applicant "has ever suffered any mental illness or been confined to any hospital or institution . . . for mental illness," *id.* § 400.00(1)(d), but

---

[4] Another statute not relevant here, Penal Law § 400.01, provides the standards for issuing firearms licenses to retired members of the state police.

the existence of a history of mental illness is not automatically disqualifying.[5] *In re Robert T.*, 26 Misc. 2d 292, 297 (Dutchess County Ct. 2009).

Section 400.00(2) establishes several types of handgun licenses. A number of these licenses do not authorize concealed carrying of weapons in public places, including licenses for (1) a person to possess a pistol or revolver in his or her dwelling, (2) a merchant or shopkeeper to possess such a weapon in his or her place of business, (3) a person to serve as a gunsmith or gun dealer, and (4) a person to possess, store, collect, and carry certain single-shot antique pistols. Penal Law § 400.00(2), (2)(a)-(b), (g).

The remaining handgun licenses authorize concealed carrying in public places. Section 400.00(2)(d) provides that certain state and city judges may obtain a license to carry a concealed handgun. Persons also may obtain a license to carry a concealed handgun while engaged in certain employment, such as employment by a prison or jail,

---

[5] In Westchester County, where each of the individual plaintiffs resides, an applicant generally must have completed a firearms safety course. Penal Law § 400.00(1)(f).

§ 400.00(2)(e), or employment as a messenger for a banking or express company, § 400.00(2)(c).

Other persons may obtain a license to carry a concealed handgun "when proper cause exists for the issuance thereof." § 400.00(2)(f). The New York Court of Appeals has held that when an applicant demonstrates "proper cause" for carrying a concealed handgun for specific purposes—*e.g.*, for target practice, hunting, or particular employment—a licensing officer may "restrict the use [of such a license] to the purposes that justified [its] issuance." *Matter of O'Connor v. Scarpino*, 83 N.Y.2d 919, 921 (1994). New York courts have also held that to obtain a full-carry license to carry a concealed handgun without any such restriction, an applicant must "demonstrate a special need for self-protection distinguishable from that of the general community or of persons engaged in the same profession." *Matter of Klenosky v. N.Y City Police Dep't*, 75 A.D.2d 793, 793 (1st Dep't 1980), *aff'd on op. below*, 53 N.Y.2d 685 (1981); *accord Matter of Bando v. Sullivan*, 290 A.D.2d 691, 693 (3d Dep't 2002).

## C. The Important Public Safety Interests Served By Concealed-Carry Laws

Before the district court, the state defendants submitted declarations from two expert witness, Philip J. Cook and Franklin E. Zimring, explaining how regulation of the carrying of concealed handguns in public serves important safety interests. (*See* J.A. 446-485 (Cook), 486-508 (Zimring)). Both Cook and Zimring have decades of experience studying strategies of firearms control, the effects and costs of gun violence, and the influence of gun availability on rates of gun crime. (J.A. 446-447, 463-485, 486-487, 491-508.) The contents of their declarations are summarized here.

As Zimring observed, "[w]hen armed citizens carry guns in public, they alter the public environment for all other users." (J.A. 490.) As compared with long guns like rifles and shotguns, the carrying of handguns outside the home poses a particular safety challenge because handguns are smaller, more conveniently carried, and easily concealed from law enforcement, potential victims, and the public at large:

> The person with a concealed handgun in his pocket generates no special notice until the weapon appears at his criminal destination. The robber or assaulter looks no different from any other user of common public spaces. And this ability to escape special scrutiny is

>the advantage that makes the concealed handgun into the dominant weapon of choice for gun criminals and a special danger to government efforts to keep public spaces safe and secure.

(J.A. 488 (Zimring).) For these reasons, concealed weapons laws represent the most common form of legal regulation of guns in the United States. (J.A. 490 (Zimring).) Because more than half of criminal homicides and other serious crimes are committed by persons who have not previously been convicted of a felony, laws prohibiting felons from possessing guns are not adequate to address the public safety concerns raised by concealed possession of handguns. (J.A. 459 (Cook).)

These public safety concerns raised by guns are substantial: nearly a million Americans have suffered gun-related deaths from homicide, accident and suicide over the past three decades. In 2007, the most recent year for which data were available, nearly seventy percent of the 18,361 criminal homicides reported in the United States were committed with guns. (J.A. 447-448 (Cook).) And although only five percent of criminal assaults are committed with guns, over two-thirds of fatal assaults are perpetrated with guns. (J.A. 449 (Cook).)

As noted above, handguns are the weapon of choice for criminal violence. While handguns constitute only approximately one third of all

guns owned by civilians in the United States, they are used in more than three-quarters of all gun killings. Studies have shown that increased availability of handguns increases the lethality of crime. By contrast, there is no reliable evidence that wider access to guns reduces crime. (J.A. 452-454 (Cook).)

### D. Factual Background

Each of the five individual plaintiffs resides in Westchester County. One of the plaintiffs holds an existing license to carry a concealed handgun outside the home for the purpose of target shooting and hunting (J.A. 79), and two others hold a concealed-handgun license for the purpose of target shooting alone (J.A. 76, 82). These three plaintiffs applied to amend their license to an unrestricted, full-carry concealed-handgun license. (J.A. 76, 79, 82.) The two other individual plaintiffs also applied for a full-carry concealed-handgun license (J.A. 74, 80.)

Plaintiffs' license applications did not demonstrate any special need beyond that of the general public to carry a concealed weapon outside the home for the purpose of self-defense. For example, the application of lead plaintiff Alan Kachalsky stated, in pertinent part:

> I believe the Constitutional right entitles me to the permit without . . . the need to establish "proper cause."
>
> If the issuing agency for some reason requires more than this, then I will cite the fact that we live in a world [in which] sporadic random violence might at any moment place one in a position where one needs to defend oneself or possibly others . . . .

(J.A. 161.)

Each of the five individual plaintiffs was denied a full-carry concealed-handgun license by one of the defendant licensing officers on the ground that they had failed to satisfy the "proper cause" requirement in Penal Law § 400.00(2)(f).[6]  (*See* J.A. 34 (Kachalsky), 37 (Nikolov), 39 (Detmer), 43-44 (Nance), 48-49 (Marcucci-Nance).)  Only Kachalsky sought judicial review of the denial of his license application in the New York courts, which was unsuccessful.  *See Matter of*

---

[6] The organizational plaintiff, the Second Amendment Foundation (SAF), alleged that it is a non-profit organization based in Washington State with members in Westchester County and that it engages in advocacy and advice to its members about the constitutional right to own firearms.  (J.A. 84.)  SAF further alleged that it has members in New York who are barred from "obtaining permits to carry handguns" by the "policies" of the defendants.  (J.A. 85.)

