# 11-3642-cv(L)
## 11-3962-cv(XAP)

IN THE

# United States Court of Appeals
### FOR THE SECOND CIRCUIT

▶▶◀◀

ALAN KACHALSKY, CHRISTINA NIKOLOV, JOHNNIE NANCE, ANNA MARCUCCI-NANCE, ERIC DETMER, SECOND AMENDMENT FOUNDATION, INC.,

*Plaintiffs-Appellants-Cross-Appellees,*

*v.*

COUNTY OF WESTCHESTER,

*Defendant-Appellee-Cross-Appellant,*

*and*

SUSAN CACACE, JEFFREY A. COHEN, ALBERT LORENZOR, ROBERT K. HOLDMAN,

*Defendants-Appellees.*

———————————

*On Appeal from the United States District Court for the Southern District of New York (White Plains)*

## RESPONSE AND REPLY BRIEF FOR PLAINTIFFS-APPELLANTS-CROSS-APPELLEES

Alan Gura
GURA & POSSESSKY, PLLC
*Attorneys for Plaintiffs-Appellants-*
  *Cross-Appellees*
101 North Columbus Street, Suite 405
Alexandria, Virginia 22314
703-835-9085

*Date Completed: April 3, 2012*

# CORPORATE DISCLOSURE STATEMENT

The Second Amendment Foundation, Inc. has no parent corporations. No publicly traded company owns 10% or more of appellant corporation's stock.

Dated: April 3, 2012          Respectfully submitted,
                                   Second Amendment Foundation, Inc.


                              By: /s/ Alan Gura_____
                                   Alan Gura
                                   Counsel for Appellants/
                                   Cross-Appellees

# TABLE OF CONTENTS

Table of Authorities.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

Standard of Review. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Summary of Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

I.  POST-*HELLER* COURTS CONTINUE TO UPHOLD THE RIGHT TO
    BEAR ARMS OUTSIDE THE HOME.. . . . . . . . . . . . . . . . . . . . . . . . . . 7

II. OPINIONS DENYING THE EXISTENCE OF THE RIGHT TO BEAR ARMS
    CONTRADICT OR MISREAD SUPREME COURT PRECEDENT. . . . . . . . 10

III. PROHIBITING ALL HANDGUN CARRY HAS NEVER BEEN
     CONSISTENT WITH THE RIGHT TO BEAR ARMS. . . . . . . . . . . . . . . 16

     A.    *Heller* Acknowledged the Long Legal Tradition of
           Protecting the Right to Carry Defensive Arms,
           Including Handguns.. . . . . . . . . . . . . . . . . . . . . . . . . . 16

     B.    Tradition Supports Neither General Handgun
           Carry Prohibition, Nor New York's Form
           of Restriction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

IV. PRIOR RESTRAINT DOCTRINE APPLIES TO THE
    SECOND AMENDMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

V.  THE "PROPER CAUSE" STANDARD FAILS ANY LEVEL OF
    MEANS-ENDS SCRUTINY. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

    A.     Defendants Confirm That the "Proper Cause"
           Requirement Is Unsupported By a Valid
           Governmental Interest.. . . . . . . . . . . . . . . . . . . . . . . . 33

B.      The "Proper Cause" Requirement Does Not Fit
        the Alleged Government Interest As Required
        Under Intermediate Scrutiny Analysis. . . . . . . . . . . . . . . 40

VI.   WESTCHESTER COUNTY IS RESPONSIBLE FOR ENFORCING
      THE "PROPER CAUSE" STANDARD. . . . . . . . . . . . . . . . . . . . . . . . 47

           A.        Westchester County Is A Proper Party. . . . . . . 47

           B.        Westchester County Is Liable for the
                     Foreseeable Consequences of Its Conduct. . . .   49

           C.        The Complaint Contains Sufficient Factual
                     Allegations Against the County. . . . . . . . . . . .   53

Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

# TABLE OF AUTHORITIES

Cases

*Andrews* v. *State*,
50 Tenn. 165 (1871) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Back* v. *Hastings on Hudson Union Free Sch. Dist.*,
365 F.3d 107 (2d Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

*Bateman* v. *Perdue*, No. 5:10-CV-265-H,
__ F. Supp. 2d __ (E.D.N.C. March 29, 2012). . . . . . . . . . . . 2, 9, 45

*Bliss* v. *Commonwealth*,
12 Ky. 90 (1822). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Bridgeway Corp.* v. *Citibank*,
201 F.3d 134 (2d Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

*Britt* v. *State*,
363 N.C. 546, 681 S.E.2d 320 (2009). . . . . . . . . . . . . . . . . . . . . . 41

*Buck* v. *Bell*,
274 U.S. 200 (1927). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*City of Las Vegas* v. *Moberg*,
82 N.M. 626, 485 P.2d 737 (N.M. Ct. App. 1971). . . . . . . . . . . . 18

*Commonwealth* v. *Blanding*,
20 Mass. 304 (1825) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Dearth* v. *Holder*,
641 F.3d 499 (D.C. Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . 48

*Denius* v. *Dunlap*,
330 F.3d 919 (7th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*District of Columbia* v. *Heller*,
554 U.S. 570 (2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

*English* v. *State*,
35 Tex. 473 (1871) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 24

*Ezell* v. *City of Chicago*,
651 F.3d 684 (7th Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . 7, 35

*Fife* v. *State*,
31 Ark. 455 (1876) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Fletcher* v. *Haas*, No. 11-10644-DPW,
2012 U.S. Dist. LEXIS 44623 (D. Mass. March 30, 2012). . . 45, 46

*In re Application of McIntyre*,
552 A.2d 500 (Del. Super. 1988). . . . . . . . . . . . . . . . . . . . . . . . 26

*In re Brickey*,
8 Idaho 597, 70 P. 609 (1902).. . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Kellogg* v. *City of Gary*,
562 N.E.2d 685 (Ind. 1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Kerman* v. *City of New York*,
374 F.3d 93 (2d Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . 49, 50

*Malley* v. *Briggs*,
475 U.S. 335 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49, 51

*McDonald* v. *City of Chicago*,
130 S. Ct. 3020 (2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

*Minnesota* v. *Carter*,
525 U.S. 83 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Morris* v. *State*,
    342 So. 2d 417 (Ala. Cr. App. 1977)......................... 26

*Mosby* v. *Devine*,
    851 A.2d 1031 (R.I. 2004)................................. 32

*O'Neill* v. *State*,
    16 Ala. 65 (1849) ....................................... 21

*Parker* v. *District of Columbia*,
    478 F.3d 370 (D.C. Cir. 2007). .......................... 48

*Payton* v. *New York*,
    445 U.S. 573 (1980) ..................................... 15

*People* v. *Zerillo*,
    219 Mich. 635, 189 N.W. 927 (1922). ...................... 32

*Piszczatoski* v. *Filko*, No. 10-CV-06110,
    2012 U.S. Dist. LEXIS 4293 (D.N.J. Jan. 12, 2012). ....... 12, 13

*Respublica* v. *Oswald*,
    1 U.S. (1 Dall.) 319 (Pa. 1788) ........................... 31

*Rex* v. *Knight*,
    90 Eng. Rep. 330 (K.B. 1686)............................. 19

*Richards* v. *County of Yolo*, No. 2:09-CV-01235
    2011 U.S. Dist. LEXIS 51906 (E.D. Cal. May 16, 2011),
    *appeal pending*, No. 11-16255 (9th Cir. filed May 16, 2011). .... 11

*Schubert* v. *De Bard*,
    398 N.E.2d 1339 (Ind. App. 1980). ...................... 18, 32

*Schwan-Stabilo Cosmetics GmbH & Co.* v. *PacificLink Int'l Corp.*,
    401 F.3d 28 (2d Cir. 2005)................................. 1

*Silverman* v. *United States*,
365 U.S. 505 (1961). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Simon & Schuster, Inc.* v. *N.Y. State Crime Victims Bd.*,
502 U.S. 105 (1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Simpson* v. *State*,
13 Tenn. 356 (1833) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 22

*State ex rel. City of Princeton* v. *Buckner*,
180 W. Va. 457, 377 S.E.2d 139 (1988). . . . . . . . . . . . . . . . 18, 32

*State* v. *Bailey*,
209 Conn. 322, 551 A.2d 1206 (1988) . . . . . . . . . . . . . . . . . . . 17

*State* v. *Blocker*,
291 Or. 255, 630 P.2d 824 (1981) . . . . . . . . . . . . . . . . . . . . . . . 14

*State* v. *Hogan*,
63 Ohio St. 202, 58 N.E. 572 (1900). . . . . . . . . . . . . . . . . . . 18, 22

*State* v. *Huntly*,
25 N.C. (3 Ired.) 418 (1843) . . . . . . . . . . . . . . . . . . . . . . . . . 17, 23

*State* v. *Kessler*,
289 Or. 359, 614 P.2d 94 (1980). . . . . . . . . . . . . . . . . . . . . . . . 14

*State* v. *Langford*,
10 N.C. (3 Hawks) 381 (1824) . . . . . . . . . . . . . . . . . . . . . . . . . 22

*State* v. *Lanier*,
71 N.C. 288 (1874) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*State* v. *Reid*,
1 Ala. 612 (1840) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*State* v. *Rosenthal*,
    55 A. 610 (Vt. 1903) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*State* v. *Schoultz*,
    25 Mo. 128 (1857) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*State v. Valentine*,
    307 A.2d 617 (N.J. Super. Ct. App. Div. 1973). . . . . . . . . . . 12, 13

*Staub* v. *City of Baxley*,
    355 U.S. 313 (1958). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Townes* v. *City of New York*,
    176 F.3d 138 (2d Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

*United States* v. *Barton*,
    633 F.3d 168 (3d Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . 41, 42

*United States* v. *Carter*,
    669 F.3d 411 (4th Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*United States* v. *Chester*,
    628 F.3d 673 (4th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . 30, 41

*United States* v. *Mahin*,
    668 F.3d 119 (4th Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

*United States* v. *Marzzarella*,
    614 F.3d 85 (3d Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*United States* v. *Masciandaro*,
    638 U.S. 458 (4th Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*United States* v. *Moore*,
    666 F.3d 313 (4th Cir. 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*United States* v. *Reese*,
627 F.3d 792 (10th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*United States* v. *Rehlander*,
666 F.3d 45 (1st Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

