11-3642 (L)
Kachalsky et al. v. Cty. of Westchester et al.

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

————————————————

August Term, 2012

(Argued: August 22, 2012     Decided: November 27, 2012)

Docket Nos. 11-3642 (Lead)
11-3962 (XAP)

————————————————

ALAN KACHALSKY, CHRISTINA NIKOLOV, JOHNNIE NANCE, ANNA
MARCUCCI-NANCE, ERIC DETMER, SECOND AMENDMENT FOUNDATION,
INC.,

*Plaintiffs-Appellants-Cross-Appellees*,

–v.–

COUNTY OF WESTCHESTER,

*Defendant-Appellee-Cross-Appellant*,

SUSAN CACACE, JEFFREY A. COHEN, ALBERT LORENZOR, ROBERT K.
HOLDMAN,

*Defendants-Appellees.*

————————————————

Before:

    KATZMANN, WESLEY, LYNCH, *Circuit Judges*.

  Plaintiffs-Appellants appeal from a September 2, 2011 Opinion and Order of the United States District Court for the Southern District of New York (Seibel, *J.*), granting Defendants-Appellees summary judgment. Plaintiffs seek declaratory and injunctive relief under 42 U.S.C. § 1983, barring New York State handgun licensing officials from requiring that applicants prove "proper cause" to obtain licenses to carry handguns for self-defense pursuant to New York Penal Law section 400.00(2)(f). They argue that application of section 400.00(2)(f) violates the Second and Fourteenth Amendments to the Constitution. Because the proper cause requirement is substantially related to New York's compelling interests in public safety and crime prevention, we affirm.


  AFFIRMED.


         _____


    ALAN GURA, Gura & Possessky, PLLC, Alexandria, VA,
       *for Plaintiffs-Appellants-Cross-Appellees*.

    THOMAS G. GARDINER, Sr. Assistant County Attorney
       (James Castro-Blanco, Chief Deputy County
       Attorney, *on the brief*), *for* Robert F. Meehan,
       County Attorney for the County of Westchester,
       Westchester, NY, *for Defendant-Appellee-*
       *Cross-Appellant*.

    SIMON HELLER, Assistant Solicitor General (Barbara
       D. Underwood, Solicitor General, Richard
       Dearing, Deputy Solicitor General, *on the*
       *brief*), *for* Eric T. Schneiderman, Attorney
       General of the State of New York, New York,
       NY, *for Defendants-Appellees*.


         _____

1    WESLEY, *Circuit Judge*:

2         This appeal presents a single issue: Does New York's

3    handgun licensing scheme violate the Second Amendment by

4    requiring an applicant to demonstrate "proper cause" to

5    obtain a license to carry a concealed handgun in public?

6         Plaintiffs Alan Kachalsky, Christina Nikolov, Johnnie

7    Nance, Anna Marcucci-Nance, and Eric Detmer (together, the

8    "Plaintiffs") all seek to carry handguns outside the home

9    for self-defense.  Each applied for and was denied a full-

10   carry concealed-handgun license by one of the defendant

11   licensing officers (the "State Defendants"[1]) for failing to

12   establish "proper cause"—a special need for self-

13   protection—pursuant to New York Penal Law section

14   400.00(2)(f).  Plaintiffs, along with the Second Amendment

15   Foundation ("SAF"), thereafter filed this action to contest

16   New York's proper cause requirement.  They contend that the

17   proper cause provision, on its face or as applied to them,

18   violates the Second Amendment as interpreted by the Supreme

19   Court in *District of Columbia v. Heller*, 554 U.S. 570

20   (2008).

21

---

[1] The State Defendants include Susan Cacace, Jeffrey A.
Cohen, Albert Lorenzo, and Robert K. Holdman.

3

1     The State Defendants moved for summary judgment.  The

2    district court granted that motion and granted Defendant

3    County of Westchester summary judgment *sua sponte*.

4    *Kachalsky v. Cacace*, 817 F. Supp. 2d 235, 273-74 (S.D.N.Y.

5    2011).  The district court found that SAF lacked standing to

6    sue on its own behalf or on behalf of its members.  *Id.* at

7    251.  Addressing the merits, the district court concluded

8    that the concealed carrying of handguns in public is

9    "outside the core Second Amendment concern articulated in

10    *Heller*: self-defense in the home."  *Id.* at 264.  In the

11    alternative, the district court determined that the proper

12    cause requirement would survive constitutional scrutiny even

13    if it implicated the Second Amendment.  *Id.* at 266-72.  For

14    the reasons that follow, we affirm.[2]

15                                 **I**

16                                  **A**

17    New York's efforts in regulating the possession and use

18    of firearms predate the Constitution.  By 1785, New York had

---

[2] Because we affirm the dismissal of Plaintiffs' suit, we do not address whether SAF has standing.  Where, as here, at least one plaintiff has standing, jurisdiction is secure and we can adjudicate the case whether the additional plaintiff has standing or not.  *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 263-64 (1977).  We also do not address Defendant County of Westchester's contention that it is not a proper party to this case.

1    enacted laws regulating when and where firearms could be
2    used, as well as restricting the storage of gun powder.
3    *See, e.g.*, Act of Apr. 22, 1785, ch. 81, 1785 Laws of N.Y.
4    152; Act of Apr. 13, 1784, ch. 28, 1784 Laws of N.Y. 627.
5    Like most other states, during the nineteenth century, New
6    York heavily regulated the carrying of concealable firearms.
7    In 1881, New York prohibited the concealed carrying of "any
8    kind of fire-arms." 1881 Laws of N.Y., ch. 676, at 412. In
9    1884, New York instituted a statewide licensing requirement
10   for minors carrying weapons in public, *see* 1884 Laws of
11   N.Y., ch. 46, § 8, at 47, and soon after the turn of the
12   century, it expanded its licensing requirements to include
13   all persons carrying concealable pistols, *see* 1905 Laws of
14   N.Y., ch. 92, § 2, at 129-30.

15       Due to a rise in violent crime associated with
16   concealable firearms in the early twentieth century, New
17   York enacted the Sullivan Law in 1911, which made it
18   unlawful for any person to possess, without a license, "any
19   pistol, revolver or other firearm of a size which may be
20   concealed upon the person." *See* 1911 Laws of N.Y., ch. 195,
21   § 1, at 443 (codifying N.Y. Penal Law § 1897, ¶ 3); *see also*
22   N.Y. Legislative Service, *Dangerous Weapons—"Sullivan Bill,"*

5

1  1911 Ch. 195 (1911).  A study of homicides and suicides

2  completed shortly before the law's enactment explained: "The

3  increase of homicide by shooting indicates . . . the urgent

4  necessity of the proper authorities taking some measures for

5  the regulation of the indiscriminate sale and carrying of

6  firearms."  *Revolver Killings Fast Increasing*, N.Y. Times,

7  Jan. 30, 1911 (quoting N.Y. State Coroner's Office Report).

8  As a result, the study recommended that New York

9   should have a law, whereby a person having a revolver in
10  his possession, either concealed or displayed, unless for
11  some legitimate purpose, could be punished by a severe
12  jail sentence. . . . [A] rigid law, making it difficult
13  to buy revolvers, would be the means of saving hundreds
14  of lives.
15

16  *Id.* (quoting N.Y. State Coroner's Office Report).

17   The Sullivan Law survived constitutional attack shortly

18  after it was passed.  *People ex rel. Darling v. Warden of*

19  *City Prisons*, 154 A.D. 413, 422 (1st Dep't 1913).  Although

20  the law was upheld, in part, on what is now the erroneous

21  belief that the Second Amendment does not apply to the

22  states, the decision provides additional background

23  regarding the law's enactment:

24   There had been for many years upon the statute books
25  a law against the carriage of concealed weapons. . . . It
26  did not seem effective in preventing crimes of violence
27  in this State.  Of the same kind and character, but

6

proceeding a step further with the regulatory
legislation, the Legislature has now picked out one
particular kind of arm, **the handy, the usual and the
favorite weapon of the turbulent criminal class**, and has
said that in our organized communities, our cities, towns
and villages where the public peace is protected by the
officers of organized government, the citizen may not
have that particular kind of weapon without a permit, as
it had already said that he might not carry it on his
person without a permit.

*Id.* at 423 (emphasis added).

In 1913, the Sullivan Law was amended to impose a

statewide standard for the issuance of licenses to carry

firearms in public. 1913 Laws of N.Y., ch. 608, at 1627-30.

To obtain a license to carry a concealed pistol or revolver

the applicant was required to demonstrate "good moral

character, and that proper cause exists for the issuance [of

the license]." *Id.* at 1629. One hundred years later, the

proper cause requirement remains a feature of New York's

statutory regime.