*Kachalsky v. Cacace*, 65 A.D.3d 1045 (2d Dep't 2009), *appeal dismissed*, 14 N.Y.2d 743 (2010).

### E. Procedural History

#### 1. The Amended Complaint

On July 15, 2010, three weeks after the United States Supreme Court decided *McDonald*, plaintiffs filed this lawsuit under 42 U.S.C. § 1983. They filed an amended complaint about three months later. The amended complaint names as defendants four state-court judges who, serving as firearms licensing officers in Westchester County, denied one or more of the individual plaintiffs' applications for a full-carry license. These four defendants have had no role in this controversy beyond denying plaintiffs' license applications and providing a statement of the reasons for the denials, as required by Penal Law § 400.00(4-a).[7] (*See* J.A. 511, 513, 514, 520.) The amended complaint

_____

[7] One of the state defendants, Jeffrey A. Cohen, is now a justice of the New York State Supreme Court, Appellate Division, Second Department (J.A. 512), and thus no longer serves as a firearms licensing officer for Westchester County. Another of the state defendants, Robert Holdman, has resigned his position as a state-court judge, and thus also no longer serves as a firearms licensing officer for

*(continued on the next page)*

also names Westchester County as a defendant,[8] alleging that the county, through its Department of Public Safety, Pistol Licensing Unit, enforces the New York laws at issue in the case. (J.A. 18.)

The amended complaint asserts causes of action under the Second Amendment and the Equal Protection Clause of the Fourteenth Amendment.[9]  (J.A. 25-26.)  It asks the court to permanently enjoin "defendants, their officers, agents, servants, employees, and all persons in active concert or participation with them who receive actual notice of the injunction, from enforcing N.Y. Penal Code § 400.00(2)(f)'s good cause [sic] requirement"; to grant declaratory relief "consistent with" such an injunction; to order the defendants to issue permits to the

_____

Westchester County.  Joel Stashenko, *Citing Poor Pay, Court of Claims Judge Resigns*, N.Y.L.J., Sept. 15, 2011.

[8] Westchester County is separately represented and has filed its own brief.

[9] On appeal, plaintiffs have abandoned their equal protection claim.  They make only passing reference to the Equal Protection Clause in their brief.  Br. for Pls.-Appellants at 15-16 (suggesting that "[t]o the extent" New York's gun licensing scheme "implicates the Equal Protection Clause," the case "might well be decided under some level of means-ends scrutiny"); *id.* at 54.  Thus, any equal-protection claim is forfeited.  *See Norton v. Sam's Club*, 145 F.3d 114, 117 (2d Cir. 1998) ("Issues not sufficiently argued in the briefs are considered waived and normally will not be addressed on appeal.").

individual plaintiffs "to carry a handgun"; and to award costs and fees under 42 U.S.C. § 1988.  (J.A. 26.)

### 2. The District Court's Grant of Summary Judgment to Defendants

The state defendants and the county defendant filed motions to dismiss the proceeding on several grounds.  Before those motions were decided, plaintiffs filed a motion for summary judgment, and the state defendants cross-moved for summary judgment.  By order dated September 2, 2011, the district court declined to dismiss the complaint for the most part,[10] and granted summary judgment to all defendants. (SPA 60.)

The court held first that "the scope of the Second Amendment right in *Heller* does not extend to invalidate regulations, such as Section 400.00(2)(f), on carrying handguns."  (SPA 38.)  Alternatively, the court held that the level of scrutiny applicable to New York's "proper cause" requirement is intermediate scrutiny (SPA 51), and held that the law

---

[10] The court dismissed plaintiff SAF for lack of standing because it failed "to allege anywhere in the First Amended Complaint that it has any members who have applied for and been rejected full-carry permits under Section 400.00(2)(f)."  (SPA 22.)

passes muster under intermediate scrutiny because it is substantially related to the important state interest "in promoting public safety and preventing crime" (SPA 55).

## SUMMARY OF ARGUMENT

In this case, plaintiffs claim that the Second Amendment gives them a right to possess concealed handguns in public spaces in New York—ranging from crowded shopping malls and public transportation centers to movie theaters and sporting events, virtually without restriction—so long as they meet threshold requirements as to age, criminal history, and the like. Although plaintiffs purport to ground their claim in the Supreme Court's recent decisions in *Heller* and *McDonald*, those cases do not at all support the result that they seek.

In *Heller* and *McDonald*, the Supreme Court struck down municipal laws that totally banned handguns, including the possession of handguns in the home for the purpose of self-defense. The handgun bans at issue in *Heller* and *McDonald* differ sharply from New York's "proper cause" requirement in three important respects. First, the laws struck down in *Heller* and *McDonald* prohibited possession of handguns

in the home, whereas New York's "proper cause" requirement applies to the carrying of concealed handguns in public places, not to handgun licenses for possession in the home. Second, the laws in *Heller* and *McDonald* essentially enacted a total ban on handgun possession, whereas New York's "proper cause" requirement regulates, but does not ban, the carrying of concealed handguns in public. New York's statute expressly permits concealed carrying by eligible persons engaged in certain specified employment; allows eligible persons, on a proper showing, to carry concealed handguns for target practice or hunting; and affords eligible persons a full-carry license for concealed handguns upon demonstrating a special need to carry handguns in public for the purpose of self-defense. Third, the laws in *Heller* and *McDonald* were recently enacted—in 1975 and 1982, respectively—whereas New York's "proper cause" requirement dates back a century, and is similar to laws prohibiting the carrying of concealed and concealable weapons with even deeper historical roots across the Nation.

Because of these significant differences, New York's "proper cause" requirement passes constitutional muster. The Supreme Court's opinion in *Heller* includes prohibitions on concealed carrying of

handguns in its description of "presumptively lawful" firearms regulations. These presumptively lawful regulations—all of which, like concealed carrying bans and restrictions, are deeply rooted in American history—have been viewed by courts after *Heller* either as falling outside the scope of the Second Amendment entirely, or as surviving means-end scrutiny because they serve important governmental interests. New York's "proper cause" requirement, which stops far short of the total prohibition on concealed carrying that the Supreme Court has endorsed, is constitutional under either approach.