*United States* v. *Weaver*,
No. 2:09-CR-00222, 2012 U.S. Dist. LEXIS 29613
(S.D. W. Va. March 7, 2012).. . . . . . . . . . . . . . . . . . . . . . . . 2, 9, 11

*United States* v. *Williams*,
616 F.3d 685 (7th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . 42

*Valley Forge Christian Coll.* v. *Ams. United for Separation of Church and State, Inc.*,
454 U.S. 464 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Vuitton* v. *Ly-USA, Inc.*, No. 08-4483-CV,
2012 U.S. App. LEXIS 6391 (2d Cir. March 29, 2012). . . . . . . . . 37

*Warner* v. *Orange County Dep't of Probation*,
115 F.3d 1068 (2d Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . 49-51

*Watson* v. *Stone*,
4 So. 2d 700 (Fla. 1941) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Woodling* v. *Garrett Corp.*,
813 F.2d 543 (2d Cir. 1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

*Woollard* v. *Sheridan*, No. L-10-2068,
2012 U.S. Dist. LEXIS 28498 (D. Md. March 2, 2012) .. 2, 8, 9, 25, 31, 33, 43-45

*Zahrey* v. *Coffey*,
221 F.3d 342 (2d Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

## Constitutional Provisions

Ala. Const. of 1819, art. I, § 27. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Conn. Const. art. I, § 15 (1819). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Ky. Const. of 1799, art. XII, cl. 23. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Mo. Const. of 1820, art. XIII, § 3. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

N.C. Declaration of Rights § 17 (1776). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Or. Const. art. I, § 27 (1857). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Tenn. Const. of 1796, art. XI, § 26. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Vt. Const. c. 1, art. 16 (1777) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

## Statutes and Rules

11 Del. Code Ann. § 1441 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

11 Del. Code Ann. § 1442. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

18 Pa. Cons. Stat. Ann. § 6109(e). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

18 U.S.C. § 922(g)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

18 U.S.C. § 922(g)(3). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42, 43

18 U.S.C. § 922(g)(4) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

18 U.S.C. § 922(g)(8). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

2010 Ariz. Sess. Laws 59. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

21 Okla. Stat. Ann. § 1290.12(A)(12). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

25 Me. Rev. Stat. Ann. § 2003(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

28 U.S.C. § 2403. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

42 U.S.C. § 1983. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 47-49

Ala. Code § 13A-11-73. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Ala. Code § 13A-11-75. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Alaska Stat. § 18.65.700(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Ariz. Rev. Stat. § 13-3102(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Ariz. Rev. Stat. § 13-3112(A). . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 26

Ark. Code Ann. § 5-73-309. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Colo. Rev. Stat. Ann.  § 18-12-203(1). . . . . . . . . . . . . . . . . . . . . . . . 25

Conn. Gen. Stat. § 29-32b(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Fed. R. App. Proc. 43(c)(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

Fed. R. Civ. Proc. 5.1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

Fla. Stat. Ann. § 790.06(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Ga. Code Ann. § 16-11-129(d)(4). . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Idaho Code Ann. § 18-3302(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Ind. Code Ann. § 35-47-2-3(e). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Iowa Code Ann. § 724.7(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Kan. Stat. Ann. § 75-7c03(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Ky. Rev. Stat. Ann. § 237.110(4). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

La. Rev. Stat. Ann. § 40:1379.3(A)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Md. Public Safety Code § 5-306(a)(5)(ii). . . . . . . . . . . . . . . . . . . . . . . . . 2

Md. Public Safety Code § 5-306(a)(5)(i). . . . . . . . . . . . . . . . . . . . . . . . 44

Mich. Comp. Laws Ann. § 28.422(3). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Minn. Stat. § 624.714, subdiv. 2(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Miss. Code Ann. § 45-9-101(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Mo. Ann. Stat. § 571.101(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Mont. Code Ann. § 45-8-321(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

N.C. Gen. Stat. § 14-415.11(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

N.D. Cent. Code § 62.1-04-03(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

N.H. Rev. Stat. Ann. § 159.6(I). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

N.M. Stat. Ann. § 29-19-4(A). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

N.Y. Penal Law § 400.00(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Neb. Rev. Stat. § 69-2430(3). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Nev. Rev. Stat. Ann. § 202.3657(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Ohio Rev. Code Ann. § 2923.125(D)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Or. Rev. Stat. Ann. § 166.291. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

R.I. Gen. Laws § 11-47-11(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

S.C. Code Ann. § 23-31-215(A). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

S.D. Codified Laws § 23-7-7. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Tenn. Code Ann. § 39-17- 1351(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Tex. Gov't Code § 411.177(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Utah Code Ann. § 53-5-704(1)(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Va. Code Ann. § 18.2-308(D). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

W. Va. Code Ann. § 61-7-4(f). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Wash. Rev. Code Ann. § 9.41.070(1). . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Wyo. Stat. Ann. § 6-8-104(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

## Other Authorities

Charles Humphreys, A COMPENDIUM OF THE COMMON LAW
IN FORCE IN KENTUCKY (1822). . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

COLLECTED WORKS OF JAMES WILSON
(K. Hall & M. Hall eds., 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

David B. Kopel, *Pretend "Gun-Free" School Zones:
A Deadly Legal Fiction*, 42 CONN. L. REV. 515 (2009) . . . . . . . . . 38

David Caplan, *The Right of the Individual to Bear Arms:
A Recent Judicial Trend*, 4 DET. C. L. REV. 789 (1982) . . . . . . . . 19

Eugene Volokh, *State Constitutional Rights to Keep and
Bear Arms*, 11 TEX. REV. LAW & POL. 191 (2006). . . . . . . . . . . . . . 17

http://licgweb. doacs.state.fl.us/stats/cw_monthly.pdf
(last visited April 2, 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

http://www.michigan.gov/documents/msp/
2011_CPL_Report_376632_7.pdf (last visited April 2, 2012). . . . 37

http://www.txdps.state.tx.us/administration/
crime_records/chl/ ConvictionRatesReport2009.pdf
(last visited April 2, 2012. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

John A. Dunlap, THE NEW-YORK JUSTICE (1815) . . . . . . . . . . . . . . . . . 20

Joyce Lee Malcolm, TO KEEP AND BEAR ARMS:
THE ORIGINS OF AN ANGLO-AMERICAN RIGHT (1994). . . . . . . . . . . 20

Restatement (Second) of Torts § 453, Comment b (1965). . . . . . . . . . . 50

Robert J. Cottrol and Raymond T. Diamond,
*"Never Intended to be Applied to the*
*White Population": Firearms Regulation*
*and Racial Disparity—the Redeemed*
*South's Legacy to a National Jurisprudence?,*
70 CHI.-KENT L. REV. 1307 (1995) . . . . . . . . . . . . . . . . . . . . . . . 23

William Blackstone, COMMENTARIES ON THE
LAWS OF ENGLAND (1769) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

William Hawkins, TREATISE OF THE PLEAS OF THE CROWN (1716). . . . 20

William Oldnall Russell, A TREATISE ON CRIMES AND
INDICTABLE MISDEMEANORS (1826). . . . . . . . . . . . . . . . . . . . . . . . 21

WORKS OF THE HONOURABLE JAMES WILSON
(Bird Wilson ed., 1804). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

STANDARD OF REVIEW

Cross-Appellant-Defendant County of Westchester ("County") errs in claiming that sua sponte grants of summary judgment are reviewed for abuse of discretion. County Br., at 8 (citing *Schwan-Stabilo Cosmetics GmbH & Co.* v. *PacificLink Int'l Corp.*, 401 F.3d 28, 33 (2d Cir. 2005)). District Courts may have "discretion" to grant summary judgment sua sponte, *id.*, but the practice is "firmly discouraged." *Bridgeway Corp.* v. *Citibank*, 201 F.3d 134, 139 (2d Cir. 2000). The sua sponte nature of the summary judgment grant does not shield the District Court's legal conclusions from de novo review.

SUMMARY OF ARGUMENT

It is no longer true that "Decisions Applying *Heller* and *McDonald* Uniformly Reject Second Amendment Challenges to Laws Restricting the Carrying of Handguns Outside the Home." Licensing Officials' Br., at 23;[1] County Br., at 14-15 ("Plaintiffs cite no post *Heller*

---

[1] Citing *District of Columbia* v. *Heller*, 554 U.S. 570 (2008) and *McDonald* v. *City of Chicago*, 130 S. Ct. 3020 (2010).

authority holding that there is a Second Amendment right to the possession of a pistol in public and, in fact, there does not appear to be any such authority") (footnotes omitted).

The District of Maryland just struck down a law virtually identical to New York's law here at issue for violating the Second Amendment. *Woollard* v. *Sheridan*, No. L-10-2068, 2012 U.S. Dist. LEXIS 28498 (D. Md. March 2, 2012) (striking down Md. Public Safety Code § 5-306(a)(5)(ii), requiring "good and substantial reason" to carry handgun). Almost immediately, another federal court found that the Second Amendment secures the right to carry a gun for self-defense outside the home. *United States* v. *Weaver*, No. 2:09-CR-00222, 2012 U.S. Dist. LEXIS 29613 (S.D. W. Va. March 7, 2012). And by month's end, a third federal court declared the Second Amendment "undoubtedly is not limited to the confines of the home," striking down North Carolina's prohibition on the carrying of handguns during declared state emergencies. *Bateman* v. *Perdue*, No. 5:10-CV-265-H, __ F. Supp. 2d __ (E.D.N.C. March 29, 2012).[2]

---

[2]Plaintiff-Appellant Second Amendment Foundation, Inc. ("SAF") prevailed as a plaintiff in *Woollard* and *Bateman*.

These are but the latest manifestations of a centuries-long legal tradition, reflected in *Heller* and *McDonald*, securing a right to carry arms outside the home for self-defense. That tradition was codified in the Second Amendment, as well as in state constitutional provisions, and has been enforced by numerous courts. It should be enforced here.