**B**

New York maintains a general prohibition on the

possession of "firearms" absent a license. *See* N.Y. Penal

Law §§ 265.01-265.04, 265.20(a)(3). A "firearm" is defined

to include pistols and revolvers; shotguns with barrels less

than eighteen inches in length; rifles with barrels less

than sixteen inches in length; "any weapon made from a

7

shotgun or rifle" with an overall length of less than twenty-six inches; and assault weapons.  N.Y. Penal Law § 265.00(3).  Rifles and shotguns are not subject to the licensing provisions of the statute.[3]

Section 400.00 of the Penal Law "is the exclusive statutory mechanism for the licensing of firearms in New York State."[4]  *O'Connor v. Scarpino*, 83 N.Y.2d 919, 920 (1994) (Mem.); *see* N.Y. Penal Law § 265.20(a)(3).  Licenses are limited to those over twenty-one years of age, of good moral character, without a history of crime or mental illness, and "concerning whom no good cause exists for the denial of the license."  N.Y. Penal Law § 400.00(1)(a)-(d), (g).

Most licenses are limited by place or profession. Licenses "shall be issued" to possess a registered handgun

---

[3] The possession of rifles and shotguns is also regulated. Subject to limited exceptions, it is unlawful to possess a rifle or shotgun "in or upon a building or grounds, used for educational purposes, of any school, college or university . . . or upon a school bus."  N.Y. Penal Law § 265.01(3).  It is also unlawful for a person under the age of sixteen to possess a rifle or shotgun unless he or she has a hunting permit issued pursuant to the environmental conservation law.  N.Y. Penal Law § 265.05; *see also* N.Y. Envtl. Conserv. Law § 11-0929.

[4] The prohibition on carrying rifles and shotguns on school grounds, in a school building, and on a school bus also applies to those licensed to carry a firearm under section 400.00.  N.Y. Penal Law §§ 265.20(3), 265.01(3).

1    in the home or in a place of business by a merchant or

2    storekeeper.  N.Y. Penal Law § 400.00(2)(a)-(b).  And

3    licenses "shall be issued" for a messenger employed by a

4    banking institution or express company to carry a concealed

5    handgun, as well as for certain state and city judges and

6    those employed by a prison or jail.  § 400.00(2)(c)-(e).

7        This case targets the license available under section

8    400.00(2)(f).  That section provides that a license "shall

9    be issued to . . . have and carry [a firearm] concealed . .

10    . by any person when proper cause exists for the issuance

11    thereof."  N.Y. Penal Law § 400.00(2)(f).  This is the **only**

12    license available to carry a concealed handgun "without

13    regard to employment or place of possession."  *Id.*  Given

14    that New York bans carrying handguns openly, applicants—like

15    Plaintiffs in this case—who desire to carry a handgun

16    outside the home and who do not fit within one of the

17    employment categories must demonstrate proper cause pursuant

18    to section 400.00(2)(f).

19        "Proper cause" is not defined by the Penal Law, but New

20    York State courts have defined the term to include carrying

21    a handgun for target practice, hunting, or self-defense.

22    When an applicant demonstrates proper cause to carry a

1  handgun for target practice or hunting, the licensing

2  officer may restrict a carry license "to the purposes that

3  justified the issuance."[5] *O'Connor*, 83 N.Y.2d at 921.  In

4  this regard, "a sincere desire to participate in target

5  shooting and hunting . . . constitute[s] a legitimate reason

6  for the issuance of a pistol permit."  *In re O'Connor*, 585

7  N.Y.S.2d 1000, 1003 (Westchester Cty. Ct. 1992) (citing

8  *Davis v. Clyne*, 58 A.D.2d 947, 947 (3d Dep't 1977)).

9      To establish proper cause to obtain a license without

10 any restrictions—the full-carry license that Plaintiffs seek

11 in this case—an applicant must "demonstrate a special need

12 for self-protection distinguishable from that of the general

13 community or of persons engaged in the same profession."

14 *Klenosky v. N.Y City Police Dep't*, 75 A.D.2d 793, 793 (1st

15 Dep't 1980), *aff'd on op. below*, 53 N.Y.2d 685 (1981).

16 There is a substantial body of law instructing licensing

17 officials on the application of this standard.  Unlike a

18 license for target shooting or hunting, "[a] generalized

---

[5] A license restricted to target practice or hunting permits
the licensee to carry concealed a handgun "in connection" with
these activities.  *In re O'Connor*, 585 N.Y.S.2d 1000, 1003
(Westchester Cty. Ct. 1992).  For instance, a license restricted
to target practice permits the licensee to carry the weapon to
and from the shooting range.  *Bitondo v. New York*, 182 A.D.2d
948, 948 (3d Dep't 1992).

1    desire to carry a concealed weapon to protect one's person

2    and property does not constitute 'proper cause.'" *In re*

3    *O'Connor*, 585 N.Y.S.2d at 1003 (citing *Bernstein v. Police*

4    *Dep't of City of New York*, 85 A.D.2d 574, 574 (1st Dep't

5    1981)).  Good moral character plus a simple desire to carry

6    a weapon is not enough. *Moore v. Gallup*, 293 N.Y. 846

7    (1944) (per curiam), *aff'g* 267 A.D. 64, 66 (3d Dep't 1943);

8    *see also In re O'Connor*, 585 N.Y.S.2d at 1003.  Nor is

9    living or being employed in a "high crime area[]." *Martinek*

10   *v. Kerik*, 294 A.D.2d 221, 221-22 (1st Dep't 2002); *see also*

11   *Theurer v. Safir*, 254 A.D.2d 89, 90 (1st Dep't 1998); *Sable*

12   *v. McGuire*, 92 A.D.2d 805, 805 (1st Dep't 1983).

13       The application process for a license is "rigorous" and

14   administered locally. *Bach v. Pataki*, 408 F.3d 75, 79 (2d

15   Cir. 2005).  Every application triggers a local

16   investigation by police into the applicant's mental health

17   history, criminal history, moral character, and, in the case

18   of a carry license, representations of proper cause. *See*

19   N.Y. Penal Law § 400.00(1)-(4).  As part of this

20   investigation, police officers take applicants' fingerprints

21   and conduct a series of background checks with the New York

22   State Division of Criminal Justice Services, the Federal

11

1    Bureau of Investigation, and the New York State Department

2    of Mental Hygiene.  N.Y. Penal Law § 400.00(4).  Upon

3    completion of the investigation, the results are reported to

4    the licensing officer.  *Id.*

5        Licensing officers, often local judges,[6] are "vested

6    with considerable discretion" in deciding whether to grant a

7    license application, particularly in determining whether

8    proper cause exists for the issuance of a carry license.

9    *Vale v. Eidens*, 290 A.D.2d 612, 613 (3d Dep't 2002); *see*

10   *also Kaplan v. Bratton*, 249 A.D.2d 199, 201 (1st Dep't

11   1998); *Unger v. Rozzi*, 206 A.D.2d 974, 974-75 (4th Dep't

12   1994); *Fromson v. Nelson*, 178 A.D.2d 479, 479 (2d Dep't

13   1991).  An applicant may obtain judicial review of the

14   denial of a license in whole or in part by filing a

15   proceeding under Article 78 of New York's Civil Practice Law

16   and Rules.  A licensing officer's decision will be upheld

17   unless it is arbitrary and capricious.  *O'Brien v. Keegan*,

18   87 N.Y.2d 436, 439-40 (1996).

---

[6] Except in New York City, Nassau County, and Suffolk County, a "licensing officer" is defined as a "judge or justice of a court of record having his office in the county of issuance."  N.Y. Penal Law § 265.00(10).  "Licensing officer" is defined in New York City as "the police commissioner of that city"; in Nassau County as "the commissioner of police of that county"; and in Suffolk County as "the sheriff of that county except in the towns of Babylon, Brookhaven, Huntington, Islip and Smithtown, the commissioner of police of that county."  *Id.*

1                                **C**

2       Each individual Plaintiff applied for a full-carry

3   license under section 400.00(2)(f).  Four of the five

4   Plaintiffs made no effort to comply with New York's

5   requirements for a full-carry license, that is, they did not

6   claim a special need for self-protection distinguishable

7   from that of the general community or of persons engaged in

8   the same profession.  Plaintiff Kachalsky asserted that the

9   Second Amendment "entitles him to an unrestricted permit

10  without further establishing 'proper cause.'"  J.A. 33.  He

11  noted: "[W]e live in a world where sporadic random violence

12  might at any moment place one in a position where one needs

13  to defend onself or possibly others."  J.A. 33-34.