Perhaps in recognition of this, plaintiffs advance the novel proposal that this Court should invalidate the "proper cause" requirement by applying First Amendment prior restraint doctrine. Prior restraint doctrine typically rejects licensing schemes for parades and similar acts of public expression that confer upon government officials unfettered discretion to deny the license. But prior restraint doctrine under the First Amendment is rooted in concerns about government censorship of public expression, and therefore has no place, and would make little sense, in the Second Amendment context. In any event, prior restraint doctrine, if it could sensibly be applied, would not

invalidate New York's objective standard for issuance of full-carry handgun licenses when an applicant shows a special need for self-protection outside the home distinguishable from that of the general population. This defined standard does not confer unfettered discretion on licensing officials.

## ARGUMENT

## NEW YORK'S "PROPER CAUSE" REQUIREMENT IS CONSTITUTIONAL UNDER THE SECOND AMENDMENT

### A. Decisions Applying *Heller* and *McDonald* Uniformly Reject Second Amendment Challenges to Laws Restricting the Carrying of Handguns Outside the Home.

In *Heller* and *McDonald*, the Supreme Court held that "the Second Amendment protects the right to possess a handgun in the home for the purpose of self-defense." *McDonald*, 130 S. Ct. at 3050. Accordingly, *Heller* struck down a District of Columbia law that "totally ban[ned] handgun possession in the home" and further "require[d] that any lawful firearm in the home [such as a rifle or shotgun] be disassembled or bound by a trigger lock at all times, rendering it inoperable." 554 U.S. at 628. Two years later, in *McDonald*, the Court held that the

Second Amendment is incorporated against the States through the Due Process Clause of the Fourteenth Amendment, 130 S. Ct. at 3036-44, and struck down a Chicago law that, like the D.C. handgun prohibition, "effectively bann[ed] handgun possession by almost all private citizens who reside in the City," *id.* at 3026.

Thus, *Heller* and *McDonald* recognize an individual right to possess a handgun in the home for self-defense, but those decisions do not suggest that persons have a federal constitutional right to carry concealed handguns in public, outside the home. As the district court observed below, "emphasis on the Second Amendment's protection of the right to keep and bear arms for the purpose of 'self-defense in the home' permeates the [*Heller*] decision and forms the basis for its holding." (SPA 35.) In striking down D.C.'s handgun ban, the *Heller* Court stressed that the prohibition "extend[ed] . . . to the home, where the need for defense of self, family, and property is most acute." *Heller*, 554 U.S. at 628; *accord McDonald*, 130 S. Ct. at 3044 (describing *Heller* as holding that "the Second Amendment protects a personal right to keep and bear arms for lawful purposes, most notably for self-defense within the home"); *see also, e.g., United States v. Masciandaro*, 638 F.3d

458, 470 (4th Cir.) ("[A]s we move outside the home, firearm rights have always been more limited, because public safety interests often outweigh individual interests in self-defense."), *cert. denied*, 132 S. Ct. 756 (2011); *Piszczatoski v. Filko*, No. 10-06110, 2012 WL 104917, at * 7 (D.N.J. Jan. 12, 2012) ("The language of Justice Scalia's majority opinion [in *Heller*] deliberately limited the scope of the right recognized to the home."), *appeal docketed*, No. 12-1150 (3d Cir. Jan. 24, 2012).

The Court in *Heller* did not in any way disturb or question the Court's statement in its 1897 decision, *Robertson v. Baldwin*, that "the right of the people to keep and bear arms . . . is not infringed by laws prohibiting the carrying of concealed weapons." 165 U.S. 275, 281-82 (1897). To the contrary, the *Heller* Court cited *Robertson* without questioning this statement. *Heller*, 540 U.S. at 599; *see also id.* at 683 (Breyer, J., dissenting) (citing this portion of *Robertson* in setting forth "four propositions, based on our precedent and today's opinions, to which [he] believe[d] the entire Court subscribe[d].").

In the wake of *Heller* and *McDonald*, courts have uniformly upheld restrictions or prohibitions on concealed carrying of firearms in public spaces; indeed, no court has found such a regulation invalid. *See,*

*e.g.*, *Moore v. Madigan*, No. 11-cv-03134, 2012 WL 344760 (C.D. Ill. Feb. 3, 2012) (rejecting Second Amendment challenge to Illinois statute criminalizing the concealed carrying of handguns outside a person's home or place of business); *Piszczatoski*, 2012 WL 104917 (rejecting Second Amendment challenge to New Jersey statute that required justification for issuance of license to carry handgun); *Peruta v. County of San Diego*, 758 F. Supp. 2d 1106 (S.D. Cal. 2010) (rejecting Second Amendment challenge to state statute prohibiting unlicensed concealed carrying of handgun), *appeal docketed*, No. 10-56971 (9th Cir. Dec. 16, 2010); *State v. Flowers*, 2011AP1757-CR, 2011 WL 6156961 (Wis. App. Dec. 13, 2011) (same); *Gamble v. United States*, 30 A.3d 161 (D.C. 2011) (same); *Martinkovich v. Oregon Legislative Body*, No. 11-cv-3072, 2011 WL 4738157, at *2 (D. Or. Aug. 23, 2011) (report & recommendation) (same), *report adopted*, 2011 WL 4738266 (Oct. 6, 2011); *Williams v. State*, 417 Md. 479 (same), *cert. denied*, 132 S. Ct. 93 (2011); *see also United States v. Rene E.,* 583 F.3d 8, 12 (1st Cir. 2009) ("laws prohibiting the carrying of concealed weapons . . . were left intact by the Second Amendment and by *Heller*"), *cert. denied*, 130 S. Ct. 1109 (2010); *United States v. Hart*, 726 F. Supp. 2d 56, 60 (D. Mass. 2010) ("*Heller*

does not hold, nor even suggest, that concealed weapons laws are unconstitutional."); *State v. King*, 2011-Ohio-3417, ¶ 24, 2011 WL 2671937, at *3 (Ct. App. 2011) (rejecting Second Amendment challenge to Ohio statute prohibiting transporting and handling handguns in a motor vehicle).