Faced with this longstanding legal tradition, and with *Heller*'s definition of "bear" as "carry," Defendants labor to change the subject. Individual Defendants alone repeat the word "concealed" one hundred and sixteen times. Since New York's handgun carry licenses authorize concealed carry, and since concealed carry could be banned outright, Defendants reason that Plaintiffs lack any constitutional interest in New York's license to carry a handgun for self-defense.

But statutes cannot redefine the scope of a constitutional right. New York's optional decision to authorize concealed carry as part of its only license for the right to bear arms does not re-write the Second Amendment. No matter how many times Defendants speak of "concealed" carry, Plaintiffs make no claim to this alleged straw-man "right." None of the relevant authorities upholding the right to bear

arms speak of a right to carry, specifically, in a *concealed* manner. As *Heller* acknowledged, guns may be carried with or without concealment—just as the right of free speech can be exercised in a variety of ways. But the right of free speech is not limited to one particular manner, which may be prohibited where ample alternatives exist, and neither is that the case with the Second Amendment.

Indeed, almost all of the authorities for upholding bans on the concealed carry of arms point out that such prohibitions would be unconstitutional if they extended to all forms of carry. Defendants cannot pick and choose from the history only those practices which are to their liking, invoking the restriction but discarding the right that it regulates. The Second Amendment is not "all exceptions, no right." Defendants are free to prohibit or regulate the concealed carrying of handguns—but only if individuals retain some practical means of bearing arms.

Having chosen to channel the entire right to bear arms into a licensing scheme, New York cannot afford its officials unbridled licensing discretion. Defendants claim New York's law is constitutional

because it "does not enact a complete ban on carrying handguns outside the home, but rather allows persons to obtain a license to carry handguns on a showing of proper cause." Licensing Officers' Br., at 33 n.12. The argument would be no different if it read, "New York does not enact a complete ban on speaking outside the home, but rather allows persons to obtain a license to speak on a showing of proper cause." Or perhaps, "New York does not enact a complete ban on abortions, but rather allows persons to obtain a license to have an abortion on a showing of proper cause."

Licensing predicates such as "proper cause" contradict the notion that the activity being licensed enjoys constitutional status as a protected *right*. That simple concept is at the heart of the Supreme Court's prior restraint doctrine, and it requires reversal here. Contrary to Defendants' assertions, prior restraint doctrine has long been applied to the right to bear arms. Nor may Defendants balance away the Second Amendment. As there exists a right to bear arms, Professors Cook and Zimring's opinions that doing so is a bad idea are irrelevant. Even if suppression of a constitutional right were a valid government interest, the law still fails intermediate scrutiny.

County's claims that it lacks responsibility for its participation in an unconstitutional licensing scheme are without merit. People harmed by the execution of an unconstitutional law may seek declaratory and injunctive relief against the "persons" who participate in and implement the constitutional deprivation, including counties that do so as a matter of established custom and practice. 42 U.S.C. § 1983.

Section 1983 defendants may be held liable for the reasonably foreseeable consequences of their actions, including the reasonably foreseeable acts of a third party. County should not be surprised that when its employees, according to its custom and practice, inform licensing officers that an applicant lacks "proper cause" for a license, and recommend the denial of a license on those grounds, that it would be a defendant in a lawsuit challenging the "proper cause" standard's unconstitutionality.[3]

---

[3]Defendants do not respond to Plaintiffs' arguments that SAF has standing, and that overbreadth doctrines apply in Second Amendment cases. Pl. Br., at 17-18, 62-66.

I. POST-*HELLER* COURTS CONTINUE TO UPHOLD THE RIGHT TO
   BEAR ARMS OUTSIDE THE HOME.

This Court would not be the first in *Heller*'s wake to uphold the right

to bear arms outside the home. Contrary to Defendants' assertions, the

Seventh Circuit already did so striking down Chicago's gun-range ban

in *Ezell* v. *City of Chicago*, 651 F.3d 684 (7th Cir. 2011). Defendants'

reading that *Ezell* merely "viewed the firing-range ban as eviscerating

the core right to possess handguns in the home," Licensing Officers' Br.,

at 42 n.14, is too narrow. *Ezell* found a "right to acquire and maintain

proficiency in [the] use [of firearms]." *Ezell*, 651 F.3d at 704. It reached

this conclusion in answering the question of "whether range training is

categorically unprotected by the Second Amendment. *Heller* and

*McDonald* suggest to the contrary." *Id.*

Studying the topic, Seventh Circuit rejected the notion that "target

practice is wholly outside the Second Amendment as it was understood

when incorporated as a limitation on the States." *Id.* at 706. It thus

enjoined Chicago's ban on gun ranges as "a serious encroachment on

the right to maintain proficiency in firearm use," *id.* at 708, a right that

obviously few if any people in Chicago can exercise at home.

More recently, and directly on-point, the District of Maryland struck down a law identical to the one at issue here. In *Woollard*, the court held that handgun carry license applicants cannot be required to show a "good and substantial reason" for wishing to carry a handgun. The court first found that the Second Amendment secures a right to carry a gun for self-defense:

> [T]he right to bear arms is not limited to the home. The signposts left by recent Supreme Court and Fourth Circuit case law all point to the conclusion that Woollard's "claim to self-defense—asserted by him as a law-abiding citizen . . . —does implicate the Second Amendment, albeit subject to lawful limitations.

*Woollard*, 2012 U.S. Dist. LEXIS 28498, at *21 (quoting *United States* v. *Masciandaro*, 638 U.S. 458, 468 (4th Cir. 2011) (Niemeyer, J., concurring)).

*Woollard* then expressed the claim's essence, in words that describe this identical case equally well:

> At bottom, this case rests on a simple proposition: If the Government wishes to burden a right guaranteed by the Constitution, it may do so provided that it can show a satisfactory justification and a sufficiently adapted method. The showing, however, is always the Government's to make. A citizen may not be required to offer a "good

and substantial reason" why he should be permitted to exercise his rights. The right's existence is all the reason he needs.

*Woollard*, at *34.

Days later, the Southern District of West Virginia reached the unsurprising conclusion that the Second Amendment does not protect the provision of armed security to a prohibited individual leading a motorcycle gang. *Weaver*, supra, 2012 U.S. Dist. LEXIS 29613. Yet the court did so because that prohibition satisfied constitutional scrutiny, not because there is no right to carry a gun for self-defense—a proposition the court flatly rejected. Reviewing, inter alia, *Heller*'s statements that the Second Amendment secures militia service, hunting, and self-defense, as well as the implications of carving out "sensitive places" outside the home, *Weaver* held "that the Second Amendment, as historically understood at the time of ratification, was not limited to the home." *Id.* at *13 (citation and footnote omitted).

Later that month, the Eastern District of North Carolina struck down that state's laws forbidding the carrying or transportation of firearms and ammunition during declared "states of emergency." *Bateman*, supra.

It cannot be seriously questioned that the emergency declaration laws at issue here burden conduct protected by the Second Amendment. Although considerable uncertainty exists regarding the scope of the Second Amendment right to keep and bear arms, it undoubtedly is not limited to the confines of the home.

*Bateman*, slip op. at 9.

"[T]he Second Amendment right to keep and bear arms 'is not strictly limited to the home environment but extends in some form to wherever those activities or needs occur.'" *Id.* at 10 (citation omitted). "Under the laws at issue here, citizens are prohibited from engaging, outside their home, in any activities secured by the Second Amendment. They may not carry defensive weapons outside the home . . ." *Id.* The challenged laws were declared unconstitutional as applied to law-abiding individuals.

II. OPINIONS DENYING THE EXISTENCE OF THE RIGHT TO BEAR ARMS CONTRADICT OR MISREAD SUPREME COURT PRECEDENT.

Although Defendants prematurely announced *Heller* and *McDonald*'s "uniform" interpretation, they fairly catalogued judicial resistance to accepting the Second Amendment as a normal part of the Constitution. But these opinions, like the one below, are not very persuasive. As one federal court just declared, "[t]he fact that courts

may be reluctant to recognize the protection of the Second Amendment outside the home says more about the courts than the Second Amendment." *Weaver*, at *14 n.7.

While courts upholding the right to bear arms look to text, history, tradition, and the logic of *Heller*'s instructions as to the right's scope and limits, those refusing to enforce the Second Amendment outside the home either single that right for special disfavored treatment, or insist that *Heller* and *McDonald* must be limited to their facts.

One decision invoked by Defendants contains this language: "Compared to many of this country's constitutional protections, the scope of rights under the Second Amendment is ambiguous and no doubt subject to change and evolution over time." *Richards* v. *County of Yolo*, No. 2:09-CV-01235, 2011 U.S. Dist. LEXIS 51906, *20 (E.D. Cal. May 16, 2011), *appeal pending*, No. 11-16255 (9th Cir. filed May 16, 2011); *contra Heller*, 554 U.S. at 576 (Second Amendment interpreted according to its original public meaning); *id.* at 629 n.27 (Second Amendment treated like other enumerated rights); *McDonald*, 130 S. Ct. at 3045.

Defendants also rely heavily on *Piszczatoski* v. *Filko*, No. 10-CV-06110, 2012 U.S. Dist. LEXIS 4293 (D.N.J. Jan. 12, 2012), *appeal pending*, No. 12-1150 (3d Cir. Jan. 24, 2012), but the gist of that opinion is that the Second Amendment right is "unlike any other constitutional right" because it relates to firearms. *Id.* at *3; *contra McDonald*, 130 S. Ct. at 3045 (rejecting argument that "Second Amendment differs from all of the other provisions of the Bill of Rights because it concerns the right to possess a deadly implement and thus has implications for public safety"); *see also Valley Forge Christian Coll.* v. *Ams. United for Separation of Church and State, Inc.*, 454 U.S. 464, 484 (1982) ("[W]e know of no principled basis on which to create a hierarchy of constitutional values."). *Piszatoski*'s impermissible bias permeates its entire discussion, culminating with approval of "the overriding philosophy of [the New Jersey] legislature . . . to limit the use of guns as much as possible." *Piszczatoski*, at *65 (quoting *State v. Valentine*, 307 A.2d 617, 619 (N.J. Super. Ct. App. Div. 1973)).