14  Plaintiffs Nance and Marcucci-Nance asserted that they

15  demonstrated proper cause because they were citizens in

16  "good standing" in their community and gainfully employed.

17  J.A. 43-44, 48-49.  Plaintiff Detmer asserted that he

18  demonstrated proper cause because he was a federal law

19  enforcement officer with the U.S. Coast Guard.[7]  J.A. 39.

20  Unlike the other Plaintiffs, Plaintiff Nikolov attempted to

---

[7] Plaintiffs Nance, Marcucci-Nance, and Detmer have carry
licenses limited to the purpose of target shooting.  Their
applications sought to amend their licenses to full-carry
licenses.

show a special need for self-protection by asserting that as a transgender female, she is more likely to be the victim of violence. J.A. 36. Like the other applicants, she also asserted that being a law-abiding citizen in itself entitled her to a full-carry license. *Id.*

Plaintiffs' applications were all denied for the same reason: Failure to show any facts demonstrating a need for self-protection distinguishable from that of the general public. J.A. 34 (Kachalsky), 37 (Nikolov), 39 (Detmer), 43-44 (Nance), 48-49 (Marcucci-Nance). Nikolov's contention that her status as a transgender female puts her at risk of violence was rejected because she did not "report . . . any type of threat to her own safety anywhere." J.A. 36. Plaintiffs aver that they have not reapplied for full-carry licenses because they believe it would be futile, and that they would carry handguns in public but for fear of arrest, prosecution, fine, and/or imprisonment.[8] J.A. 75, 77, 79, 81, 83, 85.

---

[8] Plaintiff Kachalsky was the only Plaintiff who appealed the denial of his full-carry license application. The Appellate Division, Second Department affirmed the denial, holding that Kachalsky "failed to demonstrate 'proper cause' for the issuance of a 'full carry' permit." *Kachalsky v. Cacace*, 65 A.D.3d 1045 (2d Dep't 2009). The New York Court of Appeals dismissed Kachalsky's application for leave to appeal "upon the ground that no substantial constitutional question [was] directly involved." *Kachalsky v. Cacace*, 14 N.Y.3d 743, 743 (2010).

**II**

Invoking *Heller*, Plaintiffs contend that the Second Amendment guarantees them a right to possess and carry weapons in public to defend themselves from dangerous confrontation and that New York cannot constitutionally force them to demonstrate proper cause to exercise that right. Defendants counter that the proper cause requirement does not burden conduct protected by the Second Amendment. They share the district court's view that the Supreme Court's pronouncement in *Heller* limits the right to bear arms for self-defense to the home.

*Heller* provides no categorical answer to this case. And in many ways, it raises more questions than it answers. In *Heller*, the Supreme Court concluded that the Second Amendment codifies a pre-existing "individual right to possess and carry weapons in case of confrontation." 554 U.S. at 592. Given that interpretation, the Court struck down the District of Columbia's prohibition on the possession of usable firearms in the home because the law banned "the quintessential self-defense weapon" in the place Americans hold most dear—the home. *Id.* at 628-29.

There was no need in *Heller* to further define the scope of the Second Amendment or the standard of review for laws

15

1     that burden Second Amendment rights.  As the Court saw it,

2     "[f]ew laws in the history of our Nation have come close to

3     the severe restriction of the District's handgun ban." *Id.*

4     at 629.  Because the Second Amendment was directly at odds

5     with a complete ban on handguns in the home, the D.C.

6     statute ran roughshod over that right.  Thus, the Court

7     simply noted that the handgun ban would be unconstitutional

8     "[u]nder any of the standards of scrutiny that we have

9     applied to enumerated constitutional rights." *Id.* at 628.

10    *Heller* was never meant "to clarify the entire field" of

11    Second Amendment jurisprudence.[9] *Id.* at 635.

12

---

[9] A number of courts and academics, take the view that *Heller's* reluctance to announce a standard of review is a signal that courts must look solely to the text, history, and tradition of the Second Amendment to determine whether a state can limit the right without applying any sort of means-end scrutiny. *See Heller v. District of Columbia*, 670 F.3d 1244, 1271-74 (D.C. Cir. 2011) (Kavanaugh, *J.*, dissenting); *see also* Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense: An Analytical Framework and a Research Agenda*, 56 UCLA L. Rev. 1443, 1463 (2009); Joseph Blocher, *Categoricalism and Balancing in First and Second Amendment Analysis*, 84 N.Y.U. L. Rev. 375, 405 (2009).  We disagree. *Heller* stands for the rather unremarkable proposition that where a state regulation is entirely inconsistent with the protections afforded by an enumerated right—as understood through that right's text, history, and tradition—it is an exercise in futility to apply means-end scrutiny.  Moreover, the conclusion that the law would be unconstitutional "[u]nder any of the standards of scrutiny" applicable to other rights implies, if anything, that one of the conventional levels of scrutiny would be applicable to regulations alleged to infringe Second Amendment rights.

1      Two years after *Heller*, the Supreme Court held that the

2  Second Amendment's protections, whatever their limits, apply

3  fully to the states through the Fourteenth Amendment.

4  *McDonald v. City of Chicago*, 130 S. Ct. 3020, 3026, 3042

5  (2010).  In *McDonald*, the Court struck down a Chicago law

6  that banned handguns in the home.  *Id.* at 3050.  But it also

7  reaffirmed *Heller's* assurances that Second Amendment rights

8  are far from absolute and that many longstanding handgun

9  regulations are "presumptively lawful."  *Heller* 554 U.S. at

10  627 n.26; *see McDonald*, 130 S. Ct. at 3047.  The Court also

11  noted that the doctrine of "incorporation does not imperil

12  every law regulating firearms."  *McDonald*, 130 S. Ct. at

13  3047.

14      What we know from these decisions is that Second

15  Amendment guarantees are at their zenith within the home.

16  *Heller*, 554 U.S. at 628-29.  What we do not know is the

17  scope of that right beyond the home and the standards for

18  determining when and how the right can be regulated by a

19  government.  This vast "*terra incognita*" has troubled courts

20  since *Heller* was decided.  *United States v. Masciandaro*, 638

21  F.3d 458, 475 (4th Cir. 2011) (Wilkinson, *J.*, for the

22  Court).  Although the Supreme Court's cases applying the

1    Second Amendment have arisen only in connection with

2    prohibitions on the possession of firearms in the home, the

3    Court's analysis suggests, as Justice Stevens's dissent in

4    *Heller* and Defendants in this case before us acknowledge,

5    that the Amendment must have **some** application in the very

6    different context of the public possession of firearms.[10]

7    Our analysis proceeds on this assumption.

8                                    **A**

9         Plaintiffs contend that, as in *Heller*, history and

10   tradition demonstrate that there is a "fundamental right" to

11   carry handguns in public, and though a state may regulate

12   open or concealed carrying of handguns, it cannot ban **both**.

13   While Plaintiffs concede that state legislative efforts have

14   long recognized the dangers presented by both the open and

15   concealed carrying of handguns in public places, they

16   contend that states must suffer a constitutionally imposed

17   choice between two equally inadequate alternatives.  Thus,

18   according to Plaintiffs, "access to [New York's] only

19   available handgun carry license can[not] be qualified by

---

[10] The plain text of the Second Amendment does not limit the
right to bear arms to the home.

18

1   'proper cause.'"[11]  Appellants' Br. at 38.

2        To be sure, some nineteenth-century state courts

3   offered interpretations of the Second Amendment and

4   analogous state constitutional provisions that are similar

5   to Plaintiffs' position.   In *State v. Reid*, the Supreme

6   Court of Alabama upheld a prohibition on the concealed

7   carrying of "any species of fire arms" but cautioned that

8   the state's ability to regulate firearms was not unlimited

9   and could not "amount[] to a destruction of the right, or .

10  . . require[] arms to be so borne as to render them wholly

---

[11] Plaintiffs' argument is premised, in part, on *Heller's*
enunciation of certain "longstanding" regulatory measures,
including concealed carry bans, that the Court deemed
"presumptively lawful."  *Heller*, 554 U.S. at 626-27; *see also
McDonald*, 130 S. Ct. at 3047 (plurality opinion) (same).  Thus,
plaintiffs contend that regulations that are not similarly
"longstanding" are not valid restrictions on Second Amendment
rights.  We do not view this language as a talismanic formula for
determining whether a law regulating firearms is consistent with
the Second Amendment.  While we find it informative, it simply
makes clear that the Second Amendment right is not unlimited.
    Moreover, even if this language provided a "test" for
determining the validity of a handgun regulation, it is not
self-evident what that test might be.  The "longstanding"
prohibitions on the possession of firearms by felons and the
mentally ill were identified as "presumptively lawful," *Heller*,
554 U.S. at 626-27 and n. 26, but these laws were not enacted
until the early twentieth century, *see* Carlton F.W. Larson, *Four
Exceptions in Search of a Theory: District of Columbia v. Heller
and Judicial Ipse Dixit*, 60 Hastings L.J. 1371, 1374-79 (2009).
New York's proper cause requirement is similarly
"longstanding"—it has been the law in New York since 1913.  1913
Laws of N.Y., ch. 608, at 1627-30.