Federal courts applying *Heller* have found Second Amendment violations only with respect to gun regulations that, unlike New York's "proper cause" requirement, directly burden the right to possess a handgun for self-defense in the home. For example, in *Ezell v. City of Chicago*, the Seventh Circuit struck down Chicago's prohibition on all firing ranges within the city on the ground that "[t]he right to possess firearms for protection implies a corresponding right to acquire and maintain proficiency in their use; the core right wouldn't mean much without the training and practice that make it effective." 651 F.3d 684, 704 (7th Cir. 2011). Unlike the firing-range ban struck down in *Ezell*, New York's "proper cause" requirement does not burden home possession of handguns. Indeed, three of the individual plaintiffs in this case hold licenses permitting them to carry concealed handguns for

the purpose of target practice, and the record contains no indication that the other two plaintiffs have ever sought such a license.

Even as to laws restricting home possession, federal courts of appeals decisions applying *Heller* have upheld a variety of regulations short of complete prohibitions on the possession of handguns. The courts have rejected Second Amendment challenges to the federal statutes prohibiting possession of firearms in interstate commerce:

- by persons convicted of crimes punishable by more than one year in prison, *United States v. Barton*, 633 F.3d 168, 170 (3d Cir. 2011); *United States v. Carey*, 602 F.3d 738, 741 (6th Cir.), *cert. denied*, 131 S. Ct. 322 (2010);

- by persons subject to certain domestic protection orders, *United States v. Reese*, 627 F.3d 792, 802-04 (10th Cir. 2010), *cert. denied*, 131 S. Ct. 2476 (2011);

- by users of controlled substances, *United States v. Seay*, 620 F.3d 919, 925 (8th Cir. 2010), *cert. denied*, 131 S. Ct. 1027 (2011); and

- by persons convicted of a misdemeanor crime of domestic violence, *United States v. Booker*, 644 F.3d 12, 25-26 (1st Cir. 2011), *pet. for cert. filed*, No. 11-6765 (U.S. Oct. 3, 2011); *United States v. Skoien*, 614 F.3d 638, 645 (7th Cir. 2010) (en banc), *cert. denied*, 131 S. Ct. 1674 (2011).

Likewise federal courts of appeals have also upheld the federal statute prohibiting possession of a handgun with its serial number obliterated,

18 U.S.C. § 922(k), even as to possession in the home, *United States v. Marzzarella*, 614 F.3d 85, 89 (3d Cir. 2010), *cert. denied*, 131 S. Ct. 958 (2011), as well as a federal regulation prohibiting possession of firearms in a national park, *Masciandaro*, 638 F.3d at 473-74.

Thus, cases applying the Supreme Court's decisions in *Heller* and *McDonald* have uniformly rejected Second Amendment challenges to prohibitions or restrictions on the carrying of concealed handguns in public spaces outside the home, and have further rejected most challenges to laws regulating, but not prohibiting, possession of handguns within the home by certain categories of individuals.

**B. New York's "Proper Cause" Requirement For Carrying Concealed Handguns in Public Does Not Burden Conduct That Is Protected Under the Second Amendment.**

Most courts applying *Heller* and *McDonald*, including the district court below (SPA 38), have followed a two-step inquiry that first asks whether the challenged law falls within the scope of Second Amendment protections, and, if it does, then analyzes the law under an intermediate form of means-end scrutiny. *E.g.*, *Heller v. District of Columbia,* No. 10-7036, __ F.3d __, 2011 WL 4551558, at *5 (D.C. Cir.

Oct. 4, 2011); *Marzzarella*, 614 F.3d at 89 (3d Cir.); *United States v. Chester*, 628 F.3d 673, 680 (4th Cir. 2010); *Ezell*, 651 F.3d at 701 (7th Cir.) ; *Reese*, 627 F.3d at 800-01 (10th Cir.).

As the district court concluded, plaintiffs' challenge here fails at the first step, because New York's "proper cause" requirement for obtaining a full-carry concealed-handgun license does not burden conduct protected by the Second Amendment. In *Heller*, the Court stressed that the right protected by the Second Amendment is "not unlimited" and observed that courts and commentators through history had "routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." 554 U.S. at 626. The Court cited "prohibitions on carrying concealed weapons" as a principal example of firearms regulation that had historically been permissible, noting that "the majority of the 19th-century courts to consider the question" had found such prohibitions lawful. *Id.* at 626 (citations omitted); *see also* id. at 688 (Breyer, J., dissenting) (citing the majority's approval of "prohibitions on concealed weapons" as consistent with the Second Amendment). The Court also made clear that its holding did not call

into question other longstanding forms of firearm regulation, including but expressly not limited to "prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." *Id.* at 626-27 & n.26.[11]

Because the Second Amendment was first made applicable to the States by the Fourteenth Amendment, the historical evidence contemporaneous with that Amendment's ratification is relevant to the scope of the prohibitions that were made applicable to the States. The historical record from that period strongly supports the conclusion that state concealed-weapons laws do not burden conduct protected by the Second Amendment. Both before and after the ratification of the

---

[11] Most courts have read this passage to place the laws described beyond Second Amendment scrutiny, *see, e.g., Marzzarella*, 614 F.3d at 91 ("these longstanding limitations are exceptions to the right to bear arms"), and some have read the Court's reference to the laws in a footnote as "presumptively lawful" as an indication that they are not categorically beyond Second Amendment scrutiny, but will nearly always survive such scrutiny, *see, e.g., United States v. Williams*, 616 F.3d 685, 692-93 (7th Cir.), *cert. denied*, 131 S. Ct. 805 (2010). Either way, the passage points strongly against plaintiffs' challenge here.

Fourteenth Amendment, a number of States prohibited or sharply limited the carrying of concealed or concealable handguns. Many pre-Civil War state statutes prohibited or restricted the concealed carrying of pistols and other weapons, such as bowie knives, that by their nature were readily concealable. See *supra*, at p. 5 (listing laws from Alabama (1839), Arkansas (1838), Indiana (1820), Virginia (1838)). After the ratification of the Fourteenth Amendment, several additional territorial and state statutes were enacted that prohibited concealed carrying of firearms. See *supra*, at p. 6 (listing laws from Colorado (1881), Florida (1885), Nebraska (1873), Washington (1881), West Virginia (1891)). Nearly all of these statutes were upheld against federal and state constitutional challenges. *But see Bliss v. Commonwealth*, 12 Ky. 90 (1822) (striking down Kentucky's concealed weapon ban under state constitution).