If *Heller* confirms nothing else, it confirms that legislatures *do not* enjoy a general interest to limit the public's use of guns. The use of

guns is confirmed by the Second Amendment as a fundamental right, meaning that it is, as a matter of constitutional law, a public good. Of course that is a controversial position, but the New Jersey legislature—and the federal courts—are duty bound to enforce the people's considered judgment as to what shall be protected by the Constitution, not their own. The *Valentine* court endorsed by *Piszatoski*, and the 1973 legislature whose interest it described, were writing in a pre-*Heller*, pre-*McDonald*, Second Amendment-free environment. The landscape has changed.

Plaintiffs have previously rebutted the various theories that *Heller* and *McDonald*'s language limits the holding to its facts. *See, e.g.* Pl. Br., at 25-26, 30-31 & n.7. Nonetheless, County offers that *Heller*'s holding was its invalidation of Washington, D.C.'s home firearm restrictions, and "[i]t was this Second Amendment right that was found to be applicable to the states in *McDonald*." County Br., at 13. Not so:

> [I]n [*Heller*], we held that the Second Amendment protects the right to keep and bear arms for the purpose of self-defense, and we struck down a District of Columbia law that banned the possession of handguns in the home.

*McDonald*, 130 S. Ct. at 3020. In other words, the Court interpreted the

Second Amendment, and then applied its interpretation to strike down the laws presented to it. The laws happened to relate to the home, but that does not limit the constitutional principle.

Illuminating the point is the experience of Oregon's Supreme Court, upon holding that possession of a billy club was secured by the constitutional guarantee that "[t]he people shall have the right to bear arms for the defence of themselves . . ." Or. Const. art. I, § 27 (1857). *State* v. *Kessler*, 289 Or. 359, 614 P.2d 94 (1980). The following year, prosecutors argued that the right should be confined to *Kessler*'s facts, relating to home possession of a billy club, and not to the public carrying of the same arm. The court disagreed:

> The text of the constitution is not so limited; the language is not qualified as to place except in the sense that it can have no effect beyond the geographical borders of this state . . . In *Kessler* we started from the premise that under § 27 a person has a right to bear arms for defense of self . . . We then moved from that general proposition to the more particular one that a person had the constitutional right to have a billy in his home for defense.

*State* v. *Blocker*, 291 Or. 255, 259, 630 P.2d 824, 825-26 (1981) (citation and footnote omitted). Likewise, the Supreme Court would decide future Second Amendment cases from the baseline proposition that the

Amendment secures, generally, the right to keep and carry arms for self-defense.

When the Supreme Court offered that "the need for defense of self, family, and property is *most acute*" in the home, *Heller*, 554 U.S. at 628 (emphasis added), and the Second Amendment right is secured "*most notably* for self-defense within the home," *McDonald*, 130 S. Ct. at 3044 (emphasis added), it did no more than mirror the general principle that "the home is entitled to special protection as the center of the private lives of our people." *Minnesota* v. *Carter*, 525 U.S. 83, 99 (1998) (Kennedy, J., concurring). Thus, "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed," *Payton* v. *New York*, 445 U.S. 573, 585 (1980) (quotation omitted). "At the [Fourth Amendment's] very core stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion." *Silverman* v. *United States*, 365 U.S. 505, 511 (1961). But that does not mean people enjoy no Fourth Amendment rights in public. The right of self-defense, central to the Second Amendment, has never been limited at law to the home.

III.  PROHIBITING ALL HANDGUN CARRY HAS NEVER BEEN CONSISTENT
      WITH THE RIGHT TO BEAR ARMS.

Defendants hammer home the irrelevant point that the concealed
carrying of handguns, specifically, may be banned. But their emphasis
on concealed carry obfuscates their inability to counter the fact that the
bearing of arms, generally, has long been protected. Defendants fail to
rebut the numerous precedents showing concealed carry prohibitions
could only be sustained as manner regulations. And Defendants' claims
about courts traditionally allowing the barring of all carrying, open and
concealed, are overstated.

A.    *Heller* Acknowledged the Long Legal Tradition of Protecting
      the Right to Carry Defensive Arms, Including Handguns.

Defendants suggest that New York's law fits among historical
practices prohibiting handgun carrying. *Heller* suggests otherwise.

Had *Heller* intended to limit "bear arms" to the home, it would have
been most natural to do so when explaining "that 'bear arms' did not
refer only to carrying a weapon in an organized military unit." *Heller*,
554 U.S. at 585. Instead, the Court offered that

Justice James Wilson interpreted the Pennsylvania Constitution's
arms-bearing right . . . as a recognition of the natural right of

defense "of one's person *or* house" — what he called the law of "self preservation."

*Id.* (emphasis added) (citing 2 COLLECTED WORKS OF JAMES WILSON 1142, and n.x (K. Hall & M. Hall eds., 2007)) (other citations omitted).

Indeed, *Heller* offered that "state constitutional provisions written in the 18th century or the first two decades of the 19th" were the examples "most prominent [and] most relevant to the Second Amendment" in defining the meaning of "bear arms." *Heller*, 554 U.S. at 584. None of these state constitutional provisions have been interpreted as relating solely to the home, but most, in addition to Pennsylvania's provision as noted by *Heller*, were held to secure the public carrying of arms in at least some manner. *State* v. *Reid*, 1 Ala. 612 (1840) (interpreting Ala. Const. of 1819, art. I, § 27); *State* v. *Bailey*, 209 Conn. 322, 346, 551 A.2d 1206, 1218 (1988) (Conn. Const. art. I, § 15 (1819));[4] *Bliss* v. *Commonwealth*, 12 Ky. 90 (1822) (Ky. Const. of 1799, art. XII, cl. 23); *State* v. *Schoultz*, 25 Mo. 128, 155 (1857) (Mo. Const. of 1820, art. XIII, § 3); *State* v. *Huntly*, 25 N.C. (3 Ired.)

---

[4]Revised in 1956 to change "defence" to "defense." Eugene Volokh, *State Constitutional Rights to Keep and Bear Arms*, 11 TEX. REV. LAW & POL. 191, 194 n.10 (2006).

418, 423 (1843) (N.C. Declaration of Rights § 17 (1776)); *Simpson* v.
*State*, 13 Tenn. 356 (1833) (Tenn. Const. of 1796, art. XI, § 26); *State* v.
*Rosenthal*, 55 A. 610 (Vt. 1903) (Vt. Const. c. 1, art. 16 (1777)).

The same conclusion—that people enjoy a right to publicly carry
arms for self-defense—was also reached interpreting state
constitutional arms-bearing provisions with predecessors dating to the
early republic. *See State* v. *Hogan*, 63 Ohio St. 202, 219, 58 N.E. 572,
575 (1900); *Schubert* v. *De Bard*, 398 N.E.2d 1339, 1341 (Ind. App.
1980). Later state constitutional "bear arms" provisions are likewise
understood. *See, e.g. State ex rel. City of Princeton* v. *Buckner*, 180 W.
Va. 457, 462, 377 S.E.2d 139, 144 (1988); *City of Las Vegas* v. *Moberg*,
82 N.M. 626, 627-28, 485 P.2d 737, 738-39 (N.M. Ct. App. 1971); *In re
Brickey*, 8 Idaho 597, 599, 70 P. 609 (1902).

*Heller* also approvingly referenced "the historical tradition of
prohibiting the carrying of 'dangerous and unusual weapons.'" *Heller*,
554 U.S. at 627 (citations omitted). This prohibition does not merely
refer to types of weapons, but to types of *conduct* with weapons,
reflecting the ancient common law offense of affray. Affray required as

an element that arms be used or carried in such manner as to terrorize the population, rather than in a manner suitable for ordinary self-defense. Early sources distinguished affrays from the legitimate public exercise of the right to bear arms.[5]

Blackstone offered that "[t]he offence of riding or going armed, with dangerous or unusual weapons, is a crime against the public peace, *by terrifying the good people of the land.*" 4 William Blackstone, COMMENTARIES ON THE LAWS OF ENGLAND 148 (1769) (emphasis added). Blackstone referenced the 1328 Statute of Northampton, which, by the time of the American Revolution, had long been limited to prohibit the carrying of arms only with evil intent, "in order to preserve the common law principle of allowing 'Gentlemen to ride armed for their Security.'" David Caplan, *The Right of the Individual to Bear Arms: A Recent Judicial Trend*, 4 DET. C. L. REV. 789, 795 (1982) (citing *Rex* v. *Knight*, 90 Eng. Rep. 330 (K.B. 1686)).

> [N]o wearing of Arms is within the meaning of this Statute, unless it be accompanied with such circumstances as are apt to terrify the People; from whence it seems clearly to follow, that Persons of Quality are in no Danger of Offending against this Statute by

---

[5]*See Heller*, 554 U.S. at 620 ("bearing arms for a lawful purpose").

> wearing common Weapons . . . for their Ornament or Defence, in such Places, and upon such Occasions, in which it is the common Fashion to make use of them, without causing the least Suspicion of an intention to commit any Act of Violence or Disturbance of the Peace . . . .

William Hawkins, 1 TREATISE OF THE PLEAS OF THE CROWN, ch. 63, § 9 (1716); *see* Joyce Lee Malcolm, TO KEEP AND BEAR ARMS: THE ORIGINS OF AN ANGLO-AMERICAN RIGHT 104-05 (1994).

*Heller*'s subsequent sources for the "dangerous and unusual" doctrine, 554 U.S. at 627, are in accord. "[T]here may be an affray, where there is no actual violence; as where a man arms himself with dangerous and unusual weapons, *in such a manner, as will naturally diffuse a terrour among the people.*" 3 WORKS OF THE HONOURABLE JAMES WILSON 79 (Bird Wilson ed., 1804) (footnote omitted) (emphasis added). "It is likewise said to be an affray, at common law, for a man to arm himself with dangerous and unusual weapons, *in such manner as will naturally cause terror to the people.*" John A. Dunlap, THE NEW-YORK JUSTICE 8 (1815) (emphasis added).

> Riding or going armed with dangerous or unusual weapons, is a crime against the public peace, by terrifying the people of the land . . . . But here it should be remembered, that in this country the constitution guarranties [sic] to all persons the right to bear arms;

then it can only be a crime to exercise this right in such a manner, as to terrify the people unnecessarily.