1    useless for the purpose of defence." 1 Ala. 612, 1840 WL

2    229, at *2-3 (1840). Relying on *Reid*, the Supreme Court of

3    Georgia held that a statute prohibiting the carrying of

4    concealed pistols was unconstitutional insofar as it also

5    "contains a prohibition against bearing arms *openly*." *Nunn*

6    *v. State*, 1 Ga. 243, 1846 WL 1167, at *11 (1846) (emphasis

7    in original).[12] And in *State v. Chandler*, the Supreme Court

8    of Louisiana upheld a concealed-carry ban because "[i]t

9    interfered with no man's right to carry arms . . . in full

10   open view." 5 La. Ann. 489, 1850 WL 3838, at *1 (1850)

11   (internal quotation marks omitted).[13]

12

---

[12] *Nunn* is cited in Justice Scalia's majority opinion in *Heller* as an example of state court responses to handgun regulatory efforts within the states. *Heller*, 554 U.S. at 629.

[13] Notably, *Chandler* and *Reid* conflict with Plaintiffs' position, at least in part. Plaintiffs contend that a state may choose to ban open carrying so long as concealed carrying is permitted. But both *Chandler* and *Reid* suggest that open carrying **must** be permitted. The *Reid* court explained:

> Under the provision of our constitution, we incline to the opinion that the Legislature cannot inhibit the citizen from bearing arms openly, because it authorizes him to bear them for the purposes of defending himself and the State, and it is only when carried openly, that they can be efficiently used for defence.

1840 WL 229, at *5; *see also Chandler*, 1850 WL 3838, at *1.

1    But this was hardly a universal view.  Other states

2  read restrictions on the public carrying of weapons as

3  entirely consistent with constitutional protections of the

4  right to keep and bear arms.  At least four states once

5  banned the carrying of pistols and similar weapons in

6  public, both in a concealed or an open manner.  *See, e.g.*,

7  Ch. 96, §§ 1-2, 1881 Ark. Acts at 191-92; Act of Dec. 2,

8  1875, ch. 52, § 1, 1876 Wyo. Terr. Comp. Laws, at 352; Ch.

9  13, § 1, 1870 Tenn. Acts at 28; Act of Apr. 12, 1871, ch.

10  34, § 1, 1871 Tex. Gen. Laws at 25.  And the statutes in

11  Texas, Tennessee, and Arkansas withstood constitutional

12  challenges.  *See, e.g.*, *Fife v. State*, 31 Ark. 455, 1876 WL

13  1562, at *4 (1876); *English v. State*, 35 Tex. 473, 1872 WL

14  7422, at *3 (1871); *Andrews v. State*, 50 Tenn. 165, 1871 WL

15  3579, at *11 (1871).[14]

---

[14] These cases were decided on the basis of an interpretation
of the Second Amendment—that pistols and similar weapons are not
"arms" within the meaning of the Second Amendment or its state
constitutional analogue—that conflicts with the Supreme Court's
present reading of the Amendment.  *Fife*, 1876 WL 1562, at *4;
*English*, 1872 WL 7422, at *3; *Andrews*, 1871 WL 3579, at *11.  For
instance, the Texas court construed the Second Amendment as
protecting only the "arms of a militiaman or soldier," which
include "the musket and bayonet . . . holster pistols and carbine
. . . [and] side arms."  1872 WL 7422, at *3.  To refer to the
non-military style pistols covered by the statute as necessary
for a "well-regulated militia" was, according to the court,
"simply ridiculous."  *Id*.  Similarly, the Tennessee court
invalidated the statute to the extent it covered revolvers
"adapted to the usual equipment of a solider."  *Andrews*, 1871 WL
3579, at *11.

1   It seems apparent to us that unlike the situation in

2   *Heller* where "[f]ew laws in the history of our Nation have

3   come close" to D.C.'s total ban on usable handguns in the

4   home, New York's restriction on firearm possession in public

5   has a number of close and longstanding cousins.[15] *Heller*,

6   554 U.S. at 629.  History and tradition do not speak with

7   one voice here.  What history demonstrates is that states

8   often disagreed as to the scope of the right to bear arms,

9   whether the right was embodied in a state constitution or

10  the Second Amendment.  *Compare Bliss v. Commonwealth*, 12 Ky.

11  90, 1822 WL 1085, at *3 (1822) (concluding that a

12  prohibition on carrying concealed weapons was

13  unconstitutional), *with Aymette v. State*, 21 Tenn. 154, 1840

14  WL 1554, at **4-6 (1840) (citing to *Bliss* but reaching the

15  opposite conclusion).

16      Even if we believed that we should look solely to this

17  highly ambiguous history and tradition to determine the

18  meaning of the Amendment, we would find that the cited

19  sources do not directly address the specific question before

20  us:  Can New York limit handgun licenses to those

21  demonstrating a special need for self-protection?  Unlike

---

[15] The extensive history of state regulation of handguns in public is discussed in detail in Part II.B.

22

1   the cases and statutes discussed above, New York's proper

2   cause requirement does not operate as a complete ban on the

3   possession of handguns in public.  Analogizing New York's

4   licensing scheme (or any other gun regulation for that

5   matter) to the array of statutes enacted or construed over

6   one hundred years ago has its limits.

7       Plaintiffs raise a second argument with regard to how

8   we should measure the constitutional legitimacy of the New

9   York statute that takes a decidedly different tack.  They

10  suggest that we apply First Amendment prior-restraint

11  analysis in lieu of means-end scrutiny to assess the proper

12  cause requirement.[16]  They see the nature of the rights

13  guaranteed by each amendment as identical in kind.  One has

14  a right to speak and a right to bear arms.  Thus, just as

15  the First Amendment permits everyone to speak without

16  obtaining a license, New York cannot limit the right to bear

17  arms to only some law-abiding citizens.  We are hesitant to

18  import *substantive* First Amendment principles wholesale into

19  Second Amendment jurisprudence.  Indeed, no court has done

---

[16] Plaintiffs also contend that New York's requirement that
license applicants be "of good moral character" is an
unconstitutional prior restraint.  Because, as Plaintiffs admit,
this provision was not challenged in their complaint or below, we
choose not to consider it here.

23

1    so. *See, e.g.*, *Woollard v. Sheridan*, 863 F. Supp. 2d 462,

2    472 (D. Md. 2012); *Piszczatoski v. Filko*, 840 F. Supp. 2d

3    813, 835-36 (D.N.J. 2012).

4        We recognize that analogies between the First and

5    Second Amendment were made often in *Heller*.  554 U.S. at

6    582, 595, 606, 635.  Similar analogies have been made since

7    the Founding.  *See, e.g.*, *Commonwealth v. Blanding*, 20 Mass.

8    304, 314 (1825) ("The liberty of the press was to be

9    unrestrained, but he who used it was to be responsible in

10   case of its abuse; like the right to keep fire arms, which

11   does not protect him who uses them for annoyance or

12   destruction.").  Notably, these analogies often used the

13   states' power to regulate firearms, which was taken as

14   unassailably obvious, to support arguments in favor of

15   upholding limitations on First Amendment rights.  But it

16   would be as imprudent to assume that the principles and

17   doctrines developed in connection with the First Amendment

18   apply equally to the Second, as to assume that rules

19   developed in the Second Amendment context could be

20   transferred without modification to the First.  Endorsing

21   that approach would be an incautious equation of the two

22   amendments and could well result in the erosion of hard-won

23   First Amendment rights.  As discussed throughout, there are

salient differences between the state's ability to regulate
each of these rights. *See generally* L.A. Powe, Jr., *Guns,
Words, and Constitutional Interpretation*, 38 Wm. & Mary L.
Rev. 1311 (1997) (discussing problems with efforts to
associate firearms with the First Amendment's prohibition on
prior restraints).