Plaintiffs assert that many of the nineteenth-century state statutes that prohibited the concealed carrying of handguns did not bar such weapons from being carried openly. On this basis, plaintiffs argue (Br. at 33-38) that the historical record supports the proposition that they must be permitted to carry handguns outside their homes *in some*

*manner*, either concealed or openly. They cite one early state decision, and dicta from another, that could be read to endorse a similar view. *See Nunn v. State*, 1 Ga. 243 (1846) (finding unconstitutional statute prohibiting both open and concealed carrying, but confirming in dicta validity of ban on concealed carrying); *State v. Reid*, 1 Ala. 612 (1840) (dicta in case upholding Alabama statute prohibiting concealed carrying).[12] Plaintiffs further contend that New York has chosen concealed carrying, rather than open carrying, as the permissible manner of carrying handguns in public, and that, because New York has made this choice, they are constitutionally entitled to a full-carry license allowing them to carry a concealed handgun in public places virtually without restriction.

---

[12] It is far from clear that these two decisions even support plaintiffs' position at all. As the district court correctly noted: "Those cases' holdings . . . seem not to be premised on the existence of open carry provisions specifically, but rather on the existence of provisions for some other means of carry generally; in other words, they suggest that such statutes would fail to pass muster only if functioning as complete bans to carrying weapons outside the home under any circumstances." (SPA 41-42.) New York's licensing scheme, of course, does not enact a complete ban on carrying handguns outside the home, but rather allows persons to obtain a license to carry handguns on a showing of proper cause.

Plaintiffs' argument fails for several reasons. Most significantly, they overlook several state statutes enacted shortly after the Civil War that prohibited persons from carrying pistols and similar deadly weapons in public, either in a concealed or an open manner. For example, an 1881 Arkansas statute made it a misdemeanor for any person to "carry, in any manner whatever . . . any pistol of any kind whatever, except such pistols as are used in the army or navy of the United States," making exceptions only for carrying when "upon a journey, or upon his own premises." Ch. 96, §§ 1-2, 1881 Ark. Acts at 191-92. Similarly, an 1875 Wyoming statute made it unlawful for anyone "to bear upon his person, concealed or openly, any fire-arm or other deadly weapon, within the limits of any city, town or village." Act of Dec. 2, 1875, ch. 52, § 1, 1876 Wyo. Terr. Comp. Laws 352, 352. An 1870 Tennessee statute made it a crime "for any person to publicly or privately carry" certain enumerated weapons, including a "pocket pistol or revolver," except on journeys out of his county of the state. Ch. 13, § 1, 1870 Tenn. Acts at 28. And an 1871 Texas statute prohibited any carrying of a pistol, with exceptions for carrying of arms on one's own premises or place of business and for one who "has reasonable grounds

for fearing an unlawful attack on his person, and that such ground of attack shall be immediate and pressing." Ch. 34, § 1, 1871 Tex. Gen. Laws at 25.

Moreover, these later nineteenth-century statutes prohibiting or restricting both open *and* concealed carrying were upheld against state constitutional challenge, thus confirming that public carrying of concealable weapons has been understood to fall outside the scope of the right to bear arms. To be sure, holdings under state constitutions do not necessarily map onto analysis under the Second Amendment because state provisions declaring a right to bear arms vary considerably in language, structure, and history. But state constitutional holdings recognizing certain conduct as unprotected by the right to bear arms nonetheless provide useful evidence about the scope of the federally protected right.

In *English v. State*, for example, the Texas Supreme Court upheld the 1871 prohibition on open and concealed carrying which contained an exception—far more restrictive than New York's "proper cause" requirement—for those with an "immediate and pressing" ground to fear an "unlawful attack." 35 Tex. 473 (1871). The court observed that

the statute made "all necessary exceptions, and point[ed] out the place, the time and the manner in which certain deadly weapons may be carried as means of self-defense," and concluded that "these exceptional cases . . . fully cover[ed] all the wants of society." *Id.* at 477. The Arkansas Supreme Court similarly upheld that State's prohibition (with limited exceptions) on carrying pistols openly or in a concealed manner. *Fife v. State*, 31 Ark. 455 (1876). *Fife* noted "that the pistol intended to be proscribed is such as is usually carried in the pocket, or of a size to be concealed about the person"—a statement that highlights the dangers posed by the inherent concealability of handguns, regardless of whether they happen to be carried openly at a particular moment. *Id.* at 461. Likewise, the Tennessee Supreme Court upheld the State's 1870 statute prohibiting both open and concealed carrying of pistols under the state constitution, expressly noting that possession of arms outside the home was appropriately regulated for the protection of the public. *Andrews v. State*, 50 Tenn. 165, 186 (1871) (observing that, when a person "goes among the people in public assemblages where others are to be affected by his conduct, then he brings himself within the pale of public regulation, and must submit to such restriction on the

mode of using or carrying his property as the people through their Legislature, shall see fit to impose for the general good").

Even if it were true, and it is not, that the historical tradition upholding bans on concealed carrying of handguns occurred against a backdrop where open carrying was permitted, that would not support plaintiffs' position in this case, for it is a concealed-handgun license that they seek. Despite plaintiffs' assertion that they do *not* argue for a right to carry a handgun "in, specifically, a concealed manner" (Br. at 32), that is precisely the claim that they have brought in this lawsuit. Their complaint challenges only the "proper cause" requirement for obtaining a concealed carry license (*see* J.A. 25 (first and second counts of amended complaint), not those provisions of Penal Law §§ 265.01 and 265.03 that generally prohibit any unlicensed possession of handguns. Moreover, plaintiffs' prayer for relief seeks an order directing the defendant licensing officers to issue them a concealed-handgun license, and an injunction against enforcement of the "proper cause" requirement for issuance of a concealed carry license. (J.A. 26.)