Charles Humphreys, A COMPENDIUM OF THE COMMON LAW IN FORCE IN KENTUCKY 482 (1822); *Heller*, 554 U.S. at 588 n.10.

"[T]here may be an affray . . . where persons arm themselves with dangerous and unusual weapons, in such manner as will naturally cause a terror to the people." 1 William Oldnall Russell, A TREATISE ON CRIMES AND INDICTABLE MISDEMEANORS 271 (1826). But:

> it has been holden, that no wearing of arms is within [meaning of Statute of Northampton] unless it be accompanied with such circumstances as are apt to terrify the people; from whence it seems clearly to follow, that persons of quality are in no danger of offending against the statute by wearing common weapons . . . in such places, and upon such occasions, in which it is the common fashion to make use of them, without causing the least suspicion of an intention to commit any act of violence, or disturbance of the peace.

*Id.* at 272.

The other treatises *Heller* cites in support of the "dangerous and unusual" doctrine are in accord, as are the cases *Heller* cites. *See O'Neill* v. *State*, 16 Ala. 65, 67 (1849) (affray "probable" "if persons arm themselves with deadly or unusual weapons for the purpose of an affray, *and in such manner as to strike terror to the people*") (emphasis

added); *State* v. *Lanier*, 71 N.C. 288, 290 (1874) (riding horse through courthouse, unarmed, is "very bad behavior" but "may be criminal or innocent" depending on whether people alarmed); *State* v. *Langford*, 10 N.C. (3 Hawks) 381, 383-384 (1824) (affray "when a man arms himself with dangerous and unusual weapons, *in such a manner as will naturally cause a terror to the people*") (emphasis added); *English* v. *State*, 35 Tex. 473, 476 (1871) ("terrifying the good people of the land").

Early courts took the view espoused in *Heller*, that securing the right to bear arms in public is consistent with the prohibition on provocative behavior with arms. "[N]either, after so solemn an instrument hath said the people may carry arms, can we be permitted to impute to the acts thus licensed, such a necessarily consequent operation as terror to the people to be incurred thereby." *Simpson*, 13 Tenn. at 360. "A man may carry a gun for any lawful purpose, for business or amusement, but he cannot go about with that or any other dangerous weapon to terrify and alarm a peaceful people." *Hogan*, 63 Ohio St. at 219, 58 N.E. at 575-76.

> But although a gun is an "unusual weapon," it is to be remembered that the carrying of a gun per se constitutes no offence. For any

lawful purpose--either of business or amusement--the citizen is at perfect liberty to carry his gun. It is the wicked purpose--and the mischievous result--which essentially constitute the crime.

*Huntly*, 25 N.C. (3 Ired.) at 422-23.

B.      Tradition Supports Neither General Handgun Carry Prohibition, Nor New York's Form of Restriction.

Defendants' citation to various post-Civil War Southern laws, allowing the carrying of only "Army-Navy" handguns, is unhelpful. These restrictions were not accidental, "render[ing] safe the high quality, expensive, military issue handguns that many former Confederate soldiers still maintained but that were often out of financial reach for cash poor freedmen." Robert J. Cottrol and Raymond T. Diamond, *"Never Intended to be Applied to the White Population": Firearms Regulation and Racial Disparity—the Redeemed South's Legacy to a National Jurisprudence?*, 70 CHI.-KENT L. REV. 1307, 1333 (1995) (footnote omitted).[6]

---

[6]Early discretionary handgun licensing laws were often the hallmark of Jim Crow. *See, e.g. Watson* v. *Stone*, 4 So. 2d 700, 703 (Fla. 1941) (Buford, J., concurring) ("The statute was never intended to be applied to the white population and in practice has never been so applied . . . there has never been, within my knowledge, any effort of [sic] enforce the provisions of this statute as to white people.").

Defendants overstate matters by claiming that such laws "were upheld against state constitutional challenge, thus confirming that public carrying of concealable weapons has been understood to fall outside the scope of the right to bear arms." Licensing Officers' Br., at 35. Each decision Defendants cite excluded the expensive, military-style handguns from the prohibition. *See Andrews* v. *State*, 50 Tenn. 165, 188 (1871) ("as to this weapon, the prohibition is too broad to be sustained"); *Fife* v. *State*, 31 Ark. 455, 460-61 (1876) (distinguishing "army and navy repeaters" from "pistol"); *English*, 35 Tex. at 476 ("holster pistols" and "side arms" as Second Amendment arms).

More to the point, these Southern laws were more permissive than New York's challenged provision, in that they required no "proper cause" to carry a large military-style handgun. New York's law reaches all handguns, regardless of size.

Seeking to mainstream New York's "proper cause" restriction, Defendants offer their professorial expert for the claim that "[a]s of January 2011, all but three States (Alaska, Vermont and Wyoming) either banned or required a license for the carrying of a concealed

handgun." Licensing Officers' Br., at 5. This is not merely incorrect—as of July 29, 2010, Arizona also dispensed with the requirement of a license to carry a concealed handgun[7]—it is misleading. Many states may require a license to carry a concealed handgun, but very few states have the sort of law that triggered this litigation. Plaintiffs are not complaining about the existence of licensing, but about New York's particular unconstitutional standard. And only one state (Illinois) forbids both concealed and open handgun carrying (pending the outcome of *Moore* v. *Madigan*, Seventh Cir. No. 12-1269).

New York is very much out of step with the overwhelming majority of states. As of today, forty-three states (not including post-*Woollard* Maryland) recognize that private citizens are generally entitled to carry handguns for self-defense. Of these: Thirty-seven states require officials to issue gun carry licenses to applicants meeting objective standards.[8]

---

[7]See 2010 Ariz. Sess. Laws 59. A permit is required primarily to carry a handgun in a bar. Ariz. Rev. Stat. § 13-3112(A); *see also* Ariz. Rev. Stat. § 13-3102(A).

[8]Ark. Code Ann. § 5-73-309; Colo. Rev. Stat. Ann. § 18-12-203(1); Conn. Gen. Stat. § 29-32b(b); Fla. Stat. Ann. § 790.06(2); Ga. Code Ann. § 16-11-129(d)(4); Idaho Code Ann. § 18-3302(1); Ind. Code Ann. § 35-47-2-3(e); Iowa Code Ann. § 724.7(1); Kan. Stat. Ann. § 75-7c03(a); Ky.

In many states, a license is required only if a gun is carried concealed. Four states—Alaska, Arizona, Vermont and Wyoming—do not require permits to carry handguns in any manner, of at least some people (Wyoming requires permits of visitors), although Arizona, Alaska and Wyoming issue permits for reciprocity purposes.[9] Two states—Alabama and Delaware—have discretionary statutes for licensing the carrying of concealed handguns, but do not, without more, ban private citizens from openly carrying handguns.[10]

---

Rev. Stat. Ann. § 237.110(4); La. Rev. Stat. Ann. § 40:1379.3(A)(1); 25 Me. Rev. Stat. Ann. § 2003(1); Mich. Comp. Laws Ann. § 28.422(3); Minn. Stat. § 624.714, subdiv. 2(b); Miss. Code Ann. § 45-9-101(2); Mo. Ann. Stat. § 571.101(1); Mont. Code Ann. § 45-8-321(1); Neb. Rev. Stat. § 69-2430(3); Nev. Rev. Stat. Ann. § 202.3657(2); N.H. Rev. Stat. Ann. § 159.6(I); N.M. Stat. Ann. § 29-19-4(A); N.C. Gen. Stat. § 14-415.11(b); N.D. Cent. Code § 62.1-04-03(1); Ohio Rev. Code Ann. § 2923.125(D)(1); 21 Okla. Stat. Ann. § 1290.12(A)(12); Or. Rev. Stat. Ann. § 166.291(1); 18 Pa. Cons. Stat. Ann. § 6109(e); R.I. Gen. Laws § 11-47-11(a); S.C. Code Ann. § 23-31-215(A); S.D. Codified Laws § 23-7-7; Tenn. Code Ann. § 39-17-1351(b); Tex. Gov't Code § 411.177(a); Utah Code Ann. § 53-5-704(1)(a); Va. Code Ann. § 18.2-308(D); Wash. Rev. Code Ann. § 9.41.070(1); W. Va. Code Ann. § 61-7-4(f); Wis. Stat. § 175.60(2)(a).

[9]Alaska Stat. § 18.65.700(a); Ariz. Rev. Stat. § 13-3112(A); Wyo. Stat. Ann. § 6-8-104(b).

[10]Ala. Code §§ 13A-11-73, 75; *Morris* v. *State*, 342 So. 2d 417, 418 (Ala. Cr. App. 1977); 11 Del. Code Ann. §§ 1441-42; *In re Application of McIntyre*, 552 A.2d 500, 501 n.1 (Del. Super. 1988).

Defendants offer that openly carrying handguns is socially unacceptable today, but that is hardly a basis for prohibiting constitutionally-protected conduct. Licensing Officers' Br., at 38 & n.13. Nonetheless Defendants suggest Plaintiffs should have challenged New York's general prohibition on carrying loaded handguns in public, which reaches the open carrying of firearms. *Id.* Defendants should consider carefully whether this is the outcome they want. If the licenses issued under Penal Law § 400.00(2) relate only to concealed carry, and if this Court holds that the right to bear arms extends only to open carrying, the police would enjoy no qualified immunity for enforcing an open carry prohibition. The decision would instantly place New York among the states that generally allow the unlicensed open carrying of handguns—and many individuals could be counted upon to immediately exercise that right here, as is already done elsewhere.

Defendants correctly perceive that Plaintiffs do not desire an environment where only the open carrying of handguns is allowed. But this case is not about what Plaintiffs desire, rather it concerns what is constitutionally permissible. New York may yet choose to allow only open handgun carry, as unlikely as that might be. For now, this Court

should respect the Legislature's permissible choice to require that publicly-carried handguns be carried concealed, and limit the analysis as to whether the right to carry handguns in the only form New York permits may be rationed on a "proper cause" basis.