But even if we decided to apply prior-restraint
doctrine to Second Amendment claims, this case would be a
poor vehicle for its maiden voyage. To make out a
prior-restraint argument, Plaintiffs would have to show that
the proper cause requirement lacks "narrow, objective, and
definite standards," thereby granting officials unbridled
discretion in making licensing determinations. *Forsyth
Cnty. v. Nationalist Movement*, 505 U.S. 123, 131 (1992)
(quoting *Shuttlesworth v. Birmingham*, 394 U.S. 147, 150-51
(1969)). But Plaintiffs' contention that the proper cause
requirement grants licensing officials unbridled discretion
is something of a red herring. Plaintiffs admit that there
is an established standard for determining whether an
applicant has demonstrated proper cause. The proper cause
requirement has existed in New York since 1913 and is
defined by binding judicial precedent as "a special need for
self-protection distinguishable from that of the general

25

1    community or of persons engaged in the same profession."

2    *Klenosky*, 75 A.D.2d at 793; *see e.g.*, *Brando v. Sullivan*,

3    290 A.D.2d 691, 693 (3d Dep't 2002); *Bernstein*, 85 A.D.2d at

4    574.

5        Plaintiffs' complaint is not that the proper cause

6    requirement is ***standardless***; rather, they simply do not like

7    the ***standard***—that licenses are limited to those with a

8    special need for self-protection.  This is not an argument

9    that licensing officials have unbridled discretion in

10   granting full-carry permits.  In fact, the State Defendants'

11   determinations that Plaintiffs do not have a special need

12   for self-protection are unchallenged.  Rather, Plaintiffs

13   question New York's ability to limit handgun possession to

14   those demonstrating a threat to their safety.  This is

15   precisely the type of argument that should be addressed by

16   examining the purpose and impact of the law in light of the

17   Plaintiffs' Second Amendment right.

18       Plaintiffs' attempts to equate this case with *Heller* or

19   to draw analogies to First Amendment concerns come up short.

20                                **B**

21       Thus, given our assumption that the Second Amendment

22   applies to this context, the question becomes how closely to

26

1    scrutinize New York's statute to determine its

2    constitutional mettle. *Heller*, as noted above, expressly

3    avoided deciding the standard of review for a law burdening

4    the right to bear arms because it concluded that D.C.'s

5    handgun ban was unconstitutional "[u]nder any of the

6    standards of scrutiny [traditionally] applied to enumerated

7    constitutional rights." *Heller*, 554 U.S. at 628. The Court

8    did, however, rule out a rational basis review because it

9    "would be redundant with the separate constitutional

10    prohibitions on irrational laws." *Id.* at 629 n.27.

11      We have held that "heightened scrutiny is triggered

12    only by those restrictions that (like the complete

13    prohibition on handguns struck down in *Heller*) operate as a

14    substantial burden on the ability of law-abiding citizens to

15    possess and use a firearm for self-defense (or for other

16    lawful purposes)." *United States v. Decastro*, 682 F.3d 160,

17    166 (2d Cir. 2012). *Decastro* rejected a Second Amendment

18    challenge to 18 U.S.C. § 922(a)(3), which makes it unlawful

19    for an individual to transport into his state of residence a

20    firearm acquired in another state. Because we concluded

21    that § 922(a)(3) did not impose a substantial burden on the

22    defendant's Second Amendment right, we left unanswered "the

23    level of scrutiny applicable to laws that do impose such a

27

1    burden." *Id.* at 165.  Here, some form of heightened

2    scrutiny would be appropriate.  New York's proper cause

3    requirement places substantial limits on the ability of law-

4    abiding citizens to possess firearms for self-defense in

5    public.  And unlike *Decastro*, there are no alternative

6    options for obtaining a license to carry a handgun.

7         We do not believe, however, that heightened scrutiny

8    must always be akin to strict scrutiny when a law burdens

9    the Second Amendment.  *Heller* explains that the "core"

10   protection of the Second Amendment is the "right of law-

11   abiding, responsible citizens to use arms in defense of

12   hearth and home."  *Heller*, 554 U.S. at 634-35.  Although we

13   have no occasion to decide what level of scrutiny should

14   apply to laws that burden the "core" Second Amendment

15   protection identified in *Heller*, we believe that applying

16   less than strict scrutiny when the regulation does not

17   burden the "core" protection of self-defense in the home

18   makes eminent sense in this context and is in line with the

19   approach taken by our sister circuits.[17]  It is also

---

[17] *Heller v. District of Columbia*, 670 F.3d 1244, 1261–64
(D.C. Cir. 2011) (applying intermediate scrutiny to prohibition
on possession of magazines with a capacity of more than ten
rounds of ammunition); *United States v. Booker*, 644 F.3d 12, 25
(1st Cir. 2011) (applying intermediate scrutiny to 18 U.S.C. §
922(g)(9), which prohibits the possession of firearms by a person

1    consistent with jurisprudential experience analyzing other

2    enumerated rights.  For instance, when analyzing First

3    Amendment claims, content-based restrictions on

4    noncommercial speech are subject to strict scrutiny, *see*

5    *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803,

6    813 (2000), while laws regulating commercial speech are

7    subject to intermediate scrutiny, *see Florida Bar v. Went*

8    *For It, Inc.*, 515 U.S. 618, 624-25 (1995).

9         The proper cause requirement falls outside the core

10   Second Amendment protections identified in *Heller*.  New

11   York's licensing scheme affects the ability to carry

12   handguns only ***in public***, while the District of Columbia ban

13   applied ***in the home*** "where the need for defense of self,

---

convicted of a misdemeanor crime of domestic violence), *cert.*
*denied*, 132 S. Ct. 1538 (2012); *United States v. Masciandaro*, 638
F.3d 458, 470 (4th Cir. 2011) (applying intermediate scrutiny to
36 C.F.R. § 2.4(b), which prohibits "carrying or possessing a
loaded weapon in a motor vehicle" within national park areas),
*cert. denied*, 132 S. Ct. 756 (2011); *United States v. Chester*,
628 F.3d 673, 683 (4th Cir. 2010) (applying intermediate scrutiny
to 18 U.S.C. § 922(g)(9)); *United States v. Marzzarella*, 614 F.3d
85, 97 (3d Cir. 2010) (applying intermediate scrutiny to 18
U.S.C. § 922(k), which prohibits the possession of firearms with
obliterated serial numbers), *cert. denied* 131 S. Ct. 958 (2011);
*United States v. Reese*, 627 F.3d 792, 802 (10th Cir. 2010)
(applying intermediate scrutiny to 18 U.S.C. § 922(g)(8), which
prohibits the possession of firearms while subject to a domestic
protection order), *cert. denied*, 131 S. Ct. 2476 (2011); *United*
*States v. Skoien*, 614 F.3d 638, 641-42 (7th Cir. 2010) (en banc)
(applying form of intermediate scrutiny to 18 U.S.C. §
922(g)(9)), *cert. denied*, 131 S. Ct. 1674 (2011).

family, and property is most acute." *Heller*, 554 U.S. at
628.  This is a critical difference.  The state's ability to
regulate firearms and, for that matter, conduct, is
qualitatively different in public than in the home.  *Heller*
reinforces this view.  In striking D.C.'s handgun ban, the
Court stressed that banning usable handguns in the home is a
"policy choice[]" that is "off the table," *id.* at 636, but
that a variety of other regulatory options remain available,
including categorical bans on firearm possession in certain
public locations, *id.* at 626-27 & n.26.

Treating the home as special and subject to limited
state regulation is not unique to firearm regulation; it
permeates individual rights jurisprudence.  For instance, in
*Stanley v. Georgia*, the Court held that in-home possession
of obscene materials could not be criminalized, even as it
assumed that public display of obscenity was unprotected.
394 U.S. 557, 568 (1969).  While "the States retain broad
power to regulate obscenity[] that power simply does not
extend to mere possession by the individual in the privacy
of his own home." *Id.*  Similarly, in *Lawrence v. Texas*, the
Court emphasized that the state's efforts to regulate
private sexual conduct between consenting adults is
especially suspect when it intrudes into the home: "Liberty

30

1    protects the person from unwarranted government intrusions

2    into a dwelling or other private places.  In our tradition

3    the State is not omnipresent in the home." 539 U.S. 558,

4    562 (2003); *see also Kyllo v. United States*, 533 U.S. 27, 37

5    (2001) ("In the home, our [Fourth Amendment] cases show

6    [that] the entire area is held safe from prying government

7    eyes."); *Griswold v. Connecticut*, 381 U.S. 479, 484 (1965)

8    (discussing general right to privacy that was closely

9    connected to "the sanctity of a man's home and the privacies

10   of life" (internal quotation marks omitted)).[18]

11       But while the state's ability to regulate firearms is

12   circumscribed in the home, "outside the home, firearm rights

13   have always been more limited, because public safety

14   interests often outweigh individual interests in self-

15   defense." *Masciandaro*, 638 F.3d at 470.  There is a

16   longstanding tradition of states regulating firearm

17   possession and use in public because of the dangers posed to

18   public safety.  *See* Saul Cornell & Nathan DeDino, *A Well*

19   *Regulated Right: The Early American Origins of Gun Control*,

---

[18] That the home deserves special protection from government
intrusion is also reflected in the Third Amendment, which
provides: "No Soldier shall, in time of peace be quartered in any
house, without the consent of the Owner, nor in time of war, but
in a manner to be prescribed by law." U.S. Const. amend. III.