Indeed, plaintiffs seemingly acknowledge that modern legislatures facing the realities of contemporary society may permissibly prohibit

open carrying of handguns in public: they concede that "today, openly carrying handguns may alarm individuals unaccustomed to firearms." Br. for Pls.-Appellants at 37. But plaintiffs draw the wrong conclusion from the fact that the conditions of contemporary life may make open carrying unacceptable today in a way that was not always true in the nineteenth century. If anything, this would mean only that the basis for restricting open carrying has increased over time as society has changed; it would not elevate concealed carrying to constitutionally protected status, in the face of the long history of state concealed-weapons laws.[13]

---

[13] Changing views about firearms may provide another explanation for plaintiffs' choice to challenge only New York's restriction on concealed carrying of handguns. Many private parties—such as homeowners and business owners—might choose to exclude persons openly carrying handguns from their property, thus making it impractical for plaintiffs to carry their handguns openly in their daily lives. *Cf. Gonzalez v. Vill. of W. Milwaukee*, No. 10-2356, __ F.3d __, 2012 WL 313572, at *9 n.3 (7th Cir. Feb. 2, 2012) (noting "additional complexity" of Second Amendment claim where "open carrying occurred on private property").

## C. The "Proper Cause" Requirement Would Satisfy Means-End Scrutiny If Such Scrutiny Were Applicable.

Plaintiffs' primary argument in this appeal rests on First Amendment prior restraint doctrine (*see* Br. at 39-54), which the state defendants refute in Part D below. In the alternative, plaintiffs argue (*id.* at 54-62) that the "proper cause" requirement fails means-end scrutiny under the Second Amendment. But even if New York's law burdened conduct that is protected under the Second Amendment, which it does not, the law would survive Second Amendment scrutiny because it is substantially related to important governmental interests in public safety.

### 1. The appropriate level of scrutiny would be intermediate scrutiny.

As the district court observed, in *Heller* the Supreme Court "declined to articulate the level of scrutiny that applies to claims, such as Plaintiffs', challenging the constitutionality of statutes under the Second Amendment." (SPA 36.) *See Booker,* 644 F.3d at 22 (1st Cir.); *Masciandaro*, 638 F.3d at 466-67 (4th Cir.); *Reese*, 627 F.3d at 801 (10th Cir.). The Court concluded in *Heller* that it did not need to address the

appropriate level of scrutiny because the Second Amendment "surely elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home." 554 U.S. at 635.

Plaintiffs urge this Court to apply strict scrutiny to New York's concealed-handguns law, but no circuit court has applied strict scrutiny to a regulation on firearms. Rather, the courts of appeals have applied intermediate scrutiny to a range of restrictions on firearms. *See Booker*, 644 F.3d at 25 (First Circuit holding that a "categorical ban on gun ownership by a class of individuals" is subject to intermediate scrutiny); *Marzzarella*, 614 F.3d at 97 (Third Circuit applying intermediate scrutiny to statute prohibiting possession of firearm with serial number obliterated); *Masciandaro*, 638 F.3d at 471 (Fourth Circuit holding that regulation prohibiting possession of loaded handgun in a national park subject to intermediate scrutiny); *Skoien*, 614 F.3d at 641-42 (Seventh Circuit, in an en banc opinion, holding that "categorical limit on the possession of firearms" subject to intermediate scrutiny); *Reese*, 627 F.3d at 802 (Tenth Circuit holding that statute prohibiting possession of firearm while under a domestic protection order is subject to intermediate scrutiny).

Certainly, laws regulating the carrying of handguns in public *outside* the home are longstanding and common, and do not warrant the level of scrutiny that may be appropriate for laws restricting handgun possession in the home for self-defense. Consequently, laws regulating the carrying of handguns in public outside the home should not be subject to strict scrutiny. As the Fourth Circuit observed in *Masciandaro*, "as we move outside the home, firearm rights have always been more limited, because public safety interests often outweigh individual interests in self-defense." 638 F.3d at 470. Indeed, as discussed above, the Supreme Court itself indicated that "prohibitions on carrying concealed weapons" were among the many regulations of firearms that would likely pass constitutional muster. *Heller*, 554 U.S. at 626.

The D.C. Circuit has aptly summarized the reasons that intermediate scrutiny, not strict scrutiny, should apply to regulations that do not implicate the Second Amendment's "core right" to possess a handgun in the home for self-defense: "a regulation that imposes a substantial burden upon the core right of self-defense protected by the Second Amendment must have a strong justification, whereas a

regulation that imposes a less substantial burden should be proportionately easier to justify." *Heller II*, 2011 WL 4551558, at *9. For similar reasons, the Fourth Circuit determined that a "lesser showing" than demanded under strict scrutiny "is necessary with respect to laws that burden the right to keep and bear arms outside of the home." *Masciandaro*, 638 F.3d at 471. The court noted the "privileged interpretive role in the Second Amendment context" played by "historical meaning," and observed that an 1847 Georgia Supreme Court case relied on in *Heller* "upheld a state concealed carry ban after applying review of a decidedly less-than-strict nature." *Id.* at 470.

Plaintiffs wrongly claim that New York's law "implicat[es] the core rights of responsible, law-abiding citizens to engage in an activity whose protection is literally enumerated" in the Constitution. Br. for Pls.-Appellants at 59.[14] The "core right" recognized in *Heller* and *McDonald*

_____

[14] Plaintiffs cite the Seventh Circuit's decision in *Ezell* which, in striking down Chicago's prohibition on firing ranges, stated that it was applying something more than intermediate scrutiny, but did not describe its analysis as applying strict scrutiny, 651 F.3d at 708-09. But *Ezell* viewed the firing-range ban as eviscerating the core right to possess handguns in the home recognized in *Heller* and *McDonald*: "The right to possess firearms for protection implies a corresponding right to

*(continued on the next page)*

is the right to possession in the home for self-defense, not a right to carry a concealed handgun outside the home in all manner of public places. *See, e.g., United States v. Staten*, No. 10-5318, __ F.3d __, 2011 WL 6016976, at \*2 (4th Cir. Dec. 5, 2011) ("[T]he core right of the Second Amendment is 'the right of law-abiding, responsible citizens to use arms in defense of hearth and home.'" (quoting *Heller*)); *Reese*, 627 F.3d at 800 (same); *Marzzarella*, 614 F.3d at 92 ("At its core, the Second Amendment protects the right of law-abiding citizens to possess non-dangerous weapons for self-defense in the home" (footnote omitted)); *Ezell*, 651 F.3d at 689 ("[T]he core component of [the Second Amendment right] . . . is the right to possess operable firearms—handguns included—for self-defense, most notably in the home."); *Masciandaro*, 638 F.3d at 467 (Niemeyer, J., writing separately) ("I would reject Masciandaro's argument that his car, even when he

---

acquire and maintain proficiency in their use; the core right wouldn't mean much without the training and practice that make it effective." *Id.* at 704. By contrast, restrictions on a person's ability to obtain a full-carry license for a concealed handgun impose no burden on the person's right to possess a handgun in the home.

slept in it frequently, was his 'home' so as to fall within the core protection articulated.").