Finally, as part of their effort to shoehorn the "proper cause" requirement into traditional practice, Defendants note the law only targets the carrying of handguns. Plaintiffs can presumably carry rifles and shotguns for their personal defense along the streets of New York. But carrying handguns may be forbidden, according to Professors Cook and Zimring, because

> [a]ssailants choose handguns over long guns in part because handguns are smaller and more conveniently carried on the person or in a vehicle and can be readily concealed from law enforcement officers, potential victims, and the public at large.

Licensing Officers' Br., at 4, 13-14 (citations omitted).

As Defendants assure, "handguns are the weapon of choice for criminal violence." *Id.* at 14.

Of course, handguns are also the weapon of choice for lawful self-defense, which is why this exact argument was rejected in *Heller*:

It is no answer to say, as petitioners do, that it is permissible to ban the possession of handguns so long as the possession of other firearms (i.e., long guns) is allowed. It is enough to note, as we have observed, that the American people have considered the handgun to be the quintessential self-defense weapon. . . Whatever the reason, handguns are the most popular weapon chosen by Americans for self-defense in the home, and a complete prohibition of their use is invalid.

*Heller*, 554 U.S. at 629.

And however popular handguns may be for home self-defense, they are ever more popular for self-defense in public. Millions of Americans carry handguns for self-defense, a practice reflected in virtually every historical source on the right to bear arms, including the Reconstruction-era cases Defendants endorse. Hardly anyone carries a shotgun in public for personal protection, although, as with the open carry issue, Defendants may be inviting an unappealing outcome.

IV.    PRIOR RESTRAINT DOCTRINE APPLIES TO THE SECOND AMENDMENT.

Defendants' objection to prior restraint, on grounds that it is primarily suited to First Amendment concerns, are unpersuasive. As noted in Plaintiffs' opening brief, at 51-52, prior restraint is not limited to the First Amendment, but rather more broadly, to "freedoms which the Constitution guarantees." *Staub* v. *City of Baxley*, 355 U.S. 313, 322

(1958). And as Plaintiffs further noted, Pl. Br., at 56-58, the D.C, Third, Fourth, and Seventh Circuits adopt First Amendment frameworks when analyzing Second Amendment claims. "[W]e agree with those who advocate looking to the First Amendment as a guide in developing a standard of review for the Second Amendment." *United States* v. *Chester*, 628 F.3d 673, 682 (4th Cir. 2010) (citations omitted); *cf. United States* v. *Reese*, 627 F.3d 792, 801 (10th Cir. 2010).

> Because *Heller* is the first Supreme Court case addressing the scope of the individual right to bear arms, we look to other constitutional areas for guidance in evaluating Second Amendment challenges. We think the First Amendment is the natural choice. *Heller* itself repeatedly invokes the First Amendment in establishing principles governing the Second Amendment. We think this implies the structure of First Amendment doctrine should inform our analysis of the Second Amendment.

*United States* v. *Marzzarella*, 614 F.3d 85, 89 n.4 (3d Cir. 2010).

Indeed, the First and Second Amendment parallels have been observed by courts dating to the earliest days of our nation. *See Commonwealth* v. *Blanding*, 20 Mass. 304, 314 (1825) ("The liberty of the press was to be unrestrained, but he who used it was to be responsible in case of its abuse; like the right to keep fire arms, which does not protect him who uses them for annoyance or destruction.");

*Respublica* v. *Oswald*, 1 U.S. (1 Dall.) 319, 330 n.* (Pa. 1788) ("The right of publication, like every other right, has its natural and necessary boundary; for, though the law allows a man the free use of his arm, or the possession of a weapon, yet it does not authorize him to plunge a dagger in the breast of an inoffensive neighbour."). The analogy is unsurprising: the First and Second Amendments are the only provisions of the Bill of Rights that secure some substantive individual conduct—speech, worship, the keeping and bearing of arms—against government infringement.

In *Woollard*, the court rejected Plaintiff SAF's plea to apply prior restraint doctrine against Maryland's discretionary handgun licensing scheme. *Woollard*, at *22-*25. Acknowledging "that courts have often looked to First Amendment law for guidance in navigating uncharted Second Amendment waters," and that "the First Amendment undoubtedly provides a useful framework for analysis of laws burdening Second Amendment rights," *id.* at *24, *Woollard* nonetheless hesitated to apply an analytical framework to one right that it believed was designed too specifically for another.

In response to such concerns, Plaintiffs would note that at least four courts have held that officials cannot arbitrarily deny handgun carry licenses, using language or analysis that at least suggests prior restraint. "The exercise of a right guaranteed by the Constitution cannot be made subject to the will of the sheriff." *People* v. *Zerillo*, 219 Mich. 635, 639, 189 N.W. 927, 928 (1922). "The [provision] making it a crime for an unnaturalized, foreign-born resident to possess a revolver, unless so permitted by the sheriff, contravenes the guaranty of such right in the Constitution of the State and is void." *Id.* at 642, 929 (gun in car); *Kellogg* v. *City of Gary*, 562 N.E.2d 685, 694 (Ind. 1990); *City of Princeton*, 180 W. Va. at 462, 377 S.E.2d at 144; *Schubert*, 398 N.E.2d at 1341.

Albeit in dicta, Rhode Island's Supreme Court was more specific:

[T]his Court will not countenance any system of permitting under the Firearms Act that would be committed to the unfettered discretion of an executive agency. . . One does not need to be an expert in American history to understand the fault inherent in a gun-permitting system that would allow a licensing body carte blanche authority to decide who is worthy of carrying a concealed weapon. The constitutional right to bear arms would be illusory, of course, if it could be abrogated entirely on the basis of an unreviewable unrestricted licensing scheme.

*Mosby* v. *Devine*, 851 A.2d 1031, 1050 (R.I. 2004).

In any event, while *Woollard* declined prior restraint analysis, its ultimate holding sounds in prior restraint. Plaintiffs would be hard-pressed to better encapsulate the prior restraint doctrine than the declaration that "[a] citizen may not be required to offer a 'good and substantial reason' why he should be permitted to exercise his rights. The right's existence is all the reason he needs." *Woollard*, at *34.

V.    THE "PROPER CAUSE" STANDARD FAILS ANY LEVEL OF MEANS-ENDS SCRUTINY.

A.    Defendants Confirm That the "Proper Cause" Requirement Is Unsupported By a Valid Governmental Interest.

Once a constitutional right is implicated, the first step in any application of means-ends scrutiny is the identification of a valid governmental interest for the challenged practice. Perforce the government's interest cannot be the abatement of the right as a social evil, because the very existence of a right confirms that the activity is in the public interest. After all, if the government had a valid interest in suppressing the exercise of a right, then complete prohibition would best advance the government's interest, and would also be a perfect fit.

But this is exactly what Defendants argue. Defendants have "taken the *effect* of the statute"—the reduction in the number of permits—"and posited that effect as the State's interest. If accepted, this sort of circular defense can sidestep judicial review of almost any statute, because it makes all statutes look narrowly tailored." *Simon & Schuster, Inc.* v. *N.Y. State Crime Victims Bd.*, 502 U.S. 105, 120 (1991). Here, Defendants "prove" that carrying guns for self-defense is a bad idea, the activity's value outweighed by its risk. Because it is a bad idea, each individual must show the authorities "proper cause" for engaging in this unacceptably dangerous behavior. Thus, employing interest-balancing, there is no right to carry guns.

This logic could work in a constitutional convention, but not in a legal case premised upon the existence of a right to carry arms. Defendants chide Plaintiffs for "ignor[ing] the fact that New York's 'proper cause' requirement is appropriately oriented toward assessing the applicant's *need* to carry a concealed weapon for self-defense." Licensing Officers' Br., at 46 (emphasis added). Defendants reason that only those with "a special self-defense *need* to carry a handgun outside

the home" should have licenses. *Id.* at 47 (emphasis added).

But the Second Amendment is not among the Bill of Needs. It is among the Bill of *Rights*. Defendants' arguments amount to: the government's "experts" have determined that the People do not really "need" one of their "rights." That is not constitutional law. Social science may have a role to play in illuminating the relationship between a right and its regulation, but it cannot have the role of defining the content of a right.

Judicial assessment of what is optimally desirable can be a very poor substitute for recognizing rights based on our nation's historic traditions of liberty. *See, e.g. Buck* v. *Bell*, 274 U.S. 200 (1927). "'[T]he scope of the Second Amendment right' is determined by textual and historical inquiry, not interest-balancing." *Ezell*, 651 F.3d at 702 (quoting *McDonald*, 130 S. Ct. at 3047). The Second Amendment does not "require judges to assess the costs and benefits of firearms restrictions and thus to make difficult empirical judgments in an area in which they lack expertise." *McDonald*, 130 S. Ct. at 3050.

> We know of no other enumerated constitutional right whose core protection has been subjected to a freestanding "interest-

balancing" approach. The very enumeration of the right takes out of the hands of government--even the Third Branch of Government--the power to decide on a case-by-case basis whether the right is *really worth* insisting upon. A constitutional guarantee subject to future judges' assessments of its usefulness is no constitutional guarantee at all . . . Like the First, [the Second Amendment] is the very *product* of an interest-balancing by the people . . .

*Heller*, 554 U.S. at 635 (emphasis original).

There is something unscientific in Defendants' framing of their social science argument, positing Plaintiffs' "own speculation that violent crimes would be reduced if carrying of concealed weapons in public were broadly prohibited—speculation that is refuted by expert opinions in the record." Licensing Officers' Br., at 49. Plaintiffs did not "speculate" against "expert opinions," nor did they offer "unsupported assertions." *Id.* Plaintiffs cited a significant amount of published scientific work and other data rebutting Defendants' theories, JA 188-89, 190-91—but not for the purpose of establishing any particular truth, only to confirm what the Supreme Court has repeatedly declared: that the criminological debate in this area is far from settled, and cannot be settled by judges. Respectfully, Defendants' opinions as to

what "studies have shown," and what evidence is "reliable," Licensing Officers Br., at 15, are matters of legitimate debate.