31

1    73 Fordham L. Rev. 487, 502-16 (2004).  During the Founding

2    Era, for instance, many states prohibited the use of

3    firearms on certain occasions and in certain locations.

4    *See, e.g.*, Act of April 22, 1785, ch. 81, 1785 Laws of N.Y.

5    152; Act of Nov. 16, 1821, ch. LXLIII, 1821 Tenn. Pub. Acts

6    78; Act of Jan. 30, 1847, 1846-1847 Va. Acts ch. 79, at 67;

7    Act of Dec. 24, 1774, ch. DCCIII, 1774 Pa. Stat. 410.[19]

8    Other states went even further.  North Carolina prohibited

9    going armed at night or day "in fairs, markets, nor in the

10   presence of the King's Justices, or other ministers, nor in

11   no part elsewhere."  *See* Patrick J. Charles, *The Faces of*

12   *the Second Amendment Outside the Home: History Versus*

13   *Ahistorical Standards of Review*, 60 Clev. St. L. Rev. 1, 31-

14   32 (2012) (citation and internal quotation marks

15   omitted).  Massachusetts and Virginia enacted similar laws.

_____

[19] Regulations concerning the militia and the storage of gun powder were also common.  *See* Act of May 8, 1792, 1792 Conn. Pub. Acts 440 (forming the state militia); Act of July 19, 1776, ch. I, 1775-1776 Mass. Acts 15 (regulating the militia of Massachusetts); Act of Apr. 3, 1778, ch. 33, 1778 Laws of N.Y. 62 (regulating the militia of New York State); Act of Mar. 20, 1780, ch. CLXVII, 1780 Pa. Laws 347 (regulating the militia of Pennsylvania); Act of Mar. 26, 1784, 1784 S.C. Acts 68 (regulating militia); *see also* Act of June 26, 1792, ch. X, 1792 Mass. Acts 208 (regulating storage of gun powder in Boston); Act of Apr. 13, 1784, ch. 28, 1784 Laws of N.Y. 627 (regulating storage of gun powder in New York); Act of Dec. 6, 1783, ch. CIV, 1783 Pa. Laws 161, ch. MLIX, 11 Pa. Stat. 209 (protecting the city of Philadelphia from the danger of gunpowder).

1  *Id.*[20]

2      In the nineteenth century, laws directly regulating

3  concealable weapons for public safety became commonplace and

4  far more expansive in scope than regulations during the

5  Founding Era.  Most states enacted laws banning the carrying

6  of concealed weapons.[21]  And as *Heller* noted, "the majority

7  of the 19th-century courts to consider the question held

8  that prohibitions on carrying concealed weapons were lawful

---

[20] Curiously, North Carolina referred to the "King's
Justices" after the colonies had won their independence.  The
laws in North Carolina, Massachusetts, and Virginia track
language from the 1328 Statute of Northampton, which provided
that no person shall "go nor ride armed by Night nor by Day in
Fairs, Markets, nor in the Presence of the Justices or other
Ministers nor in no Part elsewhere."  2 Edw. 3, c. 3 (1328)
(Eng.).  There is debate in the historical literature concerning
whether the Statute of Northampton, and laws adopting similar
language, prohibited the carrying of weapons in public generally
or only when it would "terrorize" the public.  *See* Charles, *The
Faces of the Second Amendment Outside the Home*, 60 Clev. St. L.
Rev. at 31-32.

[21] *See* Act of Feb. 1, 1839, ch. 77, 1839 Ala. Acts at 67-68;
Act of Apr. 1, 1881, ch. 96, § 1, 1881 Ark. Acts at 191; Act of
Feb. 1, 1881, 1881 Colo. Sess. Laws at 74; Act of Feb. 12, 1885,
ch. 3620, 1885 Fla. Laws at 61; Act of Apr. 16, 1881, 1881 Ill.
Laws at 73-74; Act of Jan. 14, 1820, ch. 23, 1820 Ind. Acts at
39; 29 Ky. Gen. Stat. art. 29, § 1 (as amended through 1880); Act
of Mar. 25, 1813, 1813 La. Acts at 172; 1866 Md. Laws, ch. 375,
§1; Neb. Gen. Stat., ch. 58, ch. 5, § 25 (1873); Act of Mar. 5,
1879, ch. 127, 1879 N.C. Sess. Laws at 231; N.D. Pen. Code § 457
(1895); Act of Mar. 18, 1859, 1859 Ohio Laws at 56; Act of Feb.
18, 1885, 1885 Or. Laws at 33; Act of Dec. 24, 1880, no. 362,
1881 S.C. Acts at 447; S.D. Terr. Pen. Code § 457 (1883); Act of
Apr. 12, 1871, ch. 34, 1871 Tex. Gen. Laws at 25-27; Act of Oct.
20, 1870, ch. 349, 1870 Va. Acts at 510; Wash. Code § 929 (1881);
W. Va. Code, ch. 148, § 7 (1891); *see also* Cornell & DeDino, *A
Well Regulated Right*, 73 Fordham L. Rev. at 502-16.

under the Second Amendment or state analogues." *Heller*, 554
U.S. at 626.  Indeed, the nineteenth century Supreme Court
agreed, noting that "the right of the people to keep and
bear arms . . . is not infringed by laws prohibiting the
carrying of concealed weapons." *Robertson v. Baldwin*, 165
U.S. 275, 281-82 (1897).

In some ways, these concealed-carry bans were similar
to New York's law because while a few states with concealed-
carry bans considered self-defense concerns, the exceptions
were extremely limited.  For instance, in Ohio there was an
exception if "the accused was, at the time of carrying [the
concealed weapon] engaged in a pursuit of any lawful
business, calling or employment, and that the circumstances
. . . justif[ied] a prudent man in carrying the weapon . . .
for the defense of his person."  Act of Mar. 18, 1859, 1859
Ohio Laws at 56-57.  Similarly, in Tennessee, a person was
exempted from the concealed carry ban who was "on a journey
to any place out of his county or state."  Act of Oct. 19,
1821, ch. XIII, 1821 Tenn. Pub. Acts at 15-16.  By contrast,
Virginia's concealed-carry ban was even stricter than New
York's statute because it explicitly rejected a self-defense
exception.  A defendant was guilty under Virginia's
concealed-carry ban even if he was acting in self-defense
when using the weapon.  1838 Va. Acts ch. 101 at 76.

34

1    Some states went even further than prohibiting the

2  carrying of concealed weapons.  As discussed above, several

3  states banned concealable weapons (subject to certain

4  exceptions) altogether whether carried openly or concealed.

5  *See* Part II.A.  Other states banned the sale of concealable

6  weapons.  For instance, Georgia criminalized the sale of

7  concealable weapons, effectively moving toward their

8  complete prohibition.  Act of Dec. 25, 1837, 1837 Ga. Laws

9  at 90 (protecting citizens of Georgia against the use of

10 deadly weapons).  Tennessee enacted a similar law, which

11 withstood constitutional challenge.  Act of Jan. 27, 1838,

12 ch. CXXXVII, 1837-1838 Tenn. Pub. Acts 200.  In upholding

13 the law, the Supreme Court of Tennessee reasoned that "[t]he

14 Legislature thought the evil great, and, to effectually

15 remove it, made the remedy strong." *Day v. State*, 37 Tenn.

16 (5 Sneed) 496, 500 (1857).

17     The historical prevalence of the regulation of firearms

18 in public demonstrates that while the Second Amendment's

19 core concerns are strongest inside hearth and home, states

20 have long recognized a countervailing and competing set of

21 concerns with regard to handgun ownership and use in public.

22 Understanding the scope of the constitutional right is the

35

1  first step in determining the yard stick by which we measure

2  the state regulation. *See, e.g.*, *Bd. Of Trustees of Univ.*

3  *of Alabama v. Garrett*, 531 U.S. 356, 365 (2001) ("The first

4  step in [analyzing legislation intersecting with enumerated

5  rights] is to identify with some precision the scope of the

6  constitutional right at issue.").