Plaintiffs are also incorrect in contending that New York's law "does not function as one restricting the right [to keep and bear arms] as to time, place, or manner," but rather restricts that right "generally, at all times and places." Br. for Pls.-Appellants at 59-60. The "proper cause" provision is clearly a regulation of the place and manner of handgun possession. The provision does not apply to possession of handguns in the home: rather, home possession is governed by Penal Law § 400.00(2)(a), which contains no "proper cause" requirement. Nor does the "proper cause" provision apply to possession or carrying of long guns, which generally does not even require a license. Moreover, applicants may obtain a license to carry a concealed handgun for the purpose of target shooting or hunting—as three of the plaintiffs here have done—without showing any special need for self-defense. And applicants may obtain other restricted concealed-carry licenses based on the nature of their employment. *E.g.*, § 400.00(2)(b)-(c).

Because plaintiffs have presented no authority and no persuasive argument supporting application of strict scrutiny, this Court should, as

did the district court, "join the multitude of other cases applying intermediate scrutiny" (SPA 51), if it finds that the "proper cause" provision burdens conduct protected by the Second Amendment at all.

### 2. New York's "proper cause" requirement satisfies intermediate scrutiny.

The State's interests in public safety and crime prevention are indisputably compelling. *United States v. Salerno*, 481 U.S. 739, 745 (1987); *Schall v. Martin*, 467 U.S. 253, 264 (1984); *see also Schenck v. Pro-Choice Network of W.N.Y.*, 519 U.S. 357, 375-76 (1997) (content-neutral injunction against First Amendment conduct justified by government interest in "public safety and order"). Indeed, plaintiffs concede (Br. at 60) that the State "has a compelling interest in regulating firearms in the interest of public safety."

Plaintiffs contend, however, that the statute they challenge does not reasonably serve that compelling interest. But they completely overlook the many ways in which widespread possession of concealed handguns would transform public spaces in New York. As the federal district court upholding California's concealed-weapons law recently observed:

> [T]he government has an important interest in reducing the number of concealed weapons in public in order to reduce the risks to other members of the public who use the streets and go to public accommodations. The government also has an important interest in reducing the number of concealed handguns in public because of their disproportionate involvement in life-threatening crimes of violence, particularly in streets and other public places. Defendant's policy relates reasonably to those interests.

*Peruta*, 758 F. Supp. 2d at 1117 (record citations omitted); *see* SPA 54. The risks of increased or widespread possession of handguns in public spaces are similar to those presented by the presence of handguns in "sensitive places such as schools and government buildings," *Heller*, 554 U.S. at 626, places where the Supreme Court stated that the government may prohibit the possession of firearms completely. For these purposes, an urban sidewalk or commuter train crowded with people of all ages is very similar to a government building or school: all are places in which the intentional or accidental use of a firearm may cause mayhem, and in which even the presence of a firearm may cause dangerous panic.

Plaintiffs also ignore the fact that New York's "proper cause" requirement is appropriately oriented toward assessing the applicant's need to carry a concealed weapon for self-defense. Limiting the public

carrying of handguns to those persons who are able to demonstrate a special self-defense need to carry a handgun outside the home is a reasonable way to protect public safety and to protect members of the public from the dangers of handguns, while according appropriate respect to individuals with a demonstrated need to possess firearms outside the home for purposes of self-defense. New York's law is less restrictive than laws absolutely prohibiting the carrying of concealed weapons, but does properly require that persons seeking to carry handguns outside the home and to introduce those deadly weapons into public places have some justification beyond the mere desire to do so.

In short, the result plaintiffs seek—nullification of the "proper cause" requirement, resulting in automatic issuance of concealed-carry licenses to all applicants meeting threshold requirements such as age and absence of a criminal record—would change dramatically the public spaces we all inhabit. Unlike possession in the home, the possession of a handgun in public places subjects all others present in those places to the dangers—intentional and accidental—presented by the handgun. *See People v. Mimes*, 2011 Ill. App. (1st) 082747, ¶¶ 56, 72, 953 N.E.2d 55, 70, 77 (2011) (reasoning, in upholding a statute "criminaliz[ing] the

open carrying of a loaded firearm on one's person on a public street," that the law was "justified by the potential deadly consequences to innocent members of the general public when someone carrying a loaded and accessible gun is either mistaken about his need for self-defense or just a poor shot"). Concealed carrying also makes it more difficult and expensive for property owners, whether business owners or home owners, to prevent others from bringing handguns onto their property if they would like to do so. This feature of the carrying of concealed weapons outside the home—the fact that by its nature such carrying subjects vast numbers of people to safety risks against their will—makes concealed carrying an appropriate subject for regulation through the collective judgment of the People's elected representatives.

In addition, increased concealed carrying of handguns renders the work of police in targeting the illegal use of handguns more difficult, and requires greater public resources to be devoted to the higher risks to public safety posed by the greater prevalence of handguns. (J.A. 546-547 (Andrew Lunetta, New York City Police Department Deputy Inspector).) The Deputy Superintendent of the New York State Police aptly framed the dangers:

> The easy accessibility of a gun in public can increase the danger associated with emotional confrontations, such as road rage incidents, disputes involving broken relationships, or suicide attempts. One who is depressed or cannot control anger or emotions may pose a greater danger in public if he or she can simply draw a gun from a waistband. Numerous unknown people may be present and the surroundings may be unfamiliar to the shooter. Uninvolved and innocent bystanders can be placed at great risk.

(J.A. 527 (Thomas L. Fazio).)