Curiously, the one type of data that Defendants failed to offer is the data most relevant to their theory that law-abiding, responsible people cannot be trusted with guns: the crime rate of individuals licensed to carry handguns for self-defense in the states where such licensing occurs on a shall-issue basis. That information, readily maintained by various government agencies, is a matter of judicial notice. *Vuitton* v. *Ly-USA, Inc.*, No. 08-4483-CV, 2012 U.S. App. LEXIS 6391, at *6 n.2 (2d Cir. March 29, 2012); *Denius* v. *Dunlap*, 330 F.3d 919, 926 (7th Cir. 2003) (government websites). It does not advance Defendants' theories.

Michigan, for example, issued 87,637 permits for the year ending June 30, 2011. In that time frame, it revoked only 466 permits. See http://www.michigan.gov/documents/msp/2011_CPL_Report_376632_7. pdf (last visited April 2, 2012). Texas compiles detailed information tracking the proclivity of handgun carry license permit holders to commit crimes. In 2009, of 65,561 serious criminal convictions in Texas, only 101— 0.1541%—could be attributed to individuals licensed to

carry handguns, though not all such crimes necessarily utilized guns, or used them in public settings. http://www.txdps.state.tx.us/ administration/crime_records/chl/ ConvictionRatesReport 2009.pdf (last visited April 2, 2012). Perhaps the most comprehensive data comes from Florida, which reports having issued 2,145,632 handgun carry licenses since 1987. http://licgweb.doacs.state.fl.us/stats/ cw_monthly.pdf (last visited April 2, 2012). To date, Florida has only revoked 168 licenses—.0078%—for crimes utilizing firearms. *Id*.; *see also* David B. Kopel, *Pretend "Gun-Free" School Zones: A Deadly Legal Fiction*, 42 CONN. L. REV. 515, 564-70 (2009) (surveying data from these and other states).

In any event, the social science debate is totally irrelevant. In considering constitutional claims, this Court does not weigh "expert" opinion disproving the utility of the right against search and seizure, various aspects of due process, or the right to counsel itself. Tax evaders cannot cite expert economists to explain the various policy deficiencies inherent in taxing income, the Sixteenth Amendment notwithstanding.

This Court does not referee academic debates. "[T]he enshrinement of constitutional rights necessarily takes certain policy choices off the table." *Heller*, 554 U.S. at 636. Professors Cook and Zimring are certainly entitled to believe that the Second Amendment right to bear arms is disastrously dangerous. They are also entitled to that same belief regarding the exclusionary rule or the right to counsel. Doubtless, virtually every aspect of the Constitution finds strong disagreement among some segment of society. But *McDonald*'s instructions bear repeating:

> Municipal respondents . . . note that there is intense disagreement on the question whether the private possession of guns in the home increases or decreases gun deaths and injuries. The right to keep and bear arms, however, is not the only constitutional right that has controversial public safety implications. All of the constitutional provisions that impose restrictions on law enforcement and on the prosecution of crimes fall into the same category.

*McDonald*, 130 S. Ct. at 3045 (citations omitted). The question of what the Second Amendment secures is a matter of text and history, not an academic debate as to who has the best statistics.

B.   The "Proper Cause" Requirement Does Not Fit the Alleged
     Government Interest As Required Under Intermediate
     Scrutiny Analysis.

Defendants do not claim that the "proper cause" requirement would

pass strict scrutiny, but suggest that it would satisfy the requirements

of intermediate scrutiny, which has been utilized to address some gun

regulations under the Second Amendment.[11]

An analysis of how this test functions in the Second Amendment

field reveals that the "proper cause" standard cannot survive

intermediate scrutiny, even were the Court to accept the notion that

the right to bear arms might eliminated as a means of satisfying the

governmental interest in public safety. While intermediate scrutiny has

been employed to uphold laws disarming violent or dangerous people,

courts have not done so automatically. Rather, courts have usually

limited the reach of their decisions, and demanded the government

meet its burden to sustain even those laws whose constitutionality, or

_____

[11]Defendants err in asserting that Plaintiffs have abandoned their
Equal Protection claim. Plaintiffs' brief duly noted that Equal
Protection review requires the same means-end, level of scrutiny
analysis appropriate as a method of evaluating the Second Amendment
claim. Pl. Br., at 15, 54.

at least vast constitutional application, was never in serious doubt. In contrast, intermediate scrutiny has been used to invalidate gun laws that apply broadly to law-abiding, responsible people—including laws that broadly restrict the right to carry a gun for self-defense.

While courts typically apply intermediate scrutiny to claims by individuals with a criminal record, *see, e.g. Chester*, 628 F.3d at 682-83, they often do so acknowledging that the government may fail that standard in some applications. "We do not foreclose the possibility that a case might exist in which an as-applied Second Amendment challenge to § 922(g)(1) could succeed." *United States* v. *Moore*, 666 F.3d 313, 320 (4th Cir. 2012). "[A] felon convicted of a minor, non-violent crime might show that he is no more dangerous than a typical law-abiding citizen. Similarly, a court might find that a felon whose crime of conviction is decades-old poses no continuing threat to society." *United States* v. *Barton*, 633 F.3d 168, 174 (3d Cir. 2011) (citing *Britt* v. *State*, 363 N.C. 546, 681 S.E.2d 320 (2009)). "[W]e recognize that § 922(g)(1) may be subject to an overbreadth challenge at some point because of its disqualification of all felons, including those who are non-violent . . ."

*United States* v. *Williams*, 616 F.3d 685, 693 (7th Cir. 2010).

The federal prohibition against individuals subject to domestic violence restraining orders, 18 U.S.C. § 922(g)(8), survived individual scrutiny because it was "temporally limited and therefore exceedingly narrow," and further "applied only to persons individually adjudged to pose a future threat of domestic abuse" after hearing and notice. *United States* v. *Mahin*, 668 F.3d 119, 125 (4th Cir. 2011) (citation omitted). "The risk of recidivism and future gun violence is . . . especially salient with respect to persons covered by § 922(g)(8), namely those personally enjoined from committing future acts of domestic abuse." *Id.* at 126. "It is well-established that felons are more likely to commit violent crimes than are other law-abiding citizens." *Barton*, 633 F.3d at 175 (citation omitted); *see also United States* v. *Rehlander*, 666 F.3d 45 (1st Cir. 2012) (interpreting Section 922(g)(4) narrowly so as to avoid Second Amendment defect).

Yet, at least on first pass in one circuit, the government failed to sustain its intermediate scrutiny burden with respect to the federal provision disarming habitual drug users. 18 U.S.C. § 922(g)(3). "To

discharge its burden of establishing a reasonable fit between the important goal of reducing gun violence and the prohibition in § 922(g)(3), the government may not rely upon mere 'anecdote and supposition.'" *United States* v. *Carter*, 669 F.3d 411, __, 2012 U.S. App. LEXIS 1243, at *16 (4th Cir. 2012) (citation omitted). Section 922(g)(3) is temporally limited, and is effective only for individuals while they continue to use drugs. "Nonetheless, the government still bears the burden of showing that § 922(g)(3)'s limited imposition on Second Amendment rights proportionately advances the goal of preventing gun violence." *Id.* at *19-*20. When the government failed to adduce "any study, empirical data, or legislative findings, [but] merely argued to the district court that the fit was a matter of common sense," the Fourth Circuit reversed and remanded a 922(g)(3) conviction. *Id.* at *20.

Directly on-point, again, stands *Woollard*'s declaration that demanding a "good and substantial reason" for a gun carry permit is overbroad. The requirement

> does not, for example, advance the interests of public safety by ensuring that guns are kept out of the hands of those adjudged most likely to misuse them, such as criminals or the mentally ill. It does not ban handguns from places where the possibility of mayhem is

most acute . . . It does not attempt to reduce accidents, as would a
requirement that all permit applicants complete a safety course. It
does not even, as some other States' laws do, limit the carrying of
handguns to persons deemed "suitable" by denying a permit to
anyone "whose conduct indicates that he or she is potentially a
danger to the public if entrusted with a handgun."

*Woollard*, at \*30-\*31 (citation omitted).[12]

Like Maryland's ill-fated law, New York's "proper cause"

requirement is merely a "rationing system" intended "simply to reduce

the total number of firearms carried outside of the home by limiting the

privilege to those who can demonstrate 'good reason' beyond a general

desire for self-defense." *Woollard*, at \*31. Professor Cook testified for

the *Woollard* Defendants as well, and the court rejected all the same

rationales for the law's constitutionality. *Id.* at \*31-\*33.

A law that burdens the exercise of an enumerated constitutional
right by simply making that right more difficult to exercise cannot
be considered "reasonably adapted" to a government interest, no
matter how substantial that interest may be. Maryland's goal of
"minimizing the proliferation of handguns among those who do not
have a demonstrated need for them," is not a permissible method of
preventing crime or ensuring public safety; it burdens the right too
broadly. Those who drafted and ratified the Second Amendment
surely knew that the right they were enshrining carried a risk of

---

[12]*Woollard* did not challenge Maryland's provision for denying
handgun carry licenses to those who have "exhibited a propensity for
violence or instability." Md. Public Safety Code § 5-306(a)(5)(i).

misuse, and states have considerable latitude to channel the exercise of the right in ways that will minimize that risk. States may not, however, seek to reduce the danger by means of widespread curtailment of the right itself.

*Woollard*, at *33-*34 (citation omitted).

Striking down North Carolina's prohibition on carrying handguns during "states of emergency," the *Bateman* court applied strict scrutiny, because the regulations also reached the transportation of arms to the home, and the purchase of arms and ammunition for home self-defense. Yet in doing so, the court indicated that the statutes could not survive intermediate time, place and manner analysis. The emergency declaration statutes

do not target dangerous individuals or dangerous conduct. Nor do they seek to impose reasonable time, place and manner restrictions by, for example, imposing a curfew to allow the exercise of Second Amendment rights during circumscribed times. Rather, the statutes here excessively intrude upon plaintiffs' Second Amendment rights by effectively banning them (and the public at large) from engaging in conduct that is at the very core of the Second Amendment at a time when the need for self-defense may be at its very greatest . . .

*Bateman*, slip op. at 15-16 (citation omitted).

Another gun regulation recently held to fail intermediate scrutiny was Massachusetts' provision disarming resident aliens. *Fletcher* v.