7      We believe state regulation of the use of firearms in

8  public was "enshrined with[in] the scope" of the Second

9  Amendment when it was adopted. *Heller*, 554. U.S. at 634.

10  As Plaintiffs admitted at oral argument, "the state enjoys a

11  fair degree of latitude" to regulate the use and possession

12  of firearms in public.  The Second Amendment does not

13  foreclose regulatory measures to a degree that would result

14  in "handcuffing lawmakers' ability to prevent armed mayhem

15  in public places." *Masciandaro*, 638 F.3d at 471 (internal

16  quotation marks omitted).

17      Because our tradition so clearly indicates a

18  substantial role for state regulation of the carrying of

19  firearms in public, we conclude that intermediate scrutiny

20  is appropriate in this case.  The proper cause requirement

21  passes constitutional muster if it is substantially related

22  to the achievement of an important governmental interest.

36

*See, e.g.*, *Masciandaro*, 638 F.3d at 471; *Skoien*, 614 F.3d at 641-42; *see also Ernst J. v. Stone*, 452 F.3d 186, 200 n.10 (2d Cir. 2006) ("[T]he label 'intermediate scrutiny' carries different connotations depending on the area of law in which it is used.").

As the parties agree, New York has substantial, indeed compelling, governmental interests in public safety and crime prevention. *See, e.g.*, *Schenck v. Pro-Choice Network*, 519 U.S. 357, 376 (1997); *Schall v. Martin*, 467 U.S. 253, 264 (1984); *Hodel v. Va. Surface Mining & Reclamation Ass'n*, 452 U.S. 264, 300 (1981); *Kuck v. Danaher*, 600 F.3d 159, 166 (2d Cir. 2010). The only question then is whether the proper cause requirement is substantially related to these interests. We conclude that it is.

In making this determination, "substantial deference to the predictive judgments of [the legislature]" is warranted. *Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180, 195 (1997). The Supreme Court has long granted deference to legislative findings regarding matters that are beyond the competence of courts. *See Holder v. Humanitarian Law Project*, 130 S. Ct. 2705, 2727 (2010); *Turner Broad. Sys., Inc.*, 520 U.S. at 195-196; *see also Walters v. National Ass'n of Radiation*

37

1   *Survivors*, 473 U.S. 305, 330-31 n.12 (1985).  In the context

2   of firearm regulation, the legislature is "far better

3   equipped than the judiciary" to make sensitive public policy

4   judgments (within constitutional limits) concerning the

5   dangers in carrying firearms and the manner to combat those

6   risks.  *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 665

7   (1994).  Thus, our role is only "to assure that, in

8   formulating its judgments, [New York] has drawn reasonable

9   inferences based on substantial evidence." *Id.* at 666.

10  Unlike strict scrutiny review, we are not required to ensure

11  that the legislature's chosen means is "narrowly tailored"

12  or the least restrictive available means to serve the stated

13  governmental interest.  To survive intermediate scrutiny,

14  the fit between the challenged regulation need only be

15  substantial, "not perfect." *Marzzarella*, 614 F.3d at 97.

16       New York's legislative judgment concerning handgun

17  possession in public was made one-hundred years ago.  In

18  1911, with the enactment of the Sullivan Law, New York

19  identified the dangers inherent in the carrying of handguns

20  in public.  N.Y. Legislative Service, *Dangerous Weapons* -

21  "*Sullivan Bill,*" 1911 Ch. 195 (1911).  And since 1913, New

22  York's elected officials determined that a reasonable method

38

1    for combating these dangers was to limit handgun possession

2    in public to those showing proper cause for the issuance of

3    a license.  1913 Laws of N.Y., ch. 608, at 1627-30.  The

4    proper cause requirement has remained a hallmark of New

5    York's handgun regulation since then.[22]

6         The decision to regulate handgun possession was

7    premised on the belief that it would have an appreciable

8    impact on public safety and crime prevention.  As explained

9    in the legislative record:

10             The primary value to law enforcement
11             of adequate statutes dealing with dangerous
12             weapons is prevention of crimes of violence
13             before their consummation.

14
15             . . . .
16
17             . . . In the absence of adequate weapons
18             legislation, under the traditional law of
19             criminal attempt, lawful action by the
20             police must await the last act necessary to
21             consummate the crime. . . . Adequate
22             statutes governing firearms and weapons
23             would make lawful intervention by police

---

[22] New York's statutory scheme was the result of a "careful balancing of the interests involved" and not a general animus towards guns.  Report of the N.Y. State Joint Legislative Comm. On Firearms & Ammunition, Doc. No. 6, at 12 (1965).  The legislature explained that "[s]tatutes governing firearms . . . are not desirable as ends in themselves." *Id.*  Rather, the purpose was "to prevent crimes of violence before they can happen, and at the same time preserve legitimate interests such as training for the national defense, the right of self defense, and recreational pursuits of hunting, target shooting and trophy collecting." *Id.*

1                    and prevention of these fatal consequences,
2                    before any could occur.
3

4   Report of the N.Y. State Joint Legislative Comm. On Firearms

5   & Ammunition, Doc. No. 6, at 12-13 (1965).  Similar concerns

6   were voiced in 1987, during a floor debate concerning

7   possible changes to the proper cause requirement.  *See* N.Y.

8   Senate Debate on Senate Bill 3409, at 2471 (June 2, 1987).

9       The connection between promoting public safety and

10  regulating handgun possession in public is not just a

11  conclusion reached by New York.  It has served as the basis

12  for other states' handgun regulations, as recognized by

13  various lower courts.  *Piszczatoski*, 840 F. Supp. 2d 813 at

14  835-36; *Richards v. Cty. of Yolo*, 821 F. Supp. 2d 1169, 1172

15  (E.D. Cal. 2011); *Peruta v. Cty. of San Diego*, 758 F. Supp.

16  2d 1106, 1110 (S.D. Cal. 2010).

17      Given New York's interest in regulating handgun

18  possession for public safety and crime prevention, it

19  decided not to ban handgun possession, but to limit it to

20  those individuals who have an actual reason ("proper cause")

21  to carry the weapon.  In this vein, licensing is oriented to

22  the Second Amendment's protections.  Thus, proper cause is

23  met and a license "shall be issued" when a person wants to

1 use a handgun for target practice or hunting.  N.Y. Penal

2 Law § 400.00(2)(f); *see, e.g.*, *Clyne*, 58 A.D.2d at 947.  And

3 proper cause is met and a license "shall be issued" when a

4 person has an actual and articulable—rather than merely

5 speculative or specious—need for self-defense.  N.Y. Penal

6 Law § 400.00(2)(f); *see, e.g.*, *Klenosky*, 75 A.D.2d at 793.

7 Moreover, the other provisions of section 400.00(2) create

8 alternative means by which applicants engaged in certain

9 employment may secure a carry license for self-defense.  As

10 explained earlier, a license "shall be issued" to merchants

11 and storekeepers for them to keep handguns in their place of

12 business; to messengers for banking institutions and express

13 companies; to state judges and justices; and to employees at

14 correctional facilities.  N.Y. Penal Law § 400.00(2)(b)-(e).

15   Restricting handgun possession in public to those who

16 have a reason to possess the weapon for a lawful purpose is

17 substantially related to New York's interests in public

18 safety and crime prevention.  It is not, as Plaintiffs

19 contend, an arbitrary licensing regime no different from

20 limiting handgun possession to every tenth citizen.  This

21 argument asks us to conduct a review bordering on strict

22 scrutiny to ensure that New York's regulatory choice will

41

1   protect public safety more than the least restrictive

2   alternative.  But, as explained above, New York's law need

3   only be **substantially related** to the state's important

4   public safety interest.  A perfect fit between the means and

5   the governmental objective is not required.  Here, instead

6   of forbidding anyone from carrying a handgun in public, New

7   York took a more moderate approach to fulfilling its

8   important objective and reasonably concluded that only

9   individuals having a bona fide reason to possess handguns

10  should be allowed to introduce them into the public sphere.

11  That New York has attempted to accommodate certain

12  particularized interests in self defense does not somehow

13  render its concealed carry restrictions unrelated to the

14  furtherance of public safety.

15      To be sure, we recognize the existence of studies and

16  data challenging the relationship between handgun ownership

17  by lawful citizens and violent crime.  Plaintiffs' Reply Br.

18  at 37-38.  We also recognize that many violent crimes occur

19  without any warning to the victims.  But New York also

20  submitted studies and data demonstrating that widespread

21  access to handguns in public increases the likelihood that

22  felonies will result in death and fundamentally alters the

1    safety and character of public spaces.  J.A. 453, 486-90.