Plaintiffs nonetheless assert (Br. at 61) that New York's "proper cause" provision is not "even rationally tailored" to the interest in public safety, based largely on their own speculation that violent crimes would be reduced if carrying of concealed weapons in public were broadly prohibited—speculation that is refuted by expert opinions in the record (*see, e.g.*, J.A. 453 (Cook)). And plaintiffs' unsupported assertions run counter to the expert testimony presented to the district court showing that widespread access to handguns increases the likelihood that felonies will result in death and fundamentally alters the safety and character of public spaces. (*See* J.A. 453 (Cook), 489-490 (Zimring).) Plaintiffs' argument also fails to account for *Heller*'s statement that governments may continue to enforce "measures regulating handguns," 554 U.S. at 636, in part because the Second Amendment right is "not a

right to keep and carry any weapon whatsoever in any manner whatsoever and for any purpose," *id.* at 626 (giving as a example "prohibitions on carrying concealed weapons").

## D. Plaintiffs' Reliance on First Amendment Prior Restraint Doctrine Is Misplaced and Unavailing.

As their primary argument in this appeal, plaintiffs (Br. at 39-54) urge the Court to apply First Amendment prior restraint doctrine in analyzing the constitutionality of the "proper cause" provision, and to strike down New York's law because it purportedly vests licensing officials with "unbridled discretion" in considering applications for concealed-handgun licenses. But the argument fails on both counts, even assuming for the sake of argument that the public carrying of concealed weapons is protected conduct under the Second Amendment. First, prior restraint doctrine has no place under the Second Amendment; rather, the prior restraint doctrine is rooted in concerns about government censorship that are specific to the First Amendment. Second, even if prior restraint doctrine were to apply here, the "proper cause" requirement would satisfy the doctrine because it applies an

objective standard that does not afford licensing officials uncontrolled discretion.

The prior restraint doctrine holds that "a law subjecting the exercise of First Amendment freedoms to the prior restraint of a license, without narrow, objective, and definite standards to guide the licensing authority, is unconstitutional." *Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 150-51 (1969) (striking down a city ordinance that, as written, afforded officials "virtually unbridled and absolute power" to prohibit any parade, procession, or demonstration on the city's streets); *see also Staub v. City of Baxley*, 355 U.S. 313, 322 (1958) (striking down a city law prohibiting solicitation without a license and leaving the decision whether to grant a license to "the uncontrolled will of an official"). The prior restraint doctrine is rooted in concerns about government censorship of the public expression of ideas:

> Even when the use of its public streets and sidewalks is involved, . . . a municipality may not empower its licensing officials to roam essentially at will, dispensing or withholding permission to speak, assemble, picket, or parade according to their own opinions regarding the potential effect of the activity in question on the 'welfare,' 'decency,' or 'morals' of the community.

*Shuttlesworth*, 394 U.S. at 153. The doctrine rejects unchanneled government discretion in the licensing of public expression, couched in terms of broadly defined goals such as promoting the public welfare, because such discretion may easily serve as a device for content- and viewpoint-based discrimination against dissenting, controversial, or unpopular ideas. *Cf. Niemotko v. Maryland*, 340 U.S. 268, 282 (1951) (Frankfurter, J., concurring) (distinguishing "[a] licensing standard which gives an official authority to censor the content of a speech . . . from one limited by its terms, or by nondiscriminatory practice, to considerations of public safety and the like.").

Given that prior restraint doctrine is driven by these concerns about government censorship—concerns that are specific to the First Amendment—it is unsurprising that not a single court has ever applied prior restraint doctrine in analyzing Second Amendment rights. *See Piszczatoski*, 2012 WL 104917, at *17 (rejecting plaintiff's attempt to import prior restraint doctrine into Second Amendment analysis because the doctrine was developed "in light of particular censorship related concerns" underlying the First Amendment). Courts have more generally rejected attempts to engraft the First Amendment's

substantive analytical framework onto the Second Amendment.  *See, e.g., Richards v. County of Yolo*, No. 09-cv-1235, 2011 WL 1885641, at *9 (E.D. Cal. May 16, 2011) ("The Court sees no reason to analogize rights under the Second Amendment to those under the First, as plenty of case authority exists to provide a clear framework of analysis to facial challenges, without poaching precedent from another Amendment's framework.").

Even if prior restraint doctrine were applicable here, and it is not, New York's "proper cause" requirement would satisfy the doctrine because the requirement is not standardless, but rather is well defined in New York law.  As discussed above, the New York courts have construed the term "proper cause," as applied to requests for a full-carry concealed-handgun license, to mean that the applicant has "a special need for self-protection distinguishable from that of the general community or of persons engaged in the same profession."  *Matter of Klenosky*, 75 A.D.2d at 793.  Contrary to plaintiffs' arguments (Br. at 45), the "proper cause" requirement frames an objective, not subjective, inquiry; the fact that the inquiry calls for the exercise of judgment hardly renders it subjective.  The "proper cause" requirement therefore

does not vest "unfettered discretion" in licensing officials. *See Prayze FM v. FCC*, 214 F.3d 245, 252 (2d Cir. 2000); *see also Piszczatoski*, 2012 WL 104917 at *17-*18. Nor does New York's law make licensure dependent on "broad criteria entirely unrelated to legitimate . . . regulation" of public spaces. *Shuttlesworth*, 394 U.S. at 153. Consequently, New York's law would satisfy prior restraint doctrine even if that doctrine were properly applied here.

# CONCLUSION

For all of the foregoing reasons, the this Court should affirm the judgment of the District Court.

Dated:  New York, New York
        February 8, 2012

Respectfully submitted,

ERIC T. SCHNEIDERMAN
  *Attorney General of the*
  *State of New York*
Attorney for the State Appellees

By:   /s/ Simon Heller
      SIMON HELLER
      Assistant Solicitor General

      120 Broadway, 25th Floor
      New York, NY 10271
      (212) 416-8025

BARBARA D. UNDERWOOD
  *Solicitor General*
RICHARD DEARING
  *Deputy Solicitor General*
SIMON HELLER
  *Assistant Solicitor General*
    *of Counsel*

# CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(a)(7)(C) of the Federal Rules of Appellate Procedure, Oren L. Zeve, an employee in the Office of the Attorney General of the State of New York, hereby certifies that according to the word count feature of the word processing program used to prepare this brief, the brief contains 10,664 words and complies with the type-volume limitations of Rule 32(a)(7)(B).

_/s/ Oren L. Zeve_
Oren L. Zeve