*Haas*, No. 11-10644-DPW, 2012 U.S. Dist. LEXIS 44623 (D. Mass.

March 30, 2012). Again, to survive intermediate scrutiny, the court

demanded some particularized demonstration that the individuals

targeted by the law are dangerous.

> Although Massachusetts has an interest in regulating firearms to
> prevent dangerous persons from obtaining firearms . . . the statute
> here fails to distinguish between dangerous non-citizens and those
> non-citizens who would pose no particular threat if allowed to
> possess handguns. Nor does it distinguish between temporary
> non-immigrant residents and permanent residents. Any
> classification based on the assumption that lawful permanent
> residents are categorically dangerous and that all American citizens
> by contrast are trustworthy lacks even a reasonable basis.

*Id.* at *46-*47.

The intermediate scrutiny pattern is clear. Even where the law's

constitutionality is not in doubt, federal appellate courts are open to as-

applied challenges, and demand particularized evidence and findings

that specifically-targeted categories of people are, in fact,

untrustworthy with firearms. Where regulations sweep too broadly,

being aimed at the general public or categories of individuals that

cannot be claimed as dangerous, courts will invalidate the laws.

Defendants cannot meet their burden of showing a proper fit between the interest in public safety, and presumptively, practically denying virtually the entire law-abiding, responsible population the right to bear arms.

VI. WESTCHESTER COUNTY IS RESPONSIBLE FOR ENFORCING THE "PROPER CAUSE" STANDARD.

In its cross-appeal, County avers that it is not a proper party because it lacks control over state law, because the individual licensing officer defendants are state employees, and because the complaint lacks sufficient factual allegations supporting the County's liability. None of these claims are correct.

A. Westchester County Is A Proper Party.

Our legal system has long recognized that state laws cannot be challenged by a Section 1983 action against the state or its legislature. Rather, such challenges must be brought against the "persons" implementing the challenged provisions, "persons" who need not be, and frequently are not, employed by the state. It does not matter who

enacted the original policy, only who implements it.[13] Accordingly, Congress has enabled states whose laws are challenged to intervene in cases to which they would not otherwise be parties. 28 U.S.C. § 2403; Fed. R. Civ. Proc. 5.1.

States rely heavily on their political subdivisions, and even private actors, for the enforcement of state laws. Since Section 1983 authorizes only actions against enforcing "persons," County's improper party argument would leave much, if not most, state law beyond federal court review.

---

[13]Although not offered as a basis for their position, the individual Defendants oddly state that they "had no role in this controversy beyond denying plaintiffs' license applications . . ." Licensing Officers' Br., at 17. In other words, they had no role in the controversy, other than creating it, and they admit being the "persons" who should be named as Defendants in this Section 1983 action. Denial of Plaintiffs' license applications is the primary injury-in-fact. *Dearth* v. *Holder*, 641 F.3d 499, 502 (D.C. Cir. 2011); *Parker* v. *District of Columbia*, 478 F.3d 370, 376 (D.C. Cir. 2007), *aff'd sub nom Heller*.

To the extent that Defendants Cohen and Holdman have moved on to other roles, Licensing Officers' Br., at 17-18 n.7, that fact alone cannot moot the controversy involving them. *See* Fed. R. App. Proc. 43(c)(2). Cohen and Holdman have not suggested that they should be dismissed, nor have they offered any particular substitutes, much less that such substitutes would revisit their decisions at issue. In any event, substitute licensing officers who might assume responsibility for the relevant applications, Defendants Cacase and Lorenzo, are already before the Court.

B.      Westchester County Is Liable for the Foreseeable
        Consequences of Its Conduct.

County's assertion that it lacked a direct role in the denial of

Plaintiffs' handgun licenses, having merely investigated their

backgrounds and provided recommendations to licensing officials, must

fail. Its actions had the foreseeable consequence of depriving Plaintiffs

of their constitutional rights.

Liability under Section 1983 "should be read against the background

of tort liability that makes a man responsible for the natural

consequences of his actions." *Malley* v. *Briggs*, 475 U.S. 335, 345 n.7

(1986) (quoting *Monroe* v. *Pape*, 365 U.S. 167, 187 (1961)). Accordingly,

this Court held that "an actor may be held liable for those consequences

attributable to reasonably foreseeable intervening forces, including the

acts of third parties." *Kerman* v. *City of New York*, 374 F.3d 93, 126 (2d

Cir. 2004) (quoting *Warner* v. *Orange County Dep't of Probation*, 115

F.3d 1068, 1071 (2d Cir. 1997) (as amended), op. reinstated, 173 F.3d

120 (2d Cir. 1999) (internal quotation marks omitted)); *see also Townes*

v. *City of New York*, 176 F.3d 138, 146 (2d Cir. 1999) (proximate cause

tort concept applied to constitutional injuries).

"The fact that the intervening third party may exercise independent judgment in determining whether to follow a course of action recommended by the defendant does not make acceptance of the recommendation unforeseeable or relieve the defendant of responsibility." *Kerman*, 374 F.3d at 127 (citations omitted). Thus, "'[a] negligent defendant will not be relieved of liability by an intervening cause that was reasonably foreseeable, even if the intervening force may have 'directly' caused the harm.'" *Warner*, 115 F.3d at 1071 n.2 (citation omitted).

> Even if the intervening decision-maker (such as a prosecutor, grand jury, or judge) is not misled or coerced, it is not readily apparent why the chain of causation should be considered broken where the initial wrongdoer can reasonably foresee that his misconduct will contribute to an "independent" decision that results in a deprivation of liberty.

*Higazy* v. *Templeton*, 505 F.3d 161, 177 (2d Cir. 2007) (quoting *Zahrey* v. *Coffey*, 221 F.3d 342, 352 (2d Cir. 2000)). Foreseeability "is normally an issue of fact." *Kerman*, 374 F.3d at 127 (citing *Warner*, 115 F.3d at 1073; *Woodling* v. *Garrett Corp.*, 813 F.2d 543, 556 (2d Cir. 1987); Restatement (Second) of Torts § 453, Comment b (1965).

Applying these principles, the Supreme Court found that a judge's wrongful decision to issue an arrest warrant did not break the causal chain between a police officer's improper application for the warrant and the subsequent arrest, and the police officer was held liable under 42 U.S.C. § 1983. *Malley*, 475 U.S. at 338-39, 344 n.7. Similarly, this Court denied immunity to the Orange County Department of Probation, which recommended an unconstitutional probationary program, even though the sentencing judge made his own decision about whether to accept that recommendation. *Warner*, 115 F.3d at 1072-73 & n.4. This Court specifically noted that the neutrality of the probation officer, unlike the bias of the police officer in *Malley*, made it more likely the court would accept his recommendation. *Id.* at 1072-73.

Similarly, supervisors who recommended the termination of a school psychologist to the superintendent and school board were found to be a sufficiently proximate cause of the psychologist's constitutional injury. *Back* v. *Hastings on Hudson Union Free Sch. Dist.*, 365 F.3d 107, 126 (2d Cir. 2004). "[A] jury [could] conclude that [other] complaints would have been insufficient on their own to cause Back's termination." *Id.*

In this case, County investigated Plaintiffs to determine whether or not "proper cause" existed to issue them a handgun license, and in each instance, recommended denial. JA 18, 21-24 (Complaint, ¶¶ 11, 26, 30, 32, 34, 36, 37), JA 214-19 (recommending Kachalsky denial); JA 253-57 (recommending Detmer denial); JA 269-72 (recommending Nikolov denial); JA 347-51 (recommending Nance denial); JA 383-87 (recommending Marcucci-Nance denial). The investigatory findings and recommendation of "proper cause" denial provided by County constituted the bulk of "evidence" upon which the licensing officials relied to make their independent licensing determinations. See JA 34 (referencing County recommendation re: Kachalsky), 36 (referencing County recommendation re: Nikolov), 43 (referencing County recommendation re: Nance), 48 (referencing County recommendation re: Marcucci-Nance). Little other justification was provided in the permit denials, and the licensing officials did not engage in additional, independent fact-finding as to the existence of "proper cause."

Given the statute's mandate that an investigation occur before the licensing hearing, and the licensing officials' routine practice of relying on these investigations rather than engaging in their own "proper

cause" investigation, it is reasonably foreseeable that the County's investigations would result in the denial of handgun licenses where it suggested that no proper cause existed.

C.  The Complaint Contains Sufficient Factual Allegations Against the County.

As demonstrated supra, the First Amended Complaint alleges that the County has a custom, practice and policy of investigating handgun carry license applicants, and in each case, recommending denial where no "proper cause" is established. Moreover, the Complaint specifically alleges that with respect to each individual Plaintiff's application, County recommended denial. On summary judgment, these allegations were conclusively proven, the original recommendations being offered into evidence by Defendants.

County's claim that Plaintiffs' "pleadings are nonetheless insufficient because they lack allegations of fact tending to support the same," County Br. 12, lacks merit.

CONCLUSION

The case should be reversed and remanded with instructions to enter summary judgment in Plaintiffs' favor against all Defendants.

Dated: April 3, 2012        Respectfully Submitted,

Alan Gura
GURA & POSSESSKY, PLLC
101 N. Columbus Street, Suite 405
Alexandria, VA 22314
703.835.9085/703.997.7665
alan@gurapossessky.com

By: /s/ Alan Gura
    Alan Gura

    Counsel for Cross-Appellees/
    Appellants

## CERTIFICATE OF COMPLIANCE
## TYPE-VOLUME LIMITATIONS, TYPEFACE REQUIREMENTS,
## AND TYPE STYLE REQUIREMENTS

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 10,683 words, excluding the parts of the brief excluded by Fed. R. App. P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in proportionately spaced typeface using WordPerfect X4 in 14 point Century Schoolbook font.

/s/ Alan Gura
Alan Gura
Counsel for Cross-Appellees/Appellants

Dated: April 3, 2012

## CERTIFICATE OF SERVICE

On this, the 3rd day of April, 2012, I served the foregoing Brief by electronically filing it with the Court's CM/ECF system, which generated a Notice of Filing and effects service upon counsel for all parties in the case.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this the 3rd day of April, 2012.


/s/ Alan Gura_____
Alan Gura