2    It is the legislature's job, not ours, to weigh conflicting

3    evidence and make policy judgments.  Indeed, assessing the

4    risks and benefits of handgun possession and shaping a

5    licensing scheme to maximize the competing public-policy

6    objectives, as New York did, is precisely the type of

7    discretionary judgment that officials in the legislative and

8    executive branches of state government regularly make.

9         According to Plaintiffs, however, New York's

10   conclusions as to the risks posed by handgun possession in

11   public are "totally irrelevant."  Plaintiffs' Reply Br. at

12   38.  Because the constitutional right to bear arms is

13   specifically for self-defense, they reason that the state

14   may not limit the right on the basis that it is too

15   dangerous to exercise, nor may it limit the right to those

16   showing a special need to exercise it.  In Plaintiffs' view,

17   the "'enshrinement'" of the right to bear arms "'necessarily

18   takes [these] policy choices off the table.'"  *Id.* at 39

19   (quoting *Heller*, 554 U.S. at 636).[23]  We disagree.

_____

     [23] Plaintiffs are quick to embrace the majority's view in
*Heller* that handguns are the "quintessential self-defense weapon"
for law abiding Americans today and extrapolate that right to
public possession of a handgun.  Thus, for Plaintiffs, handgun
possession in public has the ring of an absolute constitutional
right.  This of course overlooks *Heller's* careful restriction of

43

1    Plaintiffs misconstrue the character and scope of the

2  Second Amendment.  States have long chosen to regulate the

3  right to bear arms because of the risks posed by its

4  exercise.  As Plaintiffs admit and *Heller* strongly suggests,

5  the state may ban firearm possession in sensitive places,

6  presumably on the ground that it is too dangerous to permit

7  the possession of firearms in those locations.  554 U.S. at

8  626-27.  In fact, New York chose to prohibit the possession

9  of firearms on school grounds, in a school building, or on a

10  school bus precisely for this reason.  N.Y. Penal Law §

11  265.01(3); *see also* N.Y. Legislative Service, Governor's

12  Bill Jacket, 1974 Ch. 1041, at 2-4 (1974).  Thus, as the

13  Supreme Court has implicitly recognized, regulating firearms

14  because of the dangers posed by exercising the right is

15  entirely consistent with the Second Amendment.

16    We are also not convinced that the state may not limit

17  the right to bear arms to those showing a "special need for

18  self-protection."  Plaintiffs contend that their "desire for

19  self-defense . . . is all the 'proper cause' required . . .

---

its reach to the home and is in sharp contrast with New York's
view of concealed handguns one-hundred years ago as "the handy,
the usual and the favorite weapon of the turbulent criminal
class." *Darling*, 154 A.D. at 423-24.  It seems quite obvious to
us that possession of a weapon in the home has far different
implications than carrying a concealed weapon in public.

44

by the Second Amendment to carry a firearm." Plaintiffs'
Br. at 45. They reason that the exercise of the right to
bear arms cannot be made dependent on a **need** for self-
protection, just as the exercise of other enumerated rights
cannot be made dependent on a **need** to exercise those rights.
This is a crude comparison and highlights Plaintiffs'
misunderstanding of the Second Amendment.

State regulation under the Second Amendment has always
been more robust than of other enumerated rights. For
example, no law could prohibit felons or the mentally ill
from speaking on a particular topic or exercising their
religious freedom. *Cf. Simon & Schuster, Inc. v. New York
State Crime Victims Bd.*, 502 U.S. 105 (1991) (invalidating a
state law requiring profits from books authored by criminals
to be distributed to crime victims). And states cannot
prohibit speech in public schools. *Tinker v. Des Moines
Indep. Comty. Sch. Dist.*, 393 U.S. 503, 506 (1969) ("It can
hardly be argued that either students or teachers shed their
constitutional rights to freedom of speech or expression at
the schoolhouse gate."). Not so with regard to the Second
Amendment. Laws prohibiting the exercise of the right to
bear arms by felons and the mentally ill, as well as by law-

45

1    abiding citizens in certain locations including public

2    schools, are, according to *Heller*, "presumptively lawful."

3    554 U.S. at 627 n.26.

4         Moreover, as discussed above, extensive state

5    regulation of handguns has never been considered

6    incompatible with the Second Amendment or, for that matter,

7    the common-law right to self-defense.  This includes

8    significant restrictions on how handguns are carried,

9    complete prohibitions on carrying the weapon in public, and

10   even in some instances, prohibitions on purchasing handguns.

11   In this vein, handguns have been subject to a level of state

12   regulation that is stricter than any other enumerated right.

13        In light of the state's considerable

14   authority—enshrined within the Second Amendment—to regulate

15   firearm possession in public, requiring a showing that there

16   is an objective threat to a person's safety—a "special need

17   for self-protection"—before granting a carry license is

18   entirely consistent with the right to bear arms.  Indeed,

19   there is no right to engage in self-defense with a firearm

20   until the objective circumstances justify the use of deadly

21   force.[24]  *See, e.g.*, *People v. Aiken*, 4 N.Y.3d 324, 327-29

22   (2005) (discussing duty to retreat in New York).

---

[24] There is no question that using a handgun for self-defense constitutes deadly physical force.  *See, e.g.*, *People v. Magliato*, 68 N.Y.2d 24, 29-30 (1986).

46

1    Plaintiffs counter that the need for self-defense may

2    arise at any moment without prior warning.  True enough.

3    But New York determined that limiting handgun possession to

4    persons who have an articulable basis for believing they

5    will need the weapon for self-defense is in the best

6    interest of public safety and outweighs the need to have a

7    handgun for an unexpected confrontation.  New York did not

8    run afoul of the Second Amendment by doing so.

9        To be sure, "the enshrinement of constitutional rights

10   necessarily takes certain policy choices off the table."

11   *Heller*, 554 U.S. at 636.  But there is also a "general

12   reticence to invalidate the acts of [our] elected leaders."

13   *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 132 S. Ct. 2566,

14   2579 (2012).  "'Proper respect for a coordinate branch of

15   government' requires that we strike down [legislation] only

16   if 'the lack of constitutional authority to pass [the] act

17   in question is clearly demonstrated.'"  *Id.* (quoting *United*

18   *States v. Harris*, 106 U.S. 629, 635 (1883)).  Our review of

19   the history and tradition of firearm regulation does not

20   "clearly demonstrate[]" that limiting handgun possession in

21   public to those who show a special need for self-protection

22   is inconsistent with the Second Amendment.  *Id.*

47

1    Accordingly, we decline Plaintiffs' invitation to strike

2    down New York's one-hundred-year-old law and call into

3    question the state's traditional authority to extensively

4    regulate handgun possession in public.

5                              **III**

6         In view of our determination that New York's proper

7    cause requirement is constitutional under the Second

8    Amendment as applied to Plaintiffs, we also reject their

9    facial overbreadth challenge.[25]  Overbreadth challenges are

10   generally limited to the First Amendment context.  *United*

11   *States v. Salerno*, 481 U.S. 739, 745 (1987).  But even if we

12   assume that overbreadth analysis may apply to Second

13   Amendment cases, it is well settled "that a person to whom a

14   statute may constitutionally be applied will not be heard to

15   challenge that statute on the ground that it may conceivably

16   be applied unconstitutionally to others, in other situations

---

[25]   We also decline to consider Plaintiffs' claim under the
Equal Protection Clause.  "It is a settled appellate rule that
issues adverted to in a perfunctory manner, unaccompanied by some
effort at developed argumentation, are deemed waived."  *Tolbert
v. Queens Coll.*, 242 F.3d 58, 75 (2d Cir. 2001).  Plaintiffs made
only passing references to the Equal Protection Clause in their
brief, noting that "[t]o the extent that [New York's proper cause
requirement] implicates the Equal Protection Clause . . . the
case might well be decided under some level of means-end
scrutiny."  Plaintiffs' Br. at 15-16; 54.  Thus, this claim is
forfeited.

48

1    not before the Court." *Broadrick v. Oklahoma*, 413 U.S. 601,

2    610 (1973).  This principle "reflect[s] the conviction that

3    under our constitutional system courts are not roving

4    commissions assigned to pass judgment on the validity of the

5    Nation's laws." *Id.* at 610–11; *see also Gonzales v. Carhart*,

6    550 U.S. 124, 167–68 (2007).  Accordingly, we reject

7    Plaintiffs' facial challenge.

8                                     **IV**

9        For the foregoing reasons, the judgment of the district

10    court is hereby **AFFIRMED**.